## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF ALABAMA
## MIDDLE DIVISION

| | | |
|---|---|---|
| **GREGORY KELLY,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **CASE NO.: 2:07-CV-610-WHA** |
| | ) | |
| **JOHN FREE, Individually and in his official** | ) | |
| **position as an employee of the Alabama Public** | ) | |
| **Service Commission; JANICE M. HAMILTON,** | ) | |
| **Individually and in her official position as an** | ) | |
| **employee of the Alabama Public Service** | ) | |
| **Commission; ALABAMA PUBLIC SERVICE** | ) | |
| **COMMISSION, an agency of the** | ) | |
| **State of Alabama,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

**COME NOW** the Defendants, **JOHN FREE, JANICE HAMILTON** and the **ALABAMA PUBLIC SERVICE COMMISSION** ("APSC"), and pursuant to Rule 56 of the Federal Rules of Civil Procedure move the Court to enter summary judgment in their favor on the grounds that there is no genuine issue as to any material fact and that the Defendants are entitled to a judgment as a matter of law. In support hereof, Defendants reply upon the pleadings, all discovery of record, and the following:

1.   Defendants' Narrative Summary and Memorandum Brief.

2.   The transcript of the deposition of the Plaintiff, Gregory Kelly including the Defendants' Exhibits referenced therein (i.e., Defendants' Exhibits 1, 2, 3, 4, 5, 8, 9, 10, 12, 13, 14, 15, 16, 17, 18, 19, 20, 21, 39, 40, 41, 44, 45, 46, 47, 48, 50, 51, 52, 53,

54, 55, 56, 57, 58, 59, 61, 63, 64, 65, 68, 74, 76, 79, 80, 81, 84, 85, 87, 88, 89, 90, 91, 92, 93, 94, 95, 97, 98, 99, 100, 101 and 102).

3.    The Affidavit of John Free.

4.    The Affidavit of Janice Hamilton.

5.    The Affidavit of John Garner.

6.    The Affidavit of Aquilla Spivey.

7.    The Affidavit of Stephen Bartelt.

8.    The Affidavit of Sheila Ward.

9.    The Affidavit of Jackie Frazier.

10.   The Affidavit of James Ricky Cleckler..

11.   The Affidavit of Tonya Williams.

12.   The Affidavit of Robert Earl Reed.

13.   The Affidavit of Jim Sullivan.

14.   The Affidavit of Patricia W. Smith.

Respectfully submitted this the 3rd day of April, 2008.

s/Oakley Melton, Jr.
OAKLEY MELTON, JR. (MEL002)

s/J. Flynn Mozingo
J. FLYNN MOZINGO (MOZ003)
Attorneys for Defendants, John Free, Janice Hamilton and Alabama Public Service Commission
MELTON, ESPY & WILLIAMS, P.C.
P. O. Drawer 5130
Montgomery, AL   36103-5130
Telephone:    (334) 263-6621
Facsimile:     (334) 263-7252
fmozingo@mewlegal.com

2

## <u>CERTIFICATE OF SERVICE</u>

**I HEREBY CERTIFY** that a copy of the foregoing Motion for Summary Judgment has been electronically filed on the 3rd day of April, 2008, with the Clerk of the Court and that a copy of same will be served upon the listed counsel of record by electronic notification via the ECF/CM System:

Jim DeBardelaben
Post Office Box 152
Montgomery, AL 36107


_____s/J. Flynn Mozingo_____
OF COUNSEL

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF ALABAMA**
**NORTHERN DIVISION**

| | | |
|---|---|---|
| **GREGORY KELLY,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **CASE NO:2-07-cv-610-WHA** |
| | ) | |
| **JOHN FREE, individually and in his** | ) | |
| **official position as an employee of the** | ) | |
| **Alabama Public Service Commission;** | ) | |
| **JANICE M. HAMILTON, individually** | ) | |
| **and in her official position as a Division** | ) | |
| **Director of the Alabama Public Service** | ) | |
| **Commission; and ALABAMA PUBLIC** | ) | |
| **SERVICE COMMISSION, an agency of** | ) | |
| **the State of Alabama,** | ) | |
| | ) | |
| **Defendants.** | ) | |

**DEFENDANTS' NARRATIVE SUMMARY AND BRIEF**
**IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT**

Oakley Melton, Jr.
J. Flynn Mozingo
MELTON, ESPY & WILLIAMS, P.C.
Post Office Drawer 5130
Montgomery, AL   36103-5130
Telephone:   (334) 263-6621
Facsimile:   (334) 263-7252
fmozingo@mewlegal.com
Attorneys for Defendants

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

GREGORY KELLY,            )
                                    )
        Plaintiff,         )
                                    )
v.                                )        CASE NO:2-07-cv-610-WHA
                                    )
JOHN FREE, etc., et al.     )
                                    )
        Defendants.     )

DEFENDANTS' NARRATIVE SUMMARY AND BRIEF
IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT

COME NOW the Defendants, **ALABAMA PUBLIC SERVICE COMMISSION ("**APSC**"), JOHN FREE** ("Free") and **JANICE HAMILTON** ("Hamilton"), jointly and severally, and in support of their concurrently filed Motion for Summary Judgment submit this narrative summary and brief.

INTRODUCTION

This is an alleged racial and age discrimination case filed by the Plaintiff, Gregory Kelly (an African American, age 51), against his current employer, the APSC; Kelly's Electricity Section supervisor John Free (a Caucasian, age 44); and the Director of the APSC Energy Division, Janice Hamilton (an African American, age 51). Kelly was hired by the APSC in 2002 to work as an engineer in the Electricity Section of the APSC, which monitors, inspects and reports on the operations and financial status of Alabama Power Company. (Kelly's Deposition at 19:14 to 20:12; Defendants' Exhibit 10 to Kelly's Deposition; Affidavit of John Free at ¶ 3). Free, a Certified

1

Public Accountant, is the manager of the Electricity Section. (Affidavit of John Free at ¶¶ 2 and 3). The Electricity Section is a part of the Energy Division. (Affidavit of John Free at ¶ 3). Hamilton is the Director of the Energy Division of the APSC. (Affidavit of Janice Hamilton at ¶ 3).

Kelly admittedly got along well with Free and Hamilton from 2002 until 2005. (Kelly's Deposition at 236:17 to 237:1; Defendants' Exhibit 54 to Kelly's Deposition). During this time, Kelly requested and Free recommended Kelly for, and Kelly subsequently received, a promotion in 2004 to Utility Engineering Specialist II, a higher position and pay grade within the APSC. (Defendants' Exhibits 39 and 40 to Kelly's Deposition).

However, in January 2005, immediately following the expiration of his promotional probationary period, Kelly asked both Free and Hamilton to request a study or "desk audit" for his new position from the Alabama State Personnel Department. (Kelly's Deposition at 282:12 to 283:6; Defendants' Exhibit 46 to Kelly's Deposition). A desk audit is used by the Personnel Department to evaluate the pay structure for a specific position - not a particular individual. (Affidavit of John Free at ¶ 13). Kelly believed that he was underpaid compared to the average engineer's salary in the southeast United States and he thought that a desk audit might remedy his salary situation. (Kelly's Deposition at 283:12 to 283:20; 284:18 to 284:23). Kelly's request was denied by Free and Hamilton. (Kelly's Deposition at 169:16 to169:23; 290:11 to 290:19).

Thereafter, Kelly requested and received an administrative grievance hearing from the APSC. (Defendants' Exhibits 52, 53 and 59 to Kelly's Deposition). During the grievance hearing, in which Kelly was represented by an attorney from the Alabama State Employees' Association, Kelly complained that his career path was fractured and that he should be moved to another section in the APSC where he did not have to report directly to a certified public accountant. (Defendant's Exhibit

2

59 to Kelly's Deposition at 123:8 to 123:15; 123:22 to 124:12). Specifically, Kelly wanted his job moved from the Electricity Section to the Special Projects Section of the APSC with Rick Cleckler (a Caucasian and a 25-year veteran engineer of the APSC) where Kelly could then report directly to Hamilton, who is also an engineer. (Kelly's Deposition at 308:13 to 310:8). In his deposition Kelly admitted that he wanted to be aligned with Cleckler because he believed he could never get a desk audit or substantial salary upgrade as long as he worked in the Electricity Section under an accountant. (Kelly's Deposition at 306:10 to 307:7). Specifically, Kelly's pay grade could not be increased to exceed the pay grade of his direct supervisor, Free, an accountant. In his deposition, Kelly testified:

> A.    Mr. Free is an accountant. I'm an engineer. I shouldn't be held down and judged according to what accountant [sic] make. My job should float on the merits of engineer pay grade. It shouldn't be capped by what [sic] accountant makes.
>
> Q.    Okay. So do you believe that your ability to receive higher pay is capped or limited because you work under an accountant?
>
> A.    And in an accounting section.
>
> Q.    And in an accounting section?
>
> A.    That's correct.
>
> Q.    Okay. So you believe your ability to earn more money as an engineer is capped because you work in an accounting section under an accountant?
>
> A.    That's correct.

(Kelly's Deposition at 122:12 to 123:5).

The four-member grievance panel, composed of two white and two black APSC employees, after a full evidentiary hearing, unanimously rejected Kelly's claims and entered a multi-page finding

of facts and a recommendation that Kelly's request to be moved from the Electricity Section to the Special Projects Section be denied. (Affidavit of Janice Hamilton at ¶ 12; Defendants' Exhibit 53 to Kelly's Deposition).  The three members of the APSC, Jim Sullivan, Jan Cook and George C. Wallace, Jr., unanimously adopted the panel's recommendations. (Defendants' Exhibit 54 to Kelly's Deposition).

Thereafter, Kelly commenced and engaged in a never ending wave of personal insults and criticisms directed at Free, and other misconduct, which ultimately resulted in Kelly receiving a written reprimand from Free and Hamilton. (Defendants' Exhibit 94 to Kelly's Deposition). Notwithstanding the reprimand, Kelly continued his vendetta against Free and Hamilton and then filed charges of racial and age discrimination against them and the APSC with the EEOC. (Defendants' Exhibit 1 to Kelly's Deposition).  The EEOC found no merit in Kelly's claims, but did issue a Right to Sue Letter. (Defendants' Exhibit 3 to Kelly's Deposition). Kelly then filed this lawsuit alleging discrimination and harassment. (Defendants' Exhibit 4 to Kelly's Deposition).

As discussed herein, Kelly's complete purpose in this lawsuit is to try to get a pay raise from the State of Alabama. He attempts to do so by making two main claims, i.e., 1) that Free and Hamilton refused to submit his request for a desk audit of his position to the Alabama Personnel Department; and 2) that they denied his request to be transferred from the Electricity Section to the Special Projects Section of the APSC.  The complete controlling answer to these claims and to this entire lawsuit is simply that Kelly does not have a legal or constitutional right to a desk audit of his position or to a transfer to another section of the APSC.  Without a legal right to begin with, he does not have any claims upon which relief can be granted and the Defendants are entitled to summary judgment as a matter of law.  Indeed, Kelly himself testified that but for Free's refusal to request a

4

desk audit "we wouldn't be here today." (Kelly's Deposition at 277:9 to 277:16; 278:18 to 279:20; 280:19 to 281:15).  Therefore, Free, Hamilton and the APSC's Motion for Summary Judgment should be granted and Kelly's claims against them should be dismissed with prejudice.

## PROCEDURAL HISTORY

This lawsuit was initiated by Kelly on July 2, 2007, by the filing of a four-count Complaint against Free, Hamilton and the APSC. (Defendants' Exhibit 4 to Kelly's Deposition). The first cause of action asserts a claim against the Defendants for racial and age discrimination under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000(e). (Defendants' Exhibit 4 to Kelly's Deposition at ¶¶ 14-16).  The second cause of action also asserts a claim for racial discrimination and hostile work environment under 42 U.S.C. § 1981. (Defendants' Exhibit 4 to Kelly's Deposition at ¶¶ 17-19). The third cause of action alleges racial discrimination under the Equal Protection Clause of the United States Constitution. (Defendants' Exhibit 4 to Kelly's Deposition at ¶¶ 20-22).  The fourth cause of action is entitled "State Action - Harassment" and alleges harassment by Free in which Hamilton allegedly acquiesced. (Defendants' Exhibit 4 to Kelly's Deposition at ¶¶ 23-32).

On July 23, 2007, Defendants Free, Hamilton and the APSC filed their Answer to the Complaint denying the material allegations of Kelly's Complaint in their entirety and further asserting that Kelly is not entitled to any relief against them. (Defendants' Exhibit 5 to Kelly's Deposition).

Since the filing of the lawsuit the deposition of Kelly has been taken.  As addressed herein, based on his own deposition testimony and other evidence of record, Kelly has totally failed to and cannot state a claim for which relief can be granted.  Additionally and alternatively, his claims are affirmatively barred by the affirmative defenses of Free, Hamilton and the APSC.

5

## MATERIAL FACTS

Gregory Kelly is a 51-year-old black male employed by the APSC.  He was employed to and now works in the Electricity Section of the Energy Division. (Kelly's Deposition at 79:6 to 79:16). Kelly's job title, as given by the Alabama State Personnel Department, is Utility Technical Specialist, Senior. (Kelly's Deposition at 79:17 to 79:21). Kelly was hired by the APSC in 2002. (Kelly's Deposition at 151:3 to 151:7).  He formerly worked for Alabama Power Company and the Alabama Department of Human Resources. (See Defendant's Exhibit 101 to Kelly's Deposition). In his application for the APSC job and in his previous applications for a state job in the Department of Human Resources, Kelly falsely stated that he was terminated by Alabama Power Company because the company was "downsizing." Alabama Power Company's records show that Kelly was involuntarily terminated for cause due to "unsatisfactory job performance" of his duties. (See Defendants' Exhibit 101 to Kelly's Deposition).   Kelly provides technical engineering support in the APSC's Electricity Section, which is composed of seven (7) employees including Kelly and Free. (Kelly's Deposition at 22:1 to 22:5; 86:14 to 86:17; Defendants' Exhibit 12 to Kelly's Deposition).

The Alabama Public Service Commission is a regulatory and administrative agency created by acts of the Alabama Legislature and governed by a three-member commission elected by statewide referendum. ALA. CODE §§ 37-1-1, 37-1-3 (1975). (Affidavit of Jim Sullivan at ¶ 2). The APSC is charged with regulating utilities (e.g., electricity, natural gas, water, steam, and telecommunications services) to ensure consumers are provided with safe, adequate and reliable services at fair and reasonable rates. (Id.). The APSC's general oversight duties are established by law, set forth in ALA. CODE § 37-1-32.

The APSC includes a division known as the Energy Division which is divided into five sections and whose employees monitor and report to the Commission on activities involving various public utilities. (Kelly's Deposition at 85:11 to 85:16; Affidavit of John Free at ¶ 3). The five sections are: 1) Special Projects; 2) Water; 3) Natural Gas; 4) Electricity; and 5) Gas Pipeline Safety. (Defendants' Exhibit 12 to Kelly's Deposition). The Electricity Section, in which Kelly works, monitors and reports on the operation and status of one utility, Alabama Power Company, the largest provider of electricity in the State of Alabama. (Affidavit of John Free at ¶ 3).

John Free is a 44-year-old, white male employee of the APSC who oversees the Electricity Section. (Affidavit of John Free at ¶¶ 1 and 3). Free's job title is Public Utility Analyst Manager. (Affidavit of John Free at ¶ 4). Free holds both a degree in accounting and an M.B.A. from Auburn University at Montgomery. (Affidavit of John Free at ¶ 2). He is also a licensed certified public accountant with the State of Alabama. (Affidavit at John Free at ¶ 2). Free is Kelly's direct supervisor and is an approximate 18-year veteran of the APSC, having been hired in 1990. (Affidavit of John Free at ¶ 3).

Janice Hamilton is a 51-year-old, black female who is the Director of the Energy Division, which includes the Electricity Section. (Affidavit of Janice Hamilton at ¶¶ 1 and 3; Kelly's Deposition at 140:15 to 140:17). As Director of the Energy Division, Hamilton is Free's direct supervisor and the direct supervisor of all four section managers within the Energy Division, plus Mr. Cleckler. (Affidavit of Janice Hamilton at ¶ 4). Hamilton holds an electrical engineering degree from the University of Alabama at Birmingham. (Id. at ¶ 2). Hamilton is also an 18-year veteran of the APSC, having been hired in 1990. (Id. at ¶ 3). Prior to being appointed Manager of the Energy Division in 1992, Hamilton held the exact same engineering position which Kelly currently holds.

(Kelly's Deposition at 414:17 to 414: 19; Affidavit of Janice Hamilton at ¶ 5). Like Kelly, Hamilton also was supervised by and reported to an accountant when she worked in the Electricity Section. (Affidavit of Janice Hamilton at ¶ 5).

Although not named as a defendant is this lawsuit, Rick Cleckler's background is given here because he is the person with whom Kelly attempts to compare himself for the purpose of his alleged disparate treatment claim. (See Complaint at ¶ 15) ("The Plaintiff avers and alleges that he is treated differently from the only other working engineer in the Energy Division, J. Rick Cleckler.") Cleckler holds a degree in electrical engineering from Auburn University. (Affidavit of John Free at ¶ 17). Unlike Kelly, who is a relative newcomer to the APSC, Cleckler is a 25-year veteran of the APSC, having been hired in 1983. (Affidavit of John Free at ¶ 17). Cleckler has been assigned to and works in the "Special Projects" section of the Energy Division since 1998, four years before Kelly was hired by the APSC. (Affidavit of John Free at ¶ 17). Cleckler works on general or special projects concerning the Energy Division as a whole. He provides technical support as needed to all sections within the Energy Division. (See Affidavit of Cleckler).

On or about January 30, 2002, the APSC advertised an opening for "Utilities Engineering Specialist I." (Defendants' Exhibit 8 to Kelly's Deposition). The advertisement listed the salary and classification of the position and noted that the position was available through "**open-competit[ion]**". (Id.) Kelly applied for the position and received an interview with Free. (Defendants' Exhibit 9 to Kelly's Deposition; Affidavit of John Free at ¶ 5). Kelly qualified for the position because he held an engineering degree and had experience as an engineer for Alabama Power Company from 1979 until 1993.

8

### Kelly Made False Applications to the State of Alabama

Kelly's deposition shows that he willfully made material misrepresentations in all four (4) of the job applications which he submitted to the State of Alabama. Prior to obtaining employment with the APSC, Kelly worked with the Alabama Department of Human Resources ("DHR") as a statistician. Over the years Kelly submitted two employment applications to DHR and, as referenced herein, two to the APSC. In the first application submitted to DHR in 1993, Kelly represented he had been involuntarily terminated from Alabama Power but did not know the reason. (Defendants' Exhibit 97 to Kelly's Deposition). In a subsequent application to DHR in 1998, Kelly represented that he was involuntarily terminated and didn't know the reason, but the company was downsizing at the time. (Defendants' Exhibit 98 to Kelly's Deposition). In his 2002 application to the APSC, which led to Kelly being employed by the APSC, Kelly represented that he left Alabama Power Company because "[t]he company was downsizing." (Defendants' Exhibit 99 to Kelly's Deposition). Kelly made the same false representation in an application he submitted to the APSC in 2004 for a promotion. (Defendants' Exhibit 100 to Kelly's Deposition). In the administrative grievance hearing by the APSC in 2005, Kelly also falsely testified under oath that he left Alabama Power Company due to a "buy-out program." (Defendants' Exhibit 59 to Kelly's Deposition at 107:9 to 108:8). He falsely stated: "Alabama Power Company at the time was having a buy-out program for people who wanted to retire and downsizing. And I took the opportunity . . .." (Defendants' Exhibit 59 to Kelly's Deposition at 107:22 to 108:2).

With each application Kelly expressly certified "all statements on or attached to this application are true and correct to the best of my knowledge." (See Defendants' Exhibits 97, 98, 99,

and 100 to Kelly's Deposition). However, following the filing of Kelly's Complaint in this lawsuit the Defendants subpoenaed Kelly's employment records with Alabama Power and, according to such records, Kelly was involuntarily terminated - for cause - due to unsatisfactory job performance. (Defendants' Exhibits 101 and 102 to Kelly's Deposition) ("Employee terminated due to 'Overall unsatisfactory job performance' per Jerry Posey - Montgomery District Supt."). In his deposition, Kelly denied that he was fired for cause (although he did admit being fired in a rambling response), claiming instead that he walked off the job because he refused to work for Jerry Posey, the District Manager who, according to Alabama Power's records, terminated Kelly.

> Q. If you'll look at Defendants' Exhibit 102.
>
> A. Okay.
>
> Q. It says, terminated, effective date, 9/17/1993. Action/reason, termination. Out to the right it says unsatisfactory performance. Below that it says not eligible for rehire. Isn't it true that you were fired by Alabama Power Company?
>
> A. I refused to work for Mr. Jerry Posey. We had a meeting and he told me that I had to do things a certain way that conflicted with my family, and I told him that wasn't acceptable. And he told me I had to change. And I told him I refused to work for him and I walked off the job.

(Kelly's Deposition at 392:12 to 393:4).

> Q. And if Larry Stokley and Jerry Posey testified that you were fired for unsatisfactory job performance, you deny that?
>
> A. Well, you tell Stokley and - - to produce the documents. I had no job performance that was done at that particular time. ***They fired me in a meeting because I refused to change.*** They gave me an ultimatum that I had to change. At that particular time I had no unsatisfactory performance. They called me and I refused - - they wanted me to change the way I do things.

(Kelly's Deposition at 395:10 to 395:23) (emphasis added).

10

Kelly admitted that after he left Alabama Power he applied for and was paid unemployment compensation benefits through the State of Alabama.  (Kelly's Deposition at 418:21 to 419:3). Unemployment compensation benefits are not available to employees who voluntarily leave a job. Ex parte Director, State Dept. of Indus. Relations, 915 So. 2d 1169, 1171  (Ala. 2005) ("Alabama unemployment benefits are unavailable in the situation presented where the affected employee was not discharged.").

In reliance on Kelly's job application, he was accepted for an interview in June 2002 with the APSC.  Kelly's interview was conducted by John Free and Janice Hamilton.  (Affidavit of John Free at ¶ 6). In addition to Kelly, Free and Hamilton also interviewed another black applicant and two white applicants. (Affidavit of John Free at ¶ 5).  Thereafter, Free recommended that the job be given to Kelly and Hamilton approved.  Kelly was then hired on June 28, 2002 and began working in the Electricity Section under the direct supervision of Free, subject to a six-month probationary period. (Defendants' Exhibit 10 to Kelly's Deposition). As a Merit System employee, Kelly has at all times received all the vacation, sick leave, health care and other benefits available to all other state Merit System employees. (Affidavit of Janice Hamilton at ¶ 17).

Between 2002 and 2005, Kelly and Free had an amiable working relationship, with no material disagreements or alleged wrongful acts.  The only exception was Kelly's initial performance appraisal in December 2002, to which Kelly expressed disagreement.  See Defendants' Exhibit 64 to Kelly's Deposition (complaining that the evaluation "was an inadequate reflection of the duties I performed but John Free has admirable skills").  Otherwise, Kelly testified that he and Free got along well until Kelly requested a desk audit in 2005.

Q.      Prior to requesting the desk audit, did you like working for John Free?

A.      Sure did.  Like I told before, we got along fine.

. . .

Q.      And other than that appraisal, prior to the desk audit, did you and Mr. Free get along just fine?

A.      . . . We got along fine, you know, about best you could.  You know, we got along fine.  The point that triggered this - - triggered this ill will between myself and Mr. Free was his failure to perform a desk audit.

Q.      Was there any ill will between you and Mr. Free prior to the desk audit?

A.      I don't think so.

(Kelly's Deposition at 237:23 to 238:3; 241:2 to 241:15).

In fact, prior to the desk audit Kelly was promoted, ***upon the recommendation of John Free***, to the position of Utility Engineering Specialist II. (Defendants' Exhibits 39 and 40 to Kelly's Deposition). (In connection with such employment Kelly completed another job application previously discussed as Defendants' Exhibit 100 to Kelly's Deposition.)  In anticipation of Kelly's promotion, Free wrote the following to the APSC's Personnel Director: "I would like to request that the necessary procedures be undertaken to promote Mr. Gregory Kelly, Utility Engineering Specialist I, to the position of Utility Engineering Specialist II as soon as possible." (Defendants' Exhibit 39 to Kelly's Deposition).

Kelly received the promotion on June 1, 2004, and, likewise, received a two-step promotional increase within his new pay grade of 79. (Defendants' Exhibit 40 to Kelly's Deposition).  By contrast, Kelly's supervisor, John Free, holds a pay grade of 81, only two grades higher than Kelly's pay grade. (Affidavit of John Free at ¶ 15).

12

Upon Kelly's promotion in June 2004, Kelly then held the same position, title and pay grade as the 25-year APSC veteran white engineer, Rick Cleckler, i.e., Utility Engineering Specialist II, with a pay grade of 79. (Kelly's Deposition at 127:10 to 127:20; 140:18 to 141:7). Both Kelly and Cleckler continue to have the same pay grade and job title today although the name of both of their positions has been unilaterally changed by the State Personnel Department to "Public Utility Technical Specialist, Senior," effective September 2004. (Defendants' Exhibit 44 to Kelly's Deposition).

In January 2005, immediately following the expiration of Kelly's six-month probationary period for his promotion, Kelly wrote Free with a request that the salary for Public Utility Technical Specialist be re-evaluated. (Kelly's Deposition at 277:20 to 278:6; Defendants' Exhibit 45 to Kelly's Deposition). According to Kelly's written memorandum, the salaries for engineers in his APSC position were significantly less than the general market rate for engineers in the United States. Kelly also complained that his classification had only received cost of living adjustments ("COLA") during the past twenty-five years, although it was established in Kelly's deposition that he had personally received five non-COLA pay raises since 2002. (Defendants' Exhibits 14, 15, 16, 18, 20 and 46 to Kelly's Deposition). In addition to the five non-COLA raises, Kelly received four COLA raises. (Defendants' Exhibits 13, 17, 19 and 21 to Kelly's Deposition).

Kelly also testified that prior to his promotion he and Free had discussed a "desk audit" for Kelly's classification from the Alabama State Personnel Department. (Kelly's Deposition at 242:5 to 242:11). A desk audit is a process utilized by the State Personnel Department to upgrade the pay range of a particular position in state government. (Affidavit of John Free at ¶ 13). The ultimate

13

decision to perform a desk audit rests exclusively with the State Personnel Department although an employee's manager, at his or her discretion, can request the State Personnel Department to conduct such an audit. (Affidavit of John Free at ¶ 14).   Kelly claims that Free was unwilling to simultaneously request both a desk audit and a promotion for Kelly.   Thus, Kelly claims Free pursued the promotion first and was supposed to pursue the desk audit later. (Kelly's Deposition at 240:6 to 240:18).   Free denies ever telling Kelly he would request a desk audit for Kelly's classification. (Affidavit of John Free at ¶ 10).

After Free failed to request a desk audit, Kelly began peppering Janice Hamilton with memorandums complaining about his salary. (See Defendants' Exhibits 46, 48, 50, and 51 to Kelly's Deposition).   Hamilton also denied Kelly's request, replying as follows to one of Kelly's memorandums: "Since your promotion, I've had difficulty seeing the same level of enthusiasm, initiative and productivity in your work that you apply to your quest for a salary increase." (Defendants' Exhibit 47 to Kelly's Deposition).

Ultimately unable to obtain from Free or Hamilton a desk audit of his position, Kelly wrote Hamilton demanding that she reconsider her decision to deny him a desk audit.   According to Kelly's memorandum request:

> As per the attached specifications, the job compensable factors (education requirements, skills, experiences, and abilities) are determinants for salary. . . .
>
> I am troubled by these findings because my supervisor is an accountant.  This position (Class Code 11254) does not require my job qualifications.  However, all of my work and duties are reported to this position.  I respectfully ask that my position be supervised by a technical professional who has a vested interest in upgrading the salary of this position (Class Code 20522).
>
> . . .

14

> I respectfully ask that you reconsider your decision and request a salary study for my position (Class Code 20522).

(Defendants' Exhibit 50 to Kelly's Deposition).

In his deposition, Kelly explained that in his opinion the unfairness and inequity in his job was that it placed him under an accountant for supervision, which detrimentally affected the job's pay:

> You know, I have a lot of peers with Alabama Power Company. I have a lot of peers that work for other companies. I know what they're being paid. And I have the same qualifications, the same education, higher than some folks, but yet because I'm locked in an accounting section, refuse to give me a desk audit, I can't get the State Personnel and get a desk audit where we can find out what the pay should be. You know, if I was working for a technical manager, I guarantee you I wouldn't have this problem. He would be on-board with me and trying to help me solicit a desk audit.

(Kelly's Deposition at 285:11 to 286:2).

The day Kelly wrote his memorandum to Hamilton asking her to reconsider her decision denying him a desk audit, Kelly wrote Hamilton a "supplemental" memorandum wherein he complained, **for the first time**, that his "career path is fractured and miss-aligned [sic]" and requested that his job be moved from under Free's supervision. Kelly's supplemental memorandum states:

> As supplement to my memo dated May 23, 2003, I now strongly suggest that my position's career path is fractured and miss-aligned [sic]. I also submit that this position is compromised because it is located in a non-technical area in the electricity section. My supervisor is an accountant who has no vested interest in the field of technology. . . .
>
> I respectfully request that my career path be restored by re-assigning this position to a technical area. I am also asking that my position report to an experienced technical professional. I submit this realignment would effectively allow

15

me to compete on a level playing ground with the division's other technical position. The Commission has two job positions [referring to Cleckler] in this classification.

(Defendants' Exhibit 51 to Kelly's Deposition).

In his deposition, Kelly testified that his motivation for requesting the realignment of his job was, again, to obtain a desk audit.

> Q. Okay. And so in your reasoning, then, the way to make the more money that you believe you deserve as an engineer is to have your job aligned with another engineer?
>
> A. That's correct. You know, stop this conquer and divide theory that they try to run at PSC. There's strength in numbers. If we get over there with the other engineers, you present a solid front, you know, whatever. But, you know, if you can divide it up and split them all over the organizational chart, then they got you where they want you.
>
> Q. So the best way to get your salary adjusted like you believe it should be is to get out from under Mr. Free?
>
> A. Yes. He's an accountant. You know, you're going to be - - you're going to be capped by what [sic] accountant is going to be paid. Engineer salary shouldn't be capped by what [sic] accountant's salary is.

(Kelly's Deposition at 306:10 to 307:7).

After Hamilton refused to reconsider Kelly's request for a desk audit, Kelly then petitioned Commissioners Sullivan, Cook and Wallace for a grievance hearing. (Defendants' Exhibit 52 to Kelly's Deposition). In his grievance petition, Kelly complained that he was the victim of a "fractured career path, un-leveled playing field, compromised job position, lost synergy, and communication difficulties (vertical and horizontal)." (Defendants' Exhibit 52 to Kelly's Deposition). Specifically, Kelly alleged: "My position is fractured from its technical roots and

misaligned into an accounting area . . ..  My section peers are accountants - - not engineers."
(Defendants' Exhibit 52 to Kelly's Deposition).

Kelly testified that the reason for requesting a grievance hearing was to get his job realigned
with Cleckler and to obtain a request for a desk audit directly from Ms. Hamilton.

> Q.     Because if you're able to get over in [S]pecial [P]rojects, you can petition Ms.
>        Hamilton directly for a desk audit and not have to petition Mr. Free?
>
> A.     That's correct.

(Kelly's Deposition at 310:4 to 310:8).

Pursuant to Kelly's petition, the APSC conducted a grievance hearing for Kelly on August
10, 2005, before a grievance panel composed of four APSC employees (two white, two black and
none of whom worked in the Energy Division) and an administrative law judge. (Defendants'
Exhibits 53 and 59 to Kelly's Deposition).  Kelly was represented at the hearing by an attorney
(Linda Allen) from the Alabama State Employees' Association (a/k/a "ASEA"). (Kelly's Deposition
at 315:1 to 315:12). During the hearing Kelly, through his attorney, was allowed to present evidence
and call witnesses of his choosing, and cross-examine witnesses and evidence utilized by the APSC.
Kelly also personally testified at the hearing.

Kelly's lawyer stipulated at the hearing that the issue underlying the hearing did not concern
pay (contrary to Kelly's deposition testimony here) nor was the hearing "in any way directed at
[Kelly's] supervisors' character, that being Ms. Hamilton or Mr. Free." (Defendants' Exhibit 59 to
Kelly's Deposition at 8:10 to 8:13).

Moreover, in her opening statement, Kelly's attorney stated:

17

> *As Mr. Samford has said, this is not about a specific disagreement that Mr. Kelly has against Mr. Free regarding his supervision or supervisory skills, nor of Ms. Hamilton.*  This is about whether it is proper for an accountant or an analyst to supervise an engineer.
>
> . . .
>
> *Again, this is in no way an indictment of Mr. Free's supervisory skills nor Ms. Hamilton's.*  Ms. Hamilton is the focus of this grievance solely because she is the Division Chief, and as such has the authority to make this change and she chose not to do so.

(Defendants' Exhibit 59 to Kelly's Deposition at 17:8 to 17:15; 19:5 to 19:11) (emphasis added).

## Kelly Admits That He Has a "Dream Job" at The APSC

When Kelly testified during the grievance hearing he stressed that he had a "dream job."

> A.     Well, you know, I have no idea.  Right now I enjoy the work I do; I enjoy the people I work with.  You know, this is a dream job for me, because I get to look at generation, transmission, distribution, nuclear.  I get to look at every aspect of Alabama Power Company.  If I wanted to choose to look at broadband on a power line, I can do that.  This is a dream job for engineers to have this wide latiscope to go and to do basically anything I want to do as it relates to Alabama Power.
>
> JUDGE MORRIS: So you're saying at this point you have no desire to move to a higher level position in the Commission?
>
> A.     No, I have no desire to be Director.  I have no desire to be rate supervisor.
>
> JUDGE MORRIS: Okay.
>
> A.     *I am satisfied with the job I presently have.  This is a dream job.*

(Defendants' Exhibit 59 to Kelly's Deposition at 191:3 to 192:2) (emphasis added).  When Kelly was

asked in his deposition if he would object to working under Free if Free was an engineer, Kelly

responded that he would not:

18

Q.     . . . And do you think it would be okay for Mr. Free to supervise you if he had
an engineering background?

A.     I think that would be perfectly normal.  If he had an engineering background,
I see no problem with that.

Q.     ***Okay.  And would you object to working under Mr. Free if he had an
engineering background?***

A.     ***Not so ever.  If he had an engineering background, I wouldn't - - wouldn't
object at all.***

(Kelly's Deposition at 131:5 to 131:16) (emphasis added).

Following his grievance hearing, the panel entered its unanimous "Findings and
Recommendations of the Grievance Committee."  The panel stated:

> It appears that Mr. Kelly wishes this committee to substitute his judgment for
> Mrs. Hamilton's judgment on how the Energy Division should be organized solely
> for his personal satisfaction and convenience.  There were no allegations of
> wrongdoing or improper conduct.  We find no credible evidence of fractured career
> path, unlevel playing field, compromised job position, or lost synergy.  We find that
> any communications difficulties are the sole perception of Mr. Kelly.  We
> recommend that Mr. Kelly's request for his position to be moved to the Special
> Projects Section and his request that he report directly to a technical manager be
> denied.

(Defendants' Exhibit 53 to Kelly's Deposition).  The Findings and Recommendations of the
Grievance Committee were later unanimously adopted by Commissioners Sullivan, Cook and
Wallace. (Defendants' Exhibit 54 to Kelly's Deposition).  Despite the opportunity and State
Personnel procedure for Kelly to appeal the APSC's grievance decision to the State Personnel Board,
Kelly sought no further relief from the State of Alabama.

Instead, after his grievance hearing Kelly then commenced and has continued to engage in
an ongoing vendetta of personal attacks and insults on John Free.  He has constantly questioned or

attempted to undermine Free's authority and Free's competency to supervise him as an engineer. In this lawsuit Kelly also claims that Free has harassed him, but the undisputed evidence readily reveals exactly the opposite. As revealed in Kelly's deposition, Kelly attributes Free's attempts to defend his supervisory authority as a "dummy . . . act[ing] out." (Kelly's Deposition at 348:11 to 348:14).

On January 3, 2006, Kelly submitted a memorandum to Free regarding "2006 Job Market Value" in which he again argued that the market rate for engineers at the APSC had been neglected for 25 years. (Defendants' Exhibit 55 to Kelly's Deposition). Therein, Kelly demanded of Free: "Please explain where [sic.] the fairness and why such discrepancies exist in the system?"( Id.) Free responded to Kelly's memorandum by stating: "As stated previously, there are not any plans at this time to request state personnel to re-evaluate the PSC engineering positions or to request a pay adjustment for those same positions." (Defendants' Exhibit 56 to Kelly's Deposition). Moreover, Free advised Kelly "[I]f you are no longer satisfied with the compensation package that you accepted for your current position, you certainly have the option of pursuing other career opportunities as they become available." (Id.)

Thereafter, Kelly then filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC") against the Alabama Public Service Commission, John Free and Janice Hamilton. (Defendants' Exhibit 1 to Kelly's Deposition). The APSC subsequently responded thereto by denying all of Kelly's allegations and submitting the affidavits of John Free and Janice Hamilton, and other evidentiary documents which refute any allegations of discrimination against Kelly. (Defendants' Exhibit 2 to Kelly's Deposition).

20

On April 10, 2007, the EEOC issued a notice stating that it was unable to find an alleged employment violation but provided Kelly with a Right To Sue letter. (Defendants' Exhibit 3 to Kelly's Deposition). This lawsuit followed in this United States District Court for the Middle District of Alabama. (Defendants' Exhibit 4 to Kelly's Deposition). Many of the factual allegations pled by Kelly in his EEOC Complaint are not pled in the Complaint filed in this Court. Indeed, in his Complaint, Kelly admitted that he does not dispute or challenge many of the facts pled by the APSC in rebuttal to Kelly's EEOC charge of discrimination. (See Kelly's Deposition at 78 to 141). For example, Kelly has claimed that Free acted unfairly against him because Free had requested desk audits for other employees but would not request a desk audit for him. Yet when asked in his deposition whether he agreed or disagreed that Free had not requested desk audits for any other employees under his supervision, Kelly said he had no knowledge of the matter.

> Q.    The next sentence, . . . [i]t says, it is also important to note that Mr. Kelly's supervisor, Mr. Free, has not requested a desk audit for any of the employees under his supervision, although he has recommended promotions as noted in paragraph 3 (C) herein. Do you agree or disagree with that statement?
>
> A.    I have no knowledge of that statement.

(Kelly's Deposition at 125:21 to 126:7).

With regard to the specific allegations of racial discrimination in the Complaint here, Kelly testified that he has never heard John Free or any Commissioner with the Alabama Public Service Commission make a racially derogatory or offensive remark.

> Q.    When you wrote Defendants' Exhibit 57, had you ever heard of John Free using a racial slur?
>
> A.    I've never heard John Free use racial slurs.

21

Q.    So you've never heard in your life John Free use a racial slur?

A.    No.

(Kelly's Deposition at 332:22 to 333:6).

Q.    . . . Have you ever heard any of the Commissioners with the Public Service
       Commission, whether it be President Sullivan or Commissioner Jan Cook or
       any other commissioners that have been with the Public Service Commission
       while you've been an employee there, have you ever heard any of them make
       a racially derogatory remark?

A.    No, I haven't.

Q.    Have you ever heard any of them make a racial slur?

A.    No, I haven't.

(Kelly's Deposition at 413:11 to 413:22).

Kelly testified that this lawsuit is all about Free's failure to request a desk audit, and that had

Free requested a desk audit for his position "we wouldn't be here today."

Q.    Now, John Free - - You don't contend that John Free is required to request
       a desk audit for you, do you?

A.    I think the - - if you want to work for a supervisor who can be fair and honest.
       If you have - - If I work for someone if you bring something to their attention,
       they should be fair and honest.  They shouldn't show a favorite.  ***Now, if Mr.
       Free had went back, tried to get the desk audit, got shot down, we would
       have still been - - I would have been okay with that.  But he didn't try.  He
       didn't even go to bat and try to get anything done.***  If he would have showed
       the effort and initiative to even try to get it done and show me that he did the
       effort, I don't - - but each time I asked Mr. Free to do that, he told me he had
       no intention of doing a desk audit for now or for the foreseeable future.  To
       me that was insulting.

Q.    And you think it was unfair for him not to try?

A.    That's right.

> Q.   *Okay.  And if he would have at least tried, then he would have been fair and you - - we wouldn't be here today?*
>
> A.   *Yeah.  We wouldn't be here today.  I would have said, appreciate it, Hoss; you know, you went to bat; I know you stuck your neck out; sorry about that; you know, let's - - you know, and I thank you for trying.  That's the only thing you can ask from somebody to be fair and honest.  Now, if he had got shot down and he told me where the holdup or where the bottleneck would have been in the system where he told me, well, Janice wouldn't approve for it, then I would have been in there having conversation with Ms. Hamilton of why she wouldn't do it.  If the Commission wouldn't do it and she's approved it, I would have had conversation with the Commissioners on why you don't think this is the fair thing to do.  But he didn't try.*

(Kelly's Deposition at 280:11 to 282:9) (emphasis added).

## **Kelly Does Not Have Any Damages**

All state employees under the State of Alabama Merit System are paid a salary based on their experience and job classification.  Kelly seeks to substitute his opinion of his assignment in the APSC Electricity Section and the amount of his salary for the judgment of Janice Hamilton and the State Personnel System.  He objects to the long-standing organizational structure of the Energy Division which was created by Janice Hamilton before Kelly was ever employed at the APSC.  Kelly contends that an engineer should not be under the supervision of an accountant.  For this reason he claims damages against the Defendants based on what he says is the median salary for other engineers in the United States.  This absurd claim for damages illustrates Kelly's misunderstanding of the State Merit System and his belligerent attitude to his APSC supervisors.  Regarding his unfounded claim for damages, Kelly testified as follows:

> Q.   So the damages you are requesting in this lawsuit is the salary and lost salary you believe that you should be paid as an engineer - -

23

A.      That's correct.

Q.      - - based upon the median salary for an engineer in the state of Alabama - -
        I mean, in the United States?

A.      That's - - This is average taking all - - everything in consideration.

. . .

Q.      And the damages you're seeking today in your lawsuit is for lost salary that
        you believe you should have been paid - -

A.      That's correct.

Q.       - - as an engineer?

A.      That's correct.

(Kelly's Deposition at 322:18 to 323:14; 325:15 to 325:20).

## **ARGUMENT**

**I.      BASED ON THE UNDISPUTED FACTS PLAINTIFF HAS FAILED TO
         STATE A CLAIM AS A MATTER OF LAW FOR RACIAL OR AGE
         DISCRIMINATION.**

The alleged factual basis for Kelly's racial and age discrimination claims under Title VII, §

1981 and the Fourteenth Amendment is that Free and Hamilton refused to request a "desk audit" for

Kelly with the Alabama Personnel Department and that his engineering job in the Electricity Section

of the APSC is under the supervision of a certified public accountant.  He further contends that he

should be transferred to the Special Projects Section of the APSC and be aligned there with Rick

Cleckler who is a 25-year veteran engineer in the APSC.  Kelly concedes if he were given a desk

audit or transferred to the Special Projects Section of the APSC "we wouldn't be here" in this

lawsuit.  The long-standing organizational chart and personnel structure of the APSC and Kelly's

24

job assignment in such structure do not remotely justify or support a racial or age discrimination claim under Title VII or the Fourteenth Amendment.

Title VII forbids disparate treatment in employment practices on the basis of race. Bell v. Eufaula City Bd. of Educ., 995 F. Supp. 1377, 1383-84 (M.D. Ala. 1998). Section 1981 forbids racial discrimination in the making and enforcing of contracts. Id. A violation of the Fourteenth Amendment, which is enforceable pursuant to 42 U.S.C. § 1983, consists of the deprivation of a right or privilege secured by the Constitution or laws of the United States by a person acting under state law. Douglas v. Evans, 888 F. Supp. 1536, 1542 (M.D. 1995). However, Kelly's burden of proof and the elements for each prima facie case are the same for all three claims. St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 113 S. Ct. 2742, 2746 n. 1, 125 L. Ed. 2d 407 (1993); see also Bell v. Eufaula City Bd. of Educ., 995 F. Supp. at 1384 .

As set forth in Bell, Kelly's burden of proof is as follows:

> To establish a prima facie case under the framework described above, Plaintiff must present circumstantial evidence sufficient to create an inference that an employment-related decision was motivated by Plaintiff's age, gender or race. To establish a prima facie case, a plaintiff must allege: (1) he was a member of a protected group, (2) an adverse employment action took place, (3) he and a similarly situated non-protected person received dissimilar treatment, and (4) sufficient evidence , either circumstantial or direct, exists to infer a nexus or causal connection between race and the disparate treatment.

995 F. Supp. at 1385 (citations omitted).

As also explained by the Court in Streeter v. The Bridge, Inc., No. 2:04CV418-W, 2006 WL 680573 (M.D. Ala. March 16, 2006), an adverse employment action means a "'*serious and material* change in the terms, conditions, or privileges of employment.'" 2006 WL 680573 at *4 (quoting

Davis v. Town of Lake Park, Florida, 245 F.3d 1232, 1239 (11th Cir. 2001). The Court further stated:

> "[T]he employee's subjective view of the significance and adversity of the employer's action is not controlling; the employment action must be materially adverse as viewed by a reasonable person in the circumstances." Id. (citing Doe v. DeKalb County Sch. Dist., 145 F.3d 1441, 1453 (11th Cir. 1998)). "While not everything that makes an employee unhappy is an actionable adverse action, conduct that alters an employee's compensation, terms, conditions, or privileges of employment does constitute adverse action under Title VII." Shannon v. Bellsouth Telecommunications, Inc., 292 F.3d 712, 716 (11th Cir. 2002) (quoting Bass v. Bd. of County Comm'rs, 256 F.3d 1095, 1118 (11th Cir. 2001).

Streeter, 2006 WL 680573 at *4.

Kelly was appointed to and has held for six years the advertised job he applied for in the Electricity Section of the APSC. He has received a promotion and nine salary increases. No adverse employment action has been taken against Kelly at any time.

### A.    There are no material differences in the terms, benefits and conditions of employment between Kelly and the APSC's white engineer, Rick Cleckler.

There are no serious or material adverse or disparate differences in the terms, conditions or privileges of employment between Kelly and Rick Cleckler, the other engineer in the Energy Division of the APSC. Kelly and Cleckler both hold the same job title and have the same pay grade. (Kelly's Deposition at 140:18 to140:20; 141:1 to 141:7). As state employees, both Kelly and Cleckler receive the same job benefits, i.e., sick leave, health care, vacation, etc. (Affidavit of John Free at ¶ 17). As discussed later herein, in terms of continuing education and pay raises, Kelly has actually exceeded Cleckler.

Since 2002, when Kelly was first hired by the APSC, he has attended the following seminars and continuing education courses:

26

| Year | Course | Location |
|------|--------|----------|
| 2003 | Professional Business Writing | Montgomery |
| 2003 | Electricity Law | Alexandria, VA |
| 2004 | Market Based Concepts for Transmission Planning | San Francisco, CA |
| 2005 | PowerPoint XP/2002 | Montgomery |
| 2006 | Fossil Power Plant Fundamental Workshop | Raleigh, NC |
| 2007 | Gassification Workshop | Denver, CO |

(Affidavit of Janice Hamilton at ¶¶ 13 and 14).

In this same time period, Free and Hamilton gave approval for Kelly to attend the following seminars and courses which Kelly personally chose not to attend:

| | | |
|------|--------|----------|
| 2006 | Environmental Conference | Atlanta, GA |
| 2006 | Gasification Workshop for State Gov. Personnel | Bismark, ND |
| 2007 | FERC Tech. Workshop (re: Electric Trans. Rule 689) | Atlanta, GA |
| 2007 | Business Writing & Grammar | Montgomery |

(Affidavit of Janice Hamilton at ¶¶ 13 and 14).

In 2005, Free and Hamilton also approved Kelly's attendance at a "Custom Power Solutions for Power Quality Issues" Seminar in Chicago, IL. (Affidavit of Janice Hamilton at ¶ 13).

By comparison, Cleckler has only received the following continuing education courses in the same time period:

| | | |
|------|--------|----------|
| 2005 | Web Conference "Updating the Pro Forma Tariff" | Via internet in office |
| 2005 | Seminar "Eminent Domain in Alabama" | Montgomery |

27

2006    Professional Electrician Studies Program            Via internet in office

2007    Gassification Workshop                              Denver, CO

(Affidavit of Janice Hamilton at ¶ 15).

Consequently, contrary to Kelly's allegations that Free has restricted his training opportunities, Kelly has received more training opportunities and has attended more seminars and conferences than Cleckler. Likewise, Kelly has attended more out of town seminars and conferences than Cleckler. Indeed, if Kelly had chosen to attend all the seminars and conferences which Free and Hamilton approved for him to attend, then Kelly would have received more than double the educational opportunities received by Cleckler. Accordingly, contrary to Kelly's EEOC and deposition allegations, he has never "lost out" on or been denied training opportunities because of his race or age.

Similarly, Kelly has received more pay raises than Cleckler in the same period. According to the undisputed record, Kelly has received the following pay raises since he was hired by the APSC in 2002:

| Date | Form of Raise | Salary | Pay Grade | Grade Step |
|------|---------------|--------|-----------|------------|
| 09/7/02 | COLA | $1,467.80 Bi-Weekly | 77 | 1 |
| 01/25/03 | Probationary Raise | $1,540.60 Bi-Weekly | 77 | 3 |
| 05/29/04 | Promotion | $1,616.90 Bi-Weekly | 79 | 1 |
| 12/11/04 | Probationary Raise | $1,698,90 Bi-Weekly | 79 | 3 |
| 09/03/05 | COLA | $1,800.80 Bi-Weekly | 79 | 3 |
| 12/10/05 | Annual | $1,891.80 Bi-Weekly | 79 | 5 |

| 09/01/06 | COLA | $2,152.00 Semi-Monthly | 79 | 5 |
| 12/01/06 | Annual | $2,259.30 Semi-Monthly | 79 | 7 |
| 09/01/07 | COLA | $2,338.40 Semi-Monthly | 79 | 7 |

(Defendants' Exhibits 13 through 21 to Kelly's Deposition).

In contrast, Cleckler has only received the following pay raises in the same time period:

| Date | Form of Raise | Pay Grade | Grade Step |
|------|---------------|-----------|------------|
| 09/07/02 | COLA | 79 | 18 |
| 09/03/05 | COLA | 79 | 18 |
| 09/01/06 | COLA | 79 | 18 |
| 09/01/07 | COLA | 79 | 18 |

(Affidavit of Janice Hamilton at ¶ 16).

Thus, in addition to educational opportunities, Kelly has also received more pay raises than Cleckler while, at the same time, receiving the same number of cost of living adjustments. Accordingly, Kelly has not been discriminated against or otherwise suffered any disparate treatment in the terms, conditions or privileges of his employment.

Indeed, as alleged in paragraphs six (6), seven (7), eleven (11) and twelve (12) of the Complaint, the only actual difference between Kelly and Cleckler, besides Cleckler having worked for the APSC 25 years and Kelly only 6 years, is that Cleckler works in the Special Projects Section (where he reports directly to Hamilton) and Kelly works in the Electricity Section (where he reports directly to Free). Such insignificant differences simply do not give rise to a federal civil rights claim.

29

The existing five section structure of the Energy Division has been in existence at least since 1998, four years prior to Kelly's hiring at the APSC. (Affidavit of John Free at ¶ 3). This organizational structure was implemented by and currently exists at the direction of Defendant Hamilton, a black female, pursuant to her discretion and duties in overseeing and managing the entire five section Energy Division. (Affidavit of John Free at ¶ 3).

Cleckler holds the same position he has held in the Special Projects Section since 1998. (Affidavit of John Free at ¶ 17). In his position Cleckler provides assistance to all Energy Division Sections including, when needed, the Electricity Section where Kelly works. (Affidavit of Janice Hamilton at ¶ 7).

In contrast to Cleckler, Kelly was hired by Free in 2002 specifically to work in the Electricity Section. The Electricity Section of the Energy Division has, even prior to Kelly's hiring, provided the bulk of its own technical support internally because the inherent nature of issues specific to the electric industry requires an engineer working within the section. (See Affidavit of Janice Hamilton at ¶¶ 5 and 7). **Indeed, Hamilton previously held the same job Kelly currently holds prior to her promotion to Energy Division Manager.** (Kelly's Deposition at 414:17 to 414:19). **Like Kelly, when Hamilton held Kelly's present job she too was supervised by a white accountant, Robert Duxbury (now retired).** (Affidavit of Janice Hamilton at ¶ 5).

Moreover, as Kelly's direct supervisor, Defendant Free evaluates Kelly's work performance and provides Kelly's annual performance rating pursuant to the Rules, Regulations and Guidelines of State Personnel and the Merit System of Alabama codified at ALA. CODE § 36-26-1. (Affidavit of John Free at ¶ 4). It is not uncommon at the APSC and other agencies of the State of Alabama

for one educational discipline to report to a manager and/or director with a different educational discipline or background. See Affidavit of John Free at ¶ 4 and Affidavit of Janice Hamilton at ¶ 5). Again, when Defendant Hamilton held Kelly's present job her supervisor, an accountant (Robert Duxbury), evaluated her work performance and provided her annual performance rating. (Affidavit of Janice Hamilton at ¶ 5).

With respect to Kelly's allegations in ¶ 10 of the Complaint that his job title was changed, without a job study being conducted, from "Utility Engineering Specialist II" to "Public Utility Technical Specialist, Senior," this change was made solely by the State Personnel Department. (Defendants' Exhibit 44 to Kelly's Deposition). Moreover, since Kelly and Cleckler have the same job classification, Cleckler's title was likewise changed from "Utility Engineering Specialist II" to "Public Utility Technical Specialist, Senior" at the same time.

### Kelly Does Not Have A Legal or Constitutional Right to a Desk Audit Or to a Transfer to the Special Projects Section of the APSC

With respect to Kelly's allegations in ¶ 9 of the Complaint, Defendants deny that they have refused to request a desk audit for Kelly because he is black or because he works under Free or for any other unlawful or unreasonable reason. First, Kelly, like all other state employees, has no legal right to a desk audit and the Defendants cannot compel a desk audit by the State Personnel Department. A desk audit is only performed by the State Personnel Department which ultimately approves any change in the salary of all state employees. State Personnel can deny, ignore or grant the request for a desk audit in its overall administration of the entire State Personnel Department.

Second, Free has never requested a desk audit for himself or any other employees which he supervises in the Electricity Section. (Affidavit of John Free at ¶ 14). Third, Free and Hamilton have

investigated the salaries paid to similar engineering positions by other public service commissions in the southeast United States and, in their opinion, the salary paid by the State of Alabama to Kelly, Cleckler and all like-situated APSC engineer employees in the same classification is commensurate with the southeast average. (Affidavit of John Free at ¶ 12). Cleckler is not complaining about the salary which he and Kelly are both now being paid. Moreover, Kelly's requested salary increase would place him outside the acceptable guidelines of State Personnel for his job responsibilities and status in the Energy Division's organizational structure. (Affidavit of John Free at ¶¶ 11 and 15). Thus, there is no evidence whatsoever that Free, Hamilton or the APSC's refusal to request a desk audit for Kelly's position is racially motivated.

Finally, Kelly's remaining complaints and criticisms (i.e., Free has accountants proofread Kelly's work, Free treats everyone better than Kelly, Free threatens to write Kelly up for being late from a doctor's visit, and Free has others check on Kelly to ensure he is in the office) are all trivial and "petty slights and minor annoyances" that do not give rise to a federal cause of action. Burlington Northern & Santa Fe Railway Co., 548 U.S. 53, 126 S. Ct. 2405, 2415, 165 L. Ed. 2d 345 (2006) (observing that Title VII does not protect employees from "petty slights or minor annoyances"). It is undisputed that Free has all employees within the Electricity Section proofread each others' work product and reports prior to such reports being placed on file as permanent APSC records. (Affidavit of John Free at ¶ 23). Thus, Kelly's reports are grammatically checked by an accountant. (Id.) Moreover, Defendant John Free requires all employees in his section to keep their interior office blinds open so that work areas are visible, and Free strictly and uniformly enforces all APSC policies regarding sick leave, vacation leave and time off. (Affidavit of John Free at ¶ 22).

32

Kelly has totally and completely failed to establish that he has been the victim of any unlawful or disparate treatment by Free, Hamilton or the APSC on the basis of Kelly's race or age, or any other unlawful basis.

**B.      There is no evidence whatsoever that any alleged employment action ever taken against Kelly was made to discriminate against him on the basis of race, age or any wrongful basis.**

Kelly has not shown that Free, Hamilton or anyone else with the APSC has ever taken any discriminatory employment action against him on the basis of race, age or any other unlawful basis. Kelly himself acknowledges that he has never heard nor known of Free, Hamilton or any APSC Commissioner to make a racially derogatory or offensive remark to or about him. Kelly was himself hired by Free. When he hired Kelly, Free chose him over two equally qualified white males. Kelly received the very advertised job he applied for and he has continued in such position for six years.

The majority of employees Free has hired in the Electricity Section have been black. In particular, Free hired Jackie Frazier, a 46-year-old black female; Patricia Smith, a 38-year-old black female; and Mr. Oretoluwa Isikalu, a 60-year-old black male who is no longer employed by the APSC. (Affidavit of John Free at ¶ 7). Four of the seven employees now in the Electricity Section are black. (Kelly's Deposition at 23:2 to 23:11).

In addition to Kelly's promotion, Free has also recommended promotions for Robert Taylor, a 57-year-old black male (from Public Utility Analyst II to Public Utility Analyst III); Sheila Ward, a 56-year-old white female (from Utility Analyst I to Public Utility Analyst II); Patricia Smith, a 38-year-old black female (from Utility Auditor I to Public Utility Analyst II); and Jackie Frazier, a 46-year-old black female (from Administrative Support Assistant I to Administrative Support Assistant

II).  These hires and promotions clearly disprove any alleged discriminatory hiring and promotions by Free, Hamilton or the APSC. (Affidavit of John Free at ¶ 8).

Prior to Kelly's concerted campaign to harass and attack Free's supervisory authority, Free gave Kelly increasingly high ratings on his performance appraisals.  In his Probationary Performance Appraisal for July/October 2002, Kelly received a score of 22 out of 40, or "Meets Standards." (Defendants' Exhibit 61 to Kelly's Deposition).  In his Probationary Performance Appraisal ending January 2003, Kelly received a score of 23.30 out of 40, or "Meets Standards." (Defendants' Exhibit 63 to Kelly's Deposition).  In his Performance Appraisal ending November  2003, Kelly received a score of 31.4 out of 40, or "Exceeds Standards." (Defendants' Exhibit 65 to Kelly's Deposition). Finally, in his Probationary Performance Appraisal ending August 2004, Kelly received a score of 35.6 out of 40, or "Exceeds Standards." (Defendants' Exhibit 68 to Kelly's Deposition).

Finally, there are no employees in the APSC that have ever seen or known of Free or Hamilton to discriminate against Kelly on the basis of race or age or for any unlawful reason.  (See Affidavits attached to Defendants' Motion for Summary Judgment of Commission President Jim Sullivan; Chief Administrative Law Judge John Garner; Stephen D. Bartelt; Patricia W. Smith; Jackie Frazier; Robert Earl Reed; Aquilla Spivey; Sheila Ward; and Tonya Williams).

Accordingly, there is no evidence whatsoever that Free, Hamilton or the APSC have taken any adverse employment action against Kelly on the basis of race or age, or any other unlawful basis.

### C.    *Kelly's real motive in this lawsuit is to try to compel the APSC to pay him a higher salary.*

Based on Kelly's own testimony, it is undisputed that this lawsuit is not to vindicate some alleged racial or age discrimination against Kelly.  To the contrary, this lawsuit is really Kelly's way

34

of attempting to compel the APSC to pay him a higher salary. Kelly admitted that he would have no objection working under Free if Free had an engineering background. (Kelly's Deposition at 131:5 to 131:16) ("If he had an engineering background, I wouldn't - - wouldn't object at all."). Kelly also testified that his true motivation for bringing this lawsuit was because Free never tried to get a desk audit of Kelly's position from the State Personnel Department. (Kelly's Deposition at 277:17 to 279:20). He further testified that if Free had merely requested a desk audit "we wouldn't be here today." (Kelly's Deposition at 280:12 to 281:15). The damages which Kelly seeks here are the salary and lost salary which he believes he should have been paid by the APSC. (Kelly's Deposition at 322:18 to 323:13).

Accordingly, it is beyond dispute that this lawsuit is really not a racial or age discrimination case at all. Kelly receives the same grade of pay and all other employment benefits received by the white APSC engineer (Rick Cleckler) who has 19 years more experience and seniority than Kelly. This lawsuit is solely about Kelly's campaign to try to compel the State of Alabama to pay him a higher salary by adjusting his pay grade to which he has no legal or constitutional rights.

**II.    KELLY HAS FAILED TO SHOW A CLAIM FOR WHICH RELIEF CAN BE GRANTED AGAINST DEFENDANTS ON THE ALLEGED BASIS OF HARASSMENT.**

The fourth cause of action of Kelly's Complaint alleges that it is a "state action claim for harassment." Specifically, Kelly alleges in ¶¶ 24 through 31 of the Complaint that Defendant Free's "constant threats of disciplinary action, along with consistent failure to provide close 'hands-on supervision' *coupled with Defendant Free's lack of adequate engineering knowledge and training* amounts too [sic] constant and ongoing harassment." (Defendants' Exhibit 4 to Kelly's Deposition

35

at ¶ 31) (emphasis added). Kelly further alleges that "[s]aid harassment has caused Kelly to suffer embarrassment in front of his coworkers and to suffer mental and emotional pain and anguish." (Defendants' Exhibit 4 to Kelly's Deposition at ¶ 32).

Alabama law does not recognize a civil cause of action for harassment. In fact, the Alabama Supreme Court has previously dismissed a claim for sexual harassment noting as follows: "It is well settled that Alabama does not recognize an independent cause of action for sexual harassment. Instead, claims of sexual harassment are maintained under common law tort theories, such as assault and battery, invasion of privacy, negligent training and supervision, and outrage." Machen v. Childersburg Bancorporation, 761 So. 2d 981, 983, n. 1 (Ala. 2000).

To the extent Kelly's fourth cause of action is attempting to allege a hostile working environment claim under Title VII, then Kelly has failed to state a cause of action. The elements for a hostile environment claim are fully set forth in the 11th Circuit Court of Appeals' recent decision in Washington v. Kroger Company, No. 05-16328, 2007 WL 433519 (11th Cir. February 8, 2007). In Washington, the Court stated as follows:

> A hostile environment claim under Title VII is established upon proof that the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment. To establish a hostile work environment claims, a plaintiff must show: (1) he belongs to a protected group; (2) he has been subject to unwelcome harassment; (3) the harassment has been based on a protected characteristic, such as (in the instant case) race; (4) the harassment is sufficiently severe or pervasive to alter the terms and conditions of employment and create a discriminatory abusive work environment; and (5) the employer is responsible for such environment under a theory of vicarious liability or a theory of direct liability. The requirement that the harassment be severe or pervasive contains an objective and subjective component. "Thus, to be actionable, this behavior must result in both an environment that a reasonable person would find hostile or abusive and an environment that the victim subjectively perceives to be abusive."

36

In evaluating the objective severity of the harassment, we consider, among other things, (1) the frequency of the conduct; (2) the severity of the conduct; (3) whether the conduct is physically threatening or humiliating, or a mere offensive utterance; (4) whether the conduct unreasonable [sic] interferes with the employee's job performance. "Although we examine the statements and conduct complained of collectively to determine whether they were sufficiently pervasive or severe to constitute [racial] harassment, the statements and conduct must be of a [racial] nature ... before they are considered to in determining whether the severe or pervasive requirement is met." "Innocuous statements or conduct, or boorish ones that do not relate to the [race] of the actor or of the offended party (the plaintiff), are not counted." Additionally, teasing, offhand comments, and isolated incidents (unless extreme) will not amount to discriminatory changes in the terms and conditions of employment. <u>Mendoza v. Borden, Inc.</u>, 195 F.3d 1238, 1245 (11th Cir. 1999) (*en banc*).

<u>Washington</u>, 2007 WL 433519 at *2-3 (citations omitted).

Based upon the elements for a hostile working environment claim set forth in <u>Washington</u>, the Defendants are clearly entitled to summary judgment. Each and every alleged incident of harassment referenced in the fourth cause of action of the Complaint were documented and such documents were made exhibits to Kelly's deposition. (<u>See</u> Defendant's Exhibits 55-58; 74; 76; 79-81; 84-85; 87-91; 93-94 to Kelly's Deposition). Such documents show the personal and abusive attacks by Kelly against Free rather than any harassment of Kelly by Free.

It is readily apparent that all alleged communications and actions involving Kelly by John Free were reasonable and justified. Free's actions were not based on Kelly's race or age, nor were they so severe or pervasive as to alter the terms and conditions of his employment. Most of the incidences that Kelly claims were harassment were simply Free's warnings to Kelly to cease and desist his personal attacks and abusive conduct toward Free, and the eventual written reprimand issued to Kelly after Kelly refused to cease and desist his abusive conduct.

With regard to ¶ 24 of the Complaint, Kelly alleges that after writing Free memorandums requesting that the salary for engineering jobs be updated at the APSC, Free threatened Kelly with disciplinary action.  However, the substance of these events are memorialized in Defendants' Exhibits 57 and 58 to Kelly's deposition.  Kelly repeatedly authored memorandums to Free wherein he wrongfully accused Free of engaging in mischief, deception, professional questionable conduct, and harming his career. (See e.g., Defendants' Exhibit 57 to Kelly's Deposition).  Free responded thereto by not taking any formal disciplinary action but by advising Kelly that "I am notifying you that any future unfounded remarks of this nature will not be tolerated and will likely result in disciplinary action." (See Defendants' Exhibit 58 to Kelly's Deposition).

With regard to ¶¶ 26 through 28 of the Complaint, the allegations therein are memorialized in Defendants' Exhibits 84 and 85 to Kelly's deposition.  Specifically, in ¶ 26 Kelly complains that Free threatened him with disciplinary action after Kelly disagreed with his Performance Pre-Appraisal Report prepared by John Free.  Kelly expressed his disagreement as follows:

> Once again, Mr. Free is attempting to recast the highly complex and technical job of engineering into a t-crossing and i-doting job classification.  Engineers are taught to solve the world's problems by using science and technology.  Mr. Free does not possess these problem solving skills.  My evaluation is drifting into areas in which he can only quantitatively measure (clerical and data input errors).

(Defendants' Exhibit 84 to Kelly's Deposition).

Free's response thereto is memorialized in Defendants' Exhibit 85 to Kelly's deposition in which Free set forth detailed comments of the efforts that he had taken to help Kelly improve his performance on pre-appraisal reports.  With regard to Free's alleged threats, Free actually stated as follows:

> I must again address your propensity to level unfounded personal accusations toward
> me in an inappropriate manner. . . . By Memorandum dated February 14, 2006, you
> were notified that any future unfounded remarks would likely result in disciplinary
> action. By way of this Memorandum, I am notifying you that any further unfounded
> and degrading remarks regarding my character will be considered insubordinate
> behavior and will result in disciplinary action.

(Defendants' Exhibit 85 to Kelly's Deposition). (With regard to Kelly's allegations in ¶ 28 of the

Complaint concerning "close hands-on supervision," see Defendants' Exhibits 87 through 89 to

Kelly's Deposition). Clearly, Kelly was not warned of potential disciplinary action because he

responded to a pre-appraisal report. To the contrary, Kelly was warned that he would receive

disciplinary action for continuing to make unfounded and degrading remarks regarding his

supervisor's character.

With regard to ¶ 29 of the Complaint, the allegations are memorialized in Defendants'

Exhibit 90 to Kelly's deposition. Free's response is memorialized in Defendants' Exhibit 91 to

Kelly's deposition. On the face of these documents, Free did not and has not engaged in any

harassing or threatening behavior, but merely responded to Kelly's allegations against him in a very

professional manner. Specifically, Free stated:

> You are misconstruing as "threats" my well-documented managerial attempts to
> bring you into compliance with the rules, regulations and guidelines of the State
> Personnel Department, the Commission, the Energy Division and the Electricity
> Section. I will continue to utilize the managerial model established by the State
> Personnel Department to bring you, and all other employees under my direct
> supervision and control, into compliance with those rules and regulations when such
> corrective action is warranted.

(Defendants' Exhibit 91 to Kelly's Deposition).

With regard to ¶ 30 of the Complaint, the allegations therein are documented in Defendants'

Exhibits 92, 94 and 95 to Kelly's deposition. Specifically, Kelly received a written reprimand

because he responded to a pre-appraisal report by informing Free that Free lacked the technical competence, professional credibility and management consistency to render a fair evaluation for his performance, and that Free had exhibited a disrespectful attitude toward him and engineering. (Defendants' Exhibit 93 to Kelly's Deposition).   Free responded thereto by advising Kelly that Kelly's comments were "disrespectful, unprofessional and considered highly insubordinate." (Defendants' Exhibit 94 to Kelly's Deposition).  Kelly was provided a disciplinary meeting with Hamilton and Free in which he was advised that attacking his supervisor was unacceptable. (Exhibit 95 to Kelly's Deposition).

Based upon the undisputed evidence, Kelly has not been harassed in any way, shape, form or fashion based on his race or age, or for any reason.  Specifically, Kelly has not been subjected to any harassment so severe or pervasive as to alter the terms and conditions of his employment or to otherwise create a racially discriminatory abusive work environment.

Nine co-workers of Kelly, Hamilton and Free who see and work with all three of them on a daily basis have confirmed that they have never witnessed nor known of John Free or Janice Hamilton to do anything to discriminate against Greg Kelly on the basis of race or age, or any other wrongful basis.  None of them have ever heard John Free or Janice Hamilton make any racially derogatory remarks about Greg Kelly. (See Affidavits of Aquilla Spivey, Stephen Bartelt, Sheila Ward, Sheila Ward, Jackie Frazier, James Ricky Cleckler, Tonya Williams, Robert Earl Reed and John Garner).   No co-workers or other employees of the APSC have verified the racial discrimination and hostile work environment claims of Kelly.  Kelly is a disgruntled employee who is out of step with the State of Alabama Personnel Merit System.  Kelly himself admits that Free and

Hamilton have never made any racial slurs about or toward him and that he would have no problem working under Free as his supervisor "if he were an engineer."

Each and every claim of alleged harassment in Kelly's Complaint relates to Kelly's compliance with legitimate APSC rules and regulations and Kelly's failure and refusal to comply therewith. Accordingly, Kelly has failed to show a claim for hostile work environment. See Washington, 2007 WL at *3:

> Although we examine the statements and conduct complained of collectively to determine whether they were sufficiently pervasive or severe to constitute [racial] harassment, the statements and conduct must be of a [racial] nature ... before they are considered in determining whether the severe or pervasive requirement is met.

(quoting Gupta v. Florida Board of Regents, 212 F.3d 571, 583 (11th Cir. 2000)).

Accordingly, there is no dispute that the statements and conduct of John Free and Janice Hamilton were not remotely pervasive or severe enough to constitute racial harassment.

41

**CONCLUSION**

Kelly has completely failed to prove that he has been subjected to any serious and material change in the terms, conditions or privileges of his employment on the basis of age, race, or any other basis. He has also totally failed to show that he has been the subject of a hostile or abusive work environment or unlawful harassment. He has the same job classification and is paid the same salary and receives the same benefits as Rick Cleckler. Kelly admits that this lawsuit is not truly a claim for racial or age discrimination but is really a persistent attempt by him to obtain a desk audit of his position and to compel the APSC to transfer him to the Special Projects Section of the APSC and to thereby be paid a higher salary. Kelly conceded that but for the failure of Free and Hamilton to request a desk audit for his position "we wouldn't be here today." (Kelly's Deposition at 281:12 to 281:15). This Court should not be petitioned by Kelly to micro-manage the organizational structure of the APSC or to increase the salary of one disgruntled employee. **Kelly simply does not have a legal or constitutional right to seek to have this Court order the APSC to request a "desk audit" of Kelly's job or to transfer him to another section of the APSC simply because he personally does not like being in the Electricity Section under the supervision of a CPA.**

Accordingly, Kelly has wholly failed to show a cause of action for which relief can be granted under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 1981, § 1983, the Fourteenth Amendment to the United States Constitution, or under Alabama law. Defendants respectfully submit that Free, Hamilton and the APSC are entitled to a summary judgment and that all of Kelly's claims against them, jointly and severally, are due to be dismissed with prejudice.

Respectfully submitted this the  3<u>rd</u>  day of April, 2008.

<u>    s/Oakley Melton, Jr.    </u>
OAKLEY MELTON, JR. (MEL002)

<u>    s/J. Flynn Mozingo    </u>
J. FLYNN MOZINGO (MOZ003)
Attorneys for Defendants, John Free, Janice Hamilton and the Alabama Public Service Commission

**OF COUNSEL:**

MELTON, ESPY & WILLIAMS, P.C.
P. O. Drawer 5130
Montgomery, AL   36103-5130
Telephone:    (334) 263-6621
Facsimile:      (334) 263-7252
fmozingo@mewlegal.com

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that a copy of the foregoing has been electronically filed on the 3rd day of April, 2008, with the Clerk of the Court and that a copy of same will be served upon the listed counsel of record by electronic notification via the ECF/CM System:

Jim DeBardelaben
Post Office Box 152
Montgomery, AL 36107

　　　　　　　　　　　　　　　　s/J. Flynn Mozingo
　　　　　　　　　　　　　　　　OF COUNSEL

44

ORIGINAL

1

1          IN THE UNITED STATES DISTRICT COURT

2          FOR THE MIDDLE DISTRICT OF ALABAMA

3                    NORTHERN DIVISION

4

5    GREGORY KELLY,

6          Plaintiff,

7     vs.                          CIVIL ACTION NO.
                                   2:07-cv-610-WHA

8    JOHN FREE, et al.,

9          Defendants.

10

11

12              * * * * * * * * * * * *

13

14

15    **VIDEOTAPED DEPOSITION OF GREGORY KELLY,**

16    taken pursuant to stipulation and agreement before

17    Lyn Daugherty, ACCR #66, Certified Court Reporter

18    and Commissioner for the State of Alabama at Large,

19    in the Law Offices of Melton, Espy & Williams, 255

20    Dexter Avenue, Montgomery, Alabama, on Thursday,

21    March 6th, 2008, commencing at approximately

22    9:05 a.m.

23              * * * * * * * * * * * *

2

APPEARANCES

FOR THE PLAINTIFF:

Mr. Jim L. DeBardelaben
Attorney at Law
1505 Madison Avenue
P.O. Box 152
Montgomery, Alabama  36101-0152


FOR THE DEFENDANTS:

Mr. J. Flynn Mozingo
Mr. Oakley Melton, Jr.
Ms. Shelia Stalnaker, Paralegal
MELTON, ESPY & WILLIAMS
Attorneys at Law
301 Adams Avenue
Montgomery, Alabama  36104


ALSO PRESENT:  Mr. Michael Nicholls, Videographer
               Ms. Janice Hamilton
               Mr. John Free
               Mr. John Garner


\* \* \* \* \* \* \* \* \* \* \* \*


<u>EXAMINATION INDEX</u>


GREGORY KELLY

     BY MR. MOZINGO . . . . . . . . . . .   13


         (Index continued on next page)

3

## EXHIBIT INDEX

MAR

Defendant

| | | |
|---|---|---|
| 1 | Notice of discrimination | 70 |
| 2 | Response given by the Alabama Public Service Commission | 77 |
| 3 | Dismissal and notice of right | 141 |
| 4 | Complaint | 146 |
| 5 | Answer | 177 |
| 6 | Plaintiff's response to defendants' discovery requests | 179 |
| 7 | Application for examination with the State of Alabama for the position of Utilities Engineering Specialist I | 182 |
| 8 | Announcement for the position of Utilities Engineering Specialist I | 185 |
| 9 | Letter dated June 5, 2002 to Gregory Kelly from Loy Overstreet | 186 |
| 10 | Letter dated June 28, 2002 to Gregory Kelly from Loy Overstreet | 187 |
| 11 | Position classification questionnaire | 202 |
| 12 | Organizational structure | 18 |
| 13 | Memorandum dated September 27, 2002 to Gregory Kelly from Dorinda Kepler | 209 |
| 14 | Memorandum dated February 13, 2003 to Gregory Kelly from Dorinda Kepler | 209 |
| 15 | Memorandum dated June 18, 2004 to Gregory Kelly from Dorinda Kepler | 209 |

(Index continued on next page)

4

16    Memorandum dated December 30, 2004 to     209
      Gregory Kelly from Dorinda Kepler

17    Memorandum dated September 26, 2005 to    209
      Gregory Kelly from Dorinda Kepler

18    Memorandum dated December 30, 2005 to     209
      Gregory Kelly from Dorinda Kepler

19    Memorandum dated September 22, 2006 to    209
      Gregory Kelly from Dorinda Kepler

20    Memorandum dated December 22, 2006 to     209
      Gregory Kelly from Dorinda Kepler

21    Memorandum dated August 28, 2007 to       209
      Gregory Kelly from Dorinda Kepler

22    Training sheet                            219

23    E-mail from Greg Kelly to John Free       221

24    Statement of expenses                     222

25    Confirmation of attendance at ECUI        223
      training course

26    Statement of travel expenses             223

27    E-mail from John Free to Janice Hamilton  224

28    Memorandum from Greg Kelly to John Free   225

29    Series of e-mails between Greg Kelly and  225
      John Free

30    E-mail from Greg Kelly to Julia Friedman  226

31    Request for out-of-state travel           227

32    Statement for out-of-state travel         227
      expenses

33    E-mail from John Free to Greg Kelly       228

(Index continued on next page)

| | | | |
|---|---|---|---|
| 1 | 34 | E-mail from John Free to Greg Kelly | 229 |
| 2 | 35 | Request for out-of-state travel | 230 |
| 3 | 36 | Series of e-mails between Greg Kelly and John Free | 232 |
| 4 5 6 | 37 | Application for examination for the position of Utilities Engineering Specialist II | 242 |
| 6 7 | 38 | Notice for the position of Utilities Engineering Specialist II | 245 |
| 8 9 | 39 | Memorandum from John Free to Dorinda Kepler | 247 |
| 9 10 | 40 | Letter dated June 1, 2004 to Gregory Kelly from Dorinda Kepler | 250 |
| 11 | 41 | Memorandum dated June 18, 2004 to Gregory Kelly from Dorinda Kepler | 251 |
| 12 13 | 42 | Memorandum from Dorinda Kepler to Gregory Kelly | 252 |
| 14 | 42-A | Position classification questionnaire | 254 |
| 15 | 43 | Preappraisal form dated June 11, 2004 | 265 |
| 16 17 | 44 | Letter dated September 24, 2004 to Jim Sullivan, Jan Cook, George Wallace from Tommy Flowers | 269 |
| 18 19 | 45 | Document entitled Executive Summary: What is the 2005 market value for Public Utility Technical Specialists? | 271 |
| 20 21 | 46 | Memorandum dated May 17, 2005 to Janice Hamilton from Greg Kelly | 282 |
| 21 22 | 47 | Memorandum dated May 18, 2005 to Gregory Kelly from Janice Hamilton | 290 |

23                    (Index continued on next page)

6

| | | |
|---|---|---|
| 48 | Memorandum dated May 18, 2005 to Janice Hamilton from Gregory Kelly | 293 |
| 49 | Memorandum dated May 20, 2005 Gregory Kelly from Janice Hamilton | 298 |
| 50 | Memorandum dated may 23, 2005 to Janice Hamilton from Gregory Kelly | 298 |
| 51 | Memorandum dated May 23, 2005 to Janice Hamilton from Gregory Kelly | 302 |
| 52 | Memorandum dated June 7, 2005 to Jim Sullivan, Jan Cook and George C. Wallace, Jr. from Gregory Kelly | 307 |
| 53 | Findings and recommendations of the grievance committee | 312 |
| 54 | Letter dated August 23, 2005 to Gregory Kelly from Jim Sullivan, Jan Cook and George C. Wallace, Jr. | 315 |
| 55 | Memorandum dated January 3, 2006 to John Free from Gregory Kelly | 317 |
| 56 | Memorandum dated January 23, 2006 to Gregory Kelly from John Free | 325 |
| 57 | Memorandum dated January 25, 2006 to John Free from Greg Kelly | 326 |
| 58 | Memorandum dated February 14, 2006 to Gregory Kelly from John Free | 334 |
| 59 | Transcript of employee grievance hearing | 314 |
| 60 | Employee performance appraisal for the period 7/13/02 to 7/12/03 | 336 |
| 61 | Employee preliminary/interim performance appraisal for the period 7/13/02 to 10/12/02 | 336 |

(Index continued on next page)

7

1    62    Employee performance appraisal for the          336
           period 1/13/03 to 1/12/04

2

     63    Employee probationary performance               336
3          appraisal for the period 7/13/02 to
           1/12/03

4

     64    Memorandum to John Free from Gregory            336
5          Kelly

6    65    Employee performance appraisal for the          336
           period 11/1/02 to 11/1/03

7

     66    Employee performance appraisal for the          336
8          period 11/1/03 to 11/1/04

9    67    Employee performance appraisal for the          336
           period 5/29/04 to 5/28/05

10

     68    Employee preliminary/interim performance        336
11         appraisal for the period 5/29/04 to
           8/28/04

12

     69    Employee probationary performance               336
13         appraisal for the period 5/29/04 to
           11/28/04

14

     70    Document entitled comments:  employee           336
15         performance appraisal

16   71    Employee performance appraisal for the          336
           period 11/29/04 to 11/28/05

17

     72    Employee performance appraisal for the          336
18         period 10/1/04 to 10/1/05

19   73    Employee performance appraisal for the          336
           period 10/1/05 to 10/1/06

20

     74    Comments by Gregory Kelly                       336
21

     75    Employee performance appraisal for the          336
22         period 10/1/05 to 10/1/06

23              (Index continued on next page)

8

76    Memorandum dated September 18, 2006 to      336
      John Free from Gregory Kelly

77    Employee performance preappraisal for        336
      the period 10/1/06 to 10/1/07

78    Employee performance preappraisal for        336
      the period 10/1/06 to 10/1/07

79    Memorandum dated February 28, 2006 to        352
      Gregory Kelly from John Free

80    Memorandum dated February 28, 2006 to        359
      electricity section staff from John Free

81    Memorandum dated March 1, 2006 to John       360
      Free from Gregory Kelly

82    Records from Pri-Med                          361

83    Medical records from Montgomery              363
      Otolaryngology

84    Comments by Gregory Kelly dated April        371
      17, 2006

85    Memorandum dated April 21, 2006 to           373
      Gregory Kelly from John Free

86    Position classification questionnaire        374

87    Memorandum dated August 10, 2006 to John     375
      Free from Gregory Kelly

88    Memorandum dated August 15, 2006 to          375
      Gregory Kelly from John Free

89    Memorandum dated August 17, 2006 to John     376
      Free from Gregory Kelly

90    Memorandum dated August 18, 2006 to John     377
      Free from Gregory Kelly

(Index continued on next page)

| 91 | Memorandum dated August 22, 2006 to Gregory Kelly from John Free | 378 |
| 92 | Employee performance appraisal for the period 10/1/05 to 10/1/06 | 379 |
| 93 | Memorandum dated September 18, 2006 to John Free from Gregory Kelly | 380 |
| 94 | Memorandum dated October 25, 2006 to Gregory Kelly from John Free | 380 |
| 95 | Transcript of John Free's disciplinary meeting with Greg Kelly | 381 |
| 96 | Memorandum dated November 14, 2006 to Gregory Kelly from Jim Sullivan and Jan Cook | 382 |
| 97 | Application for examination | 385 |
| 98 | Application for examination | 388 |
| 99 | Application for examination | 390 |
| 100 | Application for examination | 391 |
| 101 | General comments by Cynthia Godbold | 391 |
| 102 | Job data | 391 |
| 103 | Report of warning or reprimand | 403 |
| 104 | Memorandum dated January 3, 2002 to Gregory Kelly from Wayne Scott | 405 |
| 105 | Complaint filed by Cohen's Electronics against Gregory Kelly | 407 |
| 106 | Complaint styled CFSC Consortium, LLC vs. Gregory Kelly, et al. | 409 |

(Index continued on next page)



10

1    107    Complaint styled Gregory Kelly d/b/a          409
            Audra and Asheley's Beauty Center vs.
2           Fidelity and Deposit Company of
            Maryland, et al.
3
     108    Complaint filed by Leon Obenhaus against      410
4           Gregory Kelly

5

6

7

8                  *  *  *  *  *  *  *  *  *  *  *  *

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

11

STIPULATIONS

1   

2      It is hereby stipulated and agreed by and

3  between counsel representing the parties that the

4  deposition of **GREGORY KELLY** is taken pursuant to

5  the Federal Rules of Civil Procedure and that said

6  deposition may be taken before Lyn Daugherty,

7  Certified Shorthand Reporter, and Commissioner for

8  the State of Alabama at Large, without the

9  formality of a commission, that objections to

10  questions other than objections as to the form of

11  the question need not be made at this time but may

12  be reserved for a ruling at such time as the said

13  deposition may be offered in evidence or used for

14  any other purpose by either party provided for by

15  the Statute.

16      It is further stipulated and agreed by and

17  between counsel representing the parties in this

18  case that the filing of said deposition is hereby

19  waived and may be introduced at the trial of this

20  case or used in any other manner by either party

21  hereto provided for by the Statute regardless of

22  the waiving of the filing of the same.

23      It is further stipulated and agreed by and

12

1    between the parties hereto and the witness that the

2    signature of the witness to this deposition is

3    hereby waived.

4                    * * * * * * * * * * *

5                    VIDEOGRAPHER:  On the record

6                         9:07 a.m.  It's March 6th,

7                         2008.  We're taking the

8                         videotaped deposition of

9                         Gregory Kelly in the matter of

10                        Gregory Kelly versus John

11                        Free, et al. before the United

12                        States District Court for the

13                        Middle District of Alabama,

14                        Northern Division.  Would the

15                        attorneys present please

16                        identify themselves.

17               MR. STEVENS:  Jim DeBardelaben,

18                        plaintiff's attorney.

19               MR. MOZINGO:  Flynn Mozingo,

20                        attorney for the Alabama

21                        Public Service Commission,

22                        Janice Hamilton and John

23                        Free.

13

1    MR. MELTON:  Oakley Melton,

2    attorney for the same

3    defendants.

4    VIDEOGRAPHER:  Would you please

5    swear in the witness.

6    COURT REPORTER:  Would you raise

7    your right hand and be sworn,

8    please.

9    **GREGORY KELLY**

10    The witness, after having first been duly sworn

11    to speak the truth, the whole truth and nothing but

12    the truth testified as follows:

13    <u>EXAMINATION</u>

14    <u>BY MR. MOZINGO</u>:

15    Q.    Would you please state your full name for

16    the record.

17    A.    Gregory Kelly.  Kelly is spelled with one

18    E.

19    Q.    No other given name other than Gregory?

20    A.    That's correct.

21    Q.    No middle name?

22    A.    That's correct.

23    Q.    Just Gregory Kelly.  Okay.

14

1       Mr. Kelly, we are here today to take

2       your deposition in the case that you have

3       filed against John Free, Janice Hamilton,

4       and the Alabama Public Service Commission

5       making allegations of racial discrimination

6       by the Commission, Ms. Hamilton, and

7       Mr. Free.  Have you ever given a deposition

8       before?

9   A.  No, sir.

10  Q.  Okay.  Well, this is simply an opportunity

11      for me as the attorney for the Commission,

12      Ms. Free, and Mr. -- I'm sorry -- for the

13      Commission, Ms. Hamilton, and Mr. Free to

14      ask you questions about your lawsuit?

15  A.  Okay.

16  Q.  Okay.  Now, if you do not understand a

17      question that I ask, please let me know.

18      If you don't understand a word that I use,

19      please let me know, because I want to make

20      sure you understand me and I want to

21      understand you.

22  A.  Okay.

23  Q.  And if I don't understand your answer, then

15

```
 1            I'll let you know.
 2    A.    Okay.
 3    Q.    So please let me know if you don't
 4          understand me.
 5                In the deposition today we -- we'll
 6          hopefully get done in plenty of time.  But
 7          if you need to take breaks periodically,
 8          again, please let me know.  I think your
 9          attorney has told me before we started that
10          he would let me know because you are on --
11          you are a diabetic.
12    A.    That's correct.
13    Q.    Is that correct?
14    A.    That's correct.
15    Q.    Are you on medication?
16    A.    Yes, I am.
17    Q.    Okay.  Are you on medication today?
18    A.    Yes, I am.
19    Q.    Okay.  What medication are you on?
20    A.    I don't have the medication with me today,
21          but we can provide you that information at
22          a later date.
23    Q.    Okay.  Do you know the medication that
```

16

1          you're on?

2    A.    I don't know -- I know -- We recently

3          changed the medication because we had some

4          FDA problems with the original medication I

5          was taking, so we've -- it used to be

6          Advantia.  We had some negative press about

7          that medication and we changed it to

8          another medication and -- recently, so I

9          don't have the name right now.

10    Q.    Okay.  Well, does the medication in any way

11          affect your ability to understand --

12    A.    No.

13    Q.    -- my questions today?

14    A.    No.

15    Q.    Does the medication in any way affect your

16          ability to recall facts or history or

17          information I'm asking for and to provide

18          it to me?

19    A.    Not that I'm aware of.

20    Q.    Okay.  Does your medication in any way

21          affect your hearing?

22    A.    Not that I'm aware of.

23    Q.    Okay.  Mr. Kelly, where do you reside?

17

| | | |
|---|---|---|
| 1 | A. | I live at 6213 Willow Glenn Drive.  Willow |
| 2 | | Glenn is two words. |
| 3 | Q. | Is that in the city of Montgomery? |
| 4 | A. | That's correct. |
| 5 | Q. | What zip code? |
| 6 | A. | 36117. |
| 7 | Q. | How long have you lived at that address? |
| 8 | A. | Probably -- I think it's 26 years.  We -- |
| 9 | | My wife and I, we built a house prior to |
| 10 | | the birth of our oldest child. |
| 11 | Q. | Okay.  Do you have an Alabama driver's |
| 12 | | license? |
| 13 | A. | That's correct. |
| 14 | Q. | What is your driver's license number? |
| 15 | A. | Do you want me to retrieve it?  I don't |
| 16 | | know it by heart. |
| 17 | Q. | If you have it on you, sure. |
| 18 | A. | Let's see if I can retrieve it.  Let's |
| 19 | | see.  License number is 3565051. |
| 20 | Q. | And what is your social security number? |
| 21 | A. | The whole number or just the last four |
| 22 | | digits?  The whole number? |
| 23 | Q. | The whole number, please. |

18

1    A.    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.

2    Q.    Now, I may have asked you this question a

3          minute ago.  I've already forgotten the

4          answer.  But have you given a deposition

5          before?

6    A.    No, sir, I haven't.

7    Q.    You've never given a deposition?

8    A.    No.

9                    (Defendants' Exhibit 12 was marked

10                       for identification.)

11   Q.    Okay.  I want to show you what I have

12         marked as Defendants' Exhibit 12.  And I'll

13         represent to you, Mr. Kelly, that this is a

14         diagram for the organizational structure of

15         the energy division of the Alabama Public

16         Service Commission.  And according to the

17         diagram, the energy division is managed by

18         a division director, who is Janice

19         Hamilton; is that correct?

20   A.    That appears to be correct.

21   Q.    Okay.  And the energy division is divided

22         up into multiple sections that consist of

23         the -- a special projects section, a water

19

1   section, a natural gas section, electricity

2   section, and a gas pipeline safety section;

3   is that correct?

4 A. According to this diagram, that's correct.

5 Q. Okay.  Well, do you know that to be true

6   where you work?

7 A. I've seen people cross over and work in

8   different sections.  I've seen -- you know,

9   I've seen people just work in all different

10   areas and all different responsibilities.

11   So, you know, to say this organizational

12   chart is adhered to strictly, that's not

13   the case.

14 Q. Okay.  Well, you work in the electricity

15   section at the Alabama Public Service

16   Commission.

17 A. That is where my job is located, yeah.

18 Q. Okay.  And the head of the electricity

19   section is John Free; correct?

20 A. That's what this organizational chart

21   states.

22 Q. Well, is he not the head of the electricity

23   section of the Public Service Commission?

20

1  A.  According to -- Yeah.  That's what the

2      chart states.

3  Q.  Well, I'm asking what your knowledge is.

4  A.  From my knowledge, yes, that's correct.

5  Q.  From your knowledge John Free is head of

6      the electricity section?

7  A.  That's correct.

8  Q.  And you work in the electricity section?

9  A.  That's correct.

10  Q.  And John Free is your manager and

11      supervisor?

12  A.  That's correct.

13  Q.  And John Free reports to Janice Hamilton?

14  A.  According to the organizational chart,

15      that's correct.

16  Q.  To your knowledge, does John Free report to

17      Janice Hamilton?

18  A.  That's -- That's correct.

19  Q.  And Janice Hamilton is John Free's manager

20      and supervisor?

21  A.  That is correct, from my knowledge.

22  Q.  Okay.  The energy division has an

23      individual by the name of Rick Cleckler

21

1          working in the special projects section; is

2          that correct?

3     A.   That is correct, according to this

4          organizational chart.

5     Q.   And is that correct according to your

6          knowledge?

7     A.   That is correct.

8     Q.   And the energy division has an individual

9          by the name of Steve Bartelt, who is the

10         manager of the water division?

11    A.   That is correct.

12    Q.   And an individual by the name of Bob Reed

13         is the manager of the natural gas division?

14    A.   That's correct.

15    Q.   And finally an individual by the name of

16         Christopher Harvey is the manager of the

17         gas pipeline safety division?

18    A.   From my knowledge, he's retired.

19    Q.   Well, when did he retire?

20    A.   I have no knowledge of that.

21    Q.   Do you know who the manager is of the gas

22         pipeline safety division today?

23    A.   I have no knowledge of that.

22

| | | |
|---|---|---|
| 1 | Q. | Now, according to this chart, the |
| 2 | | electricity section, besides yourself and |
| 3 | | Mr. Free, has five other employees; is that |
| 4 | | correct? |
| 5 | A. | That's correct. |
| 6 | Q. | And those employees are Jacqueline Frazier, |
| 7 | | Robert Taylor, Sheila Ward, Linda Gardner, |
| 8 | | and Patricia Smith? |
| 9 | A. | That's correct. |
| 10 | Q. | Jacqueline Frazier, is she a black female |
| 11 | | or a white female? |
| 12 | A. | She's a black female. |
| 13 | Q. | Robert Taylor, is he a black male or a |
| 14 | | white male? |
| 15 | A. | He's a black male. |
| 16 | Q. | Sheila Ward, is she a black female or a |
| 17 | | white female? |
| 18 | A. | She's a white female. |
| 19 | Q. | Linda Gardner, is she a black female or a |
| 20 | | white female? |
| 21 | A. | She's a white female. |
| 22 | Q. | And Patricia Smith, is she a black female |
| 23 | | or a white female? |

23

```
 1    A.    She's a black female.

 2    Q.    Okay.  So there are a total of how many

 3          black employees working in the electricity

 4          section under John Free?

 5    A.    Well, let's count them up.  You've got

 6          myself, Robert Taylor, you've got

 7          Jacqueline Frazier, and you've got Patricia

 8          Smith.  That's four.

 9    Q.    Okay.  So that is four out of one, two,

10          three, four, five, six?

11    A.    That's correct.

12    Q.    Okay.  I'm going to ask you in a few

13          minutes a little bit more about your

14          educational background.  But it's my

15          understanding that you have a degree in

16          engineering?

17    A.    That's correct.

18    Q.    And you obtained that degree from Auburn

19          University?

20    A.    That's correct.

21    Q.    You are not a licensed engineer with the

22          State of Alabama; correct?

23    A.    That is correct.
```

24

| | | |
|---|---|---|
| 1 | Q. | Have you ever sat for the licensing exam |
| 2 | | with the State of Alabama? |
| 3 | A. | That's not -- No, I haven't. |
| 4 | Q. | You have not? |
| 5 | A. | No. |
| 6 | Q. | And why haven't you? |
| 7 | A. | Well, it's a sad state to talk about.  When |
| 8 | | I finished Auburn University in 1979, to |
| 9 | | sit for the exam you have to be mentored by |
| 10 | | an engineer.  He has to vouch for your |
| 11 | | qualification.  When I finished Auburn |
| 12 | | University in 1979, I think I was about the |
| 13 | | sixth or seventh black engineer to ever |
| 14 | | finish from Auburn University.  And at that |
| 15 | | day and time you still had a lot of |
| 16 | | prejudice and racism.  I couldn't find an |
| 17 | | engineer who would let me work under him, |
| 18 | | matriculate under him so I could take the |
| 19 | | EIT and the PE exam.  So after being |
| 20 | | frustrated for a number of years, I decided |
| 21 | | now to pursue a PE. |
| 22 | Q. | Okay.  You used the letters PE.  What does |
| 23 | | that mean? |

25

| | | |
|---|---|---|
| 1 | A. | Professional engineering exam. |
| 2 | Q. | Okay. Is that the exam that you take to |
| 3 | | become a licensed engineer -- |
| 4 | A. | You take -- |
| 5 | Q. | -- in the state of Alabama? |
| 6 | A. | You take the EIT first. It's a preparatory |
| 7 | | exam. |
| 8 | Q. | Okay. Could you tell me what the EIT |
| 9 | | means? |
| 10 | A. | The EIT, engineering in training. |
| 11 | Q. | And that is a test? |
| 12 | A. | That is a test. |
| 13 | Q. | Written test? |
| 14 | A. | Written test. |
| 15 | Q. | What does it consist of? |
| 16 | A. | Well, you have to -- chemistry, physics, |
| 17 | | general circuit theory. You take it in |
| 18 | | your particular area. |
| 19 | Q. | And you have to have that test first before |
| 20 | | you can take any other licensing test; |
| 21 | | correct? |
| 22 | A. | Well, you have to take that test first -- |
| 23 | | pass that test first. |

26

| | | |
|---|---|---|
| 1 | Q. | Do you need a mentor or a sponsor to take |
| 2 | | that test? |
| 3 | A. | No, you don't. |
| 4 | Q. | Have you ever taken that test? |
| 5 | A. | No.  Because I couldn't find a mentor or a |
| 6 | | sponsor who would allow me to take the |
| 7 | | test.  When I came to work -- first started |
| 8 | | working at Alabama Power Company, really I |
| 9 | | was sort of -- you know, no one really came |
| 10 | | to my aid to assist me at that particular |
| 11 | | time.  Really I had to learn on my own.  I |
| 12 | | had to look at spec books and stuff.  I |
| 13 | | found it increasingly difficult to even |
| 14 | | have a mentor -- you know, no mentor.  I |
| 15 | | was sort of -- you know, it took about two |
| 16 | | or three years before the engineers would |
| 17 | | warm up to me and start talking to me.  And |
| 18 | | there was -- As a matter of fact, there was |
| 19 | | very few people at Alabama Power Company |
| 20 | | who had PE.  I don't think anyone who I was |
| 21 | | working for in that particular section had |
| 22 | | a PE. |
| 23 | Q. | You said that you were the sixth or seventh |

27

1         engineer to -- black engineer to graduate

2         from Auburn?

3   A.   In electrical engineering.

4   Q.   In electrical engineering?

5   A.   Yes.

6   Q.   Had there been any blacks to graduate from

7         Auburn prior to you in other engineering

8         areas besides electrical?

9   A.   Well, I don't have that knowledge.  But I

10       had a couple of fraternity brothers who --

11       you know, that's one reason I went to

12       Auburn University.  I really wanted to

13       become a civil engineer.  But once I

14       pledged and became a Kappa Alpha Psi

15       fraternity, most of my fraternity brothers

16       was civil engineers and they convinced me

17       that they had support and structure there

18       and they would help me become an electrical

19       engineer.  I had two fraternity brothers

20       that sort of act as mentors when I was at

21       Auburn University.  And ironically they

22       mentored me so well I was able to finish

23       before they did.

28

Q.   Okay.  You don't have any knowledge, then,
     of how many black engineers graduated from
     Auburn prior to you in some other field
     besides electrical engineering?

A.   I would assume it would have to be less
     than 12 -- less than a dozen.  It had to be
     less than 20 before -- prior to 1970 --
     before 1979.

Q.   Do you know any one of the six or seven
     black students that graduated from Auburn
     prior to you with a degree in electrical
     engineer?

A.   I think one works for Alabama Power Company
     now.

Q.   What is his name?

A.   I don't know his name.  I think he works
     there now.  He was -- I think he was about
     like the second person to ever finish
     there.  I don't know his name exactly.  But
     I've heard that from my fraternity
     brothers.  You know, we have a history -- a
     charter listing people who have come
     through there before and their degree.  And

29

```
 1              I think they had him listed as number two

 2              and some of the accomplishments that he had

 3              accomplished while he was at Auburn

 4              University.

 5    Q.        Okay.  So there -- According to you, there

 6              were six or seven black students that

 7              graduated in electrical engineering from

 8              Auburn University prior to your

 9              graduation.  Is that --

10    A.        That is my -- That is my understanding.

11              And I can't -- That is the history that has

12              been passed to me from my fraternity.  We

13              try to keep track of that record because we

14              want to pride ourselves as being the

15              fraternity who produced the most

16              engineers.  That was one of our selling

17              points when we tried to convince high

18              school students and other engineers to join

19              our fraternity.

20    Q.        Okay.  So I understand, then, it's your

21              understanding there were six or seven?

22    A.        That's correct.

23    Q.        Okay.  But you don't know the names of any
```

30

1         one of the six or seven?

2    A.   I would have to, you know, try to find

3         those folks. And I haven't talked to some

4         of those folks in 15 or 20 years. Kenny

5         Stevens, Alvin Gillette. Those are the

6         names. I think Kenny Stevens, I think he

7         used to work for -- as an engineer for

8         South Central Bell. I think Alvin

9         Gillette, he works somewhere as a defense

10        contractor in Florida. And one other

11        gentleman, if he hasn't retired from

12        Alabama Power Company, he's somewhere in

13        the corporate office, I believe. I don't

14        know the exact name.

15   Q.   Is that the individual you mentioned

16        earlier?

17   A.   That's correct.

18   Q.   That worked for Alabama Power?

19   A.   That's correct.

20   Q.   So you do know of a Kenneth Stevens, an

21        Alvin --

22   A.   Gillette.

23   Q.   -- Gillette, and one other individual at --

31

| | | |
|---|---|---|
| 1 | A. | Yes. |
| 2 | Q. | -- Alabama Power? |
| 3 | A. | Yes.  I think he had finished prior.  He's |
| 4 | | the one that -- he convinced Kenneth to |
| 5 | | become an electrical engineer.  He also |
| 6 | | convinced Alvin to become an electrical |
| 7 | | engineer.  He was sort of like the mentor |
| 8 | | for us.  And when I got there, they was, I |
| 9 | | think, like sophomores and we started -- |
| 10 | | you know, came to their induction part and |
| 11 | | they kind of took me in as a little |
| 12 | | brother.  And we kind of worked together |
| 13 | | and were fraternity brothers for the time I |
| 14 | | was there at Auburn. |
| 15 | Q. | Is Kenneth Stevens a licensed engineer with |
| 16 | | the State of Alabama? |
| 17 | A. | No, he's not. |
| 18 | Q. | Is Alvin Gillette a licensed engineer with |
| 19 | | the State of Alabama? |
| 20 | A. | No, he's not. |
| 21 | Q. | Do you know if Kenneth Stevens is a |
| 22 | | licensed engineer in any other state? |
| 23 | A. | I don't -- I'm not sure.  I'm not aware. |

32

```
 1              He might have attained that degree sometime

 2              later, but I doubt it.  Unless you -- The

 3              only reason you need a license to be a

 4              licensed engineer if you're going to offer

 5              your services to the public.  Most

 6              engineers do not offer their services to

 7              the public.  They work for a corporation.

 8              You work for a corporation, there's really

 9              no need to have a license.  That's the only

10              reason that you need a license if you're

11              going to offer your services to the public.

12       Q.     Are you sure that Kenneth Stevens does not

13              have an Alabama license?

14       A.     I'm almost positive.  I'm not sure, but --

15              You know, things have changed in the last

16              10 or 15 years.

17       Q.     Are you sure that Alvin Gillette does

18              not --

19       A.     Gillette.

20       Q.     Gillette.  I'm sorry.  Are you sure that

21              Alvin Gillette does not have an --

22       A.     I'm not sure.

23       Q.     -- engineering license with the State of
```

33

1         Alabama?

2    A.   I haven't talked to him in the last 10 or

3         15 years.  I'm not sure.

4    Q.   Do you know if he has an engineering

5         license with the State of Florida?

6    A.   I'm not sure.

7    Q.   You mentioned earlier two fraternity

8         brothers of yours in Kappa Alpha Psi?

9    A.   That's correct.

10   Q.   That encouraged you to pursue an electrical

11        engineering degree; is that correct?

12   A.   Instead of -- Yeah.  Instead of a civil

13        engineer degree.

14   Q.   And what were their names or what are their

15        names?

16   A.   Alvin Gillette and Kenny Stevens.

17   Q.   Okay.  So Kenneth and Alvin encouraged you

18        to major in electrical engineering?

19   A.   That's correct.

20   Q.   But they majored in civil engineering?

21   A.   No.  They majored in electrical

22        engineering.

23   Q.   They did too?

34

1    A.    Yeah.  They are EE graduate.  I think Alvin

2           and I -- I think Alvin finished one quarter

3           before I did at Auburn and I think Kenneth

4           finished a couple of quarters after I did

5           at Auburn.  I think he ended up getting

6           married and taking some time off to start a

7           family.

8    Q.    Did you have any fraternity brothers that

9           graduated either before, at the same time,

10          or shortly after you that are engineers in

11          the state of Alabama today?

12    A.    The one engineer I referred to earlier I

13          think he still works for Alabama Power

14          Company or he just shortly retired.  I'm

15          not sure his -- what his name.

16    Q.    Do you know if he is a licensed engineer in

17          the state of Alabama?

18    A.    I don't -- I'm not aware of his

19          qualifications.

20    Q.    Besides these three individuals -- and,

21          again, I'm going to try to repeat the

22          question I previously asked the best that I

23          can.  But besides Kenneth Stevens, Alvin

35

```
 1        Gillette, and your friend at Alabama

 2        Power --

 3   A.   Well, he's -- We haven't met each other --

 4        I haven't met him, but I've known him

 5        through Alvin and Stevens.  They've told me

 6        about him.  He -- you know, sort of like

 7        the pallbearer or standard-bearer for our

 8        fraternity.  When I got there, he had

 9        recently graduated or just had graduated.

10        And they had told me about some of the

11        accomplishments that he had achieved at

12        Auburn by being an electrical engineer.  So

13        I was aware of him.

14   Q.   Let me interrupt you and make sure.  You're

15        referring to the individual at Alabama

16        Power?

17   A.   That's correct.

18   Q.   Whose name you cannot recall?

19   A.   That's correct.  Whose name I cannot

20        recall.

21   Q.   Okay.  Do you have any fraternity brothers

22        that graduated either prior to you, with

23        you, or shortly after you that are now
```

36

```
 1          licensed engineers in the state of Alabama?
 2    A.    Personally I don't know any blacks who are
 3          licensed engineers.  I don't think
 4          Ms. Hamilton herself is a licensed
 5          engineer.
 6    Q.    So you don't know of any black licensed
 7          engineers in the state of Alabama?
 8    A.    I don't know any black licensed
 9          electricians in the city of Montgomery.  I
10          don't know any black licensed
11          electricians -- engineers anywhere.
12    Q.    Do you contend that -- Strike that.
13              Do you believe that blacks cannot get
14          licensed as engineers in the state of
15          Alabama?
16    A.    I believe in the early stages when blacks
17          have gotten their degrees from universities
18          we didn't have the -- I guess the mentoring
19          program where we could work and study under
20          a seasoned engineer to get the
21          qualifications that we need.  To get your
22          PE, you have to have someone to vouch for
23          your engineering soundness and your
```

37

```
 1          engineering integrity before you can be
 2          presented to the state bar.  You cannot
 3          take that PE exam unless you have that
 4          recommendation from two or three engineers
 5          who will vouch for you.  And during those
 6          days you couldn't get that -- that type of
 7          recommendation in the field of
 8          engineering.  And so I don't -- personally,
 9          I've been an engineer over 25 years.  I
10          never ran into an engineer who had a PE.
11          Never ran into one.  Very few white.  I
12          would say only about 10 percent of
13          engineers have PE license.  Very few.
14          Now -- in electrical engineering.  But in
15          civil engineering that's a different story
16          because of the nature of their work.
17     Q.   So it's your testimony that very few
18          electrical engineers, whether they are
19          white or black, are licensed with the State
20          of Alabama?
21     A.   That's correct.
22     Q.   But it's a different story for civil
23          engineers; correct?
```

38

1    A.    Because of the nature of their work.

2    Q.    And do you know any blacks who are licensed

3          civil engineers with the State of Alabama?

4    A.    I've seen people who claim to be engineers

5          for the State of Alabama who actually

6          didn't have a degree in engineering.  I've

7          seen them take people with high school

8          degrees and start them off at a stick

9          barrel, especially white ones.  And they

10         end up being promoted to engineering and

11         calling themselves engineers.

12   Q.    Let me ask that question again.  I'm not

13         asking what you've seen.  I'm asking do you

14         know of any blacks that are licensed civil

15         engineers in the state of Alabama?

16   A.    I don't know of any black engineers period

17         who works there, let alone being licensed

18         that works for the State of Alabama in the

19         Highway Department.

20   Q.    Okay.  I didn't ask the Highway

21         Department.  Do you know any blacks who are

22         licensed civil engineers, licensed by the

23         State of Alabama?

39

1    A.    No, I do not.

2    Q.    You do not.  Okay.  Thank you.

3          Now, going back I want to make sure I

4    understood.  You have the EIT exam?

5    A.    That's correct.

6    Q.    And then if you pass the EIT, then you take

7    the PE --

8    A.    That's correct.

9    Q.    -- exam?

10         And EIT means engineer in training?

11   A.    That's correct.

12   Q.    And PE means?

13   A.    Professional engineering exam.

14   Q.    Professional engineering.

15         Besides those two exams, are there any

16   other tests that you have to take to be a

17   licensed electrical engineer in the state

18   of Alabama?

19   A.    Well, not -- Can I answer the question?

20   Some -- No.  Some people have been

21   grandfathered into those professional --

22   some people have been able to come in and

23   get the PE -- become a professional

40

```
 1         engineer through the back door.  They've

 2         been grandfathered into those positions.

 3    Q.   And how would you get grandfathered into

 4         that position?

 5    A.   Someone would have to write you a letter, a

 6         recommendation stating that this individual

 7         is duly qualified before those exams became

 8         effective a certain year.  A lot of people

 9         who had been matriculating as engineers who

10         didn't have engineers -- didn't have the

11         qualifications were grandfathered in those

12         positions.

13    Q.   When did the EIT exam take effect?

14    A.   I'm not aware.  We've -- They've always

15         been a -- I guess -- I wouldn't say a

16         problem.  There's always been some question

17         of what does it really mean.  Standards

18         have been changed.  They've changed the

19         guidelines.  People have been grandfathered

20         in.  People have been given special

21         exemption.  You know, people who -- some

22         people who are not even engineers have been

23         able to become professional engineers
```

41

1       because they've been able to secure the

2       right -- I guess the right recommendation

3       from other folks.

4   Q.   You graduated with an engineering degree

5       from Auburn in 1979?

6   A.   That's correct.

7   Q.   Okay.  Was the EIT, engineer in training,

8       exam being given in 1979?

9   A.   That's correct.

10   Q.   Was it being given in 1979?

11   A.   That's correct.

12   Q.   Do you know if the EIT exam was being given

13       in 1979?

14   A.   Yeah.  Yeah.  It was given.

15   Q.   It was being given?

16   A.   Yeah.  It was being given.

17   Q.   Was the PE or professional engineering exam

18       being given in 1979?

19   A.   To my knowledge it was.

20   Q.   You do not need a mentor to take the EIT

21       exam?

22   A.   That's correct.

23   Q.   However, you do need a mentor to take the

42

| | | |
|---|---|---|
| 1 | | professional engineer exam? |
| 2 | A. | That's correct. |
| 3 | Q. | And you have not -- you have never taken |
| 4 | | the EIT exam? |
| 5 | A. | Like 85 or 90 percent of most engineers, |
| 6 | | I've never taken it. |
| 7 | Q. | And you have never taken the professional |
| 8 | | engineer exam? |
| 9 | A. | Like 85 to 90 percent of the other |
| 10 | | engineers, I've never taken it. |
| 11 | Q. | You have worked with engineers off and on |
| 12 | | throughout your adult life; correct? |
| 13 | A. | That's correct. |
| 14 | Q. | And you worked at Alabama Power for a |
| 15 | | number of years; correct? |
| 16 | A. | That's correct. |
| 17 | Q. | And Alabama Power is basically an |
| 18 | | engineering company? |
| 19 | A. | You're so correct. |
| 20 | Q. | Okay. And you had co-employees at Alabama |
| 21 | | Power and bosses and supervisors of the |
| 22 | | Alabama Power all of whom were engineers? |
| 23 | A. | That's correct. |

43

```
 1    Q.   Have you ever asked any -- anyone at
 2         Alabama Power to be a mentor for you so you
 3         could take the engineering exam for an
 4         electrical engineer?
 5    A.   They didn't have the PE, so they couldn't
 6         mentor me if they didn't have the PE.  I
 7         never worked for anybody at Alabama Power
 8         Company who had a PE.
 9    Q.   Do you know that for a fact?
10    A.   I know it for a fact.  Direct supervisor
11         never worked for anybody at Alabama Power
12         Company to my knowledge who had a PE
13         directly.
14    Q.   Did you work with an individual at Alabama
15         Power by the name of Ron Drury?
16    A.   Yes.
17    Q.   To your knowledge, does Mr. Drury have a
18         license from the State of Alabama in
19         electrical engineering?
20    A.   He never did -- To my knowledge, he never
21         stated he had a license.
22    Q.   Do you know that for a fact?
23    A.   I do not know it for a fact.
```

44

| | | |
|---|---|---|
| 1 | Q. | You do not know that for a fact? |
| 2 | A. | I do not know it for a fact. |
| 3 | Q. | And you also worked with an individual by |
| 4 | | the name of John Johnson; correct? |
| 5 | A. | Yes. |
| 6 | Q. | At Alabama Power? |
| 7 | A. | That's correct. |
| 8 | Q. | Do you know for a fact whether John Johnson |
| 9 | | is a licensed electrical engineer with the |
| 10 | | State of Alabama? |
| 11 | A. | I never saw a PE on the wall. He never did |
| 12 | | talk about having a PE license. |
| 13 | Q. | But do you know for a fact that he does not |
| 14 | | have a license? |
| 15 | A. | I do not know for a fact. |
| 16 | Q. | You also worked with an individual by the |
| 17 | | name of Mike Tucker -- |
| 18 | A. | That's correct. |
| 19 | Q. | -- at Alabama Power? |
| 20 | A. | That's correct. |
| 21 | Q. | Do you know for a fact that Mike Tucker |
| 22 | | does not have a license in electrical |
| 23 | | engineering from the State of Alabama? |

45

```
1    A.    He never stated he had a PE.

2    Q.    But do you know for a fact whether he has

3          one?

4    A.    I do not know for a fact.

5    Q.    You also worked with an individual named

6          Max Alexander at Alabama Power; correct?

7    A.    That's correct.

8    Q.    Do you know for a fact that Max Alexander

9          does not have a license from the State of

10         Alabama in electrical engineering?

11   A.    I don't believe Max have a PE.

12   Q.    Do you know for a fact whether he has one

13         or not?

14   A.    I doubt if Max have a PE.  I do not know

15         for a fact.

16   Q.    You do not know that for a fact?

17   A.    I doubt if any of those people that you

18         mentioned have a PE license.  They've never

19         brought it to my knowledge whether they had

20         a PE or not.  And most folks who have a PE,

21         they will put it on their business card or

22         have it on their wall.  And the people who

23         did -- who were in my section who did
```

46

1          pursue to get a PE, they had to go outside

2          of that chain of command to get someone

3          else in another department who they knew

4          had a PE.

5     Q.   What I'm asking, though, is, you don't know

6          for a fact that Ron Drury, John Johnson,

7          Mike Tucker, or Max Alexander do not have a

8          license from the State of Alabama in

9          electrical engineering?

10    A.   I do not know for a fact that they --

11    Q.   Okay.  That's my question.

12              You also worked with an individual by

13         the name of Danny Glover at Alabama Power;

14         correct?

15    A.   That's correct.

16    Q.   And you do not know for a fact whether

17         Danny Glover has a license from the State

18         of Alabama in electrical engineering?

19    A.   I'm almost 99 percent sure he doesn't.

20    Q.   But you do not know that --

21    A.   Do not know for a fact.

22    Q.   -- for an absolute fact?

23    A.   That's correct.

47

1    Q.    Now, the individuals I've just listed --

2           Ron Drury, John Johnson, Mike Tucker, Max

3           Alexander, and Danny Glover -- all

4           supervised you at some time when you worked

5           at Alabama Power?

6    A.    That's correct.

7    Q.    You were also supervised by an individual

8           named Larry Stokley, were you not?

9    A.    That's correct.

10   Q.    Do you know for a fact that Larry Stokley

11         does not have --

12   A.    Larry Stokley has a PE.

13   Q.    He does have?

14   A.    He has a PE.

15   Q.    Okay.  So you do know that Larry Stokley

16         has a --

17   A.    A PE.

18   Q.    -- license from the State of Alabama in

19         electrical engineering?

20   A.    That's correct.

21   Q.    And you never asked Larry Stokley to mentor

22         you?

23   A.    Stokley and I never did get along quite

48

1           well.

2      Q.   Stokley was your supervisor?

3      A.   He was my supervisor.

4      Q.   Do you know whether -- Strike that.

5           Did you also work under an individual

6           by the name of Larry Posey at Alabama

7           Power?

8      A.   That's correct.

9      Q.   I'm sorry.  Strike that question.  Jerry

10          Posey --

11     A.   That's correct.

12     Q.   -- I believe was his name.

13          Do you know for a fact that Jerry Posey

14          does not have a license from the State of

15          Alabama in electrical engineering?

16     A.   I doubt if he does, but I don't know for a

17          fact.

18     Q.   What years did you attend Auburn

19          University?

20     A.   1975 through 1979.

21     Q.   So you were able to go and graduate within

22          four years?

23     A.   Very proud of that fact.

49

| | | |
|---|---|---|
| 1 | Q. | And your degree is in electrical |
| 2 | | engineering? |
| 3 | A. | That's correct. |
| 4 | Q. | Did you have any minors? |
| 5 | A. | No, I didn't have any minors. |
| 6 | Q. | Okay. Did you obtain any other degrees |
| 7 | | from Auburn besides electrical engineering? |
| 8 | A. | No, I did not. |
| 9 | Q. | And where did you attend school prior to |
| 10 | | Auburn? |
| 11 | A. | I went to public high school, Sidney Lanier |
| 12 | | here in Montgomery. |
| 13 | Q. | Were you born in Montgomery? |
| 14 | A. | No. I was born in Hayneville, which is |
| 15 | | about -- I guess about 30 miles outside of |
| 16 | | Montgomery. |
| 17 | Q. | In Lowndes County? |
| 18 | A. | That's correct. |
| 19 | Q. | Were you raised in Montgomery? |
| 20 | A. | Yes, I was raised in Montgomery. |
| 21 | Q. | What year did you graduate from Lanier? |
| 22 | A. | 1975. |
| 23 | Q. | After graduating from Auburn, did you |

50

```
 1            attend any other colleges, universities or

 2            schools?

 3     A.     Yes, I did.

 4     Q.     Could you tell me what they were?

 5     A.     I attended Troy State University.

 6     Q.     What years did you attend Troy State?

 7     A.     I attended Troy at night.  I think the

 8            years was 1987 going part-time, work

 9            full-time 1987 through 1990.

10     Q.     So roughly three years?

11     A.     Going part-time working during the day

12            going to school at night.

13     Q.     Did you graduate from Troy State?

14     A.     Yes, I did.

15     Q.     And what degree did you obtain from Troy

16            State?

17     A.     Master's degree in business administration.

18     Q.     Otherwise known as an MBA?

19     A.     That's correct.

20     Q.     Other than Troy, Auburn and Lanier, have

21            you attended any other schools, colleges or

22            universities?

23     A.     No.
```

51

```
1    Q.   Do you attend a church in Montgomery?

2    A.   Yes.

3    Q.   What church do you attend?

4    A.   Beulah Baptist Church.

5    Q.   I'm sorry.  Can you say that again?

6    A.   Beulah Baptist Church.  I also attend --

7         That's my church.  I also attend my wife's

8         churches -- church down in the country.  I

9         don't know the exact name of it.  But we

10        sort of try to -- She want to maintain her

11        relationship with her church and I want to

12        try to maintain mine, so we try to attend

13        both churches on a basis.

14   Q.   What church does your wife attend?

15   A.   I can't think of the name of it right now.

16   Q.   What is your wife's name?

17   A.   Annette Kelly.

18   Q.   How long have you been married to Annette?

19   A.   About 25, 26 years.

20   Q.   Now, I take it you don't attend her church

21        very often if you can't remember the name;

22        is that true?

23   A.   Well, we go as much as we can, you know,
```

52

1          with the family responsibilities.  You

2          know, sometimes I go, sometimes I don't.

3          I'm not a person who go to church every

4          Sunday, but I go occasionally.

5     Q.   Okay.  Well, I'm not the best with names

6          either, but could you help me by telling me

7          where her church is located?

8     A.   It's located in Mathews, Alabama.

9     Q.   What kind of church is it?

10    A.   It's a Baptist church, traditional Baptist

11         church.  We're both traditional Baptist.

12    Q.   At your church, Beulah Baptist, that's in

13         Montgomery?

14    A.   That's correct.

15    Q.   Do you have any leadership positions or do

16         you hold any offices or do you help out at

17         the church in any way?

18    A.   Most of the time I try to spend with my

19         family.  We have a large extended family.

20         I try to spend most of my time raising

21         three kids and raising three

22         grandchildren.  I have elderly parents, so

23         I try to take my -- use my time in the

53

| | | |
|---|---|---|
| 1 | | areas I think is probably more important to |
| 2 | | me.  I'm not the type of person -- I try to |
| 3 | | lead by example.  I don't try to -- try to |
| 4 | | extend to them.  I'm not a person who want |
| 5 | | to be in the spotlight. |
| 6 | Q. | I'm not saying you have to.  I'm just |
| 7 | | asking.  Other than attend church, do you |
| 8 | | participate in the church in any other way? |
| 9 | A. | No. |
| 10 | Q. | Okay.  And for your wife's church down in |
| 11 | | Mathews, do you participate in that |
| 12 | | church -- |
| 13 | A. | No. |
| 14 | Q. | -- in any way other than attend -- |
| 15 | A. | I'm just a traditional back-seat Baptist. |
| 16 | Q. | Okay.  I think you're the first I've ever |
| 17 | | heard admit that. |
| 18 | A. | Sometimes honest is true. |
| 19 | Q. | Okay.  Besides -- Let me make sure I'm |
| 20 | | clear.  Those are the only two churches you |
| 21 | | attend? |
| 22 | A. | No.  You know, I attend multiple churches. |
| 23 | | My brother-in-law just died.  We used to |

54

```
 1        spend time over at Peoples Baptist Church.
 2        He was the pastor over there and we tried
 3        to patronize his church.  He's the one that
 4        married myself and Annette.  And we -- you
 5        know, we've attended that sometimes until
 6        his recent death.  He died probably about
 7        six months.  Well, he was actually murdered
 8        about six months ago.
 9   Q.   Is Peoples Baptist in Montgomery?
10   A.   That's correct.
11   Q.   Where is it located?
12   A.   Over by Alabama State.
13   Q.   And your brother-in-law was the pastor
14        there?
15   A.   Yeah.  Paul Boswell.
16   Q.   Paul Boswell?
17   A.   That's correct.
18   Q.   Was that -- I think I remember a pastor
19        being -- dying over in that area.  Was
20        that --
21   A.   He was actually murdered.
22   Q.   Murdered, right.
23   A.   Correct.
```

55

```
 1    Q.    And that was your brother-in-law?

 2    A.    That was my brother-in-law.

 3    Q.    And that is your wife's brother?

 4    A.    That's my wife's sister's husband.

 5    Q.    Okay.  And I'm very sorry --

 6    A.    Well, thank you.

 7    Q.    -- for your brother-in-law's death.

 8          Other than attending Peoples Baptist,

 9          did you participate in any other way there

10          at the church?

11    A.    You know, we came when they had some

12          singing events, when they had pastor

13          anniversary.  We tried to support the kids

14          when they had special programs going on.

15          You know, we try to -- as a family we try

16          to support each other.  So, you know, we --

17          If we have function going on at our church,

18          they come support us.  And if my

19          mother-in-law have church function going on

20          in her church down there in Mathews, we

21          would support her.  If my mother would have

22          something going on in her church, we would

23          try to support them.  So we -- You know, so
```

56

```
 1        each Sunday is a mystery on which church we

 2        might attend.

 3   Q.   Okay.  What other churches did you attend

 4        besides Beulah, the one in Mathews, and

 5        Peoples Baptist?

 6   A.   We've -- You know, those are probably the

 7        three majority of churches.  Sometimes

 8        we go to -- We have a good friend who is a

 9        pastor named Al Whiting.  When he was

10        preaching in Millbrook area, we would go

11        down there and support him.

12   Q.   What's the name of his church?

13   A.   I don't -- I'm not good with names and

14        stuff like that.  He was pastor there.  We

15        would support them on friends and family

16        days and anniversary and stuff like that.

17   Q.   Okay.  And you mentioned your mother's

18        church.  What church does she attend?

19   A.   She belong to -- I think it's a church in

20        the country somewhere.  We would go down

21        there and when something was going on we

22        would attend there.

23   Q.   Where is the church located?
```

57

1   A.   I think it's in Hayneville, down in

2        Hayneville or Letohatchee area somewhere.

3   Q.   And you do not know the name of your

4        mother's church?

5   A.   No.  I don't keep up.  You know, we just

6        show up and -- to be with her, support her.

7   Q.   Okay.  So you from time to time attend

8        Beulah Baptist, a church in Mathews,

9        Peoples Baptist, a church in Millbrook

10       pastored by Al Whiting, and your mother's

11       church in Hayneville.  Are there any other

12       churches that you sometimes attend?

13   A.   You know, we've got a bunch of friends.  We

14       attend, you know -- My wife has a bunch of

15       friends.  We attend churches all over the

16       city.  You know, I don't know --

17   Q.   Are there any that come to mind that you

18       attend that I haven't mentioned?

19   A.   I don't know.  My wife probably would be a

20       better orchestration of -- you know, she is

21       the social -- she keep our social calendar

22       in order.

23   Q.   Are you a member of any clubs or

58

1       organizations in Montgomery?

2   A.   I spend most of my time with -- I spend

3        most of my time with kids, Little League.

4   Q.   Do you coach Little League?

5   A.   I have, but not now.  I have for a number

6        of years coached Little League over here at

7        Bellingrath, Dixie Youth -- Dixie Youth

8        League.

9   Q.   Do you still help out with the Little

10       League?

11  A.   I'm still active.  I'm still, you know, one

12       of the people who help started the program

13       when I was working for Alabama Power

14       Company.  I still support them.  I still go

15       to the games.  I still come conduct the

16       clinics when I can, when I have time.

17  Q.   What's the name of the baseball league at

18       Bellingrath?

19  A.   Bellingrath.  Just call it Bellingrath.

20  Q.   Okay.  Did you help start that league?

21  A.   No.  Well, the league -- One of the

22       projects that we had when I first started

23       with Alabama Power Company we had on our

59

1    performance pay plan they want you to

2    become involved in civic activities.  And

3    one of the things that I always liked but

4    wasn't very good at was baseball.  So I

5    have a good friend named Stanley Dixon and

6    John Dixon, who at the time they was

7    involved in it.  And I became involved with

8    Stan and John Dixon because they needed

9    some people to come out there and help.  We

10   had a lot of kids, but not too many parents

11   would show up.  And so they -- After a

12   couple of years they talked me into the

13   program, coming out there after work and

14   assisting with the kids, you know.  That

15   worked for about four or five years.  After

16   that my own son came along.  So I had

17   another ulterior reason for becoming

18   involved.  When Lloyd came along, he was

19   born, you know, I was in the program all

20   the way from four years old until he

21   became -- now -- even now.  He's 18.  This

22   is his last year, 19.  So I've been active

23   in that program ever since Lloyd has been

60

| 1 | | four or five years old. |
|---|---|---|
| 2 | Q. | Beside Bellingrath are you active in any |
| 3 | | other sports leagues or any other community |
| 4 | | organizations? |
| 5 | A. | No. |
| 6 | Q. | So outside of work you like to spend your |
| 7 | | time either attending your church or your |
| 8 | | wife's church or various churches -- |
| 9 | A. | Well -- |
| 10 | Q. | -- and working with Little League? |
| 11 | A. | Little League and family obligation.  I |
| 12 | | have a dad who is 80 years old.  He's not |
| 13 | | in the best of health.  He's had two or |
| 14 | | three heart attacks.  We try to spend a lot |
| 15 | | of time with them.  I have a mother-in-law |
| 16 | | who -- she's not in the best of health. |
| 17 | | She -- Every other week she's in a diabetic |
| 18 | | coma.  So we spend a lot of time, my wife |
| 19 | | and I, taking care of our elderly parents. |
| 20 | | And my -- And we have three grandkids.  We |
| 21 | | just had a set of twins who were born four |
| 22 | | months ago. |
| 23 | Q. | Well, I'm going to ask you all about your |

61

```
 1        family.
 2    A.  Okay.
 3    Q.  I want to learn about them.  I want to make
 4        sure, though, besides Bellingrath and the
 5        various churches you attend that you're not
 6        involved in any other community
 7        organizations or events or clubs.
 8    A.  Okay.  Okay.
 9    Q.  Are you?
10    A.  No.
11    Q.  Okay.  So Bellingrath and the various
12        churches is the extent of your community
13        participation?
14    A.  That's correct.
15    Q.  Okay.  Now, tell me about your family.  You
16        told me about your wife.
17    A.  I have a wife.  I've got --
18    Q.  How many children do you have?
19    A.  I've got three kids.
20    Q.  What are their names?
21    A.  Audra Kelly.  She's 25.  She has three --
22        they have three -- the grandkids.  We have
23        a son.
```

62

| | | |
|---|---|---|
| 1 | Q. | Okay. Audrey is 25 and three children? |
| 2 | A. | Uh-huh (positive response). |
| 3 | Q. | Are her children all minors? |
| 4 | A. | Yes. |
| 5 | Q. | I'm assuming they are. Okay. And your |
| 6 | | next child is whom? |
| 7 | A. | Asheley Kelly. |
| 8 | Q. | By the way, is Audra the oldest? |
| 9 | A. | She's the oldest. |
| 10 | Q. | And then the next oldest would be Asheley? |
| 11 | A. | Yes. Asheley. |
| 12 | Q. | How old is Asheley? |
| 13 | A. | I think Asheley just recently turned 21. |
| 14 | Q. | Okay. And then your third child is whom? |
| 15 | A. | Lloyd. |
| 16 | Q. | Lloyd. And that is your son who is 18? |
| 17 | A. | Yeah. He's 18. |
| 18 | Q. | Audra, is she married? |
| 19 | A. | No, she's not married. |
| 20 | Q. | Has she been married? |
| 21 | A. | No. She haven't been married. |
| 22 | Q. | Does she live with anyone? |
| 23 | A. | No. She live by herself. |

63

1   Q.   Okay.  Is Asheley married?

2   A.   No, she's not.

3   Q.   Ever been married?

4   A.   No.  She's never been married.

5   Q.   Does she live with anyone?

6   A.   She live -- I think she has -- Asheley is

7        sort of -- She's a -- She works for

8        Deloitte & Touche.  She's sort of a -- I

9        don't know what you call it.  She's sort of

10       a hybrid tech sort of person.  She's a

11       software interpreter.  And she -- Her home

12       base is Atlanta, Georgia, but she has a

13       government contract where she's working now

14       in Tallahassee, Florida.  So she flies back

15       and forth on the weekend from Tallahassee

16       to Atlanta.

17  Q.   Okay.  But Asheley lives in Atlanta?

18  A.   That's correct.

19  Q.   Does Audra live in Montgomery?

20  A.   That's correct.

21  Q.   Okay.  And I'm assuming Lloyd still lives

22       at home?

23  A.   That's correct.

64

| | | |
|---|---|---|
| 1 | Q. | And what school does Lloyd attend? |
| 2 | A. | Lloyd is -- He's a baseball player at |
| 3 | | Alabama State University right now. |
| 4 | Q. | Does Audra currently work anywhere in |
| 5 | | Montgomery or -- |
| 6 | A. | No. |
| 7 | Q. | -- work anywhere? |
| 8 | A. | Well, she recently just had a set of twins, |
| 9 | | so she's at home recovering from the |
| 10 | | pregnancy.  I guess her fiance, he's a |
| 11 | | soldier in Iraq right now. |
| 12 | Q. | Is her fiance from Montgomery? |
| 13 | A. | No.  He's from -- I think he's from |
| 14 | | somewhere in Texas. |
| 15 | Q. | Does your wife Annette work anywhere? |
| 16 | A. | That's correct. |
| 17 | Q. | Does she work anywhere? |
| 18 | A. | That's correct.  Oh, I'm sorry.  She's a |
| 19 | | school -- She's a schoolteacher in the |
| 20 | | public school system. |
| 21 | Q. | Which school system? |
| 22 | A. | Okay.  McKee.  I'm bad with remembering |
| 23 | | names.  McKee Junior High. |

65

| | | |
|---|---|---|
| 1 | Q. | McKee Junior High? |
| 2 | A. | Yeah. |
| 3 | Q. | Where is McKee? |
| 4 | A. | I can't remember the school, but it's |
| 5 | | somewhere in south Montgomery. |
| 6 | Q. | It's not inside the city? |
| 7 | A. | It's inside the city limits.  Yes, it is. |
| 8 | Q. | Oh, it is.  Okay. |
| 9 | | How long has she worked with the |
| 10 | | Montgomery Public School System? |
| 11 | A. | I think she's been a state employee for 25 |
| 12 | | years.  She's worked in the school system |
| 13 | | probably about 23. |
| 14 | Q. | So has she worked for the Montgomery Public |
| 15 | | School System 23 -- |
| 16 | A. | About -- I think -- |
| 17 | Q. | -- 23 years? |
| 18 | A. | Yeah.  I think.  I'm not sure with numbers, |
| 19 | | but somewhere around that area. |
| 20 | Q. | What is her job in the school system? |
| 21 | A. | She's an art teacher.  She's an art and |
| 22 | | reading teacher. |
| 23 | Q. | Where has she spent most of her time |

66

```
 1              teaching in the past 23 years?  What
 2              school?
 3      A.      Various school systems.  She's taught at
 4              Georgia Washington.  She's taught at
 5              Montgomery County High School.  She's
 6              taught at McKee and she kind of -- on a
 7              couple of occasions she floated between
 8              schools that wanted to -- wanted art
 9              curriculum.  She's worked in several
10              different areas.
11      Q.      Now, you mentioned earlier about your
12              parents.
13      A.      That's correct.
14      Q.      Okay.  Your mom is still living?
15      A.      Yes.  That's correct.
16      Q.      Okay.  And does she reside in Montgomery
17              County?
18      A.      That's correct.
19      Q.      What is her name?
20      A.      Jimmie Kelly.
21      Q.      Jamie?
22      A.      Jimmie, J-I-M-M-I-E.
23      Q.      Jimmie.  I'm sorry.  Does she live with
```

67

| | | |
|---|---|---|
| 1 | | you? |
| 2 | A. | No, she does not. |
| 3 | Q. | Where does she live? |
| 4 | A. | She live at -- I can't remember the |
| 5 | | address.  3768 Rosa Park -- I think they |
| 6 | | changed it to Rosa Park Avenue. |
| 7 | Q. | Does she live on her own or does she live |
| 8 | | in a nursing home or -- |
| 9 | A. | No, she doesn't. |
| 10 | Q. | -- some form of group home? |
| 11 | A. | She's fully functional.  She lives at |
| 12 | | home.  She lives with her husband. |
| 13 | Q. | Okay.  And what is her husband's name? |
| 14 | A. | Amos Kelly. |
| 15 | Q. | Say that again. |
| 16 | A. | Amos Kelly.  A-M-O-S.  Amos Kelly. |
| 17 | Q. | Is Amos your father? |
| 18 | A. | That's correct. |
| 19 | Q. | Do you have any brothers or sisters living |
| 20 | | in Montgomery County? |
| 21 | A. | I do not. |
| 22 | Q. | You do not? |
| 23 | A. | Do not. |

68

1    Q.    Does your wife have any brothers or sisters

2          living in Montgomery County?

3    A.    She does.

4    Q.    Could you tell me their names?

5    A.    I'm bad with names.  I don't remember

6          names.  I'm sorry.  I'm just not a person

7          who remembers a lot of names.

8    Q.    Okay.  Do you know how many brothers or

9          sisters she has in Montgomery County?

10    A.    I would have to get that information.  She

11         has a bunch of brothers and sisters.  You

12         know, they -- and some of them live out of

13         town.  Some of them live in town.  Some of

14         them live different places.  I don't keep

15         track of those -- that information.

16                  MR. MOZINGO:  Why don't we do

17                     this.  Jim, could you have him

18                     prepare a list of his family

19                     members here in Montgomery

20                     County?

21    A.    Okay.

22    Q.    If you could provide --

23    A.    That's fine.

69

1    Q.    -- your lawyer with a list, that will help

2          me and we'll move on to another subject.

3    A.    Okay.

4    Q.    Okay.

5                    MR. DEBARDELABEN:  You're asking

6                    him to get his wife too?

7                    MR. MOZINGO:  Yes.  That's family

8                    to me.

9                         All right.  Could we take

10                   a break one moment, please.

11                   (Brief recess was taken.)

12   Q.    Mr. Kelly, I asked you earlier about the

13         medication that you're on today.  Is that

14         medication for treatment of diabetes?

15   A.    That's correct.

16   Q.    Are you on medication for anything other

17         than treating your diabetes?

18   A.    That's correct.

19   Q.    Okay.  Listen to my question.  Are you on

20         medication to treat anything other than

21         your diabetes?

22   A.    That's correct.

23   Q.    You are?

70

```
 1    A.    That's correct.

 2    Q.    You are on medication?

 3    A.    That's correct.

 4    Q.    Other medication.  Okay.  What other

 5          medication are you on?

 6    A.    High cholesterol medication.

 7    Q.    Okay.  Anything else?

 8    A.    No.  Oh, yeah.  I have some medication

 9          for -- the purple pill for stomach

10          problems.  Nexium I think what they call

11          it.  And also on some medication for

12          headaches.

13    Q.    And you're on that medication now?

14    A.    That's correct.

15    Q.    Okay.  So today you're on medication for

16          diabetes, high cholesterol, stomach

17          problems and headaches?

18    A.    That's correct.

19    Q.    Are you on medication for anything else

20          today?

21    A.    I think that's it.

22                    (Defendants' Exhibit 1 was marked

23                        for identification.)
```

71

| | | |
|---|---|---|
| 1 | Q. | Let me show you what has been marked |
| 2 | | Defendants' Exhibit 1.  This is the claim |
| 3 | | of discrimination that you filed with the |
| 4 | | Equal Employment Opportunity Commission; is |
| 5 | | that correct? |
| 6 | A. | Appears to be correct. |
| 7 | Q. | And there is a signature on the first page |
| 8 | | of Defendants' Exhibit 1 that appears to be |
| 9 | | your signature.  Can you tell me for the |
| 10 | | record whether that is your signature or |
| 11 | | not? |
| 12 | A. | That is correct. |
| 13 | Q. | Okay.  That is your signature? |
| 14 | A. | That's correct. |
| 15 | Q. | And there is another signature both -- |
| 16 | | Well, your signature appears twice at the |
| 17 | | bottom.  And there is another signature |
| 18 | | besides yours that appears to be for your |
| 19 | | attorney, Jim DeBardelaben. |
| 20 | A. | That's correct. |
| 21 | Q. | Did your attorney also sign this notice of |
| 22 | | discrimination? |
| 23 | | MR. DEBARDELABEN:  I'm going to |

72

1           object to that because

2           anything the attorney did in

3           his presence is

4           attorney-client's privilege.

5      MR. MOZINGO:  I'm not asking for

6           communications.  I'm just

7           asking --

8      MR. DEBARDELABEN:  Well, if he did

9           it and he saw me do it in

10          presence, that is

11          communications.

12     MR. MOZINGO:  Well, I would

13          disagree.  But let me ask it

14          this way, Jim.

15     MR. DEBARDELABEN:  I notarized his

16          signature if that's what you

17          want to know.

18     MR. MOZINGO:  Okay.  Well, right.

19          I was just -- Let me ask it

20          this way --

21     MR. DEBARDELABEN:  I didn't --

22     MR. MOZINGO:  -- and I'll take

23          care of your -- take care of

73

```
 1                     your objection.  Don't agree,
 2                     but I'll take care of it.
 3    Q.   Were you represented by Mr. DeBardelaben
 4         when you filed your notice of
 5         discrimination?
 6    A.   That's correct.
 7    Q.   You were represented by him?
 8    A.   That's correct.
 9    Q.   Attached to your notice of discrimination
10         is a statement of particulars.  Do you see
11         that?
12    A.   That's correct.
13    Q.   Okay.  And this statement of particulars is
14         the information that you gave the equal --
15         the EEOC as the reason for your
16         discrimination claim.
17    A.   That's correct.
18    Q.   Did you prepare the statement of
19         particulars?
20    A.   I furnished the information and assisted
21         and proofread the information.
22    Q.   Okay.  So you did read the statement of
23         particulars?
```

74

1  A.   That's correct.

2  Q.   Did you read it before it was filed with

3       the EEOC?

4  A.   That's correct.

5  Q.   Is there any reason for your alleged

6       discrimination claim that you did not

7       include in the statement of particulars?

8  A.   I'm not a lawyer.  I just -- I don't know

9       what the legal terms or whatever.  All I

10      did was furnish the information.

11 Q.   You furnished the facts?

12 A.   Furnished the facts, right.

13 Q.   Okay.  Are there any facts for your

14      discrimination claim that are not in the

15      statement of particulars?

16 A.   I furnished -- I furnished the facts.

17 Q.   You have the statement there in front of

18      you.

19 A.   This is a short statement.  If we had to

20      furnish all the facts, we would be here

21      for -- we would be here for a while.

22 Q.   Okay.  Well, what facts support your

23      discrimination claim that you did not put

```
 1            in the statement of particulars?
 2    A.      I'm not a lawyer.  I just furnished the
 3            facts.  You know, I'm -- I don't know how
 4            to answer your question there.  I'm
 5            confused with your question.  I don't know
 6            how to answer your question.
 7    Q.      You understand that the statement of
 8            particulars is -- are the facts that
 9            occurred that you claim are discrimination
10            against you.  Do you understand that?
11    A.      Yes.  Yeah.  Okay.
12    Q.      Okay.  Are there any other facts that
13            occurred that are not in your statement of
14            particulars?
15    A.      We've had incidents to occur prior to this,
16            during filing this piece of paper.  We've
17            also had some incidents to happen after
18            this.  So you, you know -- So to ask me all
19            the facts there I would -- no, we didn't --
20            in two pages, no, all the facts are not
21            there.
22    Q.      Let me ask it this way:  Were there any
23            facts that occurred prior to you filing
```

76

| 1 | | this notice with the EEOC that are not in |
| 2 | | your statement of particulars? |
| 3 | A. | I'm pretty sure there's some facts that |
| 4 | | we -- we might have not filed all the |
| 5 | | facts.  What we did was just give a generic |
| 6 | | filing. |
| 7 | Q. | Tell me what facts occurred that are not |
| 8 | | included in your statement of particulars. |
| 9 | A. | I was -- I would have to sit here and look |
| 10 | | at it and go back and look at my notes.  It |
| 11 | | would take some time.  You know, we -- This |
| 12 | | couldn't -- It couldn't be done here |
| 13 | | today.  It would take some time to do this. |
| 14 | Q. | Okay.  Well, you have it there in front of |
| 15 | | you.  Let me ask -- Let me ask it this |
| 16 | | way.  What facts occurred that you can |
| 17 | | recall sitting here right now that are not |
| 18 | | in your statement of particulars? |
| 19 | A. | A number of facts that occurred.  This is |
| 20 | | just a generic statement of facts.  I don't |
| 21 | | know how to answer that question.  You |
| 22 | | know, to -- You know, I told him what had |
| 23 | | happened.  He prepared the paperwork.  And |

77

```
1          that's where I went.  A lot of stuff has

2          happened.  I don't know how -- I don't know

3          how to answer that question to tell you the

4          truth.

5    Q.    Can you recall any facts that occurred

6          prior to filing this notice of

7          discrimination that are not included in the

8          statement of particulars?

9    A.    I can't call any particulars today.  No,

10         not today.

11                    (Defendants' Exhibit 2 was marked

12                     for identification.)

13   Q.    Let me show you what has been marked as

14         Defendants' Exhibit Number 2.  This is the

15         response of the Alabama Public Service

16         Commission to Mr. Glenn Todd, an

17         investigator with the EEOC, concerning your

18         notice of discrimination.

19   A.    Okay.

20   Q.    Have you seen Defendants' Exhibit 2 --

21   A.    That's correct.

22   Q.    -- before today?

23   A.    That's correct.
```

78

| | | |
|---|---|---|
| 1 | Q. | Have you seen it before today? |
| 2 | A. | That's correct. |
| 3 | Q. | You have seen it? |
| 4 | A. | That's correct. |
| 5 | Q. | When did you last look at Defendants' |
| 6 | | Exhibit 2? |
| 7 | A. | It's been a while.  It's been several |
| 8 | | months. |
| 9 | Q. | If you will turn the first page -- |
| 10 | A. | Okay. |
| 11 | Q. | -- of Defendants' Exhibit 2 you will see |
| 12 | | that there is a page entitled position |
| 13 | | statement of the Alabama Public Service |
| 14 | | Commission.  Do you see that? |
| 15 | A. | I see it. |
| 16 | Q. | Okay.  Have you seen that position |
| 17 | | statement before today? |
| 18 | A. | That's correct. |
| 19 | Q. | The position statement says in paragraph |
| 20 | | one that you are a 50-year-old black male |
| 21 | | employed by the electricity section of the |
| 22 | | energy division of the Alabama Public |
| 23 | | Service Commission.  Is that true? |

79

1   A.   That's correct.

2   Q.   That is true?

3   A.   Not today.  At the time I -- you know,

4        that's -- I guess at the time it was

5        correct.

6   Q.   Okay.  Well, it is true that you are a

7        black male?

8   A.   That's correct.

9   Q.   And it is true that you are employed in the

10       electricity section?

11  A.   That's correct.

12  Q.   And you are employed in the energy division

13       of the Alabama Public Service Commission?

14  A.   That's correct.

15  Q.   How old are you today?

16  A.   I'm 51 today.

17  Q.   Paragraph two states, the last sentence,

18       that Mr. Kelly's actual title per State

19       Personnel is Utility Technical Specialist

20       Senior.  Is that true?

21  A.   That's correct.

22  Q.   That is true?

23  A.   That's correct.

80

| | | |
|---|---|---|
| 1 | Q. | Flip to page 2, paragraph C. |
| 2 | A. | Okay. |
| 3 | Q. | Paragraph C states -- this is really at the |
| 4 | | beginning -- Mr. Free has recommended |
| 5 | | promotions for Mr. Robert Taylor, a |
| 6 | | 56-year-old black male, from Public Utility |
| 7 | | Analyst II to Public Utility Analyst III. |
| 8 | | Is that correct? |
| 9 | A. | I'm not aware, but it appears to be |
| 10 | | correct. |
| 11 | Q. | Okay.  Do you know that not to be true? |
| 12 | A. | I understand he recently got a promotion. |
| 13 | | I don't know if Mr. Free recommended it or |
| 14 | | not. |
| 15 | Q. | Okay.  But my question is, do you know that |
| 16 | | not to be true? |
| 17 | A. | I don't know it to be true or not.  I have |
| 18 | | no knowledge of that fact. |
| 19 | Q. | Okay.  It also says Mr. Free has |
| 20 | | recommended the promotion of Ms. Sheila |
| 21 | | Ward, a 55-year-old white female, from |
| 22 | | Utility Analyst I to Public Utility Analyst |
| 23 | | II.  Is that correct? |

81

```
1    A.   I have no knowledge of that fact.

2    Q.   It also says that Mr. Free has recommended

3         promotion for Ms. Patricia Smith, a

4         37-year-old black female from Utility

5         Auditor I to Public Utility Analyst II.  Is

6         that correct?

7    A.   I have no knowledge of that.  I have no

8         direct knowledge of that fact.

9    Q.   Okay.  It says, Mr. Free recommended the

10        promotion of Mr. Greg Kelly -- that would

11        be you -- a 50-year-old black male from

12        Utility Engineer Specialist I to Utility

13        Engineer Specialist II.  Is that correct?

14   A.   That's correct.

15   Q.   And that title, Utility Engineer Specialist

16        II, is now known as Public Utility

17        Technical Specialist Senior.  Is that

18        correct?

19   A.   That's correct.

20   Q.   It also says that Mr. Free recommended a

21        promotion for Ms. Jackie Frazier; a

22        45-year-old black female, from

23        Administrative Support Assistant I to
```

82

| | | |
|---|---|---|
| 1 | | Administrative Support Assistant II.   Is |
| 2 | | that correct? |
| 3 | A. | I have no knowledge of that fact. |
| 4 | Q. | If you'll look down to paragraph six. |
| 5 | A. | Okay. |
| 6 | Q. | It says in paragraph six the bottom of page |
| 7 | | 2, Mr. Free evaluates Mr. Kelly's work |
| 8 | | performance and provides Mr. Kelly's annual |
| 9 | | performance rating pursuant to the rules, |
| 10 | | regulations, and guidelines of State |
| 11 | | Personnel and the merit system of Alabama. |
| 12 | | Is that true? |
| 13 | A. | Appears to be true, yes. |
| 14 | Q. | It further states in that same paragraph |
| 15 | | now at the top of page 3 that it is not |
| 16 | | uncommon at the Alabama Public Service |
| 17 | | Commission and other agencies of the State |
| 18 | | of Alabama for one education discipline to |
| 19 | | report to a manager and/or director with a |
| 20 | | different educational discipline or |
| 21 | | background.  Is that true? |
| 22 | A. | I have no knowledge of that fact. |
| 23 | Q. | Look down at paragraph nine on page 3.   It |

83

1          says, the Alabama Public Service Commission

2          admits that Mr. Cleckler is in charge of

3          the special projects section of the energy

4          division and is the only individual in that

5          section.  Is that true?

6    A.    From my knowledge that appears to be true.

7    Q.    Paragraph 10 states Mr. Cleckler provides

8          technical support for all sections of the

9          energy division.  Is that true?

10   A.    I have to disagree with that fact.

11   Q.    Okay.  You do disagree with that fact?

12   A.    I would have to strongly disagree with that

13         fact.

14   Q.    You disagree that Mr. Cleckler provides

15         technical support for all sections of the

16         energy division?

17   A.    I get little or no help from Cleckler when

18         I'm performing my work in my section.

19   Q.    Okay.  Do you know if Mr. Cleckler provides

20         technical support for other members --

21   A.    I'm not aware --

22   Q.    -- of the energy division?

23   A.    I'm not aware of his activities.

84

| 1 | Q. | Okay.  But your disagreement is because you |
| 2 | | state Mr. Cleckler does not give you |
| 3 | | support? |
| 4 | A. | Mr. Cleckler cannot set foot on the Power |
| 5 | | Company property for some unknown reason to |
| 6 | | me. |
| 7 | Q. | Okay.  Let me ask my question again, then. |
| 8 | | You disagree with that statement because |
| 9 | | Mr. Cleckler does not give you technical |
| 10 | | support? |
| 11 | A. | I get little or no assistance from |
| 12 | | Mr. Cleckler.  Mr. Cleckler cannot help -- |
| 13 | | I get very little assistance from |
| 14 | | Mr. Cleckler. |
| 15 | Q. | Okay.  Do you know if Mr. Cleckler provides |
| 16 | | technical support for any other members of |
| 17 | | the electricity section? |
| 18 | A. | I have no knowledge of Mr. Cleckler's |
| 19 | | activities on a day-to-day basis. |
| 20 | Q. | So you have no knowledge of whether |
| 21 | | Mr. Cleckler provides technical support to |
| 22 | | Jackie Frazier, Robert Taylor, Sheila Ward, |
| 23 | | Linda Gardner, or Patricia Smith? |

85

1    A.    You would have to ask those individuals.

2    Q.    Okay.  If he does, then you would not

3          dispute that?

4    A.    I wouldn't.

5    Q.    Paragraph 11 states that the Alabama Public

6          Service Commission -- by the way, for the

7          record it actually says APSC, which we

8          understand to mean the Alabama Public

9          Service Commission; correct?

10   A.    That's correct.

11   Q.    It states that the Public Service

12         Commission admits that there are five

13         sections in the energy division of the

14         Public Service Commission.  Is that true?

15   A.    From this organizational chart, that

16         appears to be correct.

17   Q.    You wouldn't disagree with that?

18   A.    I wouldn't disagree with it.

19   Q.    It states further in that same paragraph 11

20         on page 3, the Public Service Commission

21         also notes that the current organizational

22         structure of the Commission's energy

23         division is the exact organizational

86

1      structure which existed at the time that

2      Mr. Kelly was hired.  Is that true?

3  A.  How do you define as being hired?  The day

4      I interviewed or the day I reported to the

5      job?

6  Q.  Is it the exact same structure that existed

7      the day you reported to the job?

8  A.  Yes.

9  Q.  Okay.  Do you know the structure the day

10     you were interviewed?

11 A.  No.

12 Q.  Next at the top of page 4 -- this is

13     actually part of paragraph 12, but it's at

14     the top of page 4.  It says, Mr. Kelly

15     provides technical support for the

16     electricity section.  Is that true?

17 A.  That's correct.

18 Q.  Look to page 13 -- I'm sorry -- paragraph

19     13 on page 4.  Near the bottom half of that

20     paragraph it states, no section of the

21     energy division provides the entirety of

22     its technical support internally, including

23     the electricity section, which occasionally

87

| | | |
|---|---|---|
| 1 | | is provided support by Mr. Cleckler.  Is |
| 2 | | that true? |
| 3 | A. | If that statement is true, I would enjoy |
| 4 | | having Mr. Cleckler help me with my field |
| 5 | | visits and my -- the outside activity.  I |
| 6 | | would encourage that strongly. |
| 7 | Q. | Okay.  Is it true that no section of the |
| 8 | | energy division provides the entirety of |
| 9 | | its technical support internally? |
| 10 | A. | I'm not sure.  I'm not aware of that.  I'm |
| 11 | | not aware. |
| 12 | Q. | You don't know whether that's true or |
| 13 | | false? |
| 14 | A. | No. |
| 15 | Q. | Look at paragraph 14. |
| 16 | A. | Okay. |
| 17 | Q. | Halfway through.  It says, the electricity |
| 18 | | section of the energy division has, even |
| 19 | | prior to Mr. Kelly's hiring, provided the |
| 20 | | bulk of its technical support internally |
| 21 | | because the inherent nature of issues |
| 22 | | specific to the electricity industry |
| 23 | | requires a dedicated employee or employees |

88

1        within the section.  Do you agree with

2        that?

3    A.   I have no way to answer that question.  I'm

4        not sure about that statement.

5    Q.   Is it that you neither agree or disagree or

6        you just don't know?

7    A.   I just don't know.

8    Q.   Okay.  Paragraph 15, again, midway through

9        the paragraph on page 4.  It says, none of

10       the various sections of the energy division

11       have their own separate budgets which they

12       are responsible for actively administering

13       and managing with the exception of the gas

14       pipeline safety section.  Do you disagree

15       with that statement?

16   A.   I don't have any knowledge.  I don't know

17       if that statement is true or false.

18   Q.   Paragraph five -- I'm sorry -- page 5,

19       paragraph 16 up at the top.  It states the

20       Public Service Commission admits that

21       Mr. Kelly operates under the budget of the

22       electricity section but denies that

23       Mr. Kelly is not organized in a separate

1    section with his own budget because he is

2    black or because of his age.  Let me

3    restate that sentence.  The Public Service

4    Commission denies that you are not in a

5    separate section other than the electricity

6    section because you are black or because of

7    your age.  Do you disagree with that?

8  A.  I can't agree or either disagree with that

9    statement.  I have -- I have no knowledge

10   of whether that statement is true or false.

11 Q.  Okay.  You have no knowledge of whether

12   that statement is true or false?

13 A.  That's correct.

14 Q.  It further says, the electricity section of

15   the Commission's energy division has

16   provided the bulk of its technical support

17   internally with engineers dedicated to that

18   section for many years prior to Mr. Kelly's

19   hiring and at least since 1988.  Do you

20   agree or disagree with that statement?

21 A.  I have no knowledge of that statement being

22   true or false.

23 Q.  It further says that those engineers have

1          never operated under their own separate

2          actively managed budget, but have instead

3          operated under the budget of the

4          electricity section generally.  Do you

5          agree or disagree with that statement?

6     A.   I have no knowledge whether that statement

7          is true or false.

8     Q.   Paragraph 17 states that the Public Service

9          Commission denies that Mr. Kelly has,

10          quote, lost out on training, end quote, as

11          a result of not being in charge of a

12          technical budget.  Do you agree or disagree

13          with that statement?

14    A.   I disagree with that statement.  I believe

15          I have lost out on training.

16    Q.   Okay.  Tell me what training you believe

17          you have lost out on.

18    A.   I've -- A trip to Chicago which I was

19          denied to go because they -- the paperwork

20          got lost.

21    Q.   Okay.  Hold on.  I know you want to give me

22          all of them at one time, but let's take

23          them one at a time.  So there was a trip to

91

1          Chicago.  And was that a continuing

2          education seminar?

3     A.    That's correct.

4     Q.    Okay.  And what was the seminar on?

5     A.    I can't remember.  It was a couple of years

6          ago.  All I remember that I was scheduled

7          to go to Chicago in latter part of the

8          month and Ms. Sheila Ward was scheduled to

9          go the first part of the month.  Her

10         paperwork was sent the same time as my

11         paperwork was sent.  Her paperwork

12         mysteriously got approved.  Mine came back

13         lost.

14    Q.    What year did this occur?

15    A.    I'd have to go back and refer to my notes.

16         I don't have that beforehand.

17    Q.    Okay.  Well, can you explain to me -- You

18         talk about paperwork being approved.  Can

19         you explain the process to me?  If you,

20         Greg Kelly wanted to go to Chicago, what

21         paperwork would you complete and how would

22         that paperwork get approved?

23    A.    I would have to, first of all, ask my

1    supervisor, Mr. Free, you know, do I have

2    his permission to attend this training

3    seminar.  He would say either yes or no.

4    And, you know, then when I prepare the

5    paperwork for his approval and

6    Ms. Hamilton's approval, then they would

7    send the information to the accounting

8    department, which is another section.

9  Q.  Another section of the PSC?

10  A.  Another section of the PSC.

11  Q.  Okay.

12  A.  Then they would send that information over

13    to the governor's office since it's

14    out-of-state travel.  Then the governor's

15    office would have to approve it, send it

16    to -- back to the accountant's office, then

17    back to Ms. Hamilton, back to Mr. Free, and

18    they would file it saying that I've been

19    approved by the governor's office and the

20    accounting department to be -- for

21    training.

22  Q.  Okay.  I'm sorry for the pause, but I'm

23    trying to write that process down.  So it's

93

1          my understanding that if you wanted to go

2          to a continuing education seminar you would

3          ask Mr. Free's permission to go?

4      A.  That's correct.

5      Q.  And if he agreed for you to go, would you

6          start the paperwork?

7      A.  Yeah.  I would start the paperwork.  He

8          would -- I would actually -- if I get his

9          approval, he would actually instruct the

10         secretary that Mr. Kelly has been approved

11         for training per my request and we would

12         get together and approve paperwork -- start

13         paperwork.

14     Q.  Okay.  So if he agreed, you start the

15         paperwork?

16     A.  That's correct.

17     Q.  Okay.  At some point does Mr. Free give the

18         paperwork to Ms. Hamilton, or do you give

19         it to her?

20     A.  Well, the paperwork would go to Mr. Free's

21         secretary, Jackie Frazier, first.  He would

22         make sure that -- you know, that social

23         security number is right, the dollar number

94

1         is right, that the date the training and

2         travel is correct.  Then he would check

3         it.  He would initial his initials.

4   Q.   So he would actually sign it or initial it?

5   A.   He will initial it --

6   Q.   Okay.

7   A.   -- and then it would go forward for

8         Ms. Hamilton's signature.  Then she would

9         basically do the same thing as Mr. Free;

10        make sure that the paperwork looks proper.

11        Then she would sign it and she would send

12        it down to the accounting department.  The

13        accounting department would do whatever

14        they got to do, put a PO number or whatever

15        they've got to do, and then they would

16        forward it to the governor's office.  The

17        governor would have to approve of the

18        out-of-state travel.  Maybe someone in his

19        office would approve it, sign his name or

20        stamp his name or whatever.  Then it would

21        come back to the accounting office.  Then

22        it would come back to Ms. Hamilton's

23        office.  It would come back to Mr. Free and

95

| | | |
|---|---|---|
| 1 | | then Mr. Free would give me a copy or give |
| 2 | | a copy to the secretary stating that the |
| 3 | | travel request has been approved. |
| 4 | Q. | Okay.  So Mr. Free is just the beginning of |
| 5 | | the process -- |
| 6 | A. | That's correct. |
| 7 | Q. | -- for getting approved? |
| 8 | A. | That's correct. |
| 9 | Q. | It has to go through several processes? |
| 10 | A. | It has to go through several different |
| 11 | | people's signatures and approval level. |
| 12 | Q. | Okay.  Do you know the governor? |
| 13 | A. | No, I do not. |
| 14 | Q. | Does the governor know you? |
| 15 | A. | No, he does not. |
| 16 | Q. | Okay.  Do you know anybody in the |
| 17 | | governor's office? |
| 18 | A. | No, I do not. |
| 19 | Q. | Do you know if anyone there knows you? |
| 20 | A. | I don't -- I doubt it. |
| 21 | Q. | Okay.  Now, for this trip in Chicago -- and |
| 22 | | you said that was a couple of years ago? |
| 23 | A. | That's correct. |

1    Q.    Okay.  You're not exactly sure on the date?

2    A.    No.  We can go back and refer to the notes

3          and find out.

4    Q.    Did you start the paperwork?

5    A.    That's correct.

6    Q.    Okay.  And did the paperwork make it to the

7          accounting department?

8    A.    I have no idea.  All I was informed when we

9          came down to due date that my paperwork

10         mysteriously got lost in the shuffle while

11         Ms. Ward's paperwork seemed to flow through

12         without any problem.

13   Q.    But you did start the paperwork?

14   A.    We started the paperwork at the same time,

15         Sheila Ward and myself.

16   Q.    Okay.  So I'm assuming that before you

17         started the paperwork and according to your

18         process Mr. Free said you could go?

19   A.    That's correct.

20   Q.    So he said you could go?

21   A.    (Witness nods head).

22   Q.    Is that correct?

23   A.    That's correct.

97

| | | |
|---|---|---|
| 1 | Q. | He said you could go to Chicago? |
| 2 | A. | That's correct. |
| 3 | Q. | And you started the paperwork? |
| 4 | A. | That's correct. |
| 5 | Q. | And you sent it to Mr. Free? |
| 6 | A. | That's correct. |
| 7 | Q. | Okay.  And is it your testimony that you |
| 8 | | don't know what happened to it after that? |
| 9 | A. | It mysteriously disappeared. |
| 10 | Q. | Okay.  So you don't know if Mr. Free gave |
| 11 | | it to Ms. Hamilton? |
| 12 | A. | I have no -- I have no idea what happened |
| 13 | | after that. |
| 14 | Q. | And you don't know if Ms. Hamilton gave it |
| 15 | | to the accounting department? |
| 16 | A. | I have no idea what happened after that. |
| 17 | Q. | Okay.  You don't know if it went from the |
| 18 | | accounting department to the governor? |
| 19 | A. | I have no idea what happened after that. |
| 20 | Q. | Okay.  You just don't know what happened to |
| 21 | | it? |
| 22 | A. | That's correct.  Mysteriously disappeared. |
| 23 | Q. | So you don't know if it was lost? |

98

```
 1    A.    That's correct.

 2    Q.    You don't know if it was denied?

 3    A.    That's correct.

 4    Q.    And if it was denied, you don't know who

 5          denied it?

 6    A.    That's correct.

 7    Q.    Okay.  So the trip to Chicago is an

 8          exception to the statement I previously --

 9    A.    Oh, there's other situations.

10    Q.    Right.  What is -- Tell me another one.

11    A.    I've been repeatedly in the last 18 months

12          requested some training on different

13          seminars and I've been turned down by

14          Mr. Free on numerous occasions.

15    Q.    Okay.  Tell me what you've been turned

16          down.

17    A.    I refer to another.  I can't tell you

18          specifically.  But there's been several

19          training opportunities that I've e-mailed

20          him and he's sent back no, no, no.

21    Q.    Okay.  Do you know a specific training

22          opportunity --

23    A.    I don't --
```

99

1    Q.    -- that he said no?

2    A.    I'm not good with those.  You know, we

3          can -- You know, we can come back at a

4          later date and provide you with that

5          information, but I -- you know, I don't

6          have that information right here today.

7    Q.    Okay.  As you sit here today, do you

8          specifically know a training opportunity

9          that you wanted to attend that Mr. Free

10         said no?

11   A.    You know, we have to refer back to the

12         notes.  I don't keep that type of -- you

13         know, like the churches and stuff, I don't

14         keep that type of information current.

15   Q.    I understand.  I understand you may not be

16         able to recall all of them.  But my

17         question is, can you recall a specific one

18         that he denied?

19   A.    Let's see.  We've -- I would have to refer

20         back to my notes.  I can't tell you exactly

21         where the location was.  You know, it was

22         last several months.  It's been two

23         recently that I requested training and he

100

1     denied -- As a matter of fact, I haven't

2     had any training since -- the State has

3     paid for since I filed the grievance that I

4     think has been paid for.  It might have

5     been one.  I don't -- It's been very few.

6     But most of the training I've been getting

7     now has been free -- have been free trips.

8     No state funds have been required.

9  Q.  But as you sit here right now, you can't

10    recall a specific training event that

11    Mr. Free denied you on?

12  A.  I would be happy to provide you that

13    information at a later date.

14  Q.  I understand.  But I'm asking as you sit

15    here today --

16  A.  No.

17  Q.  -- you cannot specifically --

18  A.  No.

19  Q.  -- recall one?

20  A.  No.

21  Q.  So we have the trip to Chicago --

22  A.  That's correct.

23  Q.  -- that you don't know what happened to the

101

| 1 | | paperwork? |
|---|---|---|
| 2 | A. | Right. |
| 3 | Q. | And then we have requests that have been |
| 4 | | denied in the past 18 months? |
| 5 | A. | Right. |
| 6 | Q. | None of which you can specifically recall? |
| 7 | A. | That's correct. |
| 8 | Q. | Okay.  Any other times that you've been |
| 9 | | denied an education opportunity -- |
| 10 | | continuing education opportunity? |
| 11 | A. | Just the ones that we just listed. |
| 12 | Q. | Okay.  So we've covered them all? |
| 13 | A. | Well, I also -- Yeah.  Just -- You know, |
| 14 | | we've pretty much covered them all. |
| 15 | Q. | Okay.  I mean, you can't, as you sit here, |
| 16 | | think of one other we haven't covered |
| 17 | | that -- |
| 18 | A. | We -- Like I said, I'll be glad to provide |
| 19 | | that information at a later date. |
| 20 | Q. | Okay.  Paragraph 17 on page 5.  Do you have |
| 21 | | it there in front of you, paragraph 17, |
| 22 | | page 5? |
| 23 | A. | Paragraph 17, page 5? |

102

1   Q.   Yes.

2   A.   Okay.

3   Q.   It says, the Public Service Commission

4        asserts that Mr. Kelly would not be, quote,

5        in charge, end quote, of his own budget

6        even if he was organized in a separate

7        section of the energy division of the

8        Public Service Commission.  Do you agree or

9        disagree with that statement?

10   A.   I have no knowledge of that statement

11       whether it's true or false.

12   Q.   Okay.  Paragraph 18 states the Public

13       Service Commission denies that Mr. Kelly

14       has, quote, lost out, end quote, on or been

15       denied training opportunities because of

16       his race or age.  Do you agree or disagree

17       with that statement?

18   A.   I strongly disagree with that statement.

19   Q.   Okay.  And why do you disagree?

20   A.   We just talked about those a few minutes

21       ago.

22   Q.   Okay.  You disagree because of the lost

23       training opportunities we just discussed?

103

1    A.    Yeah.  I also lost out training

2          opportunities in other areas.  You know, I

3          haven't had the opportunity to train in the

4          gas or either water section.

5    Q.    Okay.  Well, let's discuss those

6          opportunities.  What opportunity did you

7          have to train in gas?

8    A.    None.

9    Q.    Okay.  Well, how did you lose out on an

10         opportunity to train in gas?

11   A.    The -- My job description says the job

12         should be a multifunctional job, and I

13         haven't been given the opportunity to train

14         per the job specifications.  It says it's a

15         multifunctional job.

16   Q.    Okay.  So when you say you've lost out on

17         the opportunity to train in gas, it's

18         because no one's ever offered you the

19         opportunity to train in gas?

20   A.    That's correct.

21   Q.    And no one has ever offered you that

22         opportunity because of your job

23         description?

104

1    A.    No.  Because of the area that I'm --

2          because of the area I'm located in.  If I

3          was located in another area, I would be

4          able to -- like Mr. Cleckler, I would have

5          opportunity not only to train but -- to get

6          that training so I can assist other people

7          in the area.  But I've been denied that

8          opportunity to train -- in training in

9          other areas.

10   Q.    Okay.  And you've been denied the

11         opportunity to train in gas --

12   A.    That's correct.

13   Q.    -- because you are located in the

14         electricity section?

15   A.    That's correct.

16   Q.    Okay.  Any other reason besides where

17         you're located?

18   A.    I've been denied the opportunity to train

19         in water because I'm located here.

20   Q.    Okay.  Any other areas you've been denied

21         the opportunity to train in?

22   A.    I think that's pretty much covered; gas,

23         water and electric.

105

1   Q.   Okay.  So because you're located in the

2         electricity section, you've been denied the

3         opportunity to train in gas and water?

4   A.   That's correct.

5   Q.   Have you been denied that opportunity for

6         any other reason besides the fact you're

7         located in the electricity section?

8   A.   In my opinion it's because I'm a black

9         male.  It appears that they only allow

10        white individuals to be in the technical

11        section.

12   Q.   Okay.  You -- When you keep saying

13        technical section, I see you pointing to

14        Rick Cleckler.

15   A.   Well, you know, you can call it technical

16        section, engineering section, special

17        projects section.  You can call it any kind

18        of name you want to call it, but it's

19        basically the technical section.

20   Q.   Okay.  But the official title is special

21        projects section?

22   A.   The -- That's correct.

23   Q.   Okay.  And has Mr. Cleckler, because he's

106

1          in the special projects section, been

2          allowed to train in gas or water?

3    A.    I think we just covered that.  Didn't he

4          just tell you that he provide technical

5          expertise to all the sections.  I think

6          we've --

7    Q.    Well --

8    A.    I have no idea.

9    Q.    -- we may have covered that.  But do you

10         know that Mr. --

11   A.    I have no direct knowledge of that.

12   Q.    Let me make sure I understand, then.  You

13         have no knowledge of whether Mr. Cleckler

14         has been provided training in gas?

15   A.    I have no direct knowledge of that.

16   Q.    And you have no knowledge of whether

17         Mr. Cleckler has been provided training in

18         water?

19   A.    I have no direct knowledge of that.

20   Q.    Besides gas and water have you been denied

21         the opportunity to train in anything else?

22   A.    I've been denied to go on training

23         opportunities to enhance my ability --

107

1         enhance my marketability, you know, because

2         I've been denied these other training

3         opportunities.

4  Q.    Okay.  Now, are you referring back to like

5         the trip to Chicago and the --

6  A.    Exactly.  That's exactly what I'm talking

7         about.

8  Q.    Okay.  So you're talking, again, back about

9         Chicago and those other --

10  A.    Other trips --

11  Q.    -- opportunities you can't specifically

12         recall?

13  A.    Yeah.  That's correct.

14  Q.    So make sure I'm absolutely clear.  You've

15         been denied the opportunity to train in gas

16         and water because you're in the electricity

17         section?

18  A.    That's correct.

19  Q.    And you've been also denied the opportunity

20         to go to Chicago and other training events

21         that you cannot specifically remember?

22  A.    I didn't say I was denied.  I said the

23         paperwork got lost in the Chicago training.

108

1   Q.   Okay.  You didn't go to Chicago --

2   A.   I didn't go to Chicago.

3   Q.   -- and other places because -- Well, let me

4        strike that and let me see if I can tie it

5        up a little bit nicer than that.

6           You didn't go to Chicago because your

7        paperwork got lost?

8   A.   That's what Mr. Free say.

9   Q.   Mr. Free told you that?

10   A.   Yes.

11   Q.   Okay.  So you did discuss it with him?

12   A.   Sure, I did.

13   Q.   Okay.  And what else did he tell you?

14   A.   He just said the paperwork got lost.

15   Q.   Okay.  Did he tell you whether he had

16        signed it and forwarded it on?

17   A.   He just said the paperwork got lost.

18   Q.   Okay.  Do you know if he signed it and

19        forwarded it?

20   A.   I have no knowledge of that.

21   Q.   Okay.  When did you have this conversation

22        with Mr. Free, or when did he tell you

23        that?

109

1  A.  Shortly after I learned that Sheila Ward's

2      paperwork had been approved.

3  Q.  So this would be a couple of years ago?

4  A.  Yeah.

5  Q.  Okay.  Other than saying the paperwork got

6      lost, did he offer you any other

7      explanation?

8  A.  No.

9  Q.  Did you ask him for any other explanation?

10 A.  That was sufficient.

11 Q.  Okay.  Looking again paragraph 17.  You

12     claim you've lost out on training because

13     the paperwork got lost in Chicago and

14     Mr. Free denied you some other

15     opportunities in the past 18 months that

16     you cannot specifically recall.  And then

17     you could not cross-train in gas or water

18     because you're in the energy section?

19 A.  That's correct.

20 Q.  Any other lost training opportunities?

21 A.  Not that I'm aware of today.

22 Q.  Okay.  So we've covered all that you can

23     think of today?

110

1    A.    All I can think of today.

2    Q.    Okay.  Paragraph 17 again -- and I'm

3          sorry if -- and I'm trying not to repeat,

4          but we're all human beings.  It states,

5          Mr. Kelly would not be in charge of his own

6          budget even if he was organized in a

7          separate section of the energy division.

8          Do you agree or disagree with that

9          statement?

10   A.    I have no knowledge whether that statement

11         is true or false.

12   Q.    Okay.  Paragraph 18 states -- We've covered

13         the first sentence.  And the second

14         sentence states, the Public Service

15         Commission notes that Mr. Kelly has been

16         the recipient of more training

17         opportunities than Mr. Cleckler, the

18         54-year-old white male Utility Technical

19         Specialist Senior in the energy division

20         special projects section.  Do you agree or

21         disagree with that statement?

22   A.    I have no knowledge of whether that

23         statement is true or false.

111

1    Q.    Okay.  So you can't dispute that

2          statement?

3    A.    I can't dispute it one way or the other.

4    Q.    Look at page 6, paragraph 22 (A).  Midway

5          through that paragraph it states, a desk

6          audit is the process utilized by State

7          Personnel to upgrade the pay range of a

8          particular position in state government.

9          Do you agree or disagree with that

10         statement?

11   A.    From the information that I have been able

12         to gather, I believe that statement is

13         true.

14   Q.    Okay.  And have you requested a desk audit?

15   A.    I have requested a desk audit -- some

16         people call it a job study -- on numerous

17         occasions.

18   Q.    Okay.  And you've made that request to

19         Mr. Free?

20   A.    I made that request to Mr. Free.  I have

21         also copied Mrs. Hamilton.

22   Q.    Okay.  And so you've made that request to

23         Ms. Hamilton too?

112

```
 1    A.   I made the request to Ms. -- I made it to

 2         Mr. Free and copied Mr. [sic] Hamilton and

 3         had discussion with Ms. Hamilton.

 4    Q.   Okay.  The next sentence states, the

 5         decision of whether desk audits will be

 6         performed ultimately rests with State

 7         Personnel, although managers can, in their

 8         discretion, request that State Personnel

 9         conduct a desk audit.  Do you agree or

10         disagree with that statement?

11    A.   I have no knowledge whether that statement

12         is true.  I'm not an expert on personnel

13         law.

14    Q.   Let's look back at paragraph B, 22 (B) on

15         page 6.  It states that the Public Service

16         Commission asserts that Mr. Kelly's

17         requested pay grade increases have not been

18         pursued with State Personnel because

19         Mr. Kelly has received an increase in pay

20         grade by virtue of his promotion in 2002.

21         Do you agree or disagree with that

22         statement?

23    A.   I have no idea where that -- you know,
```

113

1      what -- that statement to me is an

2      insignificant statement.  It doesn't really

3      mean anything.  We're talking about two

4      different things here.

5   Q.  Okay.  Well, do you -- do you dispute the

6      truthfulness of that statement?

7   A.  What part of the statement are you

8      referring to?

9   Q.  Well, again, I'll read it back to you.  The

10     Public Service Commission asserts that

11     Mr. Kelly's requested pay grade increases

12     have not been pursued with State Personnel

13     because Mr. Kelly has received an increase

14     in pay grade by virtue of his promotion in

15     2002.

16  A.  I think that's a non -- a nonevent

17     statement in my opinion.

18  Q.  Okay.  Well, do you know the statement to

19     be true or false?

20  A.  I have no knowledge whether that

21     statement -- it's just a statement, you

22     know, whether it's true or false.  The

23     issues I'm raising two totally different.

114

```
 1          One has to do with a promotion.  One has to

 2          do with a desk audit job.  We're talking

 3          about two different animals here.

 4    Q.    Okay.  Well, you understand that that was

 5          the statement given by the Public Service

 6          Commission --

 7    A.    In my opinion --

 8    Q.    -- in response to your notice?

 9    A.    In my opinion it's a faulty reasoning for

10          making that statement.  It's a flawed

11          reasoning.

12    Q.    Okay.  You disagree with how they arrived

13          at that statement?

14    A.    Yeah.  It's flawed reasoning on their part.

15    Q.    Flawed reasoning.  Okay.

16              Did you receive a promotion while

17          working at the Public Service Commission?

18    A.    That's correct.

19    Q.    Okay.  And that's the promotion you

20          previously told me that Mr. Free, in fact,

21          recommended?

22    A.    That's correct.

23    Q.    When you received the promotion, did you
```

115

```
 1            get a pay raise?

 2    A.     That's correct.

 3    Q.     Okay.  Let's look at the next sentence,

 4            page 6 again, subparagraph B.  It says,

 5            Mr. Kelly's requested increases -- again,

 6            we're still talking about pay increases --

 7            would also have placed him outside the

 8            acceptable guidelines of State Personnel

 9            per his job responsibilities and status in

10            the energy division organizational

11            structure.  Do you agree or disagree with

12            that statement?

13    A.     Like I said earlier, that is flawed

14            reasoning.

15    Q.     So you're not saying you agree or

16            disagree.  You just agree with the

17            reasoning for this --

18    A.     I said it's a nonsense statement.

19    Q.     So you contend the statement is not true?

20    A.     That's -- It's flawed reasoning.

21    Q.     Okay.  Which in your mind means the

22            statement is not true?

23    A.     You know, it's not an accurate statement.
```

116

1          It's flawed reasoning.  You know, flawed

2          reasoning.  As an engineer, you have to

3          make decisions whether something is factual

4          or whatever.  It's flawed reasoning.  You

5          know, you can come to any conclusion if you

6          use the wrong facts.

7     Q.   As an engineer, do you receive courses in

8          college or at Auburn University in logic?

9     A.   Yes.

10    Q.   You do receive courses --

11    A.   We do.

12    Q.   -- in logic?

13    A.   We do.

14    Q.   Do you receive courses in analytical

15         reasoning?

16    A.   We receive -- That's correct.  We call

17         it -- Yeah.  We call it reasoning.

18    Q.   You call it reasoning?

19    A.   Yeah.  Well, you know, we call it the

20         digital logical (phonetic) -- logic

21         reasoning or whatever.  Yeah.

22    Q.   Okay.  And did you actually take a course

23         at Auburn University in logic?

117

1    A.   That's correct.

2    Q.   What was the course called?

3    A.   Called circuit logic, digital logic.  You

4         know, you do -- same way programs.  You

5         program system by using logic; this

6         statement is true and this statement is

7         true, then this has to be true.  This is,

8         you know, called logic.

9    Q.   And what statements or what kinds of

10        statements were you examining to determine

11        if they were true or not?

12   A.   Well, you have to give me a specific

13        example what you're talking about.

14   Q.   Well, can you remember any specific

15        statements from that logic course you took

16        that you had to determine whether it was

17        true or not?

18   A.   You know, it could -- It depends on the

19        problem, you know.  We just can't sit here

20        and just talk about generic answer.

21   Q.   Well, can you recall any general type of

22        problem or project in which you had to

23        determine it was true or false?

118

1   A.   One of the things we had to do in lab was

2        make sure -- like the -- like the traffic

3        signals.  It has to work on a logic

4        format.  You can't have all the red lights

5        change when the green lights change.

6        Somebody has to come in there and design a

7        system that makes sense, that has logic.

8        And, you know, it has to make sense.

9        You've got to make sure that these lights

10       synchronize with the lights down the street

11       or across the road.  You can't just have

12       the lights just turn red and green whenever

13       they so choose because you would have a

14       colossal mess.  So somebody has to come in

15       there and use some discretion and use some

16       logic to make sure the system operates

17       properly.

18   Q.   Okay.  And so were those logic classes

19       concerned with focusing on whether a

20       mechanical event or occurrence made sense

21       or not?

22   A.   Has to make sense.  You know, engineer, you

23       know, you -- what you design what you --

119

```
 1              has to make sense.  If you don't, you just

 2              voodoo signs of voodoo logic.  It has to

 3              make sense.  The application has to be

 4              practical.

 5     Q.       Did you take any courses in Auburn in legal

 6              logic?  When I say legal, my definition is

 7              law --

 8     A.       No.

 9     Q.       -- relating to law.

10     A.       No.

11     Q.       Did you take any courses in Auburn

12              concerning legal analytical reasoning?

13     A.       No.

14     Q.       Okay.  Were your courses limited to

15              engineering logic?

16     A.       I have an MBA degree.  You also --

17     Q.       Okay.  Well, I'll -- Thank you for pointing

18              that out.  I'll get back to that.

19                   But for your engineering degree were

20              your courses limited to engineering logic?

21     A.       That's correct.

22     Q.       And were your analytical reasoning courses

23              limited to engineering analytical
```

120

1          reasoning?

2     A.   That's correct.

3     Q.   Okay.  And did you take logic or analytical

4          reasoning in obtaining your MBA?

5     A.   You have to, you know, look at stuff and

6          look at the parameters and go through case

7          studies and case law and determine what is

8          appropriate and what is not appropriate.

9     Q.   Well, did you take any MBA courses that

10         were specifically concerned with the study

11         of logic or analytical reasoning?

12    A.   You do case studies.  They -- In business

13         they don't call it -- they call it case

14         studies.

15    Q.   Okay.  And what's an example of a case

16         study that you would do getting an MBA?

17    A.   You would look at a hypothetical situation

18         of why this product is not performing the

19         way it should be or why this management

20         team has lost its focus.  You know, you

21         have to go in there and look at the

22         background and training of these folks and

23         find out, hey, these guys might be missing

121

1    some particular skills in a particular

2    area.  You know, they've lost their focus,

3    stuff like that.  You have to look at the

4    whole organization, look at, you know, what

5    is going on and you have to -- you have to

6    look at it.  So, you know, you just can't

7    give a generic answer.  They teach you how

8    to drill down deep and analyze things from

9    the top to the bottom.

10  Q.  Now, do you learn -- When you got your MBA,

11      did you learn how to apply logic and

12      analytical reasoning from a different

13      perspective other than engineering?

14  A.  It balances you -- It kind of balanced it.

15  Q.  So you did learn how to apply logic and

16      analytical reasoning from a business

17      perspective?

18  A.  That's correct.

19  Q.  And do you understand that there can be

20      more than one perspective?  You can have a

21      business perspective of what's logical and

22      an engineering perspective.

23  A.  I think that's a fair statement.

122

1 Q. Okay.  When you say that -- subparagraph B,

2   that first sentence that I just read where

3   the Service Commission asserts that your

4   requested pay grade increases were not

5   pursued because you had an increase by

6   virtue of your promotion.  Okay.  You told

7   me that was -- I think your words were bad

8   logic or poor logic, something to that --

9 A. Flawed logic.

10 Q. Flawed logic.  Okay.  Why is that flawed

11   logic?

12 A. Mr. Free is an accountant.  I'm an

13   engineer.  I shouldn't be held down and

14   judged according to what accountant make.

15   My job should float on the merits of

16   engineer pay grade.  It shouldn't be capped

17   by what accountant makes.

18 Q. Okay.  So do you believe that your ability

19   to receive higher pay is capped or limited

20   because you work under an accountant?

21 A. And in an accounting section.

22 Q. And in an accounting section?

23 A. That's correct.

123

1    Q.    Okay.  So you believe your ability to earn

2          more money as an engineer is capped because

3          you work in an accounting section under an

4          accountant?

5    A.    That's correct.

6    Q.    Any other reason why you believe that your

7          ability to earn more money is limited?

8    A.    According to their reasoning, this seems to

9          be -- you know, that's the reason they give

10         here in this paragraph that I would be

11         outside the parameters of Mr. Free.

12         Mr. Free is an accountant.  He's not an

13         engineering manager.  If I reported to an

14         engineer manager, I would be able to make

15         up to what an engineer management make.

16   Q.    Okay.  So the -- Let me make sure I

17         understand you.  The sole reason you

18         believe that your income is limited is

19         because you're having to work in an

20         accounting section and under an accountant?

21   A.    I think that's one of the major factors.

22   Q.    That's one of the major factors?

23   A.    Yes.

124

1    Q.    Any other major factors?

2    A.    I don't know.  You know, we -- That's

3          one -- I think that's one of the major

4          factors.  I have no idea.  But that appears

5          to be a major reason.

6    Q.    Okay.  Well, do you know of another major

7          reason besides that one?

8    A.    Not that I have -- Not that I know right

9          now.

10   Q.    Okay.  Well, have you ever known of another

11         major reason besides that?

12   A.    I can't give you specific examples right

13         now.

14   Q.    Okay.  So the only example you can give me

15         of why your pay grade is capped is because

16         you're working in an accounting section

17         under an accountant?

18   A.    That's correct.

19   Q.    The third sentence down in subparagraph B

20         states that the pay grade for the position

21         held by Mr. Kelly compares favorably with

22         the pay grade for similar positions at

23         other utility commissions in the

125

1          southeast.  Do you agree or disagree with

2          that statement?

3     A.   I have no knowledge of that statement.  I'm

4          not a personnel manager.

5     Q.   Okay.  Have you ever checked the pay grade

6          for engineers holding positions similar to

7          yours with other utility commissions in the

8          southeast?

9     A.   I'd say the pay grades that I -- for other

10         engineers -- you know, if you want to

11         pigeonhole the PS -- or whatever.  An

12         engineer is an engineer.  I don't care

13         where you have it.  But I've checked the

14         pay grades of engineers.

15    Q.   Okay.  Have you ever looked at what

16         engineers working for utility commissions

17         in other southeastern states are making?

18    A.   I have no knowledge of that.

19    Q.   Okay.  So you haven't checked that?

20    A.   I have no knowledge of that.

21    Q.   The next sentence, it starts at the bottom

22         of page 6 and runs to the top of page 7.

23         It says, it is also important to note that

126

1    Mr. Kelly's supervisor, Mr. Free, has not

2    requested a desk audit for any of the

3    employees under his supervision, although

4    he has recommended promotions as noted in

5    paragraph 3 (C) herein.  Do you agree or

6    disagree with that statement?

7  A.  I have no knowledge of that statement.

8  Q.  Okay.  Paragraph 23 (A).  You previously

9    told me and we established that your title

10    was changed from Utility Engineer

11    Specialist II to Public Utility Technical

12    Specialist Senior; correct?

13  A.  That's correct.

14  Q.  Paragraph 23 (A) states that the change in

15    job title for you was unilaterally

16    effectuated by State Personnel for all

17    engineers in the state system, including

18    Mr. Cleckler.  Further down it says, that

19    change was made against the recommendation

20    of personnel for the Public Service

21    Commission.  Do you agree or disagree with

22    that statement?

23  A.  I have no knowledge of that statement.

127

| | | |
|---|---|---|
| 1 | Q. | So you don't know whether it's true or |
| 2 | | false? |
| 3 | A. | I have no knowledge whether that statement |
| 4 | | is true or false. |
| 5 | Q. | Well, isn't it true that Mr. Cleckler held |
| 6 | | the same title of Utility Engineer |
| 7 | | Specialist II that you once held? |
| 8 | A. | From my knowledge that appears to be |
| 9 | | correct. |
| 10 | Q. | Okay. And isn't it true that you and |
| 11 | | Mr. Cleckler both had that title at the |
| 12 | | same time at one point? |
| 13 | A. | I think we have that same title now. |
| 14 | Q. | And that title now is Public Utility |
| 15 | | Technical Specialist Senior? |
| 16 | A. | That's correct. |
| 17 | Q. | That's your title now? |
| 18 | A. | That's correct. |
| 19 | Q. | And that's Mr. Cleckler's title now? |
| 20 | A. | That's correct. |
| 21 | Q. | You told me earlier about the limitations |
| 22 | | of working in an accounting section for an |
| 23 | | accountant.  Ms. Hamilton is an engineer; |

128

```
 1              correct?

 2    A.    That's correct.

 3    Q.    And Ms. Hamilton is Mr. Free's boss?

 4    A.    That's correct.

 5    Q.    And Mr. Free is an accountant?

 6    A.    That's correct.

 7    Q.    Do you have an opinion on whether Mr. Free

 8          is limited in his job growth because he is

 9          supervised by an engineer?

10    A.    I'm probably sure he would have some of the

11          same concerns that I might have.

12    Q.    You think he has your same concerns?

13    A.    I think he would have some concerns.

14    Q.    So you would also disagree, then, with an

15          account -- excuse me -- an engineer

16          supervising an accountant?

17    A.    No.  I don't -- Well, he would have some

18          concerns -- We're talking about different

19          levels in the organizational chart here.

20          This is management level.  This is -- I'm

21          not in the management ranks.  So you're

22          talking -- You're mixing apples with

23          oranges here.  So, you know, you're talking
```

129

1              about management versus staff position.

2     Q.     Okay.  And you are not in a management

3              position?

4     A.     That's correct.

5     Q.     You're in a staff position?

6     A.     That's correct.

7     Q.     Have you ever applied for a management

8              position?

9     A.     From what it appears, it appears I'm in a

10             dead-end job.  I've been locked in a

11             dead-end job.

12    Q.     Have you ever applied for a management

13             position?

14    A.     Here at the Commission?

15    Q.     In the Public Service Commission.

16    A.     From what it appears, I'm locked in a

17             dead-end job.

18    Q.     Okay.  But have you ever applied for a

19             management position at the Public Service

20             Commission?

21    A.     No.  No.

22    Q.     Assuming Mr. Free was a staff member like

23             you --

130

1    A.    That's correct.

2    Q.    -- do you think it would be wrong for him

3          to be supervised by an engineer such as

4          Ms. Hamilton?

5                MR. DEBARDELABEN:  Object to

6                    form.  He does not show he has

7                    any educational expertise or

8                    any expertise to make that.

9                    If you want a lay opinion -- I

10                   don't know if you're asking

11                   him as an expert opinion or

12                   what.

13             MR. MOZINGO:  No.

14             MR. DEBARDELABEN:  That's why I'm

15                  objecting to form.

16    Q.    I'm not asking you as an expert.  You've

17          told me that you don't think Mr. Free as an

18          accountant should be supervising you as an

19          engineer.

20    A.    I don't -- That's correct.

21    Q.    And I want you to reverse it and say, well,

22          do you think it would be okay for an

23          engineer to supervise Mr. Free?

131

| | | |
|---|---|---|
| 1 | A. | It depends on the engineer's training.  If |
| 2 | | the engineer training -- If the engineer |
| 3 | | has a business background, an MBA degree, I |
| 4 | | see nothing wrong with that. |
| 5 | Q. | Okay.  And do you think it would be okay |
| 6 | | for Mr. Free to supervise you if he had an |
| 7 | | engineering background? |
| 8 | A. | I think that would be perfectly normal.  If |
| 9 | | he had an engineering background, I see no |
| 10 | | problem with that. |
| 11 | Q. | Okay.  And would you object to working |
| 12 | | under Mr. Free if he had an engineering |
| 13 | | background? |
| 14 | A. | Not so ever.  If he had an engineering |
| 15 | | background, I wouldn't -- wouldn't object |
| 16 | | at all. |
| 17 | Q. | Okay.  Look at paragraph 24 (B) at the |
| 18 | | bottom of page 7, down at the very bottom |
| 19 | | and running onto page 8.  It says that you |
| 20 | | asserted -- Mr. Kelly asserted -- and I'm |
| 21 | | going to kind of paraphrase a little bit |
| 22 | | because of the tense.  Mr. Kelly asserted |
| 23 | | that he has suffered a fractured career |

132

| | |
|---|---|
| 1 | path, unlevel playing field, a compromised |
| 2 | job position, lost synergies and |
| 3 | communication difficulties due to the fact |
| 4 | that he was not situated in the special |
| 5 | projects section of the energy division |
| 6 | where he could be supervised by an |
| 7 | engineer.  Is that statement true? |
| 8 | A.  That statement is true.  That statement is |
| 9 | true. |
| 10 | Q.  It goes on to say, a panel of four of |
| 11 | Mr. Kelly's Public Service Commission |
| 12 | peers, which included two black females and |
| 13 | two white males, found after a hearing |
| 14 | before the public con -- excuse me -- the |
| 15 | Service Commission administrative law judge |
| 16 | that the organizational structure of the |
| 17 | energy division did not adversely affect |
| 18 | Mr. Kelly.  Is that statement true? |
| 19 | A.  I think that statement is -- What's your |
| 20 | definition of a peer? |
| 21 | Q.  Well, the statement says that there was a |
| 22 | panel -- Okay.  I'm sorry.  I see what |
| 23 | you're asking.  Well, let me ask you this. |

133

1        Let's just disregard peers and I'll get you

2        to explain that in a minute.  But there was

3        a panel composed of four individuals, two

4        white and two black, that found after a

5        hearing in which you testified that the

6        organizational structure of the energy

7        division did not adversely impact you.  Did

8        that occur?

9   A.   That's correct.  We had a hearing.

10  Q.   Okay.  And they did find that the

11       organizational structure did not adversely

12       impact you?

13  A.   That's the ruling that I received from the

14       group.

15  Q.   And so you agree that that statement is

16       true, that that's what they found?

17  A.   That's what they found.

18  Q.   Okay.  Now, but you disagree with whether

19       the members of that panel were your peers?

20  A.   Depends on what your definition of a peer

21       is.

22  Q.   Well, what is your definition of a peer?

23  A.   Someone with similar background,

134

1          educational status.

2    Q.    Okay.  So your peers would be, then,

3          engineers?

4    A.    Somebody in the scientific community.

5    Q.    Anybody in the scientific community?

6    A.    Physics, somebody who has a physics

7          background, chemistry background, complex

8          math background, somebody in the life

9          science, medical background, somebody who

10         have done some research and -- somebody who

11         has done some lab research.  Those would be

12         considered to be my peers.

13   Q.    Okay.  Would they have to specifically be a

14         scientist?

15   A.    I want someone who -- not specifically be a

16         scientist, but have some knowledge of

17         scientific work -- somebody who have some

18         knowledge of scientific work.

19   Q.    And could that knowledge simply be a degree

20         or some classes in school in scientific

21         work?

22   A.    It depends on your definition of peer.

23   Q.    Well, I'm trying to make sure I understand

135

1         your definition.

2    A.    Someone in scientific community is my peer.

3    Q.    Okay.  Is that someone working in the

4         scientific community or someone who has had

5         some science classes in college?

6    A.    Someone who is respected by the scientific

7         career.

8    Q.    Respected by who?

9    A.    Somebody who respect -- who had some

10        respectability in the scientific career,

11        the scientific field.

12   Q.    Okay.  So it is your position that the four

13        members of the Public Service Commission in

14        front of which you testified in

15        administrative hearing are not your peers?

16   A.    That's correct.

17   Q.    And that's because they are not respected

18        in the scientific community?

19   A.    They have no knowledge about the scientific

20        community.

21   Q.    And they're not respected in the scientific

22        community?

23   A.    Well, you know, if you don't have any

136

1  knowledge in scientific career -- you

2  wouldn't want somebody to judge you who

3  didn't have -- about your law ability who

4  has no law background, which --

5  Q.  Well, I get to ask the questions here.  I

6  know Mr. DeBardelaben would love for you to

7  ask me questions, but that's not the way it

8  works here.

9        MR. DEBARDELABEN:  I thought it

10           was a pretty good one.

11        MR. MOZINGO:  Yeah.

12  Q.  And I may give you an answer, but just not

13  on the record.

14  A.  I've got a couple of guys on a street

15  corner who -- who's shade-tree lawyers

16  might want to --

17  Q.  Well, let me ask it this way.

18  A.  Okay.

19  Q.  Who were the four individuals that made up

20  the panel in front of which you testified?

21  A.  Let's see.  We've got -- I think it was

22  Aquilla Spivey.  I think her trade is she's

23  a lawyer.  I think she's the only one from

137

1           my knowledge who has a college degree.  I

2           think the other three members of the panel

3           at the time, without being disrespectful,

4           didn't have college degrees.

5       Q.  You don't think any of the other three did?

6       A.  That's correct.

7       Q.  Do you know that for a fact or you just

8           believe that to be true?

9       A.  From the information that I've been able to

10          gather with some of my coworkers they

11          didn't.  And I haven't verified those

12          facts.

13      Q.  Aquilla Spivey works in your same section?

14      A.  No, she does not.

15      Q.  I'm sorry.  I need to go back to the chart

16          that I gave you.  What section does Aquilla

17          Spivey work in?

18      A.  She doesn't work in any division.  She

19          works in the -- She works in another

20          section.  I think that section is -- I

21          forgot the name.  I'm bad with remembering

22          names.  She works in a total different -- I

23          think her director is Judy McLean.  She

138

1            works for Judy McLean.

2   Q.   Okay.  Do you know what her degree is in?

3   A.   She's a lawyer by trade.

4   Q.   She is.  Okay.

5   A.   Yeah.

6   Q.   All right.  And then you would -- because

7        she was a lawyer, she could not sit in a

8        panel over you --

9   A.   I don't think --

10  Q.   -- to determine whether your --

11  A.   I don't think he would feel -- I wouldn't

12       feel comfortable with having a lawyer judge

13       my technical degree, like you wouldn't

14       have -- feel comfortable having an engineer

15       judge your legal expertise.

16  Q.   Now, you do understand that in your lawsuit

17       there is a judge that really sits over

18       everybody in the courtroom and he has a law

19       degree.  Do you understand that?

20  A.   I think that he probably has a wide variety

21       of experience than people who sit on this

22       panel.

23  Q.   Okay.  So you're not objecting to the fact

139

```
1            that there will be a lawyer-trained judge

2            sitting over your case in this proceeding,

3            are you?

4    A.      No.

5    Q.      And you don't contend that he would be

6            unqualified to sit over you in this

7            proceeding, do you?

8    A.      I don't think he would be considered to be

9            my peer.  That's what we're talking about

10           here.  We're not talking about -- We're

11           talking about peer.  That's the issue.

12   Q.      Okay.  I understand.

13              Paragraph 25 it says that the Public

14           Service Commission denies that Mr. Kelly is

15           the first black merit system engineer that

16           has worked for the energy division of the

17           Public Service Commission.  Do you agree or

18           disagree with that statement?

19   A.      From the information that I -- From

20           Mrs. Hamilton's affidavit, she's told -- I

21           think she said that statement was false.

22   Q.      Okay.  You're saying that that statement is

23           false?
```

140

1   A.   Yeah.  I think -- I'm not -- Rephrase the

2        question, please.  Say it again.

3   Q.   It says, the Public Service Commission

4        denies that you are the first black merit

5        system engineer that has worked for the

6        energy division.

7   A.   I believe that statement is true.

8   Q.   There have been other black engineers that

9        have worked for the energy division?

10  A.   That statement is true.

11  Q.   In fact, Mrs. Hamilton, before she became

12       the director, also worked in the energy

13       division, did she not?

14  A.   I believe that statement is true.

15  Q.   And Mrs. Hamilton is a black female who is

16       an engineer?

17  A.   That's true.

18  Q.   Paragraph 26 it states that the Public

19       Service Commission asserts -- this is the

20       second sentence -- that Mr. Cleckler and

21       Mr. Kelly are both engineers who hold the

22       same job title and have the same pay

23       grade.  Do you disagree with that

141

1          statement?

2    A.    I believe that statement is true.  I'm not

3          sure that we perform the same type of work,

4          but we both have the same job title and

5          stuff.

6    Q.    And you are also in the same pay grade?

7    A.    That's correct.

8                    (Defendants' Exhibit 3 was marked

9                     for identification.)

10   Q.    Now, let me show you what's been marked

11         Defendants' Exhibit 3.  We covered the

12         notice -- We previously covered the notice

13         of discrimination that you filed with the

14         Equal Employment Opportunity Commission,

15         and we just covered the Public Service

16         Commission's response to your allegations

17         in Defendants' Exhibit 2.  Now, Defendants'

18         Exhibit 3 is a dismissal and notice of

19         right from the U.S. Equal Employment

20         Opportunity Commission; correct?

21   A.    That's correct.

22   Q.    And Defendants' Exhibit 3 was issued to you

23         in care of your attorney, Jim DeBardelaben?

142

1    A.    That's correct.

2    Q.    And Defendants' Exhibit 3 states -- there's

3          a little X in a box and next to that box it

4          states the EEOC issues the following

5          determination.  Based upon its

6          investigation, the EEOC is unable to

7          conclude that the information obtained

8          establishes violations of the statutes.

9          Did I read that correctly?

10   A.    That's the first sentence, correct.

11   Q.    Okay.  And I'm going to skip to the third

12         sentence.  It says -- Well, I'm sorry.

13                   MR. DEBARDELABEN:  We would object

14                       to skipping to the third

15                       sentence.

16                   MR. MOZINGO:  Okay.  I'll read the

17                       rest of it.

18                   MR. DEBARDELABEN:  If you're going

19                       to read it, we'd like you to

20                       read the whole thing.

21                   MR. MOZINGO:  Sure.  I'll be glad

22                       to.

23   Q.    This does not certify that the respondent

143

1    is in compliance with the statutes.  Is

2    that what it says?

3  A.  Exactly what it says.

4  Q.  And it says that no finding is made as to

5    any other issues that might be construed as

6    having been raised by this charge.  Is that

7    what it says?

8  A.  Exactly what it says.

9  Q.  So the EEOC, to your knowledge, did not

10   find that the Public Service Commission or

11   John Free or Janice Hamilton had

12   discriminated against you on the basis of

13   race?

14  A.  Can you read the second sentence and tell

15   me what it says?

16  Q.  The one I just read?

17  A.  Yes.

18  Q.  You can read it.  I mean, I've already read

19   it.  You can read it to yourself.

20  A.  Well, I think the statement -- I think this

21   statement speaks for itself.

22  Q.  Okay.  Well, let's be fair about it.  It

23   didn't say one way or the other, did it?

144

1   A.   Speaks for itself.

2   Q.   Speaks for itself.  They didn't find that

3        there was any violation; correct?

4   A.   Speaks for itself.

5   Q.   And they didn't find there wasn't any

6        violation?

7   A.   Speaks for itself.

8   Q.   And they basically said if you want to do

9        something about this, then you can pursue

10       your own lawsuit.

11  A.   Speaks for itself.

12  Q.   Is that what you understood they said?

13  A.   That is -- It speaks for itself.  I'm not a

14       lawyer, so I don't try to interpret what it

15       says.

16  Q.   The EEOC has never, to your knowledge,

17       filed a lawsuit against the Public Service

18       Commission, John Hamilton, or Linda Free

19       [sic] because of your allegations of

20       discrimination?

21  A.   Repeat that question again, please.

22  Q.   To your knowledge, the EEOC has not filed a

23       lawsuit against the Public Service

145

1      Commission, John Free, or Linda Hamilton

2      because of your allegations?

3   A.  Sounds like a fair statement to me.

4   Q.  They have not filed one?

5   A.  That's correct.

6   Q.  Do you know if they've taken any action in

7      response to your allegations of

8      discrimination?

9   A.  I'm not aware of it.

10              MR. MOZINGO:  Do you want to take

11                 a break here?  We've been

12                 about an hour.

13              MR. DEBARDELABEN:  You know, it's

14                 about 11:30.  Do you want to

15                 go to lunch and then come

16                 back?

17              MR. MOZINGO:  You --

18              MR. DEBARDELABEN:  Because he's

19                 got the problem --

20              MR. MOZINGO:  Sure.  Let's do

21                 that.

22              MR. DEBARDELABEN:  -- with the

23                 diabetes.

1              MR. MOZINGO:  I understand.  Let's

2          do that.

3              (Whereupon lunch recess was taken.)

4     Q.   (Continuing by Mr. Mozingo) Mr. Kelly, I

5          just want to check with you before we begin

6          your deposition this afternoon -- or

7          continue your deposition this afternoon to

8          make sure since you are on medication that

9          you're still -- you can still sit here and

10         answer the questions and give a response

11         and understand the questions.

12    A.   If I get uncomfortable, I'll speak up.

13    Q.   Okay.  Right.  But I just want to make sure

14         your medication is not influencing you at

15         this point forward.

16    A.   No.

17    Q.   Okay.  Good.

18             Previously I asked you about

19         Defendants' Exhibit 1, 2, 3 and 12.  And

20         I'm going to offer those at this time, so

21         you can put those to the side, if you would

22         like.

23             (Defendants' Exhibit 4 was marked

147

1                    for identification.)

2    Q.   Next I'm going to show you what's been

3         marked as Defendants' Exhibit 4.  And that

4         is a copy of the complaint that you have

5         filed in the United States District Court

6         against the Alabama Public Service

7         Commission, John Free, and Janice

8         Hamilton.  Am I correct?

9    A.   That's correct.

10   Q.   Paragraph 15 of the complaint -- Are you

11        there?

12   A.   Okay.  I'm -- Yes.

13   Q.   Paragraph 15.

14   A.   Yeah.

15   Q.   It's under the heading first cause of

16        action racial discrimination under Title

17        VII of the Civil Rights Act of 1964.

18   A.   I'm there.

19   Q.   I'm going to read that for the record.  The

20        plaintiff avers and alleges that he is

21        treated differently from the only other

22        working engineer in the energy division, J.

23        Rick Cleckler.  Plaintiff avers and alleges

|     |     |                                                        |
| --- | --- | ------------------------------------------------------ |
| 1   |     | that his age is an issue as he is older                |
| 2   |     | than John Free and Janice Hamilton.                    |
| 3   |     | Plaintiff avers that his race, black, is a             |
| 4   |     | factor in preventing him from being treated            |
| 5   |     | the same as J. Rick Cleckler, white, as                |
| 6   |     | both have the same position, both are                  |
| 7   |     | degreed engineers, and both provide                    |
| 8   |     | technical assistance.  Did I read that                 |
| 9   |     | correctly?                                             |
| 10  | A.  | You certainly did.                                     |
| 11  | Q.  | And so for purposes of your discrimination             |
| 12  |     | lawsuit, you are -- the basis of your                  |
| 13  |     | complaints is how you are treated compared             |
| 14  |     | to Rick Cleckler?                                      |
| 15  | A.  | That's one of the complaints.                          |
| 16  | Q.  | One of the basis?                                      |
| 17  | A.  | Yeah.                                                  |
| 18  | Q.  | Okay.  Let me ask you about the age, age               |
| 19  |     | being an issue.  Do you contend that you               |
| 20  |     | have been mistreated by either Janice                  |
| 21  |     | Hamilton, John Free, or the Public Service             |
| 22  |     | Commission because of your age?                        |
| 23  | A.  | That's correct.                                        |

149

1  Q.    You do?

2  A.    That's correct.

3  Q.    You are 51 years old?

4  A.    That's correct.

5  Q.    If I were to represent to you that Rick

6        Cleckler is at least 55, maybe 56, do you

7        have any reason to disagree with that?

8  A.    That sounds reasonable.

9  Q.    You wouldn't contest that?

10  A.    No.  That sounds reasonable.

11  Q.    Okay.  If I were to represent to you that

12        Janice Hamilton, who you are suing and you

13        have alleged age discrimination, is your

14        same age, at least 51, would you dispute

15        that?

16  A.    That sounds reasonable.

17  Q.    Why do you believe that Janice Hamilton has

18        discriminated against you on the basis of

19        age?

20  A.    I think she's a couple -- maybe a couple of

21        months younger than I am.

22  Q.    Okay.  Only two months difference.

23  A.    Well, two months, two hours, two minutes.

150

| | | |
|---|---|---|
| 1 | | Still age.  Still younger than I am. |
| 2 | Q. | Would you contend that Janice Hamilton |
| 3 | | treats Rick Cleckler better than she treats |
| 4 | | you? |
| 5 | A. | Absolutely. |
| 6 | Q. | But Rick Cleckler is older than you. |
| 7 | A. | That's true. |
| 8 | Q. | Then why do you contend that Janice |
| 9 | | Hamilton discriminates against you on the |
| 10 | | basis of your age? |
| 11 | A. | Because I think if it was a younger person |
| 12 | | I wouldn't be treated -- wouldn't be |
| 13 | | treated that way. |
| 14 | Q. | So you are saying if you were younger then |
| 15 | | you would be treated better? |
| 16 | A. | Sure.  Because I would have more |
| 17 | | opportunities.  You know, when you get to |
| 18 | | be my age, you know, you sort of -- this is |
| 19 | | probably going to be my last rodeo, |
| 20 | | probably going to be my last job.  And, you |
| 21 | | know, if a younger person has more mobility |
| 22 | | to go out and seek other opportunities, |
| 23 | | when you get to be my age, age become a |

1　　　　hindrance when you start looking for new

2　　　　employment.

3　　Q.　But you've only worked for the Commission

4　　　　five years at most; isn't that correct?

5　　A.　That's correct.

6　　Q.　You were hired in 2002.

7　　A.　That sounds reasonable.

8　　Q.　So when you were hired in 2002 you were

9　　　　already around 45, 46 at least?

10　　A.　That's correct.

11　　Q.　So your age wasn't a hindrance to you being

12　　　　hired, was it?

13　　A.　Not at that particular time.

14　　Q.　But you're claiming it's a hindrance now?

15　　A.　Yeah.　We -- You know, when you -- 50 years

16　　　　old, that's pretty -- that's pretty dated

17　　　　for an engineer.

18　　Q.　Do you contend that if you were a younger

19　　　　age that you would be allowed to work in a

20　　　　section other than the electricity section?

21　　A.　I can't speak to that affirmatively.　But I

22　　　　would assume that they would try to do

23　　　　everything in their power to make the job

152

```
 1              more attractive for a younger person.
 2      Q.      Have they hired a younger person for the
 3              special projects section?
 4      A.      They haven't hired anybody since I've been
 5              there on the technical side.
 6      Q.      So no one has been hired?
 7      A.      No one has been hired.
 8      Q.      No one younger, no one older?
 9      A.      Status quo.
10      Q.      No one has been hired?
11      A.      No.   That's one of the problems.
12      Q.      Now, you work in the same section as Sheila
13              Ward?
14      A.      That's correct.
15      Q.      A white female?
16      A.      That's correct.
17      Q.      If I were to represent to you that Sheila
18              Ward is actually older than you, she's 56,
19              would you disagree with that?
20      A.      That's sounds reasonable.
21      Q.      Do you dispute that John Free, in fact,
22              hired Sheila Ward?
23      A.      I believe that fact is correct.
```

153

1    Q.    Do you contend that John Free has

2          discriminated against you on the basis of

3          your age?

4    A.    Mr. Free has a history of discrimination,

5          particularly against black -- black

6          employees.  He has a file full of

7          complaints the black employees filed

8          against Mr. Free.  I think every black

9          employee that works for Mr. Free has filed

10         a complaint with the director --

11   Q.    Well, I appreciate that.  But let me repeat

12         my question; okay?  Do you contend that

13         John Free has discriminated against you on

14         the basis of your age?

15   A.    That's correct.

16   Q.    And why do you believe John Free has

17         discriminated against you on the basis of

18         your age?

19   A.    I might not know the legal term.  I can

20         tell you the layman's term.  You know, he's

21         younger than I am.  He doesn't know the

22         problems with older person of my age.

23   Q.    What are the problems with older people

154

1        your age that he doesn't know?

2  A.   Well, we just talked about it.  Medication

3        problem that sometimes we have to take an

4        extended lunch hour to make sure we get the

5        medication, make sure we get the proper

6        food.  If I go out and be late five, 10

7        minutes, I'm subject to a reprimand,

8        subject to a warning letter.  If I go to

9        the doctor during the middle of the day and

10       try to get some additional help, I'm

11       subject to a reprimand or subject to

12       warning letter.  Other employees don't have

13       that particular problem.

14  Q.   Okay.  So you contend that John Free is

15       discriminating against you on the basis of

16       your age because of medical needs that you

17       have due to your age?

18  A.   That's correct.

19  Q.   And due to those medical needs you need to

20       take a longer lunch?

21  A.   Sometimes.  Not all the time, but sometimes

22       there are occasions that I need to go and

23       check with my doctor or go home and get

| | | |
|---|---|---|
| 1 | | some medication or some other stuff. Be |
| 2 | | five, 10 minutes late, you're subject to |
| 3 | | some disciplinary action. |
| 4 | Q. | Other than Mr. Free does not know the |
| 5 | | medical needs of someone your age, is there |
| 6 | | any other reason that you claim that he has |
| 7 | | discriminated against you on the basis of |
| 8 | | your age? |
| 9 | A. | Mr. Free has loaded the job down with a |
| 10 | | heavy burden. I have a tremendous amount |
| 11 | | of work to do. There are over 300 |
| 12 | | locations that I have to go out and look |
| 13 | | at, make sure that we have adequate |
| 14 | | electricity and reliable. I've asked |
| 15 | | Mr. Free on numerous occasions to provide |
| 16 | | me with some professional technical |
| 17 | | assistance. He hasn't ever responded. |
| 18 | Q. | Okay. And you claim that he hasn't done |
| 19 | | that because of your age? |
| 20 | A. | He provide the other -- You know, Sheila |
| 21 | | Ward is not required to travel. She's a |
| 22 | | white female. She seldom ever travel. Her |
| 23 | | responsibilities are in the office. |

156

| | | |
|---|---|---|
| 1 | Q. | Well, she doesn't have the same |
| 2 | | responsibilities you do, does she? |
| 3 | A. | No, she doesn't. |
| 4 | Q. | She's not an engineer, is she? |
| 5 | A. | No, she's not. |
| 6 | Q. | And you have different responsibilities in |
| 7 | | the office because you're an engineer, |
| 8 | | don't you? |
| 9 | A. | Well, should I be treated differently |
| 10 | | because I'm an engineer? |
| 11 | Q. | Well, you have different travel |
| 12 | | requirements because you're an engineer, |
| 13 | | don't you? |
| 14 | A. | Sure, I do.  Sure, I do. |
| 15 | Q. | Okay. |
| 16 | A. | But should I be treated different because |
| 17 | | I'm an engineer? |
| 18 | Q. | Well, let me make sure I understand you, |
| 19 | | then.  Mr. Free does not travel with you? |
| 20 | A. | That's correct. |
| 21 | Q. | That's one reason.  Mr. Free does not know |
| 22 | | the needs -- the medical needs of someone |
| 23 | | your age? |

157

```
 1    A.    That's correct.  He's not sympathetic to a
 2          person of my age and their medical needs.
 3    Q.    Okay.  Any other reason he's discriminated
 4          against you on the basis of age?
 5    A.    That's about all I can think of right now.
 6    Q.    Okay.  I have he will not travel with you,
 7          he does not know the medical needs that you
 8          have due to your age, and he's not
 9          sympathetic to your medical needs.
10    A.    Mr. Free has never --
11    Q.    Let me finish my question.
12    A.    Okay.  Go ahead.
13    Q.    That's what I've written down --
14    A.    Okay.
15    Q.    -- are the three reasons that he has
16          discriminated against you on the basis of
17          your age.  Can you give me any more
18          reasons?
19    A.    Not at this -- Not at this particular time.
20    Q.    So as we sit here, these are the only three
21          reasons that you can testify to as to why
22          or how he's discriminated against you on
23          the basis of your age?
```

158

1    A.   Well, we're sitting here today, you know,

2         if you would like, I can provide you some

3         additional information at a later date.

4    Q.   Are you saying I need to redepose you at a

5         later date?

6    A.   We can provide it to you.  You know, we

7         can --

8    Q.   Do I need to redepose you at a later date?

9    A.   Sure.  You know, you're free -- You can do

10       whatever you want to.  Feel free.

11    Q.   Can you provide me any more reasons other

12       than the three that you've given me?

13    A.   That's sufficient enough.

14    Q.   Do you know of any more reasons?

15    A.   Not right -- Not at this moment.

16    Q.   Okay.  So the only reasons you know at this

17       moment why Mr. Free has discriminated

18       against you on the basis of your age is

19       that he will not travel with you, he does

20       not know the medical needs of someone your

21       age, and he's not sympathetic to your

22       medical needs.  That's all I have; right?

23    A.   That's fair.  That's a fair statement.

159

| | | |
|---|---|---|
| 1 | Q. | And that's all that you can think of as we |
| 2 | | sit here? |
| 3 | A. | As we sit here today. |
| 4 | Q. | Have you ever thought of any more? |
| 5 | A. | I'm probably sure I have, but, you know, |
| 6 | | they're not forthcoming at this particular |
| 7 | | moment. |
| 8 | Q. | Not forthcoming, does that mean that either |
| 9 | | you don't remember them or you're not going |
| 10 | | to tell me? |
| 11 | A. | I don't know right at this particular |
| 12 | | moment. |
| 13 | Q. | Well, I don't know what you mean. |
| 14 | A. | I don't know what -- Well, I've answered |
| 15 | | the question the best I could. |
| 16 | Q. | Do you -- Besides these three reasons, do |
| 17 | | you know of any reasons right now -- |
| 18 | A. | No, I do not. |
| 19 | Q. | -- why he's discriminated against you on |
| 20 | | the basis of your age? |
| 21 | A. | At this particular moment, no, I do not. |
| 22 | Q. | You know of no other reasons? |
| 23 | A. | At this particular moment, I do not know |

160

| | | |
|---|---|---|
| 1 | | right at this moment. |
| 2 | Q. | Okay.  And the three I have are he will not |
| 3 | | travel with you, he does not know the |
| 4 | | medical needs of someone your age, and he's |
| 5 | | not sympathetic to your medical needs; |
| 6 | | correct? |
| 7 | A. | Yeah.  Mr. Free has never -- He does no |
| 8 | | requirements of his job.  He's never had to |
| 9 | | work this job.  Mr. Free doesn't understand |
| 10 | | engineering work. |
| 11 | Q. | Okay.  Is that another reason, he doesn't |
| 12 | | understand -- |
| 13 | A. | That's correct.  He doesn't understand |
| 14 | | engineering work. |
| 15 | Q. | So that's a fourth reason? |
| 16 | A. | Yeah. |
| 17 | Q. | Doesn't understand engineering work.  Any |
| 18 | | other reason? |
| 19 | A. | That's all I can think of at this moment. |
| 20 | Q. | All you can think of, then, is he doesn't |
| 21 | | travel with you, he doesn't know the |
| 22 | | medical needs of someone your age, he's not |
| 23 | | sympathetic to your medical needs, and he |

161

| | | |
|---|---|---|
| 1 | | doesn't understand engineering work? |
| 2 | A. | That's correct. |
| 3 | Q. | That's all the reasons you can think of |
| 4 | | now? |
| 5 | A. | That's correct. |
| 6 | Q. | Do you contend that he treats Sheila Ward |
| 7 | | better than he treats you? |
| 8 | A. | Absolutely. |
| 9 | Q. | Although Sheila Ward is older than you? |
| 10 | A. | That's correct. |
| 11 | Q. | Does he treat Patricia Smith better than he |
| 12 | | treats you? |
| 13 | A. | Absolutely. |
| 14 | Q. | Now, Patricia Smith is a black female; |
| 15 | | correct? |
| 16 | A. | Sure. She's accountant too. |
| 17 | Q. | And Patricia Smith is -- if I represent to |
| 18 | | you that she is 37 years old, would you |
| 19 | | disagree with that? |
| 20 | A. | That sounds reasonable. |
| 21 | Q. | So he treats Sheila Ward better than you |
| 22 | | who is older than you? |
| 23 | A. | Sure, he does. |

162

```
 1   Q.   And he treats Patricia Smith better than
 2        you who is younger than you?
 3   A.   Sure, he does.  He has a problem with black
 4        males in particular.
 5   Q.   Is that another reason you're giving me
 6        that he's discriminated against you on the
 7        basis of your age?
 8   A.   Well, yes.  Well, I'm not -- I don't know
 9        the legal terms.  I don't know whether it's
10        age or whether it's race, whether it's
11        gender, you know, whatever.  But I'm not a
12        lawyer and I don't know what the legal
13        terms are, but I can tell you what has
14        occurred.
15   Q.   Okay.  Well, let me ask it this way:  Do
16        you contend he has discriminated against
17        you on the basis of your age because you
18        are a black man?
19   A.   Exactly.
20   Q.   Tell me every reason why you contend Janice
21        Hamilton has discriminated against you on
22        the basis of your age.
23   A.   She's acquiesced in this embarrassing and
```

163

1      abusive behavior.

2    Q.    Okay.  She has acquiesced.  What do you

3          mean by that?

4    A.    She stuck her head in the sand.  See no

5          evil, hear no evil.

6    Q.    And how has she done that?

7    A.    You know, I think that's self-explanatory.

8          If you stick your head in the sand and

9          don't pay attention to what's going on, she

10         acquiesced in it.

11   Q.    Well --

12   A.    She hears no evil.  She sees no evil.

13         She -- You know, when the situation get out

14         of hand, she doesn't do anything.  Free

15         and -- You know, she just let it flow, just

16         let it flow down the river.

17   Q.    So she has acquiesced?

18   A.    That's correct.

19   Q.    Acquiesced concerning whom?

20   A.    The way Free treats me.

21   Q.    The way Free treats you?

22   A.    Yeah.

23   Q.    Okay.  Can you tell me any other reason

164

```
 1            Janice Hamilton has discriminated against

 2            you on the basis of your age?

 3     A.     She just acquiesced and it's insulting and

 4            abusive behavior.

 5     Q.     Okay.  So as we sit here, the only reason

 6            that you can think of of how Hamilton has

 7            discriminated against you on the basis of

 8            your age is that she has acquiesced?

 9     A.     That's correct.

10     Q.     And you can think of no other reason?

11     A.     Well, she refused to overrule Mr. Free on

12            several important issues that I asked

13            Mr. Free to consider.  She's refused to

14            overrule Mr. Free when I asked him to

15            rescind my unfair reprimand that I

16            received.  She refused to overrule Mr. Free

17            when I asked for a desk -- a fair desk

18            audit for the engineering position.  And

19            she's refused -- she's also refused to

20            intervene on numerous other incidents that

21            have occurred.

22     Q.     Well, is that all the same as she has

23            acquiesced?
```

165

1   A.   Same thing.

2   Q.   Same thing.  My question is, besides her

3        acquiescing, has she done anything else to

4        discriminate against you on the basis of

5        your age?

6   A.   That's the only thing I can call.  She's

7        acquiesced in this -- in this intolerable

8        behavior.

9   Q.   Okay.  Tell me every reason that you

10       contend Janice Hamilton has discriminated

11       against you on the basis of your race.

12  A.   She's acquiesced in this abusive and

13       embarrassing behavior.

14  Q.   Other than acquiescing, has Janice Hamilton

15       done anything else to discriminate against

16       you on the basis of your race?

17  A.   Not that I can think of.

18  Q.   Okay.  So the only thing you can think of

19       is that she has acquiesced?

20  A.   That's correct.  She acquiesced, you know,

21       in all these activities.  She's acquiesced.

22  Q.   She's acquiesced.  You told me that.

23  A.   Yeah.

166

| 1 | Q. | But you can't think of any other reason |
| 2 | | besides she has acquiesced? |
| 3 | A. | No.  I think that pretty much covers it. |
| 4 | Q. | Okay.  Tell me every reason that you claim |
| 5 | | John Free has discriminated against you on |
| 6 | | the basis of your race. |
| 7 | A. | I can give you some, but I can't give you |
| 8 | | every.  You know, this is a situation |
| 9 | | that's been going on for several years |
| 10 | | now.  You know, just talk about one.  If |
| 11 | | I'm required to go for some medical |
| 12 | | treatment or see about a sick child or sick |
| 13 | | family member and I'm two or three minutes |
| 14 | | late, you know, even I tell him I'm going |
| 15 | | to lunch, he wants to write me up and try |
| 16 | | to discipline me.  He's come up with what I |
| 17 | | call his Free flexible rules.  He uses his |
| 18 | | flexible rules to restrict rights and |
| 19 | | personal freedom.  He has treated Cleckler |
| 20 | | one way and treated me a different way. |
| 21 | | Cleckler showed up one day to work drunk. |
| 22 | | Free got him, put him in the car, told him |
| 23 | | to take sick leave.  I don't -- And then I |

167

1    turned around and asked Cleckler -- I mean,

2    asked Free what would happen if I did the

3    same thing.  He turned around and sent me

4    an e-mail and told me I better adhere to

5    personnel rules that's stated in the

6    employee handbook.

7         Cleckler roams the hall, walks off the

8    job at will, closes his blinds, sleeps, his

9    drunkenness of intoxication.  I have to sit

10   there, even when I'm doing complicated

11   engineering work, having his little office

12   spies peep in and see what I'm doing.  And

13   he constantly sends me e-mail -- I mean,

14   letters requesting that I keep my blinds

15   open.  You know, even if I'm trying to do

16   engineering work or having a private

17   conversation, you know, he constantly

18   remind me of his flexible rules.  You know,

19   he uses flexible rules to embarrass me.  He

20   takes my work, turns it over to his

21   accountant and let them check my -- let

22   them check my spelling to make sure that I

23   dot my i's and cross my t's.  Then if I

168

1          turn around and say, hey, I need some help,

2          oh, no, we can't ask these accountants to

3          help you with your technical work because

4          that would be disrespectful and

5          embarrassing.  But they can sit there and

6          nitpick me to death on my spelling and my

7          punctuation.  Embarrassing.  Then when I

8          ask for technical help, he sends me one of

9          his accountants who think high-tech skills

10         are adding, subtracting and multiplying.

11         They have no idea how to use physics or

12         geometry to make engineering decisions.

13         But he thinks he's doing me a favor.

14    Q.   Okay.  What I have written down for the

15         reasons that you believe Free has

16         discriminated against you on the basis of

17         your race is that he writes you up if

18         you're late from a doctor's visit?

19    A.   He attempts to write me up.

20    Q.   Attempts to write you up?

21    A.   Yeah.

22    Q.   That he treats Cleckler differently than

23         you?

169

```
 1    A.   Sure, he does.

 2    Q.   And that he uses -- I'm sorry.  That he

 3         embarrasses you by having accountants check

 4         your work who nitpick it for spelling and

 5         punctuation?

 6    A.   Yeah.  They missed the whole focus that

 7         this is a technical work.  You know, you're

 8         looking for the ideas.  You're looking for

 9         the big picture.

10    Q.   That's what I wrote down.  Those are the

11         three things that I wrote down that you

12         gave me.  Besides those three, can you

13         think of any other reason that he

14         discriminates against you on the basis of

15         your race?

16    A.   I asked him numerous times for a desk

17         audit.  You know, if it's fair -- you know,

18         he recently has had a desk audit for his

19         accountants, but he refuses -- I've asked

20         him several times to have a desk audit.  He

21         refuses to have an open and fair desk audit

22         for the work that I perform.  He refuses to

23         have -- do that.  He uses his subjective
```

170

```
 1        measures to determine and he don't have the
 2        engineering ability to determine what the
 3        fair pay for engineering should be.  He
 4        never darkened the door of an engineering
 5        class, but he feels like he has the right
 6        to determine the fair pay of an engineer.
 7        He's never worked in a lab.
 8    Q.  Okay.  All right.  Well, I have that as a
 9        fourth reason.  Do you have any other
10        reason?
11    A.  That's all I can think of at this moment.
12    Q.  Okay.  Well, let me go over and make sure
13        I've covered them all.  He attempts to
14        write you up if you're two or three minutes
15        late for a doctor's visit -- from a
16        doctor's visit?
17    A.  Yeah.  From a doctor whether it's for
18        myself or my son.
19    Q.  Okay.  He treats Cleckler better than he
20        treats you?
21    A.  He treats most of the employees better than
22        he treats me.
23    Q.  So he treats most employees better than he
```

171

| | | |
|---|---|---|
| 1 | | treats you? |
| 2 | A. | Yeah. |
| 3 | Q. | He has accountants check your work who |
| 4 | | nitpick your spelling and punctuation and |
| 5 | | embarrass you? |
| 6 | A. | That's correct. |
| 7 | Q. | And he refuses to approve of you obtaining |
| 8 | | a desk audit? |
| 9 | A. | From State Personnel. |
| 10 | Q. | From State Personnel. Okay. Those are the |
| 11 | | four reasons I wrote down. Can you think |
| 12 | | of any other reason that you -- |
| 13 | A. | And he also -- We talked about before. He |
| 14 | | restrict my training opportunities. |
| 15 | Q. | Okay. Restrict training opportunities. |
| 16 | | Okay. I have five reasons now. Can you, |
| 17 | | Greg Kelly, give me any other reasons that |
| 18 | | he has discriminated against you on the |
| 19 | | basis of your race other than the five |
| 20 | | things we've covered? |
| 21 | A. | At this moment I think -- That's what I can |
| 22 | | think of at this moment. |
| 23 | Q. | Okay. Well, let me make sure I have them |

172

| | | |
|---|---|---|
| 1 | | all, then.  Attempts to write you up if |
| 2 | | you're two or three minutes late from a |
| 3 | | doctor's visit? |
| 4 | A. | That's correct. |
| 5 | Q. | Treats Cleckler better than you.  Treats |
| 6 | | everybody better than you? |
| 7 | A. | Well, you know, sometimes he have his days |
| 8 | | with him and Taylor.  They get into what |
| 9 | | they call a gentleman discussion.  But it's |
| 10 | | really just a straight-out thug fight. |
| 11 | Q. | Okay.  But I have reason number two he |
| 12 | | treats Cleckler better than you and I added |
| 13 | | treats everybody better than you. |
| 14 | A. | Yeah.  Pretty much. |
| 15 | Q. | Is that correct? |
| 16 | A. | Yeah. |
| 17 | Q. | Number three I have he has accountants |
| 18 | | spot-check your work? |
| 19 | A. | And he has accountants spying on me |
| 20 | | looking -- peeping through the blinds |
| 21 | | making sure I'm in my office when I should |
| 22 | | be or when I -- I might decide to go down |
| 23 | | the hall or down the street to go for a |

173

| | | |
|---|---|---|
| 1 | | walk.  You know, he have his accountants do |
| 2 | | walk-by looking through the blinds and make |
| 3 | | sure I'm in there. |
| 4 | Q. | Okay.  Well, I added that as a sixth |
| 5 | | reason. |
| 6 | A. | Okay. |
| 7 | Q. | So the third reason I have is that he has |
| 8 | | accountants spot-check your work and they |
| 9 | | nitpick you and embarrass you? |
| 10 | A. | Yeah. |
| 11 | Q. | He refuses to approve of a desk audit? |
| 12 | A. | That's correct. |
| 13 | Q. | He restricts your training opportunities, |
| 14 | | and he has accountants spy on you by |
| 15 | | checking to make sure you're in your |
| 16 | | office? |
| 17 | A. | Yeah.  He have people walk by and peep in |
| 18 | | and look -- peep in the blinds and see is I |
| 19 | | in there. |
| 20 | Q. | Okay.  I've got six reasons, then.  Can you |
| 21 | | think of any other reason? |
| 22 | A. | Not at this moment. |
| 23 | Q. | Okay.  So this -- The six reasons that we |

174

1           just went over are all the reasons that you

2           can presently think of --

3    A.     At this moment.

4    Q.     -- at this moment as to why Free

5           discriminates against you?

6    A.     That's correct.

7    Q.     Okay.  You can't think of any more?

8    A.     If it comes to me, we'll go back to this

9           question.

10   Q.     Okay.  If it comes to you before the end of

11          this deposition, you'll bring it to my

12          attention?

13   A.     That's correct.

14   Q.     That you just remembered another reason?

15   A.     I got you.

16   Q.     Okay.  I'm going to show you what's been

17          marked Defendants' Exhibit 5.  And that

18          is -- Hold on.  Before we go to Defendants'

19          Exhibit 5, let me ask you this:  Those last

20          questions I asked, I asked you to list the

21          reasons Janice Hamilton and John Free had

22          discriminated against you.  Other than the

23          reasons that you've given me for Hamilton

175

```
 1            and Free, can you think of any reasons that

 2            the Public Service Commission has

 3            discriminated against you either due to

 4            your age or your race?

 5    A.      They've acquiesced.  I've asked the Public

 6            Service Commission to investigate this

 7            abusive behavior that I've received from

 8            Mr. Free and they refused to investigate

 9            it.

10    Q.      Okay.  So they've acquiesced?

11    A.      Yeah.  They've acquiesced in it.

12    Q.      Okay.  Besides acquiescing, is there any

13            other reason that you know of that the PSC,

14            the Public Service Commission, has

15            discriminated against you on the basis of

16            your race or age?

17    A.      They agreed with the flawed findings that

18            was adjudicated by the grievance hearing

19            when I filed a grievance.

20    Q.      Okay.  They agreed with the grievance

21            hearing findings.

22    A.      And they've turned down requests that I

23            asked for another grievance for Mr. Free
```

176

```
 1              when I got reprimanded for stating the
 2              facts about what was going on in the
 3              electricity section.  Mr. Free wrote a
 4              reprimand after I stated the facts what was
 5              going on in the Commission.
 6        Q.    Okay.  So they turned down requests that
 7              you have made for a grievance hearing?
 8        A.    Yeah.  They turned it down.
 9        Q.    Any other reason?
10        A.    That's all I can think of.
11        Q.    Okay.  Well, I have three, then.  One, two,
12              three.  And they are, one, they have
13              acquiesced with what Mr. Hamilton -- I
14              mean, sorry -- Ms. Hamilton and Mr. Free
15              have done?
16        A.    That's correct.
17        Q.    Number two, they agreed with the grievance
18              hearing findings?
19        A.    That's correct.
20        Q.    And number three, they've turned down your
21              requests for other grievance hearings?
22        A.    That's right.  Concerning the abusive and
23              hostile treatment I received from Mr. Free.
```

177

1    Q.    All right.  Can you think of any other

2          reason besides these three that the PSC,

3          the Public Service Commission, has

4          discriminated against you on the basis of

5          your race or sex?  I'm sorry.  Let me reask

6          that.  I asked that totally wrong.  Besides

7          these three reasons, acquiescence, agreeing

8          with the grievance hearing, and turning

9          down a request for another grievance

10         hearing --

11   A.    Concerning the unfair reprimand that I

12         received.

13   Q.    Concerning the unfair reprimand.  Besides

14         those three reasons, can you think of any

15         other reason that the Public Service

16         Commission has discriminated against you,

17         Gregory Kelly, on the basis of your race or

18         your age?

19   A.    Not at this time.

20   Q.    Not at this time.  Okay.

21               (Defendants' Exhibit 5 was marked

22                  for identification.)

23   Q.    Now, let me show you what's been marked

178

1       Defendants' Exhibit 5.  That is the answer

2       that was filed by the Public Service

3       Commission, John Free, and Janice Hamilton

4       in response to your complaint; correct?

5   A.  That's correct.

6   Q.  Have you seen this before?

7   A.  Yes, I have.

8   Q.  Is it your understanding that John Free,

9       Janice Hamilton, and the Public Service

10      Commission denied your allegations?

11              MR. DEBARDELABEN:  Hold on for a

12                  second.  To answer that he's

13                  going to have to respond to

14                  what I told him, which gets

15                  into attorney-client

16                  privilege.  Any discussion he

17                  knows about the answer is what

18                  I've gone over with him and

19                  explained to him, so I

20                  don't --

21              MR. MOZINGO:  Let me ask it this

22                  way.

23              MR. DEBARDELABEN:  I will

179

```
 1                    stipulate he has seen the

 2                    answer and we have gone over

 3                    it, but I don't think it's

 4                    proper to ask him what the

 5                    understanding is where he got

 6                    that knowledge through his

 7                    attorney.

 8               MR. MOZINGO:  Right.  And I'm

 9                    going to try to fix that based

10                    upon your concern.

11    Q.   Have you read the answer?

12    A.   Yes.

13    Q.   Okay.  From reading the answer do you

14         understand that the Public Service

15         Commission, John Free, and Janice Hamilton

16         deny your complaints against them?

17    A.   That's correct.

18                    (Defendants' Exhibit 6 was marked

19                       for identification.)

20    Q.   Let me show you what has been marked

21         Defendants' Exhibit 6.  This is a document

22         entitled plaintiff's response to

23         defendants' discovery requests.  Have you
```

180

1              seen this document before?

2    A.    That's correct.

3    Q.    Have you read it before?

4    A.    That's correct.

5    Q.    Okay.  And this document is your answers --

6          your written answers to some questions that

7          my clients asked you about your lawsuit.

8    A.    That's correct.

9    Q.    Let me have you flip over to page 15.  Are

10         you there?

11   A.    That's correct.

12   Q.    Okay.  Is that your signature at the bottom

13         of page 15?

14   A.    That's correct.

15   Q.    Did you read your answers prior to signing

16         on page 15?

17   A.    That's correct.

18   Q.    Are your answers given in Defendants'

19         Exhibit 6 true and correct?

20   A.    To the best of my ability.

21   Q.    Is there any answer that you've given in

22         Defendants' Exhibit 6 that is not true and

23         correct?

181

1   A.   We might have had some typos.  After we

2         sent it realized that there was a couple of

3         typos.

4   Q.   Okay.  Well, I'm not going to hold you to a

5         typo.  I'm just -- My question is, is there

6         any answer that you've given in Defendants'

7         Exhibit 6 that is not true and correct?

8   A.   I believe all the answers I have given have

9         been true and correct.

10   Q.   Okay.  So all of your answers in

11         Defendants' Exhibit 6 are true and correct?

12   A.   To the best of my ability.

13   Q.   And as we sit here today, you know of no

14         answer in Defendants' Exhibit 6 that is not

15         true and correct?

16   A.   I haven't read over this in the last

17         several months.  So at the time that I

18         prepared this, it was prepared to the best

19         of my ability.

20   Q.   Okay.  Well, do you know of any answer

21         that's not true and correct?

22   A.   Not at this moment.

23   Q.   And I'm going to give you the opportunity

182

1          to read through that and tell me if there's

2          any answer that's not true and correct.

3     A.   I believe all answers are true and correct.

4     Q.   Okay.  Thank you.

5                    (Defendants' Exhibit 7 was marked

6                       for identification.)

7     Q.   Let me show you what has been marked

8          Defendants' Exhibit 7.

9     A.   Okay.

10                   MR. DEBARDELABEN:  Flynn, y'all

11                      didn't make me a copy of these

12                      so I could be seeing it while

13                      y'all are talking about it?

14                   MR. MOZINGO:  I thought we had

15                      more than one copy, John -- I

16                      mean, Jim.  I'm sorry.  I

17                      don't know.  Shelia, do you

18                      see an extra copy?

19                   MR. DEBARDELABEN:  It just didn't

20                      look like I had seen that one

21                      before, so ...

22                      Thank you, Shelia.

23                   MS. STALNAKER:  You're welcome.

183

Q.   Okay.  Defendants' Exhibit 7 is an
     application for examination with the State
     of Alabama for the position of Utilities
     Engineering Specialist I; is that correct?

A.   That's correct.

Q.   Okay.  Is this the application that you
     filled out to obtain employment with the
     Alabama Public Service Commission?

A.   Appears to be correct.

Q.   And this application is dated March 11,
     2002; is that correct?

A.   That's correct.

Q.   Is that your signature on the bottom of the
     first page?

A.   That's correct.

Q.   Did you sign this application?

A.   That's correct.

Q.   The handwriting that's on this application,
     is that your handwriting?

A.   No, it's not.

Q.   Pardon?

A.   No, it's not.

Q.   Well, let me ask it this way:  What

184

1       handwriting on this application is your

2       handwriting?

3   A.   The signature.

4   Q.   Who wrote the application?

5   A.   I'm not sure, but it looks like my wife

6       might have wrote this or my daughter.

7       Their penmanship is a lot better than mine.

8   Q.   Did you review the application after they

9       wrote it?

10   A.   Yes, I did.

11   Q.   And did you sign the application after you

12       reviewed it?

13   A.   That's correct.

14   Q.   Is the information in this application true

15       and correct?

16   A.   To the best of my ability at that time it

17       was.

18   Q.   Okay.  Is there anything in this

19       application that is not true and correct?

20   A.   Not that I know of.

21   Q.   Take your time to review it.

22   A.   True and correct.

23   Q.   Okay.  You've had an opportunity to review

185

1          the application --

2     A.   That's correct.

3     Q.   -- Defendants' Exhibit 7 as we sit here.

4          And it's your testimony that the

5          application is true and correct?

6     A.   That's correct.

7     Q.   Did you give this application with the

8          expectation that the State of Alabama would

9          rely upon your application?

10    A.   That's correct.

11               (Defendants' Exhibit 8 was marked

12                  for identification.)

13    Q.   Let me show you what has been marked

14         Defendants' Exhibit 8.   That is an

15         announcement for the position of Utilities

16         Engineering Specialist I; correct?

17    A.   That's correct.

18    Q.   And Defendants' Exhibit 7 was submitted by

19         you to the State of Alabama in response to

20         Defendants' Exhibit 8?

21    A.   That's correct.

22    Q.   Okay.   The announcement was made around

23         January 30th, 2002?

1    A.    According to this notice, correct.

2    Q.    According to Defendants' Exhibit 8.  And

3          thereafter Defendants' Exhibit 7 was filled

4          out, reviewed, and signed by you and

5          submitted to the State of Alabama?

6    A.    That's correct.

7    Q.    Okay.  Did you review Defendants' Exhibit 8

8          prior to applying for the job announced?

9    A.    That's correct.

10                  (Defendants' Exhibit 9 was marked

11                    for identification.)

12   Q.    Let me have you look at Defendants' Exhibit

13         9.  Defendants' Exhibit 9 is a letter

14         addressed to you from Loy Overstreet with

15         the Public Service Commission personnel

16         announcing that you have been selected for

17         an interview for the position of Utility

18         Engineer Specialist I; correct?

19   A.    That's correct.

20   Q.    And at the bottom portion of Defendants'

21         Exhibit 9 is your signature; correct?

22   A.    That's correct.

23   Q.    And you have checked that, quote, I am

187

1   available for appointment?

2 A. That's correct.

3 Q. Okay.  So to obtain your employment with

4   the Public Service Commission you would

5   have received Defendants' Exhibit 9, you

6   would have checked it off, signed it and

7   returned it to the Public Service

8   Commission?

9 A. That's correct.

10     (Defendants' Exhibit 10 was marked

11      for identification.)

12 Q. If you'll look at Defendants' Exhibit 10,

13   please.  Defendants' Exhibit 10 is a letter

14   again from Loy Overstreet announcing that

15   you have been appointed to the position of

16   Utilities Engineering Specialist I; is that

17   correct?

18 A. That appears to be correct.

19 Q. Did you receive Defendants' Exhibit 10?

20 A. I'm not certain.  I might have.  I don't --

21   I'm not certain.

22 Q. Well, were you told that you had been

23   appointed to the position of Utilities

188

1            Engineering Specialist I?

2    A.    I'm not sure -- certain if my wife had

3            opened the mail or my daughter had opened

4            the mail and told me or what.  But I had

5            got notice.  Either I had opened it or

6            either they had opened it and told me that

7            I had gotten the job.

8    Q.    Well, have you seen Defendants' Exhibit 10

9            before?

10    A.    I'm not sure I have or not.

11    Q.    Okay.  When you applied for employment with

12            the Public Service Commission, you went

13            down for an interview; correct?

14    A.    That's correct.

15    Q.    And you were interviewed by John Free?

16    A.    I was interviewed by John Free and Janice

17            Hamilton.

18    Q.    Where did the interview take place?

19    A.    On the 9th floor of the PSC offices.

20    Q.    Do you remember the month or year?

21    A.    I can't remember that.  I'm bad with dates.

22    Q.    Well, if this letter announcing you had

23            been appointed to the position is dated

189

|    |    |                                                              |
|----|----|--------------------------------------------------------------|
| 1  |    | June 28th, 2002, would it have been --                        |
| 2  |    | would the interview have occurred around                     |
| 3  |    | June 2002?                                                    |
| 4  | A. | That's a fair statement.                                     |
| 5  | Q. | How long did the interview last?                             |
| 6  | A. | I would say probably anywhere about 45                      |
| 7  |    | minutes to an hour and 15 minutes.  We --                    |
| 8  |    | About that length of time.                                   |
| 9  | Q. | So it lasted from 45 minutes to one hour                     |
| 10 |    | and 15 minutes?                                              |
| 11 | A. | Yeah.  That's my recollection this day and                   |
| 12 |    | time.  But, you know, it depends on how you                  |
| 13 |    | recall -- what you determine interview.                      |
| 14 |    | You know, I met John and his secretary.  We                  |
| 15 |    | did a little small talk.  Then we went into                  |
| 16 |    | a conference room and waited.  Ms. Hamilton                  |
| 17 |    | wasn't there.  Physically she wasn't                        |
| 18 |    | there.  We waited until she joined us on a                   |
| 19 |    | conference phone.  And then that's -- in my                  |
| 20 |    | opinion that's when the interview actually                   |
| 21 |    | started when she joined us on a conference                   |
| 22 |    | phone.                                                       |
| 23 | Q. | Okay.  But when you arrived at the PSC, you                  |

190

1   met John Free?

2 A. I met John Free's secretary.

3 Q. You met John Free's secretary who is?

4 A. Jackie Frazier.

5 Q. You met Jackie Frazier.  And did

6   Ms. Frazier introduce you to John Free?

7 A. I can't recall exactly, but I think she

8   introduced me to John or either she took me

9   to John's office or John -- you know,

10   something similar to that situation.

11 Q. Did the interview take place in John's

12   office?

13 A. No.

14 Q. Where did it take place?

15 A. Took place in a conference room.

16 Q. But you went to the conference room with

17   John Free?

18 A. That's correct.

19 Q. Did you have any conversations with John

20   Free about the job prior to Janice Hamilton

21   joining in on the conference call?

22 A. We just talked in generalities.  You know,

23   we just talked about background and stuff

191

1          like that.  We didn't really talk about any

2          specifics of the job until Ms. Hamilton

3          joined us.  She really was the person who

4          conducted the interview.

5     Q.   Okay.  But Ms. Hamilton was not there in

6          person, was she?

7     A.   No.  She was not there in person.

8     Q.   She participated over the telephone?

9     A.   She led the interview.  She was the one

10         that was asking the technical, hard

11         questions.

12    Q.   Okay.  But she did that over the telephone?

13    A.   She did it over the telephone.

14    Q.   Was it -- Was she talking through a

15         speakerphone?

16    A.   That's correct.  Speakerphone.  And she

17         joined us and she's the one that really

18         asked all the technical, hard questions.

19    Q.   Okay.  Besides John Free, was anyone else

20         present during the interview?

21    A.   No.

22    Q.   Besides John Free and Janice Hamilton, did

23         anyone else participate in the interview?

192

1    A.    No.

2    Q.    And the interview lasted 45 minutes to one

3          hour and 15 minutes?

4    A.    I would say, you know, John and I we had

5          some side talk, friendly chat talk before.

6          And then after Janice left we had some more

7          friendly side talk and he kind of

8          introduced me to the rest of his staff.  So

9          my -- what I call an interview in my

10         opinion was when Ms. Hamilton actually

11         joined us on the phone.  That's when we

12         really started talking about the specifics

13         of the job.

14   Q.    But besides John Free and Janice Hamilton,

15         no one else participated in the interview?

16   A.    That's correct.

17   Q.    Okay.  During the interview was it

18         explained to you the kind of work you would

19         be doing at the PSC?

20   A.    Janice asked the questions and I responded

21         to her questions the best I could.  And

22         she -- you know, and she was the one that

23         really asking the questions.

193

1   Q.   But was it explained to you the kind of
2        work you would be doing at the PSC?
3   A.   Well, she explained to -- you know,
4        basically she asked some technical
5        questions.  I can't remember exactly what
6        she asked at that time.  But most of the
7        questions were kind of technical and
8        detailed in nature that Ms. Hamilton
9        asked.  You know, she has a background in
10       engineering.  She worked with the Alabama
11       Power Company.  She really was just, I
12       guess, probing my technical knowledge at
13       that time.
14  Q.   Well, did anyone during the interview
15       explain to you the kind of work you would
16       be doing at the Public Service Commission?
17  A.   Well, I don't recall anybody explaining
18       specific what you would be doing but this
19       engineering job.  And I think that she made
20       a statement that I called -- I don't know
21       when she made the statement, so I'm not
22       going to say.  It could have been after I
23       was hired and she did the formal training

194

| | | |
|---|---|---|
| 1 | | when I got there.  Janice Hamilton did the |
| 2 | | training once I got on the job. |
| 3 | Q. | Okay.  During the interview did anyone tell |
| 4 | | you the kind of work that you would be |
| 5 | | doing as Utilities Engineer Specialist I? |
| 6 | A. | I don't recall.  I don't recall. |
| 7 | Q. | Okay.  You don't recall any discussion |
| 8 | | about that? |
| 9 | A. | I don't recall.  I don't recall.  All I |
| 10 | | remember that Janice asked some deep |
| 11 | | technical questions at the meeting.  And I |
| 12 | | had to -- you know, some of them I had to |
| 13 | | take a minute and pause. |
| 14 | Q. | Can you give me an example of a deep |
| 15 | | technical question that she asked? |
| 16 | A. | I forgot what she asked.  But she was |
| 17 | | asking -- you know, she was asking several |
| 18 | | questions, whatever.  Some of them were -- |
| 19 | | and I had to -- I was trying to make sure |
| 20 | | that I answered those questions.  I can't |
| 21 | | remember.  But I remember that she did come |
| 22 | | in and she did ask a couple of zingers. |
| 23 | | Some of them was detailed and thought out. |

195

| | | |
|---|---|---|
| 1 | Q. | Okay.  Is it your testimony that Janice |
| 2 | | Hamilton did the interview? |
| 3 | A. | That's my -- Yeah.  She did the interview. |
| 4 | Q. | And what did John Free do? |
| 5 | A. | He basically just sit there and listen. |
| 6 | Q. | Did John Free ever ask you any questions? |
| 7 | A. | He might have asked some questions, but -- |
| 8 | | you know, like did I have problem with |
| 9 | | traveling, stuff -- you know, he might have |
| 10 | | asked some generic questions, but it wasn't |
| 11 | | any technical questions. |
| 12 | Q. | Did John Free explain to you the kind of |
| 13 | | work you would be doing there at the Public |
| 14 | | Service Commission? |
| 15 | A. | Ms. Hamilton -- he -- you know, |
| 16 | | Ms. Hamilton did the bulk of the |
| 17 | | interview.  You know, Free -- Free was very |
| 18 | | friendly.  You know, he was very friendly, |
| 19 | | very hospitable. |
| 20 | Q. | Okay.  I heard you that Ms. Hamilton did |
| 21 | | the bulk of it, but my question is, did |
| 22 | | John Free explain to you the work that you |
| 23 | | would be doing -- |

1    A.    I don't think he did.

2    Q.    -- at the Commission?

3    A.    I don't think he did.

4    Q.    Okay.  And you can't recall if Ms. Hamilton

5          explained it to you either?

6    A.    She -- You know, engineering work.  You

7          know, engineering work is fieldwork.  And

8          when you interview for engineering job, you

9          pretty much have a feel for what type work

10         you're going to be doing.  Since I've

11         already worked for the Power Company 15

12         years, so I have a pretty good idea of, you

13         know, the type of requirement, the type of

14         knowledge that's going to be required.

15   Q.    Had you ever worked with the Public Service

16         Commission before?

17   A.    No.

18   Q.    Okay.  Had you ever worked with

19         representatives of the Public Service

20         Commission when you were working with

21         Alabama Power?

22   A.    We've had some people from Public Service

23         Commission come out from time to time.  And

197

1         they didn't talk to me direct, but we knew

2         they was coming and, you know, we --

3         I might have shook their hands or talked to

4         them in passing.

5    Q.    When you worked at Alabama Power, you never

6         talked with a representative of the Public

7         Service Commission?

8    A.    No.

9    Q.    I just want to make sure I'm correct.

10        Again, this -- I'm not trying to be tricky

11        or anything. I just want to make sure I

12        understand. You don't recall whether

13        anyone, either Janice Hamilton or John

14        Free, explained the kind of work you'd be

15        doing at the Public Service Commission when

16        you interviewed for the job back around

17        June 2002?

18   A.    Only thing I remember that Janice -- John

19        was very friendly and hospitable at the

20        time. And Janice came on and introduced

21        herself and then she started with the

22        technical questions. That's what I can

23        remember at this time. That's the only

198

| | | |
|---|---|---|
| 1 | | thing I remember. |
| 2 | Q. | Okay.  And since you don't remember that, |
| 3 | | you don't recall if anyone explained the |
| 4 | | job you would be doing -- |
| 5 | A. | No. |
| 6 | Q. | -- at the Public Service Commission? |
| 7 | A. | No. |
| 8 | Q. | Okay.  Thank you. |
| 9 | | Did anyone explain to you that you |
| 10 | | would be working in the electricity |
| 11 | | section? |
| 12 | A. | No. |
| 13 | Q. | Did anyone explain to you that John Free |
| 14 | | would be your supervisor? |
| 15 | A. | No.  John, when we first started, told me I |
| 16 | | would be working with you.  I think that |
| 17 | | was his words he used.  And he also told me |
| 18 | | at the time that he didn't have a |
| 19 | | background in engineering, so I, you know, |
| 20 | | assuming that, you know -- at Alabama Power |
| 21 | | Company you work with accountants all the |
| 22 | | time.  So I didn't have the wildest idea |
| 23 | | that I would be working for an accountant. |

199

```
 1          That's the last thing you think about.
 2    Q.    Okay.  So you didn't know you would be
 3          working for an accountant --
 4    A.    That's correct.
 5    Q.    -- when you interviewed for the job?
 6    A.    That's correct.
 7    Q.    You didn't know you'd be working in the
 8          electricity section?
 9    A.    No.
10    Q.    And you don't recall if anyone told you
11          what work you would be doing?
12    A.    You know, most of the time when you have
13          one interview, you know, you have a second
14          or third interview.  So the first interview
15          most of the time you want to answer the
16          questions best of your ability and hope
17          that you get called in for a second
18          interview.
19    Q.    Did you ever have a second interview?
20    A.    No.
21    Q.    Okay.  So you were hired after the first
22          interview?
23    A.    That's correct.
```

200

1    Q.    When you were hired, did you know what kind

2          of work you would be doing at the Public

3          Service Commission?

4    A.    Not specifically, no.

5    Q.    When you were hired, did you know John Free

6          would be your supervisor?

7    A.    No, I did not.

8    Q.    When you were hired, did you know who would

9          be your supervisor?

10   A.    No, I did not.

11   Q.    When you were hired, did you know what you

12         would be doing at the Public Service

13         Commission?

14   A.    No, I did not.  Not specifically.

15   Q.    You were aware when you were hired that

16         John Free was an accountant?

17   A.    That's correct.

18   Q.    Let me refer you to Defendants' Exhibit

19         10.  And I think it's your testimony that

20         you cannot recall ever seeing this document

21         before today?

22   A.    That's correct.

23   Q.    Okay.  Do you recall what day you started

201

```
 1            work at the Public Service Commission?
 2    A.     Only thing I remember that Patricia
 3           Washington and myself started the same
 4           day.  I beat her in to work by five
 5           minutes.  She -- And then she was next.  I
 6           think we started the same day, but I can't
 7           remember the day.
 8    Q.     Patricia Washington --
 9    A.     Patricia Smith.  I think she --
10    Q.     Patricia Smith?
11    A.     Yeah.  She got married and changed to
12           Patricia Smith.
13    Q.     Okay.  So you and Patricia Smith started
14           working the same day?
15    A.     That's correct.
16    Q.     Do you know who hired you to work at the
17           Public Service Commission?
18    A.     I knew Janice Hamilton was the director, so
19           I would assume that, you know, the director
20           would do the hiring and had control over
21           personnel issues.
22    Q.     When you were hired, did you know who at
23           the Public Service Commission hired you?
```

202

1   A.   No.

2   Q.   Okay.  Do you know who at the Public

3        Service Commission recommended you be

4        hired?

5   A.   No.

6   Q.   Do you know today who at the Public Service

7        Commission recommended you be hired?

8   A.   From what it appears from the information

9        I've been -- I'm not 100 percent -- No.

10       I'm not 100 percent certain.

11  Q.   If I were to tell you that John Free

12       recommended that you be hired, would you

13       dispute that?

14  A.   No.

15            (Defendants' Exhibit 11 was marked

16                for identification.)

17  Q.   Let me show you what's been marked as

18       Defendants' Exhibit 11.  This is a position

19       classification questionnaire for the

20       position of Utilities Engineering

21       Specialist I at the Alabama Public Service

22       Commission; is that correct?

23  A.   That appears to be correct.

203

| | | |
|---|---|---|
| 1 | Q. | And this was completed -- if you'll look at |
| 2 | | the last page -- the very last page. |
| 3 | A. | Okay. |
| 4 | Q. | Is that your signature on the last page? |
| 5 | A. | That's correct. |
| 6 | Q. | Do you recognize the signature below yours |
| 7 | | as being that of John Free? |
| 8 | A. | That appears to be Mr. Free's signature. |
| 9 | Q. | Okay.  And according to the handwriting, it |
| 10 | | was signed by you and Mr. Free both on |
| 11 | | August 16th, 2002. |
| 12 | A. | That's the date stated. |
| 13 | Q. | Okay.  Do you believe that's the day it was |
| 14 | | signed? |
| 15 | A. | That appears to be correct. |
| 16 | Q. | Was that around the approximate time that |
| 17 | | you were hired as a Utility Engineering |
| 18 | | Specialist I at the Public Service |
| 19 | | Commission? |
| 20 | A. | That appears to be correct. |
| 21 | Q. | And Defendants' Exhibit 1 gives a |
| 22 | | description of the duties performed on the |
| 23 | | bottom of page 1. |

204

| | | |
|---|---|---|
| 1 | A. | Okay. |
| 2 | Q. | Correct? |
| 3 | A. | That's correct. |
| 4 | | MR. DEBARDELABEN:  You mean |
| 5 | | Defendants' Exhibit 11. |
| 6 | | MR. MOZINGO:  I'm sorry.  Thank |
| 7 | | you. |
| 8 | Q. | Defendants' Exhibit 11 at the bottom of the |
| 9 | | first page -- actually, it says paragraph |
| 10 | | 11.  It has a description of duties |
| 11 | | performed; is that correct? |
| 12 | A. | That's correct. |
| 13 | Q. | And that continues onto the next page? |
| 14 | A. | Best I can make out, yes. |
| 15 | Q. | Is that correct? |
| 16 | A. | I can't make it out, but it appears to be |
| 17 | | something on the next page which I can't |
| 18 | | 100 percent make out, but it appears to be |
| 19 | | continued on the next page. |
| 20 | Q. | Okay.  Well, how about there is a box on |
| 21 | | the next page that says description of |
| 22 | | duties. |
| 23 | A. | Okay. |

205

| | | |
|---|---|---|
| 1 | Q. | Is that correct? |
| 2 | A. | That's correct. |
| 3 | Q. | Do you wear glasses? |
| 4 | A. | I wear contacts. |
| 5 | Q. | Okay. Do you have your contacts in? |
| 6 | A. | Yeah, I have them in. |
| 7 | Q. | Okay. Can you see the exhibit okay? |
| 8 | A. | Yeah, I can see it. |
| 9 | Q. | It's not blurry or anything? |
| 10 | A. | No, it's not. It's blurred up here at the |
| 11 | | top. |
| 12 | Q. | Okay. But otherwise you can read it? |
| 13 | A. | Yeah. And the corners are cut off. |
| 14 | | Blurred and the corners are cut off. |
| 15 | Q. | Right. I just wanted to make sure you |
| 16 | | could read the contents in the middle of |
| 17 | | the page. I realize the second page |
| 18 | | probably isn't the best copy in the world. |
| 19 | | But you can read that; correct? |
| 20 | A. | Yeah. I can read most of it. |
| 21 | Q. | Back to the first page. It lists John Free |
| 22 | | as the supervisor of the electricity |
| 23 | | section; correct? |

206

1    A.    Appears that's correct.

2    Q.    Did you review Defendants' Exhibit 11 prior

3          to signing it?

4    A.    Sure, you do, yeah.  You know -- Yes, I

5          have.

6    Q.    Did you discuss Defendants' Exhibit 11 with

7          John Free prior to signing it?

8    A.    I -- No.  I did not discuss it with John

9          Free.

10   Q.    Was it your understanding on August 16th,

11         2002 that Defendants' Exhibit 11 was

12         describing the duties of your job and

13         naming your supervisor and the section in

14         which you would be working?

15   A.    These are some of my duties, but not

16         all-encompassing of my duties.  I think

17         this is -- I'm not sure it's been revised.

18         But my duties has been greatly revised

19         since we completed this statement.

20   Q.    Okay.  Well, I'm asking about back in

21         August 2002.

22   A.    That appears to be correct for the dates it

23         was signed.  But the duties have increased

207

1       exponentially since then.

2  Q.  It was completed before you signed it;

3       correct?

4  A.  That's correct.

5  Q.  You didn't sign a blank document, did you?

6  A.  I hope not.

7  Q.  So you understood on August 11th, 2002 when

8       you signed Defendants' Exhibit 11 that it

9       was describing the duties of your job, your

10      supervisor, naming your supervisor and

11      naming the section in which you would be

12      working?

13  A.  On this date that's correct.

14  Q.  On that date?

15  A.  That's correct.

16  Q.  Now, as of August 11 -- I'm sorry.  As of

17      August 16th, 2002, is the duties described

18      there correct?

19  A.  As of this date they were generally

20      correct.  But, you know, not all the duties

21      can be listed on a piece of paper.  There's

22      some other activities that he may -- that

23      we may have deleted or added.  This process

208

1        between Free and myself has been an

2        evolving process on what's required.

3    Q.   Did Defendants' Exhibit 11 give all of your

4        major duties --

5    A.   That's correct.

6    Q.   -- in August 2002?

7    A.   That's correct.

8    Q.   Okay.  Thank you.

9            Do you contend that Rick Cleckler as a

10       white male has received more -- or has --

11       Scratch that.

12           Do you contend that Rick Cleckler as a

13       white male has received preferential

14       treatment regarding pay at the Public

15       Service Commission?

16   A.   If I understand it, Cleckler and I are on

17       the same salary structure.

18   Q.   Okay.  So y'all are on the same pay grade?

19   A.   Pay grade.  That's correct.

20   Q.   Okay.  And it's my understanding that with

21       a state merit position job like you have

22       that a given job title will have a

23       specified pay grade; is that correct?

209

1    A.    That is correct.  After you have gone

2          through the process and have a desk audit.

3          The job that I have hadn't had a desk audit

4          for over 16 years.

5    Q.    Okay.  Well, I'm just asking what I know

6          about a general merit position at the State

7          of Alabama.

8    A.    It is -- Your pay grade determines the

9          duties that you're required to do.

10    Q.    Okay.  And you have the same job title as

11          Rick Cleckler?

12    A.    But not the same duties.

13    Q.    Okay.  And you have the same pay grade as

14          Rick Cleckler?

15    A.    Same pay grade, but not the same duties.

16                 (Defendants' Exhibits 13 through 21

17                  were marked for identification.)

18    Q.    Okay.  Let me go over with you -- I'm going

19          to hand you Defendants' 13 through 21.

20    A.    Can we take a break here?

21    Q.    Sure.

22    A.    Do you want to finish this or you want

23          to -- what you want to do?

210

| | | |
|---|---|---|
| 1 | Q. | I tell you what.  I don't -- Let's go ahead |
| 2 | | and finish this.  I don't think it will |
| 3 | | take me too long to get through this. |
| 4 | A. | Okay. |
| 5 | Q. | Okay.  Defendants' Exhibit 13 is dated |
| 6 | | September 27, 2002 and sets -- Defendants' |
| 7 | | Exhibit 17 -- I'm sorry.  Scratch that. |
| 8 | | Defendants' Exhibit 13 sets forth your pay |
| 9 | | when you were hired with the Alabama Public |
| 10 | | Service Commission? |
| 11 | A. | That's correct. |
| 12 | Q. | Okay.  Actually, I think you and I are both |
| 13 | | wrong.  Let me go back. |
| 14 | | MR. DEBARDELABEN:  It sets forth |
| 15 | | the pay at 1,425 and then it |
| 16 | | shows -- so you were right, |
| 17 | | but then it shows he gets a |
| 18 | | three percent increase. |
| 19 | | MR. MOZINGO:  Right.  And that's |
| 20 | | why I'm going to go back to |
| 21 | | Defendants' Exhibit 10. |
| 22 | Q. | Let me go back to Defendants' Exhibit 10. |
| 23 | A. | Okay. |

211

1    Q.    Effective July 13th, 2002 you began working

2          as a Utilities Engineering Specialist I

3          with the Alabama Public Service Commission

4          making a biweekly salary of $1,425 or

5          $37,050 annually.

6    A.    That's correct.

7    Q.    Is that correct?

8    A.    That's correct.

9    Q.    Okay.  Defendants' Exhibit 13 reflects that

10         on September 7th, 2002 you received a

11         cost-of-living adjustment to your pay.

12   A.    That's correct.

13   Q.    And did you receive a cost-of-living

14         adjustment of three percent to your pay on

15         September 27th, 2002?

16   A.    Appears what this sheet states.  That's

17         correct.

18   Q.    Do you dispute --

19   A.    No.

20   Q.    -- that you received a cost of living?

21   A.    No, I don't.

22   Q.    Okay.  Defendants' Exhibit 14 reflects that

23         you received a probation increase in your

212

1          salary effective January 25th, 2003; is

2          that correct?

3     A.   That's correct.

4     Q.   Do you dispute receiving that increase?

5     A.   Appears to be correct.

6     Q.   So you did receive it?

7     A.   Yeah.  Appears to be correct.

8     Q.   Defendants' Exhibit 15 reflects that you

9          received a promotional increase to your

10         salary effective May 29, 2004; is that

11         correct?

12    A.   Appears to be correct.

13    Q.   Okay.  Do you dispute receiving that

14         increase?

15    A.   No, I do not.

16    Q.   Defendants' Exhibit 16 reflects that you

17         received a probationary increase effective

18         December 11, 2004; is that correct?

19    A.   Appears to be correct.

20    Q.   And did you receive a probationary increase

21         on that day?

22    A.   I believe that's correct.

23    Q.   Defendants' Exhibit 17 reflects that you

213

1          received a six percent cost-of-living

2          adjustment to your pay effective

3          September 3, 2005.

4      A.  That's correct according to -- Yes.

5      Q.  And did you, in fact, receive a six percent

6          cost-of-living adjustment on that date?

7      A.  Appears to be correct.

8      Q.  You did receive the cost-of-living

9          adjustment?

10     A.  Appears to be correct.  That's correct.

11     Q.  Defendants' Exhibit 18 reflects that you

12         received an annual salary increase

13         effective December 10th, 2005; is that

14         correct?

15     A.  Appears to be correct.

16     Q.  And you did receive an annual increase as

17         reflected in Defendants' Exhibit 18

18         effective December 10th, 2005?

19     A.  Appears to be correct.

20     Q.  You don't dispute that?

21     A.  I don't dispute it.

22     Q.  Defendants' Exhibit 19 reflects that you

23         received a cost-of-living adjustment

214

1          effective September 1, 2006; is that

2          correct?

3    A.    That's correct.

4    Q.    And you don't dispute receiving that

5          salary --

6    A.    No --

7    Q.    -- adjustment?

8    A.    -- I do not.

9    Q.    Defendants' Exhibit 20 reflects that you

10         received an annual increase in your salary

11         effective December 1, 2006; is that

12         correct?

13   A.    That's -- Yes.  That's correct.

14   Q.    You do not dispute receiving that increase,

15         do you?

16   A.    No, I do not.

17   Q.    Defendants' Exhibit 21 reflects that you

18         received a 3.5 percent cost-of-living

19         adjustment to your salary effective

20         September 1, 2007; is that correct?

21   A.    That's correct.

22   Q.    And you don't dispute receiving that

23         adjustment?

215

1    A.    No, I do not.

2    Q.    So by my count, Mr. Kelly, since you've

3          been employed with the Alabama Public

4          Service Commission you have received at

5          least nine pay increases.

6    A.    Just like the other state employees who in

7          similar situation -- who have been in

8          similar situations have received the same

9          pay increases.

10   Q.    Is it true that you received nine pay

11         increases since being employed with the

12         Alabama Public Service Commission?

13   A.    That appears to be correct.

14   Q.    And is it true that John Free was your

15         supervisor each time you received a pay

16         increase?

17   A.    Appears to be correct.

18   Q.    You don't dispute that, do you?

19   A.    I don't dispute that.

20   Q.    Now, according to the exhibits that we just

21         looked at, you also received a probationary

22         raise on January 25th, 2003; is that

23         correct?

216

1    A.    That's correct.

2    Q.    Do you contend that every other state

3          employee received a probational raise on

4          January 25th, 2003?

5    A.    If they got promoted the same time I did

6          they would have.

7    Q.    Do you know of -- Do you know of any other

8          employees that got promoted like you --

9    A.    I don't dispute --

10   Q.    -- on January 25th, 2003?

11   A.    I don't dispute that fact.

12   Q.    I'm asking do you know any?

13   A.    No, I don't know of any.

14   Q.    Okay.  So to your knowledge you're the only

15         state employee that received a probationary

16         raise on January 25th, 2003?

17   A.    I'm probably sure someone in the state

18         employee probably did.  I'm not -- you

19         know, other employees.  Now, that is a

20         loaded question.  You know, I'm probably

21         sure I'm not unique in state government.

22   Q.    Well, I just want to ask you, do you know

23         of any other state employee that received a

217

1        probationary raise on January 25th, 2003?

2  A.   No, I do not.

3  Q.   And you also received a promotional raise

4        on May 29th, 2004 when you became a Utility

5        Engineering Specialist II; is that correct?

6  A.   Appears to be correct.

7  Q.   Do you know of any other state employees

8        that received a pay increase on May 29th,

9        2004 in regards to a promotion to Utility

10       Engineering Specialist II?

11  A.   I doubt it.

12  Q.   You also received a probationary raise on

13       December 11th, 2004; correct?

14  A.   Okay.

15  Q.   Do you know of any other state employees

16       that received a probationary raise that

17       day?

18  A.   Not at this moment.

19  Q.   You received an annual raise on December

20       10th, 2005.  Do you personally know of any

21       other state employees that received an

22       annual raise on that day?

23  A.   I don't go around checking State Personnel

218

1        records.

2   Q.   I'm asking do you know of any?

3   A.   I don't know.  That's not one of the things

4        that I do.

5   Q.   You received an annual raise on December 1,

6        2006.  Do you know of any other state

7        employees that received an annual raise on

8        December 1, 2006?

9   A.   I don't have privy to State Personnel

10       records.

11  Q.   So you don't know of any?

12  A.   I don't know of any.

13            MR. MOZINGO:  Okay.  We'll go

14               ahead and take a break.

15          (Brief recess was taken.)

16  Q.   Mr. Kelly, I'll represent to you that

17       between the time you were hired in 2002 and

18       the end of 2007 Rick Cleckler only received

19       four pay raises and they were all

20       cost-of-living adjustments.  Do you have

21       any reason to dispute that?

22  A.   You want me to answer the question fully,

23       or you just want me to answer the question?

219

1    Q.    Do you know that to be false?

2    A.    I have no idea about what Rick Cleckler's

3          salary is.

4    Q.    Okay.  That's all I have.

5                    (Defendants' Exhibit 22 was marked

6                     for identification.)

7    Q.    Let me have you look next at Defendants'

8          Exhibit 22.  Defendants' Exhibit 22 is a

9          training sheet where it lists courses taken

10         and appears to be in your name, Gregory

11         Kelly; is that correct?

12   A.    That's correct.

13   Q.    Have you seen Defendants' Exhibit 22

14         before?

15   A.    I believe I have.

16   Q.    Okay.  According to Defendants' Exhibit 22

17         on July 25th, 2002 you attended a course on

18         employee -- and I cannot read that very

19         well.  Can you tell me what that says?

20   A.    I can't --

21   Q.    Or do you know what it's referring to?

22   A.    I think this might have been -- I'm not

23         sure.  Maybe like a video that might have

220

```
1          been provided to me by Mr. Free.  It might

2          have been an employee's -- as soon as you

3          come to work they give you a video about

4          the PSC.  That's about the best I could

5          tell you.

6     Q.   Is it true that on or about July 25th, 2002

7          you would have received an employee

8          training video?

9     A.   That's what it appears to be.

10    Q.   Okay.  And that's true that you did --

11    A.   Yeah.

12    Q.   -- review a video?

13    A.   That's what it appears to be.

14    Q.   Is it true that on July 10th, 2003 you

15         attended a professional business writing

16         course?

17    A.   That's correct.

18    Q.   Is it true on May 12th, 2004 that you

19         attended a course on Family and Medical

20         Leave Act?

21    A.   So did a number of other state employees.

22    Q.   I'm sorry?

23    A.   That's correct.  So -- With a number of
```

221

1          other state employees I did.

2     Q.   But you did attend that course?

3     A.   That's correct.

4     Q.   Is it true that on or about March 7th or

5          8th, 2005 you attended a course on MS

6          PowerPoint?

7     A.   Yeah.  I think myself and Mrs. Frazier went

8          to that conference.

9     Q.   Okay.  So there are three courses and a

10         video, according to Defendants' Exhibit 22,

11         you would have seen or participated in?

12    A.   That's correct.

13                    (Defendants' Exhibit 23 was marked

14                       for identification.)

15    Q.   Let me show you Defendants' Exhibit 23.

16         This is an e-mail where you are confirming

17         your registration for a seminar or course

18         on Introduction to Electricity Law at the

19         Hilton Old Town in Alexandria, Virginia; is

20         that correct?

21    A.   That's correct.

22    Q.   And did you subsequently attend a course in

23         Alexandria, Virginia on Introductory to

222

| | | |
|---|---|---|
| 1 | | Electricity Law? |
| 2 | A. | That's correct. |
| 3 | | (Defendants' Exhibit 24 was marked |
| 4 | | for identification.) |
| 5 | Q. | Let me show you Defendants' Exhibit 24.  Is |
| 6 | | this -- Defendants' Exhibit 24 is the |
| 7 | | statement of expenses to confirm your |
| 8 | | attendance at a course in Alexandria, |
| 9 | | Virginia? |
| 10 | A. | That's correct. |
| 11 | Q. | And that's the same course referenced in |
| 12 | | Defendants' Exhibit 23? |
| 13 | A. | That's correct. |
| 14 | Q. | Did John Free approve of you attending that |
| 15 | | course? |
| 16 | A. | Yes, he did. |
| 17 | Q. | Did John Free approve of you reviewing the |
| 18 | | video on May 25th, 2002 as reflected in |
| 19 | | Defendants' Exhibit 22? |
| 20 | A. | Yes, he did. |
| 21 | Q. | Did John Free approve of you attending the |
| 22 | | professional business writing course on |
| 23 | | July 10th, 2003? |

223

1    A.    Yes, he did, I believe.  Yes, he did.

2    Q.    Did John Free approve of you attending the

3          Family and Medical Leave Act course on May

4          12th, 2004?

5    A.    Yes, he did.

6    Q.    Did John Free approve of you attending the

7          MS PowerPoint course on March 7th and 8th,

8          2005?

9    A.    Yes, he did.

10                   (Defendants' Exhibit 25 was marked

11                      for identification.)

12   Q.    Let me show you what's been marked as

13         Defendants' Exhibit 25.  Exhibit 25 is

14         confirmation of your attendance at an ECUI

15         training course in San Francisco,

16         California; correct?

17   A.    That's correct.

18   Q.    And you did subsequently attend the ECUI

19         training course in San Francisco,

20         California?

21   A.    That's correct.

22                   (Defendants' Exhibit 26 was marked

23                      for identification.)

224

1    Q.   And, in fact, Defendants' Exhibit 26 that

2         I'm handing you now is, again, a statement

3         of the travel expenses for your attendance

4         at the seminar or course in San Francisco,

5         California; is that correct?

6    A.   That's correct.

7    Q.   Did John Free approve of you attending that

8         course in San Francisco, California?

9    A.   Yes, he did.

10               (Defendants' Exhibit 27 was marked

11                 for identification.)

12    Q.   Let me show you Defendants' Exhibit 27.

13    A.   Okay.

14    Q.   This is kind of an e-mail within an

15         e-mail.  But Defendants' Exhibit 27

16         confirms that John Free and Janice Hamilton

17         approved of you attending a PowerPoint

18         training.

19    A.   That's correct.

20    Q.   And did you attend the PowerPoint training?

21    A.   Yes, I did.

22    Q.   And that would have been in 2005?

23    A.   That's correct.

225

1          (Defendants' Exhibit 28 was marked

2            for identification.)

3   Q.   Let me show you Defendants' Exhibit 28.

4   A.   Okay.

5   Q.   This is an interoffice memorandum from you,

6       Gregory Kelly, to John Free; correct?

7   A.   That's correct.

8   Q.   And this is a memorandum that gives a list

9       of the schools, seminars and conferences,

10      employee enrichment, videos, books, on-line

11      that you have participated in or utilized

12      up to May 13th, 2005; is that correct?

13   A.   Appears to be correct.

14   Q.   And that also reflects that you attended a

15      course in Alexandria, Virginia and a course

16      in San Francisco, California; correct?

17   A.   That's correct.

18   Q.   As well as the Microsoft PowerPoint,

19      professional business writing, and Family

20      Medical Leave Act courses that we've talked

21      about?

22   A.   That's correct.

23          (Defendants' Exhibit 29 was marked

226

1                    for identification.)

2    Q.    Let me show you Defendants' Exhibit 29.

3          This is a series of e-mails or at least an

4          exchange of e-mails between you and John

5          Free regarding an environmental conference

6          in Atlanta, Georgia.

7    A.    Okay.

8    Q.    Isn't that correct?

9    A.    That's correct.

10   Q.    John Free approved of you also attending an

11         environmental conference in Atlanta,

12         Georgia, did he not?

13   A.    That's correct.

14   Q.    But you did not attend that conference due

15         to family engagements?

16   A.    That's correct.

17                    (Defendants' Exhibit 30 was marked

18                       for identification.)

19   Q.    Let me show you Defendants' Exhibit 30.

20         Exhibit -- Defendants' Exhibit 30 confirms

21         your plan to attend a GTC workshop in

22         Bismarck, North Dakota; correct?

23   A.    That's correct.

227

```
 1    Q.   And you subsequently attended a GTC

 2         workshop in Bismarck, North Dakota, did you

 3         not?

 4    A.   That never did happen.

 5    Q.   Okay.  Was your attendance approved by John

 6         Free?

 7    A.   Yes.

 8                   (Defendants' Exhibit 31 was marked

 9                for identification.)

10    Q.   Let me show you Defendants' Exhibit 31.

11         Since John Free approved your attendance,

12         then you proceeded to complete the request

13         for out-of-state travel reflected in

14         Defendants' Exhibit 31; is that correct?

15    A.   That's correct.

16                   (Defendants' Exhibit 32 was marked

17                for identification.)

18    Q.   Let me show you Defendants' Exhibit 32.

19         Defendants' Exhibit 32 is a statement for

20         out-of-state travel expenses for your

21         attendance at a conference in Raleigh,

22         North Carolina; correct?

23    A.   That's correct.
```

228

1    Q.   Did John Free approve of you attending the

2          conference in Raleigh, North Carolina?

3    A.   Yes, he did.

4    Q.   And as reflected in Defendants' Exhibit 32,

5          you did attend the conference in Raleigh,

6          North Carolina?

7    A.   I certainly did.

8               (Defendants' Exhibit 33 was marked

9                 for identification.)

10   Q.   Let me show you what's been marked

11         Defendants' Exhibit 33.  That's composed of

12         two pages and it reflects your potential

13         attendance at an FERC technical workshop on

14         electric transmission siting rule, order

15         number 689 in Atlanta, Georgia; correct?

16   A.   That's correct.

17   Q.   And John Free approved of you attending

18         that workshop in Atlanta, Georgia; correct?

19   A.   That's correct.

20   Q.   Did you attend the workshop?

21   A.   No, I did not.

22   Q.   And did you not attend -- did you not

23         attend the workshop due to personal

229

1        reasons?

2   A.   I think I had an illness in the family or

3        either I was sick that day.

4   Q.   But you did not attend for personal

5        reasons?

6   A.   That's correct.

7   Q.   But John Free did approve of you attending?

8   A.   That's correct.

9              (Defendants' Exhibit 34 was marked

10                for identification.)

11   Q.   Let me show you what's been marked as

12        Defendants' Exhibit 34.  This is an e-mail

13        from John Free to you thanking you for

14        bringing to his attention that the

15        gasification workshop was available for you

16        and other PSC employees to attend free of

17        charge; correct?

18   A.   That's correct.

19   Q.   Did you attend the gasification workshop in

20        Denver, Colorado?

21   A.   That's correct.

22   Q.   And Defendants' Exhibit Number 34 is

23        referencing the gasification workshop in

230

| | | |
|---|---|---|
| 1 | | Denver, Colorado? |
| 2 | A. | That's correct. |
| 3 | Q. | Have you ever contended that John Free |
| 4 | | denied your request to attend the Denver |
| 5 | | gasification workshop? |
| 6 | A. | He initially did, yeah. |
| 7 | Q. | But he did subsequently approve it; |
| 8 | | correct? |
| 9 | A. | After there was some discussion. Yes. |
| 10 | | That's correct. |
| 11 | Q. | But he did approve you attending? |
| 12 | A. | Approved. |
| 13 | Q. | And you did attend the gasification |
| 14 | | workshop in Denver, Colorado? |
| 15 | A. | Yeah. After we went around -- around and |
| 16 | | around a couple of times. |
| 17 | Q. | But he did approve it? |
| 18 | A. | Eventually with a little arm-twisting. |
| 19 | Q. | Mr. Free attend -- did approve you |
| 20 | | attending the workshop in Denver, Colorado? |
| 21 | A. | Sure, he did. |
| 22 | | (Defendants' Exhibit 35 was marked |
| 23 | | for identification.) |

231

1    Q.    Let me show you Defendants' Exhibit 35.

2           Defendants' Exhibit 35 is the State's

3           record where John Free approved of you

4           attending the gasification workshop in

5           Denver, Colorado; correct?

6    A.    That's correct -- That appears to be

7           correct.

8    Q.    Mr. Kelly, according to the exhibits that

9           we have just flipped through, since you've

10          been employed with the Alabama Public

11          Service Commission since 2002, less than

12          six years, you have attended seminars in

13          Alexandria, Virginia, San Francisco,

14          California, Raleigh, North Carolina,

15          Denver, Colorado, and you were also

16          approved for a seminar in Bismarck, North

17          Dakota; correct?

18    A.    That's correct.

19    Q.    So you have attended at least once each

20          year and sometimes twice out-of-state

21          workshops?

22    A.    I'd have to check the records, but that

23          seems -- appears to be correct.

232

1    Q.    And John Free approved every one of those

2          workshops, did he not?

3    A.    That's correct.

4                    (Defendants' Exhibit 36 was marked

5                     for identification.)

6    Q.    Let me show you what's been marked as

7          Defendants' Exhibit 36.

8    A.    Okay.

9    Q.    This is an e-mail -- a series of e-mails

10         between you and John Free where you

11         requested permission to attend another

12         workshop this past year in Washington, D.C.

13   A.    That's correct.

14   Q.    Now, Mr. Free denied your request on the

15         basis that he believed you needed to attend

16         a business writing and grammar skills

17         workshop instead; is that correct?

18   A.    Very insulting.

19   Q.    So the fact that Mr. Free denied your

20         request to go to Washington, D.C. and

21         instead asked you to attend another seminar

22         is insulting?

23   A.    It's insulting to -- you know, to ask

233

```
 1          someone to go to a grammar -- a grammar

 2          class.  Insulting.

 3    Q.    Okay.  When you say that Mr. Free denied

 4          you continuing education, is this an

 5          example --

 6    A.    That is correct.

 7    Q.    -- of what you're claiming?

 8    A.    He's interjected himself into the career of

 9          an engineer.  He -- It's insulting.

10          Engineers need to be trained in

11          technology.  Grammar is not a strong point

12          for most engineers.  I write as well as any

13          other engineer.  Grammar wasn't a problem

14          getting two degrees, getting an MBA

15          degree.  That is -- you know -- I don't --

16          It's insulting to send someone a letter and

17          keep harping on grammar.

18    Q.    So when you claim that John Free has

19          discriminated against you either on the

20          basis of your race or your age by denying

21          you the opportunity to obtain continuing

22          education, then Defendants' Exhibit Number

23          36 is an example of that discrimination?
```

234

1    A.    That is correct.

2    Q.    Do you deny that your business writing or

3          grammar skills need improving?

4    A.    We all need improving on something.  I'm

5          not perfect.  I have some problems -- I

6          have a lot of areas I need to improve on.

7          That might be one of them.

8    Q.    So you do need to improve your business

9          writing and grammar skills; true?

10   A.    Just like he needs to improve his technical

11         skills.

12   Q.    But you need to improve your business

13         writing and grammar skills; true?

14   A.    I don't see that to be a problem.  It

15         wasn't a problem in other jobs I had.

16   Q.    So you deny, then, that you need to improve

17         your business writing --

18   A.    I write as well --

19   Q.    -- and grammar skills?

20   A.    I write as -- You know, if you can get an

21         MBA degree and engineering degree, I write

22         as well as anyone.

23   Q.    Let me ask it this way:  Do you have an

235

1           opinion on whether you need to improve your

2           business writing and grammar skills?

3    A.     We all can improve on something.  I'm not

4           perfect.

5    Q.     So then you do have an opinion, yes, you do

6           need to improve your business writing and

7           grammar skills?

8    A.     We all need improving, but -- we all can

9           improve on something.

10   Q.     If I were to -- Scratch that.  Let me ask

11          this way, Mr. Kelly.  I'll represent to

12          you, then, in that same time frame that you

13          were going to Alexandria, Virginia, San

14          Francisco, California, Denver, Colorado and

15          approved to go to North Dakota, during that

16          same time frame Rick Cleckler only attended

17          one out-of-state conference, would you

18          dispute that?

19   A.     That was Rick's choice not to seek the

20          training.

21   Q.     So you would not dispute that he only

22          attended one out-of-state conference?

23   A.     If you know Rick Cleckler, Rick Cleckler is

236

```
 1        afraid to fly.  Rick Cleckler -- Quite

 2        frankly, Rick is happy with his situation.

 3        Rick don't want additional training.  Rick

 4        is happy with the status of his job now.

 5        Rick is sailing in the moonlight.  He don't

 6        want to improve his skills.

 7   Q.   Mr. Kelly, isn't it true that Rick Cleckler

 8        went with you to Denver, Colorado?

 9   A.   Rick Cleckler's arm was twisted by Mr. --

10        Ms. Hamilton to go to Denver, Colorado.

11        Ms. Hamilton also has twisted Rick Cleckler

12        to go to Tampa, Florida next week.  Rick

13        Cleckler doesn't care about training,

14        keeping up his engineering degree.  He

15        could care less.  He was twisted.  He was

16        forced to go.  I volunteered both times.

17   Q.   Do you contend that John Free discriminated

18        against you when he recommended that you be

19        hired for the Alabama Public Service

20        Commission?

21   A.   The discrimination didn't start until about

22        the -- just before -- after the grievance

23        hearing.  That's when we ran into the
```

237

1      problem of discrimination.

2  Q.  Okay.  So John Free never discriminated

3      against you either on the basis of your age

4      or on the basis of your race prior to the

5      administrative hearing?

6  A.  Thereabouts or six months prior.  When the

7      issue of a desk audit came up, that's when

8      things got a little hairy.  It got a little

9      ugly when I brought up that I wanted to

10     be -- have a desk audit.  That's when --

11     pardon my French, young ladies.  That's

12     when everything went to hell.

13 Q.  Okay.  So prior to you requesting a desk

14     audit, John Free had never discriminated

15     against you on the basis of your race or

16     your age?

17 A.  We got along fine.

18 Q.  You got along fine?

19 A.  (Witness nods head).

20     But after -- after requesting the desk

21     audit numerous times, everything went to

22     hell.

23 Q.  Prior to requesting the desk audit, did you

238.

```
 1          like working for John Free?
 2    A.    Sure did.  Like I told before, we got along
 3          fine.
 4    Q.    Prior to requesting the desk audit, did you
 5          have any problems working with John Free?
 6    A.    We had little minor problems.  He's a --
 7          He's a -- I guess a neat freak.  Some folks
 8          at the Commission says he's OCD or ADD, you
 9          know, and he likes to have things in a
10          certain order.  He -- You know, I've -- He
11          likes to arrange a tie and arrange the
12          paper on your desk and stuff like that.
13          But, you know, that's just his way of doing
14          things.
15    Q.    So the only problem you had with John Free
16          prior to requesting a desk audit was he was
17          a neat freak and you're not?
18    A.    Yeah.  You know, we're polar opposites,
19          John and I.  He's the kind -- We are polar
20          opposite.  We have polar opposite
21          temperament, background, education.  We're
22          polar opposite in a lot of ways.
23    Q.    But notwithstanding that you are polar
```

239

1             opposites, prior to requesting the desk

2             audit you had no problem working with John

3             Free?

4     A.     I have no problem working with most folks

5             who are fair and honest.  But Mr. Free

6             started to engage in some activities that

7             wasn't quite ethical.

8     Q.     Prior to requesting the desk audit, was

9             John Free fair and ethical?

10    A.     We had a run-in on -- the first evaluation

11            wasn't quite what it should have been.  I

12            wrote letters to John, copied Janice

13            Hamilton stating my objection.  And we was

14            able to get together and work out the

15            problems and it went along smooth after we

16            was able to iron out that initial what I

17            thought -- what I told him was a low-ball

18            audit -- low-ball evaluation.  After I

19            voiced my opinion, you know, we worked that

20            out, things went along smoothly until we

21            came to the point of the desk audit.

22    Q.     And that desk audit, was that -- did that

23            issue or problem, I guess as you would call

240

1           it, did that -- that arose when?

2    A.    Arose probably in the -- I think like 2004

3          about -- prior to Mr. Free and the

4          accountant having -- they had a desk audit

5          a couple of months earlier and I had -- you

6          know, I had -- I had talked to Free before

7          they had the desk audit.  Then once I had

8          found out they had received a desk audit, I

9          had requested the same privilege for the

10         engineers.  He initially told me that he

11         would have a desk audit performed the first

12         of the year and I needed to get the

13         information provided to him and that my

14         desk audit would be the first one on the --

15         Ms. Hamilton and the Commission agenda.  He

16         didn't keep his word.  After he didn't keep

17         his word, that's when we -- our

18         relationship began to deteriorate.

19   Q.    But I heard you say that you had a little

20         disagreement with his first appraisal?

21   A.    That's correct.

22   Q.    And you filed -- and you responded to it

23         and y'all got together and worked it out?

241

1   A.   That's correct.

2   Q.   And other than that appraisal, prior to the

3        desk audit, did you and Mr. Free get along

4        just fine?

5   A.   You know, we didn't get along on a lot of

6        stuff. You know, we -- I understood his

7        background. He understood my background.

8        We got along fine, you know, about best you

9        could. You know, we got along fine. The

10       point that triggered this -- triggered this

11       ill will between myself and Mr. Free was

12       his failure to perform a desk audit.

13  Q.   Was there any ill will between you and

14       Mr. Free prior to the desk audit?

15  A.   I don't think so.

16  Q.   And other than having different

17       personalities, y'all got along fine prior

18       to the desk --

19  A.   We got along fine. You know, we got along

20       fine. He -- You know, John -- We got along

21       fine. He was -- You know, we was doing the

22       best we could with what we had. But we got

23       along fine until the issue of the desk

242

1      audit created ill will.

2  Q.  And even before that desk audit, isn't it

3      true that Mr. Free recommended you for a

4      promotion?

5  A.  No.  The -- I asked for the desk audit.

6      Then the promotion kind of put things at

7      bay for a minute.  Then after I got the

8      promotion -- I asked for a desk audit

9      before the promotion.  Then he -- I got a

10     promotion.  Then after the promotion, then

11     they came back with the desk audit.

12                (Defendants' Exhibit 37 was marked

13                   for identification.)

14 Q.  Well, let me show you what I've marked as

15     Defendants' Exhibit 37.  This is an

16     application for examination for the

17     position of Utilities Engineering

18     Specialist II.

19 A.  Okay.

20 Q.  And Defendants' Exhibit 37 is the

21     application you filled out to apply for the

22     promotion of Utilities Engineering

23     Specialist II; is that correct?

243

1   A.   That's correct.

2   Q.   Is this your handwriting on Defendants'

3        Exhibit 37?

4   A.   Yeah.  It appears to be my style

5        handwriting.

6   Q.   Is any of this handwriting on Defendants'

7        Exhibit 37 not your handwriting?

8   A.   Yes.  This appears to be completely my

9        handwriting.

10  Q.   So all of the handwriting on Defendants'

11       Exhibit 37 is your handwriting?

12  A.   That's correct.

13  Q.   At the bottom of the first page on

14       Defendants' Exhibit 37, is that your

15       signature?

16  A.   That's correct.

17  Q.   And did you sign the application on March

18       19th, 2004?

19  A.   That's correct.

20  Q.   And by signing that application, you

21       certified, quote, that all statements on or

22       attached to this application are true and

23       correct to the best of my knowledge --

244

1    A.    That's correct.

2    Q.    -- period.

3    A.    That's correct.

4    Q.    I know that any false statements may cause

5          me to be denied the chance for testing, to

6          be removed from the employment register, or

7          to be released -- actually it says

8          release -- from employment.

9    A.    That's what it says.

10   Q.    Okay.

11   A.    Okay.

12   Q.    And are your statements in Defendants'

13         Exhibit 37 true and correct?

14   A.    To the best of my ability.

15   Q.    Okay.  Well, do you know of any statement

16         in Defendants' Exhibit 37 that is not true

17         and correct?

18   A.    Not at this time I don't.

19   Q.    Have you looked through Defendants' Exhibit

20         37?

21   A.    I looked at it.

22   Q.    Okay.  And you don't see any statement in

23         there that's not true and correct?

245

```
 1    A.    Not -- I don't have a habit of putting

 2          false statements in documents.

 3    Q.    Okay.  Now, you submitted Defendants'

 4          Exhibit 37 with the intent that the State

 5          of Alabama rely upon that application in

 6          considering you for the position of

 7          Utilities Engineering Specialist II?

 8    A.    That's correct.

 9                     (Defendants' Exhibit 38 was marked

10                      for identification.)

11    Q.    Let me show you what's been marked

12          Defendants' Exhibit 38.

13    A.    Okay.

14    Q.    That is the notice for the position of

15          Utilities Engineering Specialist II;

16          correct?

17    A.    That's correct.

18    Q.    Now, I know it's been scratched through on

19          your copy and my copy and someone has

20          written Public Utility Technical Specialist

21          Senior; is that correct?

22    A.    That's correct.

23    Q.    That's because that title was eventually
```

246

```
 1            changed?
 2    A.      That's correct.
 3    Q.      Okay.  Now, is -- Defendants' Exhibit 38
 4            would be the announcement you received and
 5            which prompted you to fill out Defendants'
 6            Exhibit 37?
 7    A.      That's correct.
 8    Q.      Did you review Defendants' Exhibit 38 prior
 9            to filling out your application?
10    A.      Wait a minute, now.  You've got something
11            added behind.  This is what we've got
12            here.  This wasn't part of this document
13            here.
14    Q.      You're right.  I see they have a different
15            date.  Okay.  Why don't we do this.  Let's
16            just tear off the first page.  And here you
17            go.  We'll put that to the side.  And I
18            tore it off my copy too.
19                 Let's make sure that we're correct.
20            Was -- Is Defendants' Exhibit 38 to your
21            knowledge just a one-page document?
22    A.      That's correct.
23    Q.      And if you were accepted for the position
```

247

1           of Utilities Engineering Specialist II as

2           announced in Defendants' Exhibit 38, you

3           would receive a salary increase?

4    A.    That's correct.

5    Q.    Because your pay grade would go up?

6    A.    That's correct.

7    Q.    Your classification would go up?

8    A.    That's correct.

9                    (Defendants' Exhibit 39 was marked

10                       for identification.)

11   Q.    Let me show you Defendants' Exhibit 39.

12         This is a memorandum from John Free to

13         Dorinda Kepler in PSC personnel and it

14         states, quote, I would like to request that

15         the necessary procedures be undertaken to

16         promote Mr. Gregory Kelly, Utility

17         Engineering Specialist I, to the position

18         of Utility Engineering Specialist II as

19         soon as possible, period.  Did I read that

20         statement correctly?

21   A.    That appears to be correct.

22   Q.    Mr. Free, in fact, requested that you be

23         promoted to Utility Engineering Specialist

248

1     II; isn't that correct?

2  A.  According to the letter, that's correct.

3  Q.  Well, do you dispute --

4  A.  I don't dispute --

5  Q.  -- the truthfulness of the letter?

6  A.  I don't dispute that.

7  Q.  You don't contend that Mr. Free was

8      discriminating against you on the basis of

9      your race or age when he wrote Defendants'

10     Exhibit 39, do you?

11 A.  No.  Like I stated before, the ill will

12     didn't start -- you know, he was -- you

13     know, got along fine.  The ill will didn't

14     start until the issue of the desk audit

15     came up.  That's when the ill will began to

16     permeate the air.

17 Q.  Okay.  So he did not discriminate against

18     you either on the basis of race or age when

19     he recommended you be promoted to Utility

20     Engineering Specialist II?

21 A.  No.  We hadn't went -- We hadn't went to

22     the land of no return yet.

23 Q.  I'm sorry?

249

1    A.    We had -- The situation hadn't gotten out

2          of hand yet.  We were still working trying

3          to resolve the issue.  He knew of my desire

4          for a desk audit.  I have stated that

5          unequivocally that I wanted a desk audit

6          prior to this day, and he knew of my desire

7          for a desk audit.

8    Q.    Did you also want the position of Utility

9          Engineer Specialist II?

10   A.    Yes.

11   Q.    You wanted that position?

12   A.    That's correct.

13   Q.    And you applied for it?

14   A.    That's correct.

15   Q.    And Mr. Free recommended you be given that

16         position?

17   A.    That's correct.

18   Q.    And you were given that position?

19   A.    That's correct.

20   Q.    And you're not claiming discrimination

21         because you were given that position, are

22         you?

23   A.    No.  We -- The discrimination -- Let's make

250

```
 1              it perfectly clear.  The discrimination and

 2              ill will did not permeate until the desk

 3              audit was requested.

 4     Q.       Until the desk audit?

 5     A.       Yeah.  And I think this was prior to that

 6              point.  We didn't get to that until the end

 7              of this year, I think 2000 -- at the --

 8              October or November, December we was -- at

 9              this particular time, Mr. Free and myself,

10              we still had a good working relationship.

11     Q.       And so when you say at this particular

12              time, you're referring to May 12, 2004?

13     A.       That's correct.  We still had a -- still

14              had a good working relationship.

15     Q.       And that's the document -- the date on

16              Defendants' Exhibit 39 you just --

17     A.       That's correct.

18                        (Defendants' Exhibit 40 was marked

19                         for identification.)

20     Q.       Okay.  Let me show you Defendants' Exhibit

21              40.  This is the letter that you received

22              confirming that you had received the

23              promotion to Utility Engineering Specialist
```

251

1          II?

2    A.   That's correct.

3    Q.   Now, you had a six-month probationary

4         period for that promotion; correct?

5    A.   That's correct.

6    Q.   And if in that six-month period of time, if

7         things didn't work out with you on that job

8         or if you didn't like the job, then you had

9         a six-month window to turn down the

10        promotion?

11   A.   That's correct.

12   Q.   Either -- And that six-month window gave

13        the State the right to turn back your

14        promotion and it gave you the right to turn

15        back the promotion; is that correct?

16   A.   That's correct.   That's correct.

17                   (Defendants' Exhibit 41 was marked

18                    for identification.)

19   Q.   Now, Defendants' Exhibit 41, let me show

20        you that.   And I'll admit to you this is a

21        duplicate of what I handed you earlier

22        regarding one of your salary adjustments.

23        But I have this here just because it does

252

1        establish that you did receive a pay raise

2        for that adjustment -- for that promotion;

3        correct?

4  A.   Okay.  That's correct.

5  Q.   And Defendants' Exhibit 41 confirms your

6        pay increase?

7  A.   That's correct.

8             (Defendants' Exhibit 42 was marked

9               for identification.)

10  Q.   Now, Defendants' Exhibit 42 that Shelia is

11        handing you is a memorandum from Dorinda

12        Kepler asking you to fill out a

13        preappraisal form, a selective service

14        form, and a Form 40.

15  A.   I don't fill out the Form 40.  Mr. Free

16        fills out the Form 40.  I have no input in

17        Form 40.

18  Q.   Well, this memorandum is addressed to

19        Mr. Gregory Kelly; correct?

20  A.   It might be addressed to me, but I have no

21        input in Form 40.

22  Q.   Have you ever seen Defendants' Exhibit 42?

23  A.   Not that I'm aware of.

253

1    Q.    Okay.  Well, it does state -- tell me if I

2          read it incorrectly -- in conjunction with

3          your recent promotion effective May 29th,

4          2004 to Engineering Specialist II, please

5          complete and return the enclosed forms to

6          the personnel section.  Okay.  You never

7          received Defendants' Exhibit 42?

8    A.    Yeah.  I probably -- I can't remember back

9          in 2004.  But I know for a fact I have no

10         input in my Form 40.  I have no input.

11         Mr. Free, he produces the Form 40 and I'm

12         required to sign it.

13   Q.    Well, what about the preappraisal form, did

14         you have any input in that?

15   A.    I probably filled it out.

16   Q.    I'm sorry?

17   A.    Yeah.  I don't recall what happened on this

18         particular day.

19   Q.    Well, do you believe that you did fill out

20         the preappraisal form?

21   A.    I could have.  I'm not 100 percent sure.

22   Q.    Okay.  And did you fill out the selective

23         service form?

254

| | | |
|---|---|---|
| 1 | A. | I can't recall at this particular time. |
| 2 | Q. | But you say that you did not fill out the |
| 3 | | Form 40? |
| 4 | A. | I have no input in the Form 40.  Only thing |
| 5 | | required from me is my signature. |
| 6 | | (Defendants' Exhibit 42-A was |
| 7 | | marked for identification.) |
| 8 | Q. | Well, let me show you Defendants' Exhibit |
| 9 | | 42-A.  This is a position classification |
| 10 | | questionnaire.  And it says up in the |
| 11 | | right-hand corner Form 40? |
| 12 | A. | That's correct. |
| 13 | Q. | Is this the Form 40 that Dorinda Kepler's |
| 14 | | memorandum to you refers to? |
| 15 | A. | That's correct. |
| 16 | Q. | Okay.  It does say Utilities Engineering |
| 17 | | Specialist II. |
| 18 | A. | That's correct. |
| 19 | Q. | That was your new job? |
| 20 | A. | That's correct. |
| 21 | Q. | Okay.  And Dorinda Kepler's memorandum is |
| 22 | | dated June 8th, 2004.  And if we look at |
| 23 | | the back page of this Form 40, it was |

255

| | | |
|---|---|---|
| 1 | | signed by you on June 11th, 2004. |
| 2 | A. | That's correct. |
| 3 | Q. | Is that your signature? |
| 4 | A. | That's correct. |
| 5 | Q. | And you did sign this Form 40 on July 11th, |
| 6 | | 2004? |
| 7 | A. | That's correct. |
| 8 | Q. | Was the Form 40 completed when you signed |
| 9 | | it? |
| 10 | A. | I'm not sure if Mr. Free's name was on |
| 11 | | there.  I think he gave it to me and I |
| 12 | | could look at it a couple of days.  I went |
| 13 | | and talked to one of the other engineers, |
| 14 | | Wayne Wright, and told him I wasn't |
| 15 | | comfortable with some of the information on |
| 16 | | this Form 40, specifically the close |
| 17 | | hands-on supervision.  After I talked to |
| 18 | | Mr. Wayne Wright, he said, Greg, if you |
| 19 | | don't sign the Form 40, they have the right |
| 20 | | to terminate you.  If you don't sign the |
| 21 | | Form 40, he said, I'm telling you, son, |
| 22 | | they will terminate you. |
| 23 | Q. | Wayne Wright? |

256

| | | |
|---|---|---|
| 1 | A. | That's correct. |
| 2 | Q. | How do you spell his name? |
| 3 | A. | W-R-I-G-H-T. |
| 4 | Q. | Who is Wayne Wright? |
| 5 | A. | He used to be an engineer in the |
| 6 | | telecommunications department, but he's |
| 7 | | been retired now for about -- for a couple |
| 8 | | of years. |
| 9 | Q. | Did he work for the Public Service |
| 10 | | Commission? |
| 11 | A. | That's correct. |
| 12 | Q. | And when did you talk to Mr. Wright? |
| 13 | A. | Shortly before or shortly after and told |
| 14 | | him I had some misgivings about how my job |
| 15 | | was being handled and my job being |
| 16 | | supervised from accounting.  And I think he |
| 17 | | had some of the same problems going on in |
| 18 | | telecommunications.  And we talked and I |
| 19 | | think he had refused to sign his Form 40 |
| 20 | | and he had received a letter from legal |
| 21 | | stating if he didn't sign this Form 40 by a |
| 22 | | certain date that his employment at the |
| 23 | | Commission will be terminated.  He said, |

257

```
 1          this is exactly what's going to happen to

 2          you if you don't sign this Form 40.

 3               I also talked to ASEA about signing a

 4          document that I didn't completely agree

 5          with.  They told me that sign it, dispute

 6          it later.  The only thing that you

 7          shouldn't sign as an employee is your

 8          termination agreement.  That's the only

 9          document that you shouldn't sign.

10    Q.    Okay.  Prior to June 11th, 2004, you talked

11          to Wayne Wright about Defendants' Exhibit

12          42-A?

13    A.    It could have -- I'm not -- It could have

14          been at that time or around that time.

15          Wayne and I were having some discussions

16          about some stuff going on at the

17          Commission.  He -- You know, he was -- Once

18          I found out he was an engineer, had been an

19          engineer for a number of years at that time

20          and he was -- he knew exactly how things

21          work at the Commission.  I was having

22          conversation with Mr. Wayne Wright on what

23          was the proper protocol.
```

258

| | | |
|---|---|---|
| 1 | Q. | And you had those discussions with |
| 2 | | Mr. Wayne Wright on or about June 2004? |
| 3 | A. | Around that time.  We was talking about a |
| 4 | | number of issues. |
| 5 | Q. | Did you have those discussions before you |
| 6 | | signed Defendants' Exhibit 42-A? |
| 7 | A. | I can't remember.  It might have been.  A |
| 8 | | couple of -- you know, we've had talk -- we |
| 9 | | talked about it and I told him I wasn't |
| 10 | | comfortable signing documents that I knew |
| 11 | | wasn't true.  Then he assured me that if I |
| 12 | | didn't sign it and I protested this that |
| 13 | | the Commission did indeed have a right to |
| 14 | | early terminate my employee if I didn't |
| 15 | | sign the Form 40. |
| 16 | Q. | And you contend Defendants' Exhibit 42-A |
| 17 | | Form 40 is not true? |
| 18 | A. | It's not, especially line 21. |
| 19 | Q. | And line 21 simply says, check below the |
| 20 | | type of supervision provided by the |
| 21 | | immediate supervisor to this position and |
| 22 | | close, backslash, hands-on is checked? |
| 23 | A. | That's correct. |

259

1  Q.  And you -- it's your contention that that

2      is not true?

3  A.  He's not capable as accountant to provide

4      close hands-on supervision to a highly

5      technical job like the engineering

6      position.  He doesn't have the technical

7      background, training, knowledge or

8      expertise to perform that job.

9  Q.  So it's your contention that Defendants'

10     Exhibit 42-A is not true because John Free

11     as an accountant cannot provide you,

12     Gregory Kelly, an engineer, close hands-on

13     supervision?

14 A.  That's correct.  He can provide -- you

15     know, in the technical area.  He try to

16     provide you close hands-on supervision as

17     in dotting the i's and crossing the t's.

18     That's the only area of my position that

19     Free can provide close hands-on supervision

20     is in the grammar area.

21 Q.  So the only close hands-on supervision John

22     Free can provide you, Gregory Kelly, is in

23     grammar?

260

1    A.    That's the only thing he can do.  And

2          grammar is subjective.  You know, how you

3          write stuff is your personal style and

4          opinion.  It's subjective.

5    Q.    Grammar is subjective?

6    A.    It's subjective.

7    Q.    Is writing skills subjective?

8    A.    Subjective.  All arts are subjective.

9    Q.    Is spelling subjective?

10   A.    On some words it could be.

11   Q.    Okay.  Other than paragraph 21 on close

12         hands-on supervision, is there anything

13         else on Defendants' Exhibit 42-A that you

14         claim is untrue?

15   A.    All the -- we've -- you know, some of the

16         duties -- you know, not all -- not every

17         specific duty is listed in there.  But the

18         biggest complaint that I have with this

19         particular document is line 21.

20   Q.    That's your biggest complaint?

21   A.    That's correct.

22   Q.    That's your major complaint?

23   A.    That's the major complaint.

261

1    Q.    Okay.  Now, let me ask you this, then.  Is

2          this Form 40 -- We went over your first

3          Form 40 back -- that you filled out when

4          you began working with the Commission in

5          2002 earlier this -- today.  And you told

6          me that at that time that the only thing

7          that you disagreed with that Form 40 was

8          that it did not list all of the things you

9          did.

10   A.    Well, let's put it like this.  You know,

11         I'm not a State Personnel expert.  I don't

12         know all the personnel rules and

13         regulations.  Over time information begin

14         to come to you and you begin to go back and

15         review documents that you've signed or

16         information that you've gained and you

17         begin to -- you know, like any other job

18         you begin to understand how the system

19         works.  And once I was able to -- went

20         through and reviewed all my personnel file,

21         this stuck out like a sore thumb.

22   Q.    That paragraph 21?

23   A.    Yeah.  Stuck out like a sore thumb.

262

| | | |
|---|---|---|
| 1 | Q. | Line 21? |
| 2 | A. | It did. |
| 3 | Q. | But the duties here that are listed on the |
| 4 | | second page, is that correct?  Are those |
| 5 | | your major duties as a Utility Engineer |
| 6 | | Specialist II? |
| 7 | A. | Well, these duties are just generic |
| 8 | | duties.  You could write one line that |
| 9 | | could encompass ten other -- I think the |
| 10 | | best description of my duties is going to |
| 11 | | be found on the PSC web site.  If you want |
| 12 | | to know exactly what my duties entail, the |
| 13 | | best information would entail looking on |
| 14 | | the PSC web site. |
| 15 | Q. | Is Defendants' Exhibit 42 a fair |
| 16 | | description of your duties? |
| 17 | A. | It's fair.  It's generic.  It's not |
| 18 | | all-encompassing, but it's -- |
| 19 | Q. | But it's a fair description -- |
| 20 | A. | It's fair. |
| 21 | Q. | -- of your duties? |
| 22 | A. | You know, it's fair.  It's written by an |
| 23 | | accountant and it's been dumbed down into |

1        layman's terms.  It's written by an

2        accountant, accounting level.

3    Q.  Is that another one of your criticisms

4        about it, it's written by an accountant and

5        dumbed down to layman's terms?

6    A.  Well, I'm using the word that he often

7        used.

8    Q.  Okay.  But is that your belief too?

9    A.  The facts speak for themselves.  That's a

10       term he used to describe his ability when

11       it comes to understanding engineering.

12   Q.  But do you believe Defendants' Exhibit 42-A

13       is dumbed down for a layman's term?

14   A.  Sure, it is.

15   Q.  Now, Defendants' Exhibit 42-A was signed --

16       excuse me -- was filled out when you signed

17       it?

18   A.  That's correct.

19   Q.  Okay.  And so you had an opportunity to

20       review it?

21   A.  Sure, I did.

22   Q.  And when you reviewed it, you disagreed

23       with paragraph 21?

1    A.    Well, you know, disagreed with some of the

2          writing.  But, you know, you're not going

3          to argue with your supervisor.  You want to

4          pick your fights.  You don't want to argue

5          about every little thing that comes across

6          your desk there.

7    Q.    But you believed when you signed it that

8          paragraph 41 was not true?

9    A.    You're talking about line 21?

10   Q.    Line 21.

11   A.    Yeah.  Line 21 is totally false.

12   Q.    On page 3 up above your signature?

13   A.    Yeah.  Totally false.

14   Q.    So where it said that you were provided

15         close hands-on supervision, line 21, you

16         believed on June 11th, 2004 that that

17         statement was untrue?

18   A.    Yeah.  Free doesn't have that capability.

19   Q.    But you signed it anyway?

20   A.    I wanted to maintain my job.

21   Q.    Well, you wanted a promotion; correct?

22   A.    Sure, I did.

23   Q.    Okay.  So to get your promotion you signed

265

```
 1         this form even though you believed line 21

 2         on page 3 above your signature was untrue?

 3    A.   Yeah.  It's untrue.

 4                   (Defendants' Exhibit 43 was marked

 5                    for identification.)

 6    Q.   Let me show you Defendants' Exhibit 43.

 7         This is a preappraisal form also dated June

 8         11th, 2004.

 9    A.   Okay.

10    Q.   Is that correct?

11    A.   Appears to be correct.

12    Q.   Okay.  If you look at your -- page 2, is

13         that your signature?

14                   MR. MOZINGO:  Jim, I'm

15                     referring --

16                   MR. DEBARDELABEN:  I was just

17                     looking at that -- whatever is

18                     written down there.  I can't

19                     read it.

20                   MR. MOZINGO:  Yeah.  I'll ask

21                     him.  I'll ask him to explain

22                     that.

23    Q.   If you look at the second page, there is --
```

266

1     it has an employee's signature.  Is that

2     your signature on that line?

3  A.  That's correct.

4  Q.  Okay.  And was Defendants' Exhibit 43

5     filled out prior to you signing it?

6  A.  That's correct.

7  Q.  Now, on page 9 -- I'm sorry.  On page 1,

8     paragraph nine at the very bottom, the

9     paragraph is in very small type and there's

10    some handwritten notes there -- or a

11    handwritten note.  Did you write that?

12  A.  No, I did not.

13  Q.  Was paragraph nine on Defendants' Exhibit

14    43 when you signed it in June 2004?

15  A.  I can't recall.  I think that was one of

16    the duties he could have added later.

17  Q.  Well, it just says perform technical

18    research analysis and documentation of the

19    company's environmental compliance

20    activities and strategies.  Would the

21    company be Alabama Power Company?

22  A.  That's correct.

23  Q.  Okay.  And did you perform technical

267

1        research and analysis and document Alabama

2        Power's environmental compliance activities

3        and strategies?

4  A.  We did the best we could with the resource

5        that we had.  I'm one engineer.  I have

6        over 300 site locations to look at.  And on

7        several occasions I've asked Mr. Free to

8        provide me with technical assistance.

9        Never respond.  I have asked Mr. Free to

10       increase the staffing of engineers'

11       function.  He never respond.

12  Q.  Mr. Kelly --

13  A.  Yes.

14  Q.  -- I hate to interrupt you, but let me

15       repeat my question.  I simply asked is

16       paragraph nine -- and I'm going to kind of

17       paraphrase it again.  But is paragraph nine

18       a fair description of one of your job

19       responsibilities as Utility Engineer

20       Specialist II?

21  A.  Fair responsibility?

22  Q.  Is that a fair description of one of your

23       job responsibilities?

268

1   A.    Yeah.  That's a fair responsibility.

2         Appears to be.

3   Q.    Okay.  Thank you.

4                    MR. DEBARDELABEN:  Flynn, does

5                    that say the handwritten -- I

6                    can't read mine that well.

7                    You might have the original

8                    someplace.  Added 8/27/04.

9               MR. MOZINGO:  It says for prior

10                   four months.  Added 8/27/04

11                   for prior four months would

12                   have put it back in --

13              MR. DEBARDELABEN:  Well, that's

14                   what I was looking.  It was

15                   signed 6/11/04 and it looks

16                   like that was added on 8, you

17                   know, best I can tell 27/04

18                   and I can't read the initials

19                   on it.  Can you?

20              MR. MOZINGO:  Well, that's why I

21                   asked him if he recalls

22                   whether it was on there or

23                   not.

269

1    A.    I don't recall.

2              MR. MOZINGO:  And he doesn't

3                   recall.  But he did say it is

4                   a fair description of what he

5                   does, so ...

6              (Defendants' Exhibit 44 was marked

7                   for identification.)

8    Q.    All right.  Let me have you look,

9          Mr. Kelly, at Defendants' Exhibit 44.  And

10         this is simply -- I'm showing you this

11         because this document simply confirms that

12         your title as Utilities Engineer Specialist

13         II was changed to Public Utility Technical

14         Specialist Senior on or about September

15         20th, 2004.

16   A.    I didn't receive the information until it

17         was done at this time.  But this

18         information I didn't receive until several

19         months later.

20   Q.    Okay.  But this is not a PSC document.

21         This is from the State Personnel

22         Department; correct?

23   A.    That's correct.

270

| 1 | Q. | Okay. And it appears to be addressed to |
| 2 | | the Public Service Commission advising them |
| 3 | | that they have changed your title; is that |
| 4 | | correct? |
| 5 | A. | That's correct. |
| 6 | Q. | Because we talked about your title being |
| 7 | | changed, but -- |
| 8 | A. | I had no input in that. |
| 9 | Q. | -- based on Defendants' Exhibit 44, that |
| 10 | | change was made by the State Personnel |
| 11 | | Department? |
| 12 | A. | I understand that the PSC has some input in |
| 13 | | this from my understanding. |
| 14 | Q. | Okay. |
| 15 | A. | And I wasn't notified of these changes |
| 16 | | until several months after this date. |
| 17 | Q. | Now, if my math is correct, you would have |
| 18 | | received your promotion on June 1, 2004, |
| 19 | | according to Defendants' Exhibit 40. |
| 20 | A. | Okay. |
| 21 | Q. | Okay. That's when you were promoted to |
| 22 | | Utility Engineer Specialist II. |
| 23 | A. | Okay. |

271

| | | |
|---|---|---|
| 1 | Q. | You told me earlier that you had a |
| 2 | | six-month probationary period. |
| 3 | A. | That's correct. |
| 4 | Q. | So if my math is correct, then your |
| 5 | | six-month probationary period expired at |
| 6 | | least by January 2005. |
| 7 | A. | Okay. |
| 8 | Q. | Would you agree with that? |
| 9 | A. | That appears to be correct. |
| 10 | Q. | I mean, actually, it would have expired -- |
| 11 | | if you got the promotion in June, it would |
| 12 | | have expired in December 2004. |
| 13 | A. | That's correct. |
| 14 | | (Defendants' Exhibit 45 was marked |
| 15 | | for identification.) |
| 16 | Q. | Let me show you what's been marked |
| 17 | | Defendants' Exhibit 45. |
| 18 | A. | Okay. |
| 19 | Q. | Defendants' Exhibit 45 is an executive |
| 20 | | summary that you prepared to John Free |
| 21 | | entitled, "What is the 2005 Market Value |
| 22 | | For Public Utility Technical Specialist". |
| 23 | A. | That's correct. |

272

```
 1   Q.   And you would have prepared this on or
 2        about January 4th, 2005 and given it to
 3        Mr. Free thereafter?
 4   A.   Well, I think I actually -- Yeah.  To
 5        Ms. Hamilton and the Personnel Department
 6        it looks like.
 7   Q.   Now, in Defendants' Exhibit 45 -- in fact,
 8        the first sentence it kind of begins with a
 9        question.  On several occasions over a
10        period of 16 months, comma, the topic of,
11        quote, what is the market value for a
12        Public Utility Technical Specialist has
13        been discussed.  Okay?
14   A.   That's correct.
15   Q.   And this executive summary that you
16        prepared was your thoughts on what the
17        market value was for -- or is for a Public
18        Utility Technical Specialist?
19   A.   It wasn't my thought.  The information was
20        gathered from information web sites and
21        government agencies that stated what it --
22   Q.   Let me ask it this way.  Defendants'
23        Exhibit 45 was your response to that
```

273

1        question?

2   A.   This was the information that I had

3        promised Mr. Free. At the beginning of the

4        year we had talked about doing a desk audit

5        for my position. He had told me to go

6        ahead and get the information ready for the

7        desk audit -- you know, given me the

8        information. He had given me a handwritten

9        note stating what type of information he

10       wanted and he had showed me what type of

11       form that he wanted. He had told me to

12       provide him with the information that he

13       need and he'll see if he can go ahead and

14       get this information on the Commissioner's

15       desk.

16   Q.   And when did you first request that desk

17       audit?

18   A.   We had -- I'd have to look at my notes. I

19       think I had talked to Ms. Hamilton prior to

20       the promotion. I brought it to their

21       attention that this job hadn't been looked

22       at for about 16 years. And I felt like

23       with the way the technology had advanced

274

1    that this job needed to be looked at, you

2    know, because of the duties that I was

3    performing, that the duties have become

4    outdated and that the skills required from

5    that job were being outdated and that we

6    need to update this job and update the

7    specifications for this job.  Free, at that

8    particular time, he seemed to be -- was

9    receptive to the idea.  He told me, okay,

10    Greg.  You know, then we had some other

11    discussion when I first brought it to his

12    attention.  He -- You know, he said that

13    I'll be making more than him.  We had some

14    more discussion.

15    And then he -- I think I was getting

16    ready to go to a trip to east Alabama.  He

17    called me in his office.  He said, Greg,

18    let's call State Personnel and check on

19    what you told me.  You know, I was in his

20    office, very friendly, very cordial.  Gave

21    him name of a young lady I had been talking

22    to because the information wasn't in the

23    computer.  He called over to State

275

1    Personnel.  They verified the information

2    that I had provided him.  The job had

3    become so old that State Personnel had no

4    record of the job ever being updated.  And

5    that information was told to Free, told him

6    in a meeting.  And then after that meeting

7    we had in Free's office, I went on to do my

8    site work.  And then I think later on that

9    month I had a discussion with Ms. Hamilton

10   about the same thing, about that this job

11   is dated, this job hadn't been looked at

12   for over 16 years.  And I think at that

13   particular time we was in the middle of a

14   freeze.

15   Q.   Now, these conversations, did these

16        conversations happen before you received

17        your promotion?

18   A.   These conversations were going during the

19        promotion.  They had recommended a

20        promotion and then we still had this

21        outstanding issue of we need to look at

22        this job for the desk audit.  They were

23        working on one track of getting -- Mr. Free

276

1          and Hamilton, they were working on one

2          track of getting the promotion and I was

3          still concerned about a desk audit.  We had

4          two issues that was going on at the same

5          time.

6     Q.   When you received your promotion, you

7          obtained the same job title as Rick

8          Cleckler?

9     A.   That's correct.

10    Q.   You obtained the same job classification as

11         Rick Cleckler?

12    A.   That's correct.

13    Q.   And you received -- you were put into the

14         same pay grade as Rick Cleckler?

15    A.   That's correct.

16    Q.   Okay.  When you were requesting a desk

17         audit, were you requesting the desk audit

18         for the position of Utility Engineer

19         Specialist I or Utility Engineer Specialist

20         II?

21    A.   I was really requesting a desk audit for

22         the whole engineering series, the whole

23         engineering series just like the -- this

277

```
 1            job here.  When they did a desk audit, they

 2            look at the whole series of jobs from my

 3            understanding to make sure that what you

 4            wanted to do -- from what I understand from

 5            people in State Personnel, when you do a

 6            desk audit, you look at a whole series of

 7            jobs.  Make sure those jobs are where they

 8            should be.

 9     Q.     So you were asking a desk audit, then, for

10            all the engineering positions in the Public

11            Service Commission?

12     A.     No.  I was asking for a desk audit for

13            Utility Engineering Specialist I, Utility

14            Engineering Specialist II.  I was asking

15            for a desk audit for these jobs that were

16            shown -- let's see.

17     Q.     If you'll look at Defendants' Exhibit --

18     A.     44, yeah.

19     Q.     -- 44.

20     A.     I was requesting for a desk audit for

21            really the ones that was in our area,

22            202 -- 20521, 20522.  Those were the two

23            jobs I was concerned with.  And I think we
```

278

```
 1          also have a technician job, which is 20504,

 2          according to this sheet.  These are jobs

 3          that I had listed that I was concerned

 4          about having a --

 5     Q.   For the record you're pointing at

 6          Defendants' Exhibit 45?

 7     A.   Yeah.  45.  The ones I have concern with --

 8          I was concerned -- where it says Public

 9          Utility Technical Assistant, I didn't know

10          what the job was at the time.  But those

11          are the jobs at the bottom end that I was

12          concerned about wanting to have a desk

13          audit.

14     Q.   And those were the jobs that either you

15          currently held or you were seeking a

16          promotion?

17     A.   Yes.

18     Q.   Now, if a desk audit had been approved,

19          then that entire -- those entire series of

20          jobs would have been reviewed --

21     A.   That's correct.

22     Q.   -- for pay compatibility?

23     A.   You would -- They would have been reviewed
```

279

1        for the activities that was being performed

2        by those jobs.  Just like I understand when

3        they had the -- Mr. Free's job reviewed.  I

4        understand that they had a peer review

5        group get together and they met with the

6        auditors from State Personnel and they

7        stated what their job responsibilities

8        were.  And they turn it in to the auditor

9        of the pay -- State Personnel and they went

10       and did what they do.  Then they came back

11       with the recommendation.  I was asking the

12       same consideration that the accounting

13       received -- for that same consideration to

14       be given to the technical job.

15   Q.  And if that same consideration were given,

16       then you believe you would have benefited?

17   A.  I don't think we would be here today.  If

18       that same consideration was given, I don't

19       think we would be here today having this

20       conversation.

21   Q.  And if that consideration had been given,

22       you believe it would have benefited you?

23   A.  I believe it would have benefited me.

280

| | | |
|---|---|---|
| 1 | Q. | And it also would have benefited Rick |
| 2 | | Cleckler, wouldn't it? |
| 3 | A. | It would have benefited all the jobs in |
| 4 | | that whole series. |
| 5 | Q. | And Rick Cleckler was in that series? |
| 6 | A. | That's correct. |
| 7 | Q. | So it would have benefited him too? |
| 8 | A. | That's correct. |
| 9 | Q. | The white male that's older than you? |
| 10 | A. | That's correct. |
| 11 | Q. | Now, John Free -- You don't contend that |
| 12 | | John Free is required to request a desk |
| 13 | | audit for you, do you? |
| 14 | A. | I think the -- if you want to work for a |
| 15 | | supervisor who can be fair and honest.  If |
| 16 | | you have -- If I work for someone if you |
| 17 | | bring something to their attention, they |
| 18 | | should be fair and honest.  They shouldn't |
| 19 | | show a favorite.  Now, if Mr. Free had went |
| 20 | | back, tried to get the desk audit, got shot |
| 21 | | down, we would have still been -- I would |
| 22 | | have been okay with that.  But he didn't |
| 23 | | try.  He didn't even go to bat and try to |

281

```
 1        get anything done.  If he would have showed

 2        the effort and initiative to even try to

 3        get it done and show me that he did the

 4        effort, I don't -- but each time I asked

 5        Mr. Free to do that, he told me he had no

 6        intention of doing a desk audit for now or

 7        for the foreseeable future.  To me that was

 8        insulting.

 9   Q.   And you think it was unfair for him not to

10        try?

11   A.   That's right.

12   Q.   Okay.  And if he would have at least tried,

13        then he would have been fair and you -- we

14        wouldn't be here today?

15   A.   Yeah.  We wouldn't be here today.  I would

16        have said, appreciate it, Hoss; you know,

17        you went to bat; I know you stuck your neck

18        out; sorry about that; you know, let's --

19        you know, and I thank you for trying.

20        That's the only thing you can ask from

21        somebody to be fair and to be honest.  Now,

22        if he had got shot down and he told me

23        where the holdup or where the bottleneck
```

282

1    would have been in the system where he told

2    me, well, Janice wouldn't approve for it,

3    then I would have been in there having

4    conversation with Ms. Hamilton of why she

5    wouldn't do it.  If the Commission wouldn't

6    do it and she's approved it, I would have

7    had conversation with the Commissioners on

8    why you don't think this is the fair thing

9    to do.  But he didn't try.

10                   (Defendants' Exhibit 46 was marked

11                        for identification.)

12   Q.   Let me show you what's been marked

13        Defendants' Exhibit 46.  This is a letter

14        or memorandum from you to Janice Hamilton

15        requesting Ms. Hamilton's assistance in

16        reviewing the salaries for your engineering

17        position.

18   A.   That's correct.

19   Q.   Is that the same thing as the desk audit?

20        Did they kind of go hand in hand --

21   A.   Yeah.

22   Q.   -- with the desk audit and salary?

23   A.   Some people call them a desk audit.  Some

283

1    of them call it a job study.  Some of them

2    call it -- you know, I'm not a personnel

3    person.  Some of them call it whatever.

4    But, yeah, this is a response Free and I --

5    Do you want me to explain this or not

6    explain this or just --

7  Q.  No, no.  That's --

8  A.  Do you want me to explain it?

9  Q.  I'll ask you for an explanation --

10  A.  Okay.

11  Q.  -- if I need one.

12        Is the ultimate purpose of a desk

13    audit -- for you is the ultimate purpose to

14    increase your salary?

15  A.  I want to be paid for comparable

16    engineers -- the type of work that I

17    provide the PSC.  I want to be paid for

18    other similar situated jobs in the

19    southeast who provide the same similar

20    situation jobs that I have.  Now, if we

21    have a desk audit, a fair desk audit, you

22    know, let the chips fall where they may and

23    this is -- this is what happened, I'm

284

1          fine.  But after 16 years of not having a

2          desk audit and they've pigeonholed this

3          job.  This job -- No.  Desk audit -- Excuse

4          me.  I get my dates correct.  A desk audit

5          hasn't been done on this job for nearly 30

6          years.  My job has been pigeonholed for a

7          black person or black engineer for the last

8          16 years.  What they have done, they've

9          trashed this job.  They've trashed this job

10         by not keeping this job competitive with

11         what's in the market for it.  What they've

12         done now, you've got a senior accountant

13         paid the same salary as a senior engineer.

14         People, that's not right.  Senior

15         accountant do not make the same pay as a

16         senior engineer.  That is totally wrong.

17         It is totally unfair.

18    Q.   And so the ultimate objective of a desk

19         audit is to, if possible, ensure that your

20         engineering grade is paid or receives a

21         commensurate salary with engineers in the

22         southeast?

23    A.   That's right.  You want to get paid for the

285

1    work and what the service that you're being

2    provided.  You know, you don't want people

3    to take advantage of you because -- you

4    know, you wouldn't want -- as a lawyer you

5    wouldn't want somebody to pay you for what

6    a street sweeper would pay.  You want to be

7    paid what a similarly situated lawyer with

8    your qualifications and credentials are

9    paid.  You don't want to be embarrassed of

10   paying sub minimum wages.  You want to be

11   paid -- You know, I have a lot of peers

12   with Alabama Power Company.  I have a lot

13   of peers that work for other companies.  I

14   know what they're being paid.  And I have

15   the same qualifications, the same

16   education, higher than some folks, but yet

17   because I'm locked in an accounting

18   section, refuse to give me a desk audit, I

19   can't get the State Personnel and get a

20   desk audit where we can find out what the

21   pay should be.  You know, if I was working

22   for a technical manager, I guarantee you I

23   wouldn't have this problem.  He would be

286

1          on-board with me and trying to help me

2          solicit a desk audit.

3    Q.    Okay.  And because you want the position

4          that you hold to be paid a commensurate

5          salary with other engineers you prepared

6          Defendants' Exhibit 45 which gave examples

7          of what you believe other engineers are

8          paid in the southeast?

9    A.    No.  This is a response.  Do you want me to

10         answer this question?

11   Q.    No, no.  Defendants' Exhibit 45.

12   A.    You want me -- 45, yeah.

13   Q.    45.

14   A.    Yeah.  Yeah.  45, yeah.  This is a -- I did

15         the research.  I did some research January

16         2005.  I went through and looked at similar

17         situated jobs.  The top line we have these

18         similar situated jobs.  Ms. Kay Oswalt,

19         she's a program specialist here at the

20         Commission.  That job, 10529, that is

21         Ms. Kay Oswalt's job.  She is paid right

22         there at the market rate.  She is only 3

23         point -- at 2005 she's only 3.63 percent

HAISLIP, RAGAN, GREEN, STARKIE & WATSON, P.C.
(334) 263-4455

287

```
 1              below the market rate.  But then you come

 2              over here -- And I don't have my job.  But

 3              that would show you where --

 4      Q.      Uh-huh.

 5      A.      But then you look at my job.  My job is

 6              almost 36 or 37 percent below the market

 7              rate.  People, that's not right.  That's

 8              not right to have two similar situated

 9              jobs, one at the market rate, one

10              30-something percent below the market rate.

11              That's not fair.

12      Q.      Now, back when you received your promotion

13              on June 1, 2004, you were in the pay grade

14              of 79 and receiving an annual salary of

15              over $42,000.

16      A.      A good technician coming out of high school

17              make that kind of money today.

18      Q.      And you believe that $42,000 is woefully

19              underpaid for an engineer like yourself?

20      A.      A good technician coming out of high school

21              makes that salary today.

22      Q.      What kind of technician, Mr. Kelly?

23      A.      Someone with a 12th grade education that
```

288

| | | |
|---|---|---|
| 1 | | went out here to Trenholm Trade School and |
| 2 | | learned how to hook up circuits.  No |
| 3 | | college education, someone who just -- with |
| 4 | | a 12th grade education who went out here to |
| 5 | | Trenholm Trade School for a year and |
| 6 | | learned how to hook up circuits. |
| 7 | Q. | So as a Utility Engineer Specialist II with |
| 8 | | the Alabama Public Service Commission |
| 9 | | making in excess of 42,000 back on June 1, |
| 10 | | 2004, you were woefully underpaid? |
| 11 | A. | That is correct. |
| 12 | Q. | Now, Defendants' Exhibit 46 is where you |
| 13 | | asked for Ms. Hamilton's assistance in |
| 14 | | getting your salary adjusted. |
| 15 | A. | That is correct.  Can I tell you why this |
| 16 | | letter was precipitated?  We have had -- |
| 17 | | after this -- to make sure we're clear. |
| 18 | | After this meeting here when I sent the |
| 19 | | letter to Mr. Free, Free denied that this |
| 20 | | happened.  He denied he ever made any |
| 21 | | attempt to get this job market.  He |
| 22 | | disavowed that we had ever had this |
| 23 | | conversation.  I went to Ms. Hamilton with |

289

1      my concerns around the first of the year,

2      told her what had happened.  She sit there

3      very patiently.  She listened, heard what I

4      had to say, and then she called Mr. Free

5      and myself into a joint meeting.  Basically

6      said the same thing.  I told -- I told

7      Ms. Hamilton that I believe this job was

8      woefully underpaid, that we need to bring

9      this job in the 21st century.  This job is

10     being paid on salary that's, you know, 30

11     years behind times.  She listened very

12     patiently.  At the end of that

13     conversation -- It lasted for a while.

14     Talked about ethics, talked about doing the

15     right thing, talked about being a man or

16     woman of integrity and honor.  She listened

17     very patiently.  Mr. Free was in that

18     meeting.  And then she said that in due

19     time that she would tender a solution to

20     this problem.  90 days went by.  No

21     solution was tendered.  That's what

22     precipitated this letter.

23  Q.  So her words to you with regard to your

290

1    request for a desk audit was that in due

2    time she would tender --

3    A.   A solution --

4    Q.   -- a solution.

5    A.   -- to this problem.

6    Q.   Did she tell you what that solution was

7         going to be?

8    A.   No, she did not.

9              (Defendants' Exhibit 47 was marked

10               for identification.)

11   Q.   Let me show you what's been marked as

12        Defendants' Exhibit 47.  This is a

13        memorandum from Ms. Hamilton to you,

14        Gregory Kelly, dated the day after

15        Defendants' Exhibit 46 where she says in

16        the final paragraph that there is no plan

17        on her part to request a salary study for

18        the foreseeable future; is that correct?

19   A.   That is -- Yeah.  That is correct.  But

20        that's totally opposite what we had

21        discussed in our private meeting.  Now

22        we're getting down to short strokes.  You

23        know, there's no more talking.  Letters are

291

| | | |
|---|---|---|
| 1 | | beginning to fly, you know. |
| 2 | Q. | Well, she didn't -- she didn't take nine |
| 3 | | days to respond.  She responded the next |
| 4 | | day -- |
| 5 | A. | Yeah.  You know -- |
| 6 | Q. | -- saying she's not asking for a desk |
| 7 | | audit; correct? |
| 8 | A. | That's correct.  She's told me she has no |
| 9 | | intention of doing a desk audit. |
| 10 | Q. | Actually it says that she's not asking for |
| 11 | | a salary study.  That's what her words are. |
| 12 | A. | That is correct.  Same thing in my opinion |
| 13 | | as a desk audit. |
| 14 | Q. | So her solution that she ultimately |
| 15 | | tendered was to say, no, I'm not going to |
| 16 | | request a salary study? |
| 17 | A. | That's what it appears to be to me. |
| 18 | Q. | Okay.  And that was Janice Hamilton's |
| 19 | | words, not John Free's words? |
| 20 | A. | That is correct. |
| 21 | Q. | The last -- The last sentence of the second |
| 22 | | paragraph in that same letter says, since |
| 23 | | your promotion, I've had difficulty seeing |

292

1     the same level of enthusiasm, initiative,

2     and productivity in your work that you

3     apply to your request for a salary

4     increase.  That's a statement she made to

5     you.

6  A.   So what?  How am I supposed to respond to

7     that?

8  Q.   Did your enthusiasm level for your job

9     drop --

10  A.   I think it --

11  Q.   -- after your promotion?

12  A.   In my opinion Janice tries in a cold

13     fear -- a hot fear.  That's -- You don't

14     worry about stuff like that.  That's a hot

15     fear.  That's --

16  Q.   So your enthusiasm level did not drop?

17  A.   No.

18  Q.   Did your initiative and productivity in

19     your work drop?

20  A.   No.

21  Q.   So you disagree with that statement?

22  A.   I totally disagree with that statement.

23  Q.   I'm sorry?

293

A.   I totally disagree with that statement.

                    (Defendants' Exhibit 48 was marked

                     for identification.)

Q.   Let me show you what's been marked as

     Defendants' Exhibit 49.

                    MS. STALNAKER:   48.

Q.   I'm sorry.  48.  Defendants' Exhibit 48.

     And in this exhibit you state the first

     paragraph, I'm very confused to what my

     official job title is at the Commission.

     Okay.  It says, my latest employee

     performance appraisal form and the recent

     revised employee's handbook both list the

     job title of Utilities Engineering

     Specialist II.  But your recent memo -- and

     I'm paraphrasing here.  It's the next

     sentence.  But your -- my recent --

     recently mentioned promotion in your memo

     is -- also was to the position of Utilities

     Engineering Specialist II.  Okay.  Now, is

     the purpose of this letter, Defendants'

     Exhibit 48, just to express that you have

     some confusion as to what your actual job

294

1          title is?

2    A.    Yeah.  Like I told you before, I didn't --

3          I had no knowledge of this -- this was

4          done.  I had no knowledge of exhibit -- at

5          that particular time I had no knowledge of

6          Exhibit 44, what had happened.

7    Q.    Okay.  So you had no knowledge that your

8          title was now Public Utility Technical

9          Specialist Senior?

10   A.    That's correct.

11   Q.    Okay.  Well, on Defendants' Exhibit 45 in

12         that first sentence you announced to John

13         Free that you're giving him what you find

14         to be the market value of a Public Utility

15         Technical Specialist?

16   A.    If you read the paperwork, you've got

17         conflicting information.  You've got --

18         Like I told you before, I had gotten

19         information from Wayne Wright saying, Hoss,

20         your job has been changed unbeknownst to

21         you.  But I have not received any official

22         information from Mr. Free, Ms. Hamilton, or

23         personnel had been done.  The only person

295

| | | |
|---|---|---|
| 1 | | that told me incognito was Mr. Wayne |
| 2 | | Wright -- and he had given me this form -- |
| 3 | | that your job has been changed, Hoss. |
| 4 | Q. | Let's look at the last paragraph.  You end |
| 5 | | this letter -- this memo, Defendants' |
| 6 | | Exhibit 48, by stating I am still hopeful |
| 7 | | that this position can receive the same |
| 8 | | equitable and fair consideration as most |
| 9 | | positions have in the Commission and state |
| 10 | | government. |
| 11 | A. | That's correct. |
| 12 | Q. | And are you saying when you ask for the |
| 13 | | same equitable and fair consideration, are |
| 14 | | you referring to your request for a salary |
| 15 | | study? |
| 16 | A. | I'm referring to this Exhibit 45.  Now, if |
| 17 | | you look at these jobs here at -- here, |
| 18 | | these jobs are competitive to what's in the |
| 19 | | marketplace.  They're not 35 percent off. |
| 20 | | These jobs are close in range.  Look at the |
| 21 | | accounting job.  Let's see that sheet of |
| 22 | | paper.  Mr. Free's classification.  They |
| 23 | | have competitive -- Let's see.  Let's see |

296

1       if I've got them.  I don't have -- In the

2       memo I don't have -- Let's see.  Mr. Free.

3       But if you look at Mr. Free's -- Kay

4       Oswalt's job competitive with the market.

5       Mr. Free's accounting jobs are competitive

6       with the market.  Only jobs that I have

7       been able to find at the PSC that is not

8       competitive with the market force because

9       it hasn't had a job study in almost 30

10      years has been the technical position here

11      at the PSC.  They're not competitive.  But

12      most jobs at the Commission are competitive

13      with the market.

14  Q.  So on Defendants' Exhibit 48 where you

15      asked for the same equitable and fair

16      consideration, you're referring to your

17      request for a salary evaluation?

18  A.  Salary evaluation or a job study or a desk

19      audit, whatever they want to call it.

20  Q.  Are you referring to anything else?

21  A.  I'm talking to the way I've been treated

22      like Mr. Cleckler.  I wanted my job to be

23      properly staffed with technical folks.  I

297

1     wanted the job to have other engineers that

2     I could mentor or collaborate with. I

3     didn't have that at that particular time.

4     I was asking that I be put in a

5     technical -- I was asking that this job be

6     looked at just like the accounting. The

7     accountants work in the same work group.

8     They go do audit work together. They

9     support each other. They help each other.

10    I have no one to help me. I can't -- If I

11    go to Mr. Free and ask him, he don't

12    know -- you know, he can't help me. I have

13    to go to Mr. Free and ask him for

14    permission to talk to Ms. Hamilton or

15    Mr. Cleckler. And then, you know, I don't

16    have anybody helping me. I don't have

17    anybody to help me with my assignments. If

18    I'm out sick, can't be there a particular

19    day, just like on -- we had a plant that

20    was doing engineering testing. I get back,

21    the work wasn't done. The work was there

22    still waiting for me to be done; important

23    tests trying to determine the load factor.

298

1    The work wasn't done.  I'm sitting there

2    like, you know, I need some help, folks.

3    You know, give me a break, give me some

4    help.

5                   MR. MOZINGO:  Let's go ahead and

6              take a break here.

7              (Brief recess was taken.)

8              (Defendants' Exhibit 49 was marked

9              for identification.)

10   Q.   Mr. Kelly, just as a little housekeeping

11        matter, all these prior exhibits we've

12        already marked I'm going to go ahead and

13        offer them at this time.  And I'm going to

14        show you Defendants' Exhibit 49 now.

15        Defendants' Exhibit 49 is simply a letter

16        from Janice Hamilton to you advising you

17        that your job title was, in fact, changed

18        to Public Utility Specialist Senior;

19        correct?

20   A.   Now we got the truth out.

21              (Defendants' Exhibit 50 was marked

22              for identification.)

23   Q.   Let me show you Defendants' Exhibit 50.

299

| | | |
|---|---|---|
| 1 | | This is a letter from you to Janice |
| 2 | | Hamilton three days later. |
| 3 | A. | Weekend probably was involved.  If you |
| 4 | | check the calendar probably. |
| 5 | Q. | Okay.  But it's dated three days later. |
| 6 | A. | Okay. |
| 7 | Q. | And you copied President Jim Sullivan, |
| 8 | | Commissioner Jan Cook and Commissioner |
| 9 | | George C. Wallace, Jr.; okay? |
| 10 | A. | That's correct. |
| 11 | Q. | And in this letter you submit that your job |
| 12 | | title has changed but your classification |
| 13 | | remains the same and that your pay scale is |
| 14 | | outdated? |
| 15 | A. | That's correct. |
| 16 | Q. | And you also state in the third |
| 17 | | paragraph -- you say, I am troubled by |
| 18 | | these findings because my supervisor is an |
| 19 | | accountant. |
| 20 | A. | That's correct. |
| 21 | Q. | And then you state a couple of sentences |
| 22 | | over, I respectfully ask that my position |
| 23 | | be supervised by a technical professional |

300

```
 1          who has a vested interest in upgrading the

 2          salary of this position.

 3     A.   That's correct.

 4     Q.   Now, when this letter was written, you

 5          contend that John Free had turned you down

 6          for a salary adjustment survey?

 7     A.   That's correct.

 8     Q.   And Janice Free had also turned you down?

 9     A.   Janice Hamilton.

10     Q.   I'm sorry.  Janice Hamilton had also turned

11          you down?

12     A.   We're in -- We're in the process of

13          changing letters right now.  We've gone

14          from talking to writing letters about the

15          subject.

16     Q.   Thank you for correcting me with that name,

17          by the way.

18               But when Defendants' Exhibit 50 was

19          written, you've been turned down for a job

20          salary survey by John Free and you've been

21          turned down by Janice Hamilton?

22     A.   That's correct.

23     Q.   And you end this letter -- you asked for a
```

305

```
 1        you can't get -- in my opinion they've
 2        gotten you set up so you can't get a desk
 3        audit, because the problem is if you get a
 4        desk audit and you're still in that same
 5        organizational structure, then Mr. Free has
 6        to get a pay raise.  In my opinion State
 7        Personnel is not going to approve an
 8        accountant with his qualifications being
 9        paid at the same rate as an engineer.  So
10        to fix the problem you've got to get lined
11        up with somebody who has similar
12        characteristics and similar job
13        qualifications that you have.  You know,
14        you -- Once you get lined up with
15        somebody who is -- you know, like a
16        lawyer.  If you're a lawyer and you're
17        working with paralegals and your boss is a
18        paralegal, then, you know, you're
19        restrained about the knowledge of a
20        paralegal.  You're going to be paid at the
21        paralegal rate.  But if you can somehow get
22        lined up with Mr. Melton or whoever is
23        a head lawyer, then you have a greater
```

```
 1         possibility of being treated like the

 2         lawyer that you are instead of the

 3         paralegal that you are.

 4    Q.   So I take it that Mr. Free had told you

 5         earlier that if you were to have a job

 6         salary adjustment you'd be making more

 7         money than him?

 8    A.   Yes, he did.  He said, golly, you'll be

 9         making more money than me.

10    Q.   Okay.  And so in your reasoning, then, the

11         way to make the more money that you believe

12         you deserve as an engineer is to have your

13         job aligned with another engineer?

14    A.   That's correct.  You know, stop this

15         conquer and divide theory that they try to

16         run at PSC.  There's strength in numbers.

17         If we get over there with the other

18         engineers, you present a solid front, you

19         know, whatever.  But, you know, if you can

20         divide it up and split them all over the

21         organizational chart, then they got you

22         where they want you.

23    Q.   So the best way to get your salary adjusted
```

307

1        like you believe it should be is to get out

2        from under Mr. Free?

3   A.   Yes.  He's an accountant.  You know, you're

4        going to be -- you're going to be capped by

5        what accountant is going to be paid.

6        Engineer salary shouldn't be capped by what

7        accountant's salary is.

8              (Defendants' Exhibit 52 was marked

9              for identification.)

10   Q.   Defendants' Exhibit 52, then, is your

11        memorandum to President Jim Sullivan,

12        Commissioner Jan Cook, and Commissioner

13        George C. Wallace, Jr. with the Alabama

14        Public Service Commission informing them of

15        your wish to file a grievance; correct?

16   A.   That's correct.

17   Q.   And you state in Defendants' Exhibit 52

18        that this action is being considered with

19        regard to the following circumstances;

20        fractured career path, unlevel playing

21        field, compromised job position, lost

22        synergy, and communication difficulties,

23        open paren, vertical and horizontal, close

1         paren.

2    A.   That's correct.

3    Q.   So is that just another way of saying what

4         you just told me, the way to improve your

5         job salary is to get out from under

6         Mr. Free?

7    A.   Yeah.  You've got to get equally yoked with

8         people who are similar -- in a similar

9         situation.  Accountants and engineers are

10        not equally yoked.  You've got to get in a

11        classification who has the similar values

12        and similar skills that you have.

13   Q.   Okay.  And so you were unsuccessful getting

14        into the classification that you want to be

15        in.  You were unsuccessful with Mr. Free

16        and Ms. Hamilton, so you file a grievance?

17   A.   Well, you know, that's one way to look at

18        it.  You've got -- you know, having an MBA

19        degree, you have to use your skills that

20        you have MBA degree to understand that --

21        when you look at this -- the organizational

22        chart is like real estate.  If they locate

23        you in a red zone, low-class area where the

309

1    houses are run down, school system is bad,

2    then you can't demand a higher property

3    value.  Nontechnical job.  They locate you

4    in a high-rent district over there where

5    you're near a golf course and where

6    everybody has a professional job and they

7    are making market value, you have a

8    possibility of maintaining the value of

9    your position.

10   Q.   So in your analysis, Rick Cleckler in

11        special projects is the high-rent district?

12   A.   Yeah.  He's technical.  It requires more

13        skill -- To do Rick's job, it's going to

14        require more skills than to do Patricia

15        Washington's job.  Patricia Washington is

16        not my peer.  Together with Rick Cleckler

17        we have similar situated characteristics.

18        He's an engineer.  I'm an engineer.  So get

19        over there, get up under -- let

20        Ms. Hamilton be your direct supervisor.

21        Petition Ms. Hamilton for -- Petition

22        Ms. Hamilton for a job (inaudible).

23   Q.   Petition Ms. Hamilton for what?

310

```
 1    A.    For a desk audit.

 2    Q.    For a desk audit?

 3    A.    Yeah.

 4    Q.    Because if you're able to get over in

 5          special projects, you can petition

 6          Ms. Hamilton directly for a desk audit and

 7          not have to petition Mr. Free?

 8    A.    That's correct.  And, plus, you know, when

 9          you do a desk audit, they look at the

10          skills that you're required -- they look at

11          the skills that are required to do the

12          job.  Over here they -- State Personnel

13          review, but you're reporting to an

14          accounting manager.  You can't -- You know,

15          you -- If you look at this organizational

16          chart, anybody, you're viewed as an

17          accountant, not an engineer because you're

18          in the accounting section.

19    Q.    Okay.  And you filed your grievance?

20    A.    That's correct.

21    Q.    And you were subsequently granted a

22          grievance hearing?

23    A.    That tells you something wrong because they
```

311

```
 1            granted you a grievance hearing.  They see

 2            problem.  When they grant you a grievance

 3            hearing -- If they didn't see problems,

 4            they would have dismissed, there's no

 5            problem.  But they see problem.

 6      Q.   But they did what you asked.

 7      A.   Sure, they did.

 8      Q.   They gave you a grievance hearing?

 9      A.   Sure, they did.  Sure, they did.

10      Q.   And you've told me before that that hearing

11            was not conducted in your opinion by your

12            peers, but there were four employees of the

13            Public Service Commission that served as

14            your panel?

15      A.   If it wasn't problem, you wouldn't have

16            gotten -- you wouldn't have gotten the

17            grievance hearing.  If they didn't see a

18            problem, there wouldn't have been a

19            grievance hearing.

20      Q.   Okay.  So you believe that even the Public

21            Service Commission saw a problem because

22            they granted you a hearing?

23      A.   They threw it down to the workers.  You
```

312

```
 1        decide.  You make the decision.  If

 2        management was so convinced that they're

 3        doing the right thing, they would have

 4        denied the grievance.

 5   Q.   Well, you do have the right to request a

 6        grievance hearing, don't you?

 7   A.   I was denied one about the -- they totally

 8        denied one.  They didn't deny this one.

 9   Q.   Well, under the rules -- employee rules,

10        are you entitled to request a grievance

11        hearing if you've been denied --

12   A.   You've entitled to one, but they don't have

13        to give you one.  They can find rules and

14        regulations for not giving you one.  You're

15        not entitled to one.

16                 (Defendants' Exhibit 53 was marked

17                    for identification.)

18   Q.   Defendants' Exhibit 53 is the findings and

19        recommendations of the grievance

20        committee.

21   A.   Okay.

22   Q.   Have you seen Defendants' Exhibit 53

23        before?
```

313

A.   That's correct.

Q.   And in summary Defendants' Exhibit 53 is
     the grievance committee's findings of --
     Well, strike it.  Let me better use their
     words instead of paraphrasing it.  They
     state on the second page there were no
     allegations of wrongdoing or improper
     conduct.  We find no credible evidence of
     fractured career path, unlevel playing
     field, compromised job position, or lost
     synergy.  We find that any communication
     difficulties are the sole perception of
     Mr. Kelly.  We recommend that Mr. Kelly's
     request for his position to be moved to the
     special projects section and his request
     that he report directly to a technical
     manager be denied.  And that next paragraph
     states that their findings are unanimous
     and there are signatures there above the
     names for Aquilla Spivey, Debra Jackson,
     Tom Jones, and Doug Dillard; correct?

A.   That's correct.

Q.   Did I read that correctly?

314

1    A.   Yeah.

2    Q.   So you had your grievance hearing and the

3         grievance committee found against you?

4    A.   Yeah.

5    Q.   And that's what Defendants' Exhibit 53 is;

6         they're telling you they find against you?

7    A.   (Witness nods head).

8                 (Defendants' Exhibit 59 was marked

9                   for identification.)

10   Q.   Let me show you what's been marked

11        Defendants' Exhibit 59.  And Defendants'

12        Exhibit 59 is the transcript -- recorded

13        transcript of your grievance hearing;

14        correct?

15   A.   Appears to be.

16   Q.   Well, I asked in your answers to

17        interrogatories whether you would stipulate

18        that it is the true and correct copy and

19        you did.

20   A.   Okay.

21   Q.   So you don't now disagree with that, do

22        you?

23   A.   I haven't looked at it.  It appears to be.

315

1   Q.   Okay.  Now, according to Defendants'

2       Exhibit 59, you had a lawyer present at the

3       grievance hearing?

4   A.   That's correct.

5   Q.   And her name was Linda B. Allen?

6   A.   That's correct.

7   Q.   And she was legal counsel for the Alabama

8       State Employees Association?

9   A.   That's correct.

10   Q.   And she was your lawyer during the

11       grievance committee?

12   A.   That's correct.

13   Q.   And she represented your viewpoint during

14       the grievance committee?

15   A.   That's correct.

16   Q.   And she represented your interest in the

17       grievance committee?

18   A.   That's correct.

19             (Defendants' Exhibit 54 was marked

20               for identification.)

21   Q.   Let me show you what's been marked

22       Defendants' Exhibit 54.  Defendants'

23       Exhibit 54 is the ruling of the Public

316

1          Service Commission signed by President Jim

2          Sullivan, Commissioner Jan Cook, and

3          Commissioner George C. Wallace, Jr.

4          announcing that they have reviewed the

5          findings and recommendations of the

6          grievance committee and they adopt and

7          concur with the findings and

8          recommendations; is that correct?

9     A.   That's correct.

10    Q.   And that was a unanimous decision by the

11         three commissioners on the Alabama Public

12         Service Commission?

13    A.   Okay.  That's correct.

14    Q.   The three Commissioners state the

15         Commission therefore finds that Mr. Gregory

16         Kelly's request that his position be moved

17         from the electricity section of the energy

18         division to the special projects section of

19         the energy division is due to be denied; is

20         that correct?

21    A.   That's correct.

22    Q.   And the Commissioners further state, the

23         Commission further finds that Mr. Gregory

317

1          Kelly's request that he report directly to

2          a technical manager is also due to be

3          denied.

4    A.    That's correct.

5    Q.    And that letter is dated August 25th --

6          23rd, 2005?

7    A.    Yeah.  I'm the only engineer who don't

8          report to a technical manager.  In my

9          opinion that's discrimination.

10                    (Defendants' Exhibit 55 was marked

11                     for identification.)

12   Q.    Let me show you what's been marked

13         Defendants' Exhibit 55.  This is a letter

14         from you to John Free -- a memorandum from

15         you to John Free.

16   A.    Uh-huh (positive response).

17   Q.    And you state a review has been completed

18         of the 2006 job market value for

19         accountant, computer science and

20         engineering positions in state government,

21         including the APSC or the Public Service

22         Commission.

23   A.    That's correct.

318

```
 1    Q.   Is that correct?

 2    A.   That's correct.

 3    Q.   And you have attached an executive

 4         summary --

 5    A.   That's correct.

 6    Q.   -- which you contend shows that the Senior

 7         Public Service Commission Accountant

 8         position has been updated to reflect the

 9         market rate in the last 18 months.

10    A.   That's correct.

11    Q.   However, the Senior Public Service

12         Commission Engineering position, according

13         to you in this memo, has, quote, now been

14         neglected for more than 25 years, end

15         quote.

16    A.   That's the absolute truth.

17    Q.   And you asked for John Free to explain the

18         fairness and the discrepancies in such a

19         system?

20    A.   That's correct.

21    Q.   And this letter was written six months

22         after your grievance hearing?

23    A.   That's correct.
```

319

1  Q.   And in this letter are you again asking
2       John Free to reevaluate the salary that you
3       receive at the Alabama Public Service
4       Commission?
5  A.   I'm asking him to explain it.  Why -- Look
6       on the next to last page if you want -- if
7       you care to look.  I've included the
8       accountant salary on this job list.  As you
9       can see, PSC Analyst II, PSC Analyst III
10      according to my figures are 9.82 percent
11      above the market value because they --
12      remember, they recently had a job study.
13      They're enjoying good times now.  They're
14      9.82 percent above the fair market value
15      for the southeastern region.  At the bottom
16      you look at the engineering job.  The
17      Specialist I is 29.59 below market value
18      and the Senior Specialist job is 35.15
19      below the market value.  And you look at
20      Ms. Kay Oswalt, which is the second -- the
21      computer science job, also at the PSC job,
22      if you look at her job, her job is IT
23      System Specialist Senior, 10529.  She is

320

| | | |
|---|---|---|
| 1 | | 1.9 percent below the market value.  I |
| 2 | | think the numbers speak for themselves, and |
| 3 | | I think the fairness of the system speak |
| 4 | | for itself. |
| 5 | Q. | And under the system you are underpaid? |
| 6 | A. | According to my calculations I'm underpaid |
| 7 | | 35.15 percent. |
| 8 | Q. | And that's unfair? |
| 9 | A. | I think that speak for itself. |
| 10 | Q. | You believe that's unfair? |
| 11 | A. | It's highly unfair. |
| 12 | Q. | Okay.  Now, Defendants' Exhibit 6 is my -- |
| 13 | | is your answers to my discovery request. |
| 14 | A. | Okay. |
| 15 | Q. | Okay.  Do you have that? |
| 16 | A. | Yeah.  What you want to look -- |
| 17 | Q. | Defendants' Exhibit 6. |
| 18 | A. | Okay. |
| 19 | Q. | You were asked on page 5 -- |
| 20 | A. | Page ... |
| 21 | Q. | 5. |
| 22 | A. | Number 5 or -- |
| 23 | Q. | No.  It's page 5, number 13.  Number 13 on |

321

1       page 5.

2   A.   Okay.

3   Q.   It says, please identify the amount and

4       nature of all damages you claim against

5       defendants and how such damages were

6       derived and/or calculated.  And your answer

7       is see attachments.

8   A.   That's correct.

9   Q.   Okay.  And if you'll flip back to those

10      attachments, there is a page -- a computer

11      printout.  See it?

12  A.   Yeah, I see.

13  Q.   I think it's right in front of -- I think

14      you --

15  A.   Let's see.  Where is it?

16  Q.   Let me flip to it for you and help you out.

17  A.   Okay.

18  Q.   You passed it.  There are two pages and I'm

19      going to hand both of them to you.  Here we

20      go.

21  A.   Okay.

22  Q.   And on one page -- again, this is an

23      attachment -- you have calculation of

322

| | | |
|---|---|---|
| 1 | | Kelly's present lost salary. |
| 2 | A. | Okay. |
| 3 | Q. | Do you see that? |
| 4 | A. | That's correct. |
| 5 | Q. | And I'm going to keep my thumb attached to |
| 6 | | the second page. |
| 7 | A. | Okay.  I can hold it. |
| 8 | Q. | Okay.  So you have a calculation of your |
| 9 | | lost salary? |
| 10 | A. | That's correct. |
| 11 | Q. | And then you have attached the median |
| 12 | | expected salary for a typical engineer |
| 13 | | manager in the United States. |
| 14 | A. | That's correct. |
| 15 | Q. | And according to that attachment it's |
| 16 | | $110,965? |
| 17 | A. | As of October 2007.  That's correct. |
| 18 | Q. | So the damages you are requesting in this |
| 19 | | lawsuit is the salary and lost salary you |
| 20 | | believe that you should be paid as an |
| 21 | | engineer -- |
| 22 | A. | That's correct. |
| 23 | Q. | -- based upon the median salary for an |

323

| | | |
|---|---|---|
| 1 | | engineer in the state of Alabama -- I mean, |
| 2 | | in the United States? |
| 3 | A. | That's -- This is average taking all -- |
| 4 | | everything in consideration. |
| 5 | Q. | So for your damages in this lawsuit in |
| 6 | | which you're suing the Public Service |
| 7 | | Commission, Linda Hamilton and -- Janice |
| 8 | | Hamilton and John Free, your damages are |
| 9 | | the lost salary that you believe you should |
| 10 | | be paid -- |
| 11 | A. | That's correct. |
| 12 | Q. | -- as an engineer? |
| 13 | A. | That's correct. |
| 14 | Q. | And your claim before the administrative |
| 15 | | hearing of the Public Service Commission |
| 16 | | also was that you were not -- Strike that. |
| 17 | | Let me ask it this way:  The basis of your |
| 18 | | claim before the Public Service Commission |
| 19 | | was that you were not in the proper section |
| 20 | | you should be in -- |
| 21 | A. | That's correct. |
| 22 | Q. | -- as an engineer, and because you were not |
| 23 | | in a proper section, then that you are not |

324

| | | |
|---|---|---|
| 1 | | paid the salary you should be paid as an |
| 2 | | engineer? |
| 3 | A. | That's correct. |
| 4 | Q. | So the relief you were seeking in your |
| 5 | | administrative hearing -- |
| 6 | A. | Which hearing are we referring to now? |
| 7 | Q. | Your administrative hearing back in 2005, |
| 8 | | what we've previously marked as Defendants' |
| 9 | | Exhibit -- |
| 10 | A. | Pay was not an issue in this hearing.  Pay |
| 11 | | was not something that we can discuss.  You |
| 12 | | know, I talked to my lawyer.  Pay was not |
| 13 | | an issue.  We just wanted to get it lined |
| 14 | | up.  Pay was not an issue in the hearing. |
| 15 | Q. | You wanted to be lined up with Rick |
| 16 | | Cleckler? |
| 17 | A. | Yeah. |
| 18 | Q. | Okay.  And the only way that you could ever |
| 19 | | receive, in your opinion, consideration to |
| 20 | | improve your pay would be if you were lined |
| 21 | | up with Rick Cleckler? |
| 22 | A. | That's correct.  You can't have -- I |
| 23 | | think I told this analogy to somebody that |

325

```
 1          you can't have a quarterback playing center

 2          and a wide receiver playing guard and

 3          expect to be efficient on offense.

 4     Q.   So pay may not have been an express issue

 5          in Defendants' Exhibit 59, but your

 6          motivation in filing an administrative

 7          grievance for which you had a hearing was

 8          so that you could be properly aligned with

 9          another engineer and then you could have

10          your salary readjusted?

11     A.   That's correct.  Next step.  That's --

12          You've got to take things in logical step.

13          You've got to get lined up first and then

14          you pursue the correct market path.

15     Q.   And the damages you're seeking today in

16          your lawsuit is for lost salary that you

17          believe you should have been paid --

18     A.   That's correct.

19     Q.   -- as an engineer?

20     A.   That's correct.

21                    (Defendants' Exhibit 56 was marked

22                     for identification.)

23     Q.   Let me show you what's been marked
```

326

1          Defendants' Exhibit 56.  This is a

2          memorandum from John Free to you, Gregory

3          Kelly --

4    A.    Okay.

5    Q.    -- where he states I've received your 2006

6          job market survey.  As stated previously,

7          there are not any plans at this time to

8          request State Personnel to reevaluate the

9          PSC engineering positions or to request a

10         pay adjustment for those same positions;

11         correct?

12   A.    That's correct.

13   Q.    So John wrote you this memorandum dated

14         June 23rd, 2006 to inform you --

15   A.    January.

16   Q.    -- dated January 23rd, 2006 to inform you

17         that, again, he was not going to ask that

18         your salary be adjusted?

19   A.    That's correct.

20                    (Defendants' Exhibit 57 was marked

21                      for identification.)

22   Q.    Let me show you what's been marked

23         Defendants' Exhibit 57.  This is dated two

 1          days later from John's memorandum --

 2    A.    That's correct.

 3    Q.    -- dated January 23rd.  And in Defendants'

 4          Exhibit 57 you respond to John Free

 5          subjecting your response with the title

 6          unlevel playing field for engineering

 7          positions.  And in that letter you informed

 8          John that you have requested that he

 9          relinquish his authority over your position

10          because of his indifference and unfairness

11          toward the engineering profession.

12    A.    That's correct.

13    Q.    And you further state, your actions and

14          inactions have left me no other choice but

15          to conclude that you seek to avoid

16          fairness.

17    A.    That's correct.

18    Q.    Furthermore, you have engaged in mischief,

19          deception, and questionable professional

20          conduct which have also harmed my career.

21    A.    That's correct.

22    Q.    You seek to unjustly enrich your own

23          nontech profession by integrating and

328

```
 1          linking it with the high-tech field of
 2          engineering; is that correct?
 3     A.   That's correct.
 4     Q.   You further state you have further
 5          wronged -- it says by position.  I'm
 6          assuming you meant my position.  You have
 7          further wronged my position --
 8     A.   I occasionally do that, yes.
 9     Q.   -- by refusing to let the position float on
10          its own job merits.
11     A.   Desk audit.  I'm referring to we need a
12          desk audit.
13     Q.   That's what you're referring to?
14     A.   That's correct.
15     Q.   Don't let it float?
16     A.   Let it float on its own merits.  Don't let
17          it be capped by what accountant pay is
18          going to be.
19     Q.   So you've refused to give me a desk audit,
20          in other words?
21     A.   Yeah.
22     Q.   Your actions also seek to harm a vocation
23          in which you have no vested interest or
```

329

1          academic capital.

2    A.    He's not a member of the scientific

3          community.  He could care less about

4          engineering profession.

5    Q.    Okay.  You conclude in the last paragraph,

6          there is no doubt that my engineering

7          position is subjected to unfair treatment,

8          neglect and harm under your supervision.

9    A.    I think the job study proves that, that

10         they have let the job go almost 30 years

11         without a desk audit.

12   Q.    That's your statement to John?

13   A.    How long they going to let it go?

14   Q.    Did I read that correctly?

15   A.    That's correct.

16   Q.    You further state, these unjust practices

17         have injured my career and placed it on an

18         unlevel playing field when compared to

19         other job classifications at the Commission

20         and in state government.  Did I read that

21         correctly?

22   A.    I.e., Ms. Kay Oswalt.  She has -- She's a

23         computer science person.  She's level 84.

330

```
 1         I'm level 80 -- 79.  My job should be at

 2         least equal or even higher to Ms. Kay

 3         Oswalt's job.

 4    Q.   Okay.  I read that last statement

 5         correctly?

 6    A.   That's correct.

 7    Q.   So when you accused John of engaging in

 8         mischief, deception and questionable

 9         professional conduct, it is because he has

10         refused to request a desk audit for your

11         position?

12    A.   He -- That and he made false statements by

13         stating that he has the ability and the

14         training to adequately supervise

15         engineering position.  He knows that to be

16         false.  He testified right here that he

17         didn't.  He testified the information had

18         to be dumbed down to him.  To me that's

19         insulting to have to work with somebody who

20         admit that stuff has to be dumbed down to

21         him.  That's insulting.  So if he is the

22         dumb-down supervisor, that means I must be

23         the dumb-down engineer.  That's insulting.
```

331

| | | |
|---|---|---|
| 1 | Q. | So you contend that John Free has engaged |
| 2 | | in mischief, deception and questionable |
| 3 | | professional conduct because he testified |
| 4 | | that he could supervise you? |
| 5 | A. | I got written up.  I got a reprimand where |
| 6 | | he highly disputed my claim that he has -- |
| 7 | | don't have the competence, the credibility |
| 8 | | and the consistency to supervise the job. |
| 9 | | He turned around and reprimand me when I |
| 10 | | brought this to attention.  I thought that |
| 11 | | was -- That's about as low as you can go. |
| 12 | Q. | Okay.  I've heard you.  I want to make sure |
| 13 | | I understand you.  You claim he has engaged |
| 14 | | in mischief, deception and questionable |
| 15 | | professional conduct -- |
| 16 | A. | Sure, he has. |
| 17 | Q. | -- one, because he testified he could |
| 18 | | supervise you, and, two, because he failed |
| 19 | | to request a desk audit? |
| 20 | A. | And he -- |
| 21 | Q. | Is that true?  Are the first two true? |
| 22 | A. | That's true. |
| 23 | Q. | Okay.  You wanted to add something. |

332

A.    And he -- you know, and he goes around --
      you know, you tell him the information to a
      technical question, he goes and propagates
      that he came up with the answer.  I got
      this answer all by myself.  He didn't get
      the answer by hisself.  Then he tries to
      supervise you by going to Alabama Power
      Company, getting the answers from Alabama
      Power Company, and then he tried to ambush
      you with what Alabama Power Company told
      him.
           On a particular underground project
      he -- Alabama Power Company spent almost
      six weeks vetting and discussing the
      project with Free.  Free tried to come back
      and ambush me after the Power Company had
      been vetting and discussing one particular
      incident about an underground surge.
      They've OJT'd him and he's going to say,
      well, you know, tell me all you know so I
      can ambush you.

Q.    When you wrote Defendants' Exhibit 57, had
      you ever heard of John Free using a racial

333

1       slur?

2   A.   I've never heard John Free use racial

3       slurs.

4   Q.   So you've never heard in your life John

5       Free use a racial slur?

6   A.   No.

7   Q.   Have you ever heard John Free say anything

8       derogatory about African-Americans?

9   A.   I've heard -- I've heard him cut down a

10      couple of them, Robert Taylor, and he cut

11      down one of the other accountants there.

12      You know, he have -- you know, he cutting

13      them down.  He cut them down every chance

14      he get.

15   Q.   Is that a personal thing between Mr. Free

16      and Robert Taylor and some other

17      individuals?

18   A.   No.  They just -- They're like star-crossed

19      lovers.  One minute they're fighting like

20      wild bulldogs and the next minute they're

21      kissing and making up.  They call it a

22      gentleman discussion, but to me it looks

23      like two thugs fighting in the alley.

334

| | | |
|---|---|---|
| 1 | Q. | Okay.  Well, other than John Free and |
| 2 | | Robert Taylor fighting like two thugs in an |
| 3 | | alley, have you ever heard John Free say |
| 4 | | anything derogatory about an |
| 5 | | African-American? |
| 6 | A. | I haven't heard any.  I haven't heard him. |
| 7 | | But then they call that a gentleman |
| 8 | | discussion. |
| 9 | Q. | Have you ever heard John Free say that he |
| 10 | | does not like blacks? |
| 11 | A. | I've never heard that.  I'm probably sure |
| 12 | | he wouldn't tell me that because he knew I |
| 13 | | wouldn't like to hear that. |
| 14 | Q. | But you've never heard him say that? |
| 15 | A. | John Free knows I wouldn't want to hear |
| 16 | | that.  He's not going to say anything like |
| 17 | | that. |
| 18 | | (Defendants' Exhibit 58 was marked |
| 19 | | for identification.) |
| 20 | Q. | Let me show you what's been marked |
| 21 | | Defendants' Exhibit 58.  This is John |
| 22 | | Free's response to your memorandum dated -- |
| 23 | | I'm sorry -- marked Defendants' Exhibit |

335

```
 1        57.  And he writes that I have received and
 2        reviewed your, quote, unlevel playing field
 3        for engineering positions memorandum;
 4        correct?
 5   A.   That's correct.
 6   Q.   And he states the following:  Please be
 7        advised that I categorically deny your
 8        claims that I have been unfair, indifferent
 9        and inconsistent and/or selective in my
10        supervision and evaluation of employees
11        under my direct supervision and control.
12        That's what he states.  Did I read that
13        correctly?
14   A.   That's correct.
15   Q.   That's what he states.  He further states,
16        I am quite concerned by your unfounded
17        representations that I have, quote, engaged
18        in mischief, deception and questionable
19        professional conduct, end quote, and,
20        quote, seek to unjustly enrich your -- he
21        puts in paren -- my own nontech profession
22        by integrating and linking it with the
23        high-tech field of engineering, period, end
```

336

```
 1              quote.  He further states, in addition to

 2              being untrue, these remarks and accusations

 3              are, at a minimum, borderline insubordinate

 4              and abusive.  That's what he states; right?

 5     A.       Let me tell you something.

 6     Q.       Is that what he states?

 7                        MR. DEBARDELABEN:  Just answer his

 8                   question.

 9     A.       Yeah.  That's correct.

10     Q.       That's what he states?

11     A.       Uh-huh (positive response).

12     Q.       And then he states in the next sentence, by

13              way of this memorandum I am notifying you

14              that any future unfounded remarks of this

15              nature will not be tolerated and will

16              likely result in disciplinary action.

17     A.       That's what he states.

18     Q.       That's what he states?

19     A.       Yeah.

20                        (Defendants' Exhibits 60 through 78

21                   were marked for identification.)

22     Q.       Let me show you -- I'm going to show you a

23              whole group of exhibits.  They're marked
```

337

1       Defendants' Exhibits 60 through 78.  What I

2       want you to do is simply look through each

3       one of those exhibits, and I'll represent

4       to you that they're either a preappraisal,

5       employee preliminary interim performance

6       appraisal, an employee probationary

7       performance appraisal, or an appraisal.

8       There's a whole group of them there and

9       there's some other documents.  We're going

10      to go through them.  But just for the

11      record so we can just go ahead and go

12      through this, these appraisals that you

13      have sitting before you that's been marked

14      as Defendants' Exhibits 60 through 78 are

15      appraisals that you have received from John

16      Free during your employment with the

17      Alabama Public Service Commission?

18  A.   Appears to be correct.

19  Q.   Now, let's go through a couple of them,

20      because, again, not every single one is an

21      appraisal, so we just want to make sure

22      it's clear for the record.  Defendants'

23      Exhibit 61, for example, this covers the

338

| | | |
|---|---|---|
| 1 | | period in July 2002 to October 2002. |
| 2 | | That's when you were hired? |
| 3 | A. | Okay. |
| 4 | Q. | Is that correct? |
| 5 | A. | That's correct. |
| 6 | Q. | And you received a probationary appraisal |
| 7 | | of 22? |
| 8 | A. | That's correct. |
| 9 | Q. | Out of a possible 40? |
| 10 | A. | That's correct. |
| 11 | Q. | Defendants' Exhibit 63 is another appraisal |
| 12 | | for July 2002 to January 2003 where you |
| 13 | | received a probationary performance |
| 14 | | appraisal of 23.30 out of 40. |
| 15 | A. | That's correct. |
| 16 | Q. | Now, following this appraisal you told me |
| 17 | | earlier that John Free wrote an appraisal |
| 18 | | that you disagreed with.  Defendants' |
| 19 | | Exhibit 64 is your disagreement? |
| 20 | A. | That's correct. |
| 21 | Q. | And that's where you stated that you |
| 22 | | believed that the evaluation was an |
| 23 | | inadequate reflection of the duties you |

339

```
1          perform?

2     A.   That's correct.

3     Q.   Now, your next appraisal is marked

4          Defendants' Exhibit 65.

5     A.   That's correct.

6     Q.   And on this appraisal you receive a

7          performance score of 31.4 out of 40.

8     A.   That's correct.

9     Q.   A significant jump from your past

10         appraisal?

11    A.   I wonder why.

12    Q.   But it was a significant jump from your

13         past appraisal?

14    A.   That's correct.

15    Q.   And if you'll look over to the next page it

16         says responsibility, and there are eight

17         items listed.

18    A.   Okay.

19    Q.   And you're graded on a score from zero to

20         four, zero being you do not meet standards

21         and four being consistently exceeds

22         standards.

23    A.   That's correct.
```

340

```
 1    Q.   And you received two fours on that
 2         appraisal?
 3    A.   That's correct.
 4    Q.   And you also received three threes?
 5    A.   Let me see if I see the numbers.  I don't
 6         have the numbers.  I don't see the numbers
 7         here.
 8                    MR. DEBARDELABEN:  He's got four
 9                 threes.
10                    MR. MOZINGO:  Four threes.  I'm
11                 sorry.  You're right.
12    A.   I don't see the numbers.  Where -- I don't
13         see --
14    Q.   It's the second page, Defendants' Exhibit
15         65.
16    A.   I don't have that.  65?  Okay.
17    Q.   65.  Do you see that?
18    A.   Yeah, I see that.
19    Q.   You received two fours, which is the
20         highest score you can get; is that correct?
21    A.   That's correct.
22    Q.   And you received four threes, which is the
23         next highest score you can get?
```

341

| | | |
|---|---|---|
| 1 | A. | That's correct. |
| 2 | Q. | Let me show you the -- Defendants' Exhibit |
| 3 | | 68.  Let me direct your attention to that |
| 4 | | one.  On this appraisal for the period from |
| 5 | | May 2004 to 8 -- to August 2004 you |
| 6 | | received a probationary performance |
| 7 | | appraisal of 35.60 out of 40. |
| 8 | A. | That's correct. |
| 9 | Q. | So you're only -- You're less than five |
| 10 | | points away from making a perfect score? |
| 11 | A. | Like I previously testified, we didn't have |
| 12 | | a problem at this particular time. |
| 13 | Q. | So you didn't have a problem.  And this -- |
| 14 | | When this appraisal was written -- And this |
| 15 | | is the same time period that you're up for |
| 16 | | promotion? |
| 17 | A. | That's correct.  Same time period we're |
| 18 | | also discussing the desk audit. |
| 19 | Q. | And if you look at the second page of that |
| 20 | | where it has the nine areas of |
| 21 | | responsibility graded, by my count you |
| 22 | | received five perfect scores. |
| 23 | A. | Which page are we talking about now? |

342

1    Q.    The very next page.

2    A.    69 or --

3    Q.    68.  Defendants' Exhibit 68.  This is the

4          survey we were just talking about, the

5          appraisal.  You received five perfect

6          scores.

7    A.    I see four.

8    Q.    Five.  Count them.  You received five

9          fours.

10   A.    Okay.  I see it now.

11   Q.    So you received five perfect scores?

12   A.    Okay.

13   Q.    And then you received four near perfect

14         scores?

15   A.    That's correct.

16   Q.    You didn't have any score less than a near

17         perfect?

18   A.    That's correct.

19   Q.    And you and Free -- John Free were getting

20         along just fine when Defendants' Exhibit 68

21         was written?

22   A.    That's correct.

23   Q.    Now, Defendants' Exhibit 69 is the next

343

1          appraisal you received, and you received a

2          33.3 on that appraisal.

3     A.   That's correct.

4     Q.   Again, about the same time frame, but still

5          well within the category of exceeds

6          standards?

7     A.   That's correct.  Still not having a

8          problem.

9     Q.   Still no problems.  So Defendants' Exhibit

10         69 you're still not having any problems.

11         But then you write Defendants' Exhibit 70.

12    A.   Okay.

13    Q.   Those are your comments to that appraisal.

14         You basically state that the evaluation

15         does not reflect my knowledge of the job

16         and the technical skills that I possess.

17    A.   That's correct.

18    Q.   So even though you received a score well

19         within exceeds standards, you believe that

20         the appraisal was not a true evaluation of

21         your technical skills --

22    A.   That's correct.

23    Q.   -- and ability?

344

| 1 | A. | That's correct.  Others in the section |
| 2 | | receive higher. |
| 3 | Q. | Let me show you Defendants' Exhibit 73. |
| 4 | | Okay.  This is an evaluation you would have |
| 5 | | received in 2006.  If you look at the |
| 6 | | second page, it has John Free's signature |
| 7 | | and the date of April 17th, 2006 -- |
| 8 | A. | Okay. |
| 9 | Q. | -- and April 21, 2006 next to it.  Does |
| 10 | | that mean that you signed it on April 17, |
| 11 | | 2006 and he signed it on April 21, 2006? |
| 12 | A. | I can't remember.  I can't remember, but it |
| 13 | | appears to be correct. |
| 14 | Q. | Okay.  So this would have been completed |
| 15 | | around that time frame? |
| 16 | A. | Yeah. |
| 17 | Q. | And this is a performance appraisal.  And |
| 18 | | if you flip through it, he's attached to it |
| 19 | | several sheets in which he gives your |
| 20 | | rating. |
| 21 | | MR. DEBARDELABEN:  Are we talking |
| 22 | | about 73? |
| 23 | | MR. MOZINGO:  Yeah.  We're talking |

345

1           about 73 actually starting on

2           the third page.

3                MR. DEBARDELABEN:  On the second

4                page mine says employee

5                performance mid-appraisal.  Is

6                this the same --

7                MR. MOZINGO:  You're right.

8                Actually --

9                MR. DEBARDELABEN:  Is this the

10               same 73 as your 73?

11               MR. MOZINGO:  It is the same.

12               Actually, you -- Thank you for

13               pointing that out.

14               MR. DEBARDELABEN:  I was just a

15               little confused.

16               MR. MOZINGO:  It is confusing.

17     Q.   Mr. Kelly, I think it would be more

18          accurate that you-all -- this appraisal

19          itself was given in October of 2005.  Would

20          that be correct?  Do you see above that

21          mid-appraisal?

22     A.   Which page are you on now?

23     Q.   The next page, the second page of

346

```
 1              Defendants' Exhibit 73.
 2    A.    Okay.  Okay.  I got you.
 3    Q.    Right.  Is that correct?
 4    A.    Yeah.  I think Ms. Hamilton signed it in
 5          October 6, '05.  Is that what we're
 6          referring to?
 7    Q.    Right.  And the process is they give you
 8          this in the form of a mid-appraisal;
 9          correct?
10    A.    Yeah.  You get two appraisals,
11          mid-appraisal and final.
12    Q.    And then they use that same mid-appraisal
13          to -- and they incorporate into your
14          annual -- into your annual appraisal?
15    A.    That's correct.
16    Q.    Okay.  And attached to Defendants' Exhibit
17          73 are several pages.  Beginning on the
18          third page.
19    A.    I see.
20    Q.    John Free sets out the rating that he's
21          given you --
22    A.    (Witness nods head).
23    Q.    -- and he explains the basis of that rating
```

347

```
 1         and then he gives you strengths and

 2         weaknesses and an action plan; is that

 3         correct?

 4    A.   That's correct.

 5    Q.   So if John Free did -- when he gave you a

 6         rating, he explained to you his rating, why

 7         he gave it to you, and gave you an action

 8         plan to improve; is that correct?

 9    A.   According to accounting standards, that's

10         what he did, yeah.

11    Q.   Is that what he generally would do, though,

12         when he would give you an appraisal?

13    A.   I'm not accountant.  We're getting

14         appraisal on accounting merits now.

15    Q.   But I'm asking when he would give you an

16         appraisal, would he generally tell you the

17         reason for your appraisal --

18    A.   No.

19    Q.   -- and how to improve it?

20    A.   No.  This is the first time we're getting

21         into strength and weaknesses.  You know,

22         most of the time if you've seen the prior

23         appraisals, they were one or two sheets.
```

348

```
 1          But since we've in the process now of being

 2          at a grievance hearing or we just came out

 3          of grievance hearing, we've got ill will in

 4          the air now.

 5     Q.   And would that be because your appraisal

 6          ratings are now going down?

 7     A.   Yeah.  Going down.  We've got ill will in

 8          the air now.  We just went to the grievance

 9          hearing and he had to embarrass himself in

10          this grievance hearing before his

11          colleagues by admitting that he was a

12          dummy.  He's embarrassed now.  He's

13          embarrassed and he's hurt and now he's

14          began to act out.

15     Q.   Defendants' Exhibit 74 is your comments to

16          the appraisal that's been marked

17          Defendants' Exhibit 73; is that correct?

18     A.   That's correct.

19     Q.   And you state, once again Mr. Free is

20          attempting to recast the highly complex and

21          technical job of engineering into a

22          t-crossing and i-dotting job

23          classification.
```

349

| | | |
|---|---|---|
| 1 | A. | That's correct. |
| 2 | Q. | That's your belief? |
| 3 | A. | Uh-huh (positive response). |
| 4 | Q. | Mr. Free does not possess scientific and |
| 5 | | technological solving skills. |
| 6 | A. | That's correct. |
| 7 | Q. | Is that correct?  I'm paraphrasing, but |
| 8 | | that's what you meant? |
| 9 | A. | That's a fair statement. |
| 10 | Q. | You state, my evaluation is drifting into |
| 11 | | areas in which he can only quantitatively |
| 12 | | measure, and you have in parenthesis |
| 13 | | clerical and data input errors. |
| 14 | A. | That's what we've got here. |
| 15 | Q. | Okay.  In your belief that's the only area |
| 16 | | that he can competently measure is clerical |
| 17 | | and data input errors? |
| 18 | A. | Same way he would grade a secretary. |
| 19 | Q. | And that's your belief -- |
| 20 | A. | That's my belief. |
| 21 | Q. | -- that his only -- |
| 22 | A. | That he reduced me -- |
| 23 | Q. | -- competent area -- the only competent |

350

| | | |
|---|---|---|
| 1 | | area he can measure is clerical and data |
| 2 | | input? |
| 3 | A. | When it comes to judging my work, that's |
| 4 | | correct. |
| 5 | Q. | Okay. |
| 6 | A. | Do you want to read the end of this page? |
| 7 | | Can we go on and read the end part of it or |
| 8 | | just what -- |
| 9 | Q. | No.  I'm moving on to another exhibit. |
| 10 | | Defendants' Exhibit 76 is another |
| 11 | | comment that you gave.  Let me ask it this |
| 12 | | way.  Defendants' 76 are comments that you |
| 13 | | made to another appraisal that Mr. Free |
| 14 | | subsequently gave you. |
| 15 | A. | Which one that -- |
| 16 | Q. | Defendants' Exhibit 76. |
| 17 | A. | This is -- |
| 18 | Q. | 76. |
| 19 | A. | Looking at 76.  Okay. |
| 20 | Q. | You're looking at it. |
| 21 | A. | Okay. |
| 22 | Q. | Okay.  And I believe if you want to look |
| 23 | | back, Defendants' Exhibit 76 was written in |

351

| | | |
|---|---|---|
| 1 | | response to the appraisal that's marked |
| 2 | | Defendants' Exhibit 75. |
| 3 | A. | That's correct. |
| 4 | Q. | Is that correct? |
| 5 | A. | That's correct. |
| 6 | Q. | Okay.  Did you prepare Defendants' Exhibit |
| 7 | | 76? |
| 8 | A. | That's correct. |
| 9 | Q. | You wrote it? |
| 10 | A. | That's correct. |
| 11 | Q. | You typed it? |
| 12 | A. | Yeah.  With my poor English skills I typed |
| 13 | | and wrote it. |
| 14 | Q. | You typed it.  And that's your work |
| 15 | | product? |
| 16 | A. | That's my work product. |
| 17 | | MR. MOZINGO:  Okay.  I'm going to |
| 18 | | offer all of those previous |
| 19 | | exhibits that we've gone |
| 20 | | through at this time. |
| 21 | | MR. DEBARDELABEN:  Are you |
| 22 | | talking -- Some of them we |
| 23 | | didn't really go through.  Are |

352

1          you talking about you want to

2          offer 60 through 77?

3               MR. MOZINGO:  Well, I said that

4               they were all --

5               MR. DEBARDELABEN:  I'm sorry.  78.

6               MR. MOZINGO:  -- appraisals.

7               Unless we specifically covered

8               them.  So I've covered every

9               one --

10              MR. DEBARDELABEN:  Okay.

11              MR. MOZINGO:  Agreed.  So I'll

12              offer them at this time.

13              MR. DEBARDELABEN:  I thought you

14              and I were on the same page.

15              I just wanted to be sure.

16              MR. MOZINGO:  Yeah.  We are.

17              That's why I made the point to

18              go through the ones that

19              weren't appraisals.

20              (Defendants' Exhibit 79 was marked

21              for identification.)

22     Q.   Okay.  Let's look at Defendants' Exhibit

23          79.  Okay.  Your complaint has previously

353

| | | |
|---|---|---|
| 1 | | been marked as Defendants' Exhibit 4, if |
| 2 | | you'd like to find it in here. |
| 3 | A. | Which one now? |
| 4 | Q. | Your complaint.  It's marked Defendants' |
| 5 | | Exhibit 4.  We covered it this morning.  It |
| 6 | | should be on the bottom somewhere. |
| 7 | A. | I see 1, 2 -- I'm bad with paperwork. |
| 8 | Q. | You're getting close. |
| 9 | A. | 3, 4.  Okay. |
| 10 | Q. | Why don't we do this.  I don't want you to |
| 11 | | be overburdened with documents and I don't |
| 12 | | want our court reporter to be |
| 13 | | overburdened.  If you'll hand me this stack |
| 14 | | right there, I'll put this to the side. |
| 15 | A. | Okay. |
| 16 | Q. | Okay.  And hand me that one there.  That |
| 17 | | way we'll try to keep it a little bit |
| 18 | | organized for everybody. |
| 19 | | Now, you have your complaint in front |
| 20 | | of you. |
| 21 | A. | Okay. |
| 22 | Q. | Which is Defendants' Exhibit 4. |
| 23 | A. | Okay. |

354

| | | |
|---|---|---|
| 1 | Q. | In paragraph 25 of that complaint -- |
| 2 | A. | You're talking about number 25? |
| 3 | Q. | Paragraph number 25. The pages aren't |
| 4 | | numbered, so I just have to go by the |
| 5 | | paragraph number. |
| 6 | A. | Okay. I got you. |
| 7 | Q. | That paragraph is contained under the |
| 8 | | heading fourth cause of action -- |
| 9 | A. | Okay. |
| 10 | Q. | -- harassment. |
| 11 | A. | Okay. |
| 12 | Q. | In paragraph 25 you state that you were |
| 13 | | returning from an out-of-town trip and your |
| 14 | | ear was bothering you and you had to seek |
| 15 | | medical attention. |
| 16 | A. | That's correct. |
| 17 | Q. | So on Monday, February 13th, 2006, |
| 18 | | Defendant Free held a counseling session |
| 19 | | with Plaintiff Kelly because he sought |
| 20 | | medical attention without calling the |
| 21 | | office first. |
| 22 | A. | That's correct. |
| 23 | Q. | You say, on February 28th, 2006, Defendant |

355

| | | |
|---|---|---|
| 1 | | Free prepared a written summation of the |
| 2 | | counseling session and forwarded a copy of |
| 3 | | it to Defendant Hamilton.  Okay.  Is that |
| 4 | | what's been marked Defendants' Exhibit 79? |
| 5 | A. | Let's make sure that we are talking about |
| 6 | | the same thing. |
| 7 | Q. | You refer to a memo from Mr. Free dated |
| 8 | | January -- excuse me -- February 28th, |
| 9 | | 2006. |
| 10 | A. | It appears that that's correct.  This is |
| 11 | | what we're talking about. |
| 12 | Q. | So that memo in your complaint is what's |
| 13 | | been marked Defendants' Exhibit 79? |
| 14 | A. | That's correct. |
| 15 | Q. | Okay.  And that is what you claim is a |
| 16 | | summary of a counseling session? |
| 17 | A. | That's correct. |
| 18 | Q. | Okay.  And Mr. Free counseled you because |
| 19 | | you had attended the doctor without |
| 20 | | notifying the office of your absence? |
| 21 | A. | Yes.  I had a ruptured eardrum.  Very |
| 22 | | painful.  I was very dizzy and nauseous |
| 23 | | coming back from Birmingham.  And my first |

356

```
 1         thought was to seek prompt medical
 2         attention as soon as I can.
 3    Q.   And as Mr. Free set forth in Defendants'
 4         Exhibit 79, he says on the day that you had
 5         what you claim is a ruptured eardrum you
 6         were out of the office?
 7    A.   That's correct.
 8    Q.   You were in Birmingham?
 9    A.   It happened on the way back from
10         Birmingham.
11    Q.   Okay.  But you were out of the office in
12         Birmingham, and according to y'all's
13         discussions you should have been back in
14         Montgomery no later than 2:30.
15    A.   I believe -- let me --
16    Q.   At least that's what he says in his memo.
17         That's midway --
18    A.   My recollection from this statement that
19         when I -- that was his time.  When I was --
20         As I recall this particular date, I didn't
21         get back from Birmingham until about the
22         3:15, 3:30 area.
23    Q.   Okay.  Well, he says you -- This is what he
```

357

```
 1         says now.  You should have been able to
 2         report to your office no later than
 3         2:30 p.m.  You agreed, but commented that
 4         you were ill and needed to go to Pri-Med.
 5    A.   That's Mr. Free's writing.  I don't --
 6    Q.   Well, that's what I said.  This is what
 7         he's writing.  He says, I explained that a
 8         doctor's visit was your decision but that
 9         you must call into the office and receive
10         permission to be on leave.  And he says,
11         furthermore, I clearly explained to you
12         that such an incident as this is considered
13         walking off the job, which is a serious
14         violation; right?
15    A.   That's his writing.
16    Q.   So he's telling you that if you don't call
17         in then it's considered walking off the
18         job, which is a serious violation?
19    A.   (Witness nods head).
20    Q.   That's what he's telling you in this memo?
21    A.   That's what he's saying.
22    Q.   Do you disagree with his statement that if
23         you don't call in it's considered walking
```

358

1              off the job?

2    A.    I've seen employees do it all the time.

3          I've seen Cleckler just walks off for no

4          apparent reason.  I see Taylor walks off

5          for no apparent reason.  I get a ruptured

6          eardrum I'm considered abandoning the job.

7    Q.    But Mr. Cleckler does not work for

8          Mr. Free, does he?

9    A.    I think in my complaint I claimed that I

10         wasn't treated similar to the other similar

11         situated engineer.  That's the heart of the

12         complaint.

13   Q.    But Mr. Cleckler doesn't answer to

14         Mr. Free, does he?

15   A.    So I should be held to a different standard

16         because I work for Mr. Free?

17   Q.    Well, is it true that Mr. Cleckler doesn't

18         answer to Mr. Free?

19   A.    That's correct.

20   Q.    So Mr. Free is not Mr. Cleckler's boss?

21   A.    But he's Mr. Taylor's boss.

22   Q.    Okay.  All right.  And Mr. Taylor is a

23         black male who is not an engineer; correct?

359

| | | |
|---|---|---|
| 1 | A. | No.  He gets special privilege from |
| 2 | | Mr. Free.  He walks off and who knows |
| 3 | | where, goes who knows where -- |
| 4 | Q. | So Mr. Taylor -- |
| 5 | A. | -- and nothing said. |
| 6 | Q. | It's your testimony, then, that Mr. Taylor, |
| 7 | | a black male who is not an engineer, gets |
| 8 | | special privileges from Mr. Free? |
| 9 | A. | Sure, he does. |
| 10 | | (Defendants' Exhibit 80 was marked |
| 11 | | for identification.) |
| 12 | Q. | Let me show you what's been marked |
| 13 | | Defendants' Exhibit 80.  This is what |
| 14 | | appears to be a memorandum John Free sent |
| 15 | | to the electricity section staff, and it's |
| 16 | | entitled -- the subject is expectations |
| 17 | | regarding work policies and guidelines. |
| 18 | | And he says, this memorandum is to remind |
| 19 | | each of you of the expectations associated |
| 20 | | with the following policies and reinforce |
| 21 | | that the policies apply uniformly to each |
| 22 | | of you.  And this is sent out the same day |
| 23 | | as Defendants' Exhibit 79 and he's |

360

1           informing everybody and he attaches to that

2           memorandum the employee -- the electricity

3           section policy for tardiness, breaks, lunch

4           hours and end of shift; is that correct?

5    A.    Yeah.  Then he turns around and contradicts

6           himself.

7    Q.    But he sent everybody in the electricity

8           section a memo to remind them of the

9           electricity section policy regarding

10          tardiness, break, lunch hours and end of

11          shift.

12   A.    That's correct.

13                (Defendants' Exhibit 81 was marked

14                  for identification.)

15   Q.    Now, Exhibit -- Defendants' Exhibit 81 is

16          your response to Mr. Free's two memorandums

17          of February 28th.

18   A.    Okay.

19   Q.    Is that correct?

20   A.    Let me read and make sure we've got it,

21          because we've got a lot of writing going on

22          here.

23   Q.    Well, it says in the subject line response

361

```
 1            to memo dated February 28th.
 2    A.      Okay.
 3    Q.      And so that's what you wrote back to him?
 4    A.      Yeah.  According to that Birmingham thing
 5            there.  Okay.
 6    Q.      And you state that my vision was impaired
 7            and I had a sharp pain.  A sharp pain
 8            existed in my ear.
 9    A.      That's correct.
10    Q.      And I made the decision to seek immediate
11            medical attention.
12    A.      That's correct.
13    Q.      And that would have -- You made that
14            decision somewhere around three or 3:30?
15    A.      Between three and 3:30.  That's correct.
16                    (Defendants' Exhibit 82 was marked
17                        for identification.)
18    Q.      Let me show you what's been marked
19            Defendants' Exhibit 82.  If you want to
20            make -- kind of stack those up to help you
21            keep up with them.
22    A.      Okay.
23    Q.      I'll represent to you that Defendants'
```

362

1          Exhibit 82 is your records that I

2      subpoenaed from Pri-Med for the date of

3      your emergency doctor's visit.

4   A.  Okay.

5   Q.  Have you ever seen these records before?

6   A.  No, I haven't.

7   Q.  Okay.

8   A.  I might have.  I'm not sure.

9   Q.  If you look under your patient name --

10  A.  Okay.

11  Q.  -- it states, in, 4:15.

12  A.  Where?

13  Q.  Right under patient name.  Very top line

14      says, patient, Gregory Kelly, and right

15      under that it says in at 4:15.

16  A.  Okay.

17  Q.  Is it possible that you did not go to

18      Pri-Med until 4:15?

19  A.  I have no idea.  I went to Pri-Med when I

20      was going there.  I have no idea what time

21      they signed me up.  I know I had to wait to

22      see a doctor for a particular time.

23  Q.  Well, it says, in 4:15, box 4:49, screened

363

| | |
|---|---|
| 1 | | five o'clock.  I'm just wondering does that |
| 2 | | mean you got there at 4:15 and you were |
| 3 | | finally screened at five o'clock? |
| 4 | A. | I know when I got -- I tried to find my |
| 5 | | wife first.  I was at Pri-Med -- because I |
| 6 | | couldn't see.  I really couldn't fill out |
| 7 | | the information.  I was trying to get her |
| 8 | | on the cell phone.  I couldn't get my wife, |
| 9 | | so I had to end up filling out the |
| 10 | | paperwork myself.  And I think I got some |
| 11 | | assistance from some of the folks at |
| 12 | | Pri-Med.  So really I had no -- When I got |
| 13 | | there, I really had to fill out the |
| 14 | | paperwork myself. |
| 15 | Q. | Okay.  You had a cell phone with you that |
| 16 | | day? |
| 17 | A. | Yes. |
| 18 | Q. | Was it in working order? |
| 19 | A. | Yes. |
| 20 | | (Defendants' Exhibit 83 was marked |
| 21 | | for identification.) |
| 22 | Q. | And let me show you what's been marked |
| 23 | | Defendants' Exhibit 83. |

364

```
1    A.    Now, you've got to remember now, when I got

2          back -- oh, let me clarify this.  I think I

3          can clarify this right quick.  I got back

4          to Montgomery about the -- somewhere about

5          3:30 time frame.  I was in Prattville when

6          I got back to -- almost that time.

7          Prattville.  That's when it really hit me.

8          Then by the time I got -- drove all the way

9          across town to Pri-Med, you know, it could

10         have been close to four o'clock or 4:15 or

11         whatever because I waited for a few minutes

12         in the parking lot trying to find my wife

13         on the cell phone.

14   Q.    But the earache hit you about 3:30?

15   A.    Yeah.  About -- And I was just right

16         outside of Prattville.  About three

17         o'clock, somewhere about three o'clock,

18         3:15.

19   Q.    Okay.  And that's when you decided that you

20         needed immediate medical attention --

21   A.    That's correct.

22   Q.    -- was at 3:30?

23   A.    Yeah.
```

365

1   Q.   Let me show you what's been marked

2        Defendants' Exhibit 83. And is it

3        correct -- my understanding -- and I'm no

4        doctor and I know you're no doctor, but I

5        just want to ask if this is what you

6        understand to be the case -- that -- and

7        these are also some medical records that I

8        subpoenaed. I believe they're from

9        Montgomery Otolaryngology, if I pronounced

10       that correct.

11  A.   Okay.

12  Q.   Did you subsequently go to Montgomery

13        Oto --

14  A.   Yeah. What they did was patch me up. It

15        was on a Friday. What they did was patch

16        me up on a Friday. I didn't get out of

17        there until about 6:15 or whatever. They

18        cleaned the ear out, sucked the ear out,

19        patched it up and gave me some medication

20        and stuff. And they told me that I really

21        need to go see a specialist. And they --

22        what they did they was going to make an

23        arrangement for me, but I decided to call

366

```
 1          my sister-in-law -- she was a nurse -- and
 2          she referred me to a specialist at Jackson
 3          Hospital.  So I went to see that -- to have
 4          it further checked out because they
 5          couldn't tell me what the problem was.
 6          They just knew I had all this blockage and
 7          they sucked it out while I was at Pri-Med.
 8     Q.   Okay.  But you subsequently went -- and I
 9          think I pronounce it right -- Montgomery
10          Otolaryngology?
11     A.   Yeah.
12     Q.   I think that's it.
13     A.   Uh-huh (positive response).
14     Q.   Do you believe that to be --
15     A.   Yeah.  I don't know what the -- All I know
16          is it's Jackson Hospital.
17     Q.   And from what I reviewed looking at the
18          first page near the bottom it says, left
19          side ear pain, external canal on the left
20          is debrided of fungal materials.
21     A.   Okay.
22     Q.   Did you have a fungus in your ear?
23     A.   I had a -- They told me I had a ruptured
```

367

1    eardrum.  And because the ear ruptured it

2    created pus and cysts and other kind of

3    debris in there because it had abscessed.

4    And so they couldn't tell exactly what it

5    was that they cleaned the ear out.  And

6    once they cleaned the ear out, then they

7    were able to determine what the problem was

8    after they cleaned the ear out.  But the

9    folks at Pri-Med couldn't tell what the

10    problem.  All they could tell that this ear

11    was gummed up and that it was stopped up

12    and I couldn't -- and they cleaned it out

13    and flushed it and gave me some medication

14    and then told me that I need to follow up

15    with an ear specialist.

16    Q.    Okay.  And if you look at the history of

17          the present illness on page 3, now, that

18          list says, location of problem, left ear.

19          Do you see it under section two, history of

20          present illness?

21    A.    Okay.  I see it.

22    Q.    It says the quality, achy; severity,

23          moderate.  Was the pain only moderate?

368

| | | |
|---|---|---|
| 1 | A. | The pain was hurt.  This is -- You're |
| 2 | | talking about some time after.  On that |
| 3 | | Friday it was excruciating.  You're talking |
| 4 | | about some -- You're talking about the |
| 5 | | whole weekend after.  At that -- On that |
| 6 | | Friday it was excruciating and blinding. |
| 7 | Q. | Okay.  Now, Mr. Free, by the way, never |
| 8 | | wrote you up or gave you any type of |
| 9 | | employee discipline -- |
| 10 | A. | I feel like -- |
| 11 | Q. | -- because you didn't call in? |
| 12 | A. | I feel like he was inconsiderate.  He |
| 13 | | was -- You know, I explained it to him and |
| 14 | | then here he comes with a counseling |
| 15 | | session.  I thought it was real -- You |
| 16 | | know, he seemed to understand and then he |
| 17 | | was really inconsiderate.  You know, I feel |
| 18 | | like as a 50-year-old man I think I need -- |
| 19 | | I think I can make a decision on when I |
| 20 | | need to seek medical attention to have |
| 21 | | somebody like Mr. Free tell me when I need |
| 22 | | to seek medical attention.  I think I know |
| 23 | | when I'm hurt and when I'm not hurt. |

369

```
 1          That's disrespectful to a 50-year-old man

 2          when he can and when he can't seek medical

 3          attention.

 4    Q.    Well, he didn't tell you you couldn't seek

 5          medical attention, did he?

 6    A.    He told me that -- That's basically what he

 7          told me, that, you know, you've got to call

 8          in and whatever to seek medical attention.

 9          I'm not here to try to fabricate that --

10          that I didn't need medical attention that

11          day.  I think, you know -- I feel like he

12          should have took me at my word that I had

13          to have medical attention that day.

14    Q.    But is it true that you're supposed to call

15          in before you go see a doctor?

16    A.    When you're in pain -- When you're in pain,

17          ear throbbing, calling worrying about a job

18          is the last thing on your mind.  You want

19          to take care of your primary concern and

20          that's health.  You don't think about the

21          job.  You don't think about mama and

22          daddy.  You think about stopping this

23          pain.  Now, after we stop this pain, we'll
```

370

```
 1          deal with the systemic problems later
 2          whether to call in the job or not.
 3          Mr. Free was the last thing on my mind when
 4          my ear started aching.
 5     Q.   Okay.  I just want to be clear, though.  Is
 6          it true, though, that the policy is for the
 7          section that you have to call in before you
 8          go to the doctor if you're at work?
 9     A.   Policy -- You know, you're going to -- If
10          you've got a heart -- sitting there with a
11          heart attack, you're going to seek
12          permission before you go -- I think that
13          should be individual call.  If you need
14          medical attention, you need to get medical
15          attention right then.  You don't need to
16          try to hunt and find a supervisor to seek
17          medical attention.
18     Q.   Let's be clear now.  Mr. Free never said
19          that you could not seek medical attention,
20          did he?
21     A.   I got a counseling letter because I sought
22          medical attention.
23     Q.   Okay.  Well, we'll let the letter speak for
```

371

1        itself, then.

2   A.   Thank you.

3   Q.   Let me ask you about paragraph 26.

4   A.   Which page are we on now?

5   Q.   We're looking at your complaint again.  You

6        have that open to you.

7   A.   Okay.

8   Q.   Right under paragraph 25.  Paragraph 25

9        talked about your medical.  Paragraph 26

10       asks if -- Well, it alleges in your

11       complaint.  It says that you received an

12       employee performance preappraisal prepared

13       by Defendant Free and reviewed by Defendant

14       Hamilton.  By memorandum dated April 17,

15       2006 Plaintiff Kelly forwarded his comments

16       to Defendant Free.  Defendant Free

17       responded in a memo dated April 21, 2006

18       threatening Plaintiff Kelly with

19       disciplinary action.  Okay.  Is -- Let me

20       show you what's been marked Defendants'

21       Exhibit 84.

22                (Defendants' Exhibit 84 was marked

23                  for identification.)

372

| | | |
|---|---|---|
| 1 | Q. | Okay.  Defendants' Exhibit 84.  Now, is |
| 2 | | Defendants' Exhibit 84 the comments that |
| 3 | | you're referring to in paragraph 26 of your |
| 4 | | complaint? |
| 5 | A. | That appears to be correct.  I think this |
| 6 | | is -- Yeah.  This is the response on |
| 7 | | April ... |
| 8 | Q. | So paragraph 26 of your complaint when it |
| 9 | | refers to the comments that you |
| 10 | | forwarded -- |
| 11 | A. | Hold on a second.  Hold on a second. |
| 12 | Q. | Okay.  See, it says by memorandum dated |
| 13 | | April 17, 2006 Plaintiff Kelly forwarded |
| 14 | | his comments to Defendant Free. |
| 15 | A. | Yeah.  I think -- Yeah.  This is the |
| 16 | | comments, yeah. |
| 17 | Q. | Defendants' Exhibit 84 is dated April 17th, |
| 18 | | 2006 -- |
| 19 | A. | Yeah. |
| 20 | Q. | -- and it's entitled comments? |
| 21 | A. | Yeah.  These are the comments. |
| 22 | Q. | Okay.  So Defendants' Exhibit 84 are the |
| 23 | | comments you're referring to in paragraph |

373

1    26 of your complaint?

2 A. That's correct.

3      (Defendants' Exhibit 85 was marked

4       for identification.)

5 Q. Let me show you what Defendants' Exhibit 85

6    is.  Again, in paragraph 26 of your

7    complaint you state Defendant Free

8    responded in a memo dated April 21, 2006

9    threatening Plaintiff Kelly with

10    disciplinary action.  And my question is,

11    is Defendants' Exhibit 85 Mr. Free's

12    response?

13 A. Let me look at this for a second.

14      MR. MOZINGO:  And while you look

15       at that, let me -- let's go

16       ahead and change our tape.

17      (Brief recess was taken.)

18 Q. Mr. Kelly, the question I left off with, in

19    paragraph 26 of your complaint you state

20    that Defendant Free responded in a memo

21    dated April 21, 2006 threatening Plaintiff

22    Kelly with disciplinary action.

23 A. That's correct.

374

```
 1    Q.    Okay.  Is Defendants' Exhibit 85 the memo
 2          that you're referring to?
 3    A.    That appears to be correct.
 4    Q.    And when you say that he threatened you
 5          with disciplinary action, you're referring
 6          to the last paragraph on page 2 --
 7    A.    That's correct.
 8    Q.    -- of Defendants' Exhibit 85?
 9    A.    That's correct.
10                  (Defendants' Exhibit 86 was marked
11                     for identification.)
12    Q.    Let me show you what's been marked
13          Defendants' Exhibit 86.  If you'll look
14          back again to your complaint, paragraph 28.
15    A.    Okay.
16    Q.    You state, by memorandum dated August 10,
17          2006, Plaintiff Kelly again complained
18          about the lack of, quote, close hands-on
19          supervision, end quote, by Defendant Free.
20          The plaintiff complained that Defendant
21          Free, an accountant by training, did not
22          possess the basic engineering skills and
23          training to provide close hands-on
```

375

1        supervision.   Defendant Free refused to

2        change wording on plaintiff's Form 40 job

3        description.   Okay.   Is Defendants' Exhibit

4        86 the Form 40 that you're referring to?

5   A.   I believe that's correct.

6   Q.   Okay.

7   A.   It just -- It -- Yes.   Several Form 40's,

8        but this might be the latest Form 40.   I

9        believe that's correct.

10                  (Defendants' Exhibit 87 was marked

11                      for identification.)

12  Q.   Okay.   If you'll look at Defendants'

13       Exhibit 87.   Is Defendants' Exhibit 87 your

14       memo that's referenced in paragraph 28 of

15       the complaint?

16  A.   I believe that's correct.

17  Q.   It says, by memorandum dated August 10th,

18       2006, Plaintiff Kelly again complained

19       about the lack of close hands-on

20       supervision by Defendant Free.   Is

21       Defendants' Exhibit 87 your memorandum?

22  A.   That's correct.

23                  (Defendants' Exhibit 88 was marked

376

1               for identification.)

2    Q.    If you'll look at Defendants' Exhibit 88.

3          Is Defendants' Exhibit 88 the response that

4          you received from Mr. Free to your

5          memorandum that's been marked Defendants'

6          Exhibit 87?

7    A.    That's correct.

8    Q.    So he disagreed with your memorandum and he

9          set forth his disagreement in Defendants'

10         Exhibit 88.

11   A.    Yeah.  He --

12   Q.    Is that correct?

13   A.    That's correct.

14                   (Defendants' Exhibit 89 was marked

15                    for identification.)

16   Q.    Is -- Let me show you what's been marked

17         Defendants' Exhibit 89.  After you received

18         Mr. Free's response, you then filed another

19         response to his response?

20   A.    That's correct.

21   Q.    And that's been marked Defendants' Exhibit

22         89?

23   A.    That's correct.

377

| | | |
|---|---|---|
| 1 | Q. | Okay. And, again, paragraph 28 of your |
| 2 | | complaint and Exhibits 86 through 89 are |
| 3 | | the Form 40 and the memorandums back and |
| 4 | | forth concerning the Form 40? |
| 5 | A. | That's correct. |
| 6 | Q. | And that's the basis of paragraph 28 of |
| 7 | | your complaint? |
| 8 | A. | That's correct. |
| 9 | | (Defendants' Exhibit 90 was marked |
| 10 | | for identification.) |
| 11 | Q. | Let me show you what's been marked |
| 12 | | Defendants' Exhibit 90. You state in |
| 13 | | paragraph 29 of your complaint, by |
| 14 | | memorandum dated August 18, 2006 to |
| 15 | | Defendant Hamilton, Plaintiff Kelly |
| 16 | | complained Defendant Free was harassing and |
| 17 | | threatening him. Defendant Free denied the |
| 18 | | issues raised by Plaintiff Kelly in a |
| 19 | | memorandum dated August 22nd, 2006. Okay. |
| 20 | | My question, Defendants' Exhibit 90 that |
| 21 | | you have in front of you, is that the |
| 22 | | memorandum you refer to in paragraph 29 of |
| 23 | | your complaint where you complained about |

378

| | | |
|---|---|---|
| 1 | | Mr. Free harassing and threatening you? |
| 2 | A. | These are -- This letter sums up some of |
| 3 | | the threatening complaints that I have |
| 4 | | received thus far. |
| 5 | Q. | Okay. Well, is this the memorandum -- |
| 6 | A. | That's correct. |
| 7 | Q. | -- that you refer to in paragraph 29 of |
| 8 | | your complaint? |
| 9 | A. | That's correct. |
| 10 | Q. | Okay. So Defendants' Exhibit 90 is the |
| 11 | | memorandum? |
| 12 | A. | That's correct. |
| 13 | Q. | Okay. Now, actually, you wrote the |
| 14 | | memorandum to John Free and copied Janice |
| 15 | | Hamilton? |
| 16 | A. | That's correct. |
| 17 | Q. | Okay. So where it says in the complaint |
| 18 | | that you wrote it to Hamilton, you actually |
| 19 | | wrote it to Free but copied Hamilton? |
| 20 | A. | That's correct. |
| 21 | | (Defendants' Exhibit 91 was marked |
| 22 | | for identification.) |
| 23 | Q. | And let me show you Defendants' Exhibit |

379

1    91.   Defendants' Exhibit 91 is Mr. Free's

2          response to your memorandum in which he,

3          quote, categorically denies -- or he

4          states, quote, I categorically deny these

5          claims of harassing and threatening

6          behavior?

7    A.    That's correct.

8    Q.    And you received Mr. Free's memorandum

9          that's been marked Defendants' Exhibit 91?

10   A.    That's correct.

11                (Defendants' Exhibit 92 was marked

12              for identification.)

13   Q.    Let me show you what's been marked

14         Defendants' Exhibit 92.  In paragraph 30

15         you state by memorandum dated -- and I'm

16         reading from the complaint again.

17   A.    Okay.

18   Q.    What I'm trying to do, Mr. Kelly, and I'm

19         sure you realize it.  But I'm going through

20         that Count 4 of your complaint.

21   A.    Okay.

22   Q.    And I want to make sure that I have the

23         documents that you're referring to in

380

1       there.

2   A.   I got you.

3   Q.   You state in paragraph 30, by memorandum

4       dated September 18, 2006 Plaintiff Kelly

5       responded to Defendant Free concerning his

6       appraisal review.

7   A.   That's correct.

8   Q.   Okay.  Now, Exhibit -- Defendants' Exhibit

9       92 is the appraisal that you're referring

10      to in paragraph 30 of your complaint?

11  A.   That's correct.

12          (Defendants' Exhibit 93 was marked

13           for identification.)

14  Q.   And Defendants' Exhibit 93 that I'm having

15      Shelia hand to you now, that is your

16      response to the appraisal?

17  A.   That's correct.

18          (Defendants' Exhibit 94 was marked

19           for identification.)

20  Q.   Defendants' Exhibit 94 that Shelia is now

21      handing to you is the written reprimand to

22      you from John Free that's referred to in

23      paragraph 30 of the complaint?

381

1    A.    That's correct.

2    Q.    So this is the reprimand?

3    A.    That is the reprimand.

4              (Defendants' Exhibit 95 was marked

5                 for identification.)

6    Q.    Let me show you what's been marked

7          Defendants' Exhibit 95.  You subsequently

8          were called into a disciplinary meeting

9          with John Free and Janice Hamilton

10         regarding the reprimand.

11   A.    They taped it.  That might be what they

12         wrote, but they had a tape recorder going.

13   Q.    That's right.  You got the reprimand from

14         John Free and then you had a disciplinary

15         hearing with Janice Hamilton and John Free?

16   A.    That's correct.

17   Q.    And they taped that disciplinary hearing?

18   A.    That's correct.

19   Q.    Okay.  I'll represent to you that

20         Defendants' Exhibit 95 is the transcript of

21         that hearing.

22   A.    I can't -- I can't remember what was said,

23         but I know it was taped.

382

```
 1    Q.    Okay.  My question to you -- And take your
 2          time to review that.  Is this a true and
 3          accurate transcript of the disciplinary
 4          meeting?
 5    A.    Let me read it for a second.
 6    Q.    Okay.
 7                    (Brief pause.)
 8    A.    Yeah.  This appears to be what took place.
 9    Q.    So you believe Defendants' Exhibit 95 to be
10          a true and accurate transcript --
11    A.    Appears to be.
12    Q.    -- of that disciplinary hearing?
13    A.    Appears to be.
14    Q.    Okay.  Now, you mentioned earlier that you
15          had requested a grievance hearing but had
16          been denied that grievance hearing?
17    A.    Yeah.  I wrote -- I think I wrote a letter
18          to Ms. Hamilton requested I address the
19          issues that I wrote in that -- in my
20          letter.  And I stated that that information
21          that was written was completely accurate
22          and true.
23                    (Defendants' Exhibit 96 was marked
```

383

1              for identification.)

2    Q.    Now, let me show you Defendants' Exhibit

3          96.

4    A.    Yeah.  This is --

5    Q.    Is this where your request for a grievance

6          hearing was denied?

7    A.    That's -- Yeah.  I think -- I think I -- It

8          was denied, but there was some other

9          paperwork associated this where it was

10         denied, yes.

11   Q.    Okay.  But this -- Defendants' Exhibit 96

12         is the denial of that request?

13   A.    That's correct.

14   Q.    And that is -- It's a memorandum to you

15         from President Jim Sullivan and

16         Commissioner Jan Cook?

17   A.    That's correct.

18   Q.    And the reason for the denial, according to

19         President Sullivan and Commissioner Cook,

20         is that pursuant to Rule 7 of the

21         Commission's employee guidelines no

22         employee of the Commission can file a

23         grievance due to the receipt of a written

1      warning or reprimand.

2  A.   That's correct.  Yes.  That's what they

3      wrote.

4  Q.   Okay.  And it's your understanding they

5      would not give you a grievance hearing for

6      the reprimand because the employee

7      guidelines do not allow a grievance

8      hearing?

9  A.   According to this letter, that's correct.

10  Q.   Okay.  Do you have any reason to dispute

11      their reason for not giving you a grievance

12      hearing?

13  A.   I don't have any reason, but that's --

14      that's their call.

15           MR. MOZINGO:  Let's take a break

16              at this point.  I'm close to

17              being done --

18           MR. DEBARDELABEN:  Are we going to

19              get to 100?

20           MR. MOZINGO:  -- and we'll come

21              back.  We'll see.  Let's go

22              ahead and take a break.

23           (Brief recess was taken.)

385

```
 1              (Defendants' Exhibit 97 was marked
 2                 for identification.)
 3    Q.   Mr. Free -- I'm sorry -- Mr. Kelly --
 4         excuse me -- let me show you what's been
 5         marked Defendants' Exhibit 97.  This is an
 6         application for employment that you filled
 7         out to work with the State of Alabama as a
 8         statistician.
 9    A.   Okay.
10    Q.   Is that correct?
11    A.   That appears to be correct.  I'm not sure.
12    Q.   Prior to working for the Department of
13         Public Safety, you were employed with the
14         State Personnel Department?
15              MR. FREE:  Flynn, not Public
16                 Safety.
17              MR. MOZINGO:  I'm sorry.  You
18                 know, I know it's late for
19                 you.  It's late for me too.
20                 There I go.  Excuse me.  Let
21                 me reask that.  Thank you.
22    Q.   Prior to -- I was thinking Public Safety
23         about something else.
```

386

```
 1              Prior to working for the Public Service
 2         Commission, you worked with the State
 3         Personnel Department as a Statistician II?
 4    A.   No.  I worked for the Department of Human
 5         Resources.
 6    Q.   Okay.  Department of Human Resources.
 7         Okay.  And could you explain to me how
 8         they're different from State Personnel?
 9    A.   They track welfare payments to different
10         individuals.  They also track payments to
11         different agencies that take care of
12         indigent kids and families in the state of
13         Alabama.
14    Q.   Okay.  How long were you employed as a
15         Statistician II?
16    A.   About four or five years.  I'm not sure.
17    Q.   Okay.  And you left Human Resources to go
18         to work at the Public Service Commission?
19    A.   That's correct.
20    Q.   And Defendants' Exhibit 97, is all of this
21         your handwriting?
22    A.   I believe it -- I believe this -- It
23         appears to be my handwriting.
```

387

1   Q.   Okay.  Because you told me earlier your

2          wife had filled one out for you.

3   A.   Yeah.  My wife or either my daughter.  I'm

4          not sure.

5   Q.   Now, is this one here all of your

6          handwriting?

7   A.   That's -- That appears to be my

8          handwriting.

9   Q.   And you signed this on October 20th, 1993?

10   A.   I can't make it out, but that appears to be

11          correct.

12   Q.   Okay.  Is that your signature at the

13          bottom?

14   A.   That appears to be correct.

15   Q.   Okay.  And you filled out this application;

16          correct?

17   A.   That's correct.

18   Q.   You reviewed it before you signed it?

19   A.   That's correct.

20   Q.   And you submitted it to the Department of

21          Human Resources to be considered for the

22          job of Statistician II?

23   A.   That's correct.

388

| | | |
|---|---|---|
| 1 | Q. | And you submitted this application with the |
| 2 | | intent that the Department of Human |
| 3 | | Resources rely upon this application in |
| 4 | | hiring you? |
| 5 | A. | That's correct. |
| 6 | | (Defendants' Exhibit 98 was marked |
| 7 | | for identification.) |
| 8 | Q. | Okay. Let me show you what's been marked |
| 9 | | Defendants' Exhibit 98. This appears to be |
| 10 | | another application you submitted with the |
| 11 | | Department of Human Resources again for the |
| 12 | | job of Statistician II; is that correct? |
| 13 | A. | That's correct. |
| 14 | Q. | Okay. Did you apply for the job twice? |
| 15 | A. | I can't -- I can't remember. |
| 16 | Q. | Because Defendants' Exhibit 97 is dated |
| 17 | | October 20th, 1993 and Defendants' Exhibit |
| 18 | | 98 is dated April 7, 1998. |
| 19 | A. | I can't remember. I might have filled it |
| 20 | | out twice. I'm not sure. I can't remember |
| 21 | | back that far. |
| 22 | Q. | Do you believe that you applied for that |
| 23 | | job in 1993 but you didn't get it? |

389

| | | |
|---|---|---|
| 1 | A. | That appears to be correct.  Yeah.  About |
| 2 | | five years later. |
| 3 | Q. | Okay.  So you reapplied five years later in |
| 4 | | 1998? |
| 5 | A. | That's correct. |
| 6 | Q. | And Defendants' Exhibit 98 is the |
| 7 | | application that you filled out to reapply |
| 8 | | for the job? |
| 9 | A. | That's correct. |
| 10 | Q. | Okay.  Now, is this handwriting yours? |
| 11 | A. | That's correct. |
| 12 | Q. | All of it? |
| 13 | A. | Appears to be correct.  I'm not sure. |
| 14 | | Appears to be correct. |
| 15 | Q. | Well, is there anything that doesn't appear |
| 16 | | to be your handwriting? |
| 17 | A. | I think it's all my handwriting. |
| 18 | Q. | Okay.  Now, again, you would have filled |
| 19 | | out the application and you would have |
| 20 | | reviewed it before you signed it? |
| 21 | A. | That's correct. |
| 22 | Q. | And then you signed it? |
| 23 | A. | That's correct. |

390

| | | |
|---|---|---|
| 1 | Q. | And you submitted it to the Department of |
| 2 | | Human Resources with the intent that they |
| 3 | | rely upon the application in possibly |
| 4 | | hiring you -- |
| 5 | A. | That's correct. |
| 6 | Q. | -- for the job of Statistician II? |
| 7 | A. | That's correct. |
| 8 | | (Defendants' Exhibit 99 was marked |
| 9 | | for identification.) |
| 10 | Q. | Now, Defendants' Exhibit 99. We've covered |
| 11 | | this, but, again, that is the application |
| 12 | | you filled out in March 2002 to be hired by |
| 13 | | the Public Service Commission in the |
| 14 | | position of Utilities Engineering |
| 15 | | Specialist I? |
| 16 | A. | Appears to be correct. |
| 17 | Q. | And this is the one I think you said your |
| 18 | | wife filled it out? |
| 19 | A. | Wife or daughter. I believe that's |
| 20 | | correct. |
| 21 | Q. | Okay. But you reviewed it after they |
| 22 | | filled it out and you signed it and |
| 23 | | submitted it? |

391

```
 1    A.    That's correct.

 2                    (Defendants' Exhibit 100 was marked

 3                     for identification.)

 4    Q.    And then let me show you Defendants'

 5          Exhibit 100.

 6    A.    Okay.

 7    Q.    Okay.  This is, again, kind of a repeat of

 8          what we covered earlier, but this is the

 9          application that you personally filled out

10          to be considered for the promotion of

11          Utilities Engineering Specialist II?

12    A.    That's correct.

13    Q.    And these four applications are true and

14          correct?

15    A.    Appears to be.

16                    (Defendants' Exhibits 101 and 102

17                     were marked for identification.)

18    Q.    Let me show you what's been marked

19          Defendants' Exhibit 101 and 102.

20    A.    Okay.

21    Q.    These are documents I received from Alabama

22          Power Company.

23    A.    Okay.
```

392

1 Q. Defendants' Exhibit 101 states -- again, if

2   you look at your name up at the left,

3   Gregory Kelly -- comment, employee

4   terminated due to, quote, overall

5   unsatisfactory job performance, end quote,

6   per Jerry Posey, Montgomery district

7   superintendent.

8 A. Okay.

9 Q. Employee was terminated at 3:30 p.m. on

10   September 16th, 1993.  Was not paid for any

11   unused vacation.

12    If you'll look at Defendants' Exhibit

13   102.

14 A. Okay.

15 Q. It says, terminated, effective date,

16   9/17/1993.  Action/reason, termination.

17   Out to the right it says unsatisfactory

18   performance.  Below that it says not

19   eligible for rehire.  Isn't it true that

20   you were fired by Alabama Power Company?

21 A. I refused to work for Mr. Jerry Posey.  We

22   had a meeting and he told me that I had to

23   do things a certain way that conflicted

393

1          with my family, and I told him that wasn't

2          acceptable.  And he told me I had to

3          change.  And I told him I refused to work

4          for him and I walked off the job.

5    Q.    Isn't it true that you were fired because

6          you failed to complete an assignment

7          concerning an Alabama Power engineering

8          project on Highway 231 to Wetumpka --

9    A.    That's --

10   Q.    -- in a timely and professional manner?

11   A.    That's false.  That 231 project was

12         finished years before that.  Posey now told

13         me I had to change the way -- He gave me an

14         ultimatum that I couldn't live with.  He

15         told me I had to change and -- change the

16         way I conduct myself and the way I do

17         things.  And if you read the record, Posey

18         came to Wetumpka to get me.  I had declined

19         to work with Posey that personal year.

20         Posey forced me to return from

21         Montgomery -- from Wetumpka back to

22         Montgomery.  I told Posey I had no interest

23         of ever working for him.  He forced the

394

1       folks in Wetumpka to make me move back to

2       Montgomery.  So when I moved back to

3       Montgomery, you know -- he had had other

4       problems with other black engineers and we

5       had to swap.  And then when we had a

6       problem, I told him that I just can't work

7       for him.

8    Q.  Isn't it true that Mr. Posey terminated you

9       for substandard engineering work product

10      related to your assignments, a poor

11      attitude and customer complaints?

12   A.  Posey don't know much about engineering.

13      Posey -- Well, we can dispute that.  Posey,

14      he gave me an ultimatum and I refused to

15      work for him.

16   Q.  Isn't Mr. Posey an engineer?

17   A.  I understand he is.  I refused to work for

18      him.

19   Q.  But he doesn't know anything about

20      engineering?

21   A.  He didn't know anything -- From my

22      knowledge he didn't know much about

23      engineering.  He got different qualities

395

1      about engineer.

2   Q.  Well, isn't it true that you were

3       terminated in the presence of Jerry Posey

4       and Larry Stokley?

5   A.  That's -- That's correct.

6   Q.  So Larry Stokley was there too?

7   A.  That's right.  He told me that he wanted me

8       to do something and I refused to work for

9       him.

10  Q.  And if Larry Stokley and Jerry Posey

11      testified that you were fired for

12      unsatisfactory job performance, you deny

13      that?

14  A.  Well, you tell Stokley and -- to produce

15      the documents.  I had no job performance

16      that was done at that particular time.

17      They fired me in a meeting because I

18      refused to change.  They gave me an

19      ultimatum that I had to change.  At that

20      particular time I had no unsatisfactory

21      performance.  They called me and I

22      refused -- they wanted me to change the way

23      I do things.

396

```
 1    Q.    Isn't it true that you were called into

 2          Jerry Posey's office right across the

 3          street here and fired?

 4    A.    No.  He called me in and gave me an

 5          ultimatum and I refused to work for him.

 6          That's the way it went down.  Now, he can

 7          put anything he want to put, but I refused

 8          to work with Mr. Posey and Stokley.  I

 9          refused to work for them.

10    Q.    Well, then it's not true that you no longer

11          work at Alabama Power because Alabama Power

12          was downsizing?  That's not true, is it?

13    A.    That's one reason they gave one other

14          employees when they called and checked on

15          it.  They told them they were downsizing.

16          I had -- because I thought about taking

17          legal action against Alabama Power

18          Company.  I had a person to call Alabama

19          Power Company personnel to find out.  They

20          told that person that the reason he was let

21          go because they were downsizing.

22    Q.    You didn't leave Alabama Power, though,

23          because it was downsizing?
```

397

1    A.    That's the reason that they gave an

2          attorney of mine that they were

3          downsizing.

4    Q.    But that's not the reason you left Alabama

5          Power Company?

6    A.    I left Alabama Power Company because I

7          refused to work for them.

8    Q.    Okay.  The reason you left Alabama Power

9          Company, according to you, is because you

10         refused to work for Jerry Posey?

11   A.    Yeah.

12   Q.    Not because Alabama Power Company was

13         downsizing?

14   A.    Yeah.  I refused to work for Jerry Posey.

15         And Posey knew of my apprehension of

16         working for him when I was in Wetumpka.  I

17         had stated on numerous occasions that I did

18         not want to work for him because of his bad

19         reputation of harassing and discriminating

20         against black employees.  I had told him

21         that when he forced the issue.

22   Q.    Did you ever sue Jerry Posey?

23   A.    No.

398

| | | |
|---|---|---|
| 1 | Q. | Did you ever sue Larry Stokley? |
| 2 | A. | No. |
| 3 | Q. | If Larry Stokley testifies that you were, |
| 4 | | in fact, fired by Jerry Posey in his |
| 5 | | presence, do you dispute that? |
| 6 | A. | I dispute that.  I left Alabama Power |
| 7 | | Company because I refused to work for Jerry |
| 8 | | Posey.  Anybody at Alabama Power will tell |
| 9 | | you that when they wanted me to move back |
| 10 | | to Montgomery that I refused to work for |
| 11 | | Jerry Posey.  I had stated several times |
| 12 | | that I did not want to work with Jerry |
| 13 | | Posey. |
| 14 | Q. | So if you ever told anybody or represented |
| 15 | | anywhere that you left Alabama Power |
| 16 | | Company because they were downsizing, |
| 17 | | that's not true? |
| 18 | A. | That's what the people -- My attorney, when |
| 19 | | they called Alabama Power Company to find |
| 20 | | out the real reason because we were |
| 21 | | contemplating a lawsuit for wrongful |
| 22 | | termination, that's what they told the |
| 23 | | attorney that the reason that Mr. Kelly was |

399

```
 1        let go because they were downsizing.
 2        That's the reason that was given.  And
 3        once, you know, I hired an attorney he told
 4        me, he said, the reason that you have no
 5        legal grounds to sue them because they said
 6        the reason that you left because they said
 7        they were downsizing.  That's the reason
 8        they gave my attorney.
 9   Q.   Did you -- Well, then you obviously talked
10        to an attorney about suing Alabama Power?
11   A.   I explored -- I explored my opportunities.
12        I looked at it.  He told me that the more
13        money that I would be wasting trying to
14        pursue this, you're a young man, go start
15        another career, go on with your life, let
16        this go.
17   Q.   And so you would have talked to an attorney
18        about suing Alabama Power, then, prior to
19        1993 when you first applied with the State
20        Department of Human Resources?
21   A.   Yes.  That's correct.  I've sought counsel
22        from attorney.
23   Q.   And so if you represented in any employment
```

400

| | | |
|---|---|---|
| 1 | | application that you left Alabama Power |
| 2 | | because Alabama Power was downsizing, that |
| 3 | | is untrue, isn't it? |
| 4 | A. | That's not what they gave my original |
| 5 | | attorney. |
| 6 | Q. | But that's not the reason you personally |
| 7 | | left Alabama Power, is it? |
| 8 | A. | I left -- I left -- That's the reason -- I |
| 9 | | want it to be clear when I filled out an |
| 10 | | application for other jobs the reason why I |
| 11 | | left.  When we petitioned Alabama Power |
| 12 | | Company why we left, the information they |
| 13 | | gave to my attorney -- I wanted to make |
| 14 | | sure that we had accurate information and |
| 15 | | we put on those job descriptions.  The |
| 16 | | information they gave my attorney that |
| 17 | | Mr. Kelly was let go because of a |
| 18 | | downsizing of the company.  That's the |
| 19 | | reason that was given to me. |
| 20 | Q. | But that's not the reason you left?  You |
| 21 | | left because you didn't want to work with |
| 22 | | Jerry Posey? |
| 23 | A. | That is correct. |

401

Q.   And that's the reason you left?

A.   That's correct.  I did not want to work

     with Jerry Posey or Larry Stokley.  And I

     made it quite clear when I was the district

     engineer in Wetumpka that I had no

     intention of ever coming to Montgomery to

     work in Montgomery district again under the

     supervision of Jerry Posey.  And that can

     be -- John Johnson, my former supervisor,

     he can tell you that, that I made clear

     reference that I didn't want to go back to

     Montgomery.

Q.   But you say you left Alabama Power Company

     because you didn't want to work with Jerry

     Posey?

A.   That's correct.

Q.   And it had nothing to do with downsizing,

     did it?

A.   The official reason -- Let me make this

     clear again.  The official reason when we

     petitioned Alabama Power Company why I was

     let go -- because we was looking at maybe a

     wrongful termination -- they told me that

402

```
 1        the reason he was let go through my
 2        attorney that the company was downsizing.
 3   Q.   Okay.  You said through your attorney.  So
 4        Alabama Power never told you that?
 5   A.   No.
 6   Q.   You say that's what they told your
 7        attorney?
 8   A.   That's correct.
 9   Q.   Okay.  So Alabama Power has never told you
10        that you were let go due to downsizing?
11   A.   That's what they told me, down -- They told
12        me through downsizing.
13   Q.   Well, they told your attorney that?
14   A.   That's correct.
15   Q.   That's what you claim?
16   A.   That's correct.
17   Q.   But they have never told you --
18   A.   No --
19   Q.   -- personally --
20   A.   -- when we --
21   Q.   -- Gregory Kelly that?
22   A.   When I walked off the job across the
23        street, it was my decision.  I said, I no
```

403

```
 1        longer can work with you because of the
 2        claims that you're making on the job.  And
 3        I walked off and left the job.  I said, I
 4        can't work with you under these conditions.
 5   Q.   And you walked off and left the job because
 6        you didn't want to work for Jerry Posey?
 7   A.   That's correct.  Posey -- I'm not the first
 8        person that felt like that.  Didn't want to
 9        work for him.
10   Q.   So if Jerry Posey and Larry Stokley are
11        subpoenaed for a deposition and testify
12        that you were fired, it's your position
13        here in front of us all that they're not
14        telling the truth?
15   A.   They're not telling the truth.  They never
16        told the truth.  You can ask anybody who
17        work for the Power Company who would be
18        fair and accurate that I never wanted to
19        work for Larry Posey or Jerry Stokley.  I
20        made it quite clear that I was happy with
21        the job I had in Wetumpka.
22                    (Defendants' Exhibit 103 was marked
23                        for identification.)
```

404

| | | |
|---|---|---|
| 1 | Q. | Let me show you what's been marked |
| 2 | | Defendants' Exhibit 103.  This is a report |
| 3 | | of warning or reprimand you received from |
| 4 | | Larry Stokley and Jerry Posey for |
| 5 | | insubordination in your direct refusal to |
| 6 | | discuss a work project with a supervisor. |
| 7 | | Is that correct? |
| 8 | A. | That appears to be correct. |
| 9 | Q. | And you, in fact, did receive before your |
| 10 | | termination a written reprimand from |
| 11 | | Alabama Power for insubordination? |
| 12 | A. | That's the -- That's correct. |
| 13 | Q. | Now, Larry Stokley was your immediate |
| 14 | | supervisor? |
| 15 | A. | Like I told you before, Larry Stokley and I |
| 16 | | never did get along from day one. |
| 17 | Q. | Okay.  Was he your immediate supervisor? |
| 18 | A. | When I came back from Montgomery, they |
| 19 | | assigned me to work with Larry Stokley. |
| 20 | Q. | And Larry Stokley was your immediate |
| 21 | | supervisor? |
| 22 | A. | That's correct. |
| 23 | Q. | And in your answers to interrogatories, |

HAISLIP, RAGAN, GREEN, STARKIE & WATSON, P.C.
(334) 263-4455

405

| | |
|---|---|
| 1 | number seven, you were asked to provide the |
| 2 | name, address, telephone number, and job |
| 3 | title of all persons who supervised you |
| 4 | when you were employed by Alabama Power |
| 5 | Company.  You didn't name Larry Stokley? |
| 6 | A.   No. |
| 7 | Q.   So you left him off? |
| 8 | A.   That's correct. |
| 9 | (Defendants' Exhibit 104 was marked |
| 10 | for identification.) |
| 11 | Q.   Let me show you what's been marked |
| 12 | Defendants' Exhibit 104.  Now, you take a |
| 13 | look at that.  That is a letter of |
| 14 | reprimand you also received while working |
| 15 | as a statistician with the Department of |
| 16 | Human Resources. |
| 17 | A.   Okay. |
| 18 | Q.   Correct? |
| 19 | A.   That's correct. |
| 20 | Q.   And you, in fact, did receive also a letter |
| 21 | of reprimand from the Department of Human |
| 22 | Resources? |
| 23 | A.   That's correct. |

406

```
 1    Q.   Okay.  So it's true, then, that you've
 2         received letter of reprimands in your
 3         employment career from both Alabama Power
 4         from the Department of Human Resources and
 5         from John Free which you complain about in
 6         this lawsuit?
 7    A.   That's not uncommon for black males to be
 8         reprimanded by white -- white supervisors.
 9         Not uncommon.
10    Q.   Okay.  And if you ever received a
11         reprimand, then, it's your position it was
12         due to the fact that you're black?
13    A.   It's not uncommon.  It's not uncommon for
14         black males to be rep -- especially prior
15         black men to receive reprimand from white
16         supervisors.  Not uncommon.
17    Q.   So it's true, then, that in your employment
18         history you've never been insubordinate?
19    A.   Insubordinate is in the eye of the
20         beholder.
21    Q.   Okay.  And in your eye you've never been
22         insubordinate?
23    A.   No.  I've never been insubordinate.
```

407

```
 1    Q.   And you've never been abusive or
 2         belligerent to John Free?
 3    A.   No.
 4    Q.   You've never made personal attacks against
 5         John Free?
 6    A.   John Free and I -- what you see in writing,
 7         John Free -- we've hardly ever talked.  We
 8         write letters.  We don't get into those
 9         conversations that we -- like other folks
10         get into.  We don't call each other names.
11    Q.   So if John Free has ever written you up for
12         making a personal attack against him, it's
13         your position that's just in his -- the eye
14         of the beholder?
15    A.   It's not a personal attack.  The facts that
16         I have wrote in that letter are true.
17         Personal attack -- You know, you write the
18         truth.  That's not a personal attack when
19         you state the truth.
20                   (Defendants' Exhibit 105 was marked
21                    for identification.)
22    Q.   Let me show you what's been marked
23         Defendants' Exhibit 105.  This is a
```

408

| | | |
|---|---|---|
| 1 | | statement of a claim in small claims court |
| 2 | | by Cohen's Electronics against you, Gregory |
| 3 | | Kelly; is that correct? |
| 4 | A. | That appears to be correct. |
| 5 | Q. | And so you were, in fact, sued by Cohen's |
| 6 | | Electronics for a bad debt? |
| 7 | A. | That's not true.  I was sued by Cohen's |
| 8 | | Electronics because the builder refused to |
| 9 | | pay for this piece of equipment. |
| 10 | Q. | Okay.  But Cohen's Electronics was the |
| 11 | | plaintiff and they sued you and you were |
| 12 | | the defendant? |
| 13 | A. | That's correct. |
| 14 | Q. | Just like Janice Hamilton and John Free and |
| 15 | | the PSC are the defendants here, you were |
| 16 | | the defendant in that lawsuit? |
| 17 | A. | And that was resolved when the builder paid |
| 18 | | this debt. |
| 19 | Q. | Okay.  But you were sued and you were |
| 20 | | defendant? |
| 21 | A. | That was settled out of court.  They sued |
| 22 | | and the builder paid this debt.  It was the |
| 23 | | builder's debt, not my debt. |

409

Q.   Okay.  But it was true that you were sued?

A.   Now that you bring forward, yeah, it
     appears it was --

Q.   Defendants' Exhibit 105?

A.   Yeah.

          (Defendants' Exhibit 106 was marked
               for identification.)

Q.   And let me show you what's been marked
     Defendants' Exhibit 106.  This is a
     complaint that was also filed against you
     by CFSC Consortium, LLC; correct?

A.   That appears to be correct.

Q.   Okay.  So you've been sued by Cohen's
     Electronics and you've been sued by CFSC
     Consortium?

A.   That's correct.

Q.   And you were sued in the circuit court of
     Montgomery County, Alabama?

A.   That's correct.

          (Defendants' Exhibit 107 was marked
               for identification.)

Q.   Let me show you what's been marked
     Defendants' Exhibit 107.  This is a

410

1    complaint where you sued somebody.  You

2    sued Fidelity and Deposit Company of

3    Maryland, Hoyt Henley Builder, and C & C

4    Electric Company, Inc.

5    A.    That appears to be -- Let's see.

6    Q.    It says Gregory Kelly --

7    A.    Yeah.  I think that's correct.

8    Q.    Gregory Kelly is listed as a plaintiff?

9    A.    Yeah.

10    Q.    And you sued over in district court several

11          defendants as reflected in Defendants'

12          Exhibit 107?

13    A.    Okay.  That's correct.

14                    (Defendants' Exhibit 108 was marked

15                      for identification.)

16    Q.    Let me show you Defendants' Exhibit 108.

17          Okay.  You were also sued by Leon Obenhaus

18          in the small claims court of Montgomery

19          County; is that correct?

20    A.    That appears to be correct from this

21          document.

22    Q.    Okay.  Well, were you, in fact, sued by

23          Mr. Obenhaus?

411

| | | |
|---|---|---|
| 1 | A. | I don't recall.  I don't recall how this |
| 2 | | was settled. |
| 3 | Q. | Is it possible Mr. Obenhaus sued you? |
| 4 | A. | I think he tried to sue me for hitting his |
| 5 | | car in the parking lot with a shopping cart |
| 6 | | or something.  Long time ago.  I can't |
| 7 | | remember.  I think I put a dent in his car |
| 8 | | with a shopping buggy or something. |
| 9 | Q. | So you have been a plaintiff or a defendant |
| 10 | | in a civil lawsuit? |
| 11 | A. | None of these cases never came to court. |
| 12 | Q. | Okay.  But you were a plaintiff or a |
| 13 | | defendant in at least four lawsuits? |
| 14 | A. | Now that you bring them to my attention, |
| 15 | | yeah.  These was handled by my attorney and |
| 16 | | never came to court. |
| 17 | Q. | So if you ever represented that you have |
| 18 | | never been a plaintiff or a defendant in a |
| 19 | | lawsuit, that's not true? |
| 20 | A. | Yeah.  Now that you brought this, that's -- |
| 21 | | that's not true.  I have been defendant. |
| 22 | Q. | Do you know a Sharon Kelly? |
| 23 | A. | No, I don't. |

412

| | | |
|---|---|---|
| 1 | Q. | Okay. Mr. Kelly, have you ever -- Since |
| 2 | | coming to work for the Public Service |
| 3 | | Commission, have you ever applied for an |
| 4 | | engineering job outside the Public Service |
| 5 | | Commission? |
| 6 | A. | Yes, I have. |
| 7 | Q. | And what job have you applied for? |
| 8 | A. | I can't remember. I've applied for a |
| 9 | | number of jobs over a number -- over the |
| 10 | | past several years. |
| 11 | Q. | A number of jobs in the private sector? |
| 12 | A. | Private sector. I can't -- A number of |
| 13 | | jobs. |
| 14 | Q. | Can you recall any of the employers that |
| 15 | | you applied with? |
| 16 | A. | I can't remember. |
| 17 | Q. | You can't recall one today? |
| 18 | A. | I can't recall. I sent out dozens of |
| 19 | | applications. |
| 20 | Q. | Okay. Have you interviewed with a |
| 21 | | prospective employer since coming to work |
| 22 | | for the Public Service Commission? |
| 23 | A. | No. I haven't interviewed for anybody -- |

413

1    for anyone, no.

2 Q. Okay.  So you've sent out dozens of

3    applications and nobody has asked you for

4    an interview?

5 A. It's going to be hard at this age.

6 Q. No one has asked you for an interview?

7 A. No.  No one asked for an interview.

8 Q. Do you know why no one has asked you for an

9    interview?

10 A. I have no idea.

11 Q. Okay.  Have you ever heard any of the

12    Commissioners with the Public Service

13    Commission, whether it be President

14    Sullivan or Commissioner Jan Cook or any

15    other commissioners that have been with the

16    Public Service Commission while you've been

17    an employee there, have you ever heard any

18    of them make a racially derogatory remark?

19 A. No, I haven't.

20 Q. Have you ever heard any of them make a

21    racial slur?

22 A. No, I haven't.

23 Q. Other than the promotion that you received

414

```
 1            upon the recommendation of Mr. Free back in

 2            2004, have you applied for any other

 3            promotions within the Public Service

 4            Commission?

 5     A.     Only other jobs that I could apply for

 6            would be Mrs. Hamilton's job in my career

 7            path.

 8     Q.     So the only job that you could apply for in

 9            your career path is Janice Hamilton's job?

10     A.     That's correct.

11     Q.     And Janice Hamilton currently holds that

12            job?

13     A.     That's correct.

14     Q.     And so there's never been an opening for

15            that job?

16     A.     That's correct.

17     Q.     Isn't it true that Janice Hamilton once

18            held the very job you hold now?

19     A.     That's correct.

20     Q.     And she went from the job that you hold now

21            to being director of an entire division at

22            the PSC?

23     A.     That's correct.
```

415

| | | |
|---|---|---|
| 1 | Q. | And she did that being an engineer and a |
| 2 | | black female? |
| 3 | A. | That's correct. |
| 4 | | MR. MOZINGO:  Let me see -- Let me |
| 5 | | check my notes.  I think that |
| 6 | | may be it, but let me check my |
| 7 | | notes. |
| 8 | | (Brief pause.) |
| 9 | Q. | Who was your attorney that you -- |
| 10 | A. | I can't remember -- |
| 11 | Q. | -- hired to investigate your Alabama Power |
| 12 | | lawsuit? |
| 13 | A. | I can't remember.  I can't remember.  I |
| 14 | | can't remember this -- I'm kind of thinking |
| 15 | | maybe Troy Massey or something, but I can't |
| 16 | | remember.  I know I talked to an attorney |
| 17 | | and he just told me just, son, just go on |
| 18 | | and enjoy your life and find something |
| 19 | | else. |
| 20 | Q. | Did you only talk to one attorney? |
| 21 | A. | That's right. |
| 22 | Q. | And that attorney said, go on, don't worry |
| 23 | | about suing Alabama Power? |

416

| | | |
|---|---|---|
| 1 | A. | No. He said with Balch & Bingham it would |
| 2 | | be an uphill fight, you know, trying to |
| 3 | | sue. You just, you know, make it work; you |
| 4 | | know, just find another job; just go on |
| 5 | | with your life. |
| 6 | Q. | Okay. And you don't remember the name of |
| 7 | | that attorney that told you that? |
| 8 | A. | I can't remember -- I can't remember that |
| 9 | | attorney that told me. We talked to the |
| 10 | | attorney and he gave me the advice and said |
| 11 | | I'll make a phone call for you and try to |
| 12 | | get you straight, make sure that when you |
| 13 | | apply for a job that this won't be on your |
| 14 | | record. |
| 15 | Q. | Okay. And this is the attorney that you |
| 16 | | claim Alabama Power informed him -- |
| 17 | A. | Yeah. |
| 18 | Q. | -- that you left because of downsizing? |
| 19 | A. | Yeah. He told me that we need to get this |
| 20 | | straight, make sure this is straight so |
| 21 | | this won't be following you in your |
| 22 | | career. Now, if they telling other |
| 23 | | prospective employees that they fired you |

417

```
 1        stopping you -- hindering you from getting

 2        other jobs, then we might have something

 3        here.  But, you know, if they're saying

 4        that you left because of downsizing, go on,

 5        you're a young man, a degree, go on and

 6        enjoy your life, find another job

 7        somewhere, let this go.

 8   Q.   But according to the records that they gave

 9        me, Defendants' Exhibit 101 and 102, that's

10        not the reason they say you left?

11   A.   That's not the reason that they gave my

12        attorney or they gave -- not the reason

13        they gave my attorney when we checked on

14        it.

15   Q.   Okay.  John Jeffers -- John Jeffers, was he

16        a supervisor of yours at Alabama Power?

17   A.   I have no idea who John Jeffers is.

18   Q.   Okay.  Well, besides Ron Drury, John

19        Johnson, Mike Tucker, Max Alexander, Danny

20        Glover, and Larry Stokley, did you have any

21        other supervisors at Alabama Power?

22   A.   I think Kenneth Strong from -- I had --

23        over about a 15-year career at Alabama
```

418

| | | |
|---|---|---|
| 1 | | Power Company I had a number of |
| 2 | | supervisors. I could -- You know, I think |
| 3 | | Ken Strong was once -- one time my |
| 4 | | supervisor. I had a number of |
| 5 | | supervisors. Sometimes you get a good |
| 6 | | one. Sometimes you get a bad one. I had |
| 7 | | one bad supervisor while I was at Alabama |
| 8 | | Power Company the whole time I was there. |
| 9 | | That was Jerry Posey and Larry Stokley. I |
| 10 | | had one bad supervisor. Now, you want to |
| 11 | | talk about -- By the same token, you know, |
| 12 | | I would encourage you to call people |
| 13 | | like -- call other folks and get a balanced |
| 14 | | opinion on me instead of listening to those |
| 15 | | two. |
| 16 | Q. | But Larry Stokley was your supervisor when |
| 17 | | you left Alabama Power? |
| 18 | A. | Yeah. When I left there, yeah. |
| 19 | Q. | He was your last one? |
| 20 | A. | He was my last one. |
| 21 | Q. | Okay. When you left Alabama Power, did you |
| 22 | | apply for unemployment compensation? |
| 23 | A. | I believe I did. |

419

1   Q.   And did you receive unemployment
2        compensation?

3   A.   I did.

4   Q.   You did receive it?

5   A.   I did.

6   Q.   Okay.  And did you receive it from the
7        Department of Human Resources?

8   A.   I don't recall.  All I remember that I
9        applied for unemployment compensation.  At
10       that time I -- yeah, I did receive it.

11   Q.   Do you know who you received it from?

12   A.   I have no idea.

13   Q.   Okay.  Did you have a hearing --

14   A.   No.

15   Q.   -- to receive your unemployment
16        compensation?

17   A.   I don't think I did.  I don't recall.  I
18       think the -- As I recall, I don't think I
19       had a hearing.

20   Q.   Well, did you apply for unemployment
21       compensation?

22   A.   Yes, I did.

23   Q.   Who did you apply to?

420

```
 1    A.   Applied to the State Personnel -- whatever
 2         they call where you -- you know, out there
 3         on the Southern Boulevard.
 4    Q.   Did you apply to the Department of Human
 5         Resources?
 6    A.   All I know is just -- you know, I was
 7         instructed by mom and daddy just go down
 8         there and apply or something and see what
 9         happens.
10    Q.   But you went somewhere to the Southern
11         Boulevard and you applied?
12    A.   Yeah.
13    Q.   How long did you receive --
14    A.   I don't --
15    Q.   -- unemployment compensation?
16    A.   I don't recall.  Probably about five --
17         four or five months.
18    Q.   Okay.  And why did it cease at the end of
19         four or five months?  Do you know?
20    A.   I don't think I replied.  At that time my
21         wife and I, we were busy constructing our
22         own business.
23    Q.   Okay.  And that is what you did between the
```

421

```
 1           time you left Alabama Power Company and you

 2           got a job with the Department of Human

 3           Resources, you worked in your own business?

 4      A.   That's correct.

 5      Q.   And was that a beauty salon?

 6      A.   That's correct.

 7      Q.   Okay.  And so you didn't work in the field

 8           of engineering?

 9      A.   No.

10      Q.   And when you did get a job with the State

11           of Alabama and the Department of Human

12           Resources, you still didn't work in the

13           field of engineering?

14      A.   I taught -- No.  I taught school before

15           that.  No, I didn't.

16      Q.   Okay.  So between the time you left Alabama

17           Power and John Free recommended that you be

18           hired to work at the department -- I'm

19           sorry -- at the Public Service Commission,

20           you never worked in engineering?

21      A.   No.

22      Q.   So the only time you worked in engineering

23           after leaving Alabama Power Company was
```

422

1    when John Free hired you to work at the

2    Public Service Commission?

3  A.    That was by choice.

4  Q.    I didn't understand your answer.  Let me

5        ask it again.  The only time you worked in

6        the field of engineering after you left

7        Alabama Power Company was when John Free

8        hired you to work at the Alabama Public

9        Service Commission?

10  A.    That's correct.

11              MR. MOZINGO:  Okay.  I think that

12              will do it, Mr. Kelly.  I

13              thank you for sitting here

14              today.

15          (Deposition was concluded at

16          approximately 6:10 p.m.)

17

18        * * * * * * * * * * * * * *

19        FURTHER DEPONENT SAITH NOT

20        * * * * * * * * * * * * * *

21

22

23

423

1                    REPORTER'S CERTIFICATE

2   STATE OF ALABAMA:

3   MONTGOMERY COUNTY:

4           I, Lyn Daugherty, Certified Shorthand

5   Reporter and Commissioner for the State of Alabama

6   at Large, do hereby certify that I reported the

7   deposition of:

8                    **GREGORY KELLY**

9   who was duly sworn by me to speak the truth, the

10  whole truth and nothing but the truth, in the

11  matter of:

12                    GREGORY KELLY,

13                    Plaintiff,

14                    vs.

15                    JOHN FREE, et al.,

16                    Defendants.

17                    IN THE UNITED STATES DISTRICT COURT

18                    FOR THE MIDDLE DISTRICT OF ALABAMA

19                    NORTHERN DIVISION

20                    Civil Action No. 2:07-cv-610-WHA

21  on Thursday, March 6th, 2008.

22          The foregoing 422 computer-printed pages

23  contain a true and correct transcript of the

ORIGINAL

424

1  examination of said witness by counsel for the

2  parties set out herein.  The reading and signing is

3  hereby waived.

4       I further certify that I am neither of kin

5  nor of counsel to the parties to said cause nor in

6  any manner interested in the results thereof.

7       This 19th day of March 2008.

8

9

10  _____
   Lyn Daugherty, ACCR #66

11  Expiration Date:  9-30-2008
   Certified Court Reporter

12  And Commissioner for the
   State of Alabama at Large

13

14

15

16

17

18

19

20

21

22

23

301

| | | |
|---|---|---|
| 1 | | reconsideration by Janice Hamilton of her |
| 2 | | decision and request a salary study and |
| 3 | | then you end by stating, I am still hopeful |
| 4 | | that this position can receive the same |
| 5 | | equitable and fair consideration as most |
| 6 | | jobs have in the Commission and state |
| 7 | | government. |
| 8 | A. | Same policies, staying alert, still being |
| 9 | | aggressive and hoping for the best out of a |
| 10 | | bad situation. |
| 11 | Q. | And you're hoping for that job salary |
| 12 | | analysis? |
| 13 | A. | Hoping for that job -- Still hoping that |
| 14 | | there will be a change of heart by |
| 15 | | management to be fair and equitable to all |
| 16 | | employees under their supervision and to do |
| 17 | | the right thing. |
| 18 | Q. | And you're hoping Janice will change your |
| 19 | | mind -- |
| 20 | A. | That's correct. |
| 21 | Q. | -- upon that letter and give you a job |
| 22 | | salary -- |
| 23 | A. | Desk audit.  A desk audit. |

302

1    Q.    Okay.  You're hoping that she will change

2          your mind on that letter, Defendants'

3          Exhibit 50, and give you a desk audit?

4    A.    That's correct.

5                    (Defendants' Exhibit 51 was marked

6                     for identification.)

7    Q.    Now, Defendants' Exhibit 51 --

8    A.    Okay.

9    Q.    -- is also dated the same day as

10         Defendants' Exhibit 50.

11   A.    Okay.

12   Q.    And it is also a memorandum to Janice

13         Hamilton.

14   A.    That's correct.

15   Q.    And this is a memorandum that you wrote

16         her --

17   A.    Okay.

18   Q.    -- that same day.  And you begin this

19         memorandum by stating, as supplement to my

20         memo dated May 23rd, 2003 -- and that

21         supplement -- this would be the supplement,

22         then, to Defendants' Exhibit 50?

23   A.    That's correct.

303

| | | |
|---|---|---|
| 1 | Q. | I now strongly suggest that my position's |
| 2 | | career path is fractured and misaligned. |
| 3 | A. | Okay. |
| 4 | Q. | That's what you state. |
| 5 | A. | Okay. |
| 6 | Q. | Correct? |
| 7 | A. | Uh-huh (positive response). |
| 8 | Q. | If you could please answer yes or no for |
| 9 | | her benefit. |
| 10 | A. | That's correct. |
| 11 | Q. | She can't write down an uh-huh. |
| 12 | A. | That's correct. |
| 13 | Q. | You also state that -- It says, I also |
| 14 | | submit that this position is compromised |
| 15 | | because it is located in a nontechnical |
| 16 | | area in the electricity section; is that |
| 17 | | correct? |
| 18 | A. | That's correct. |
| 19 | Q. | And you further state, my supervisor is an |
| 20 | | accountant who has no vested interest in |
| 21 | | the field of technology. |
| 22 | A. | That's correct. |
| 23 | Q. | And finally you state in the second |

304

```
 1        paragraph next to the last sentence, I

 2        submit this realignment would effectively

 3        allow me to compete on a level playing

 4        field with the division's other technical

 5        position.

 6   A.   That's correct.

 7   Q.   What realignment are you asking for?

 8   A.   I'm asking to be put in the same section

 9        with Cleckler in the engineering -- in the

10        technical section, special projects

11        section, whatever you want to call it.

12   Q.   Do you believe if -- that you had been

13        granted that realignment and been put in

14        the same position as Cleckler that that

15        would help you in your request for a salary

16        adjustment?

17   A.   Yeah.  I believe that -- you know, you've

18        got to fix one problem before you fix the

19        other problem.  Free -- Getting a desk

20        audit from Free is a nonstarter.

21   Q.   I'm sorry.  I didn't hear that.

22   A.   You've got to fix -- They've gotten you

23        misaligned.  They've gotten you set up so
```

CHARGE OF DISCRIMINATION

ENTER CHARGE NUMBER

☐ FEPA

☒ EEOC   420-2007-01781

This form is affected by the Privacy Act of 1974; see Privacy Act Statement on reverse, before completing this form.

_____ and EEOC
(State or local Agency, if any)

NAME (Indicate Mr., Mz., or Mrs.)
Mr. Gregory Kelly

HOME TELEPHONE NO. (Include Area Code)
(334) 271-2478

STREET ADDRESS                    CITY, STATE AND ZIP CODE
6213 Willow Glenn Drive, Montgomery, AL 36117

COUNTY
Montgomery

NAMED IS THE EMPLOYER, LABOR ORGANIZATION, EMPLOYMENT AGENCY, APPRENTICESHIP COMMITTEE, STATE OR LOCAL GOVERNMENT AGENCY WHO DISCRIMINATED AGAINST ME (If more than one list below.)

NAME
Alabama Public Service COmmission

NO. OF EMPLOYEES/MEMBERS
Approx. 103

TELEPHONE NUMBER (Include Area Code)
(334) 242-2696

STREET ADDRESS                                CITY, STATE AND ZIP CODE
100 North Union Street, Montgomery, Alabama 36104

NAME
John Free

TELEPHONE NUMBER (Include Area Code)
(334) 242-9579

STREET ADDRESS                                CITY, STATE AND ZIP CODE
100 NOrth UNion Street, Montgomery, AL 36104

CAUSE OF DISCRIMINATION BASED ON (Check appropriate box(es))
☒ RACE   ☐ COLOR   ☐ SEX   ☐ RELIGION   ☐ NATIONAL ORIGIN
☒ AGE   ☐ RETALIATION   ☐ OTHER (Specify)

DATE MOST RECENT OR CONTINUING DISCRIMINATION TOOK PLACE (Month, day, year)
01-30-07

THE PARTICULARS ARE (If additional space is needed, attached extra sheet(s)):

Janice M. Hamilton
100 North Union Street
Montgomery, AL 36104
(334) 242-2835

Particulars are attached

Defendants' Exhibit 1

FEB 09 2007

☐ I also want this charge filed with the EEOC. I will advise the agencies if I change my address or telephone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures.

I declare under penalty of perjury that the foregoing is true and correct.

Date 02/06/07   _Gregory Kelly_
                Charging Party (Signature)

NOTARY - (When necessary to meet State and Local Requirements)

I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief.

SIGNATURE OF COMPLAINANT
_Gregory Kelly_

SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE
(Day, month, and year)
02/06/07   _Tammy L. DeBardelaben_

EEOC FORM 5

PREVIOUS EDITIONS OF THIS FORM ARE OBSOLETE AND MUST NOT BE USED

## STATEMENT OF PARTICULARS

My name is Gregory Kelly, I am a fifty (50) year old black male employed by the Alabama Public Service Commission as a Public Utility Technical Specialist, Senior Energy Division, in the Electricity Section, as an Engineer.

My direct supervisor is John D. Free, a white male, younger than I, who is the Electricity Section Manager. John Free has an accounting degree, but evaluates my work performance and provides my annual performance rating. There are only two other degreed engineers employed in the Energy Division. Janice M. Hamilton is a black female, Division Director and has an engineering degree. The other degreed engineer is J. Rick Cleckler, a white male, and is in charge of the Special Project Section, but he is the only person in that section. Basically, J. Rick Cleckler does the engineering work for the Water Section.

There are five sections in the Energy Division. The Water Section, who is provided technical support by the Special Projects Section, Natural Gas Section, who is provided technical support by the Gas Pipeline Safety Section, and the Electricity Section which I am in and whose technical support is also provided by me. It is apparent that the only section that does not have technical support separate is the one whose technical support would be provided by a black male, over fifty (50) years of age.

All sections have budgets to operate under. The other two sections, being Special Projects and Gas & Pipeline Safety, that provide technical assistance have their own separate budget. However, I have to operate under the Electricity Section budget. Thus, if I was separate I would be the only black in a section that had its own budget. As a result of being in charge of the technical budget, I have lost out on training. The latest example was I was offered the opportunity to go to Denver Colorado for a Gas Technology Workshop. It was a all expense paid seminar, and would not cost the State of Alabama one cent. My supervisor, John Free, refused permission to go citing budget reasons. This happened on January 30, 2007. Since no state funds would be spent, the budget explanation has to be false. I believe I was not allowed to attend because of my race and possibly because of my age. On January 31, 2007, I had a meeting with Janice M. Hamilton concerning Mr. Free not allowing me to go to Colorado for training. Director Hamilton overruled John Free, not only allowing me to go, but several other staff members, including herself as well.

The position I presently hold has been occupied by a black person for the past sixteen (16) years. This position has not had a desk audit (job study) for over twenty five (25) years. The last time a desk audit was done on this position, it was occupied by a white person. I have on numerous occasions requested that a desk audit be performed on my position. Each time my request has been refused by John Free.

In May 2005 my job title was changed from "Utilities Engineering Specialist II" to "Public Utility Technical Specialist, Senior." No job study was conducted at this time and no reason was provided for the change in job titles. However, since I have the same job title as J. rick Cleckler, a

FEB 0 9 2007

white male, I do not understand why I am treated differently, except that I am a black person.

Although the position I hold has been filled by a black person for the past sixteen (16) years, I am the first merit system black engineer that has worked for the Alabama Public Service Commission, Energy Division. The only explanation of why I am treated different from J. Rick Cleckler is my age and my race. I believe my age is an issue because John Free and Janice M. Hamilton are younger than I am. I believe my race definitely prevents me from being treated the same as J. Rick Cleckler, as we have the same position, are both degreed engineers, and both provide technical assistance, but he is supervised by a black female with an engineering degree and I am supervised by a younger white male with an accounting degree.

FEB 0 9 2007



# STATE OF ALABAMA
ALABAMA PUBLIC SERVICE COMMISSION
P.O. BOX 304260
MONTGOMERY, ALABAMA 36130-4260

JIM SULLIVAN, PRESIDENT

JAN COOK, ASSOCIATE COMMISSIONER

SUSAN D. PARKER, PhD, ASSOCIATE COMMISSIONER

March 12, 2007

WALTER L. THOMAS, JR.
SECRETARY

Mr. Glenn Todd, Investigator
EEOC Birmingham District Office – 420
Ridge Park Place
1130 22nd Street, South
Birmingham, Alabama 35205

    In re:  *Gregory Kelly v. Alabama Public Service Commission*
          Charge No. 420-2007-01781

Dear Mr. Todd:

    Attached hereto is the Position Statement of the Alabama Public Service Commission and the supporting documentation therefor. Please date stamp the extra copy of this cover letter and return it in the stamped, self-addressed envelope.

    Thank you for your assistance in this matter. Should you have questions, please do not hesitate to contact me at (334)242-5200.

                Sincerely,

                John A. Garner
                Chief Administrative Law Judge and
                Attorney for the Commission in this matter

JAG:eml
Attachments



Defendants' Exhibit 2

BEFORE THE EQUAL EMPLOYMENT OPPORTUNITY COMMISSION

Gregory Kelly                        )
                                     )
        Complainant                  )
                                     )
v.                                   )        CHARGE NO. 420-2007-01781
                                     )
Alabama Public Service Commission    )
                                     )
        Respondent                   )

## POSITION STATEMENT OF THE ALABAMA PUBLIC SERVICE COMMISSION

Comes now the Alabama Public Service Commission (the "APSC") and submits this Position Statement in response to the Charge of Discrimination filed with the Equal Employment Opportunity Commission (the "EEOC") by Mr. Gregory Kelly ("Mr. Kelly") (or the "Complainant") and assigned Charge No. 420-2007-01781. The APSC generally denies Mr. Kelly's conclusory allegations of discrimination based on his race and/or age and responds to the more specific allegations which Mr. Kelly apparently relies upon to arrive at his claims of discrimination as noted in more detail below:

## GENERAL ALLEGATIONS

(1)     The APSC admits that Mr. Gregory Kelly is a 50-year-old black male employed in the Electricity Section of the Energy Division of the APSC.

(2)     The APSC further admits that Mr. Kelly is an Engineer, although that fact is not reflected in his job title per the specifications of the State Personnel Department of Alabama ("State Personnel"). Mr. Kelly's actual title per State Personnel is Utility Technical Specialist, Senior.

(3)     The APSC admits that Mr. Kelly's direct supervisor is Mr. John D. Free, the manager of the Electricity Section of the APSC's Energy Division, who has been employed in that capacity since May 2001 (See Affidavit of Mr. Free which is attached hereto at Appendix 1 at ¶3)

-1-

(4)  (a)  The APSC admits that Mr. Free is a white male, who at 43 years of age is younger than Mr. Kelly. The APSC further notes that Mr. Free interviewed and subsequently hired Mr. Kelly as a Utility Engineering Specialist I on July 13, 2002 after also considering and/or interviewing one black male and two white male candidates from an employment register compiled by State Personnel. (See Free Affidavit at ¶5)

(b)  The APSC also notes that since being promoted to the position of manager of the Electricity Section of the Energy Division in May 2001, Mr. Free has hired four other individuals in addition to Mr. Kelly to work in the Electricity Section. In particular, Mr. Free has hired Ms. Jackie Frazier, a 45-year-old black female; Ms. Patricia Smith, a 37-year-old black female; Ms. Sheila Ward, a 55-year-old white female; and Mr. Oretoluwa Isikalu, a 60-year-old black male who is no longer employed by the APSC. (See Free Affidavit at ¶7)

(c)  The APSC further represents that since being promoted to the position of Manager of the Electricity Section, Mr. Free has recommended promotions for Mr. Robert Taylor, a 56-year-old black male (from Public Utility Analyst II to Public Utility Analyst III); Ms. Sheila Ward, a 55-year-old white female (from Utility Analyst I to Public Utility Analyst II); Ms. Patricia Smith, a 37-year-old black female (from Utility Auditor I to Public Utility Analyst II); Mr. Greg Kelly, the 50-year-old black male Complainant (from Utility Engineering Specialist I to Utility Engineering Specialist II, which is now known as Public Utility Technical Specialist, Senior); and Ms. Jackie Frazier, a 45-year-old black female (from Administrative Support Assistant I to Administrative Support Assistant II). Clearly, these hirings and promotions are not reflective of discriminatory practices by the APSC or Mr. Free. (See Free Affidavit at ¶8)

(5)  The APSC admits that Mr. Free majored in Accounting and received a Bachelors of Science degree from Auburn University at Montgomery in 1987. The APSC further notes, however, that Mr. Free is also a 1991 graduate of the Auburn University at Montgomery's Masters of Business Administration program and is a Certified Public Account licensed by the State of Alabama. (See Free Affidavit at ¶2)

(6)  The APSC admits that as Mr. Kelly's direct supervisor, Mr. Free evaluates Mr. Kelly's work performance and provides Mr. Kelly's annual performance rating pursuant to the Rules, Regulations and

Guidelines of State Personnel and the Merit System of Alabama codified at *Code of Alabama*, 1975, §36-26-1 *et seq.* The APSC asserts that it is not uncommon at the APSC and other agencies of the State of Alabama for one educational discipline to report to a manager and/or director with a different educational discipline or background. (See Free Affidavit at ¶4 and Affidavit of Janice M. Hamilton, Director of the APSC Energy Division, attached hereto as Appendix 2 at ¶5(a))

(7)    The APSC admits that there are only two other degreed engineers employed in the Energy Division of the APSC.

(8)    The APSC admits that one of the two additional engineers in the Energy Division referenced by Mr. Kelly in his charge is Ms. Janice M. Hamilton, a 50-year-old black female, who is the Director of the Energy Division of the APSC.

(9)    The APSC admits that Mr. J. Rick Cleckler ("Mr. Cleckler"), a 54-year-old white male, is the other degreed engineer in the Energy Division referenced by Mr. Kelly in his complaint. The APSC further admits that Mr. Cleckler is in charge of the Special Projects Section of the Energy Division and is the only individual in that Section. (See Hamilton Affidavit at ¶ 5(d))

(10)    The APSC denies that Mr. Cleckler "basically does the engineering work for the Water Section" of the Energy Division of the APSC. Indeed, the APSC notes that Mr. Cleckler provides technical support for all sections of the Energy Division. (See Hamilton Affidavit at ¶5(d))

(11)    The APSC admits that there are five sections in the Energy Division of the APSC. The APSC also notes that the current organizational structure of the Commission's Energy Division about which Mr. Kelly complains is the exact organizational structure which existed at the time that Mr. Kelly was hired (See Free Affidavit at ¶6 and Hamilton Affidavit at ¶6).

(12)    The APSC admits that the Water Section of the Energy Division is provided technical support by the Special Projects Section. The APSC denies, however, that the Natural Gas Section of the Energy Division is provided technical support by the Gas Pipeline Safety Section and instead notes that the Natural Gas Section is provided technical support by the Special Projects Section. The

APSC admits that Mr. Kelly provides technical support for the Electricity Section, but notes that Mr. Cleckler of the Special Projects Section is also called upon to provide technical support for the Electricity Section as well. (See Hamilton Affidavit at ¶5)

## THE SPECIFIC CHARGES ASSERTED BY MR. KELLY

(13)    The APSC denies Mr. Kelly's claim that the only section of the Energy Division which does not have technical support provided by an employee outside of the particular section in question is the Electricity Section of the Energy Division of which Mr. Kelly is an employee. Indeed, the APSC notes that no section of the Energy Division provides the entirety of its technical support internally, including the Electricity Section which is occasionally provided support by Mr. Cleckler of the Special Projects Section as noted above in ¶12. (See Hamilton Affidavit at ¶5)

(14)    The ASPC denies that Mr. Kelly is not organized in his own separate section to provide technical support to the Electricity Section due to the fact that Mr. Kelly is a black male over the age of 50 years. The APSC notes that the Electricity Section of the Energy Division has, even prior to Mr. Kelly's hiring, provided the bulk of its technical support internally because the inherent nature of issues specific to the electric industry requires a dedicated employee (or employees) within the section. (See Hamilton Affidavit at ¶¶5(d) and 7)

(15)    The APSC denies that all sections of the Energy Division of the APSC have their own separate budget to operate under and specifically denies that the Special Projects Section over which Mr. Cleckler is in charge has its own separate budget. Indeed, the APSC notes that even though the individual managers of the various sections of the Energy Division have input with the Energy Division Director regarding their respective section needs which go into the initial formulation of the overall budget for the Energy Division, none of the various sections of the Energy Division have their own separate budgets which they are responsible for actively administering and managing with the exception of the Gas Pipeline Safety Section. The manager of the Gas Pipeline Safety Section is responsible for actively managing his section's budget throughout the fiscal year because the Gas Pipeline Safety Section receives federal funding which is contingent on the amount of money expended by the section each year. (See Hamilton Affidavit at ¶9)

(16)    The APSC admits that Mr. Kelly operates under the budget of the Electricity Section, but denies that Mr. Kelly is not organized in a separate section with his own budget because he is black or because of his age. For the reasons set forth above in paragraph 14 of this position statement, the Electricity Section of the Commission's Energy Division has provided the bulk of its technical support internally with engineers dedicated to that section for many years prior to Mr. Kelly's hiring and at least since 1988. Those engineers have never operated under their own separate, actively managed budget, but have instead operated under the budget of the Electricity Section generally. (See Hamilton Affidavit at ¶¶7 and 9)

(17)    The APSC denies that Mr. Kelly has "lost out on training" as a result of not being in charge of a technical budget. As noted in paragraph 15 above, the APSC asserts that Mr. Kelly would not be "in charge" of his own budget even if he was organized in a separate section of the Energy Division of the APSC. (See Hamilton Affidavit at ¶9)

(18)    The APSC denies that Mr. Kelly has "lost out" on or been denied training opportunities because of his race or age. Indeed, the APSC notes that Mr. Kelly has been the recipient of more training opportunities than Mr. Cleckler, the 54-year-old white male Utility Technical Specialist, Senior, in the Energy Division's Special Projects Section. (See Hamilton Affidavit at ¶9)

(19)    The APSC specifically denies that Mr. Kelly was initially denied the opportunity to attend training in Denver, Colorado because of his race or age. The APSC admits that the Gas Technology Training Seminar in Denver, Colorado referenced in the Complaint of Mr. Kelly is an all expense paid program that will not require the expenditure of state funds for certain APSC attendees and that Mr. Kelly's initial request to attend the seminar was denied by Mr. Free. The APSC asserts, however, that Mr. Free initially denied Mr. Kelly's request to go to Denver not because of Mr. Kelly's race or age, but because Mr. Kelly did not sufficiently explain that the Denver seminar was an all expense paid session and because Mr. Free had not yet made in-depth training evaluations for the remainder of the year. The APSC specifically denies that Mr. Kelly was subsequently allowed to go to Denver because Mr. Free was "overruled" by Ms. Hamilton, the Director of the Energy Division. The APSC instead asserts that after Mr. Free

was subsequently made aware that the Denver training seminar was free of charge, Mr. Free contacted the Denver event sponsors to confirm that fact and eventually received permission from the sponsors to send additional Commission employees, including Mr. Kelly and Ms. Hamilton, free of charge. The APSC admits that Mr. Kelly met with Ms. Hamilton regarding the Denver trip, but again denies that Ms. Hamilton "overruled" Mr. Free on that matter. (See Free Affidavit at ¶12 and Hamilton Affidavit at ¶10)

(20)    The APSC admits that the position which Mr. Kelly currently holds at the APSC has been occupied by a black person for the past 16 years except for the time period from February 1999 when Mr. Bernard Givan vacated the position due to resignation and Mr. Kelly was promoted to the position in May 2004. The position in question was formerly known as Utility Engineering Specialist II, but was changed by State Personnel to Utility Technical Specialist, Senior. (See Free Affidavit at ¶10)

(21)    The APSC has insufficient knowledge to respond to Mr. Kelly's claim that his position has not had a desk audit/job study for over 25 years or Mr. Kelly's claim that the last time a desk audit was done on his position it was occupied by a white person.

(22) (a)    The APSC denies that Mr. Kelly has specifically requested that a desk audit be performed on his position on "numerous occasions" but admits that Mr. Kelly has pursued changes to his salary range which would require a "desk audit" by State Personnel. A desk audit is the process utilized by State Personnel to upgrade the pay range of a particular position in state government. Notably, the decision of whether desk audits will be performed ultimately rests with State Personnel although managers can in their discretion request that State Personnel conduct a desk audit. (See Free Affidavit at ¶¶9(d) and (e))

(b)    The APSC asserts that Mr. Kelly's requested pay grade increases have not been pursued with State Personnel because Mr. Kelly has received an increase in pay grade by virtue of his promotion in 2002. Mr. Kelly's requested increases would have also placed him outside the acceptable guidelines of State Personnel per his job responsibilities and status in the Energy Division organizational structure. Further, the pay grade for the position held by Mr. Kelly compares favorably with the pay grade for similar positions at other utility commissions in the Southeast. It is also important to note that Mr. Kelly's Supervisor, Mr. Free, has not requested a desk

audit for any of the employees under his supervision although he has recommended promotions as noted in ¶3(c) herein. (See Free Affidavit at ¶¶9(c) and (f))

(23) (a)   The APSC admits that Mr. Kelly's job title was changed from "Utilities Engineering Specialist II" to "Public Utility Technical Specialist, Senior" in May 2005. The APSC notes, however, that the change in job title referenced by Mr. Kelly was unilaterally effectuated by State Personnel for all engineers in the state system, including Mr. Cleckler, the 54-year-old white male in the Special Projects Section of the Energy Division, against the recommendation of personnel from the APSC. (See Free Affidavit at ¶10)

(b)   The APSC is unaware as to whether State Personnel conducted a job study or provided specific justification for changing the job title in question. The APSC asserts, however, that such action by State Personnel would have likely been unnecessary since the decision did not impact the job responsibilities or pay grade of any individual in state government in the affected position, including Mr. Kelly or Mr. Cleckler. (See Free Affidavit at ¶10(b))

(24) (a)   The APSC admits that Mr. Kelly has the same job title and pay grade as Mr. Cleckler; that Mr. Cleckler is a white male who is older than Mr. Kelly; and that Mr. Kelly is a black male. The APSC denies, however, that Mr. Kelly is "treated differently" than Mr. Cleckler except that Mr. Cleckler is situated differently in the Commission's organizational structure and is supervised by a younger black female engineer while Mr. Kelly is supervised by a younger white male Public Utility Analyst Manager with an Accounting Degree and a Certified Professional Accountant license. For the reasons set forth in ¶¶15 and 16 above, the APSC again asserts that there are valid reasons for the organizational structure established by the Energy Division which are unrelated to the race and/or age of any individual including Mr. Kelly. (See Hamilton Affidavit at ¶¶5 and 7)

(b)   The APSC further notes that Mr. Kelly filed an internal grievance at the APSC against APSC Energy Division Director, Ms. Janice M. Hamilton regarding the organizational structure of the Energy Division claiming that it resulted in unfair treatment to him. In particular, Mr. Kelly asserted that he had suffered a "fractured career path, unlevel playing field, a compromised job position, lost

synergy and communication difficulties" due to the fact that he was not situated in the Special Projects Section of the APSC Energy Division where he could be supervised by an engineer. A panel of four of Mr. Kelly's APSC peers, which included two black females and two white males, found, after hearing before an APSC Administrative Law Judge, that the organizational structure of the Energy Division of the APSC did not adversely impact Mr. Kelly and was a matter within the discretion of the management of the APSC. (See Hamilton Affidavit at ¶8)

(25)   The APSC again admits that the position currently held by Mr. Kelly at the APSC has been held by a black person for the past 16 years, except for the time period from February 1999 when Mr. Bernard Givan vacated the position due to resignation and Mr. Kelly was promoted to the position in May 2004. The APSC denies, however, that Mr. Kelly is the first black, merit system engineer that has worked for the Energy Division of the APSC. The APSC indeed notes that Mr. Kelly's predecessor, Mr. Bernard Givan, was also a black, merit system engineer. (See Hamilton Affidavit at ¶5)

(26)   The APSC again denies that Mr. Kelly is treated differently than Mr. Cleckler because of Mr. Kelly's race and/or age. Indeed, the APSC asserts that Mr. Cleckler and Mr. Kelly are both engineers who hold the same job title and have the same pay grade. The APSC again maintains that the only ways in which Mr. Kelly is treated differently than Mr. Cleckler lie in the fact that Mr. Cleckler is in a separate section of the Energy Division and supervised by a younger black female with an engineering degree while Mr. Kelly is supervised by a younger white male Public Utility Analyst Manager with an accounting degree and Certified Public Accountant license. The APSC denies that these circumstances or "differences" give rise to a claim that Mr. Kelly is discriminated against by virtue of his race or age.

## CONCLUSION

In conclusion, the APSC reasserts its general denial of the Complainant's claim of discrimination based on race and/or age. Except where specifically noted to the contrary, the APSC further denies the allegations raised by the Complainant in support of his ultimate claims of discrimination.

The APSC particularly asserts that the positions set forth above and the supporting documentation provided therefor conclusively demonstrate that Mr. Kelly has failed to even remotely demonstrate any evidence of race and/or age discrimination.  To the contrary, the APSC argues that:

(1)    The evidence submitted herein demonstrates that neither Mr. Free, Mr. Kelly's direct supervisor, nor anyone else at the APSC has been discriminatory in any way toward Mr. Kelly or any other employee;

(2)    Mr. Kelly is not organized in his own separate section of the Energy Division of the APSC due to legitimate managerial considerations that are completely unrelated to race and/or age;

(3)    Mr. Kelly would not be "in charge" of his own budget even if he were organized in a separate section of the Energy Division;

(4)    Mr. Kelly has not "lost out" on any training opportunities because of his race or age and has in fact received more training than his older, white contemporary in the APSC Energy Division, Mr. Cleckler;

(5)    The subtitle for all Utilities Engineering Specialist II's in state government, including Mr. Kelly and Mr. Cleckler, was changed to Utility Technical Specialist, Senior due to unilateral action by State Personnel which did not result in a change in pay grade or job responsibilities;

(6)    A desk audit has not been requested by Mr. Free for Mr. Kelly's position due to legitimate managerial considerations unrelated to race and/or age.

It thus appears that Mr. Kelly's charges of discrimination are merely vehicles for achieving his desired modifications to the organizational structure of the Energy Division of the APSC which is not discriminatory to Mr. Kelly in its establishment or effects. The APSC accordingly urges the EEOC to see through Mr. Kelly's subterfuge and dismiss his charges of discrimination on the grounds that there is no cause to support said charges.

John A. Garner
Chief Administrative Law Judge
Alabama Public Service Commission
Attorney for the Commission in this matter

CERTIFICATE OF SERVICE

I hereby certify that the foregoing Position Statement of the Alabama Public Service Commission and the supporting documentation therefor were sent FedEx Priority Overnight, prepaid, this 12th day of March, 2007 to the party listed below:

Mr. Glenn Todd, Investigator
EEOC Birmingham District Office – 420
Ridge Park Place
1130 22nd Street, South
Birmingham, Alabama 35205

I hereby certify that the foregoing Position Statement of the Alabama Public Service Commission and the supporting documentation therefor were mailed, postage prepaid, this 12th day of March, 2007 to the party listed below:

Mr. Gregory Kelly
6213 Willow Glenn Drive
Montgomery, Alabama 36117

John A. Garner
Chief Administrative Law Judge
Alabama Public Service Commission
Attorney for the Commission in this matter

BEFORE THE EQUAL EMPLOYMENT OPPORTUNITY COMMISSION

| | | |
|---|---|---|
| Gregory Kelly | ) | |
| | ) | |
| Complainant | ) | |
| | ) | |
| v. | ) | CHARGE NO. 420-2007-01781 |
| | ) | |
| Alabama Public Service Commission | ) | |
| | ) | |
| Respondent | ) | |

## AFFIDAVIT OF JOHN D. FREE

(1)     My name is John D. Free. I am 43 years of age and otherwise competent to testify in courts of the United States and this state. I have personal knowledge of the facts contained in this affidavit.

(2)     I am a 1991 graduate of the Auburn University at Montgomery Masters of Business Administration program and received a Bachelor of Science degree from Auburn University at Montgomery in 1987. I am also a Certified Public Accountant licensed by the State of Alabama.

(3)     I am currently employed as a Public Utility Analyst Manager with the Electricity Section of the Energy Division of the Alabama Public Service Commission (the "APSC") and have been so employed since mid-2001. From May 1990 until mid-2001, I was employed in the Electricity Section of the Energy Division as a Public Utilities Auditor.

(4)     As a Public Utility Analyst Manager, I am responsible for the day-to-day supervision and control of the employees in the Electricity Section of the Energy Division of the APSC. In my aforementioned capacity as a Public Utility Analyst Manager, I am responsible for hiring, evaluating and rating the performance of the employees under my direct supervision and control pursuant to the Rules, Regulations and Guidelines of Alabama State Personnel Department ("State Personnel") and the Merit System of Alabama codified at *Code of Alabama*, 1975, §36-26-1, *et seq.*

(5)     I hereby certify that I am the individual at the APSC who interviewed and hired the Complainant in this cause, Mr. Gregory Kelly, on or about July 13, 2002. I hired Mr. Kelly over one other black male candidate and two white male candidates who appeared on an employment register compiled by State Personnel.

(6)     The organizational structure of the Energy Division of the APSC is the same today as it was on the date that Mr. Kelly was hired as a Utilities Engineering Specialist I on July 13, 2002. Mr. Kelly was interviewed by Mr. Free and APSC Energy Division Director, Ms. Janice M. Hamilton, and was made aware that he would report to Mr. Free. Mr. Kelly expressed no concerns or reservations regarding this organizational structure or his salary range. (See JDF Exhibit 1 which is attached hereto)

(7)     In addition to hiring Mr. Kelly, I have, in my capacity as Manager of the Electricity Section of the Energy Division, also hired Ms. Jackie Frazier, a 45-year-old black female, Ms. Patricia Smith, a 37-year-old black female, Ms. Sheila Ward, a 55-year-old white female, and Mr. Oretoluwa Isikalu, a 60-year-old black male who is no longer employed by the APSC.

(8)     In addition to the above hirings, I have also recommended that numerous employees under my supervision be promoted. Notably, I have recommended promotions for Mr. Robert Taylor, a 56-year-old black male (from Public Utility Analyst II to Public Utility Analyst III), Ms. Sheila Ward, a 55-year-old white female (from Public Utility Analyst I to Public Utility Analyst II), Ms. Patricia Smith, a 37-year-old black female (from Public Utility Auditor I to Public Utility Analyst II), Mr. Greg Kelly (from Utility Engineering Specialist I to Utility Engineering Specialist II which is now known as a Public Utility Technical Specialist, Senior), and Ms. Jackie Frazier, a 45-year-old black female (from Administrative Support Assistant I to Administrative Support Assistant II).

(9)     (a)     Upon his promotion in May 2004, Mr. Kelly's salary structure was upgraded from pay grade 77 to pay grade 79. Despite this fact, Mr. Kelly has persistently requested that his position be further evaluated and that his pay grade be upgraded to a salary range of 85. These salary upgrades requested by Mr. Kelly would have necessitated a "desk audit" by State Personnel as explained in ¶9(d) below. Mr. Kelly has requested a desk audit, but not on numerous occasions as he represented. In addition, Mr. Kelly has submitted several self-prepared "market studies" of various engineering related positions.

        (b)     The market surveys, compiled and submitted by Mr. Kelly, attempt to compare his current salary range to the salary ranges of other positions that are engineering related. Based on this information, Mr. Kelly has requested that his salary range be increased to Pay Grade 85, which is higher than the Energy Division Director's salary level and of his immediate supervisor, Mr. Free. It is unclear if Mr. Kelly's comparisons attempt to consider the following: 1) differences between private sector positions vs. government sector positions, 2) the level of responsibilities for each position, 3) supervisory responsibilities of each position, 4) requirements to hold a

Professional Engineer's License and 5) other benefits that may be part of a total compensation package.

(c)  It is my opinion that, in addition to private sector comparisons, the salary range for the Public Utility Technical Specialist, Senior position should be compared with the salary ranges of similarly situated positions at other Public Service Commissions in the Southeast. As such, I contacted several other state commissions in the Southeast and requested job descriptions and salary information for engineering positions that, in my opinion, closely resembled the job responsibilities of the Public Utility Technical Specialist, Senior. Using this information, it appears that the salary range of the Public Utility Technical Specialist, Senior position is in line with the salary ranges of closely related engineering positions at other state Commissions.

(d)  A "desk audit" is a process utilized by State Personnel to assess requests for salary upgrades to particular positions. Notably, when State Personnel performs desk audits for a particular position in the Merit System, all individuals within the entire state system who hold the position in question are impacted. As such, all persons holding the position in question would be interviewed as well as their managers and directors. Thus, any resulting changes to the position in question would affect all persons holding that position.

(e)  It is also important to note that managers and/or directors may only request that State Personnel perform a desk audit for a particular position. The ultimate decision of whether a desk audit will be performed ultimately rest with State Personnel. Further, managers and directors are under no obligation to request desk audits for any position. The pursuit of desk audits is instead a discretionary matter impacted to some degree by an employee's responsibilities, performance and compliance with applicable rules and policies. Notably, I have never requested a desk for any employee under my supervision, but I have recommended promotions on numerous individuals under my supervision including Mr. Kelly as noted in 8 herein.

(f)  Furthermore, it is my opinion that the pay grades for the various positions in our agency should be structured in such a way as to recognize the level of the position within the organizational structure, as well as the level of responsibilities for each position. In the current salary structure, Mr. Kelly's position is pay grade 79, Mr. Free's pay grade is 81 and Ms. Hamilton's pay grade is 84. Therefore, as should be the case, the current salary structure does

differentiate between the various positions of professional staff, managers and directors.

(10) (a)  While there have been no changes to Mr. Kelly's salary range for his current position, it is true that the job title for Mr. Kelly's position was changed from Utilities Engineering Specialist II to Public Utility Technical Specialist, Senior by State Personnel. It is important to note that this action by State Personnel was a unilateral decision by that department and in no way related to any actions on the part of the APSC. Indeed, division directors at the APSC and the APSC's personnel officer attempted to persuade State Personnel to reconsider their decision to change the job title in question because they felt it would hamper the APSC's efforts to attract and hire quality engineers that do not possess professional engineer's licenses if the word "engineer" or "engineering" is excluded from the position title.

(b)  It is unclear whether State Personnel conducted any job studies when changing the job title for Mr. Kelly's position, but is noteworthy that State Personnel's actions did not impact the pay grade for Mr. Kelly's position or the job responsibilities for the position. Further, State Personnel's actions impacted all persons in state government who hold the position that Mr. Kelly does, including Mr. Cleckler, a 54-year-old white male in the Special Projects Section of the APSC's Energy Division.

(11) (a)  With respect to Mr. Kelly's claims regarding lost training opportunities, it is important to note that employees of the APSC's Energy Division receive training and professional development through various avenues, including "on the job training" whereby employees are exposed to various industry related topics and regulatory assignments that provide them with experience regarding many facets of a utility company's industry and/or business. The second method of professional development utilized by the Energy Division is through the review of work related articles, journals, magazines, newsletters, research on new technologies and/or participation in web-based seminars, conference calls and other similar activities. A third method of professional development utilized by the Energy Division is employee attendance at industry related seminars.

(b)  With all of the various methods of training discussed above, the degree of professional development derived is to a great extent dependent on the individual employee's preparation, level of engagement, and the quality of the training source. Additionally, the type of training selected for employees of the Energy Division are

dependent on a number of considerations, including the availability of funds, expected costs versus expected benefits of the training in question, the relevance and urgency of such training, an assessment of staff needs, staff performance and conduct, individual employee preference, distribution of training opportunities among various employees in the section and/or division, and the demonstrated benefits of the training methodology selected.

(c)     Notably, Mr. Kelly has had available to him the exact same Internet access, industry publications and subscriptions as other employees in the Electricity Section of the APSC Energy Division.    Further, Mr. Kelly has had as much or more opportunities to attend the more costly out-of-state seminars/conferences than other similarly situated employees within the Electricity Section.

(12)   (a)    With respect to Mr. Kelly's charge that he was not allowed to attend the Gasification Technologies Workshop to be held in Denver, Colorado, on March 13-15, 2007, it is my recollection that on or about January 30, 2007, Mr. Kelly came to my office sometime around midmorning.    At the time, I was engaged in a telephone discussion with Alabama Power Company personnel regarding a work-related matter. As Mr. Kelly entered my office, I noticed that Mr. Kelly was holding some documents in his right hand. As I was on the telephone, Mr. Kelly did not interrupt, but simply placed the papers on the left front corner of my desk and walked away. Mr. Kelly did not say anything at this time.    After completing my telephone conversation and then attending to some other small matters, I picked up the documents Mr. Kelly had left on my desk and began to scan them. As I briefly read through some of the documents, the information that came to my attention included the following:

1. The document was an invitation to attend a    Gasification Technologies Workshop; and
2. The workshop was being held in Denver, Colorado.

(b)    My thought process at that point was as follows:  1) Gasification Technology is not an urgent issue at this time because Alabama Power Company will not need to construct additional electric generation units for several years to come.  This being the case, I would rather save any training dollars my section may have for other issues;  2) A conference in Denver, Colorado would most likely be very costly;  3) To my recollection, it seemed that Mr. Kelly had attended a coal gasification workshop within the last two years and; 4) I believed that Alabama Power Company had a coal gasification research facility in nearby Wilsonville, Alabama which I could make arrangements for Mr. Kelly to visit to learn about coal gasification

technology more cost effectively. Based on the foregoing, I made the initial decision to not request approval for Mr. Kelly to attend the Denver workshop.

At the time of Mr. Kelly's request, I had already approved approximately three less expensive training sessions for employees of the Electricity Section. I was concerned with the Denver seminar because it was out-of-state and likely costly. I accordingly placed a "sticky note" on the top page of the Denver workshop invitation that Mr. Kelly had provided to me and wrote the following message (or something very similar):

Greg,
Not at this time. I have not decided on a training schedule/budget for 2007.
John

After writing the note above, Ms. Jackie Frazier, the Electricity Section Secretary, came into my office to deliver something. As she was leaving, I asked her if she would deliver the workshop invitation with attached "sticky note" to Mr. Kelly. Ms. Frazier indicated that she would do so.

(c)    A while later, Mr. Kelly came into my office holding some documents and inquired if I had read the documents in question in their entirety. I advised Mr. Kelly that I had not read all of the documents but did scan through them. Mr. Kelly then commented that the workshop was "free." I then asked Mr. Kelly if all of the costs were covered including accommodations and travel rather than just the workshop fee. Mr. Kelly advised that "yes," everything was covered. I suggested that Mr. Kelly leave the documents with me again. In light of this additional information, I agreed to review them more closely. I began reading the entire document (approximately 3 pages) and discovered on page 3 that the cost of the workshop, including meals, travel and hotel would indeed be reimbursed. At this time, I telephoned the contact person listed on the document, Ms. Marie Kent, to discuss the reimbursement provisions and to ascertain the appropriate procedures that would ensure timely reimbursement. In my discussions with Ms. Kent, I learned that the workshop's sponsor was not opposed to the Commission sending up to six (6) people to the workshop, free of charge, rather than three (3) persons as originally indicated in the invitation. At that point, I thought I should share the available information with Ms. Janice Hamilton, the Director of the APSC Energy Division.

(d)    Sometime later that day or the next, Ms. Hamilton came to my office and explained that Mr. Kelly had approached her and indicated that I had turned him down for a request to attend a coal gasification workshop. Ms. Hamilton further indicated that Mr. Kelly had asked if she would consider his request. I immediately recounted to Ms. Hamilton exactly what had transpired to that point regarding Mr. Kelly's request and informed her that when I had made the original decision to not allow Mr. Kelly to attend the Denver conference, I was unaware that it was an "all expenses paid" workshop. I further stated that Mr. Kelly had not mentioned that the workshop was "free" initially. I further explained to Ms. Hamilton that I had already contacted Ms. Kent for further details on the workshop and that Ms. Kent had said that the APSC could send up to six (6) people. Ms. Hamilton indicated that, in addition to Mr. Kelly, she would like to attend the workshop and would ask Mr. Cleckler to attend. Ms. Hamilton continued the conversation by asking which other employees I would like to send to the workshop. I replied that, in addition to Mr. Kelly, I would like to send Ms. Sheila Ward, Ms. Linda Gardner and possibly myself. Within a couple of days, I made the decision to not attend the workshop but suggested that perhaps Mr. Brad Williams, an assistant to the newly-elected Commissioner Susan Parker, might like to attend.

(e)    Either that same day or the next, I sent an email to Mr. Kelly informing him that Ms. Hamilton and I had reviewed the Coal Gasification Technology Workshop invitation and the associated reimbursement allowances. I further stated that we would attempt to make plans for five or six persons to attend including Mr. Kelly. I thanked Mr. Kelly for bringing this workshop to our attention (See JDF Exhibit 2 attached hereto)

(f)    On February 1, 2007, the necessary out-of-state travel requests for Mr. Kelly, Ms. Ward and Ms. Gardner were completed and approved by both Ms. Hamilton and me. On February 16, 2007, Ms. Hamilton sent an email to the persons planning to attend the workshop and copied me, whereby, Ms. Hamilton informed me therein that she had received the required travel approval from the parties in question.

(13)    I hereby represent in conclusion that I have never discriminated against Mr. Kelly for any reason including his race or age. This is true with respect to all aspects of his employment including his salary, his job responsibilities and his professional development and training.

Further, the affiant sayeth not.

_____
John D. Ffee

SWORN TO AND SUBSCRIBED before me this the _12th_ day of March, 2007.

_____
Notary Public

My Commission Expires: _October 21, 2010_



# ELECTRICITY SECTION

## As of 12/17/01

Hamilton, J.M.
Director
2-2835; IC260

ELECTRICITY

Free, John
Supervisor
2-9579; IC323

Gardner, Linda D.
Staff Accountant
2-9798; IC264

Isikalu, Oretoluwa
Accountant
2-9848; IC349

(Future)
Engr Spec II
2-5669; IC267

(Future)
Engr Spec I
2-9727; IC347

Taylor, Robert III
Analyst II
2-5870; IC266

Ward, Sheila H.
Analyst I
2-9575; IC322

(Vacant)
ASA I
2-5668; IC270

JDF Exhibit
4

ENERGY DIVISION



As of 7/15/2002



Organizational Structure
As of March 10, 2003

Christopher J. Harvey
Gas Pipeline Safety
2-6780 / 850-0047

Jannalie S. Mitchell
2-6776 / 850-0053

Receptionist
2-5778

John Paul Harris, North
2-9744 / 850-0046

David P. Snoddy
2-8788 / 850-0052

Gregory C. Meadows
2-9787 / 850-0049

O. Harold Dunson, Central
2-9732 / 850-0054

Hosie E. Powell
2-9849 / 850-0051

Tommy W. Lancaster, South
2-9782 / 850-0048

Judy D. Ramsey
2-9879 / 850-0281

Spencer C. Brady
2-9864 / 850-0044



**Energy Division**
Organizational Structure
As of January 1, 2004



**Energy/Division**
Organizational Structure
As of December 1, 2006

Christopher J. Harvey
Gas Pipeline Safety
Administrator
2-5780 / 850-0047 (283)

Jametta S. Mitchell
2-5779 / 850-0053 (286)

Spencer C. Brady
GPS Training Officer
2-9894 / 850-0044

Carlton L. Avery
Student Aide
2-5869 (287)

Tommy W. Lancaster, South
GPS Investigator, Supv.
2-9782 / 850-0048

Jody D. Ramsey
GPS Investigator, Sr.
2-9879 / 850-0061

Investigator (Future)
2-9879 (222)

John Paul Harris, North
GPS Investigator, Supv.
2-9741 / 850-0056

David F. Snoddy
GPS Investigator, Sr.
2-9780 / 850-0052

Gregory C. Meadows
GPS Investigator, Sr.
2-9787 / 850-0049

Investigator (Future)
2-9879 (222)

O. (Harold Dunson, Central
GPS Investigator, Supv.
2-9733 / 850-0054

Hezie E. Powell
GPS Investigator, Sr.
2-9849 / 850-0051

Investigator (Future)
2-9879 (222)

JDF Exhibit 2

**From:** Free, John
**Sent:** Thursday, February 01, 2007 11:47 AM
**To:** Kelly, Greg
**Cc:** Ward, Sheila; Gardner, Linda; Cleckler, Rick; Hamilton, Janice
**Subject:** Gasification meeting in Denver

Greg,

Janice and I have reviewed the Gasification Workshop letter and the reimbursement allowances.
As such, we are trying to make plans for 5 or 6 people to attend, including yourself. I have
spoken with Marie Kent and she assured me this would be ok. Janice is going to book six rooms
in for our attendees. We need estimates from each attendee to send to Ms. Kent for approval.
Also, any cost incurred by the attendee that is not covered under the reimbursement allowance
shall be borne by the attendee. Thanks for bringing this to our attention.

John

BEFORE THE EQUAL EMPLOYMENT OPPORTUNITY COMMISSION

Gregory Kelly    )
          )
 Complainant   )
          )
v.         )  CHARGE NO. 420-2007-01781
          )
Alabama Public Service Commission )
          )
 Respondent   )

## AFFIDAVIT OF JANICE M. HAMILTON

(1) My name is Janice M. Hamilton. I am 50 years of age and otherwise competent to testify in courts of the United States and this state. I have personal knowledge of the facts contained in this affidavit.

(2) I am a 1981 graduate of the University of Alabama at Birmingham from which I received a Bachelor or Science degree in Engineering.

(3) I am currently employed as the Director of the Energy Division of the Alabama Public Service Commission (the "APSC") and have been so employed since October 1992. From August 20, 1990 until my promotion to Director in October 1992, I was an APSC Engineer in the Electricity Section of the Energy Division.

(4) As Director of the Energy Division of the APSC, I am responsible for the organizational structure of the Energy Division and the day-to-day supervision and control of the employees in the Energy Division. I am responsible for hiring, evaluating, and rating the performance of the employees under my supervision pursuant to the Rules, Regulations and Guidelines of Alabama State Personnel Department ("State Personnel") and the Merit System of the State of Alabama codified at *Code of Alabama*, 1975, §36-26-1, *et seq.*

(5) (a) Upon my hiring by the APSC in August 1990, the Energy Division of the APSC was organized into four sections – Electricity, Natural Gas, Water and Gas Pipeline Safety. The Electricity Section consisted of eleven employees with different areas of expertise. The various disciplines included engineering, financial analysis, auditing, business accounting and administrative. Included this group were employees with technical backgrounds that reported to Mr. Robert Duxbury, the Supervisor of the Electricity Section whose background was in the area of financial analysis. Those employees consisted of three engineers, Mr. Bernard Givan, a black male; Mr. J. Rick Cleckler, a white male; and me. It is not uncommon at the APSC and other agencies of the State of Alabama for

one educational discipline to report to a manager or director with a different educational discipline or background.

(b)    In October 1992, I was promoted to the position of Director of the Energy Division. In preparation for Mr. Duxbury's inevitable retirement, I made the decision to form a Technical Section in 1993 in order to alleviate the undue burden of having to directly manage nine subordinates from the Electricity Section and three other section supervisors as well as perform my administrative duties as Director. This was also an effort to see if concentrating the division's engineering efforts into one section would be more productive. Mr. Duxbury subsequently retired in 1995.

(c)    The Technical Section was led by Mr. Bernard Givan, a Utility Engineering Specialist II, who reported directly to me before and after this organizational change. Mr. Givan also reported to Mr. Duxbury prior to Mr. Duxbury's retirement. Also included in the Technical Section were Mr. Cleckler, a Utility Engineering Specialist II at the time, and Mr. Will Straughn, a Utility Engineering Technician, who was moved from the Water Section. This structure continued after Mr. Givan's resignation in February 1999. Both Mr. Cleckler and Mr. Straughn reported to me for the next couple of years. In May 2001, Mr. John Free was promoted to Electricity Section Supervisor. At the same time, Mr. Straughn was moved to the Electricity Section to perform technical support for that section absent another engineer and reported to Mr. Free. I elected at that time to retain Mr. Cleckler as the sole employee of the Technical Section due to his vast knowledge and broad background in multiple facets of regulatory principles and techniques. (See JMH Exhibit 1 which is attached hereto)

(d)    The Technical Section was subsequently renamed the "Special Projects Section" and continued to have Mr. Cleckler as its sole employee. Mr. Cleckler performed and continues to perform a variety of duties including coordinating the following (1) issues that pertain to multiple disciplines and/or unregulated utilities, (2) research of federal and state utility policies and topics, (3) regulatory support required to be provided to the Alabama Department of Public Health pursuant to an APSC contract, and (4) technical support to the Natural Gas, Water, Gas Pipeline Safety and Electricity Sections. Notably, Mr. Cleckler's provision of technical support for the Electricity and Gas Pipeline Safety Sections is somewhat limited due to the fact that those two sections have always provided the bulk of their technical support with internal employees due to the inherent nature of their respective areas of responsibility.

In September 2001, Mr. Straughn retired. His retirement, combined with existing engineering vacancies, left the Electricity Section without a fulltime staff engineer to provide technical support. It was at this time that Mr. Free and I began our efforts to hire an engineer for the Electricity Section, a position which had been vacant since Mr. Givan's resignation in 1999.

(6)     Mr. Gregory Kelly was hired as a Utility Engineering Specialist I for the Electricity Section by Mr. Free on July 13, 2002. Mr. Kelly was made aware that he would report directly to Mr. Free at the time of his hiring and raised no concerns regarding same. Notably, the organizational structure of the Energy Division discussed above was in place when Mr. Kelly was hired and on the date that Mr. Kelly filed his charges of discrimination in this matter. (See JMH Exhibit 1 which is attached hereto)

(7)     With respect to Mr. Kelly's insinuation that he is not in a separate technical section due to his age and/or race, I again note that the Electricity Section where Mr. Kelly is employed has for many years provided its own technical support with an employee or employees inherent to that section due to the general nature of the electricity issues addressed by that section. Accordingly, Mr. Kelly's employment within the Electricity Section is based exclusively on managerial concerns that are totally unrelated to Mr. Kelly's age and/or race.

(8)     It is also important to note that in July 2005, Mr. Kelly filed a formal grievance with the APSC against me pursuant to internal APSC procedures asserting that the Energy Division's organizational structure caused him to suffer a "fractured career path, an unlevel playing field, a compromised job position, lost synergy and communication difficulties." Mr. Kelly's claims were adjudicated in accordance with the APSC's formal grievance procedures. A hearing was held concerning Mr. Kelly's claims before an APSC Administrative Law Judge and a panel of four of Mr. Kelly's APSC peers, which included two black females and two white males. The panel found, and the APSC agreed, that Mr. Kelly's grievance was due to be dismissed because the organizational structure of the Energy Division had not resulted in unfair treatment to Mr. Kelly and was a matter within the managerial discretion of the APSC and its Energy Division Director. (See JMH Exhibit 2 attached hereto)

(9)     With respect to Mr. Kelly's insinuation that he has "lost out" on training as the result of not being in charge of a technical budget, I first note that Mr. Kelly has received as much or more training than any individual in the Energy Division including Mr. Cleckler, his white male contemporary. (See JMH Exhibit 3 attached hereto) I also note that the only section manager within the Energy Division which actively manages a section budget is the Gas Pipeline Safety Section. The Gas Pipeline Safety Section Administrator only has this responsibility due to the fact that the Gas Pipeline Safety Section receives federal funding that is contingent on amounts expended each year. The other section managers merely provide input to me on their projected needs for the fiscal year in question. I then review the information provided by each section manager and compile an overall Energy Division budget for submission to the APSC's Administrative Division, Finance Section for their review, revisions and/or approval. The Administrative Division, Finance Section then submits the overall budget of the APSC, which includes the Energy Division, to the Alabama Legislature for their review, revisions, and/or approval. No section manager in the Energy Division other than the Administrator of the Gas Pipeline Safety

Section actually has or manages a section budget. This includes Mr. Cleckler, the 54-year-old white male Utilities Technical Specialist, Senior who manages the Special Projects Section. Thus, even if Mr. Kelly were in a standalone section he would not be in charge of a budget that would allow him sole discretion regarding training opportunities just as Mr. Cleckler is not. Mr. Kelly's training would instead be considered in the overall context of the budget of the Energy Division as a whole.

(10)  (a)   Regarding Mr. Kelly's claim that I "overruled" Mr. Free's initial decision not to let Mr. Kelly attend the Gasification Technologies Seminar in Denver, Colorado scheduled for March 2007, my recollection is that on January 31, 2007, Mr. Kelly came to my office and asked me if there was any reason why I thought Mr. Free would not approve of him to attend a free conference. I first advised Mr. Kelly that I didn't know and asked him to what was he referring. Mr. Kelly then handed me the Denver coal gasification workshop invitation and pointed out to me that the invitation discussed a reimbursement proposal for state regulatory employees. I advised Mr. Kelly that I was sure that Mr. Free had a good reason for not approving his participation in the workshop and that I would speak to Mr. Free about his decision when he returned to work the next day.

       (b)   Around noon the next day, I went to Mr. Free's office to discuss the matter of the coal gasification workshop with him and to find out exactly what had transpired. When I told Mr. Free that Mr. Kelly had come to my office and complained that he was not being allowed to attend the free coal gasification workshop, Mr. Free immediately explained the matter to me just as he explained in ¶12 of his Affidavit attached hereto as Appendix 1. Mr. Free advised me that Mr. Kelly did not initially make him aware that the workshop was offered at no cost to state regulatory personnel when he first left the invitation on Mr. Free's desk. Mr. Free advised me that his first thoughts were that a trip to Denver would likely be expensive and that coal gasification was not a priority topic for immediate Commission action or concern. Mr. Free advised me that he would take a closer look into the workshop details, talk to the sponsors and reconsider his decision. Mr. Free later determined that the seminar was fully reimbursable by the workshop's sponsors and approved Mr. Kelly to attend. I at no point "overruled" Mr. Free on this matter.

Further, the affiant sayeth not.

_Janice M. Hamilton_

Janice M. Hamilton

SWORN TO AND SUBSCRIBED before me this the 12th day of March, 2007.

_Eileen Milton Laurence_

Notary Public

My Commission Expires: _October 21, 2010_



# ELECTRICITY SECTION

As of 12/17/01

Hamilton, J.M.
Director
2-2836; IC260

ELECTRICITY

Free, John
Supervisor
2-8579; IC323

Gardner, Linda D.
Staff Accountant
2-9798; IC264

Isikalu, Oretoluwa
Accountant
2-9848; IC349

(Future)
Engr Spec II
2-5869; IC267

(Future)
Engr Spec I
2-9727; IC347

Taylor, Robert III
Analyst II
2-5870; IC266

Ward, Sheila H.
Analyst I
2-9575; IC322

(Vacant)
ASA I
2-5868; IC270

JMH EXHIBIT 4



ENERGY DIVISION

As of 7/15/2002



Organizational Structure
As of March 10, 2003

Christopher J. Harvey
Gas Pipeline Safety
2-5760 / 850-0047

Jannette S. Mitchell
2-5776 / 850-0053

Receptionist
2-5776

Rick Chandler
Special Projects
2-5745

John Paul Innis, North
2-9744 / 850-0046

David F. Snoddy
2-9788 / 850-0052

Gregory C. Meadows
2-9787 / 850-0049

O. Harold Dunson, Central
2-9732 / 850-0054

Hosie E. Powell
2-9849 / 850-0051

Tommy W. Lancaster, South
2-9782 / 850-0048

Judy D. Ramsey
2-9873 / 850-0281

Spencer C. Brady
2-9864 / 850-0044



**Energy Division**
Organizational Structure
As of January 1, 2004

- Jane M. Hamilton, Division Director
- T. Rick Gaddie, Special Projects Engineer
- Stephen D. Stevenson, Water
- Joyce L. White, Auditor
  - W. James Gibson, Sr. Chief Analyst
  - Robert Sherrell, Auditor
  - Edward Lloyd, Analyst
  - Emily McInnes, Secretary
- Robert E. Goodwin, Natural Gas Manager
- Daniel E. Morris, Energy
  - Spencer C. Brady, Training Officer
  - Jeanette S. Mitchell, Secretary
  - Christopher J. Harvey, Gas Pipeline Safety Administrator
    - Receptionist (Vacant)
    - John Paul Harris, Northern District Supervisor
      - David P. Snoddy, Investigator
      - Gregory C. Meadows, Investigator
    - O. Harold Dunson, Central District Supervisor
      - Hosie E. Powell, Investigator
    - Tommy W. Lancaster, Southern District Supervisor
      - Judy D. Ramsey, Investigator

**Energy Division**
Organizational Structure
(As of November 1, 2006)



Christopher J. Harvey
Gas Pipeline Safety
Administrator
2-5780 / 850-0247 (283)

Jametes S. Mitchell
Steno III
2-5779 / 850-0055 (285)

Spencer C. Brady
GPS Training Officer
2-9884 / 850-0044

Carlton L. Avery
Student Aide
2-5869 (287)

Tammy W. Lancaster, South
GPS Investigator, Supv.
2-9752 / 850-0048

Judy D. Ramsey
GPS Investigator, Sr.
2-9873 / 850-0051

John Paul Harris, North
GPS Investigator, Supv.
2-9744 / 850-0046

O. Harold Dannon, Central
GPS Investigator, Supv.
2-9732 / 850-0054

David F. Snoddy
GPS Investigator, Sr.
2-9787 / 850-0052

Gregory C. Meadows
GPS Investigator, Sr.
2-9786 / 850-0049

Investigator (Future)
2-9879 (222)

Hosie E. Powell
GPS Investigator, Sr.
2-9849 / 850-0051

Investigator (Future)
2-9879 (222)

Investigator (Future)
2-9879 (222)

JMH Exhibit 2



# STATE OF ALABAMA
ALABAMA PUBLIC SERVICE COMMISSION
P.O. BOX 304260
MONTGOMERY, ALABAMA 36130-4260

JIM SULLIVAN, PRESIDENT
JAN COOK, ASSOCIATE COMMISSIONER
GEORGE C. WALLACE, JR., ASSOCIATE COMMISSIONER

August 23, 2005

WALTER L. THOMAS, JR.
SECRETARY

Mr. Gregory Kelly
Public Utility Technical Specialist
Alabama Public Service Commission
Montgomery, Alabama 36104

Dear Mr. Kelly:

We have reviewed the August 16, 2005 Findings and Recommendations of the Grievance Committee appointed to hear the Employee Grievance you filed pursuant to Section VI of the Commission's Employee Guidelines and Procedures Manual. We are unaware of any unusual or extenuating circumstances of record in this case which would justify a decision contrary to that reached by the Committee. Accordingly, we adopt and concur with the Findings and Recommendations of the Grievance Committee.

THE COMMISSION, THEREFORE, FINDS, That Mr. Gregory Kelly's request that his position be moved from the Electricity Section of the Energy Division to the Special Projects Section of the Energy Division is due to be denied.

THE COMMISSION FURTHER FINDS, That Mr. Gregory Kelly's request that he report directly to a technical manager is also due to be denied.

ALABAMA PUBLIC SERVICE COMMISSION

Jim Sullivan, President

Jan Cook, Commissioner

George C. Wallace, Jr., Commissioner

JS/JC/GCWjr:eml



STATE OF ALABAMA
ALABAMA PUBLIC SERVICE COMMISSION
P.O. BOX 304260
MONTGOMERY, ALABAMA 36130-4260

WALTER L. THOMAS, JR.
SECRETARY

JIM SULLIVAN, PRESIDENT
JAN COOK, ASSOCIATE COMMISSIONER
GEORGE C. WALLACE, JR., ASSOCIATE COMMISSIONER

IN RE:     EMPLOYEE GRIEVANCE FILED BY MR. GREGORY KELLY

Findings and Recommendations of the Grievance Committee

We, the Grievance Committee appointed by the Commission to hear the Employee Grievance filed by Mr. Gregory Kelly pursuant to Section VI of the Alabama Public Service Commission's Employee Guidelines, have considered said grievance as well as the testimony adduced at the August 10, 2005 hearing held on this matter and the documentation provided at said hearing.

Based on the evidence which we have been presented, we find that Mr. Kelly's grievance is without merit. Mr. Kelly made no allegations of wrongdoing or improper conduct by his immediate supervisor, Mr. John Free, or by the Energy Division director, Mrs. Janice Hamilton. His complaint appears to be that his position is not located in the Special Projects Section with the other Public Utility Technical Specialist in the Energy Division and that he is not directly supervised by another engineer. Mr. Kelly alleges that he has a "fractured career path, an unleveled playing field, compromised job position, lost synergy, and communication difficulties (vertical and horizontal)" due to this situation. We find that the evidence does not support Mr. Kelly's allegations.

Mr. Kelly testified that he was satisfied with his current job position— even remarking that it was a "dream job" — and that he had no desire to seek a higher level position at the Commission. We are therefore at a loss to understand his claims of fractured career path and unlevel playing field. The evidence indicated that Mr. Kelly is currently filling the senior engineering position available at the Commission. The current organizational structure (which has been in place since Mr. Kelly interviewed and was hired at the Commission) did not hinder him from being promoted to this position. The only higher level positions in the Energy Division (outside of Gas Pipeline Safety) are Public Utility Analyst Manager and Energy Division Director. Both of these positions are multi-discipline, involving the supervision of not only technical, but also financial and clerical disciplines. From the record, it appears that Mr. Kelly meets the education requirements for both of these positions. In fact, Mrs. Hamilton was promoted to Energy Division Director directly from the position currently held by Mr. Kelly. Given Mr. Kelly's promotion to the most senior engineering position at the Commission, his stated lack of desire to move to any higher level position, and his apparent qualification to fill such positions should he have a change of heart, we find his allegations of fractured career path and unlevel playing field completely lacking in merit.

Mr. Kelly's claim of compromised job position was equally confusing. Given his apparent satisfaction with the job, his promotion to the senior engineering classification, and his supervisor's satisfaction with his job performance, we find no compromise of Mr. Kelly's job position.

Mr. Kelly also claims that the current organization is responsible for "lost synergy" in the Energy Division. He testified that his structural separation from the other Public Utility Technical Specialist in the Energy Division and the fact that he does not report directly to Mrs. Hamilton is the

Findings and Recommendations of the Grievance Committee
August 16, 2005
Page #2

cause of "lost synergy." Mrs. Hamilton, the Division Director, disagrees. She believes that the current organization is the most efficient and effective at the current time. Given that the Commission has delegated to Mrs. Hamilton the authority and the responsibility to organize and manage the Energy Division, we see no justification to substitute Mr. Kelly's judgment for Mrs. Hamilton's.

Finally, Mr. Kelly claims that he has both vertical and horizontal communication difficulties. Our analysis of the evidence leads us to find that any communications difficulties are not due to the organization at the Energy Division, Mr. Free, Mrs. Hamilton, or any of Mr. Kelly's co-workers, but are solely attributable to Mr. Kelly.

It appears that Mr. Kelly wishes this committee to substitute his judgment for Mrs. Hamilton's judgment on how the Energy Division should be organized solely for his personal satisfaction and convenience. There were no allegations of wrongdoing or improper conduct. We find no credible evidence of fractured career path, unlevel playing field, compromised job position, or lost synergy. We find that any communications difficulties are the sole perception of Mr. Kelly. We recommend that Mr. Kelly's request for his position to be moved to the Special Projects Section and his request that he report directly to a technical manager be denied.

In conclusion, we emphasize that the above findings, conclusions and recommendation are based on the documentary evidence submitted to us and the record compiled at the hearing in this matter. We feel that, based on the information we have, the unanimous findings, conclusions and recommendations set forth herein are just, reasonable and appropriate.

Aquilla Spivey

Debra Jackson

Tom Jones

Doug Dillard

G. Scott Morris
Administrative Law Judge

| Name / Position / Section | Race / Sex / Age | Years of Service | Date | Description of Training Classes/Conference/Seminars | Status | Location |
|---|---|---|---|---|---|---|
| Gregory Kelly<br><br>Tech. Spec., Senior<br><br>Electricity Section | Black<br><br>Male<br><br>Age 50 | 4.5 | 2003 | Electicity Law Seminar | Attended | Alexandria, VA |
| | | | 2004 | Market Based Concepts for Transmission Planning | Attended | San Francisco, California |
| | | | 2005 | PowerPoint XP/2002 Introduction | Attended | Alabama TechnaCenter |
| | | | 2005 | Seminar & Workshop for "Custom Power Solutions for Power Quality Issues". | Approved by Mr. Free & Ms. Hamilton but never received from Governor's Office. | |
| | | | 2006 | Fossil Power Plant Fundamental Workshop | Attended | Chicago, Illinois |
| | | | 2006 | Gasification Workshop for State Government Personnel | Attended | Raleigh, North Carolina |
| | | | 2007 | FERC Tech. Workshop "Electric Transmission Siting Rule, Order No. 689". | Attended | Bismarch, North Dekota |
| | | | | | | Atlanta, GA |
| Rick Cleckler<br><br>Tech. Spec., Senior<br><br>Technical Section | White<br><br>Male<br><br>Age | | 2006 | Professional Electrician Studies Program - Internet 4-Part Course and Exams | | Internet Self-Study Course |
| | | | 2005 | Web conference "Updating the Pro Forma Tariff (OATT)" | | Internet Web Conference |
| | | | 2005 | Seminar "Eminent Domain in Alabama" | | Montgomery, AL |

JMH EXHIBIT 3

EEOC Form 161 (3/98)

U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION

## DISMISSAL AND NOTICE OF RIGHTS

| To: Gregory Kelly<br>c/o Attorney Jim L. DeBardelaben<br>P. O. Box 152<br>Montgomery, AL 36101-0152 | From: Birmingham District Office - 420<br>Ridge Park Place<br>1130 22nd Street, South<br>Birmingham, AL 35205 |
|---|---|

| | On behalf of person(s) aggrieved whose identity is<br>CONFIDENTIAL (29 CFR § 1601.7(a)) | |
|---|---|---|

| EEOC Charge No. | EEOC Representative | Telephone No. |
|---|---|---|
| 420-2007-01781 | Glenn Todd, Investigator | (205) 212-2031 |

### THE EEOC IS CLOSING ITS FILE ON THIS CHARGE FOR THE FOLLOWING REASON:

[ ] The facts alleged in the charge fail to state a claim under any of the statutes enforced by the EEOC.

[ ] Your allegations did not involve a disability as defined by the Americans with Disabilities Act.

[ ] The Respondent employs less than the required number of employees or is not otherwise covered by the statutes.

[ ] Your charge was not timely filed with EEOC; in other words, you waited too long after the date(s) of the alleged discrimination to file your charge.

[ ] Having been given 30 days in which to respond, you failed to provide information, failed to appear or be available for interviews/conferences, or otherwise failed to cooperate to the extent that it was not possible to resolve your charge.

[ ] While reasonable efforts were made to locate you, we were not able to do so.

[ ] You were given 30 days to accept a reasonable settlement offer that affords full relief for the harm you alleged.

[x] The EEOC issues the following determination: Based upon its investigation, the EEOC is unable to conclude that the information obtained establishes violations of the statutes. This does not certify that the respondent is in compliance with the statutes. No finding is made as to any other issues that might be construed as having been raised by this charge.

[ ] The EEOC has adopted the findings of the state or local fair employment practices agency that investigated this charge.

[ ] Other (briefly state)

## - NOTICE OF SUIT RIGHTS -
(See the additional information attached to this form.)

**Title VII, the Americans with Disabilities Act, and/or the Age Discrimination in Employment Act:** This will be the only notice of dismissal and of your right to sue that we will send you. You may file a lawsuit against the respondent(s) under federal law based on this charge in federal or state court. Your lawsuit must be filed WITHIN 90 DAYS of your receipt of this Notice; or your right to sue based on this charge will be lost. (The time limit for filing suit based on a state claim may be different.)

**Equal Pay Act (EPA):** EPA suits must be filed in federal or state court within 2 years (3 years for willful violations) of the alleged EPA underpayment. This means that backpay due for any violations that occurred more than 2 years (3 years) before you file suit may not be collectible.

On behalf of the Commission

_Delner Franklin-Thomas_                 4/10/07

| Enclosure(s) | Delner Franklin-Thomas,<br>District Director | (Date Mailed) |
|---|---|---|

cc: John A. Garner, Esq.
Attorney for the Commission
State of Alabama
Public Service Commission
P. O. Box 304260
Montgomery, AL 36130-4260

Defendants'
Exhibit 3

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

RECEIVED

2007 JUL -2 A 10: 27

DEBRA P. HACKETT, CLK
U.S. DISTRICT COURT
MIDDLE DISTRICT ALA

| | |
|---|---|
| GREGORY KELLY | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs | ) |
| | ) |
| JOHN FREE, Individually and in his official | ) |
| position as an employee of the Alabama Public | ) |
| Service Commission; | ) |
| JANICE M. HAMILTON, Individually and in | ) |
| her official position as a Division Director of the | ) |
| Alabama Public Service Commission; | ) |
| ALABAMA PUBLIC SERVICE COMMISSION, | ) |
| an agency of the State of Alabama. | ) |
| | ) |
| Defendants. | ) |

CASE NO.: 2:07-CV-610-WHA

JURY TRIAL DEMANDED



## COMPLAINT

Comes Now the Plaintiff, Gregory Kelly, and files this Complaint seeking relief under the

provisions of Title VII of the Civil Rights Act of 1964, as amended in 1991, 42 U.S.C. §2000 @

et. seq. and under the provisions of 42 U.S.C. §§ 1981, 1983 and under the Equal Protection

Clause of the Fourteenth Amendment to the Constitution of the United States. The Plaintiff also

seeks relief on various state causes of action.

## JURISDICTION

1. Jurisdiction in this Honorable Court is posted under the provisions of 28 U.S.C. §

1331 and 28 U.S.C. § 1343 because it involves the civil rights of the Plaintiff and because it

involves questions of Federal law.



Defendants'
Exhibit 4

## PARTIES

2. Plaintiff Gregory Kelly, is a black male, over the age of forty (40) years, and at all times relevant hereto was a resident of Montgomery, Montgomery County, Alabama, which is encompassed in the area of the United States District Court For The Middle District Of Alabama, Northern Division.

3. Defendant John Free, a white male, over the age of forty (40) years, is employed by the Alabama Public Service Commission with his office located at 100 North Union Street, Montgomery, Montgomery County, Alabama, which is encompassed in the area of the United States Middle District Of Alabama, Northern Division.

4. Defendant Janice M. Hamilton, is a black female, over forty (40) years of age, and is employed as a Division Director of the Alabama Public Service Commission with her office located at 100 North Union Street, Montgomery, Montgomery County, Alabama, which is encompassed in the area of the United State District Court For The Middle District Of Alabama, Norther Division.

5. Defendant Alabama Public Service Commission, is an agency of the State of Alabama with its offices located at 100 North Union Street, Montgomery, Montgomery Count, Alabama, which is encompassed in the area of the United States District Court For The Middle District Of Alabama, Northern Division.

## STATEMENT OF FACTS SUPPORTING CAUSE OF ACTION

6. Plaintiff Kelly, is a black male, over forty (40) years of age, employed by the Alabama Public Service Commission as a Public Utility Technical Specialist, Senior Energy Division, in the Electricity Section, as an Engineer. Plaintiff Kelly has a degree in engineering.

7. Defendant John Free, is a white male, younger than Plaintiff Kelly, and is the Electricity Section Manager. Defendant Free has an accounting degree, but evaluates the technical work performance of Plaintiff Kelly and performed Plaintiff Kelly's annual evaluation.

8. The only other degreed engineers in the Energy Division are Janice M. Hamilton, a black female Division Director, and J. Rick Cleckler, a white male, who is in charge of the Special Project Section. The direct supervisor of J. Rick Cleckler is Janice M. Hamilton.

9. The position Plaintiff Kelly presently occupies has been occupied by a black employee for the past sixteen (16) years. A desk audit has not been conducted on this position for at least twenty-five (25) years. The last time a desk audit was performed on this position held by Plaintiff Kelly was when it was occupied by a white employee. On numerous occasions Plaintiff has requested a desk audit be performed on his position and each time his request was denied by Defendant John Free.

10. In May 2005, Plaintiff Kelly's job title was changed from "Utilities Engineering Specialist II" to "Public Utility Technical Specialist, Senior." No job study was conducted at the time of the change and no reason was provided for the change in job title.

11. Plaintiff Kelly's job title is the same as J. Rick Cleckler, a white male. However, Mr. Cleckler reports directly to the Division Director, Janice M. Hamilton, who is an engineer and she also performs J. Rick Cleckler's annual evaluations.

12. Plaintiff Kelly is the only black merit system engineer presently working for the Alabama Public Service Commission, Energy Division. Cleckler is a white merit system engineer and Hamilton, Energy Division Director, is a non-merit system engineer.

13. Plaintiff Kelly filed an EEOC Complaint against the Defendants and received a Right To Sue Notice dated April 10, 2007. (Exhibit 1)

### FIRST CAUSE OF ACTION
### RACIAL DISCRIMINATION
### UNDER TITLE VII OF THE CIVIL RIGHTS ACT OF 1964

14. The Plaintiff realleges and incorporates herein this First Cause of Action the allegations contained in paragraphs 1-13 of this Complaint the same as if set out herein in full.

15. The Plaintiff avers and alleges that he is treated differently from the only other working engineer in the Energy Division, J. Rick Cleckler. Plaintiff avers and alleges that his age is an issue as he is older than John Free and Janice M. Hamilton. Plaintiff avers that his race, black, is a factor in preventing him from being treated the same as J. Rick Cleckler, white, as both have the same position, both are degreed engineers, and both provide technical assistance.

16. Plaintiff Kelly avers and alleges that Defendant Free and/or Defendant Hamilton acting under the color of state law, has discriminated against him based on his race and has created a racially hostile working environment. Plaintiff avers that Defendants are in violation of the Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000 @ et. seq., as amended.

Plaintiff Kelly prays for the actual damages, equitable and declaratory relief, and recovery of costs and attorney fees to which he may be entitled under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000 @ et. Seq., as amended.

### SECOND CAUSE OF ACTION
### RACIAL DISCRIMINATION UNDER 42 U.S.C. § 1981

17. Plaintiff Kelly realleges and incorporates herein in this Second Cause of Action the allegations of paragraphs 1-16 above as if set out herein in full.

18.  Plaintiff Kelly alleges and avers that Defendants Free and Hamilton have discriminated against him based on his race, and the actions of the Defendants have created a racially hostile and/or generally hostile and abusive working environment. Therefore, the Defendants are in violation of 42 U.S.C. §1981.

19.  Plaintiff Kelly prays for actual damages, equitable and declaratory relief, and recovery of costs and attorney fees against all Defendants, who may be appropriately sued under 42 U.S.C. §1981 and to which the Plaintiff may be entitled under 42 U.S.C. §1981.

## THIRD CAUSE OF ACTION
## DISCRIMINATION UNDER THE EQUAL PROTECTION CLAUSE
## OF THE CONSTITUTION OF THE UNITED STATES

20.  Plaintiff Kelly realleges and incorporates herein in this Third Cause of Action the allegations of paragraphs 1-19 above as if set out herein in full.

21.  Plaintiff Kelly avers and alleges that Defendant Free and/or Defendant Hamilton, acting under color of state law, have treated him differently from similarly situated white male employees, denying him equal protection of the law.  The actions of Defendant Free and/or Defendant Hamilton have created an abusive, hostile and intimidating working environment for the Plaintiff.

22.  Plaintiff Kelly alleges and avers that the actions of Defendant Free and/or Defendant Hamilton have caused him to suffer mental and emotional pain and has caused the Plaintiff to seek medical attention and to expend funds for medical treatment.

WHEREFORE, PREMISES CONSIDERED, Plaintiff prays that a jury upon considering the evidence in this case will award the following relief:

A. An amount of money to sufficiently and adequately compensate the Plaintiff for the suffering inflicted upon him by the Defendant and an adequate amount in punitive damages to deter such action in the future.

B. The recovery of Court costs and an adequate and proper attorney fee.

C. Such other, further, and different relief that the Court determines the Plaintiff is entitled to receive.

## FOURTH CAUSE OF ACTION
## STATE ACTION-HARASSMENT

23. Plaintiff Kelly realleges and incorporates herein in this Fourth Cause of Action the allegations contained in paragraphs 1-22 above as if set out herein in full.

24. In January 2006, Plaintiff Kelly wrote Defendant Free a memorandum, with a copy going to Defendant Hamilton concerning updating the engineering jobs as the accountant jobs had been updated. Defendant Free responded with a memorandum, a copy of which was sent to Defendant Hamilton, informing Plaintiff Kelly there was no plans to request state personnel to re-evaluate PSC engineering positions. Defendant Free then, in essence, informed Plaintiff Kelly that if he did not like his compensation he could leave. Plaintiff Kelly responded that the engineers were not being treated "fair and equitable," and not given the same considerations as accountants, and Defendant Free was an accountant. Defendant Free responded to Plaintiff Kelly and threatened Plaintiff Kelly with disciplinary action and reminding Plaintiff Kelly if he did not like his situation he could leave. A copy of Defendant Free's memo went to Defendant Hamilton.

25. On Friday, February 10, 2006, Plaintiff Kelly was returning from an out of town trip, his ear was bothering him and he went to seek medical attention in place of coming back to the

office. On Monday, February 13, 2006, Defendant Free held a counseling session with Plaintiff Kelly because he sought medical treatment without calling the office first. On February 28, 2006, Defendant Free prepared a written summation of the counseling session and forwarded a copy of it to Defendant Hamilton. Defendant Free threatened Plaintiff Kelly with suspension or discharge in the future.

26. On April 17, 2006, Plaintiff Kelly received his Employee Performance Pre-Appraisal prepared by Defendant Free and reviewed by Defendant Hamilton. By memorandum dated April 17, 2006, Plaintiff Kelly forwarded his comments to Defendant Free. Defendant Free responded in a memo dated April 21, 2006 threatening Plaintiff Kelly with disciplinary action.

27. By memorandum dated June 22, 2006, Plaintiff Kelly expressed his displeasure of Defendant Free threatening him with a lower evaluation when Kelly informed Free that the Public Service Commission lacked expertise necessary on a certain project. A copy of the memorandum was sent to Defendant Hamilton.

28. By memorandum dated August 10, 2006, Plaintiff Kelly again complained about the lack of "close hands-on supervision" by Defendant Free. The Plaintiff complained that Defendant Free, an accountant by training, did not posses the basic engineering skills and training to provide "close hands-on supervision." Defendant Free refused to change wording on Plaintiff's Form 40 job description.

29. By memorandum dated August 18, 2006, to Defendant Hamilton, Plaintiff Kelly complained Defendant Free was harassing and threatening him. Defendant Free denied the issues raised by Plaintiff Kelly in a memorandum dated August 22, 2006.

30. By memorandum dated September 18, 2006, Plaintiff Kelly responded to Defendant Free concerning his Appraisal Review. On October 25, 2006, Defendant Free served Plaintiff

Kelly with a "Written Reprimand" because of Plaintiff Kelly's response to the Appraisal Review.

31.  Plaintiff Kelly avers and alleges that Defendant Free's constant threats of disciplinary action, along with consistent failure to provide "close hands-on supervision" coupled with Defendant Free's lack of adequate engineering knowledge and training amounts too constant and on going harassment.  Defendant Hamilton is aware of Defendant Free's actions toward Plaintiff Kelly and acquiesced in it, and failed to take any action to prevent the on going harassment.

32.  Said harassment has caused Plaintiff Kelly to suffer embarrassment in front of his co-workers and to suffer mental and emotional pain and anguish.

WHEREFORE, PREMISES CONSIDERED, Plaintiff prays that the jury will award him, based on the facts and circumstances of this case, an amount of money to adequately compensate the Plaintiff and to sufficiently punish the Defendants so as to deter such action in the future.

Respectfully submitted this the 2nd day of July, 2007.

Jim L. DeBardelaben (DEB003)
Attorney for Plaintiff Kelly

OF COUNSEL:
Jim L. DeBardelaben
Attorney At Law
Post Office Box 152
Montgomery, Alabama 36101-0152
(3340 265-9206
(334) 265-9299 Fax

EEOC Form 161 (3/98)

U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION

## DISMISSAL AND NOTICE OF RIGHTS

| To: Gregory Kelly<br>c/o Attorney Jim L. DeBardelaben<br>P. O. Box 152<br>Montgomery, AL 36101-0152 | From: Birmingham District Office - 420<br>Ridge Park Place<br>1130 22nd Street, South<br>Birmingham, AL 35205 |
|---|---|

|  | On behalf of person(s) aggrieved whose identity is<br>CONFIDENTIAL (29 CFR § 1601.7(a)) |
|---|---|

| EEOC Charge No. | EEOC Representative | Telephone No. |
|---|---|---|
| 420-2007-01781 | Glenn Todd, Investigator | (205) 212-2031 |

THE EEOC IS CLOSING ITS FILE ON THIS CHARGE FOR THE FOLLOWING REASON:

| | |
|---|---|
| [ ] | The facts alleged in the charge fail to state a claim under any of the statutes enforced by the EEOC. |
| [ ] | Your allegations did not involve a disability as defined by the Americans with Disabilities Act. |
| [ ] | The Respondent employs less than the required number of employees or is not otherwise covered by the statutes. |
| [ ] | Your charge was not timely filed with EEOC; in other words, you waited too long after the date(s) of the alleged discrimination to file your charge. |
| [ ] | Having been given 30 days in which to respond, you failed to provide information, failed to appear or be available for interviews/conferences, or otherwise failed to cooperate to the extent that it was not possible to resolve your charge. |
| [ ] | While reasonable efforts were made to locate you, we were not able to do so. |
| [ ] | You were given 30 days to accept a reasonable settlement offer that affords full relief for the harm you alleged. |
| [x] | The EEOC issues the following determination: Based upon its investigation, the EEOC is unable to conclude that the information obtained establishes violations of the statutes. This does not certify that the respondent is in compliance with the statutes. No finding is made as to any other issues that might be construed as having been raised by this charge. |
| [ ] | The EEOC has adopted the findings of the state or local fair employment practices agency that investigated this charge. |
| [ ] | Other (briefly state) |

## - NOTICE OF SUIT RIGHTS -
(See the additional information attached to this form.)

**Title VII, the Americans with Disabilities Act, and/or the Age Discrimination in Employment Act:** This will be the only notice of dismissal and of your right to sue that we will send you. You may file a lawsuit against the respondent(s) under federal law based on this charge in federal or state court. Your lawsuit must be filed <u>WITHIN 90 DAYS</u> of your receipt of this Notice; or your right to sue based on this charge will be lost. (The time limit for filing suit based on a state claim may be different.)

**Equal Pay Act (EPA):** EPA suits must be filed in federal or state court within 2 years (3 years for willful violations) of the alleged EPA underpayment. This means that backpay due for any violations that occurred <u>more than 2 years (3 years)</u> before you file suit may not be collectible.

On behalf of the Commission

*Delner Franklin-Thomas*                          4/10/07

Enclosure(s)                          Delner Franklin-Thomas,          (Date Mailed)
                                                District Director

cc:  John A. Garner, Esq.
     Attorney for the Commission
     State of Alabama
     Public Service Commission
     P. O. Box 304260
     Montgomery, AL 36130-4260



INFORMATION RELATED TO FILING SUIT
UNDER THE LAWS ENFORCED BY THE EEOC

*(This information relates to filing suit in Federal or State court under Federal law.*
*If you also plan to sue claiming violations of State law, please be aware that time limits and other*
*provisions of State law may be shorter or more limited than those described below.)*

**Title VII of the Civil Rights Act, the Americans with Disabilities Act (ADA),**
PRIVATE SUIT RIGHTS —    **or the Age Discrimination in Employment Act (ADEA):**

In order to pursue this matter further, you must file a lawsuit against the respondent(s) named in the charge within 90 days of the date you *receive* this Notice. Therefore, you should keep a record of this date. Once this 90-day period is over, your right to sue based on the charge referred to in this Notice will be lost. If you intend to consult an attorney, you should do so promptly. Give your attorney a copy of this Notice, and its envelope, and tell him or her the date you received it. Furthermore, in order to avoid any question that you did not act in a timely manner, it is prudent that your suit be filed within 90 days of the date this Notice was *mailed* to you (as indicated where the Notice is signed) or the date of the postmark, if later.

Your lawsuit may be filed in U.S. District Court or a State court of competent jurisdiction. (Usually, the appropriate State court is the general civil trial court.) Whether you file in Federal or State court is a matter for you to decide after talking to your attorney. Filing this Notice is not enough. You must file a "complaint" that contains a short statement of the facts of your case which shows that you are entitled to relief. Your suit may include any matter alleged in the charge or, to the extent permitted by court decisions, matters like or related to the matters alleged in the charge. Generally, suits are brought in the State where the alleged unlawful practice occurred, but in some cases can be brought where relevant employment records are kept, where the employment would have been, or where the respondent has its main office. If you have simple questions, you usually can get answers from the office of the clerk of the court where you are bringing suit, but do not expect that office to write your complaint or make legal strategy decisions for you.

PRIVATE SUIT RIGHTS — Equal Pay Act (EPA):

EPA suits must be filed in court within 2 years (3 years for willful violations) of the alleged EPA underpayment: backpay due for violations that occurred more than 2 years (3 years) before you file suit may not be collectible. For example, if you were underpaid under the EPA for work performed from 7/1/96 to 12/1/96, you should file suit before 7/1/98 -- not 12/1/98 -- in order to recover unpaid wages due for July 1996. This time limit for filing an EPA suit is separate from the 90-day filing period under Title VII, the ADA or the ADEA referred to above. Therefore, if you also plan to sue under Title VII, the ADA or the ADEA, in addition to suing on the EPA claim, suit must be filed within 90 days of this Notice and within the 2- or 3-year EPA backpay recovery period.

ATTORNEY REPRESENTATION — Title VII and the ADA:

If you cannot afford or have been unable to obtain a lawyer to represent you, the U.S. District Court having jurisdiction in your case ma-, in limited circumstances, assist you in obtaining a lawyer. Requests for such assistance must be made to the U.S. District Court in the form and manner it requires (you should be prepared to explain in detail your efforts to retain an attorney). Requests should be made well before the end of the 90-day period mentioned above, because such requests do not relieve you of the requirement to bring suit within 90 days.

ATTORNEY REFERRAL AND EEOC ASSISTANCE — All Statutes:

You may contact the EEOC representative shown on your Notice if you need help in finding a lawyer or if you have any questions about your legal rights, including advice on which U.S. District Court can hear your case. If you need to inspect or obtain a copy of information in EEOC's file on the charge, please request it promptly in writing and provide your charge number (as shown on your Notice). While EEOC destroys charge files after a certain time, all charge files are kept for at least 6 months after our last action on the case. Therefore, if you file suit and want to review the charge file, please make your review request within 6 months of this Notice. (Before filing suit, any request should be made within the next 90 days.)

*IF YOU FILE SUIT, PLEASE SEND A COPY OF YOUR COURT COMPLAINT TO THIS OFFICE.*

CHARGE OF DISCRIMINATION

This form is affected by the Privacy Act of 1974; see Privacy Act Statement on reverse before completing this form.

ENTER CHARGE NUMBER

☐ FEPA

☒ EEOC  420-2007-01781

and EEOC

_____ (State or local Agency, if any) _____

| NAME (Indicate Mr., Ms., or Mrs.) | HOME TELEPHONE NO. (Include Area Code) |
|---|---|
| Mr. Gregory Kelly | (334) 271-2478 |

| STREET ADDRESS            CITY, STATE AND ZIP CODE | COUNTY |
|---|---|
| 6213 Willow Glenn Drive, Montgomery, AL 36117 | Montgomery |

NAMED IS THE EMPLOYER, LABOR ORGANIZATION, EMPLOYMENT AGENCY, APPRENTICESHIP COMMITTEE, STATE OR LOCAL GOVERNMENT AGENCY WHO DISCRIMINATED AGAINST ME (If more than one list below.)

| NAME | NO. OF EMPLOYEES/MEMBERS | TELEPHONE NUMBER (Include Area Code) |
|---|---|---|
| Alabama Public Service COmmission | Approx. 103 | (334) 242-2696 |

| STREET ADDRESS                          CITY, STATE AND ZIP CODE |
|---|
| 100 North Union Street, Montgomery, Alabama 36104 |

| NAME | TELEPHONE NUMBER (Include Area Code) |
|---|---|
| John Free | (334) 242-9579 |

| STREET ADDRESS                        CITY, STATE AND ZIP CODE |
|---|
| 100 NOrth UNion Street, Montgomery, AL 36104 |

CAUSE OF DISCRIMINATION BASED ON (Check appropriate box(es)):

☒ RACE   ☐ COLOR   ☐ SEX   ☐ RELIGION   ☐ NATIONAL ORIGIN
☒ AGE   ☐ RETALIATION   ☐ OTHER (Specify)

DATE MOST RECENT OR CONTINUING DISCRIMINATION TOOK PLACE (Month, day, year)
01-30-07

THE PARTICULARS ARE (If additional space is needed, attached extra sheet(s)):

Janice M. Hamilton
100 North Union Street
Montgomery, AL 36104
(334) 242-2835

Particulars are attached

FEB 0 9 2007

☐ I also want this charge filed with the EEOC.
I will advise the agencies if I change my address or telephone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures.

NOTARY - (When necessary to meet State and Local Requirements)

I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief.

I declare under penalty of perjury that the foregoing is true and correct.

_Gregory Kelly_

Date: 02/06/07      Charging Party (Signature)

SIGNATURE OF COMPLAINANT

_Gregory Kelly_

SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE (Day, month, and year)
02/06/07

EEOC FORM 5      PREVIOUS EDITIONS OF THIS FORM ARE OBSOLETE AND MUST NOT BE USED

## STATEMENT OF PARTICULARS

My name is Gregory Kelly, I am a fifty (50) year old black male employed by the Alabama Public Service Commission as a Public Utility Technical Specialist, Senior Energy Division, in the Electricity Section, as an Engineer.

My direct supervisor is John D. Free, a white male, younger than I, who is the Electricity Section Manager. John Free has an accounting degree, but evaluates my work performance and provides my annual performance rating. There are only two other degreed engineers employed in the Energy Division. Janice M. Hamilton is a black female, Division Director and has an engineering degree. The other degreed engineer is J. Rick Cleckler, a white male, and is in charge of the Special Project Section, but he is the only person in that section. Basically, J. Rick Cleckler does the engineering work for the Water Section.

There are five sections in the Energy Division. The Water Section, who is provided technical support by the Special Projects Section, Natural Gas Section, who is provided technical support by the Gas Pipeline Safety Section, and the Electricity Section which I am in and whose technical support is also provided by me. It is apparent that the only section that does not have technical support separate is the one whose technical support would be provided by a black male, over fifty (50) years of age.

All sections have budgets to operate under. The other two sections, being Special Projects and Gas & Pipeline Safety, that provide technical assistance have their own separate budget. However, I have to operate under the Electricity Section budget. Thus, if I was separate I would be the only black in a section that had its own budget. As a result of being in charge of the technical budget, I have lost out on training. The latest example was I was offered the opportunity to go to Denver Colorado for a Gas Technology Workshop. It was a all expense paid seminar, and would not cost the State of Alabama one cent. My supervisor, John Free, refused permission to go citing budget reasons. This happened on January 30, 2007. Since no state funds would be spent, the budget explanation has to be false. I believe I was not allowed to attend because of my race and possibly because of my age. On January 31, 2007, I had a meeting with Janice M. Hamilton concerning Mr. Free not allowing me to go to Colorado for training. Director Hamilton overruled John Free, not only allowing me to go, but several other staff members, including herself as well.

The position I presently hold has been occupied by a black person for the past sixteen (16) years. This position has not had a desk audit (job study) for over twenty five (25) years. The last time a desk audit was done on this position, it was occupied by a white person. I have on numerous occasions requested that a desk audit be performed on my position. Each time my request has been refused by John Free.

In May 2005 my job title was changed from "Utilities Engineering Specialist II" to "Public Utility Technical Specialist, Senior." No job study was conducted at this time and no reason was provided for the change in job titles. However, since I have the same job title as J. rick Clecker, a

white male, I do not understand why I am treated differently, except that I am a black person.

Although the position I hold has been filled by a black person for the past sixteen (16) years, I am the first merit system black engineer that has worked for the Alabama Public Service Commission, Energy Division. The only explanation of why I am treated different from J. Rick Cleckler is my age and my race. I believe my age is an issue because John Free and Janice M. Hamilton are younger than I am . I believe my race definitely prevents me from being treated the same as J. Rick Cleckler, as we have the same position, are both degreed engineers, and both provide technical assistance, but he is supervised by a black female with an engineering degree and I am supervised by a younger white male with an accounting degree.

FEB 0 9 2007

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
_____NORTHERN_____ DIVISION

RECEIVED

2007 JUL -2  A. 10: 27

DEBRA P. HACKETT, CLK
U.S. DISTRICT COURT
MIDDLE DISTRICT ALA

GREGORY KELLY
_____

        Plaintiff,

v.

JOHN FREE, et al.
_____

        Defendants,

)
)
)
)
)
)
)
)
)
)

CASE NO. 2:07-cv-610

## CONFLICT DISCLOSURE STATEMENT

COMES NOW Gregory Kelly , a Plaintiff                in the above-captioned
matter, and in accordance with the order of this Court, making the following disclosure
concerning parent companies, subsidiaries, partners, limited liability entity members and
managers, trustees (but not trust beneficiaries), affiliates, or similar entities reportable under
the provisions of the Middle District of Alabama's General Order No. 3047:

☒   This party is an individual, or

☐   This party is a governmental entity, or

☐   There are no entities to be reported, or

☐   The following entities and their relationship to the party are hereby reported:

Reportable Entity                          Relationship to Party

_____              _____

_____              _____

_____              _____

7/2/2007
_____
Date

_____
(Signature)

Jim L. DeBardelaben
_____
(Counsel's Name)

Gregory Kelly
_____
Counsel for (print names of all parties)

P.O. Box 152, Montgomery, AL 36101-0152
_____
Address, City, State Zip Code
(334) 265-9206
_____
Telephone Number

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

GREGORY KELLY,                              )
                                           )
   Plaintiff,                              )
                                           )
v.                                         )       CASE NO:2-07-cv-610-WHA
                                           )
JOHN FREE, individually and in his         )
official position as an employee of the    )
Alabama Public Service Commission;         )
JANICE M. HAMILTON, individually           )
and in her official position as a          )
Division Director of the Alabama           )
Public Service Commission; and             )
ALABAMA PUBLIC SERVICE                     )
COMMISSION, an agency of the State         )
of Alabama,                                )
                                           )

   Defendants.

## ANSWER

COME NOW the Defendants, **JOHN FREE, JANICE HAMILTON** and the

**ALABAMA PUBLIC SERVICE COMMISSION** and for Answer to Plaintiff's

Complaint state as follows:

### JURISDICTION

1.    Defendants admit that the Court has subject matter and personal jurisdiction

over the claims pled in the Complaint.

### PARTIES

2.    Upon information and belief, admitted.

1


Defendants'
Exhibit 5

3.    Admitted.

4.    Admitted.

5.    Admitted.

## STATEMENT OF FACTS

6.    Defendants admit the allegations in paragraph number 6.  Specifically, Plaintiff's title is Public Utility Technical Specialist, Senior and Plaintiff is employed as an Engineer in the Electricity Section of the Energy Division of the Alabama Public Service Commission ("PSC").

7.    Defendants admit that John Free is a white male, has an Accounting Degree, manages the Electricity Section of the Energy Division, and is younger than the Plaintiff.  Defendants further admit that as Plaintiff's direct supervisor and the person who interviewed and hired Plaintiff for his job at the PSC, Defendant Free evaluates Plaintiff's job performance and completes Plaintiff's annual evaluation.

8.    Defendants admit that Janice Hamilton, a black female, and Rick Cleckler, a white male, are Engineers with the PSC.  Defendants admit that Hamilton is the Director of the Energy Division and direct supervisor of Cleckler, who is assigned to the Special Projects Section of the Energy Division.

9.    Defendants admit that the position which Plaintiff presently occupies has been occupied by a black employee for the past 16 years, except for the time period between February 1999, when the employee then holding the position resigned, and the

2

Plaintiff was promoted to the position in May 2004. The position was formerly known as Utility Engineer Specialist II, but was changed by the Alabama State Personnel Department to Public Utility Technical Specialist, Senior. Defendants deny that Plaintiff has ever specifically requested a "desk audit" be performed for his position but admit that Plaintiff has pursued changes to his salary range which would require the State Personnel Department to conduct a desk audit of the position, and has requested a "re-evaluation of the PSC technical specialist positions." Defendants are without sufficient information and knowledge to either admit or deny the remaining allegations contained in paragraph 9 and thus the allegations are denied.

10.    Defendants admit that Plaintiff's job title was changed from "Utilities Engineer Specialist II" to "Public Utility Technical Specialist, Senior" in May 2005. However, Defendants admit that the change in job title was unilaterally made by the Alabama State Personnel Department for all engineers in the state system, including Plaintiff's co-employee, Rick Cleckler. Defendants further admit that the change in job title by the State Personnel Department was made against the recommendation of division directors of the Alabama Public Service Commission.

11.    Defendants admit that Plaintiff's job title and pay grade is the same as Rick Cleckler's. Defendants admit the remaining allegations contained in paragraph 11.

12.    Defendants admit that Plaintiff is a merit system employee and that Rick Cleckler is also a merit system employee. Defendants further admit that Janice

3

Hamilton's current position with the Alabama Public Service Commission is a non-merit position. The remaining allegations in paragraph 12 are denied.

13. Defendants admit that Plaintiff filed a charge of discrimination with the EEOC, that the EEOC conducted an investigation and made no findings of a violation of applicable federal law by Defendants but did issue Plaintiff a Right-To-Sue letter on or about April 10, 2007.

### FIRST CAUSE OF ACTION

14. Defendants hereby reincorporate and reassert the matters pled in the preceding paragraphs of this Answer to the Complaint.

15. Defendants deny the allegations in their entirety and demand strict proof thereof.

16. Defendants deny the allegations in their entirety and demand strict proof thereof.

Defendants deny that Plaintiff is entitled to any damages, equitable or declaratory relief, and further deny that Plaintiff is entitled to costs and attorneys' fees, or any other relief he seeks in the Complaint.

### SECOND CAUSE OF ACTION

17. Defendants hereby reincorporate and reassert the matters pled in the preceding paragraphs of this Answer to the Complaint.

18. Defendants deny the allegations in their entirety and demand strict proof

4

thereof.

19.    Defendants deny that Plaintiff is entitled to any damages, equitable or declaratory relief, and further deny that Plaintiff is entitled to costs and attorneys' fees, or any other relief he seeks in the Complaint.

## THIRD CAUSE OF ACTION

20.    Defendants hereby reincorporate and reassert the matters pled in the preceding paragraphs of this Answer to the Complaint.

21.    Defendants deny the allegations in their entirety and demand strict proof thereof.

22.    Defendants deny the allegations in their entirety and demand strict proof thereof.

Defendants deny that Plaintiff is entitled to any relief requested in the WHEREFORE paragraph, and further deny that Plaintiff is entitled to any monetary, compensatory and/or punitive damages, the recovery of costs and attorneys' fees, or any other relief he seeks in the Complaint.

## FOURTH CAUSE OF ACTION

23.    Defendants hereby reincorporate and reassert the matters pled in the preceding paragraphs of this Answer to the Complaint.

24.    Defendants admit that on or about January 3, 2006, the Plaintiff sent a memo to Defendant John Free to which Mr. Free responded on or about January 23, 2006.

5

Defendants further admit that on or about January 25, 2006, the Plaintiff sent a reply to Defendant Free's response to which Defendant Free again responded on or about February 14, 2006. Defendants deny the remaining allegations contained in paragraph 24 of the Complaint.

25. Defendants admit that Plaintiff previously claimed that he had to seek medical treatment on or about February 10, 2006, and further admit that Defendant Free had a counseling session with the Plaintiff on or about February 13, 2006, of which Defendant Free prepared a summation. Defendants deny the remaining allegations in paragraph 25 of the Complaint.

26. Defendants admit that Plaintiff would have received on or about April 17, 2006 his Employee Performance Mid-Appraisal prepared by Defendant Free and reviewed by Defendant Hamilton. Defendants further admit that Plaintiff subsequently provided "comments" to the report to Defendant Free and Defendant Free subsequently responded thereto. Defendants deny the remaining allegations in paragraph 26 of the Complaint.

27. Defendants admit that on or about June 22, 2006, Defendant Free received a memorandum from the Plaintiff concerning an assignment the Plaintiff had been given. Defendants deny the remaining allegations in paragraph 27 of the Complaint.

28. Defendants admit that on or about August 10, 2006, Defendant Free received a memorandum from Plaintiff concerning Form 40. Defendants further admit

6

that Defendant Free advised the Plaintiff that there were no "conditions and/or circumstances that would warrant" a modification of Plaintiff's Form 40. The remaining allegations in paragraph 28 of the Complaint are denied.

29.    Defendants admit that on our about August 18, 2006, Defendant Free received a memorandum from the Plaintiff on which Defendant Hamilton was copied. Defendants further admit that Defendant Free responded thereto on or about August 22, 2006. The remaining allegations in paragraph 29 of the Complaint are denied.

30.    Defendants admit that on or about September 15, 2006, Defendant Free prepared and submitted to the Plaintiff the Plaintiff's Employee Performance Appraisal. Defendants further admit that on or about September 18, 2006, Defendant Free received a memorandum from the Plaintiff in response to the Appraisal and, subsequently thereto, Defendant Free replied to the Plaintiff's response and served a "Written Reprimand" on or about October 25, 2006. The remaining allegations in paragraph 30 of the Complaint are denied.

31.    Defendants deny the allegations in their entirety and demand strict proof thereof.

32.    Defendants deny the allegations in their entirety and demand strict proof thereof.

Defendants deny that Plaintiff is entitled to any relief requested in the WHEREFORE paragraph, and further deny that Plaintiff is entitled to any monetary,

7

compensatory and/or punitive damages, or any other relief he seeks in the Complaint.

## AFFIRMATIVE DEFENSES

### FIRST DEFENSE

The Plaintiff's claims herein are essentially the same as his Employee Grievance which he filed pursuant to § VI of the Alabama Public Service Commission's Employee Guidelines. Pursuant to such Guidelines, a Grievance Committee, composed of the Plaintiff's co-employees and a PSC Administrative Law Judge, thoroughly considered the Plaintiff's grievances at a full hearing on August 10, 2005. Based on the evidence at such hearing, the Grievance Committee found that the Plaintiff's grievance was without merit and rendered the Findings and Recommendations attached hereto as Exhibit 1. Such Findings and Recommendations were unanimously adopted and concurred in by the full Commission on August 23, 2005. (Exhibit 2 hereto).

### SECOND DEFENSE

Defendants specifically deny any and all allegations of wrongdoing contained in Plaintiff's Complaint.

### THIRD DEFENSE

The Complaint in its entirety, and each claim or cause of action therein, fails to state or infer a claim upon which relief can be granted.

### FOURTH DEFENSE

Defendants plead not guilty.

8

### FIFTH DEFENSE

Defendants plead the general issue.

### SIXTH DEFENSE

Defendants aver that Plaintiff has failed to and cannot state a claim for which relief

can be granted against the Alabama Public Service Commission pursuant to 42 U.S.C. §

1981.

### SEVENTH DEFENSE

There is an efficient, intervening cause which isolates Defendants from liability.

### EIGHTH DEFENSE

Defendants committed no act or omission, nor did they breach any duty, that

caused or contributed in any manner to the injuries and damages complained of by the

Plaintiff.

### NINTH DEFENSE

Defendants deny that they have acted or failed to act in any manner that caused or

contributed to any damages or injuries alleged by the Plaintiff.

### TENTH DEFENSE

Defendants aver the Plaintiff's claims are barred under any of the following

Doctrines: Waiver (equitable, judicial or otherwise), Estoppel (equitable, judicial or

otherwise), Laches, Fraud, Ratification, Release, Acceptance, Assumption of the Risk and

Unclean Hands.

9

### ELEVENTH DEFENSE

Defendants allege that the Complaint fails to state any injuries or damages which were proximately caused by Defendants and deny that any act or omission on their part, whether individually or jointly, proximately caused the damages sued for in Plaintiff's Complaint.

### TWELFTH DEFENSE

Defendants deny any and all express or implied allegations of *respondeat superior* and/or agency.

### THIRTEENTH DEFENSE

Plaintiff has failed to state a claim and cannot state a claim for relief against Defendants John Free or Janice Hamilton pursuant to Title VII of the Civil Rights Act of 1964.

### FOURTEENTH DEFENSE

Defendants assert that Plaintiff's alleged damages were not within their control to either cause or prevent.

### FIFTEENTH DEFENSE

Defendants Free and Hamilton assert and are entitled to qualified immunity.

### SIXTEENTH DEFENSE

Defendant Alabama Public Service Commission asserts and is entitled to Eleventh Amendment Immunity.

10

## SEVENTEENTH DEFENSE

Defendants assert that Plaintiff has failed to exhaust any and all applicable administrative remedies.

## EIGHTEENTH DEFENSE

Defendants assert that Plaintiff's claims are barred by the applicable statute of limitations.

## NINETEENTH DEFENSE

Plaintiff's economic damages, if any, are limited to or foreclosed by his failure to engage in reasonable efforts to mitigate those damages.

## TWENTIETH DEFENSE

At all times relevant to this lawsuit, Defendants acted in good faith and in accordance with applicable law.

## TWENTY-FIRST DEFENSE

Any action taken by Defendants was taken for legitimate, non-discriminatory business reasons, not for the purposes of interfering with or depriving Plaintiff of rights or benefits.

## TWENTY-SECOND DEFENSE

Plaintiff's damages may be limited to and/or foreclosed by the after acquired evidence doctrine.

11

<u>TWENTY-THIRD DEFENSE</u>

Plaintiff's own acts or omissions caused or contributed to Plaintiff's alleged injury.

<u>TWENTY-FOURTH DEFENSE</u>

Plaintiff's claim for punitive damages violates the Fourth, Fifth, Eighth and

Fourteenth Amendments of the Constitution of the United States on the following

separate and several grounds:

(a) It is a violation of the Due Process and Equal Protection Clauses of the Fourteenth Amendment of the United States Constitution to impose punitive damages, which are penal in nature, against a civil defendant upon the Plaintiff satisfying a burden of proof which is less than the "beyond a reasonable doubt" burden of proof required in criminal cases;

(b) The procedures pursuant to which punitive damages are awarded fail to provide a reasonable limit on the amount of an award against Defendants, which thereby violate the Due Process Clause of the Fourteenth Amendment of the United States Constitution;

(c) The procedures pursuant to which punitive damages are awarded fail to provide specific standards which thereby violate the Due Process Clause of the Fourteenth Amendment of the United States Constitution;

(d) The procedures pursuant to which punitive damages are awarded result in the imposition of different penalties for the same or similar acts and, thus, violate the Equal Protection Clause of the Fourteenth Amendment of the United States Constitution;

(e) The procedures pursuant to which punitive damages are awarded permit the imposition of punitive damages in excess of the maximum criminal fine for the same or similar conduct, which thereby infringes the Due Process Clause of the Fifth

12

and Fourteenth Amendments and the Equal Protection Clause of the Fourteenth Amendment of the United States Constitution;

(f)    The procedures pursuant to which punitive damages are awarded permit the imposition of excessive fines in violation of the Eighth Amendment of the United States Constitution.

### TWENTY-FIFTH DEFENSE

Plaintiff's claim for punitive damages violates the Due Process Clause of Article I, Section 6 of the Constitution of Alabama on the following separate and several grounds:

(a)    It is a violation of the Due Process Clause to impose punitive damages, which are penal in nature, against a civil defendant upon the Plaintiff satisfying a burden of proof other than the "beyond a reasonable doubt" burden of proof required in criminal cases;

(b)    The procedures pursuant to which punitive damages are awarded fail to provide a limit on the amount of the award against Defendants;

(c)    The procedures pursuant to which punitive damages are awarded are constitutionally vague;

(d)    The procedures pursuant to which punitive damages are awarded fail to provide specific standards for the amount of punitive damages;

(e)    The award of punitive damages in this case would constitute deprivation of property without due process of law;

(f)    The procedures permit the award of punitive damages upon satisfaction of a reduced standard of proof;

(g)    The procedures fail to provide a clear and consistent appellate standard of review of an award of punitive damages;

13

(h)    The procedures permit the admission of evidence relative to punitive damages in the same proceedings during which liability and compensatory damages are determined.

## TWENTY-SIXTH DEFENSE

The award of punitive damages to the Plaintiff in this action would constitute a deprivation of property without due process of law required under the Fifth and Fourteenth Amendments of the United States Constitution.

## TWENTY-SEVENTH DEFENSE

The procedures pursuant to which punitive damages are awarded permit the imposition of an excessive fine in violation of Article I, Section 15 of the Constitution of Alabama.

## TWENTY-EIGHTH DEFENSE

Plaintiff's demand herein for punitive damages violates the Due Process Clauses of the Fifth and Fourteenth Amendments of the United States Constitution and Article I, Section 6 of the Constitution of Alabama of 1901. The Plaintiff's claim for punitive damages herein is vague and not rationally related to any legitimate government interests.

## TWENTY-NINTH DEFENSE

Plaintiff's demand herein for punitive damages violates the Sixth Amendment to the United States Constitution and Article I, Section 11 of the Constitution of Alabama of 1901. The Plaintiff's demand for punitive damages herein is penal in nature and deprives Defendants of the same procedural safeguards accorded to a criminal defendant under

14

said federal and state constitutional provisions.

## THIRTIETH DEFENSE

Plaintiff's demand for punitive damages violates the Self-Incrimination Clauses of the Fifth Amendment of the United States Constitution and Article I, Section 6 of the Constitution of Alabama of 1901. The punitive damages claimed by the Plaintiffs are penal in nature. Defendants are required to disclose documents and/or other evidence without the safeguard against self-incrimination provided for in said federal and state constitutional provisions.

## THIRTY-FIRST DEFENSE

Plaintiff's demand herein for punitive damages violates Article I, Sections 10 and 13 of the Constitution of Alabama of 1901.

## THIRTY-SECOND DEFENSE

Plaintiff's demand herein for punitive damages is unconstitutional under the Due Process Clauses of the Fifth and Fourteenth Amendments of the United States Constitution and Article I, Section 6 of the Constitution of Alabama of 1901. Said Constitutional provisions prohibit the deprivation of life, liberty or property without due process of law. Punitive damages are penal in nature and require a burden of proof which is less than the "beyond a reasonable doubt" standard required in criminal cases.

## THIRTY-THIRD DEFENSE

Plaintiff's demand herein for punitive damages is unconstitutional under the Equal

Protection Clauses of the Fifth and Fourteenth Amendments of the United States Constitution and Article I, Sections 1, 6 and 22 of the Constitution of Alabama of 1901.

### THIRTY-FOURTH DEFENSE

Defendants aver that the imposition of punitive damages under Alabama law is arbitrary and capricious. Inasmuch as there are no standards for fair and objective calculation of such damages and as the same are penal in nature, Plaintiffs must show entitlement to the same by evidence beyond a reasonable doubt. Further imposition of punitive damages under Alabama law is contrary to the Due Process and Equal Protection clauses of both the Constitution of the United States of America and of the State of Alabama. Additionally, the imposition of punitive damages under Alabama law, even with Green Oil and Hammond's guidelines, is arbitrary and capricious leading to "grossly excessive" punitive damage awards, inasmuch as the jury is provided neither guidelines in reaching some rational ratio between compensatory and punitive damages nor some rational relation between the Defendants' alleged conduct and the legitimate interest of the State to punish unlawful conduct and deter its repetition. BMW of North America v. Gore, 116 S.Ct. 1589 (1996).

### THIRTY-FIFTH DEFENSE

The claims of Plaintiff for punitive damages against Defendants cannot be upheld, because any award of punitive damages under Alabama law without bifurcating the trial of all punitive damages would violate Defendants' Due Process rights guaranteed by the

16

United States Constitution and the Alabama Constitution.

### THIRTY-SIXTH DEFENSE

Defendants deny and contest the damages and injuries which are being asserted in Plaintiff's Complaint and demand strict proof thereof.

### THIRTY-SEVENTH DEFENSE

Defendants assert any statutory cap on damages enacted at present or subsequent to the filing of this Answer.

### RESERVATION OF DEFENSES

**Defendants reserve the right to plead additional affirmative defenses as they become known in the course of discovery or until a reasonable time following the conclusion of all factual discovery in this case.**

### DEFENSIVE CLAIM FOR COSTS AND ATTORNEYS' FEES

Plaintiff's claims against Defendants are groundless, completely void of merit, and have been brought for purposes of harassment and without factual support. As a result of this action, Defendants have been compelled to employ Oakley Melton, Jr. and J. Flynn Mozingo to defend them in this frivolous action. To the extent allowed by law, Defendants hereby request an award of their costs and attorneys' fees for any and all claims on which the Defendants, or any one of them, may prevail.

17

Respectfully submitted this the 23th day of July, 2007.

    s/Oakley Melton, Jr.
OAKLEY MELTON, JR. (MEL002)

    s/J. Flynn Mozingo
J. FLYNN MOZINGO (MOZ003)
Attorneys for Defendants, John Free, Janice
Hamilton and Alabama Public Service
Commission
MELTON, ESPY & WILLIAMS, P.C.
P. O. Drawer 5130
Montgomery, AL  36103-5130
Telephone:   (334) 263-6621
Facsimile:   (334) 263-7252
fmozingo@mewlegal.com

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that a copy of the foregoing has been electronically filed on the 23th day of July, 2007, with the Clerk of the Court and that a copy of same will be served upon the listed counsel of record by electronic notification via the ECF/CM System:

Jim DeBardelaben
Post Office Box 152
Montgomery, AL 36107

    s/J. Flynn Mozingo
OF COUNSEL

18



STATE OF ALABAMA
ALABAMA PUBLIC SERVICE COMMISSION
P.O. BOX 304260
MONTGOMERY, ALABAMA 36130-4260

JIM SULLIVAN, PRESIDENT
JAN COOK, ASSOCIATE COMMISSIONER
GEORGE C. WALLACE, JR., ASSOCIATE COMMISSIONER

WALTER L. THOMAS, JR.
SECRETARY



IN RE:    EMPLOYEE GRIEVANCE FILED BY MR. GREGORY KELLY

Findings and Recommendations of the Grievance Committee

We, the Grievance Committee appointed by the Commission to hear the Employee Grievance filed by Mr. Gregory Kelly pursuant to Section VI of the Alabama Public Service Commission's Employee Guidelines, have considered said grievance as well as the testimony adduced at the August 10, 2005 hearing held on this matter and the documentation provided at said hearing.

Based on the evidence which we have been presented, we find that Mr. Kelly's grievance is without merit. Mr. Kelly made no allegations of wrongdoing or improper conduct by his immediate supervisor, Mr. John Free, or by the Energy Division director, Mrs. Janice Hamilton. His complaint appears to be that his position is not located in the Special Projects Section with the other Public Utility Technical Specialist in the Energy Division and that he is not directly supervised by another engineer. Mr. Kelly alleges that he has a "fractured career path, an unleveled playing field, compromised job position, lost synergy, and communication difficulties (vertical and horizontal)" due to this situation. We find that the evidence does not support Mr. Kelly's allegations.

Mr. Kelly testified that he was satisfied with his current job position— even remarking that it was a "dream job" – and that he had no desire to seek a higher level position at the Commission. We are therefore at a loss to understand his claims of fractured career path and unlevel playing field. The evidence indicated that Mr. Kelly is currently filling the senior engineering position available at the Commission. The current organizational structure (which has been in place since Mr. Kelly interviewed and was hired at the Commission) did not hinder him from being promoted to this position. The only higher level positions in the Energy Division (outside of Gas Pipeline Safety) are Public Utility Analyst Manager and Energy Division Director. Both of these positions are multi-discipline, involving the supervision of not only technical, but also financial and clerical disciplines. From the record, it appears that Mr. Kelly meets the education requirements for both of these positions. In fact, Mrs. Hamilton was promoted to Energy Division Director directly from the position currently held by Mr. Kelly. Given Mr. Kelly's promotion to the most senior engineering position at the Commission, his stated lack of desire to move to any higher level position, and his apparent qualification to fill such positions should he have a change of heart, we find his allegations of fractured career path and unlevel playing field completely lacking in merit.

Mr. Kelly's claim of compromised job position was equally confusing. Given his apparent satisfaction with the job, his promotion to the senior engineering classification, and his supervisor's satisfaction with his job performance, we find no compromise of Mr. Kelly's job position.

Mr. Kelly also claims that the current organization is responsible for "lost synergy" in the Energy Division. He testified that his structural separation from the other Public Utility Technical Specialist in the Energy Division and the fact that he does not report directly to Mrs. Hamilton is the

Findings and Recommendations of the Grievance Committee
August 16, 2005
Page #2

cause of "lost synergy." Mrs. Hamilton, the Division Director, disagrees. She believes that the current organization is the most efficient and effective at the current time. Given that the Commission has delegated to Mrs. Hamilton the authority and the responsibility to organize and manage the Energy Division, we see no justification to substitute Mr. Kelly's judgment for Mrs. Hamilton's.

Finally, Mr. Kelly claims that he has both vertical and horizontal communication difficulties. Our analysis of the evidence leads us to find that any communications difficulties are not due to the organization at the Energy Division, Mr. Free, Mrs. Hamilton, or any of Mr. Kelly's co-workers, but are solely attributable to Mr. Kelly.

It appears that Mr. Kelly wishes this committee to substitute his judgment for Mrs. Hamilton's judgment on how the Energy Division should be organized solely for his personal satisfaction and convenience. There were no allegations of wrongdoing or improper conduct. We find no credible evidence of fractured career path, unlevel playing field, compromised job position, or lost synergy. We find that any communications difficulties are the sole perception of Mr. Kelly. We recommend that Mr. Kelly's request for his position to be moved to the Special Projects Section and his request that he report directly to a technical manager be denied.

In conclusion, we emphasize that the above findings, conclusions and recommendation are based on the documentary evidence submitted to us and the record compiled at the hearing in this matter. We feel that, based on the information we have, the unanimous findings, conclusions and recommendations set forth herein are just, reasonable and appropriate.

Aquilla Spivey

Debra Jackson

Tom Jones

Doug Dillard

G. Scott Morris
Administrative Law Judge



STATE OF ALABAMA
ALABAMA PUBLIC SERVICE COMMISSION
P.O. BOX 304260
MONTGOMERY, ALABAMA 36130-4260

JIM SULLIVAN, PRESIDENT                         August 23, 2005                    WALTER L. THOMAS, JR.
JAN COOK, ASSOCIATE COMMISSIONER                                                   SECRETARY
GEORGE C. WALLACE, JR., ASSOCIATE COMMISSIONER

EXHIBIT

2

Mr. Gregory Kelly
Public Utility Technical Specialist
Alabama Public Service Commission
Montgomery, Alabama 36104

Dear Mr. Kelly:

We have reviewed the August 16, 2005 Findings and Recommendations of the Grievance Committee appointed to hear the Employee Grievance you filed pursuant to Section VI of the Commission's Employee Guidelines and Procedures Manual. We are unaware of any unusual or extenuating circumstances of record in this case which would justify a decision contrary to that reached by the Committee. Accordingly, we adopt and concur with the Findings and Recommendations of the Grievance Committee.

THE COMMISSION, THEREFORE, FINDS, That Mr. Gregory Kelly's request that his position be moved from the Electricity Section of the Energy Division to the Special Projects Section of the Energy Division is due to be denied.

THE COMMISSION FURTHER FINDS, That Mr. Gregory Kelly's request that he report directly to a technical manager is also due to be denied.

ALABAMA PUBLIC SERVICE COMMISSION

Jim Sullivan, President

Jan Cook, Commissioner

George C. Wallace, Jr., Commissioner

JS/JC/GCWjr:eml

## Answers to Complaints
2:07-cv-00610-WHA-SRW Kelly v. Free et al

U.S. District Court

**Alabama Middle District**

Notice of Electronic Filing

The following transaction was received from Mozingo, James Flynn entered on 7/23/2007 at 1:36 PM
CDT and filed on 7/23/2007

| | |
|---|---|
| Case Name: | Kelly v. Free et al |
| Case Number: | 2:07-cv-610 |
| Filer: | Alabama Public Service Commission |
| | John Free |
| | Janice M. Hamilton |

Document Number: 5

**Docket Text:**
ANSWER to Complaint by John Free, Janice M. Hamilton, Alabama Public Service Commission.
(Attachments: # (1) Exhibit Exhibit 1# (2) Exhibit Exhibit 2)(Mozingo, James)

The following document(s) are associated with this transaction:

**Document description:**Main Document
**Original filename:**n/a
**Electronic document Stamp:**
[STAMP dcecfStamp_ID=1053018227 [Date=7/23/2007] [FileNumber=762014-0]
[916968511139660225e130331255b56c24de27606fa6c8e144e11c328182ae437508
da2bac22ab0f299a1d3a65d189cc7dcc7583d2899714b9fd7e0bf34006b0]]
**Document description:**Exhibit Exhibit 1
**Original filename:**n/a
**Electronic document Stamp:**
[STAMP dcecfStamp_ID=1053018227 [Date=7/23/2007] [FileNumber=762014-1]
[6133940f25a34ea5ec6eef3fd2f604ed8eb522bf07fb2abb9415b758aa5c2ef02300
bd8e73d27f07d51423f3ee23255cb6a08179cce2f27fb955d0c565f3004e]]
**Document description:**Exhibit Exhibit 2
**Original filename:**n/a
**Electronic document Stamp:**
[STAMP dcecfStamp_ID=1053018227 [Date=7/23/2007] [FileNumber=762014-2]
[85323fb047f5d1bff2642a40f3b249ffbb15f50f1ce056ad598472e7df39deced381
9f50f0e10e1b1b64ec7f331a3d0e61d9e6e6336b72e65879a7ff083f9d7f]]

2:07-cv-610 Notice will be electronically mailed to:

Jim Lee DeBardelaben    dgoollaw@aol.com, jimdebard@aol.com

James Flynn Mozingo    fmozingo@mewlegal.com, wroberts@mewlegal.com

2:07-cv-610 Notice will be delivered by other means to:

Announcement Date: January 30, 2002

State of Alabama
Personnel Department
64 North Union Street
PO Box 304100
Montgomery, AL 36130-4100
(334) 242-3389
Internet: www.personnel.state.al.us

# UTILITIES ENGINEERING SPECIALIST I - 20521
## Energy Option - 009
## $37,050.00-$56,266.60

Defendants'
Exhibit 8

Department: Public Service Commission
Location: Montgomery

## Type of Examination

An **open-competitive** register will be established by an evaluation of the extent and quality of the applicants' training and experience as shown on their application. This evaluation of training and experience will comprise 100% of the final grade.

## Qualifications Needed to Apply

You must have **all** of the following to qualify:

- Bachelor's degree in Electrical Engineering, Mechanical Engineering, Industrial Engineering, Civil Engineering, Chemical Engineering, Nuclear Engineering, or a closely related engineering field.

- Two (2) years of professional engineering experience, to include one year of experience in the electric, natural gas, or water utility field or in an agency regulating utilities.

## Special Requirement

Eligibility for licensure as a professional engineer by the Alabama Board for the Registration of Professional Engineers and Land Surveyors.

## Kind of Work

This is professional engineering work with electric, natural gas and water utilities. Employees in this class perform a variety of engineering duties associated with the planning, location, design, operation, and/or construction of utility plants and engineering projects. Work involves independently performing or reviewing preliminary field engineering studies; preparing computer-generated comparisons and technical assessments; conducting plant citing evaluations; reviewing plans and specifications; or assisting an engineering superior with complex projects. On occasion, supervision is exercised over technical personnel. Employees receive general instructions from a supervisor who assists with difficult problems, and reviews work through reports and other written materials. Work involves performing studies of the operations and services of utility companies; reviewing field engineering reports regarding utility companies; preparing recommendations; participating in studies of utility property, inventories, and construction; appraising value and physical condition; determining compliance with approved policies and standards; participating in studies of rate changes and depreciation rates; participating in the development of engineering evidence and testimony for proceedings of the Commission; preparing charts, graphs, diagrams; and drafting general engineering maps.

## How to Apply

Use an Application for Examination form to apply. You can get the form at this office or any Alabama Employment Service Office. It can also be downloaded from our web site. You must send your application to the State Personnel Department. It must be received by the close of business on March 13, 2002. Applications received after 5:00 p.m. on this date WILL BE REJECTED. The names of those who apply late will be put on a mailing list. They will be notified when they should apply again. The State Personnel Department is not responsible for late receipt of applications due to mail service or fax malfunctions. Photocopied applications are accepted. Our fax number is 334-242-1110.

THE STATE OF ALABAMA IS AN EQUAL OPPORTUNITY EMPLOYER.



# STATE OF ALABAMA
ALABAMA PUBLIC SERVICE COMMISSION
P.O. BOX 991
MONTGOMERY, ALABAMA 36101-0991



JIM SULLIVAN, PRESIDENT
JAN COOK, ASSOCIATE COMMISSIONER
GEORGE C. WALLACE, JR., ASSOCIATE COMMISSIONER

Mr. Gregory Kelly                                      June 5, 2002
5213 Willow Glen Drive
Montgomery, AL 36117

Dear Mr. Kelly:

Your name has been certified to this Commission by the State Personnel Department in the classification shown below. This is not an offer of appointment or interview, but is merely to determine your availability for the position.

Please check the statement below that describes your situation and return your letter in the enclosed, self-addressed envelope within ten (10) days from the date of this letter. Your failure to reply will be considered a declination for the location shown below, as well as all other locations, until you notify the State Personnel Department otherwise.

Sincerely,

Loy N. Overstreet
PSC Personnel

Classification: Utility Engineering Spec I      Rank on Certification: 89.00
Location: Montgomery                            Number Certified: 4
Salary: $1,425.00         biweekly             Vacancies to be Filled: 1

*Tied with _____ other applicant(s) in _____.

CHECK THE STATEMENT THAT DESCRIBES YOUR SITUATION:

(X) I am available for appointment.
( ) I am not available for appointment. Please remove my name from the register.
( ) I am not available now, but will be available beginning: _____

Gregory Kelly                  334-271-2478        334-242-3524
Signature                   Current Home Phone    Current Work Phone

Defendants'
Exhibit 9



### STATE OF ALABAMA
ALABAMA PUBLIC SERVICE COMMISSION
P.O. BOX 304260
MONTGOMERY, ALABAMA 36130-4260

WALTER L. THOMAS, JR.
SECRETARY

JIM SULLIVAN, PRESIDENT

JAN COOK, ASSOCIATE COMMISSIONER

GEORGE C. WALLACE, JR., ASSOCIATE COMMISSIONER

June 28, 2002

Mr. Gregory Kelly
6213 Willow Glen Drive
Montgomery, AL 36117

Dear Mr. Kelly:

You have been appointed to the position of utilities engineering specialist I, class code 20521, at the Alabama Public Service Commission, effective July 13, 2002 at a biweekly salary of $1,425.00-$37,050.00 annually. This is an eight-step promotional increase to step 1 of pay grade 77. The increase should appear on your August 9 paycheck. Your work assignment will be in the Commission's Energy Division.

Your status during at least a six-month period beginning on your appointment date is probationary. Your supervisor will evaluate your job performance at three months and six months. The final probationary appraisal will determine your eligibility for permanent status.

Congratulations on this promotion, Mr. Kelly. We wish you continued success in your career, and invite you to contact this office with any personnel-related matters you may encounter.

Sincerely,

Loy N. Overstreet
PSC Personnel

pc:  Certification Division
     Ms. Janice Hamilton, Director
     Mr. John Free, Supervisor


Defendants' Exhibit 10



Energy Division
Organizational Structure
As of January 1, 2004

Jack E. Kelley
Special Projects
2-9674 / (324)

Melvin L. Catrett, Sr.
2-9669 / (262)

Marilla B. Holley
2-2687 / (261)

Stephen D. Sipper
Water
2-9670 / ( )

William C. Bill Knight
2-9671 / (849)

Towski Wolfe

Joe Leventis
2-9556 / (851)

Donald R. Powell
2-6715 / (259)

Brenda H. Roberts
2-2688 / (263)

Robert L. Bob Reed
Natural Gas
2-2838 / (266)

Bruce M. Hamilton
Division Director
2-2835 / (850-0043) (260)

Jimmy D. Kent
2-9712 / (847)

Patricia W. Smith
2-9716 / (849)

Linda F. Latimer
2-9718 / (264)

Eddie H. Ware
2-9534 / (326)

Robert L. Cobb, III
2-9546 / (265)

Jacqueline R. Frazier
2-2841 / (271)

John D. Free
Electricity
( )

Spencer C. Brady
2-9684 / 850-0044

Jannette S. Mitchell
2-5779 / 850-0053

Christopher J. Harvey
Gas Pipeline Safety
2-5780 / 850-0047 (283)

John Paul Harris, North
2-9744 / 850-0046

Receptionist (Vacant)
2-5778

Tommy W. Lancaster,
South

O. Harold Dunson,
Central

David P. Snoddy
2-9786 / 850-0052

Gregory C. Meadows
2-9787 / 850-0049

Judy D. Ramsey
2-9879 / 850-0261

Hosia E. Powell
2-9649 / 850-0051

Defendants'
Exhibit 12

PSC Form 5



# STATE OF ALABAMA
## ALABAMA PUBLIC SERVICE COMMISSION
P.O. BOX 991
MONTGOMERY, ALABAMA 36101-0991

WALTER L. THOMAS, JR.
SECRETARY

JIM SULLIVAN, PRESIDENT
JAN COOK, ASSOCIATE COMMISSIONER
GEORGE C. WALLACE, JR., ASSOCIATE COMMISSIONER

# M E M O R A N D U M

DATE:      9/20/02

TO:        Mr. Gregory Kelly
           Energy Division

FROM:      Dorinda J. Kepler
           PSC Personnel

SUBJECT:   SALARY ADJUSTMENT

Effective September 7, 2002, your salary was adjusted as follows:

From:  $1425.00  biweekly

To:    $1467.80  biweekly (grade 77 , step 1 )

This adjustment is being made due to the reason checked below and will appear on your October 4, 2002 paycheck.

_____ Probationary Increase

_____ Promotional Increase

_____ Annual Increase

_____ Merit Increase

3%  _X_ Cost-of-Living Adjustment

_____ Other: _____

           D. J. K.



Defendants' Exhibit 13

PSC Form 5



# STATE OF ALABAMA
ALABAMA PUBLIC SERVICE COMMISSION
P.O. BOX 304260
MONTGOMERY, ALABAMA 36130-4260

WALTER L. THOMAS, JR.
SECRETARY

JIM SULLIVAN, PRESIDENT
JAN COOK, ASSOCIATE COMMISSIONER
GEORGE C. WALLACE, JR., ASSOCIATE COMMISSIONER

## M E M O R A N D U M

DATE: *February 13, 2003*

TO: *Mr. Gregory Kelly*
*Energy Division*

FROM: Dorinda J. Kepler
PSC Personnel

SUBJECT: SALARY ADJUSTMENT

Effective *1-25-03*, your salary was adjusted as follows:

From: $ *1467.80* biweekly

To: $ *1540.60* biweekly (grade *77*, step *3*)

This adjustment is being made due to the reason checked below and will appear on your *2/21/03* paycheck.

✓ Probationary Increase

_____ Promotional Increase

_____ Annual Increase

_____ Merit Increase

_____ Cost-of-Living Adjustment

_____ Other: _____

D. J. K.



Defendants'
Exhibit 14

PSC Form 5



# STATE OF ALABAMA
### ALABAMA PUBLIC SERVICE COMMISSION
P.O. BOX 304260
MONTGOMERY, ALABAMA 36130-4260

WALTER L. THOMAS, JR.
SECRETARY

JIM SULLIVAN, PRESIDENT
JAN COOK, ASSOCIATE COMMISSIONER
GEORGE C. WALLACE, JR., ASSOCIATE COMMISSIONER

## M E M O R A N D U M

DATE: *6-18-04*

TO: *Mr. Gregory Kelly*
*Energy Division*

FROM: Dorinda J. Kepler *DJK*
PSC Personnel

SUBJECT: SALARY ADJUSTMENT

### PERSONAL

Effective *5-29-04*, your salary was adjusted as follows:

From: $ *1540.60* biweekly

To: $ *1616.90* biweekly (grade *79*, step *1*)

This adjustment is being made due to the reason checked below and will appear on your *6-25-04* paycheck.

_____ Probationary Increase

__✓__ Promotional Increase

_____ Annual Increase

_____ Merit Increase

_____ Cost-of-Living Adjustment

_____ Other: _____

D. J. K.

Defendants' Exhibit 15

PSC Form 5



# STATE OF ALABAMA
ALABAMA PUBLIC SERVICE COMMISSION
P.O. BOX 304260
MONTGOMERY, ALABAMA 36130-4260

JIM SULLIVAN, PRESIDENT

JAN COOK, ASSOCIATE COMMISSIONER

GEORGE C. WALLACE, JR., ASSOCIATE COMMISSIONER

WALTER L. THOMAS, JR.
SECRETARY

## M E M O R A N D U M

DATE:      December 30, 2004

TO:        *Mr. Gregory Kelly*
           *Energy Division*

FROM:      Dorinda J. Kepler
           PSC Personnel

SUBJECT:   SALARY ADJUSTMENT

### PERSONAL

Effective 12/11/04, your salary was adjusted as follows:

    From:  $ *1616.90*  biweekly

    To:    $ *1698.90*  biweekly (grade *79*, step *3*)

This adjustment is being made due to the reason checked below and will
appear on your 01/07/05 paycheck.

        X    Probationary Increase

        ___  Promotional Increase

        ___  Annual Increase

        ___  Merit Increase

        ___  Cost-of-Living Adjustment

        ___  Other: _____

                D. J. K.


Defendants' Exhibit 16



PSC Form 5

# STATE OF ALABAMA
ALABAMA PUBLIC SERVICE COMMISSION
P.O. BOX 304260
MONTGOMERY, ALABAMA 36130-4260

JIM SULLIVAN, PRESIDENT

JAN COOK, ASSOCIATE COMMISSIONER

GEORGE C. WALLACE, JR., ASSOCIATE COMMISSIONER

WALTER L. THOMAS, JR.
SECRETARY

## M E M O R A N D U M

DATE:     September 26, 2005

TO:       *Mr. Gregory Kelly*
          *Energy Division*

FROM:     Dorinda J. Kepler
          Personnel Section

SUBJECT:  SALARY ADJUSTMENT

### PERSONAL

*Effective September 3, 2005, your salary was adjusted as follows:*

From:  $ 1698.90  biweekly

To:    $ 1800.80  biweekly (step 3 of pay grade 79 )

*This adjustment is being made due to the reason checked below and will appear on your October 7 paycheck.*

_____ Probationary Increase

_____ Promotional Increase

_____ Annual Increase

_____ Merit Increase          6%

  X   Cost-of-Living Adjustment

_____ Other: _____

          D. J. K.



Defendants' Exhibit 17

PSC Form 5



### STATE OF ALABAMA
ALABAMA PUBLIC SERVICE COMMISSION
P.O. BOX 304260
MONTGOMERY, ALABAMA 36130-4260

JIM SULLIVAN, PRESIDENT

JAN COOK, ASSOCIATE COMMISSIONER

GEORGE C. WALLACE, JR., ASSOCIATE COMMISSIONER

WALTER L. THOMAS, JR.
SECRETARY

## M E M O R A N D U M

DATE:    _12/30/05_

TO:    _Mr. Gregory Kelly_

_Energy Division_

FROM:    Dorinda J. Kepler
Personnel Section

SUBJECT:  SALARY ADJUSTMENT

### PERSONAL

Effective _12/10/05_, your salary was adjusted as follows:

From:    $ _1800.80_   biweekly

To:    $ _1891.80_   biweekly (step _5_ of pay grade _79_ )

This adjustment is being made due to the reason checked below and will appear on your
_1-6-06_ paycheck.

_____ Probationary Increase

_____ Promotional Increase

_✓_ Annual Increase

_____ Merit Increase

_____ Cost-of-Living Adjustment

_____ Other: _____

D. J. K.

Defendants' Exhibit 18

PSC Form 5



# STATE OF ALABAMA
ALABAMA PUBLIC SERVICE COMMISSION
P.O. BOX 304260
MONTGOMERY, ALABAMA 36130-4260

WALTER L. THOMAS, JR.
SECRETARY

JIM SULLIVAN, PRESIDENT
JAN COOK, ASSOCIATE COMMISSIONER
GEORGE C. WALLACE, JR., ASSOCIATE COMMISSIONER

## MEMORANDUM

DATE:  September 22, 2006

TO:  *Mr. Gregory Kelly*
*Energy*

FROM:  Dorinda J. Kepler
Personnel Section

SUBJECT:  SALARY ADJUSTMENT

### PERSONAL

Effective September 1, 2006, your salary was adjusted as follows:

From:  $ *2049.50* semi-monthly

To:  $ *2152.00* semi-monthly (step *5* of pay grade *79* )

This adjustment is being made due to the reason checked below and will appear on your October 2 paycheck.

_____ Probationary Increase

_____ Promotional Increase

_____ Annual Increase

_____ Merit Increase

_XX_ Cost-of-Living Adjustment

_____ Other: _____

D.J.K.

Defendants' Exhibit 19



PSC Form 5

# STATE OF ALABAMA
### ALABAMA PUBLIC SERVICE COMMISSION
P.O. BOX 304260
MONTGOMERY, ALABAMA 36130-4260

JIM SULLIVAN, PRESIDENT

JAN COOK, ASSOCIATE COMMISSIONER

SUSAN D. PARKER, PhD, ASSOCIATE COMMISSIONER

WALTER L. THOMAS, JR.
SECRETARY

## MEMORANDUM

DATE:     12/22/06

TO:       Mr. Gregory Kelly

          Energy Division

FROM:     Dorinda J. Kepler
          Personnel Section

SUBJECT:  SALARY ADJUSTMENT

### PERSONAL

Effective _____12/1/06_____, your salary was adjusted as follows:

From:   $2152.00_____ semi-monthly

To:     $2259.30_____ semi-monthly (step _7_ of pay grade _79_)

This adjustment is being made due to the reason checked below and will appear on your
____12/29/06____ paycheck.

_____ Probationary Increase

_____ Promotional Increase

__X__ Annual Increase

_____ Merit Increase

_____ Cost-of-Living Adjustment

_____ Other: _____

D. J. K.

Defendants' Exhibit 20

 

PSC Form 5

**STATE OF ALABAMA**
ALABAMA PUBLIC SERVICE COMMISSION
P.O. BOX 304260
MONTGOMERY, ALABAMA 36130-4260

JIM SULLIVAN, PRESIDENT

JAN COOK, ASSOCIATE COMMISSIONER

SUSAN D. PARKER, PhD, ASSOCIATE COMMISSIONER

WALTER L. THOMAS, JR.

SECRETARY

## M E M O R A N D U M

DATE:    August 28, 2007

TO:    *Mr. Gregory Kelly*
    *Energy Division*

FROM:    Dorinda J. Kepler
    Personnel Section

SUBJECT:    SALARY ADJUSTMENT

### PERSONAL

Effective  September 1, 2007 , your salary was adjusted as follows:

From:    $2359.30 semi-monthly

To:    $2338.40  semi-monthly (step _7_ of pay grade _79_ )

This adjustment is being made due to the reason checked below and will appear on your
  October 1  paycheck.

_____ Probationary Increase

_____ Promotional Increase

_____ Annual Increase

_____ Merit Increase

3.5%  Cost-of-Living Adjustment

_____ Other: _____

D. J. K.

Defendants'
Exhibit 21



# STATE OF ALABAMA
### ALABAMA PUBLIC SERVICE COMMISSION
P.O. BOX 304260
MONTGOMERY, ALABAMA 36130-4260

May 12, 2004

JIM SULLIVAN, PRESIDENT
JAN COOK, ASSOCIATE COMMISSIONER
GEORGE C. WALLACE, JR., ASSOCIATE COMMISSIONER

WALTER L. THOMAS, JR.
SECRETARY

## MEMORANDUM

To:        Ms. Dorinda Kepler,
           PSC Personnel

Through:   Ms. Janice M. Hamilton, Director
           Energy Division

From:      Mr. John Free, Supervisor
           Electricity Section

Re:        Promotional Request

    I would like to request that the necessary procedures be undertaken to promote Mr. Gregory Kelly, Utility Engineering Specialist I, to the position of Utility Engineering Specialist II as soon as possible. Please let me know if you should need any additional information.

Cc: Ms. Janice M. Hamilton
    Mr. Gregory Kelly
    File



Defendants' Exhibit 39



### STATE OF ALABAMA
ALABAMA PUBLIC SERVICE COMMISSION
P.O. BOX 304260
MONTGOMERY, ALABAMA 36130-4260

WALTER L. THOMAS, JR.
SECRETARY

JIM SULLIVAN, PRESIDENT
JAN COOK, ASSOCIATE COMMISSIONER
GEORGE C. WALLACE, JR., ASSOCIATE COMMISSIONER

June 1, 2004

PERSONAL

Mr. Gregory Kelly
Energy Division
Public Service Commission
Montgomery, AL 36130

Dear Mr. Kelly:

You have been appointed to the classification of utility engineering specialist II, class code 20522, at the Alabama Public Service Commission, effective May 29, 2004, at a salary of $1616.90 biweekly ($42,039.40 annually). This is a two-step promotional increase to step 1 of pay grade 79. The increase should appear in your June 25 paycheck.

Your status during at least a 6-month period beginning on your appointment date is probationary. Your supervisor will evaluate your job performance at three months and six months. The final probationary appraisal will determine your eligibility for permanent status.

Congratulations on this promotion. I wish you continued success in your career, and invite you to contact this office with any personnel-related matters you may encounter.

Sincerely,

Dorinda J. Kepler
Personnel Section

By Hand Mail

pc Certification Division
    Ms. Janice M. Hamilton (confidential)
    Mr. John Free (confidential)





# STATE OF ALABAMA
## PERSONNEL DEPARTMENT
300 Folsom Administrative Building
Montgomery, Alabama 36130-4100
Telephone: (334) 242-3389 Fax: (334) 242-1110



Tommy Flowers
State Personnel Director
Jackie Graham
Deputy Director

September 24, 2004



MAY 2005
RECEIVED
Energy Division

State Personnel Board
Joe Dickson
Harry McMillan
John McMillan
Joyce P. O'Neal
Horace Powell

Mr. Jim Sullivan, President
Ms. Jan Cook, Commissioner
Mr. George C. Wallace, Commissioner
Alabama Public Service Commission
Montgomery, Alabama

Dear Commissioners:

At its meeting on September 20, 2004, the State Personnel Board took the following actions:

* Revised specifications and changed the titles for the following classifications:

| Code | Current Title | Approved Title |
|------|---------------|----------------|
| 11251 | Public Utilities Analyst I | Public Utility Analyst I |
| 11252 | Public Utilities Analyst II | Public Utility Analyst II |
| 11253 | Public Utilities Analyst III | Public Utility Analyst III |

* Abolished the classes of Public Utilities Auditor II, class code 11262, and Public Utilities Auditor III, class code 11263, upon the transfer of these employees to the Public Utility Analyst series.

* Revised specifications and changed the titles for the following classifications:

| Code | Current Title | Approved Title |
|------|---------------|----------------|
| 20503 | Utility Engineering Tech. Supv. | Public Utility Field Technician, Sr. |
| 20504 | Utility Engineering Technician | Public Utility Field Technician |
| 20521 | Utilities Engineering Specialist I | Public Utility Technical Specialist |
| 20522 | Utilities Engineering Specialist II | Public Utility Technical Spec., Sr. |
| 20525 | Utilities Engineering Director | Public Utility Regulatory Advisor |

Sincerely,

*T. Flowers*

Tommy Flowers
State Personnel Director

Defendants' Exhibit 44

c: Ms. Dorinda Kepler

# Executive Summary: 'What is the 2005 market value for Public Utility Technical Specialists?'

### January 4, 2005

Report To: John D. Free, Public Utility Analyst Manager
Energy Division

From: Gregory Kelly, Utility Technical Specialist II
Energy Division


Defendants'
Exhibit 45

On several occasions over a period of sixteen (16) months, the topic of 'what is the market value for a public utility technical specialist has been discussed. What is a public utility technology specialist? A public utility technical specialist is a degreed electrical engineer who primary focus is on power and control systems. Power systems are transmission and distribution systems. These systems are high voltage and connected in a closed loop or grid system. Power control systems employ automation, instrumentation and linear feedback (real time data collection system) to operate and monitor these closed loop systems. Generating units, power plants, and power distribution facilities are examples of closed loop power systems.

Recently, several jobs at the APSC (transportation, consumer services, accounting & finance), and other state agencies have been re-evaluated or created by the State Personnel Board (please see attached supporting information). However, the engineering positions at APSC have not been re-evaluated for twenty-five (25) years; only COLAs (cost of living adjustments) have been received during this time. COLAs are not pay adjustments to the increased market value of a job classification. An in-depth study of internal and external job classifications was conducted to determine the fair market value for a public utility technology specialist position.

## Summary of Findings

- Public utility engineers rank #2 (behind nuclear engineers) in average national technology pay
- The technical specialist positions are -31.8% & -37.1% below market value
- The State ranks public utility engineers last behind all other engineering and computer science job classifications
- A public utility technical assistance (non-degreed position) is now paid more than a degreed public utility engineer
- A senior public utility analyst (senior accountant) is paid approximately the same salary as a senior public utility engineer

**Recommendations**

These results show that the public utility engineer salary is significantly undervalued to the market and other job classifications. A formal request should be sent to state personnel requesting the following:

- Re-evaluation of the PSC technical specialist positions
- Pay adjustment request to the southeastern average

These recommendations are on par with established procedures and past practices (see attached classification and pay issues, dated September 20, 2004).

**Supporting Information**

Attached are several documents which support these findings and recommendations:

- Recommendation Report
- 2005 Public Utility Engineering Salaries (0 & 4 years of experience)
- 2005 Job Comparison (tech & non-tech professionals)
- Classification and Pay Issue (dated September 20, 2004)
  & Request Letter

Cc:  Janice M. Hamilton, Director of the Energy Division
     Alabama Public Service Commission
     File

January 4, 2005

# Recommendation Report: 'What is the 2005 market value for Public Utility Technical Specialists?'

This recommendation report will analyze and summarize the 2005 market value for engineers, computer science and financial professionals. This report will compare the market job classifications in several areas: education requirements, area of responsibility, years of experience, 2005 job market value, and states pay performance versus the market.

| Job Title (Code) (Current Title) | Education (required study and/or eighth grade completed) | Areas of Responsibility | Years of Experience | Salary Range | % State over/under Nat'l Avg |
|---|---|---|---|---|---|
| **IT System Classifications** | | | | | |
| IT Systems, Associate (10527) | 2-yrs College (info systems) | Software & Programming | 2 yrs | 76 79 | 0.19% |
| IT Systems, Specialist (10528) | 4-yrs College (info systems) | Software & Programming | 4 yrs | 82 | -0.01% |
| IT Systems, Specialist Sr (10529) | 4-yrs College (info systems) | Software & Programming | 8 yrs | 84 | -3.63% |
| **ALDOT Classifications** | | | | | |
| Transp. Tech, Sr. (20482) | Tech Sch (High Sch or GED) | Road & Bridge Constr. | 12 yrs | 757/8 | -1.72% |
| Civil Engineer 1 (20433) | 4-yrs College (CE-Engineering) | Road & Bridge Constr. | 2 yrs | 81 | -4.95% |
| Civil Engineer 2 (20434) | 4-yrs College (CE-Engineering) | Road & Bridge Constr. | 4 yrs | 83 | -10.07% |
| Civil Engineer 3 (20435) | 4-yrs College (CE-Engineering) | Road & Bridge Constr. | 8 yrs | 87 | -1.18% |
| **ADEM Classifications** | | | | | |
| Environmental Engineer 3 (20673) | 4-yrs College (CE-Engineering) | Air & Water Quality Mgt | 4 yrs | 81 | -20.13% |
| Environmental Engineer 4 (20674) | 4-yrs College (CE-Engineering) | Air & Water Quality Mgt | 5 yrs | 84 | -16.15% |
| Environmental Mgt Engineer (20635) | 4-yrs College (CE-Engineering) | Air & Water Quality Mgt | 8 yrs | 87 | -11.18% |
| **APSC Classifications** | | | | | |
| Public Utilities Analyst 3 (11253) | 4-yrs College (Business) | Accounting & Finance | 5 yrs | 78 | -11.46% |
| Public Utilities Analyst Mgt (11254) | 4-yrs College (Business) | Accounting & Finance | 5 yrs | 81 | -6.28% |
| Public Utility Tech Ass. (xxxxxx) | Tech Sch (High Sch or GED) | Utility Technology | 8 yrs | 80 | 3.76% |
| Public Utility Tech Spec (20521)[1] | 4-yrs College (EE-Engineering) | Power Systems & Controls | 2 yrs | 83.[2] | -3.40% |
| Public Utility Tech Spec, Sr. (20522)[1] | 4-yrs College (EE-Engineering) | Power Systems & Controls | 4 yrs | 85[2] | -6.45% |

**Summary of Findings:** [1] Jobs are 31.76% and 37.11% below market value. These pay ranges have not been evaluated for 25 years. Jobs in blue recently re-evaluated and raised to the S/E average salary. The average state job is +/- 5 % of national average. A senior public utility analyst (senior accountant) is now paid approximately the same salary as a senior public utility engineer. The state now ranks public utility engineers last in technology paid behind all other engineers and computer science professionals. A public utility technical assistance (non-degreed) is now paid more than a degreed public utility engineer. **Recommendation:** [2] Increase the salary range to levels #83 & #85. Jobs are now 3.4% and 6.45% below market value. Rationale.: Based on information obtained from other S/E states, an internal review of similar job classifications, the average 2005 public utility engineer's salary (starting and with 4 yrs of experience).

January 4, 2005

## 2005 National Median Starting Salary

Engineers, Computer Science & Accounting Jobs

| Job Title | National Rankings | State Rankings | Highest Level of Education | Median Starting Salary |
|---|---|---|---|---|
| Engineers & Computer Sciences (Technology) | | | | |
| Nuclear Engineers | 1 | N/A | 4-yrs College (Engineering) | $56,499.00 |
| Electrical Engineers | 2 | 5 | 4-yrs College (Engineering) | $54,093.00 |
| Chemical Engineers | 3 | N/A | 4-yrs College (Engineering) | $52,278.00 |
| Mechanical Engineers | 4 | 4 | 4-yrs College (Engineering) | $51,543.00 |
| Industrial Engineers | 5 | N/A | 4-yrs College (Engineering) | $51,350.00 |
| Software Engineers | 6 | N/A | 4-yrs College (Engineering) | $50,173.00 |
| Environmental Engineers | 7 | 3 | 4-yrs College (Engineering) | $49,438.00 |
| Aerospace Engineers | 8 | N/A | 4-yrs College (Engineering) | $49,401.00 |
| IT Systems | 9 | 2 | 4-yrs College (Info systems) | $47,957.00 |
| Civil Engineers | 10 | 1 | 4-yrs College (Engineering) | $47,857.00 |
| Accounting & Finance (non-technology) | | | | |
| Civil Engineering Techs | 1 | 1 | Tech Sch (High Sch or GED) | $36,654.00 |
| Electrical Engineering Techs | 2 | 2 | Tech Sch (High Sch or GED) | $35,097.00 |
| Accountants | 1 | 1 | 4-yrs College (Business) | $38,284.00 |
| Accountant Techs | 2 | 2 | 2-yrs College (Business) | $27,928.00 |

January 4, 2005

## 2005 Southeastern (S/E) Median Salary,
### Electrical Engineers (4yrs min of Experience)
### Power & Control Systems

| State | Survey City | Rank | Median Salary |
|---|---|---|---|
| | | Southeastern Average | Median (50th %) Salary Range |
| Texas (no state income tax) | Houston | 1 | $84,676 |
| Florida (no state income tax) | Boca Raton | 2 | $81,423 |
| Georgia | Atlanta | 3 | $81,748 |
| Virginia | Richmond | 6 | $81,260 |
| Tennessee (tax only interest & dividends) | Memphis | 5 | $81,179 |
| Kentucky | Louisville | 4 | $81,016 |
| North Carolina | Raleigh-Durham | 7 | $80,284 |
| Louisiana | New Orleans | 8 | $79,470 |
| Alabama | Birmingham | 9 | $78,738 |
| West Virginia | Charleston | 10 | $78,332 |
| South Carolina | Columbia | 11 | $77,844 |
| Mississippi | Pascagoula | 12 | $76,624 |
| Arkansas | Little Rock | 13 | $75,566 |
| | Comparison of Different Groups ($) | | |
| National Average (Nat. Avg) | | | $81,341 |
| Southeastern (S/E Avg w/o Alabama) | | | $79,952 |
| Alabama (AL Avg) | | | $78,373 |
| | Comparison of Different Groups (%) | | |
| % AL Avg over/ under S/E Avg | | | -1.52% |
| % AL Avg over/ under Nat Avg | | | -3.20% |

## Engineering & Computer Science (Technology/Construction Competitions)

January 4, 2005

| Job Title | (Code) | Education (Field of Study and/or Highest Grade Completed) | Years of Experience | Salary Range | State Median | National Median | % State over/ under National Avg |
|---|---|---|---|---|---|---|---|
| **Computer Science** (Info Technology) | | | | | | | |
| IT Systems,Tech Sr. | (10526) | Tech Sch (High Sch or GED) | 2 yrs | 74 | $ 40,055.00 | $ 35,381.00 | 13.21% |
| IT Systems, Associate | (10527) | 2-yrs College (Info systems) | 2 yrs | 7679 | $ 47,543.00 | $ 47,957.00 | -0.86% |
| IT Systems Specialist | (10528) | 4-yrs College (Info systems) | 4 yrs | 82 | $ 60,964.00 | $ 61,585.00 | -1.01% |
| IT Systems Specialist, Sr | (10529) | 4-yrs College (Info systems) | 8 yrs | 84 | $ 70,686.00 | $ 74,112.00 | -4.62% |
| **Civil Engineers** (Road & Bridge Construction) | | | | | | | |
| Transp. Tech, Sr. | (20482)[2] | Tech Sch (High Sch or GED) | 12 yrs | 7578 | $ 45,286.00 | $ 47,317.00 | -4.29% |
| Grad Civil Engineer | (20425)[2] | 4-yrs College (CE-Engineering) | 0 yrs | 7578 | $ 45,286.00 | $ 47,857.00 | -5.37% |
| Civil Engineer 1 | (20433)[2] | 4-yrs College (CE-Engineering) | 2 yrs | 81 | $ 56,511.00 | $ 59,590.00 | -5.17% |
| Civil Engineer 2 | (20434)[2] | 4-yrs College (CE-Engineering) | 4 yrs | 83 | $ 65,686.00 | $ 73,215.00 | -10.28% |
| Civil Engineer 3 | (20435)[2] | 4-yrs College (CE-Engineering) | 8 yrs | 87 | $ 88,405.00 | $ 89,462.00 | -1.18% |
| **Environmental Engineers** (Air & Water Quality) | | | | | | | |
| Environmental Engineer 2 | (20672) | 4-yrs College (CE-Engineering) | 2 yrs | 78 | $ 48,718.00 | $ 58,089.00 | -16.13% |
| Environmental Engineer 3 | (20673) | 4-yrs College (CE-Engineering) | 4 yrs | 81 | $ 56,511.00 | $ 70,971.00 | -20.37% |
| Environmental Engineer 4 | (20674) | 4-yrs College (CE-Engineering) | 6 yrs | 84 | $ 70,686.00 | $ 84,302.00 | -16.15% |
| Environmental Mgt Engineer | (20635) | 4-yrs College (CE-Engineering) | 8 yrs | 87 | $ 88,405.00 | $ 99,531.00 | -11.18% |
| **Electrical Engineers** (Power Systems & Controls) | | | | | | | |
| Public Utility Field Tech Sr. | (20503) | Tech Sch (High Sch or GED) | 8 yrs | 77 | $ 46,402.00 | $ 50,547.00 | -8.20% |
| Public Utility Tech Ass. | (xxxxx)[2] | Tech Sch (High Sch or GED) | 8 yrs | 80 | $ 52,447.00 | $ 50,547.00 | 3.76% |
| Public Utility Tech Spec | (20521)[1] | 4-yrs College (EE-Engineering) | 2 yrs | 77 | $ 46,402.00 | $ 67,997.00 | -31.76% |
| Public Utility Tech Spec, Sr. | (20522)[1] | 4-yrs College (EE-Engineering) | 4 yrs | 79 | $ 51,155.00 | $ 81,341.00 | -37.11% |
| **State Average** | | | | | | | -5.86% |

[1] Jobs have not been evaluated for 25 years & not included in state average calculations    [2] Jobs recently re-evaluated or created by State Personnel



## STATE OF ALABAMA
### ALABAMA PUBLIC SERVICE COMMISSION
P.O. BOX 304260
MONTGOMERY, ALABAMA 36130-4260

May 17, 2005

WALTER L. THOMAS, JR.
SECRETARY

JIM SULLIVAN, PRESIDENT
JAN COOK, ASSOCIATE COMMISSIONER
GEORGE C. WALLACE, JR., ASSOCIATE COMMISSIONER

## MEMORANDUM

To:     Janice M. Hamilton, Director
        Energy Division

From:   Gregory Kelly, Utilities Engineering Specialist II
        Energy Division

Re:     Utilities Engineering Specialist II Pay Range

As per our previous discussions, the above pay range dates back approximately 25 years. The only revisions taken on this pay-rate thus far has been COLAs (cost of living adjustments).

This position is now 37.83% below fair market value. On average, state employees' salaries fall within 5% of the southeastern average for similar job classifications.

I am requesting that this position receive the same equitable and fair consideration as most positions have in the Commission and State Government.

Your assistance in this matter will be most appreciated. If any additional information is needed, please advise.

GK: *GK*

CC:     Jim Sullivan, President
        Jan Cook, Commissioner
        George C. Wallace, Jr., Commissioner
        John D. Free, Utility Analyst Manager
        Dorinda Kepler, Personnel Assistant III





**STATE OF ALABAMA**
ALABAMA PUBLIC SERVICE COMMISSION
P.O. BOX 304260
MONTGOMERY, ALABAMA 36130-4260

May 18, 2005

JIM SULLIVAN, PRESIDENT
JAN COOK, ASSOCIATE COMMISSIONER
GEORGE C. WALLACE, JR., ASSOCIATE COMMISSIONER

WALTER L. THOMAS, JR.
SECRETARY

## *M E M O R A N D U M*

To:   Mr. Gregory Kelly
      Electricity Section

From:  Janice M. Hamilton, Director
      Energy Division

Re:   "Utilities Engineering Specialist II" Pay Range

Please be informed that there is no longer any such "Utility Engineering Specialist II" position within State Service. Additionally, I have received and thoroughly examined all of the comparative analyses of various other engineering positions that you have prepared for consideration in a salary range increase for your job classification.

Even though it is true that the salary range for your job classification has not been changed in several years, I am puzzled as to why this action is so urgent to you in light of the fact that you were awarded a promotion within the past several months. Since your promotion, I've had difficulty seeing the same level of enthusiasm, initiative and productivity in your work that you apply to your quest for a salary increase.

As it pertains to the Technical classifications in the Energy Division, there is no plan on my part to request a salary study for the foreseeable future. At the appropriate time, however, when it benefits the Commission as a whole, such a request will be initiated from the division's management level.

Cc:   President Jim Sullivan
      Commissioner Jan Cook
      Commissioner George C. Wallace, Jr.
      Mr. John D. Free
      Ms. Dorinda J. Kepler
      File



Defendants' Exhibit 47



**STATE OF ALABAMA**
ALABAMA PUBLIC SERVICE COMMISSION
P.O. BOX 304260
MONTGOMERY, ALABAMA 36130-4260

May 18, 2005

JIM SULLIVAN, PRESIDENT
JAN COOK, ASSOCIATE COMMISSIONER
GEORGE C. WALLACE, JR., ASSOCIATE COMMISSIONER

WALTER L. THOMAS, JR.
SECRETARY

M E M O R A N D U M

To:    Janice M. Hamilton, Director
       Energy Division

From:  Gregory Kelly
       Electricity Section

Re:    "Utilities Engineering Specialist II" Pay Range

In regards to your memo dated May 18, 2005, I am very confused to what my official job title is at the Commission. Prior to your memo, I have never been notified by you, supervision or personnel regarding this job title change.

My latest employee performance appraisal form (covering the period from November, 29 2004 to November 28, 2005), and the recent revised employees' handbook (dated April 12, 2005) both list the job title of Utilities Engineering Specialist II. My recently mentioned promotion in your memo also was to the position of Utilities Engineering Specialist II. This job title clearly states that a degree in engineering with four years of experience is required.

In regards to your memo linking promotions and pay ranges, I respectfully believe these matters are two separate issues. This pay increase from a promotion is still based on out dated 25 year information.

My background and education are in the field of engineering. My job responsibilities here at the Commission are in the field of engineering. I am completely perplexed to what education requirements, skills, experiences and abilities are required for by my present job position. Please inform me of what my current job title is, education requirements and the corresponding duties are.

I am still hopeful that this position can receive the same equitable and fair consideration as most positions have in the Commission and State Government.

cc:    President Jim Sullivan
       Commissioner Jan Cook
       Commissioner George C. Wallace, Jr.
       Ms. John Free
       Ms. Dorinda J. Kepler





# STATE OF ALABAMA
## ALABAMA PUBLIC SERVICE COMMISSION
P.O. BOX 304260
MONTGOMERY, ALABAMA 36130-4260

May 23, 2005



WALTER L. THOMAS, JR.
SECRETARY

JIM SULLIVAN, PRESIDENT

JAN COOK, ASSOCIATE COMMISSIONER

GEORGE C. WALLACE, JR., ASSOCIATE COMMISSIONER

## M E M O R A N D U M

To:      Janice M. Hamilton, Director
         Energy Division

From:    Gregory Kelly
         Energy Division

Re:      "Utilities Engineering Specialist II" Pay Range

Please be advised that I have received your memo dated May 20, 2005, concerning the above-mentioned position. Additionally, please be informed that I have received a copy of the revised specifications dated July 2, 2004 for this position (Class Code 20522). This information was obtained from the PSC Personnel Department.

I submit that the job title has changed. However, this position (Class Code 20522) remains the same. These requirements are consistent with those of an experienced engineer or technical specialist. These specifications confirm my original analysis that the pay scale is outdated. As per the attached specifications, the job compensable factors (education requirements, skills, experiences, and abilities) are determinants for salary.

I am troubled by these findings because my supervisor is an accountant. This position (Class Code 11254) does not require my job qualifications. However, all of my work and duties are reported to this position. I respectfully ask that my position be supervised by a technical professional who has a vested interest in upgrading the salary of this position (Class Code 20522). As previously stated, the pay scale for my position dates back approximately 25 years.

I am also concerned that I was not allowed to participate in the re-evaluation process. My participation would have eliminated the confusion.

I respectfully ask that you reconsider your decision and request a salary study for my position (Class Code 20522). Please consider these new findings and the previously submitted "Executive Summary Analysis" dated January 4, 2005 in your decision making.

I am still hopeful that this position (Class Code 20522) can receive the same equitable and fair consideration as most jobs have in the Commission and State Government.

Attachment

cc:      President Jim Sullivan
         Commissioner Jan Cook
         Commissioner George C. Wallace, Jr.
         Mr. John D. Free
         Ms. Dorinda J. Kepler



Defendants'
Exhibit 50

*Public Utility Technical Specia...*

TITLE: PUBLIC UTILITY SENIOR SPECIALIST                      CODE: 20522

## DEFINITION

This is advanced disciplined professional work with power to include electricity, natural gas, and water.

Employees in this class perform a variety of complex procedural duties associated with the planning, location, design, or construction of utility projects. Work involves monitoring, performing, reviewing, or monitoring operational studies; conducting location investigations; and supervising the preparation and review of plans and specifications. Assignments require the independent selection of courses of action for which well-established guidelines may not be available. Supervision is normally exercised over professional and technical personnel. Work is assigned in broad outline by an administrative supervisor who reviews completed work for engineering soundness and satisfactory completion of assigned projects.

## EXAMPLES OF WORK PERFORMED (Any one position may not include all of the duties listed, nor do the examples cover all of the duties which may be performed.)

Supervises and coordinates programs to ensure that the construction, operation, and services of companies regulated by the commission conform with established laws, rules, and regulations.

Advises field staff regarding current issues of concern in the utility industry.

Participates in proceeding of the Commission where specialized technical knowledge of the utility industry is required.

Assists in the formulation or interpretation of Commission policies regarding the utility industry.

Stays abreast of all developments in the utility area, and advises other members of the program area.

Assists in the development of training programs pertaining to energy industry.

Reviews field engineering reports regarding utility companies and makes appropriate recommendations.

Assists in formulating the staff position regarding proceedings before the Commission; prepares engineering evidence, testimony, and cross-examination questions regarding cases involving utility industry; acts as an expert witness as required.

Recommends service, policies, and standards for Commission approval.

Conducts studies of plant property, inventories, and construction, appraising value and physical conditions and determining compliance with approved policies and standards.

Represents the Commission in conferences with utility companies regarding areas of concern.

Participates in industry association meetings to stay abreast of modern trends and practices.

Advises other divisions regarding evaluations of property and inventories, rate changes, and depreciation rates in the utility industries.

Performs related work as assigned.

## COMPENSABLE FACTORS (The following statements are provided in order to identify compensable factors. Minimum qualifications utilized for selection purposes will be determined as part of an examination job analysis procedure.)

Graduation from an accredited four-year college or university with major course work in engineering, preferably in electrical, mechanical, or civil engineering.

Considerable progressively responsible professional engineering experience in the telecommunication, gas, or electric utility industry, including experience in a supervisor capacity.

## *SPECIAL REQUIREMENT

Eligibility for licensure as a professional engineer by the Alabama Board for the Registration of Professional Engineers and Land Surveyors.

REVISED: 7/04





### STATE OF ALABAMA
ALABAMA PUBLIC SERVICE COMMISSION
P.O. BOX 304260
MONTGOMERY, ALABAMA 36130-4260

May 23, 2005

JIM SULLIVAN, PRESIDENT
JAN COOK, ASSOCIATE COMMISSIONER
GEORGE C. WALLACE, JR., ASSOCIATE COMMISSIONER

WALTER L. THOMAS, JR.
SECRETARY

## M E M O R A N D U M

To:    Janice M. Hamilton, Director
       Energy Division

From:   Gregory Kelly  $GK$
        Energy Division

Re:    "Utilities Engineering Specialist II" Pay Range

As supplement to my memo dated May 23, 2003, I now strongly suggest that my position's career path is fractured and miss-aligned. I also submit that this position is compromised because it is located in a non-technical area in the electricity section. My supervisor is an accountant who has no vested interest in the field of technology. Please see attached organizational chart.

I respectfully request that my career path be restored by re-assigning this position to a technical area. I am also asking that my position report to an experienced technical professional. I submit this realignment would effectively allow me to compete on a level playing ground with the division's other technical position. The Commission has two job positions in this classification.

Attachment

cc:    President Jim Sullivan
       Commissioner Jan Cook
       Commissioner George C. Wallace, Jr.
       Mr. John D. Free
       Ms. Dorinda J. Kepler



Defendants' Exhibit 51



**Energy Division**
Organizational Structure
As of January 1, 2004



# STATE OF ALABAMA
ALABAMA PUBLIC SERVICE COMMISSION
P.O. BOX 304260
MONTGOMERY, ALABAMA 36130-4260

June 7, 2005

JIM SULLIVAN, PRESIDENT
JAN COOK, ASSOCIATE COMMISSIONER
GEORGE C. WALLACE, JR., ASSOCIATE COMMISSIONER

## M E M O R A N D U M

To:     President Jim Sullivan
        Commissioner Jan Cook
        Commissioner George C. Wallace, Jr.

From:   Gregory Kelly, GK
        Electricity Section

Re:     Formal Grievance Notice,
        Organization Structure



Defendants'
Exhibit 52

As follow-up to my memo dated May 23, 2005 to the Director of Energy, I am now writing to inform you that I wish to file a grievance. This action is being considered with regard to the following circumstances: fractured career path, un-leveled playing field, compromised job position, lost synergy, and communication difficulties (vertical and horizontal).

My position is fractured from its technical roots and misaligned into an accounting area (see attached organization chart). My section peers are accountants--not engineers. For future promotional opportunities, I am unduly competing with accountants, who have no vested interests in the field of technology.

The present organization structure has an un-leveled playing field for my position. The Special Projects Section position (Class Code 20522) has one layer of management and reports directly to the Director. My position (Class Code 20522) in the Electricity Section has two layers of management and reports to a non-technical manager position (Class Code 11254) who has limited technical skills. In the current system, my position is at an unfair competitive disadvantage.

My position is compromised because it has an onus to confirm in a non-tech environment. It is improperly infiltrated with non-tech tasks such as cost variance, cost comparisons, etc. Accounting issues such as rates and tariffs are more important, whereas highly technical problems are unjustly devalued in this system.

Synergy in technical matters is nonexistent in the system because teamwork is rare and limited. As a technical specialist, one must be able to cross the structure to effectively communicate with my technical peer. My job classification has no assistance with the highly complex technical tasks associated with this position. Technical jobs are unfairly isolated and separated in this system and do not enjoy any of the positive benefits associated with the division of labor.



Horizontal communication is a problem in this organizational structure. My section peers are unable to understand basic technical terms common among engineers—power factors, feeders, cut-outs, ring bus, etc. Highly complex technical matters are almost impossible to commute. Unfairly obligated, my position is taxed with the responsibilities to keep a non-tech manager and non-tech peers informed about technical issues.

Vertical communication is also difficult because my position is unduly disconnected in the organization structure. My job classification reports to a non-tech manager and the organizational scheme lacks a technical manager who would inform and protect the vested interests of my position (see attached organization chart). My job (Class Code 20522) has been unfairly neglected because a job study has not been conducted for 25 years (see memo dated May 18, 2005 from employee).

In this system, my position is also unjustly subjected to misinformation (i.e. handbook and appraisal forms outdated - see memo dated May 18, 2005 from employee) and sometimes given no information (i.e. job title and specification revisions- see memo dated May 20, 2005 from Director). Technology positions are prohibited from participating in staff budget meetings, and are not entitled to be involved in their own job re-evaluation process (see memo dated May 23, 2005 from employee).

I respectfully request that my career path be restored by reconnecting this position back to its technical roots. I am also requesting that my position reports to a technical manager who has vested interest in the field of technology. Prior to my inclusion in the staff, this position had always been located in a technical area and reported to an experienced technical manager

I believe that this realignment would improve communication and synergy in the organization. I also believe that this realignment would effectively allow me to compete for future promotional opportunities in the division with my own technical peers. Additionally, I submit that a job study with input from my technical peers should be considered to update the requirements and qualifications for my position.

I am entitled to a hearing to discuss these matters. I am also entitled, if I wish, to be accompanied by another work colleague.

Please reply within 10 days of the date of this letter.

Attachments

cc:     Ms. Janice M. Hamilton, Director Energy Division
        Mr. Tommy Flowers, Director State Personnel
        Ms. Dorinda J. Kepler, PSC Personnel



**Energy Division**
**Organizational Structure**
As of June 7, 2005

This position is fractured and misaligned from its technical roots into a non-technical area



## STATE OF ALABAMA
ALABAMA PUBLIC SERVICE COMMISSION
P.O. BOX 304260
MONTGOMERY, ALABAMA 36130-4260

WALTER L. THOMAS, JR.
SECRETARY

JIM SULLIVAN, PRESIDENT
JAN COOK, ASSOCIATE COMMISSIONER
GEORGE C. WALLACE, JR., ASSOCIATE COMMISSIONER

IN RE:    EMPLOYEE GRIEVANCE FILED BY MR. GREGORY KELLY


Defendants'
Exhibit 53

### Findings and Recommendations of the Grievance Committee

We, the Grievance Committee appointed by the Commission to hear the Employee Grievance filed by Mr. Gregory Kelly pursuant to Section VI of the Alabama Public Service Commission's Employee Guidelines, have considered said grievance as well as the testimony adduced at the August 10, 2005 hearing held on this matter and the documentation provided at said hearing.

Based on the evidence which we have been presented, we find that Mr. Kelly's grievance is without merit. Mr. Kelly made no allegations of wrongdoing or improper conduct by his immediate supervisor, Mr. John Free, or by the Energy Division director, Mrs. Janice Hamilton. His complaint appears to be that his position is not located in the Special Projects Section with the other Public Utility Technical Specialist in the Energy Division and that he is not directly supervised by another engineer. Mr. Kelly alleges that he has a "fractured career path, an unleveled playing field, compromised job position, lost synergy, and communication difficulties (vertical and horizontal)" due to this situation. We find that the evidence does not support Mr. Kelly's allegations.

Mr. Kelly testified that he was satisfied with his current job position — even remarking that it was a "dream job" — and that he had no desire to seek a higher level position at the Commission. We are therefore at a loss to understand his claims of fractured career path and unlevel playing field. The evidence indicated that Mr. Kelly is currently filling the senior engineering position available at the Commission. The current organizational structure (which has been in place since Mr. Kelly interviewed and was hired at the Commission) did not hinder him from being promoted to this position. The only higher level positions in the Energy Division (outside of Gas Pipeline Safety) are Public Utility Analyst Manager and Energy Division Director. Both of these positions are multi-discipline, involving the supervision of not only technical, but also financial and clerical disciplines. From the record, it appears that Mr. Kelly meets the education requirements for both of these positions. In fact, Mrs. Hamilton was promoted to Energy Division Director directly from the position currently held by Mr. Kelly. Given Mr. Kelly's promotion to the most senior engineering position at the Commission, his stated lack of desire to move to any higher level position, and his apparent qualification to fill such positions should he have a change of heart, we find his allegations of fractured career path and unlevel playing field completely lacking in merit.

Mr. Kelly's claim of compromised job position was equally confusing. Given his apparent satisfaction with the job, his promotion to the senior engineering classification, and his supervisor's satisfaction with his job performance, we find no compromise of Mr. Kelly's job position.

Mr. Kelly also claims that the current organization is responsible for "lost synergy" in the Energy Division. He testified that his structural separation from the other Public Utility Technical Specialist in the Energy Division and the fact that he does not report directly to Mrs. Hamilton is the

Findings and Recomme    ttions of the Grievance Committee
August 16, 2005
Page #2

cause of "lost synergy." Mrs. Hamilton, the Division Director, disagrees. She believes that the current organization is the most efficient and effective at the current time. Given that the Commission has delegated to Mrs. Hamilton the authority and the responsibility to organize and manage the Energy Division, we see no justification to substitute Mr. Kelly's judgment for Mrs. Hamilton's.

Finally, Mr. Kelly claims that he has both vertical and horizontal communication difficulties. Our analysis of the evidence leads us to find that any communications difficulties are not due to the organization at the Energy Division, Mr. Free, Mrs. Hamilton, or any of Mr. Kelly's co-workers, but are solely attributable to Mr. Kelly.

It appears that Mr. Kelly wishes this committee to substitute his judgment for Mrs. Hamilton's judgment on how the Energy Division should be organized solely for his personal satisfaction and convenience. There were no allegations of wrongdoing or improper conduct. We find no credible evidence of fractured career path, unlevel playing field, compromised job position, or lost synergy. We find that any communications difficulties are the sole perception of Mr. Kelly. We recommend that Mr. Kelly's request for his position to be moved to the Special Projects Section and his request that he report directly to a technical manager be denied.

In conclusion, we emphasize that the above findings, conclusions and recommendation are based on the documentary evidence submitted to us and the record compiled at the hearing in this matter. We feel that, based on the information we have, the unanimous findings, conclusions and recommendations set forth herein are just, reasonable and appropriate.


_____
Aquilla Spivey


_____
Debra Jackson


_____
Tom Jones


_____
Doug Dillard


_____
G. Scott Morris
Administrative Law Judge



### STATE OF ALABAMA
ALABAMA PUBLIC SERVICE COMMISSION
P.O. BOX 304260
MONTGOMERY, ALABAMA 36130-4260

August 23, 2005

WALTER L. THOMAS, JR.
SECRETARY

JIM SULLIVAN, PRESIDENT
JAN COOK, ASSOCIATE COMMISSIONER
GEORGE C. WALLACE, JR., ASSOCIATE COMMISSIONER

Mr. Gregory Kelly
Public Utility Technical Specialist
Alabama Public Service Commission
Montgomery, Alabama 36104

Dear Mr. Kelly:

We have reviewed the August 16, 2005 Findings and Recommendations of the Grievance Committee appointed to hear the Employee Grievance you filed pursuant to Section VI of the Commission's Employee Guidelines and Procedures Manual. We are unaware of any unusual or extenuating circumstances of record in this case which would justify a decision contrary to that reached by the Committee. Accordingly, we adopt and concur with the Findings and Recommendations of the Grievance Committee.

THE COMMISSION, THEREFORE, FINDS, That Mr. Gregory Kelly's request that his position be moved from the Electricity Section of the Energy Division to the Special Projects Section of the Energy Division is due to be denied.

THE COMMISSION FURTHER FINDS, That Mr. Gregory Kelly's request that he report directly to a technical manager is also due to be denied.

ALABAMA PUBLIC SERVICE COMMISSION

Jim Sullivan, President

Jan Cook, Commissioner

George C. Wallace, Jr., Commissioner

Defendants' Exhibit 54

JS/JC/GCWjr:eml



STATE OF ALABAMA
ALABAMA PUBLIC SERVICE COMMISSION
P.O. BOX 304260
MONTGOMERY, ALABAMA 36130-4260

JIM SULLIVAN, PRESIDENT
JAN COOK, ASSOCIATE COMMISSIONER
GEORGE C. WALLACE, JR., ASSOCIATE COMMISSIONER

WALTER L. THOMAS, JR.
SECRETARY

IN RE:     EMPLOYEE GRIEVANCE FILED BY MR. GREGORY KELLY

### Findings and Recommendations of the Grievance Committee

We, the Grievance Committee appointed by the Commission to hear the Employee Grievance filed by Mr. Gregory Kelly pursuant to Section VI of the Alabama Public Service Commission's Employee Guidelines, have considered said grievance as well as the testimony adduced at the August 10, 2005 hearing held on this matter and the documentation provided at said hearing.

Based on the evidence which we have been presented, we find that Mr. Kelly's grievance is without merit. Mr. Kelly made no allegations of wrongdoing or improper conduct by his immediate supervisor, Mr. John Free, or by the Energy Division director, Mrs. Janice Hamilton. His complaint appears to be that his position is not located in the Special Projects Section with the other Public Utility Technical Specialist in the Energy Division and that he is not directly supervised by another engineer. Mr. Kelly alleges that he has a "fractured career path, an unleveled playing field, compromised job position, lost synergy, and communication difficulties (vertical and horizontal)" due to this situation. We find that the evidence does not support Mr. Kelly's allegations.

Mr. Kelly testified that he was satisfied with his current job position— even remarking that it was a "dream job" – and that he had no desire to seek a higher level position at the Commission. We are therefore at a loss to understand his claims of fractured career path and unlevel playing field. The evidence indicated that Mr. Kelly is currently filling the senior engineering position available at the Commission. The current organizational structure (which has been in place since Mr. Kelly interviewed and was hired at the Commission) did not hinder him from being promoted to this position. The only higher level positions in the Energy Division (outside of Gas Pipeline Safety) are Public Utility Analyst Manager and Energy Division Director. Both of these positions are multi-discipline, involving the supervision of not only technical, but also financial and clerical disciplines. From the record, it appears that Mr. Kelly meets the education requirements for both of these positions. In fact, Mrs. Hamilton was promoted to Energy Division Director directly from the position currently held by Mr. Kelly. Given Mr. Kelly's promotion to the most senior engineering position at the Commission, his stated lack of desire to move to any higher level position, and his apparent qualification to fill such positions should he have a change of heart, we find his allegations of fractured career path and unlevel playing field completely lacking in merit.

Mr. Kelly's claim of compromised job position was equally confusing. Given his apparent satisfaction with the job, his promotion to the senior engineering classification, and his supervisor's satisfaction with his job performance, we find no compromise of Mr. Kelly's job position.

Mr. Kelly also claims that the current organization is responsible for "lost synergy" in the Energy Division. He testified that his structural separation from the other Public Utility Technical Specialist in the Energy Division and the fact that he does not report directly to Mrs. Hamilton is the

Findings and Recommendations of the Grievance Committee
August 16, 2005
Page #2

cause of "lost synergy." Mrs. Hamilton, the Division Director, disagrees. She believes that the current organization is the most efficient and effective at the current time. Given that the Commission has delegated to Mrs. Hamilton the authority and the responsibility to organize and manage the Energy Division, we see no justification to substitute Mr. Kelly's judgment for Mrs. Hamilton's.

Finally, Mr. Kelly claims that he has both vertical and horizontal communication difficulties. Our analysis of the evidence leads us to find that any communications difficulties are not due to the organization at the Energy Division, Mr. Free, Mrs. Hamilton, or any of Mr. Kelly's co-workers, but are solely attributable to Mr. Kelly.

It appears that Mr. Kelly wishes this committee to substitute his judgment for Mrs. Hamilton's judgment on how the Energy Division should be organized solely for his personal satisfaction and convenience. There were no allegations of wrongdoing or improper conduct. We find no credible evidence of fractured career path, unlevel playing field, compromised job position, or lost synergy. We find that any communications difficulties are the sole perception of Mr. Kelly. We recommend that Mr. Kelly's request for his position to be moved to the Special Projects Section and his request that he report directly to a technical manager be denied.

In conclusion, we emphasize that the above findings, conclusions and recommendation are based on the documentary evidence submitted to us and the record compiled at the hearing in this matter. We feel that, based on the information we have, the unanimous findings, conclusions and recommendations set forth herein are just, reasonable and appropriate.

Aquilla Spivey

Debra Jackson

Tom Jones

Doug Dillard

G. Scott Morris
Administrative Law Judge



STATE OF ALABAMA
ALABAMA PUBLIC SERVICE COMMISSION
P.O. BOX 304260
MONTGOMERY, ALABAMA 36130-4260

January 3, 2006

WALTER L. THOMAS, JR.
SECRETARY

JIM SULLIVAN, PRESIDENT
JAN COOK, ASSOCIATE COMMISSIONER
GEORGE C. WALLACE, JR., ASSOCIATE COMMISSIONER

## MEMORANDUM

TO:      Mr. John Free,
         PSC Analyst Manager

FROM:    Mr. Gregory Kelly,
         PSC Technical Specialist, Senior

SUBJECT: 2006 Fair Market Value for
         PSC Engineers

A review has been completed of the "2006 Job Market Value" for accountant, computer science and engineering positions in state government including the APSC. Attached are an "Executive Summary" and study findings.

As the attached "Executive Summary" shows, the Senior PSC Accountant position has been updated to reflect the market rate in the last 18-months. However, the Senior PSC Engineering position has now been neglected for more than 25-years. Accountants enjoy a 15 step gap and engineers now have only a 2 step gap between senior professional and sub-professional job classifications. If this neglect continues, the accountant's salary range 78 will soon leapfrog engineer's salary range 79.

Please explain where the fairness and why such discrepancies exist in the system? Will the engineering jobs continue to be neglected or updated like the accountant positions? Can the engineers (like the accountants) count on your support in reconciling these matters in a timely manner? Please note these disparities listed above and in the attached report are directly under your supervision.

Please reply within 10 days of the date of this letter.

GK

Attachments

cc: Ms. Janice M. Hamilton, Energy Director
    Ms. Dorinda J. Kepler, PSC Personnel



Defendants' Exhibit 55

# Executive Summary: 'What is the 2006 Fair Market Value for PSC Technical Specialists'?

January 3, 2006
By: Gregory Kelly

On several occasions over a period of twenty-eight (28) months, the topic of 'what is the fair market value for a PSC Technical Specialist' has been discussed. What is a PSC Technical Specialist? A PSC Technical Specialist is an Electrical Engineer whose primary focus is on power and communication systems.

In 2005, several jobs at the APSC (consumer services, accounting & finance), and other state agencies were re-evaluated and/ or created by the State Personnel Board. These jobs were re-evaluated and/ or adjusted to south-eastern average present market value. However, the engineering positions at APSC have not been re-evaluated or adjusted for more than twenty-five (25) years; only COLAs (cost of living adjustments) have been received during this time. COLAs are not pay adjustments to the increased market value of a job classification.

An in-depth study of internal and external job classifications was conducted to determine the 2006 fair market value for a PSC Technical Specialists position.

Please review the below findings, recommendations, summary statements and supporting information:

**Findings:**
- Average National Technology Pay:
  - Electrical Engineers rank #2 (only behind Nuclear Engineers)
  - PSC Engineers are -29.43% & -35.0% below fair market value
- Salary Range Deviation (SRD) Value:
  - SRD Value is the pay range gap between professional & sub-professional job classifications
    - SRD Value for PSC Accountants : 15
    - SRD Value for ADOT Engineers: 12
    - SRD Value for PSC Engineers : 2
- PSC Accountants & Engineers Salary Values are approximately the same
  - Sr. PSC Engineers: salary value (79)
  - Sr. PSC Accountants: salary value (78)
- Salary Range Value Last Review & Update
  - PSC Engineers more than 25 years ago
  - PSC Accountants in the last 18-months

**Recommendations:**

These results clearly show that the PSC Engineer job value is significantly undervalued in comparison to the market and other job classifications in sate government including the APSC.

A formal request should be sent to state personnel requesting the following:

- Re-evaluation of the PSC Engineering positions
- Pay adjustment request to the southeastern average

**Summary Statements:**

These recommendations are on par with established past and present state personnel procedures and policies

If submitted and adopted, the PSC Engineering positions would receive the same equitable and fair consideration as most positions have at the Commission and in state government.

**Supporting Information:**

- 2006 Recommendation Report
- 2006 Job Comparison Study
- 2006 Starting Salary Study

January 3, 2006

# Recommendation Report:    'What is the 2006 Market Value for PSC Technical Specialists'?

This recommendation report will analyze and summarize the 2006 market value for engineers, computer science and financial professionals. This report will compare job classifications in several areas: salary range deviation (SRD) values, education requirements, area of responsibility, staffing class (professional and sub-professional jobs), 2006 job market value and states pay performance versus the market.

| Job Title (Code) Career Path | | Education Field of Study and/or Level of Education Required | Area of Responsibility Staffing class | National Median | Salary Range | % State Over/Under National Avg. |
|---|---|---|---|---|---|---|
| **PSC Accountants** *(Auditing & Finance)* | | | | | | |
| Accounting, Clerk | (10601) | Tech Sch (High Sch or GED) | Sub-Professional | $28,239.00 | 6367 | -9.78% |
| PSC Analyst 3 | (11253) | 4-yrs College (BSB-Business) | Professional | $47,344.00 | 78 | 9.09% |
| SRD Value | | | | | 15 | |
| **Computer Science** *(Info Technology)* | | | | | | |
| IT Systems Tech, Sr. | (10526) | Tech Sch (High Sch or GED) | Sub-Professional | $44,206.00 | 74 | -3.95% |
| IT Systems Specialist, Sr | (10529) | 4-yrs College (BSIT-Info systems) | Professional | $75,753.00 | 84 | -1.09% |
| SRD Value | | | | | 10 | |
| **ADOT Engineers** *(Road & Bridge Construction)* | | | | | | |
| Transp. Tech, Sr. | (20482) | Tech Sch (High Sch or GED) | Sub-Professional | $49,792.00 | 7578 | -1.62% |
| Civil Engineer 3 | (20435) | 4-yrs College (BSCE-Engineering) | Professional | $92,185.00 | 87 | 1.71% |
| SRD Value | | | | | 12 | |
| **PSC Engineers** *(Power & Communication Systems)* | | | | | | |
| PSC FieldTech Sr. | (20503) | Tech Sch (High Sch or GED) | Sub-Professional | $53,972.00 | 77 | -8.87% |
| PSC Tech Spec, Sr. | (20522)[1] | 4-yrs College (BSEE-Engineering) | Professional | $83,420.00 | 85 [2] | -0.07% |
| SRD Value | | | | | 8 | |

*Salary Range Deviation (SRD) Values are the pay range steps between professional & sub-professional classifications :*

*Summary of Findings:  [1] Job is 35.0% below market value. Pay range has not been evaluated for more than 25 years.  Jobs in blue were recently re-evaluated and raised to the S/E average salary. The average state job is +/- 5 % of national average. Sr. public utility analysts (sr. accountant) are now paid approximately the same salary as sr. public utility engineers. The state now ranks public utility engineers last in technology paid behind all other engineers and computer science professionals. A public utility technical assistance (non-degreed) is now paid more than a degreed public utility engineer.*

*Recommendation:  [2] Increase the salary range level from #79 to #86. Rationale:  Based on information obtained from other S/E states, an internal review of similar job classifications, the average 2006 public utility engineer's salary  (starting end with 4 yrs of experience) .*

January 3, 2006

## 2006 Job Classification Comparisons Study

Salary Range Deviation (SRD) is the difference between the highest in the profession & subprofession starting classification

| Job Title (Code) (Career Path) | Education (Field of Study and/or Highest Grade Completed) | Years of Experience | Salary Range | State Median | National Median | % State over/ under National Avg |
|---|---|---|---|---|---|---|
| **PSC Accountants** (Auditing & Finance) | | | | | | |
| Accounting, Clerk (10601) | Tech Sch (High Sch or GED) | 1 yrs | 6367 | $25,477.00 | $ 28,239.00 | -9.78% |
| PSC Analyst 2 (11252) | 4-yrs College (BSB-Business) | 1 yrs | 74 | $43,303.00 | $ 39,430.00 | 9.82% |
| PSC Analyst 3 (11253)[2] | 4-yrs College (BSB-Business) | 4 yrs | 78 | $51,642.00 | $ 47,344.00 | 9.08% |
| SRD Value | | | 15 | | | |
| **Computer Science** (Info Technology) | | | | | | |
| IT Systems,Tech Sr. (10526) | Tech Sch (High Sch or GED) | 2 yrs | 74 | $ 42,458.00 | $ 44,206.00 | -3.95% |
| IT Systems, Associate (10527) | 2-yrs College (AST-info systems) | 2 yrs | 7679 | $ 50,396.00 | $ 48,989.00 | 2.87% |
| IT Systems Specialist (10528)[2] | 4-yrs College (BST-info systems) | 4 yrs | 82 | $ 64,622.00 | $ 62,039.00 | 4.16% |
| IT Systems Specialist, Sr (10529)[4] | 4-yrs College (BST-info systems) | 8 yrs | 84 | $ 74,927.00 | $ 75,753.00 | -1.09% |
| SRD Value | | | 10 | | | |
| **ADOT Engineers** (Road & Bridge Construction) | | | | | | |
| Transp. Tech, Sr. (20482)[2] | Tech Sch (High Sch or GED) | 12 yrs | 7578 | $ 48,003.00 | $ 48,792.00 | -1.62% |
| Civil Engineer 1 (20433)[2] | 4-yrs College (BSCE-Engineering) | 2 yrs | 81 | $ 59,902.00 | $ 61,235.00 | -2.18% |
| Civil Engineer 2 (20434)[2] | 4-yrs College (BSCE-Engineering) | 4 yrs | 83 | $ 69,627.00 | $ 72,936.00 | -4.54% |
| Civil Engineer 3 (20435)[4] | 4-yrs College (BSCE-Engineering) | 8 yrs | 87 | $ 93,757.00 | $ 92,185.00 | 1.71% |
| SRD Value | | | 12 | | | |
| **PSC Engineers** (Power & Communication Systems) | | | | | | |
| PSC Field Tech Sr. (20503) | Tech Sch (High Sch or GED) | 8 yrs | 77 | $ 49,186.00 | $ 53,972.00 | -8.87% |
| PSC Tech Specialist (20521)[1] | 4-yrs College (BSEE-Engineering) | 2 yrs | 77 | $ 49,186.00 | $ 69,855.00 | -29.59% |
| PSC Tech Specialist Sr (20522)[1] | 4-yrs College (BSEE-Engineering) | 4 yrs | 79 | $ 54,224.00 | $ 83,609.00 | -35.15% |
| SRD Value | | | 2 | | | |
| **State Average** | | | | | | 1.01% |

(1) Jobs have not been evaluated for more than 25 years (not included in calculation)  (2) Jobs recently re-evaluated or created by State Personnel

January 3, 2006

# 2006 National Median Starting Salary

Engineers, Computer Science & Accounting Jobs

| Job Title | National Rankings | Staffing Class | Highest Level of Education | Median 2006 Starting Salary |
|---|---|---|---|---|
| **Engineers & Computer Sciences** | | | | |
| Nuclear Engineers | 1 | Professional | 4-yrs College (Engineering) | $60,916.00 |
| Electrical Engineers | 2 | Professional | 4-yrs College (Engineering) | $55,586.00 |
| Chemical Engineers | 3 | Professional | 4-yrs College (Engineering) | $54,298.00 |
| Mechanical Engineers | 4 | Professional | 4-yrs College (Engineering) | $53,188.00 |
| Aerospace Engineers | 5 | Professional | 4-yrs College (Engineering) | $51,011.00 |
| Civil Engineers | 6 | Professional | 4-yrs College (Engineering) | $50,832.00 |
| Computer Science | 7 | Professional | 4-yrs College (Info systems) | $48,989.00 |
| Computer Science Techs | 8 | Sub-Professional | Tech Sch (High Sch or GED) | $44,206.00 |
| Electrical Engineering Techs | 9 | Sub-Professional | Tech Sch (High Sch or GED) | $38,330.00 |
| Civil Engineering Techs | 10 | Sub-Professional | Tech Sch (High Sch or GED) | $37,802.00 |
| **Accounting & Finance** | | | | |
| Accountants | 1 | Professional | 4-yrs College (Business) | $39,430.00 |
| Accountant Techs | 2 | Sub-Professional | Tech Sch (High Sch or GED) | $28,239.00 |



# STATE OF ALABAMA
ALABAMA PUBLIC SERVICE COMMISSION
P.O. BOX 304260
MONTGOMERY, ALABAMA 36130-4260

January 23, 2006

JIM SULLIVAN, PRESIDENT

JAN COOK, ASSOCIATE COMMISSIONER

GEORGE C. WALLACE, JR., ASSOCIATE COMMISSIONER

WALTER L. THOMAS, JR.
SECRETARY

## MEMORANDUM

TO:     Mr. Gregory Kelly,
        PSC Technical Specialist, Senior

FROM:   Mr. John Free,
        PSC Analyst Manager

SUBJECT: 2006 Fair Market Value for
         PSC Engineers

I have received your "2006 Job Market Value" study dated January 3, 2006 and this information will be included in your personnel file. As stated previously, there are not any plans at this time to request state personnel to re-evaluate the PSC engineering positions or to request a pay adjustment for those same positions.

However, if you are no longer satisfied with the compensation package that you accepted for your current position, you certainly have the option of pursuing other career opportunities as they become available.

Cc:     Ms. Janice M. Hamilton, Director
        Energy Division

        Ms. Dorinda J. Kepler,
        PSC Personnel


Defendants' Exhibit 56



# STATE OF ALABAMA
### ALABAMA PUBLIC SERVICE COMMISSION
P.O. BOX 304260
MONTGOMERY, ALABAMA 36130-4260

JIM SULLIVAN, PRESIDENT                           January 25, 2006                    WALTER L. THOMAS, JR.
JAN COOK, ASSOCIATE COMMISSIONER                                                      SECRETARY
GEORGE C. WALLACE, JR., ASSOCIATE COMMISSIONER

## M E M O R A N D U M

To: Mr. John D. Free; PSC Analyst Manager



From: Greg Kelly; PSC Technical Specialist, Senior

Subject: "Unleveled –Playing Field for Engineering Positions"

On several communications (meetings, e-mails and memos) over the past 28- months, I have outlined my concerns regarding the unfairness that surrounds the engineering positions. In several memos, I have requested the engineering positions receive the same "fair and equitable consideration" that most jobs receive in the Commission and State Government. However, my attempt to seek such fairness appears to have failed.

After the accountant jobs (senior and manager) which include your own position were adjusted to the market rate on September 20, 2004, I requested the same consideration for engineering positions which have now been neglected for more than 25-years. Nevertheless, every request I made, you have rejected (see attached memos dated Feb. 14, 2005).

As a result, I later requested that you relinquish your authority over my position because of your indifference and unfairness toward the engineering profession. These issues were raised in my grievance letter to the Commission on June 7, 2005. You counteracted these charges in a Commission's Hearing on August 10, 2005 by testifying that you had the ability to properly supervise my position. However, you still refused to render the same standard of care afforded to your own accounting profession.

Recently on January 3, 2006, I made yet another request for fairness regarding my position. In this memo, I questioned your logic and suggested that the same rules be applied fairly to both the engineering and accountant careers. And again, you rejected my request for such fairness (see memo dated Jan 23, 2006).

Your actions and inactions have left me no other choice but to conclude that you seek to avoid fairness. Furthermore, you have engaged in mischief, deception and questionable professional conduct which have also harmed my career (see attached memo dated Feb. 14, 2005). You seek to unjustly enrich your own non-tech profession by integrating and linking it with the high-tech field of engineering. You have further wronged by position by refusing to let the position float on its own job merits. Your actions also seek to harm a vocation in which you have no vested interest or academic capital. Your responses have been selective and questionable when applying rules, principles, logic, and ethics (see attached memo dated Oct. 3, 2005).

If you or any other reasonable man reviewed the above facts objectively, there is no doubt that my engineering position is subjected to unfair treatment, neglect and harm under your supervision. These unjust practices have injured my career and placed it on an un-level playing field when compared to other job classifications at the Commission and in State Government.

Hopefully, you will reevaluate your position and change your course of action

GK

Attachment

cc: Ms. Janice M. Hamilton, Energy Director

    Ms. Dorinda J. Kepler, PSC Personnel

Original Message -----
From: Greg Kelly
To: John Free ; jhamilton@psc.state.al.us
Sent: Monday, February 14, 2005 9:30 AM
Subject: Re: Utility Technical Specialist II report

John & Janice


On February 11, 2005 at 2:00pm, a meeting was held in the director's office to discuss the issues
outline in the Utility Technical Specialist II report. Attendees were John Free, Gregory Kelly and
Janice Hamilton (Energy Director)

The director has agreed to tender a solution at the appropriate time concerning this matter.

Hopefully, this issue can be resolved with this position receiving the same equitable and fair
consideration as most jobs have in the Commission and State Government



Greg Kelly
----- Original Message -----
From: Greg Kelly
To: John Free
Cc: JANICE HAMILTON
Sent: Thursday, February 10, 2005 8:15 AM
Subject: Re: Utility Technical Specialist II report

John,

I believe this will clearly conclude our discussion on the matter. This report was not my idea.
This report was requested by you and I have the hand written request by you.

I thank for your help and input into the final report.

Greg Kelly
----- Original Message -----
From: John Free
To: Greg Kelly
Cc: JANICE HAMILTON
Sent: Wednesday, February 09, 2005 6:04 PM
Subject: Re: Utility Technical Specialist II report

Greg,

In October 2004, while you were in my office for other discussions, you asked me if "I
had the paper work ready?" This was in reference to making a request for a pay range
adjustment for the Utility Technical Specialist II position. At that time, I responded that I
did not have any plans to make such a request. I hope this answers your questions.

John Free
----- Original Message -----

**From:** Greg Kelly
**To:** John Free
**Sent:** Wednesday, February 09, 2005 8:08 AM
**Subject:** Re: Utility Technical Specialist II report

----- Original Message -----
**From:** Greg Kelly
**To:** John Free
**Cc:** jhamilton@psc.state.al.us
**Sent:** Monday, February 07, 2005 10:24 AM
**Subject:** Re: Utility Technical Specialist II report

John,

Can you give me an update on this report? Thirty (30) days have pasted from the final report. This issue has been reviewed and discussed for nearly two (2) years. Hopefully, this matter can be resolved quickly with-out further delay.

Thanks,

Gregory Kelly, Engineer
Electricity Section

----- Original Message -----
**From:** John Free
**To:** Greg Kelly
**Sent:** Thursday, January 13, 2005 9:07 AM
**Subject:** Utility Technical Specialist II report

Greg,

I have received your report "Executive Summary: What is the 2005 market value for Public Utility Technical Specialists?", dated January 4, 2005. The report has been duly noted.

Sincerely,

John Free, Manager
Electricity Section



### STATE OF ALABAMA
ALABAMA PUBLIC SERVICE COMMISSION
P.O. BOX 304260
MONTGOMERY, ALABAMA 36130-4260

January 23, 2006

JIM SULLIVAN, PRESIDENT

JAN COOK, ASSOCIATE COMMISSIONER

GEORGE C. WALLACE, JR., ASSOCIATE COMMISSIONER

WALTER L. THOMAS, JR.
SECRETARY

## MEMORANDUM

TO:         Mr. Gregory Kelly,
            PSC Technical Specialist, Senior

FROM:       Mr. John Free,
            PSC Analyst Manager

SUBJECT:    2006 Fair Market Value for
            PSC Engineers


I have received your "2006 Job Market Value" study dated January 3, 2006 and this information will be included in your personnel file. As stated previously, there are not any plans at this time to request state personnel to re-evaluate the PSC engineering positions or to request a pay adjustment for those same positions.

However, if you are no longer satisfied with the compensation package that you accepted for your current position, you certainly have the option of pursuing other career opportunities as they become available.


Cc:   Ms. Janice M. Hamilton, Director
      Energy Division

      Ms. Dorinda J. Kepler,
      PSC Personnel

-----Original Message-----
**From:** Kelly, Greg
**Sent:** Monday, October 03, 2005 2:52 PM
**To:** Free, John
**Subject:** RE: Confidential

John,

Thanks,

Greg

     -----Original Message-----
     **From:** Free, John
     **Sent:** Monday, October 03, 2005 2:12 PM
     **To:** Kelly, Greg
     **Cc:** JANICE HAMILTON
     **Subject:** RE: Confidential

     See my response below.

          -----Original Message-----
          **From:** Kelly, Greg
          **Sent:** Monday, October 03, 2005 11:16 AM
          **To:** Free, John
          **Subject:** RE: Confidential

          John,

          As a follow-up to last week's meetings on personnel issues:

          What is your policy when a employee report to work unable to
          perform his or her duties (drunk, drug –out, etc.)
     Please see Section 14, Pages 21 – 22 of the APSC's Employee
Guidelines.

          What is your policy when an employee leaves work for personnel
          reasons with out a sign leave slip?
          Please see Section III, page 2 of the APSC's Employee Guidelines.

          Please inform me because I know the Energy Division in the PSC
          does not have double standards for separate employee?

          Greg

               -----Original Message-----
               **From:** Free, John
               **Sent:** Thursday, September 29, 2005 11:01 AM

**To:** Kelly, Greg
**Subject:** RE: Confidential

Greg,

There is nothing to hide. But I would first rather us have an opportunity to discuss the Performance Appraisal in its entirety this afternoon at 1:30. I think a complete discussion will be beneficial to us both.

Thank You

----Original Message----
**From:** Kelly, Greg
**Sent:** Thursday, September 29, 2005 11:52 AM
**To:** Free, John
**Subject:** RE: Confidential

John,

Please shown me in the hand-book or other source
why I can't discuss this issue.
You have something to hide?

Greg

----Original Message----
**From:** Free, John
**Sent:** Thursday, September 29, 2005 9:26 AM
**To:** Greg Kelly (Greg.Kelly@psc.alabama.gov)
**Subject:** Confidential

Greg,

It is important that our conversations associated with personnel issues and evaluations remain confidential between you and I and Janice. I hope you will respect this request.

Thanks.



# STATE OF ALABAMA

ALABAMA PUBLIC SERVICE COMMISSION
P.O. BOX 304260
MONTGOMERY, ALABAMA 36130-4260

February 14, 2006

JIM SULLIVAN, PRESIDENT

JAN COOK, ASSOCIATE COMMISSIONER

GEORGE C. WALLACE, JR., ASSOCIATE COMMISSIONER

WALTER L. THOMAS, JR.
SECRETARY

## MEMORANDUM

**TO:**   Mr. Gregory Kelly
Public Utility Technical Specialist, Senior

**FROM:**   Mr. John Free
Public Utility Analyst Manager



**SUBJECT:**   Your Memorandum dated January 25, 2006

I have received and reviewed your "Unleveled – Playing Field for Engineering Positions" memorandum, dated January 25, 2006, wherein you made numerous unfounded allegations that cause me great concern. Please be advised that I categorically deny your claims that I have been unfair, indifferent and inconsistent and/or selective in my supervision and evaluation of employees under my direct supervision and control. To the contrary, it has always been my goal to be as fair and objective as I can humanly be with every employee in the section that I supervise.

Aside from the inaccuracy of your allegations regarding my fairness, I am quite concerned by your unfounded representations that I have "engaged in mischief, deception and questionable professional conduct" and "seek to unjustly enrich your (my) own non-tech profession by integrating and linking it with the high-tech field of engineering." In addition to being untrue, these remarks and accusations are, at a minimum, borderline insubordinate and abusive. **By way of this memorandum, I am notifying you that any future unfounded remarks of this nature will not be tolerated and will likely result in disciplinary action.**

Finally, I have previously advised you that there are no plans at this time to request State Personnel to reevaluate the PSC engineering positions or to request a pay adjustment for those same positions. I will advise you regarding the need for further salary research regarding your position if I decide to pursue the requested reevaluation in the future. From this point forward, do not spend any part of your work day on the proposed reevaluation and do not send me any verbal or written requests for such a reevaluation unless I advise you to do so.

As indicated in my memorandum of January 23, 2006, if you are no longer satisfied with the compensation package that you accepted for your current position, you certainly have the option of pursuing other career opportunities as they become available.

Cc:   The Honorable John A. Garner
      Chief Administrative Law Judge

      Ms. Janice M. Hamilton, Director
      Energy Division

      Ms. Dorinda J. Kepler
      PSC Personnel

STATE OF ALABAMA

ALABAMA PUBLIC SERVICE COMMISSION

MONTGOMERY, ALABAMA


IN RE:   EMPLOYEE GRIEVANCE OF

GREGORY KELLY


PROCEEDINGS taken before an Employee
Grievance Panel of the Alabama Public
Service Commission in the above-referenced
matter on Wednesday, August 10th, 2005,
commencing at 9:25 a.m. in the Carl L. Evans
Chief Administrative Law Judge Hearing Room
of the Alabama Public Service Commission,
Room 904, RSA Union Building, Montgomery,
Alabama, before Ricky L. Tyler, Certified
Shorthand Reporter and Notary Public in and
for the State of Alabama at Large.

```
1   BEFORE:
2   SCOTT MORRIS, Administrative Law Judge
3   TOM JONES, Telecommunications Division
4   DOUG DILLARD, Telecommunications Division
5   DEBORAH JACKSON, Advisory Division
6   AQUILLA SPIVEY, Advisory Division
7                    APPEARANCES
8   FOR THE PSC:
9        THOMAS D. SAMFORD, IV, ESQ.
10       Attorney, Advisory Staff
11       100 North Union Street, Suite 948
12       Montgomery, AL 36104
13
14       JANICE M. HAMILTON
15       Director, Energy Division
16       100 North Union Street, Suite 950
17       Montgomery, AL 36104
18  FOR GREGORY KELLY:
19       LINDA B. ALLEN, ESQ.
20       Legal Counsel
21       Alabama State Employees Association
22       110 North Jackson Street
23       Montgomery, AL 36104
```

1                        I N D E X

                                              PAGE
2    Opening Remarks By Ms. Allen:            17
3    Opening Remarks By Mr. Samford:          19

4    JOHN D. FREE
       Direct Examination by  MS. ALLEN:      24
5      Cross-Examination by  MS. HAMILTON:     49
       Cross-Examination by  MR. SAMFORD:      58

6    ROBERT TAYLOR, III
7      Direct Examination by  MS. ALLEN:       66

8    JANICE M. HAMILTON
       Direct Examination by  MS. ALLEN:       74
9      Cross-Examination by  MR. SAMFORD:      89
       Recross-Examination by  MR. SAMFORD:   102
10     Redirect Examination by  MS. ALLEN:    102

11   GREGORY KELLY
       Direct Examination by  MS. ALLEN:      105
12     Cross-examination by  MS. HAMILTON:    128
       Cross-Examination by  MR. SAMFORD:     140
13     Cont'd Cross-exam by  MR. SAMFORD:     153
       Cont'd Cross-exam by  MR. SAMFORD:     163
14     Redirect Examination by  MS. ALLEN:    179
       Recross-Examination by  MR. SAMFORD:   182
15     Further Redirect Exam by  MS. ALLEN:   184
       Further Recross-exam by  MR. SAMFORD:  184

16
17   LOY OVERSTREET
       Direct Examination by  MR. SAMFORD:    193

18   Employee's Exhibits 1 - 14               209

19   PSC Exhibits 2 and 3                     209

20   Closing Statement by Ms. Allen:          197

21   Closing Statement by Ms. Hamilton:       203

22   Closing Statement by Mr. Samford:        204

23             *    *    *    *

P R O C E E D I N G S

1

2

3    JUDGE MORRIS:  Let's go ahead and

4    go on the record.  Today is Wednesday,

5    August the 10th, 2005.  We are here

6    today for the employee grievance

7    hearing of Mr. Gregory Kelly.  And

8    first I would like to present the

9    members of the panel.  I'm not sure the

10   court reporter is familiar with

11   everybody.

12        On my left we have Mr. Doug

13   Dillard of the Telecommunications

14   Division, on my far left.  On my

15   immediate left is Mr. Tom Jones,

16   Telecommunications Division.  On my

17   immediate right, Ms. Deborah Jackson of

18   the Advisory Division, in the

19   Information Technology Section.  And on

20   my far right, Ms. Aquilla Spivey of the

21   Consumer Services Section of the

22   Advisory Division.  And I will be

23   chairing the panel, Scott Morris,

Administrative Law Judge in the Legal Division.

To start off with I just want to briefly go over the role of the panel and what we are to do. And I'm going to refer to the Alabama Public Service Commission Employee Guidelines, the latest copy. And this is, of course, the Grievance Committee.

Of course, the employee, under the grievance procedures, can take a dispute to the Grievance Committee. He will have the opportunity to present his evidence pertinent to the grievance and this hearing will be heard by this committee.

The committee will make a recommendation to the Commissioners within five working days, which will be a one week time frame. So by the end of next Wednesday we will have a written recommendation to the Commissioners.

1     At that point, unless the

2     Commissioners find unusual or

3     extenuating circumstances to justify a

4     decision other than that recommended,

5     the recommendation of this committee

6     shall be adopted by the Commissioners.

7     The Commissioners shall render their

8     final decision of the matter within

9     five working days from the submission

10    of the committee recommendation.

11        Just as a note of procedure,

12    unless there is a tie in terms of the

13    decision of this committee, I will not

14    participate in the recommendation.  I

15    will help draft the final

16    recommendation, that is one of my

17    assigned responsibilities under the

18    guidelines, but I will not participate

19    in that decision unless there is a tie

20    that needs to be broken.

21        And that is -- again, if -- if

22    anyone or if the employee, Mr. Kelly,

23    is not happy with the decision or if he

1    feels any further action is necessary,

2    he, of course, may appeal to the State

3    Personnel Board, at which time it would

4    come under the rules and regulations of

5    the Board.

6        Are there any -- well, first of

7    all, let's go ahead and take

8    appearances on behalf of Mr. Kelly.

9        MS. ALLEN:  Linda Allen.

10        JUDGE MORRIS:  Okay.  And,

11    Ms. Hamilton?

12        MS. HAMILTON:  Janice Hamilton,

13    Director of the Energy Division.

14        JUDGE MORRIS:  Okay.

15        MR. SAMFORD:  Tom Samford

16    representing the Public Service

17    Commission.

18        JUDGE MORRIS:  Okay.  Are there

19    any preliminary matters?

20        MR. SAMFORD:  Yes, sir, Your

21    Honor.

22        JUDGE MORRIS:  Okay.

23        MR. SAMFORD:  First of all, I

1    would like to confirm the understanding

2    stated at the prehearing conference by

3    Ms. Allen that Mr. Kelly's pay is not

4    at issue in this grievance.

5         MS. ALLEN:  That is correct.

6         JUDGE MORRIS:  Okay.

7         MR. SAMFORD:  And also, as you

8    will recall, Ms. Allen at the

9    prehearing conference stated that

10   Mr. Kelly's grievance was not in any

11   way directed at his supervisor's

12   character, that being Ms. Hamilton or

13   Mr. Free.  And I just wanted also to

14   verify that.

15        MS. ALLEN:  That would be part of

16   my opening remarks.

17        MR. SAMFORD:  In other words, the

18   Public Service Commission -- with that

19   understanding, there appear to be no

20   allegations of wrongdoing or illegal

21   activity in regards to the supervision

22   of Mr. Kelly and his supervisors.  It's

23   the Commission's contention that it has

1   the ability to organize its divisions

2   in such a manner as it sees fit.  There

3   are no laws, rules or regulations that

4   require otherwise, as long as there is

5   no allegation that there has been

6   illegal discrimination as a result of

7   race, sex, et cetera, et cetera.

8        The Public Service Commission

9   contends that the current state of the

10  law is that an employee's ideas,

11  whatever their merit, are just that,

12  those are ideas.  And as to the

13  organizational structure, the

14  Commission contends that Mr. Kelly's

15  ideas, good or bad, are irrelevant to

16  this proceeding.

17       I'm trying to narrow the issues

18  here, because there are no rules and

19  regulations or laws requiring that the

20  Public Service Commission organize one

21  way or the other.  There are no

22  allegations of illegal conduct or

23  illegal discrimination. So I would

1    request at this point that any evidence

2    of the merit of an employee of the

3    Commission's ideas with regard to

4    organization are irrelevant to this

5    proceeding.

6         MS. ALLEN:  If I may address that,

7    Mr. Samford.  When you look at the job

8    specifications that are developed with

9    the PSC's approval, as I understand it,

10   through State Personnel, there are some

11   guidelines which, while I'm not saying

12   they might rise to the level of

13   illegality, they do appear to be

14   improper; in that Mr. Kelly, his job

15   specifications would appear to require

16   that he be supervised by someone with a

17   technical background, and that is not

18   currently the way that the organization

19   of the PSC Energy Division is set up.

20   And that is the area in which we would

21   like to concentrate.

22        MR. SAMFORD:  The Public Service

23   Commission would contend that the

1  organization as it currently exists is

2  exactly the same organization that

3  existed at the time Mr. Kelly applied

4  for and accepted a job. He either knew

5  or should have known what that

6  organization was, because nothing has

7  changed since he was employed to change

8  that. And, you know, we again contend

9  that the evidence -- any evidence of

10  the merit of his ideas as to

11  organization be excluded.

12      JUDGE MORRIS: Ms. Allen, do you

13  intend to focus your case on the

14  alleged discrepancies between the

15  organization as it refers to his job

16  description and the State Personnel

17  guidelines, the discrepancies between

18  them? Is that where you intend to

19  focus?

20      MS. ALLEN: Primarily, yes.

21      JUDGE MORRIS: Okay. I'm going to

22  allow this to go forward at this time

23  with that understanding. If we begin

1    to stray from that, I'm sure

2    Mr. Samford will have the appropriate

3    objection at the appropriate time.

4        MR. SAMFORD:  And I would

5    appreciate a continuing objection in

6    general, Your Honor.

7        The other thing is the Commission,

8    in its discovery, has asked that

9    Mr. Kelly produce, and I quote, copies

10    of any work products, that is reports,

11    memoranda, spreadsheets, analyses,

12    studies, et cetera, prepared

13    exclusively by Mr. Kelly that in his

14    opinion have received an unfair

15    assessment by Mr. Free in regards to

16    their engineering soundness.  To date

17    nothing to that effect has been

18    produced, although there has been

19    production.  So I would ask the Court

20    to take judicial notice of that fact,

21    and would suggest that Mr. Kelly has

22    waived any disagreement with the way

23    Mr. Free supervises his section.

1      MS. ALLEN:  Mr. Free does not have

2  an engineering background.  It is our

3  position that Mr. Free would not really

4  recognize if Mr. Kelly had failed to

5  properly conduct an engineering

6  function, and that's part of the

7  discussion and the witness testimony.

8      JUDGE MORRIS:  Okay.  We'll get to

9  that at that time.  Are there any

10  further --

11      MR. SAMFORD:  Just one further,

12  Your Honor.  Mr. Robert Taylor has been

13  listed as a witness for Mr. Kelly.

14  Mr. Kelly is currently employed by the

15  Commission as an engineer.  We do not

16  -- the Commission does not know

17  exactly, without the benefits of

18  depositions, why Mr. Taylor has been

19  called, but as a preliminary matter,

20  it's our understanding that Mr. Taylor

21  in the past has informally advised PSC

22  employees with regard to certain

23  situations or problems that they have

1    had.  And I would ask that any

2    testimony provided by Mr. Taylor be

3    along the lines of his technical

4    knowledge relating to his current

5    position, which involves engineering,

6    and not have Mr. Taylor be up here

7    potentially discussing the propriety of

8    personnel matters.

9         JUDGE MORRIS:  Okay.

10        MS. ALLEN:  Mr. Taylor does have a

11   number of what I believe to be relevant

12   statements regarding the situation as

13   it relates to Mr. Kelly.  And I will

14   certainly try to maintain your concerns

15   in questioning Mr. Taylor.

16        MR. SAMFORD:  Well, I really feel

17   -- and this is the last one, but I

18   would state for the record that a large

19   part, as the Commission understands it,

20   of Mr. Kelly's grievance is that his

21   immediate supervisor is an analyst,

22   say, an accountant, instead of an

23   engineer.  Mr. Taylor is an analyst.

1    And to the extent that we are on one

2    hand disagreeing that an analyst cannot

3    supervise an engineer, but bringing an

4    analyst in to provide in effect expert

5    testimony, because otherwise he has no

6    personal knowledge with regard to this

7    engineer who has filed the grievance, I

8    think is totally improper.

9        JUDGE MORRIS:  Okay.  Well, we'll

10   see where this heads as we get into

11   this.  I will certainly -- you know, we

12   don't want to bring up anything that's

13   not relevant to the situation, but I

14   will allow her -- she hasn't gotten a

15   chance to even explore where she's

16   going yet.

17       MR. SAMFORD:  I just please ask

18   for a continuing objection on that.

19       JUDGE MORRIS:  Ms. Allen, any

20   preliminary matters before you get

21   started?

22       MS. ALLEN:  Oh, nothing

23   preliminarily, no.

1    JUDGE MORRIS: Okay. One thing I
2    forgot, too; what will happen is at
3    this point we're going to let Ms. Allen
4    present the case for Mr. Kelly. As she
5    calls her witnesses, of course, she
6    will have the first opportunity to
7    question them, then Ms. Hamilton and
8    Mr. Samford. And then at that point
9    any members of the panel will also be
10   able to have questions of the
11   witnesses.
12       MR. SAMFORD: And, Your Honor, as
13   far as when we have one in here, I take
14   it that rather than being limited to
15   rebutting or crossing those issues
16   brought up on direct, that we need to
17   just go ahead and finish with the
18   witness. Like, you know, if Linda
19   calls one, I'm not going to call them
20   back in order to present it, if that is
21   acceptable.
22       MS. ALLEN: That's acceptable.
23       JUDGE MORRIS: Okay. We'll try to

1    move this along as quick as we can.

2        MS. ALLEN:  Certainly

3        JUDGE MORRIS:  Okay.  Ms. Allen?

4        MS. ALLEN:  Ladies and gentlemen

5    of the panel, I'm Linda Allen.  I am

6    representing Mr. Kelly in the pursuit

7    of this grievance.

8        As Mr. Samford has said, this is

9    not about a specific disagreement that

10    Mr. Kelly has against Mr. Free

11    regarding his supervision or

12    supervisory skills, nor of

13    Ms. Hamilton.  This is about whether it

14    is proper for an accountant or an

15    analyst to supervise an engineer.

16        The evidence and the facts, I

17    believe, will show that the Commission

18    has, over a very long history, had a

19    Technical Section in the Energy

20    Division.  And that Technical Section

21    included persons who have Mr. Kelly's

22    background and experience and job

23    classification.

1       When Mr. Kelly was hired, he was

2   hired in an accounting division.

3   Mr. Free is an accountant or a

4   technical analyst, not an engineering

5   analyst. Mr. Kelly had no specific

6   knowledge about the structure of the

7   PSC at the time he took the position.

8   Only after he came to work for the

9   Commission and saw the structure, saw

10  the fact that there was a person with

11  his same technical background and his

12  same classification in a separate

13  division, which used to be called the

14  Technical Division, that was the only

15  time that he had the option of knowing

16  what was going on. And it was at this

17  point that Mr. Kelly, I think, had the

18  idea that maybe something needed to be

19  looked at.

20      Over a period of time certain

21  things came to his attention. And over

22  a period of time he looked at and

23  determined that perhaps there were some

1    things that could be made more

2    efficient and effective, not only for

3    the Commission staff, but for the

4    taxpayers of Alabama in that regard.

5    Again, this is in no way an indictment

6    of Mr. Free's supervisory skills nor

7    Ms. Hamilton's.  Ms. Hamilton is the

8    focus of this grievance solely because

9    she is the Division Chief, and as such

10   has the authority to make this change

11   and she chose not to do so.

12        Thank you very much.

13        JUDGE MORRIS:  Okay.  How do y'all

14   want to --

15        MR. SAMFORD:  I was just going to

16   take the opening, if that's okay.

17        JUDGE MORRIS:  That's fine.

18        MR. SAMFORD:  Ladies and gentlemen

19   of the panel, you've heard most of what

20   I'm going to say from the preliminary

21   matters that I mentioned, but the case

22   is very simple.  Mr. Kelly applied for

23   a job.  All of you have applied for

jobs.  Mr. Kelly had the opportunity to ask any questions Mr. Kelly wanted to ask.  I presume you have, too, when you have been interviewed.  If Mr. Kelly had been concerned about the organization, he could have asked.

There are any number of analysts in the Energy Division.  And to throw up his hands and say, "Well, gosh, I, you know, went and interviewed with the Energy Division, but I didn't know it had analysts or accountants, I thought I was going to be an engineer."  We would suggest that, number one, he had just left a job at DHR where he was employed as a statistician, not an engineer.  And I do not say that to criticize the job of statistician, but in that job he worked for the chief statistician.  So working out of his engineering background is not totally foreign.

Ms. Allen says the only time he

had an option to know the organization
was once the PSC reached out, grabbed
him, held him down, and said "We've got
you now and there's nothing you can do
about it." He could have asked. Y'all
have asked when you've been in. And we
suggest that if he didn't know what he
was getting into, he should have.

But the primary focus of this
whole case is the discretion and the
ability of a Commission, an agency of
State government, to organize itself.
Mr. Kelly's ideas, Ms. Hamilton has
been receptive to letting him send
those ideas, but there is no reason,
there is no requirement, there is no
law requiring that the Commission
organize one way or the other.

Indeed, in my situation, using his
argument, Judy McLean should not
supervise me, nor should Commissioner
Wallace; they haven't been to law
school. And the decision you make here

1   does not just affect Mr. Kelly, it

2   affects all State government. And I'm

3   sure, in addition, here at the

4   Commission there are people watching

5   and waiting. Because if you just think

6   what's in your common knowledge about

7   the makeup of the Commission, there are

8   quite a few areas around here where

9   somebody is supervised by somebody

10   else.

11       The second thing I would say is

12   Ms. Hamilton is an engineer. And we

13   intend to show you that when Mr. Free

14   has an engineering problem or situation

15   assigned to him, if he doesn't

16   understand the technical aspects -- and

17   he's not required to be an engineer. I

18   would suggest he is not required to be

19   an engineer to supervise an engineer.

20   And you will hear from various

21   witnesses how he finds out things. I'm

22   sure all of you have areas in what you

23   do that you do not understand. And I

1    would suggest you probably go to folks,

2    ask questions, do this and that.

3         So, in any event, we just want the

4    panel to realize the dire importance

5    and impact that you will have in this

6    case. We suggest he should have known

7    the organization; if he didn't, we

8    suggest that he is being supervised

9    sufficiently. And we thank you for

10   your time and attention.

11        JUDGE MORRIS: Ms. Allen?

12        MS. ALLEN: I would like to call

13   Mr. Free.

14        JUDGE MORRIS: Mr. Free. Okay.

15   Can we round up Mr. Free?

16        MS. HAMILTON: I'll get him.

17            (Recess.)

18        JUDGE MORRIS: Let's go ahead and

19   go back on the record. We have Mr.

20   Free. Mr. Free, let's go ahead and

21   swear you in.

22            (Witness sworn.)

23        JUDGE MORRIS: Okay. Thank you.

1     Please be seated.  Ms. Allen, your

2     witness.

3

4          JOHN D. FREE, of lawful age,

5  having first been duly sworn, testified as

6  follows:

7

8          DIRECT EXAMINATION

9  BY MS. ALLEN:

10  Q.   Would you state your name for the

11       record, please?

12  A.   John D., as in David, Free, F-R-E-E.

13  Q.   And what is your position with the

14       Public Service Commission, Mr. Free?

15  A.   Public Utility Analyst Manager.

16  Q.   And what division are you employed in?

17  A.   The Energy Division.

18  Q.   Okay.  And specifically what area are

19       you in charge of?  What section is your

20       responsibility?

21  A.   The Electricity Section.

22  Q.   Okay.  Mr. Free, what is your

23       educational background?

1  A.  I have an undergraduate degree in

2      business, emphasis in accounting.  I

3      have a Master's in Business

4      Administration, MBA degree, with no

5      emphasis.  I have a CPA license.

6  Q.  Would you say that your primary focus

7      and responsibilities at the PSC deal

8      with accounting and those type of

9      functions?

10 A.  Primary focus?

11 Q.  Yes.

12 A.  As in, like, a percentage of my time

13     spent or how would you define primary?

14 Q.  Well, let me ask, if you would, to look

15     at Mr. Kelly's Exhibit Number 1, and

16     let me ask you, if you would, to

17     identify that document for the record?

18 A.  It looks like a Form 40 for me, I

19     believe.

20 Q.  Do you know whether that's your most

21     recent Form 40?

22 A.  No, I wouldn't.

23 Q.  Based on the description of duties

1    performed, would you say that your
2    primary focus is on the accounting end
3    or the engineering end of the Energy
4    Division, or of the Electric Section,
5    Electricity Section?

6        MR. SAMFORD:  Your Honor, excuse
7    me.  This document, and I believe it is
8    the document that was produced pursuant
9    to Ms. Allen's request, speaks for
10   itself.  There is a description of
11   duties here, it's got percent, but to
12   characterize a primary focus is vague.
13   Well, is 51 percent primary or is the
14   rest?  We would suggest that it's down
15   here in black and white and the
16   document would speak for itself.

17       JUDGE MORRIS:  Well, I'm sure that
18   the document does, but I allow her to
19   proceed in terms of his actual -- the
20   witness' perception of how he actually
21   spends his time.

22   BY MS. ALLEN:
23   Q.   Well, let me ask this, Mr. Free; how

1      many employees are in your section?

2  A.  Six, seven counting me, I believe

3      that's right.

4  Q.  Okay. And of those six people whom you

5      supervise, how many of those people are

6      in the accounting or analyst field?

7  A.  Accounting, analyst, auditing and

8      clerical are five. Engineering is one.

9  Q.  Mr. Kelly is the only engineer in your

10     section?

11 A.  Correct.

12 Q.  Do you spend more time supervising and

13     dealing with Mr. Kelly than you do with

14     the other five people in your division?

15 A.  Combined, no. No.

16 Q.  I'm going to also ask, if you would,

17     please turn to Exhibit 2 and tell me if

18     you recognize the documents that make

19     up Exhibit 2. There are actually two

20     separate documents.

21 A.  What was the question again?

22 Q.  Do you recognize those documents? Have

23     you ever seen those documents before?

1   A.   I assume so, yes. I mean, I applied

2        for the Utility Rate Supervisor

3        position, so I'm sure I saw it at that

4        time.

5   Q.   And that position title was changed at

6        some point by State Personnel; is that

7        correct?

8   A.   Correct. Correct.

9   Q.   All right. Looking at the definition

10       and examples of work performed listed

11       in the first page of Exhibit 2, is

12       there anything listed about supervision

13       of engineering personnel?

14   A.   I don't know. That would take some

15       time for me to read through this

16       document if we want to do that at this

17       point.

18   Q.   If you would, please. If you're not

19       familiar with it, if I could get you to

20       review it.

21   A.   Now, what was that question again?

22   Q.   If this document discusses the

23       supervision of engineering functions?

1   A.   Does this document -- either of these

2        documents?

3   Q.   Yes.

4   A.   Can I take some notes as I read through

5        it?

6   Q.   Certainly.

7                 (Witness reviewing document.)

8   A.   Okay.  Can you repeat the question

9        again?

10  Q.   Basically, Mr. Free, I'm trying to find

11       out, is there anything in the job

12       specifications or the announcement

13       which would lead you to believe that

14       your position should have the authority

15       to supervise an engineer?  All of this

16       appears to refer to rates and tariffs

17       and analysis of regulatory practices,

18       not with the engineering section.

19            MR. SAMFORD:  I would merely state

20       as an objection that what it appears --

21       the document speaks for itself.  The

22       Commission would contend that any

23       number of items on this document, being

1   Employee's Exhibit 2, could be read to
2   affect engineering and engineering
3   things as well as accounting and
4   figures.
5        MS. ALLEN:  I am sorry; I disagree
6   completely, Mr. Samford.  This position
7   is a Utility Rate Analyst Manager
8   basically, and everything concerns
9   rates, tariffs, et cetera.  There is
10  not a single word in either of these
11  two documents which refers to
12  engineering.
13       MR. SAMFORD:  The Commission
14  disagrees.
15       JUDGE MORRIS:  All right.  Well,
16  you can proceed.  The document, of
17  course, says what it says and the panel
18  will take that into account.
19  A.  Knowing the position, and when I took
20  the position, I knew it involved
21  engineering.  So it's kind of hard to
22  differentiate between what I knew the
23  position entailed and what you're

```
 1        asking me to say.  But having said

 2        that, any time it mentions rates and

 3        tariffs, you know that behind that is

 4        everything that goes on with the

 5        company you regulate, involving, you

 6        know, reliability, anything that

 7        affects costs, anything that they do

 8        that affects costs, whether it be

 9        engineering-related or

10        personnel-related or their pension

11        plans or whatever, all of that goes

12        back to rates and tariffs.  And so it's

13        our job to take a look at everything

14        under the big umbrella of rates and

15        tariffs.

16   Q.   What about your specific background and

17        education gives you the expertise to

18        supervise Mr. Kelly when he performs

19        engineering duties?

20   A.   Is there anything -- what's your

21        question?

22             MR. SAMFORD:  Is that not the

23        ultimate question of this whole
```

1    hearing, Your Honor?

2        MS. ALLEN:    I'm asking for his

3    opinion.

4  Q.  What in your opinion provides you the

5    technical background to supervise

6    Mr. Kelly when he is performing

7    engineering functions?

8  A.  Well, I would have to say that my 15

9    years experience with the Commission in

10    reviewing numerous and a myriad of

11    subject matters.  And considering that

12    with the resources that I have

13    available to me to apply to the review

14    of engineering positions; such as a

15    Director with an engineering

16    background; other staff engineers;

17    other Commissions that we can pick up

18    the phone and call; other PSC staff

19    members.  There is numerous resources

20    at my fingertips.

21  Q.  If I could ask you to look at Employee

22    Exhibit 5.  This is what was provided

23    to me by the Commission in response to

1       my request for production regarding the

2       job specifications and announcement for

3       the position which Mr. Kelly currently

4       holds, is that your understanding of

5       these two documents?

6   A.  Okay.  I believe that would be correct.

7       I haven't read them all the way

8       through, but I believe that is correct.

9   Q.  I'm going to ask you to look at page

10      two of the exhibit, which is the actual

11      job specifications, under the

12      definition section in paragraph one,

13      and ask, if you would, to respond to

14      the very last sentence of that

15      statement -- of that paragraph, "Work

16      is assigned in broad outline by an

17      administrative supervisor who reviews

18      completed work for engineering

19      soundness and satisfactory completion

20      of assigned projects."  Do you feel

21      that you, as an accountant, are

22      qualified to review this work for its

23      engineering soundness?

A.    I believe we've done a good job with
      that so far, you know, knowing the
      resources that we have available.  You
      ask me to respond to that sentence, and
      what I would tell you is, some issues
      we look at are routine and some are
      complex.  And depending on which one
      they are, we utilize more resources.
      If it's something routine that lends
      itself to Mr. Kelly's background,
      Mr. Kelly is given great latitude to
      resolve that issue himself.  If it is
      something that's more complex, then we
      pull in other people such as our other
      staff engineers, Ms. Hamilton, other
      Commissions.  We utilize these other
      resources to see if we can get
      everybody's opinion going in the same
      direction.

           And a good example of that is
      these electric rules, it's a task that
      we did back when Mr. Kelly came on
      board.  And it was the special electric

1    rules of the Commission.  And we took

2    it upon ourself, at the direction of

3    Ms. Hamilton, to review those electric

4    rules.  And the way we did that was we

5    got a set of proposed rules from our

6    engineers.  We let Alabama Power look

7    at them.  We let Mr. Kelly look at

8    them.  We let Rick Cleckler look at

9    them.  Ms. Hamilton looked at them.  I

10   looked at them.  Everybody had

11   comments.  We sat around big tables,

12   hashed around our ideas, hashed things

13   out, and we came up with a final set

14   and presented it to the Commission.

15   But that's how we go about working on

16   complex issues for engineering

17   soundness.

18  Q.  So this was not your final decision?

19  A.  What's that?

20  Q.  The decision on those rules?

21  A.  It was a group decision.

22  Q.  And Ms. Hamilton was involved in that

23      decision?

1   A.   Yes.

2   Q.   And is it your understanding that

3        Ms. Hamilton has a background in

4        engineering?

5   A.   Yes.

6   Q.   And how long did you say you've been

7        with the Commission, Mr. Free?

8   A.   In May of 1990 was when I started.  So

9        a little over 15 years.

10  Q.   And have you always been assigned to

11       the Electricity Section?

12  A.   I have.

13  Q.   And in your experience during that

14       number of years with the Commission, is

15       it common for there to be an engineer

16       in the Electricity Section?

17  A.   Over those 15 years, yes, it was common

18       to have engineers in the Electricity

19       Section.

20  Q.   When did that occur; do you remember?

21  A.   When I was hired in May of 1990 there

22       were engineers in the Electricity

23       Section.  And they remained in the

1    section -- I don't know the exact day,

2    but it seems like after Mr. Ducksberry

3    retired, the previous supervisor,

4    Ms. Hamilton became responsible for the

5    Electricity Section.  There was a

6    period of time of about maybe four to

7    five years that there was not an

8    Electricity Section supervisor per se.

9    Ms. Hamilton took on that role.

10        And during that time I believe she

11   let Bernard Givan, one of our senior

12   engineers, provide a leadership role

13   for the engineers, but he reported to

14   her.  And she let the accountants and

15   auditors and analysts and myself report

16   to her.  But then when she was able to

17   fill the Utility Rate Supervisor slot

18   with myself, then it went back to the

19   old form of having an engineer that was

20   in.  And we've downsized, we don't have

21   as many as we once had.  But prior to

22   Mr. Kelly, with Will Straughn, right

23   before his retirement, he reported to

1        me.

2    Q.    Well, I'm a little confused about that.

3          I'm looking at Employee Exhibit Number

4          7 -- and I will explain these exhibits

5          are partial exhibits.

6    A.    Sure.

7    Q.    I went to the Public Service Commission

8          website and printed off certain

9          sections of annual reports. And for

10         the sake of economy, I didn't copy the

11         entire thing. But Exhibit Number 7 was

12         the 1997 annual report. And you flip

13         over a couple of pages and it would

14         appear that William Straughn was in the

15         Technical Section, not in the Electric

16         Section -- Electricity Section?

17   A.    He was for a period of time, that's

18         correct. But he was reassigned to me,

19         and I don't know the date, but --

20   Q.    Now, according to this particular

21         exhibit, he was a Utility Engineer

22         Technician or a Utilities Engineering

23         Technician. Do you know the

1    differentiation between the engineering

2    technician and the engineering

3    specialist, such as Mr. Cleckler and

4    Mr. Givan were in that same section at

5    that period of time?

6  A.  I don't have that information in front

7    of me.  No, I don't.

8  Q.  Okay.  But looking at the Electricity

9    Section, do you see any engineering-

10   type employees listed in that section

11   based on their job titles?

12 A.  On this page seven of 62?

13 Q.  Yes.

14 A.  Under the Electricity Section?  No,

15   there is no engineers on that page

16   seven of 62 in the Electricity Section.

17 Q.  Okay.  I would like to ask you to look

18   at the last page of that exhibit, which

19   is page 27 of 62.  And, if you would,

20   review the outline of information that

21   is assigned to the Technical Section,

22   and ask if that is the type of activity

23   that Mr. Kelly currently does at the

1      Commission?

2   A.    I would say the majority of it does;

3         there are a few sentences that do not.

4   Q.    I understand that he does not become

5         involved in gas utilities or water

6         utilities; is that correct?

7   A.    Yeah.  The first sentence, you know,

8         about the gas and water is not -- we

9         haven't done that.

10  Q.    But generally speaking, these things

11        which are outlined in the Technical

12        Section of the annual report for 1997

13        apply to the job that Mr. Kelly is

14        currently doing at the Commission?

15  A.    Yes, the ones that relate to the

16        electricity piece of it.

17  Q.    At what point, Mr. Free, if you recall,

18        was a position such as Mr. Kelly's

19        assigned to the Electricity Division?

20  A.    I don't have that information.

21  Q.    Prior to Mr. Kelly being hired, did you

22        have someone in that position in your

23        division or in your section?

1  A.   Prior to Mr. Kelly?  How far back do

2       you want to go?  Immediately preceding

3       Mr. Kelly?

4  Q.   Well, at any point in time did you have

5       anyone who currently has the same

6       classification, I know it was named

7       something differently beforehand, but

8       the same classification that Mr. Kelly

9       is today, if you had anybody who

10      matched that description prior to his

11      being hired at the Commission?

12 A.   No.  I believe Bernard resigned or

13      moved on prior to the reorganization or

14      prior to putting the Technical, all

15      except Rick, back under us in the

16      Electricity Section.  But Will, who

17      wasn't the same title, he was

18      technician, did come under me

19      immediately, but he retired also prior

20      to Mr. Kelly being hired.  That's what

21      created the vacancies was some people

22      moving.

23 Q.   The vacancy that Mr. Kelly filled,

1    where was that vacancy located at the

2    Commission?  Do you know that?

3  A.  I don't know.  You would have to ask

4    Personnel or something.

5  Q.  Did you participate in the decision to

6    change the organization of the Energy

7    Division to do away with the Technical

8    Section?

9  A.  No.

10 Q.  I'm going to show you what has been

11    marked by the Public Service Commission

12    as its Exhibit Number 3 and ask, if you

13    would, to identify that for the record?

14    JUDGE MORRIS:  Hold on a minute.

15    Mr. Samford, have you provided copies

16    for the panel?

17    MR. SAMFORD:  Yes, sir.  Your

18    Honor, I had not -- I apologize, I had

19    not made copies for each individual

20    panel member.  I don't have that many.

21    I've got that.  I was going to

22    introduce it.  I figured the exhibits

23    would be given to the panel at the

1     conclusion, so I had not made

2     individual copies, and I apologize.

3           JUDGE MORRIS:  Okay.

4  BY MS. ALLEN:

5  Q.  Now, the cover page is just that, a

6     cover page.  Would you look at the

7     document and tell me if you recognize

8     this document?

9  A.  Yes, I recognize it.

10  Q.  Were you instrumental in that

11     document's preparation?

12  A.  Yes.

13  Q.  Would you consider that a technical

14     document?

15  A.  I would consider it a report.  I mean,

16     it was -- I don't know what you mean by

17     technical, but I can explain, if you

18     would like, how this document arose.

19  Q.  Please.

20  A.  There was a petition by Alabama Power

21     Company to develop an environmental

22     cost recovery mechanism.  And as part

23     of that procedure, at the end of last

1   year they submitted their environmental

2   plan to the Commission for its review.

3   As a part of that plan and as a part of

4   the cost recovery, it is based on the

5   capital projects that are placed in

6   service during '05. They listed those

7   capital projects in the plan with a

8   time line of when they would come in

9   service and at what cost.

10      We scheduled a conference call to

11   talk with their -- I believe it was the

12   project manager and some of their

13   regulatory people to discuss ,

14   line-item-by-line-item each one of

15   those capital projects. And we wanted

16   to know, in their opinion and in their

17   description, what those projects were;

18   what they would be used for; how much

19   they estimated them costing; and what

20   law or legislation they tied back to

21   that made them necessary to be put in

22   place.

23      And so we went to the conference

1     room and we got Alabama Power on the

2     phone.  It was me, Greg and Mr. Taylor,

3     Robert Taylor.  And we were there to

4     interview them via the conference call

5     and discuss the projects via the

6     conference call.  We were taking notes.

7     I was taking notes; Robert was taking

8     notes; Greg didn't take notes.

9          After the conference call was

10    over, Greg had come in my office and I

11    asked him would he write up that

12    conference call for our staff review of

13    the company's environmental compliance

14    plan.  It was going to be a piece of

15    the staff review.

16         And so after a couple of weeks I

17    was working on it myself from my notes.

18    And the top pages are what I prepared

19    for the staff's review and the bottom

20    section is what Mr. Kelly submitted to

21    me as his understanding of that

22    conference call.

23  Q.  So those first several pages were taken

1       from your notes?

2  A.  And research.

3  Q.  Did you ever go and visit any of these

4       facilities and check any of the

5       engineering soundness of what they were

6       doing?

7  A.  Visit them, no.  This was not -- we

8       weren't at that stage at that point.

9       This was purely a descriptive piece of

10      the report to lay out there what they

11      had in mind and what they were planning

12      on doing and why it was necessary.  I

13      do believe I made some phone calls

14      afterwards for a little bit of

15      clarification to my notes, and I think

16      I did -- I'm pretty sure I did quite a

17      bit of Internet research on some of

18      these subject matters.

19  Q.  Okay.  So would it be fair to say that

20      most of this information came from your

21      Internet research and your notes from a

22      telephone conversation?

23  A.  And the phone calls.

1    Q.   And the phone calls?

2    A.   Yes.

3    Q.   Okay.  Now, some of that documentation

4         from that PSC Exhibit Number 3 deals

5         with some very technical equipment and

6         activities?

7    A.   Uh-huh.

8    Q.   Do you have any specific knowledge of

9         what engineering is required to produce

10        the results that have been outlined in

11        your report?

12   A.   Specific engineering knowledge?

13   Q.   Yes.

14   A.   Like how do they construct these things

15        and put them in place?

16   Q.   Yes.

17   A.   No.  Mr. Kelly goes out and makes site

18        visits for the staff in that regard.

19   Q.   Do you have any independent background

20        or knowledge or understanding of

21        engineering terminology?

22   A.   Background as in educational or just my

23        experience here at the Commission?  I

1    mean, we've discussed a lot of these

2    projects over the years at the

3    Commission.  Not these particular ones,

4    but, you know, when they're getting

5    ready to build new plant or co-gens or

6    things like that, you know, I've sat

7    down around the table before with

8    engineers and listened and learned

9    along the way various things.  I mean,

10    I'm sure -- go ahead.

11    Q.    I guess my reason, and not that I'm

12    trying to put a bad spin on Mr. Kelly,

13    but how do you know whether he's doing

14    his job appropriately if you don't have

15    the engineering background to review

16    his work?

17    A.    Well, you have to take the issues at

18    hand, you know, and what's at stake,

19    and you just hope Mr. Kelly will

20    present the information.  For lack of a

21    better term, you know, you kind of dumb

22    it down.  You don't go out and do a

23    site visit and then come back and write

1    it in chemical formulas and all of that

2    stuff and expect us to understand it.

3    That's part of the burden of the

4    engineer is to dumb these things down

5    and write them in layman's terms so you

6    can make a logical decision.

7        MS. ALLEN:  I think that's all I

8    have for right now.

9        JUDGE MORRIS:  Okay.  Mr. Samford.

10       MR. SAMFORD:  I'll let

11   Ms. Hamilton go first, if that's all

12   right.

13       JUDGE MORRIS:  Okay.

14

15             CROSS-EXAMINATION

16   BY MS. HAMILTON:

17   Q.   Okay.  Mr. Free, at the time you

18        started working with the Public Service

19        Commission, to whom did you report?

20   A.   Mr. Robert Ducksberry.

21   Q.   Okay.  And what was Mr. Ducksberry's

22        job classification and educational

23        background?

1    A.   His job classification?  I guess you

2         mean the Utility Rate Supervisor.  And

3         his background, as best I recall, was

4         in financial analysis, accounting-type

5         area.

6    Q.   Okay.  In the early years of your

7         career with the Commission, to whom did

8         the Energy Division's engineering and

9         technical personnel report?

10   A.   They reported to Mr. Ducksberry.

11   Q.   Okay.  Who was the Energy Division

12        Director at that time?

13   A.   Charles Stults.

14   Q.   Okay.  During that time how many

15        technical staff members were included

16        in the Electricity Section, to your

17        recollection?

18   A.   I believe there was Bernard and Rick

19        and Will and yourself were the

20        engineers, the best I recall.

21   Q.   Okay.  And Mr. Will Straughn was an

22        engineering technician; is that

23        correct?

1    A.    Correct.

2    Q.    When Mr. Stults left the PSC, who

3          replaced him?

4    A.    Jim Bradford.

5    Q.    Okay.  What was his --

6    A.    He was an Interim Director, appointed

7          as Interim Director.

8    Q.    Okay.  Under Mr. Bradford's leadership

9          how did the organizational structure of

10         the Electricity Section change?

11   A.    The best I recall, it didn't change at

12         all.

13   Q.    Okay.  And when Mr. Bradford left the

14         Commission, who replaced him?

15   A.    You replaced him, Ms. Hamilton.  I'm

16         not sure about the timing, but you were

17         the next Director.

18   Q.    Okay.  What is Mr. Ducksberry's

19         position at the Commission now?

20   A.    Mr. Ducksberry retired; he's no longer

21         at the Commission.

22   Q.    Okay.  Do you remember about when that

23         was?

1    A.    '95 maybe, something like that.

2    Q.    All right.  After Mr. Ducksberry's

3          retirement, to whom did the engineers

4          and technical staff report in the

5          Energy Division?

6    A.    The best I recall, I mean, I think it

7          stayed like it was for a while and then

8          as the Electricity Section was

9          reporting to you at that time, the best

10         I recall now, you carved out the

11         engineers and made Mr. Givan the leader

12         of that group.  He did not hold any

13         supervisory title, he was still an

14         Engineer II, but I think Will and Rick

15         reported to him and he reported to you.

16         Does that answer your question?

17   Q.    Yes.  Thank you.  How long have you

18         performed your role of Utility Rate

19         Analyst Manager at the Commission?

20   A.    You know, I don't know.  I believe that

21         was 2001 or 2002 I was promoted.

22   Q.    Okay.

23   A.    So that would be about four to five

1　　　years, something like that.

2　Q.　Okay.  Have you ever, during the course

3　　　of your 15 years with the Commission,

4　　　worked with any of the engineers at the

5　　　Commission on any projects?

6　A.　Sure.  Sure.

7　Q.　Is that common or just every now and

8　　　then you do that?

9　A.　Again, I think it goes back to the

10　　　issue, but not necessarily always does

11　　　it have to be a complex issue.  I mean,

12　　　from time to time me and Mr. Cleckler

13　　　will talk about things or I will get

14　　　his advice on different subject

15　　　matters.  And I think we worked the

16　　　same way with Will and Bernard when

17　　　they were here.  It's not always an

18　　　all-in or all-out; it's just, you know,

19　　　you work with the subject matters and

20　　　turn to whoever you think can give you

21　　　the best help.

22　Q.　Okay.  How many other engineers/

23　　　technical positions are assigned to

1    other sections in the Energy Division?

2 A.  The only one I'm aware of is

3    Mr. Cleckler's position in the

4    Technical Section.  He reports to you,

5    I believe.

6 Q.  Okay.  When Mr. Kelly -- when you

7    interviewed Mr. Kelly for the job that

8    he's holding now, was he told that he

9    would be reporting to you?

10 A.  Yes.

11 Q.  Is the organizational structure of the

12    Electricity Section the same today as

13    it was when Mr. Kelly was interviewed?

14 A.  Yes.

15 Q.  Is it the same as the day he was hired?

16 A.  Yes.

17 Q.  Just briefly can you tell us what role

18    the engineer in the Electricity Section

19    has?

20 A.  Yeah.  I mean, it's very similar to his

21    Form 40, his tasks and

22    responsibilities.  And they are -- they

23    range from assisting with consumer

1          complaints, to going out and doing

2          these site visits, to doing some

3          training on his own, to staying abreast

4          of other technical matters in the

5          energy field.  It's a variety of things

6          that he performs, but those are, you

7          know, some of them.  Not all of them,

8          but some of them.

9     Q.   Okay.  You've already stated that you

10         discussed engineering subjects and

11         issues with Mr. Cleckler who is the

12         Division's other engineer.  Would you

13         agree that plant operations and

14         maintenance concerns are more

15         engineering-related than

16         accounting-related?

17    A.   Yes.

18    Q.   So the cost of operations and

19         maintenance, are they included in rates

20         and tariffs at all?

21    A.   Yes.

22    Q.   Okay.  The Public Utility Technical

23         Specialist job description indicates

1    that Mr. Kelly's work will be reviewed

2    for engineering soundness. How do you

3    generally review Mr. Kelly's work

4    products for engineering soundness?

5  A.   Again, I would have to go back, I

6    guess, and restate my early response to

7    Ms. Allen. You know, it depends on the

8    issue, the complexity of the issue, but

9    at your hand, I mean, you can utilize a

10   number of resources to get involved.

11   And I listed those as other PSC staff

12   members being engineers, too; you've

13   got other Commissions you can call;

14   you've got technical literature; you've

15   got the Internet.

16       And the more complex, the more

17   individuals you get involved to help

18   you with your research and pull

19   information out. You will involve the

20   utility, you will get their side of it

21   and get their technical expertise

22   involved. You try to facilitate this

23   type of problem so that you can come

1    back to a resolution that everybody can

2    live with.

3  Q.  Okay.  Thank you.  Is there a technical

4    position of a higher grade in the

5    Energy Division than the position that

6    Mr. Kelly now holds, to your knowledge?

7  A.  No.

8  Q.  In order for a Utility Technical

9    Specialist Senior to move to a higher

10    classification, would that require a

11    transfer to another division or to

12    another agency?

13  A.  I would assume so.

14  Q.  Would you discourage Mr. Kelly's

15    transfer to another PSC division or

16    another State agency that would provide

17    the work situation he desires?

18  A.  Not if that's Mr. Kelly's wishes, I

19    wouldn't.

20  Q.  And finally, very briefly, Mr. Free,

21    what is your wife's educational

22    background and work experience?

23        MS. ALLEN:  Objection as to

1    relevance.

2         JUDGE MORRIS:  Ms. Hamilton, how

3    is this relevant?

4         MS. HAMILTON:  Well, I just wanted

5    to show that, you know, other

6    accountants supervise engineers as

7    well.  It is my understanding that Mr.

8    Free's wife is an accountant and she

9    supervises engineers on her job.

10        JUDGE MORRIS:  I don't think that

11   that's relevant to the situation at

12   hand here at the PSC.

13        MS. HAMILTON:  All right.  Well,

14   that's all I have.  Thank you,

15   Mr. Free.

16

17              CROSS-EXAMINATION

18   BY MR. SAMFORD:

19   Q.   Mr. Free, you stated previously that

20        Will Straughn's job title was not the

21        same as Mr. Kelly's, but Will Straughn

22        was under your supervision?

23   A.   At one point in time he was.

1    Q.   And was his job description, although

2         not the same, was it technical in

3         nature?

4    A.   Yes, definitely.

5    Q.   I have what has been marked as PSC

6         Exhibit 3.  Is that a document that you

7         prepared?  All right.  Now, 3 is what

8         -- I'm sorry.

9              MR. SAMFORD:  I made extra copies.

10        Who didn't get a 3?  Your Honor, I

11        would ask that PSC Exhibit Number 3 be

12        -- it's already been referred to, I

13        would ask that it be admitted into

14        evidence.  And I guess would the

15        original go with the court reporter?

16             JUDGE MORRIS:  Yes.

17   Q.   I show you now what has been marked as

18        PSC Exhibit 2 and ask you to identify

19        it?  Please just describe the document,

20        if you recognize it.

21   A.   Yeah, I recognize it.  It's really very

22        simple, it's just some e-mail

23        correspondence between myself and

1    Ms. Hamilton and Mr. Kelly. It kind of

2    shows how we work together hopefully to

3    get the right answer back to the

4    Division Director or whoever it needs

5    to go to. I think you could read it

6    and it speaks for itself, but it's our

7    way of how we work together and try to

8    monitor answers and e-mails and try to

9    copy each other and things like that.

10 Q.   And I believe I heard Ms. Hamilton ask

11    you the question, but is the

12    organization the same as it was at the

13    time Mr. Kelly was hired?

14 A.   Yes.

15 Q.   Do you feel -- in light of everything

16    that's been discussed and your

17    on-the-job education, so to speak, do

18    you feel confident to supervise

19    Mr. Kelly?

20 A.   Yes.

21 Q.   Have you ever received any complaints

22    of illegal discrimination by Mr. Kelly?

23 A.   No.

1          MR. SAMFORD:  I'm done, Your

2   Honor.

3          JUDGE MORRIS:  Okay.  Members of

4   the panel, do you have any questions of

5   the witness?

6          MR. JONES:  Just one point of

7   clarification.  Is there still a

8   Technical Section within the Energy

9   Division?

10  A.  Not as it once existed.  Back after

11   Mr. Ducksberry retired and there were

12   three engineers on staff, that's when

13   Bernard Givan kind of headed up Rick

14   and Will and reported to Janice.  Since

15   that time the engineers, all except

16   Mr. Cleckler, were moved back under the

17   Electricity Section.

18          Now, whether you call Mr. Cleckler

19   the Technical Section, I don't know.

20   It's one person.  He really just works

21   on special projects and they could be a

22   number of things.  And he's at the --

23   works at the discretion of the

1      Director.

2              MR. DILLARD:   I believe in

3      Ms. Hamilton's earlier testimony that

4      she said that the organization chart,

5      if you will, or the way these sections

6      are divided was the same at the time of

7      his hiring -- Mr. Kelly's hiring as it

8      exists today; is that correct?

9   A.  They're the same today as they were

10     when Mr. Kelly was hired.

11             MR. DILLARD:   There has been no

12     reorganization since that time?

13  A.  No.

14             MR. DILLARD:   Also I understand

15     that Mr. Kelly's position is a merit

16     system or merit system employee; is

17     that correct?

18  A.  Yeah, Mr. Kelly is a merit employee.

19             MR. DILLARD:   Merit employee.   And

20     he underwent a six month probationary

21     period, would that be correct?

22  A.  He was hired as an Engineer I and went

23     under a six month's probationary period

1    and was given permanent status with the

2    necessary step increases. After about

3    a year and a half, I think, we pursued

4    getting him promoted to an Engineer II.

5    Again, he went under a six month's

6    probationary status. He was given

7    permanent status afterwards.

8          MR. DILLARD: During either one of

9    those probationary periods, did he

10   express any concern about the

11   arrangements, supervisor/employee

12   arrangements, or any concerns during

13   those periods?

14   A.   I don't recall anything regarding the

15   organizational structure.

16         MR. DILLARD: That's all I have.

17         MR. SAMFORD: I failed -- excuse

18   me, Your Honor, I failed to ask that

19   Exhibit 2 -- that PSC Exhibit 2 be

20   admitted.

21         JUDGE MORRIS: Okay. I'm going to

22   rule on these at the end, hopefully

23   just at the very end, unless someone

1   has an objection. We will get

2   everything admitted at that point

3   formally in the record.

4        MS. SPIVEY: I have a question.

5   The other engineers that are in the

6   Energy Section, are they -- do they do

7   comparable work to Mr. Kelly?

8  A.   They have done comparable work to

9   Mr. Kelly. And I -- I would say yes.

10   I mean, not identical work, but I think

11   comparable would be an appropriate

12   term.

13        MS. SPIVEY: And they are assigned

14   to the --

15  A.   There's only one other.

16        MS. SPIVEY: There's only one

17   other?

18  A.   Rick Cleckler.

19        MS. SPIVEY: There's only one

20   other, so there are two engineers?

21  A.   In the Energy Division.

22        MS. SPIVEY: In the Energy

23   Section. Mr. Cleckler and Mr. Kelly?

1  A.    That's correct.

2          JUDGE MORRIS:  Any other

3  questions?  Okay.  Do you have any

4  follow-up?

5          MS. ALLEN:  No.

6          JUDGE MORRIS:  The witness is

7  excused.

8          THE WITNESS:  For the day?

9          MR. SAMFORD:  I don't -- I don't

10  expect to need Mr. Free any more.

11          MS. ALLEN:  I don't have any

12  reason to expect so either.

13          JUDGE MORRIS:  Okay.  Yes.

14  At this time, before we call the next

15  witness, let's take a short -- about a

16  ten minute recess.

17          (Recess.)

18          JUDGE MORRIS:  Mr. Taylor, if you

19  will please stand and raise your right

20  hand, I will swear you in.

21          (Witness sworn.)

22          JUDGE MORRIS:  Thank you.  Please

23  be seated.

1          ROBERT TAYLOR, III, of lawful age,

2    having first been duly sworn, testified as

3    follows:

4

5                    DIRECT EXAMINATION

6    BY MS. ALLEN:

7    Q.    Would you state your name for the

8          record, please?

9    A.    Robert Taylor, III.

10   Q.    And where are you employed, Mr. Taylor?

11   A.    Alabama Public Service Commission.

12   Q.    And in what capacity are you employed

13         by the PSC?

14   A.    I'm employed as a Public Utilities

15         Analyst III in the Energy Division of

16         the Public Service Commission.

17   Q.    What is the primary focus of your job

18         duties, Mr. Taylor?

19   A.    Primarily the analysis of financial

20         operations of the electric utility, in

21         particular Alabama Power Company, and

22         also the auditing of fuel transactions

23         that flow through that organization.

1    Q.    And what is your educational

2          background, Mr. Taylor?

3    A.    I have a BS degree from Tuskegee

4          University, a major in Industrial

5          Technology with a concentration in

6          electronics and a minor in math.  I

7          matriculated through Texas AUM and

8          finished their core courses for

9          meteorology.  I also finished the MBA

10         program curriculum at Troy State.  I

11         did not sit for the comps; I just chose

12         not to.  And various other management

13         and personnel courses.  I also finished

14         a six weeks' in-residence personnel

15         officers' course in the United States

16         Air Force.

17   Q.    So you have both a business and an

18         engineering background; is that fair to

19         say, based on your experience and your

20         education?

21   A.    Industrial technology, which is akin to

22         engineering, but is in the School of

23         Applied Sciences at Tuskegee

1       University.

2   Q.  How long have you been with the

3       Commission?

4   A.  Since 1986.

5   Q.  And have you always been in the analyst

6       job series?

7   A.  Correct.

8   Q.  And, again, that is a primarily

9       accounting focus; is that correct?

10  A.  Primarily.

11  Q.  Have you ever considered looking at

12      whether you might qualify for any of

13      the more technical or engineering jobs

14      at the Commission?

15          MR. SAMFORD:  Objection, Your

16      Honor, it's irrelevant.  His current

17      position is an analyst and he has so

18      testified.  I don't believe the issues

19      in question have anything to do with

20      what he might have considered doing.

21          JUDGE MORRIS:  Ms. Allen, where

22      are you going with this?

23          MS. ALLEN:  Let me ask a different

1    question and I will lead back into that

2    one and see if you will understand the

3    relevance.

4                 JUDGE MORRIS:  Okay.

5    Q.   Who was your supervisor at the

6    Commission, Mr. Taylor?

7    A.   John Free.

8    Q.   And that is your direct line

9    supervisor?

10   A.   That's correct.

11   Q.   And he is also an analyst supervisor;

12   is that correct?

13   A.   Correct.

14   Q.   As an accounting-type or an analyst, do

15   you have confidence that when Mr. Free

16   reviews your work that he understands

17   the aspects of the job performed?

18               MR. SAMFORD:  I object.  Your

19   Honor, what Mr. Taylor thinks about

20   Mr. Free's competence has absolutely

21   nothing -- Mr. Free's competence as a

22   supervisor is -- as to an engineer has

23   nothing to do with the opinion of this

1    witness as an analyst as to whether

2    Mr. Free can competently supervise an

3    engineer.

4         JUDGE MORRIS:  Ms. Allen?

5         MS. ALLEN:  I am attempting to

6    show that this individual, who has both

7    a background in a technical field and

8    an accounting field, and I don't want

9    to testify for him, but the fact that

10   he has no issues being supervised by an

11   accountant in an accounting field, but

12   that as an engineer, in a follow-up

13   question, that that might be of some

14   separate concern.

15        MR. SAMFORD:  I would suggest that

16   Mr. Taylor is incompetent to testify on

17   the issue of Mr. Free's ability to

18   competently supervise an engineer.

19   Second of all, Mr. Taylor is on the

20   same level, if you will, as Mr. Kelly.

21   He is not privy to anywhere near all of

22   the discussions that would be had at a

23   higher level, either horizontally or

1    vertically upwards, and I would say,

2    again, is incompetent to pass judgment

3    or even express an opinion on whether

4    Mr. Free can competently supervise an

5    engineer.

6    JUDGE MORRIS: I am inclined to

7    agree with Mr. Samford's reasoning

8    here. I mean, all of these panel

9    members here at the Commission, in many

10   instances, are in similar positions and

11   I think are -- understand a lot of the

12   organizational structures and some of

13   the points you're trying to make.

14   They're in similar positions. I'm not

15   sure what Mr. Taylor adds to this. Is

16   there another line of questioning that

17   you have for Mr. Taylor?

18   MR. SAMFORD: And while she's

19   talking to her client, Your Honor, I

20   would further mention that the listing

21   of Mr. Taylor's qualifications, while

22   very impressive, I heard a good deal of

23   emphasis being placed on the personnel

1    training and so forth. And I renew my

2    objection to his expertise or any

3    training he might have in personnel.

4    His job is an analyst and that just

5    goes along with the rest of my

6    objection.

7    BY MS. ALLEN:

8    Q.   If Mr. Free for some reason were unable

9         to perform his job duties, would you be

10        in a position, as an analyst, to assume

11        those responsibilities if you applied

12        for that position? Would you have the

13        necessary qualifications and skills to

14        step into that job if he retired

15        tomorrow?

16   A.   According to the job specifications, I

17        would qualify, yes.

18   Q.   Since you've testified that to your

19        belief that you would likely qualify to

20        perform the job functions that Mr. Free

21        currently has, would you be in a

22        position to supervise the other

23        analysts in that --

1    MR. SAMFORD: Objection, Your

2    Honor. Number one, it is speculative

3    as to what he would do if the position

4    was open. Number two, it is his

5    opinion only, which would have to be

6    verified by our Personnel, State

7    Personnel. This, as has been stated,

8    is a merit system job. Third of all,

9    the fact that Mr. Taylor might or might

10    not qualify to fill John Free's

11    position, Ms. Allen, with all due

12    respect, is trying to come in the back

13    door where you have not allowed her to

14    come to the front. The fact that he

15    might qualify and then supervise Greg

16    Kelly does not give him the competence

17    to testify on the issue, which is

18    Mr. Free's supervision of Greg Kelly.

19    MS. ALLEN: I have no further

20    questions of this witness.

21    JUDGE MORRIS: Okay.

22    Ms. Hamilton.

23    MS. HAMILTON: I don't have any

1    questions.

2         MR. SAMFORD:  No, sir.

3         JUDGE MORRIS:  Mr. Taylor, you are

4    excused.

5         MS. ALLEN:  And now I would like

6    to call Ms. Hamilton.

7              (Witness sworn.)

8         JUDGE MORRIS:  Thank you.  Please

9    be seated.

10

11         JANICE M. HAMILTON, of lawful age,

12    having first been duly sworn, testified as

13    follows:

14

15              DIRECT EXAMINATION

16    BY MS. ALLEN:

17    Q.    Ms. Hamilton, what is your current

18          position?

19    A.    I'm currently the Director of the

20          Energy Division.

21    Q.    And how long have you been at the

22          Public Service Commission?

23    A.    I came on board in August 1990.

1    Q.    And how long have you held the position

2          of Director of the Energy Division?

3    A.    Since October 1992.

4    Q.    Prior to being appointed Director, were

5          you also in the Energy Division?

6    A.    Yes, I was.

7    Q.    And what was your classification?

8    A.    I was an engineer, Engineering

9          Specialist II.

10   Q.    At the time that you were an

11         engineering specialist in the Energy

12         Division, were you in the Electricity

13         Division or were you in the Technical

14         Section?

15   A.    I was in the Electricity Section.

16   Q.    At what point do you recall a Technical

17         Section being created, or do you

18         recall?

19   A.    I do.  It was around the 1995 or 1996

20         time frame.

21   Q.    Do you recall the reason for that

22         occurring?

23   A.    Yes.

1   Q.   Would you testify as to those reasons?

2   A.   Yes.  Mr. Bob Ducksberry, who had been

3        the Electricity Section supervisor,

4        retired in 1995.  I assumed the

5        responsibilities of the section,

6        supervising that in addition to my

7        other duties.  It became a little

8        cumbersome for me to perform all of

9        those duties at once, so I split the

10       section up and asked Mr. Givan to lead

11       the technical aspects of the

12       Electricity Section.

13  Q.   Did the engineers in the Technical

14       Section do any activities outside the

15       Electricity Division or Electricity

16       Section?

17  A.   On occasion they did.  Mr. Cleckler

18       primarily worked with water matters

19       that had to do with engineering and

20       some gas, very little gas, but water

21       sometimes.

22  Q.   At what point did you reduce the

23       Technical Division to one employee or

1    did that Technical Section reduce

2    itself to one person?

3  A.  It was around 2001.  The Commission

4    wanted Mr. Cleckler to address more

5    generic energy issues, such as

6    wastewater, which later came on, and

7    some multidiscipline functions, because

8    from time-to-time we will get surveys

9    requesting information for all the

10   energy functions and we needed someone

11   to coordinate that.  So I had him to

12   perform special projects as they came

13   up for the Energy Division.  And the

14   other engineers were assigned to the

15   Electricity Section when Mr. Free was

16   promoted to supervisor.

17 Q.  Why did you feel it was necessary to

18   separate the -- Mr. Cleckler's position

19   from the other engineers?  Why would

20   his position not have simply had

21   different job duties or assignments

22   within the same Technical Section?

23 A.  Because, like I said, it covered every

1     other discipline, gas and water as

2     well.

3  Q.  Is that not all, though, underneath

4     your supervision?

5  A.  Yes, it is.

6        MR. SAMFORD:  Your Honor, I'm

7     going to object to Ms. Hamilton's

8     reasoning on her putting some other

9     employee who is not at issue in this

10    case in the organization.  It's like

11    her asking, you know, why Judy McLean

12    put me under her; it has nothing to do

13    with Mr. Free and Mr. Kelly.

14       MS. ALLEN:  I would argue that it

15    does and I will hope to make the

16    connection.

17  Q.  Do you recall when Mr. Kelly was hired

18     by the Commission?

19  A.  Yes.

20  Q.  And what year was that?

21  A.  2002.

22  Q.  2002?

23  A.  Uh-huh.

1   Q.   At that time did you still have a

2        Technical Section?

3   A.   It may have been called that, but it

4        was doing the functions of the special

5        projects.

6   Q.   And, again, prior to Mr. Kelly's

7        arrival, all of the engineers had been

8        grouped together in the Technical

9        Section?  I think there was a technical

10       assistant or a technician, I think, in

11       the Energy Division at one time in the

12       Electricity Section?

13  A.   He was an engineering technician in the

14       Electricity Section, yes.

15  Q.   But generally speaking, the people who

16       were in the Electricity Section were

17       analysts and I think one engineering

18       technician according to the 2001 annual

19       report, would that be the best of your

20       recollection?

21  A.   Yes.

22  Q.   And at that time Mr. Cleckler was the

23       only engineering specialist in the

1       Technical Section?

2   A.  Right.

3   Q.  At what point was the name changed from

4       Technical Section to Special Projects,

5       do you recall?

6   A.  It may not have been immediately after

7       Mr. Free was promoted to supervisor of

8       the Electricity Section, but it was

9       some months after that.

10  Q.  When Mr. Kelly was hired, did you ever

11      consider re-creating the Technical

12      Section to put all of the engineers

13      into one area?

14  A.  No.

15  Q.  And why is that?

16  A.  Because the focus for Alabama Power

17      needed to be with one person. Because

18      of the broad complex scope of the

19      company, one person needed to oversee

20      all of the aspects of regulating the

21      company, in my opinion.

22  Q.  Now, you've testified as to your

23      background in engineering. In your

1   opinion, do you believe that it would

2   be better for an engineer to supervise

3   another engineer because of the

4   technical competency nature of that

5   type of position?

6   A.   Not necessarily, no.

7   Q.   All right.  And what do you base that

8   opinion on?

9   A.   Well, because one person needs to be

10   responsible for the oversight of

11   Alabama Power Company, which

12   encompasses more than just financial

13   aspects.  It encompasses engineering,

14   personnel, computers, a whole lot of

15   different things.  And I believe that

16   having one person to coordinate those

17   efforts would be much more -- would

18   provide a much better work product than

19   having them separated.

20   Q.   Is this based on your experiences?

21   A.   Yes.

22   Q.   Because for a number of years,

23   according to the annual reports, you

1    had a Technical Section, and the

2    definition of what those employees in

3    the Technical Section did are those

4    duties which Mr. Kelly now performs?

5  A.   And that's because I was the person

6    coordinating everything for Alabama

7    Power Company.

8  Q.   Even though you were at the time the

9    Director of the Energy Division?

10  A.   Yes.

11  Q.   Are you saying that the person who was

12    in the -- in charge of the Electricity

13    Section was not competent to manage

14    those engineering requirements?

15  A.   I was the person --

16        MR. SAMFORD:  Your Honor, the

17    question has been asked and it's been

18    answered, she said she was in charge.

19        JUDGE MORRIS:  Well, I think she's

20    trying to clarify a point here.  And

21    actually I'm a little confused, too.

22  Q.   Was there a person during this time

23    frame who was over the Electricity

1          Section?

2     A.   Yes, that was me.

3     Q.   So you were both the Energy Division

4          Director and Electricity Section

5          Director; is that correct?

6     A.   That's correct.

7     Q.   How long did that occur?

8     A.   Too long actually.  At least five --

9          well, no, at least four years.

10    Q.   So you're testifying, as I understand

11         it, that you were over the entire

12         division?

13    A.   Uh-huh..

14    Q.   And you specifically individually

15         supervised those employees in the

16         Electricity Section?

17    A.   Yes.

18              MR. SAMFORD:  That question has

19         now been asked for the third time, Your

20         Honor.  She has answered it twice in

21         the affirmative.

22              MS. ALLEN:  I'm just making sure.

23         This one included direct supervision

1    over those employees in the Electricity

2    Section, including the accountants and

3    the analysts and so forth.

4  A.   Yes.

5  Q.   Okay.

6         JUDGE MORRIS:   Hopefully we're all

7    clear on that now.

8         MR. SAMFORD:   Thank you.   I am.

9  Q.   I believe that you may recall

10   Mr. Free's testimony when I asked about

11   his ability to supervise the technical

12   aspects of Mr. Kelly's work.   My best

13   recollection, and I'm paraphrasing, was

14   that other people within the division

15   may also help review to make sure that

16   nothing he did is incorrect as far as

17   engineering soundness; was that the

18   best recollection?

19  A.   Yes, uh-huh.

20  Q.   Let me ask you, based on the fact that

21   you are the head of the entire Energy

22   Division, whether in your opinion it

23   would not be a more clean supervisory

1    chain of command for someone with an

2    engineering background, who doesn't

3    have to go out and get opinions from

4    others, to supervise Mr. Kelly's work?

5         MR. SAMFORD: Your Honor, that

6    question has now been asked for the

7    second time. Ms. Hamilton has the

8    organization she has. If she thought

9    there was a better way, Ms. Hamilton

10   would have reorganized it. But that is

11   the second time the question has been

12   asked. Well, you've got it this way,

13   but don't you think it would be better

14   or make more sense if you did it this

15   way? Well, obviously if she did, she

16   would have it that way. But that

17   question was asked at the start of this

18   examination. We're just going round

19   and round the mulberry bush over and

20   over again.

21 Q.  Ms. Hamilton, I'm going to ask you, if

22   you would, to look at Employee Exhibit

23   Number 14. And, again, this is a

1      partial reproduction of a number of

2      documents given to me in response to my

3      request for production.  Did you

4      generate these documents, Ms. Hamilton?

5  A.  No, I did not.

6  Q.  Do you know who did?

7  A.  I believe someone in the Advisory

8      Division Personnel Section did.

9  Q.  Page one of that, if you would look,

10     has a date on it of November 15, 2004.

11  A.  Uh-huh.

12  Q.  And it does not show a Special Projects

13     Section, but it does show a Technical

14     Section; is that a mistake?

15  A.  It is.

16  Q.  Who reviews these organizational charts

17     for their accuracy?

18  A.  I have no idea.

19  Q.  I ask you, if you would, to flip over,

20     the last two pages of this exhibit is

21     an organizational chart showing the

22     entire Energy Division as opposed to

23     little snapshots, would that be a fair

1       statement?

2   A.  Yes.

3   Q.  Okay.  And in this first sheet dated

4       August 1st, 2005, this shows the Water

5       Division, Natural Gas, Electricity, Gas

6       Pipeline Safety and Special Projects,

7       does it not?

8   A.  It does.

9   Q.  And under that it clearly shows

10      Mr. Kelly falls within the Electricity

11      Division reporting to Mr. Free; is that

12      an accurate statement?

13  A.  Yes.

14  Q.  The one that had been submitted and

15      represented, I think, as the one

16      immediately prior to Mr. Kelly being

17      hired, that also shows only one person,

18      but again it was called Technical?

19  A.  Uh-huh.

20  Q.  And you changed the name of that to

21      Special Projects, you said?

22  A.  Uh-huh.

23  Q.  Okay.  Do you recall an employee by the

1    name of Bernard Givan?

2  A.  I do.

3  Q.  And did he hold the position that

4    Mr. Kelly now holds when he was at the

5    Commission?

6  A.  Yes.  For all practical purposes, yes.

7  Q.  Okay.  And did he perform the same

8    basic job responsibilities that

9    Mr. Kelly does?

10  A.  Yes.

11  Q.  And this was during the time that he

12    was heading up the Technical Division?

13  A.  Yes.

14  Q.  Do you recall when --

15  A.  He was leading the Technical Section,

16    yes.

17  Q.  Okay.  Do you recall when Mr. Givan

18    left the PSC?

19  A.  It was either 1999 or 2000.

20  Q.  Was his position filled?

21  A.  No, not immediately.

22  Q.  Do you know who filled that position?

23  A.  Mr. Kelly did actually.  Well, the

1    position he now holds is the position

2    Mr. Givan held.

3         MS. ALLEN:  I see.  That's all I

4    have at present.

5         JUDGE MORRIS:  Okay.

6         MR. SAMFORD:  Does Ms. Hamilton

7    wish to ask herself any questions

8    first?

9

10                CROSS-EXAMINATION

11   BY MR. SAMFORD:

12   Q.  First of all, after we furnished these

13       organizational charts, which are

14       identified as Employee Exhibit 14, that

15       were prepared by Personnel, did you

16       find a mistake or several mistakes in

17       those?

18   A.  Yes.

19   Q.  Did that include the one that Ms. Allen

20       just identified?

21   A.  Uh-huh.

22   Q.  All right.  I ask you to look, not on

23       the last two pages, which I believe

1       were charts you prepared, but the next

2       page forward, which is unnumbered, but

3       it's the third page from the -- excuse

4       me, the fourth page from the rear?

5   A.  Uh-huh.

6   Q.  Would you identify that?

7   A.  The one where I'm supervising Rick

8       Cleckler?

9   Q.  Yes.  And what section is that?

10  A.  That's the Special Project Section.

11  Q.  So this chart that was furnished,

12      although it was not placed on the first

13      page that Ms. Allen discussed, there

14      was a part in the back --

15  A.  Right.

16  Q.  -- that showed clearly the Special

17      Projects Section and that Mr. Cleckler

18      was the only one in it?

19  A.  Yes.

20  Q.  In your experience at the Commission,

21      have you ever known a Form 40 or a job

22      description to be out-of-date?

23  A.  Oh, yes.

1    Q.   Is it possible that even some Form 40s

2          and job descriptions in your division

3          might not be totally current?

4    A.   Yes, that's possible.

5    Q.   Does Mr. Free regularly discuss matters

6          assigned to his section with you?

7    A.   He does.

8    Q.   Are there conversations between you and

9          Mr. Free of which Mr. Kelly is not a

10         party and would not know?

11    A.   Yes, quite often.

12    Q.   If you know, does Mr. Free have

13         conversations with other members of the

14         Energy Division of which Mr. Kelly is

15         unaware?

16    A.   I'm pretty sure he does, yes.

17    Q.   So, in your opinion, Mr. Kelly would

18         not be privy, as a subordinate, to

19         every technical or -- technical

20         conversation or otherwise dealing with

21         projects assigned to his section?

22    A.   That's right.

23    Q.   As Director of the Energy Division, do

1    you believe Mr. Kelly is an effective

2    supervisor -- I'm sorry, Mr. Free?  I

3    apologize.

4  A.  Yes, I believe he is.

5  Q.  Have you ever received any complaints

6    of illegal discrimination by Mr. Kelly?

7  A.  No, I haven't.

8        MR. SAMFORD:  That's all, Your

9  Honor.

10        JUDGE MORRIS:  Members of the

11  panel?

12        MS. SPIVEY:  I have a question.

13  When you had your Technical Section and

14  before you downsized, if you would, to

15  the one person, did it require some

16  permission for you to reorganize that

17  section?  Did it require approval from

18  Personnel or one of the Commissioners,

19  or was that an individual decision that

20  you made?

21  A.  It was an individual decision that I

22  made with the Commissioners' review and

23  approval.

1    MR. DILLARD:  I'm assuming that

2    the number of engineering folks

3    diminished through attrition in one

4    shape, form or another?

5  A.  Uh-huh.

6    MR. DILLARD:  And for various and

7    sundry reasons at division level, you

8    decided not to replace those

9    individuals, or had the requirements of

10   the division changed or not?

11 A.  No.  The requirements of the division

12   did not change.  We were asked to hold

13   down our personnel costs because, you

14   know, the State was getting into bad

15   financial shape.  So we were not

16   allowed to hire and replace certain

17   people.  And that was basically the

18   reason.

19   MR. DILLARD:  You'll note on the

20   last page of Exhibit 14, to the right

21   of Mr. Kelly's block there, it says "PU

22   Tech Spec future," is that some slot

23   that currently remains open today?

1  A.    Yes.   The Engineering Specialist I, do

2        you mean?

3            MR. DILLARD:   It just says "PU

4        Tech Spec future."

5  A.    Uh-huh.

6            MR. DILLARD:  So one could surmise

7        from that that there is a possibility

8        that that slot remains open and there

9        could be an individual hired for that

10       slot at some point in the future?

11  A.   Yes.   We're hoping to fill that

12       position at some point in the future.

13           MR. DILLARD:  Would that position

14       be filled by someone whose background

15       would be similar to Mr. Kelly's?

16  A.   Yes.

17           MR. DILLARD:  Okay.   That's all I

18       have.

19           MS. SPIVEY:  Another question,

20       please.  Is there a need for your

21       Utility Rates Manager, I guess that's

22       John Free's title, to have a technical

23       person?  Do you think there is a need

1    to have a technical person attached to

2    that section?

3  A.  Do you mean to have technical people

4    within the section?

5        MS. SPIVEY:  Yes.

6  A.  Yes, uh-huh.

7        MS. SPIVEY:  Do you think the job

8    could be done without that technical

9    person being a member of the staff?

10 A.  It would not be done well, I don't

11   think, because you have so many

12   engineering-related issues pertaining

13   to Alabama Power Company when it comes

14   to operations of the company.  You have

15   power plants that accountants may or

16   may not understand the ins-and-outs and

17   how they work.  You have power lines

18   and they may not understand how

19   electricity is transmitted from one

20   place to another.  So an engineer is

21   needed to help the financial people to

22   better understand what's happening, why

23   the costs are so high, and why the way

1    they operate their business is

2    efficient and cost-effective.

3         MS. SPIVEY:  Thank you.

4         MR. DILLARD:  In the event this

5    future technician was hired, what would

6    be the scope of his duties relative to

7    what type or class of engineer?

8  A.  Well, we would look for someone that

9    has a degree in engineering, whether

10   it's in electrical, mechanical,

11   industrial, some engineering.  And if

12   they have utility experience that would

13   be preferable.  If they have analytical

14   experience where they've analyzed data

15   of any kind, whether it's cost data or

16   electric quality or anything along that

17   line, we would look for someone with

18   that set of skills.

19        It's very important to have

20   someone that understands the utility

21   business, although it's not necessary,

22   because they'll have to learn that

23   here.  Learning to be a regulatory

1    engineer, you have to do that more or

2    less at a regulatory agency.  And it

3    takes some time to do that, because,

4    you know, with us having the Rate RSE,

5    you have to learn that as well as

6    learning engineering principles.

7         MR. DILLARD:  And you, as Division

8    Director, would exercise your

9    discretion as to what path that

10   prospective employee would take,

11   whether it be energy -- or not energy,

12   but electricity or water or some other

13   course that you would steer him towards

14   in that regard?

15 A.  Yes, it would depend on the workload

16   that we have at the time that we need

17   to hire someone.  If we have a bigger

18   workload in water, we may hire someone

19   for water.

20        MR. DILLARD:  And that would be

21   left solely to your discretion,

22   correct?

23 A.  Yes.

1          MR. DILLARD:  Okay.  Thank you.

2          JUDGE MORRIS:  I just have a

3     couple of clarifying questions to get

4     some dates and all straight.

5  A.  Okay.

6          JUDGE MORRIS:  When did you become

7     the Division Director?

8  A.  It was October, I think it was '92.

9          JUDGE MORRIS:  '92?

10 A.  Uh-huh.

11         JUDGE MORRIS:  And at that time

12    you were also supervising the

13    Electricity Section?

14 A.  No.

15         JUDGE MORRIS:  When did you

16    undertake supervision of the

17    Electricity Section in addition to your

18    duties as Division Director?

19 A.  It was in 1995 after Mr. Bob Ducksberry

20    retired.

21         JUDGE MORRIS:  Mr. Ducksberry?

22 A.  Uh-huh.

23         JUDGE MORRIS:  And for how long --

1        and you -- as I understand it, you

2        remained supervisor until -- of the

3        Electricity Section until that position

4        was filled?

5    A.   That's correct.

6            JUDGE MORRIS:   And that was filled

7        by Mr. Free?

8    A.   Yes.

9            JUDGE MORRIS:   And when was that?

10   A.   In 2001, I believe.

11           JUDGE MORRIS:   In 2001?

12   A.   Uh-huh.

13           JUDGE MORRIS:   When was -- and you

14       said when you were -- as I understand

15       this, when you were the supervisor and

16       the Division Director, you had the

17       Technical Section essentially where

18       they were reporting directly to you?

19   A.   Uh-huh.

20           JUDGE MORRIS:   And how long did

21       that take?  I mean, what were the years

22       during that?

23   A.   It was the same period, three to four

1    years.

2         JUDGE MORRIS:    The same period.

3    Who did they report to prior to

4    Mr. Ducksberry's retirement?    Were they

5    a separate section that reported to --

6  A.    They reported to Mr. Ducksberry.

7         JUDGE MORRIS:    They reported to

8    Mr. Ducksberry.    So they were under the

9    Electricity Section?

10  A.    Yes.

11         JUDGE MORRIS:    And then subsequent

12    to that you moved Mr. Cleckler into

13    Special Projects that reported directly

14    to you?

15  A.    Yes.

16         JUDGE MORRIS:    But the technical

17    -- the other technical positions

18    remained under the Electricity Section?

19  A.    Right.

20         JUDGE MORRIS:    Okay.    I just

21    wanted to get all of that clear.    I

22    wasn't sure how all of that moved in

23    time.    Okay.    Thank you.

1    MR. DILLARD:  On the last page of
2    Exhibit 14, this was -- I understand
3    it's dated 5/21/2001, and both the
4    slots under the electricity there, the
5    future Engineering Specialist II, there
6    was two blocks, and that was prior to
7    Mr. Kelly's hiring, so as of that date
8    this is -- this is the way it was
9    constructed at that time?
10   A.   Right.
11        MR. DILLARD:  It was set up to
12   have two engineering specialists at
13   that time?
14   A.   Uh-huh.
15        MR. DILLARD:  And was that
16   determined under your leadership that
17   that requirement existed at that time?
18   A.   Yes.
19        MR. DILLARD:  Okay.  And you
20   subsequently hired one individual, that
21   being Mr. Kelly, right?
22   A.   Right.
23        MR. DILLARD:  Okay.  Thank you.

```
 1                RECROSS-EXAMINATION

 2    BY MR. SAMFORD:

 3    Q.    Why did you not hire a second one?

 4    A.    Well, like I said, the finances --

 5    Q.    Due to finances?

 6    A.    Yeah, right.

 7              MR. SAMFORD:   Thank you.

 8

 9                REDIRECT EXAMINATION

10    BY MS. ALLEN:

11    Q.    In follow-up to a question that was

12          asked by the panel regarding the

13          communication and the need to have

14          someone -- a technical person in the

15          Electricity Division, if someone were

16          in a separate division, such as

17          Technical, would it be your testimony

18          they would not communicate freely with

19          any other division chief that might

20          need information concerning their

21          activity?

22    A.    I'm sorry, I didn't understand your

23          question.  Could you repeat it?
```

1    Q.    Well, the way you answered the question

2          made it sound as though that the

3          individuals under a separate Technical

4          Section would not communicate their

5          activities with other individuals in

6          the division.  Did you find when there

7          was a separate Technical Section that

8          those people did not communicate with

9          people in the Electricity Division?

10   A.    They did, but they were all reporting

11         to me.  I mean, I was coordinating all

12         of the activities for Alabama Power

13         Company, whether it's technical or

14         financial.  And I just had the two

15         groups separated and working together

16         with each other, but they all reported

17         to me and I coordinated everything with

18         Alabama Power Company, just as Mr. Free

19         does today.

20   Q.    Does Mr. Cleckler normally provide any

21         feedback to Mr. Free regarding his

22         activities that might relate to the

23         Electricity Section?

A.    Yes.  His role in the Electricity
      Section is very limited.  He works
      mostly with -- when there are
      multidiscipline projects that we have,
      he coordinates those.  And that may
      include electricity and natural gas or
      electricity, natural gas and water, or
      all sections that we have in the Energy
      Division, or something outside of the
      Commission's jurisdiction.

          JUDGE MORRIS:  Anything further?
          MS. ALLEN:  No.
          JUDGE MORRIS:  Okay.
      Ms. Hamilton, you are excused.
          THE WITNESS:  Thank you.
          MS. ALLEN:  And as my final
      witness I would like to call Mr. Kelly.
          JUDGE MORRIS:  Okay.  Mr. Kelly,
      if you would, raise your right hand.
              (Witness sworn.)
          JUDGE MORRIS:  Thank you.  Please
      be seated.

```
 1           GREGORY KELLY, of lawful age,

 2    having first been duly sworn, testified as

 3    follows:

 4

 5              DIRECT EXAMINATION

 6    BY MS. ALLEN:

 7    Q.   Mr. Kelly, what is your position with

 8         the Public Service Commission?

 9    A.   Public Utilities Technical Specialist.

10    Q.   And how long have you been with the

11         Commission?

12    A.   Since 2002.

13    Q.   What is your educational background?

14    A.   I have a BS degree in Electrical

15         Engineering from Auburn University and

16         an MBA degree from Troy State

17         University.

18    Q.   And give us a little bit of background

19         on some of your job experiences prior

20         to coming with the PSC?

21    A.   Okay.  I've worked 15 years for Alabama

22         Power Company as a distribution

23         engineer, coordinating projects with
```

1    transmission lines and substation

2    activities, with limited experience in

3    generation before taking this job at

4    the Public Service Commission. And I

5    also -- I owned my own business for

6    four years. I've been a statistician

7    for three or four years. I had an

8    opportunity to come and work here at

9    the Public Service Commission ever

10   since 2002.

11   Q.   Okay. What attracted you about the

12   position at the Public Service

13   Commission?

14   A.   The job specification. The job

15   specifications gave me independence, if

16   you pull the job specifications,

17   independence, and it also stated that

18   you would have an opportunity to

19   supervise subordinates.

20   Q.   Was that your understanding of the job

21   when you --

22   A.   My understanding, you know, looking at

23   the job description that was posted and

1       the information that was required that

2       you had to have a BS degree in

3       electrical engineering and extensive

4       knowledge for working with a public

5       utility company.  And also you would

6       have the opportunity to lead and train

7       other subordinates in that position --

8       in that particular position.

9   Q.  What prompted you to leave Alabama

10      Power?

11  A.  Well, I had been with Alabama Power

12      Company about 15 -- about 15 years

13      working mostly in distribution.  And

14      when you work in distribution, a lot of

15      times you miss Thanksgiving holidays,

16      Christmas holidays.  And at the time I

17      had three kids, my son was two years

18      old, and I was losing -- I guess losing

19      control of the family, because they

20      complained I was never home all the

21      time.

22          So Alabama Power Company at the

23      time was having a buy-out program for

1    people who wanted to retire and

2    downsizing.  And I took the opportunity

3    really to come home to be a full-time

4    father and be a full-time husband,

5    which is something I had never done at

6    the time, because I've always missed a

7    lot of family time by working with

8    Alabama Power Company.

9  Q.  When you went back and started looking

10    for another position, you were not

11    necessarily looking at an engineering

12    job; is that correct?

13  A.  Well, what I did first is we

14    constructed our own business.  I owned

15    my own business for four years, a

16    beauty salon for four years.  And then

17    we closed the beauty salon.  And then I

18    taught school on a program that let

19    people who had advanced math knowledge

20    to come in without a teacher's

21    certificate, and I taught

22    underprivileged kids in the junior high

23    level.  Then a job came open with the

1    State as a statistician.  I worked in

2    that position for a couple of years.

3    And after my son became 12 years

4    old, I felt like he was big enough to

5    handle the problems of his own.  And so

6    I started to look for engineering jobs

7    in the Southeast.  And the position at

8    the Public Service Commission came

9    open; I applied and I was accepted for

10    that position.

11  Q.  When you were interviewed, who

12    participated in that process?

13  A.  I interviewed with Mr. John Free, and

14    Mrs. Hamilton later joined the process

15    over the speaker phone.  And, you know,

16    not knowing the organizational

17    structure, I assumed that Mr. Free was

18    standing in for -- he told me he was

19    not the Director, but the Director

20    would join us shortly, and that jointly

21    they would interview me about this job

22    I had applied for.

23  Q.  Did you have any independent knowledge

1        of the organizational structure of the

2        PSC at the time of the interview?

3  A.   At the time of the interview I still

4        had some contacts at Alabama Power

5        Company. And we knew -- I had worked

6        with Bernard Givan at Alabama Power

7        Company. He worked in the transmission

8        section; I had worked in the

9        distribution section. We had some

10       mutual friends.

11         And I had known that Bernard had

12       left the Public Service Commission to

13       start building homes. That was one of

14       his things that he wanted to do was to

15       become a home builder. And I knew

16       Bernard had left the Public Service

17       Commission and I knew the job was

18       vacant. So I assumed, you know, when I

19       interviewed for the job that, you know,

20       I would be doing the same duties and

21       responsibility as Bernard Givan.

22  Q.   Since coming to work for the

23       Commission, you have been assigned to

```
 1        the Electricity Section; is that

 2        correct?

 3   A.   That is correct.

 4   Q.   And during this entire time has

 5        Mr. Free been your supervisor?

 6   A.   That is correct.

 7   Q.   Do you regularly provide Mr. Free

 8        information regarding technical aspects

 9        of your job?

10   A.   That is correct.

11   Q.   Now, he himself mentioned the term

12        "dumbing down," is that part of what

13        you do is put information in layman's

14        terms?

15   A.   Before I turn in a report to Mr. Free,

16        most of the times I sit it on my desk

17        and it sits there for a day or two and

18        I come back and reread the report. And

19        sometimes I even take the report home

20        to my wife, and let my wife read the

21        report to make sure that she

22        understands the report that I'm going

23        to submit to not cause problems or
```

1    conflict with my supervisor.

2    Q.   Would you discontinue that practice of

3         preparing reports in layman's terms if

4         you were required to file a report with

5         Mr. Free if you were no longer under

6         his supervision?

7    A.   That is correct.  A lot of vital

8         information is left out of the report

9         because Mr. Free does not understand

10        the terminology, the technology, the

11        equipment, and all the aspects that

12        surround the job.  So you have to be

13        very careful that the information that

14        you transfer to Mr. Free doesn't insult

15        his intelligence.

16   Q.   Are you familiar with Ms. Hamilton's

17        background?

18   A.   That is correct.

19   Q.   Were you aware of her background in

20        engineering at the time that you were

21        interviewed?

22   A.   That is correct.  I checked with some

23        sources with Alabama Power Company.  I

1    knew that the Director -- she had a --

2    held an engineering degree.

3  Q.  When you became aware of the

4    circumstances of there having been a

5    previous Technical Section, did you

6    approach someone about the possibility

7    of having your position transferred to

8    that Technical Section?

9  A.  After my six month's probation, I wrote

10    a letter complaining about how the job

11    was being supervised, how the job was

12    being functioned.  I felt that my true

13    abilities as an engineer was being

14    limited, because I had to be careful

15    how I presented reports and how I

16    displayed information.  The whole full

17    compass of the information could not be

18    displayed and the abilities that I

19    possessed could not be shown because I

20    was dealing with a supervisor that did

21    not understand the subject matter.

22  Q.  What is your purpose in seeking a move

23    of your position from Mr. Free's

1          supervision to the -- either the

2          Special Projects or the Technological

3          Section or directly under Ms. Hamilton?

4    A.    In my opinion this job is trouble.  The

5          job is being compromised.  It's

6          misaligned.  I am surrounded by

7          non-technical people who do not speak

8          the language.  We get into meetings; I

9          start talking in technical terms and

10         jargon; they start looking at pictures

11         on the wall; start taking their pen and

12         doodling, start talking to each other.

13         They do not appreciate what I bring to

14         the table as an engineer with over 20

15         years of experience.

16              But at the same time, you know, I

17         have learned that you have got to put

18         it in layman's terms to capture their

19         interest.  And a lot of times I have to

20         make parables.  I have to make parables

21         of how electricity works.

22              I made a parable in 2003 of the

23         Northeastern blackout to explain to

1  non-technical people exactly what
2  happened.  I made a parable about a
3  stagecoach.  He had five horses riding
4  along the road.  What happened in the
5  Northeastern blackout, one of the
6  horses had a heart attack; the dispatch
7  driver had to reconfigure the load; the
8  plant operator had to reconfigure.  He
9  went down the road and another horse
10 had a heart attack; he had to, you
11 know, reconfigure the load, but the
12 stagecoach operator decided to shut the
13 system down.

14      This is how I have to explain
15 engineering terminology and technology
16 to the non-technical group that I work
17 with here in the Energy Division -- in
18 the Electricity Section.  I have to
19 make parables to understand the highly
20 complex technical nature.  It's
21 burdensome on me.  I have to be
22 creative.  I have to come up with ideas
23 to not lose my audience.  So it

1    requires extra work on me to come up

2    with those ideas.

3  Q.  What does your job entail?  Give us

4    some examples of the work you perform.

5  A.  Well, a lot of work I do is I will go

6    out to talk to my equal, an engineering

7    manager or an engineering supervisor at

8    a distribution office.  We will talk in

9    highly technical terms.  They will give

10    me highly technical terms and details.

11    I will go out to a plant operator; we

12    will talk in highly technical terms and

13    highly technical detail.

14        In my job I do not interface with

15    any accountants, anybody who is

16    responsible for any accounting work.

17    All of the peers that I deal with at

18    Alabama Power Company are technical in

19    nature.  I have to get the information

20    back, break it down, formulate it so

21    people can understand without being

22    intimidated, without getting

23    technical-phobia, when I present this

1    information.

2  Q.  Well, wouldn't that be the same

3      circumstance if you were in a Technical

4      Section?

5  A.  No.  Those people would have the

6      necessary training, the background, the

7      skills.  Mrs. Hamilton has testified

8      that she wants people with utility

9      experience.  You just don't walk in

10     this job without any experience.  She

11     said that she wants people who are

12     already trained in the utility business

13     before she will consider hiring those

14     folks.

15 Q.  Well, Mr. Free testified, and I think

16     Ms. Hamilton did, that information that

17     you provide is important for them to do

18     their rate analysis?

19 A.  That information could be -- you know,

20     that information could be obtained if I

21     was in another section.  Mr. Free also

22     said he obtained information from the

23     Internet, from other sources, from

1    reading publications; what's the

2    difference?  Why would I have to be

3    captured in an organization that is

4    capped by an accountant who doesn't

5    understand or doesn't appreciate the

6    work that I provide the Commission

7    after 20 years of experience?

8         On-the-job training is not going

9    to get this knowledge; you have to

10   know.  If you are going to supervise

11   someone, you have to have equal or

12   better knowledge than that person to

13   supervise them.  You can't get the

14   knowledge on OJT.  If that's the case,

15   why would an engineer spend countless

16   hours getting an engineering degree,

17   and just be an accountant  and supervise

18   engineers.  It doesn't make sense to

19   me.

20  Q.  As part of the job description for your

21      position, and I believe it is Exhibit

22      5, you based your decision to come to

23      the PSC and apply for this job based on

1          this announcement; is that fair?

2    A.    That is correct.  And other contacts

3          that I had, mutual friends who knew

4          about the Public Service Commission and

5          their working with Alabama Power

6          Company.

7    Q.    And based on this job announcement you

8          believed that you would be reporting to

9          a technical person?

10   A.    It says, you know, four years of

11         professional engineering experience is

12         required.  I would assume, if four

13         years of engineering experience is

14         required, that person would have to

15         have some working knowledge of

16         engineering.  You don't learn this

17         stuff on the job.  This is highly

18         technical stuff that you have to learn

19         in formal schooling, not on the job.

20   Q.    Have you ever asked Mr. Free to

21         accompany you on any of your job site

22         inspections?

23   A.    I have repeatedly asked Mr. Free to

1      accompany me on visits to observe my

2      technical abilities.  Just lately we've

3      had two visits, and I've had over a

4      hundred visits since I've been here in

5      2002.  He's made less than five.  He

6      shows no interest.  He has no best

7      interest in the technology field and he

8      shows no interest.

9    Q.   Do you have any doubt that Mr. Free is

10      a competent supervisor for the analyst

11      staff?

12   A.   I have no idea.  Mr. Free is well-

13      qualified with an MBA degree, CPA, has

14      15 years of training in rates and

15      tariff.  I understand he has only

16      supervised an engineer for the last

17      three years.  You know, three years of

18      supervising is going to negate five

19      years of training as an engineer in

20      school, 15 years on the job, three

21      years here at the Public Service

22      Commission, I don't believe so.  I

23      don't believe three years of on-the-job

1    training can negate real work

2    activities that a person gained by

3    knowing the job, doing the job, been

4    there and having done that.

5 Q.  How do you think your position would be

6    benefited, how do you think the

7    Commission would be benefited, if you

8    were to report directly to

9    Ms. Hamilton?

10 A.  Well, Mrs. Hamilton, she's an engineer.

11    She understands the jargon; she

12    understands the terminology.  The

13    reports would probably be more

14    technical in nature; they probably

15    would contain more technical facts than

16    what they contain now.

17 Q.  Do you believe that that would be

18    beneficial to the Commission?

19 A.  It would be beneficial to the

20    Commission.  Also, it would be

21    beneficial to any other person that you

22    would want to hire in the future.  You

23    could bring a person in and show them

```
 1        we have the necessary trained and

 2        skilled people that can assist you in

 3        your career as you begin to develop.

 4        If I came -- if you brought a young

 5        engineer off the street and told him

 6        that you're going to be supervised and

 7        managed by an accountant, that person

 8        would look for another job quick --

 9        quickly.

10   Q.   You don't want to look for another job

11        though, do you?

12   A.   Well, I enjoy what I do.  I think I'm a

13        pretty fair engineer; I've been around

14        this business for awhile; I enjoy what

15        I do.  I have a lot of folks that I

16        started with at Alabama Power Company

17        that are still there and I enjoy

18        visiting with them on my visits as I go

19        around the state and renew

20        acquaintance.  A lot of them, you know,

21        we came together, we have a lot of

22        family ties, our kids are about the

23        same age; we share over war stories;
```

1    we, you know, keep abreast of all of

2    the retirees that used to work for

3    Alabama Power Company.  So I enjoy what

4    I do working and I enjoy the people.

5    But this job, you know, is -- this job

6    is -- it's in trouble; it's

7    compromised; it's not what it could be.

8  Q.  What was the primary purpose for your

9    filing this grievance?

10  A.  Well, I listed -- let me borrow that

11    letter.  In the letter that I dated to

12    the Commission on June 7th, 2005, I

13    listed these circumstances.  The first

14    circumstance I listed was a fractured

15    career path.  I listed an unlevel

16    playing field; compromised job

17    position; lost synergy; communication

18    difficulities, vertical and horizontal.

19  Q.  Explain that to me in English.

20  A.  Well, this is MBA talk.  You know, I've

21    swapped hats and I'm wearing my MBA

22    stuff.  But a fractured career path, if

23    you look at the organizational chart,

1    for me, if I wanted to get to be

2    director, my path has to go through

3    Mr. Free, has to go through the

4    accounting field. But Mr. Cleckler, on

5    the other hand, he doesn't have that

6    same burden of going through someone in

7    the accounting field. He's right under

8    the Director, he's being supervised by

9    the Director, he's right there. But I

10    have two levels of management that I

11    must overcome if I'm going to get to

12    the next position.

13        The job is compromised. The job

14    is compromised because my job has a lot

15    of accounting tasks, cost analysis,

16    cost variance. A lot of stuff in my

17    job is put there because that's what

18    Mr. Free understands. You know, he put

19    stuff in my job Form 40, you know, that

20    he feels comfortable with. You know,

21    he has that right as a supervisor, but

22    also, you know, that's really not

23    engineering work.

1    Lost synergy. Lost synergy is

2    teamwork. Rick is on one end of the

3    organizational chart; I'm on the other

4    end of the organizational chart. If I

5    need to talk to Rick, you know, we've

6    got to cross the organizational

7    structure. We've got to cross

8    management levels to even communicate

9    on a project. And if you look on the

10    organization chart, that's John Free.

11    John Free is right there in the middle

12    of communication, receiving information

13    that comes from Mr. Cleckler and myself

14    right there in the middle of the

15    organizational chart.

16    You've got communication

17    difficulties vertically. Information

18    is being missed. There is nobody on

19    the technical side of the house that's

20    going to inform -- keep me informed on

21    when events occur. When the job title

22    is going to change; we would have a job

23    reevaluation process; or when we're

1    thinking about hiring a new employee.

2    Mr. Free, you know, I understand he's

3    an accountant, you know, he shows --

4    I'm not going to say favoritism, but

5    you've got to realize you've got to do

6    what you do best and accounting is what

7    he do best.

8        You've got horizontal problems.

9    Just like I said before, the people

10   that I work with are non-technical

11   folks.  They don't understand an amp

12   from a coulomb.  They don't understand

13   volts, amps.  They don't understand

14   power factors.  They don't understand

15   anything that you have to do on my job,

16   but yet I'm responsible for helping

17   them to understand the technical

18   jargon.  There is a handicap to this

19   position.  Mr. Cleckler doesn't have

20   that same handicap when he's performing

21   his work.

22       And there's an unlevel playing

23   field.  He has one level of management;

1    I have two levels of management.  Even

2    his Form 40 is different from mine.  I

3    receive close hands-on supervision; he

4    receives general administrative

5    supervision, totally different.  The

6    same job functions, the same Form 40,

7    totally different.  Why?  I don't know.

8  Q.  Ultimately what you want out of this is

9    what?

10  A.  I want -- I feel like I've been treated

11    like a second-class engineer.  That's

12    exactly how I feel.  I don't feel like

13    this job is given the same privileges,

14    the same rights, and the same

15    opportunities that Mr. Cleckler is

16    receiving.  I feel that this job -- you

17    know, I'm not receiving the same

18    opportunities to compete.

19        Say, tomorrow, Ms. Hamilton

20    retires or goes into the private

21    sector.  Well, you know, she

22    understands the organizational chart,

23    but who is going to come in and give --

1    say, look, you've been evaluated by an

2    accountant, Rick Cleckler has been

3    evaluated by an engineer.  What

4    evaluation will carry more weight?  The

5    one that's done by an engineer, not the

6    one that is done by an accountant..

7         MS. ALLEN:  Thank you.

8

9              CROSS-EXAMINATION

10   BY MS. HAMILTON:

11   Q.   Mr. Kelly?

12   A.   Yes, ma'am.

13   Q.   Do you know what position I held

14        immediately before becoming Director of

15        the Energy Division?

16   A.   No, ma'am, I do not.

17   Q.   Well, I will have you know I reported

18        to the Electricity Section supervisor

19        and I worked as a Utility Engineering

20        Specialist before I became Energy

21        Division Director.  So as far as your

22        argument for a level playing field,

23        that goes out the window; that does not

1      apply.

2   A.   I'm looking at the organizational

3      chart; you can't deny that -- you know,

4      what's happened in the past. I have no

5      privy information with it. But you

6      can't deny, looking at this

7      organizational chart, that this is not

8      a fair playing field. He has one level

9      of management, I have two levels of

10     management. The job is not being --

11     the jobs are not treated -- created

12     equal.

13  Q.   Well, you're missing my point. Your

14     argument was that you have no

15     opportunity -- you have to go through a

16     separate level of management to get to

17     the position that I now hold?

18  A.   That's correct.

19  Q.   That is not correct.

20  A.   Why not?

21  Q.   Because I skipped that level of

22     management that you're referring to to

23     become Energy Division Director.

1  A.   If I were to give this organizational

2       chart to a personnel manager and look

3       strictly at the organizational chart

4       without having that knowledge, they

5       would say -- using my MBA degree, they

6       would say you can't get to that job

7       without going through being an analyst

8       manager.

9  Q.   Well, who verified that for you, that

10      you have to go through that position?

11      Did you ask somebody?

12 A.   I didn't ask anybody.  I'm using the

13      knowledge I obtained when I got an MBA

14      degree.  This is the organizational

15      chart; this is the way it is

16      structured.  If that's not the case,

17      why am I not over here with

18      Mr. Cleckler competing with him on a

19      level playing field?

20 Q.   You stated that you leave vital

21      information out of your reports that

22      you turn in to Mr. Free.  Why would you

23      leave out vital information out of

1     your --

2  A.  Well --

3  Q.  Wait, let me finish my question.  Why

4      would you leave vital information out

5      of your reports when you don't know

6      whether or not Mr. Free is the last

7      person reviewing your report?

8  A.  Well, the reason, when I first got

9      here, my reports were long and

10     detailed.  I spent quite a bit of time

11     in Mr. Free's office explaining to him

12     what these words meant and what these

13     terms meant.  I quickly learned that to

14     avoid that unnecessary process, just

15     give -- like he said, "dumb it down."

16     His own words, "dumb it down."

17 Q.  Okay.  Do you know what percentage of

18     the staff of the Energy Division are

19     not engineers?

20 A.  Well, the only thing, I see two

21     engineers in the Energy Division.

22     That's all I see is two engineers.

23 Q.  Okay.  So would you say that roughly

```
 1        ten percent of the whole Energy

 2        Division staff are engineers, right?

 3   A.   Yeah.

 4   Q.   90 percent are not engineers?

 5   A.   That's correct.

 6   Q.   And I'm an engineer, right?

 7   A.   That's correct.

 8   Q.   How do you think the people who are not

 9        engineers in the Energy Division help

10        me to understand aspects of their job

11        that I'm not familiar with or trained

12        to understand?

13   A.   Well, you're the Director.  And as

14        being the Director, you have

15        administrative supervision.  Your job

16        is not really to get detailed; your job

17        is sort of like be the drum major, show

18        up, play the drum, or whatever, and

19        then take your bow and go off stage.

20        You don't have to get into the detailed

21        interworkings of each job.  That's not

22        your job -- I mean, not your function,

23        you're administrative.
```

1   Q.   How do you know that?

2   A.   Well, because that's what I was taught

3        at MBA school.  The director is not

4        responsible for the day-to-day activity

5        of the organization.

6   Q.   And when you went to school for your

7        MBA, do they cover regulatory --

8        utility regulatory agency structures

9        there?

10  A.   They cover personnel management; they

11       cover organizational management; they

12       cover marketing; they cover accounting;

13       they cover finance.  They talk about

14       the whole gamut in the business world.

15  Q.   All right.  Well, what happens then

16       under your proposed scenario if the

17       next Energy Division Director is an

18       accountant?

19  A.   Nothing.

20  Q.   Wouldn't --

21  A.   Well, there is nothing wrong with

22       having a director who is an accountant.

23       He has broad latitude.  He's not going

1       to give you hands-on, close-up

2       supervision. He's going to view your

3       work in general administrative form.

4       He's going to expect for you to bring a

5       finished product, not to look at every

6       detail, every nook, every cranny, and

7       question everything that's on the

8       report.

9  Q.  All right. Do you know how many visits

10      Mr. Free has made with analysts or the

11      other staff members in his section?

12  A.  No, I don't.

13  Q.  All right. If a Commissioner had a

14      question about an engineering

15      situation, how would you explain a

16      situation to them to help them

17      understand it if they don't have an

18      engineering degree?

19  A.  Well, the same way, broad

20      administrative supervision. If I knew

21      that that person had an engineering

22      background, I would get in more

23      technical detail. You speak to your

1      audience.  In other words, if that

2      person don't have the necessary

3      technical background, it's the

4      engineer's job to make that person

5      understand the best way he can.  You

6      have to know your audience.  If I'm

7      talking to somebody who has a Ph.D in

8      engineering, the conversation is going

9      to be completely different than when I

10     talk to an accountant.

11  Q.  And I fully agree with you.  So why

12     can't you do that with the Electricity

13     Section staff?

14  A.  They don't understand the terminology.

15     They don't know what coulombs and amps

16     and voltares mean.

17  Q.  Nor does a Commissioner without an

18     engineering degree.  So what is

19     different about a Commissioner without

20     an engineering degree and your

21     explaining it to an analyst within the

22     Electricity Section?

23  A.  He's at a high level.  He's up in the

1    organizational chart.  He's not

2    grassroots.  That's the biggest

3    difference.  You know, like I say, you

4    have to know the audience that you're

5    talking to.  You know, if you're

6    talking about a Commissioner, he's up

7    in the organizational chart.  These

8    folks right here are peers, I would

9    say, non-technical peers.

10       You know, I see a Commissioner

11    very infrequently; I see these guys on

12    a day-to-day basis.  A Commissioner

13    wouldn't expect for me to come in there

14    and blow him away with a lot of facet

15    details.  He would probably go straight

16    to the bottom line, you know, how to

17    solve what the problem is and what can

18    we expect in the future.

19  Q.  Okay.  So when it comes to engineering

20    matters that pertain to Alabama Power

21    Company, who would be there in the

22    Electricity Section to explain those

23    things to them, to help them understand

1       why you have certain problems with

2       engineering equipment?

3  A.   The way it's set up now, the

4       information would come to Mr. Free.

5       Mr. Free would disseminate the

6       information down to me.  I would send

7       the information back up to Mr. Free and

8       Mr. Free would probably send it back up

9       to you for you to submit to the

10      Commission the way it's set up now, if

11      you follow his organizational chart.

12         MS. HAMILTON:  Okay.  I have no

13      other questions.

14         MR. SAMFORD:  I know we had said

15      that John Free could go.  I want to --

16      Linda and I -- I understand John had

17      given me something, and I'm going to

18      just start reading it, object if you

19      want to, but I'm just saying, I let Mr.

20      Kelly -- this is dealing with site

21      visits and going with him.  John may be

22      at lunch.  I'm going to read it.  If

23      you disagree, I'm just asking -- I'm

1    not saying this is true, but I'm saying

2    this is what he wrote.  And if you

3    disagree with it --

4         THE WITNESS:  Can I read it first

5    before you read it?

6         MR. SAMFORD:  Yes, sir.  But I

7    will represent to you that is a piece

8    of paper given to me by John Free this

9    morning addressing site visits.

10        THE WITNESS:  Well, I would prefer

11   Mr. Free come back and --

12        MR. SAMFORD:  Well, now, you asked

13   could you read it and then I was going

14   to, you know, read them what you read.

15   He may be at lunch and we excused him.

16        THE WITNESS:  I have several

17   questions -- I have several objections

18   to that piece of paper.

19        MR. SAMFORD:  Linda, do you -- I

20   would think it would be within my

21   rights to just read a statement of

22   anybody, and ask what Mr. Kelly thought

23   about the following statement, and to

1    respond to it regardless of any hearsay

2    objection.

3    THE WITNESS:  You've been tough on

4    me today; I've got to be tough with you

5    today.  You've been tough with me

6    today.

7    MR. SAMFORD:  But I would think I

8    could read any statement I wanted to

9    and just ask for his impressions of

10   what had been read.

11   THE WITNESS:  I have some

12   objections to that statement.

13   MR. SAMFORD:  Well, I understand.

14   I'm talking to your lawyer right now,

15   with all due respect.

16   MS. ALLEN:  I don't believe that

17   there is any way that I can prevent

18   Mr. Samford from asking you if those

19   things are correct.  It might be a

20   better process to see if Mr. Free is

21   still in the building and just have him

22   testify as to that since that's a

23   document that I have not attested to

1    its authenticity.

2         MR. SAMFORD:  Okay.  Do you want

3    to see -- I can ask a few other

4    questions, if you want to see.

5

6              CROSS-EXAMINATION

7  BY MR. SAMFORD:

8  Q.  On -- I believe, Ms. Allen said,

9    because she asked you, Employee Exhibit

10   Number 5, I believe, was the document

11   she mentioned, about you being -- could

12   you point the panel on Employee Exhibit

13   Number 5 to where this says you will be

14   supervised by an engineer?  I heard a

15   lot in your testimony of "I would

16   assume" or "I assumed it would be by an

17   engineer," but I'm just -- I got

18   confused as to where exactly the words

19   are that say you will be supervised by

20   an engineer; I heard assumptions.

21  A.  "Work is assigned in broad outline by

22   an administrative supervisor who

23   reviews complete work for engineering

1          soundness and satisfactory completion

2          of assigned project."

3     Q.   Has Mr. -- has Mr. Free -- are you

4          stating to this panel -- we asked for

5          you to produce any report that you said

6          and claimed was inappropriate, had not

7          been satisfactorily reviewed, and there

8          was no production associated with that.

9          Is that -- and your lawyer said it's

10         because Mr. Free didn't know enough to

11         know whether he was right or wrong.

12    A.   I agree with that statement.

13    Q.   My question to you is, Mr. Free, using

14         his 15 years on the job, education he

15         picked up from that, and his intellect,

16         as well as his schooling, are you

17         saying -- tell me exactly what he

18         incorrectly evaluated for engineering

19         soundness?

20    A.   I stayed in the hospital for five weeks

21         with my dad when he had a heart attack.

22         I'm not a physician; I spent a lot of

23         time in there.  I'm not a physician.

1           How are you going to learn something if
2           you've never done it.
3      Q.   I'm asking you, as you were asked in
4           discovery, to specifically identify --
5           I said all reports that you claim
6           Mr. Free had incorrectly evaluated;
7           none were produced.  This right here,
8           you are stating that your conclusion, I
9           believe, that in order to review
10          something for engineering soundness and
11          it also, I might add, says
12          "administrative supervisor"?
13     A.   That's correct.
14     Q.   And he certainly is an administrative
15          supervisor, but you are stating your
16          conclusion, he cannot evaluate
17          completed work for engineering
18          soundness?
19     A.   I think Mr. Free testified the stuff
20          has to be dumbed down, his very words,
21          "dumbed down," for him to understand.
22          That's his very words.
23     Q.   Well, I believe his "dumbed down"

1    indicated changing the words so it was

2    understandable, but not the conclusion.

3    I'm merely asking you to identify for

4    this panel --

5  A.    I think I gave a specific instance.

6  Q.    Mr. Free has used utilized resources,

7    including Ms. Hamilton, an engineer;

8    including Rick Cleckler, an engineer;

9    other people it has been testified to,

10   conversation of which -- to which you

11   were not privy.  I'm merely asking you

12   to identify the reports that Mr. Free

13   has been incompetent to evaluate for

14   engineering soundness?

15  A.    I don't.  Mr. Free -- you generated

16   very simple reports for Mr. Free.  You

17   could get someone with a high school

18   education that could understand those

19   reports with a little OJT on the job.

20       MR. SAMFORD:  Well, Your Honor, I

21   would note for the panel that I have

22   asked the question four times, have not

23   received an answer yet --

1  A.  I answered the best way I could.

2      MR. SAMFORD:  -- as to any

3  specific report that he's complaining

4  about.

5      JUDGE MORRIS:  Let's move along

6  then.

7      MR. SAMFORD:  Yes, sir.

8  Q.  Also, I believe I heard you testify

9  that you dumbed down those reports so

10  that -- to avoid having to stay in his

11  office and explain?

12  A.  That's correct.

13  Q.  Was that your --

14  A.  That is correct.

15  Q.  So as an employee and a subordinate of

16  Mr. Free, you changed reports or left

17  stuff out because you did not wish to

18  have to go into his office and perform

19  the job of explaining your report to --

20      MS. ALLEN:  I'm going to object.

21  That was not what he testified to.

22      MR. SAMFORD:  Ms. Allen, he just

23  said "That is correct, that is exactly

1       what I said."

2   A.  You didn't finish.

3           MR. SAMFORD:  I'm saying you

4       object and say that's not what he said;

5       he just admitted that's what he said.

6           MS. ALLEN:  Again, as he stated,

7       you have expounded on your question to

8       the point where I think you are

9       testifying about things which he did

10      not --

11          MR. SAMFORD:  Okay.  I apologize.

12      I will rephrase my question.

13          MS. ALLEN:  Thank you.

14  Q.  Is it true that you said to avoid

15      having to stay in Mr. Free's office --

16      that you did not wish to have to stay

17      in Mr. Free's office and explain terms

18      in your report?

19  A.  No, that's not what I said.

20  Q.  All right.  I'm sorry.

21  A.  I said I didn't want to stay in

22      Mr. Free's office for an extended time

23      to go over simple engineering stuff.

1      You make -- you know, you dumb it down;

2      you use analogies; you use simple

3      terms; you do the best you can to

4      transfer the information to Mr. Free so

5      that the process would not take two to

6      three hours and sometimes until the

7      next day for him to get the full

8      understanding of it.

9    Q.   Thank you.  You mentioned a desire to

10      supervise.  How many positions were you

11      to supervise?

12   A.   I never said.  I said the job specs

13      said there was the possibility that you

14      could supervise.

15   Q.   But you realized in the position you

16      applied for and were hired that you

17      would not be supervising anyone?

18   A.   That is correct.

19   Q.   In your interview did Ms. Hamilton,

20      Mr. Free or anybody else at the

21      Commission tell you not to ask

22      questions?

23   A.   I asked questions.  I asked questions

1       that I thought were necessary, that I
2       needed to know.
3    Q.  Yes, sir.  But no offense, I heard you
4       explaining more the questions you asked
5       of your contacts at Alabama Power than
6       I did you asking questions of the very
7       people that were going to hire you.
8    A.  I think that interview lasted a
9       sufficient enough time for that, 30
10      minutes, 45 minutes.
11   Q.  But you had the ability, had you chosen
12      to do so, instead of using your
13      contacts at Alabama Power, to ask
14      specifically what you would be doing
15      regardless of what the individual you
16      were replacing had done?
17   A.  We talked about specifically the job.
18      We talked about what was expected.  We
19      looked at the job announcement.  And he
20      explained what he expected, you know.
21      And basically explained he expected me
22      to be on time, show up on time for
23      work, and perform the duties in this

```
 1        job specification.
 2   Q.   But he did not -- you did not have
 3        explained that you would be supervised
 4        by an analyst?  You did not know that
 5        when you accepted the job?
 6   A.   Well, he told me he was an accountant.
 7        Okay.  We didn't get into the -- no
 8        organizational chart was presented.
 9        Did anybody lay out an organizational
10        chart?
11   Q.   Was he -- I'm sorry, go ahead.
12   A.   Did anybody lay out an organizational
13        chart?  No.
14   Q.   Okay.  Did Mr. Free interview you?
15   A.   That's correct.
16   Q.   Did you know at the time Mr. Free would
17        be your supervisor?
18   A.   He told me that I would be, you know,
19        working in the Electric Section with
20        him, but on that same time --
21   Q.   Did you know Mr. Free was the head of
22        the Electrical Section?
23   A.   No, I did not.  No, I did not.
```

1   Q.   Who did you think was the head of the

2        Electrical Section?

3   A.   Mrs. Hamilton could not be present, so

4        I assumed Mr. Free was standing in for

5        Mrs. Hamilton because she could not be

6        present at the meeting.

7   Q.   And you believed Ms. Hamilton to be in

8        charge of the Electrical Section?

9   A.   She was in charge of the whole division

10       from my understanding.

11  Q.   Yes, sir.

12  A.   She was there.

13  Q.   But who did you think was head of the

14       Electrical Section?

15  A.   Mr. Free told me at the interview that

16       he was the head of rates and tariffs.

17       He never told -- he didn't tell me at

18       the time that he supervised other

19       engineers. He didn't tell me; I didn't

20       ask.

21  Q.   Thank you. Are you making any

22       allegations of illegal discrimination

23       today?

1  A.  I think, you know, this is a nice way

2      of putting it, unlevel playing field.

3      You've got a white engineer who has one

4      level of supervision; you've got a

5      black engineer who has two levels of

6      supervision.  Plain as day, a nice way

7      of putting it.

8  Q.  Are you attempting to use a grievance

9      procedure to file an EEOC complaint?

10 A.  We haven't thought that far.  We're

11     dealing with today.

12         MR. SAMFORD:  That's all I've got,

13     Your Honor.

14         JUDGE MORRIS:  Okay.  Any

15     questions from members of the panel?

16         MR. DILLARD:  Yeah.

17         MR. JONES:  Mr. Kelly, how do you

18     think your job would change if you were

19     moved into this other section?

20 A.  Well, you would be surrounded with

21     people that speak the same language,

22     Mr. Cleckler, and we would report to

23     Ms. Hamilton.  You would have a clear

1    flow of authority from the head

2    engineer to other engineers.  We would

3    be doing the engineering function.

4         If any accounting people needed

5    assistance, if they needed technical

6    assistance, they could come and talk.

7    The same situation that Mr. Cleckler

8    have now.  You've got two engineers who

9    cross organizational structures to

10   communicate; why can't an accountant

11   cross the organizational structure and

12   communicate with the engineer?  I see

13   no difference.  As a matter of fact, I

14   think that would be a better fit.

15        MR. JONES:  If you were doing

16   engineering work with Alabama Power,

17   would you not still go back and relate

18   your findings to John Free?

19 A.  I don't understand the question.

20        MR. JONES:  If you were moved to

21   another section and you still had the

22   same job qualifications, which were the

23   engineering with Alabama Power, would

1    you not still have to go back to John

2    Free and --

3  A.    John Free and I would work

4    hand-in-hand, but the relationship

5    would -- we would be co-equal; we

6    wouldn't be supervisor/subordinate.  We

7    would be co-workers like Rick Cleckler

8    and John Free now.  Rick Cleckler

9    doesn't report to John Free; he assists

10    John Free.  I would have the same

11    privilege, the same obligation, the

12    same rights that Mr. Cleckler would

13    have.

14        MR. SAMFORD:  Your Honor, in

15    getting into this and all, I'm sorry, I

16    forgot the first thing I started out

17    with.  Now, we can't find John Free.

18    Ms. Allen, I think, has indicated, you

19    know, that she didn't know how she

20    could stop me from reading this.  I

21    would ask the Court's indulgence or the

22    Board's indulgence to read this half of

23    page and then --

1      MS. ALLEN: Well, let me state

2   this, Tom, if you don't mind. Why

3   don't you ask Mr. Kelly questions

4   specifically about that? Because

5   again, you know, in thinking about that

6   document, that is not the best

7   evidence. Mr. Free's testimony is the

8   best evidence. You can ask certainly

9   Mr. Kelly questions that deal with

10   those things which Mr. Free informed

11   you about, but reading the statement, I

12   think, would be inappropriate and I

13   would have an objection to that.

14      MR. SAMFORD: Okay. I understand.

15

16      CONTINUED CROSS-EXAMINATION

17   BY MR. SAMFORD:

18   Q.   Mr. Kelly, do you know whether Mr. Free

19   has gone on more visits with you than

20   any other staff member?

21   A.   I can't think of anybody who made a

22   site visit other than Linda, Robert and

23   myself who make site visits. Anybody

154

else that makes a site visit, most of
the time it is going to be with me.
You know, I think Patricia, she makes
site visits to the company in
Birmingham. She has an office there.

Q. Has Mr. Free been with you to Alabama
Power Company's headquarters to visit
the generation control system?

A. When I first got here, about two years
ago.

Q. Has he been to Alabama Power Company's
headquarters to talk about cyber
security?

A. That is correct.

Q. Has he been to the Montgomery offices
to talk about the Wares Ferry Road
project?

A. That is correct.

Q. Have you been accompanied by other
staff members on at least four other
occasions of which, if you know,
Mr. Free sought out those persons'
opinions of your skills?

155

A.   Here we go again, we're talking about
     non-technical people trying to make a
     determination on my skills.
     Mr. Samford, I made over a hundred site
     visits, so you're talking about three
     out of a hundred; that's three percent
     of the site visits that Mr. Free has
     made.  In my mind that is inadequate
     supervision.

Q.   And you have a background as a
     supervisor that would give you that
     expertise to --

A.   Yes, I have.  Yes, I have.  I was a
     district engineer here in Wetumpka for
     two years.

Q.   Have there been conference calls made
     in lieu of site visits?

A.   Mr. Free and I, we've had conference
     calls to different personnel with
     Alabama Power Company.

Q.   In which case at which time he was able
     to observe your preparation and
     interview skills?

156

```
 1   A.   Well, yeah.  You know, that's one
 2        snippet.
 3   Q.   Has he offered to go on a couple of
 4        other visits to hydro dams and you
 5        suggested they would not be worth the
 6        time?
 7   A.   I told Mr. Free -- again, you're
 8        leaving out part of the problem.
 9   Q.   I was told to ask these questions and
10        you were going to answer them.
11   A.   I'm going to answer the question.
12        Let's back up a little bit.  Let's get
13        the whole picture in focus.  The reason
14        I'm pressing Mr. Free to join me on
15        site visits is that Alabama Power
16        Company is in the process of spending
17        ten million dollars, I think it's -- I
18        don't know the figure, over a three
19        year time period.  Mr. Free has not
20        accompanied me not one time to one of
21        those environmental projects, not one
22        time.  So I think if this Commission is
23        going to approve that type of
```

1     expenditure, we need to put more eyes

2     on the project than just mine.

3  Q.  Well, I would respectfully suggest that

4     would be a Commission decision.  If you

5     know, did Mr. Ducksberry accompany

6     engineers on their site visits?

7  A.  I have no privy -- I have no knowledge

8     of that.

9  Q.  If you know, have Bernard, Rick or Will

10     ever requested that their supervisor go

11     with them on site visits?

12  A.  I have no knowledge of that.

13  Q.  Do you know if Mr. Free accompanies

14     other staff members on their audits?

15  A.  I have no knowledge of that.

16  Q.  Did you receive 4s on your tasks on

17     your eval related to site visits?

18  A.  I believe so.

19     MR. SAMFORD:  That's all.

20     MS. SPIVEY:  I've got a couple of

21  questions for you.  Once you applied --

22  well, let me back up.  When you heard

23  about the job opening and you applied

1    for the job, did you read the job

2    description for the Utility Engineering

3    Specialist?

4  A.   Well, not the job description.  The

5    only thing was a --

6        MS. SPIVEY:  Excuse me, the

7    announcement?

8  A.   The announcement.  Yeah, I read the

9    announcement.

10        MS. SPIVEY:  So after reading the

11    announcement, and after your interview,

12    and after taking the job, did you see

13    that things were not what you thought

14    they were going to be?

15  A.   This is inflated.

16        MS. SPIVEY:  Yes or no?

17  A.   Things are different than what appear

18    on this.

19        MS. SPIVEY:  So after finding out

20    things were different, did you resign

21    or did you think about resigning or did

22    you just continue working?

23  A.   No.  I enjoy the work that I do.

1    MS. SPIVEY:  So even though you

2  were displeased, you continued to work

3  at the position?

4 A. I wouldn't use the word "displeased."

5    MS. SPIVEY:  Dissatisfied?

6 A. I'm not dissatisfied.  I feel like this

7  job -- the way that i view this job,

8  I'm probably the primary technical

9  person at the Public Service

10  Commission.  In my mind this is a very

11  important job at the Commission.  I

12  think this job is losing -- it's being

13  compromised, being slowly compromised,

14  being slowly taken emphasis off.  This

15  is an important job.  Alabama Power is

16  nothing but a technology company,

17  nothing but an engineering company.

18  You know, back to the blackout of 2003,

19  nobody was worrying about where the

20  accountants were; they were all looking

21  for engineers.

22    MS. SPIVEY:  Are you asked to

23  analyze any financial data or do you

1    just provide expertise on engineering

2    matters?

3  A.  Well, sometimes we look, you know, you

4    get some information from something.

5        MS. SPIVEY:  So you cross -- you

6    go across both the accounting as well

7    as engineering?

8  A.  No.  What I try to do for Mr. Free

9    sometimes, as an engineer I understand

10   the accounts of how transformers are

11   coded and what a blanket is.  So even

12   though you're an engineer, you still

13   have to make sure that the material is

14   charged out right, that the men are

15   paid correctly, and time is done

16   appropriately.  So, you know, in those

17   areas where Mr. Free wouldn't

18   understand how distribution expenses

19   are charged, and why they are charged

20   this way, we might sit down and have a

21   talk on why these charges are done this

22   way.

23       MS. SPIVEY:  Thank you.

1       MS. JACKSON:  At the time of your

2   interview with Mr. Free, did you state

3   that you thought that he was there only

4   because Ms. Hamilton could not be

5   there?

6  A.  No.  I had no idea.

7       MS. JACKSON:  You didn't know why

8   he was there interviewing?

9  A.  Well, he told -- you know he arranged

10   the interview.  And he told me to come

11   in for the interview and talk.  You

12   know, he really didn't talk to me.  He

13   had his secretary call and arrange the

14   interview.  And she told me when I get

15   there I need to see Mr. Free.

16      And when we got there, we

17   exchanged pleasantries, you know, we

18   talked about hmself, I talked about

19   myself, talked about some experiences

20   and whatever, and Ms. Hamilton shortly

21   joined us after we got through.  You

22   know, the interview didn't start until

23   Ms. Hamilton came on line.  The

1    interview did not start until she got

2    there.  When she got there, the full

3    interview was conducted.  Mr. Free

4    asked questions and I answered;

5    Ms. Hamilton asked questions and I

6    answered.  Then when she finished with

7    her questions, Mr. Free and I, you

8    know, talked some and I think we talked

9    about some engineering terms and stuff

10   like that.  And he told me "Thank you

11   for coming in.  I've got to interview a

12   couple of other folks and we'll get

13   back with you."

14        MS. JACKSON:  So no one at that

15   time told you that he would be your

16   supervisor at the time of the

17   interview?

18   A.  No one told me whether it would be

19   Mr. Free or either Ms. Hamilton.  No

20   one specifically told me who was going

21   to be my supervisor.

22        MS. JACKSON:  So you found out the

23   first day you came to work that John

1    would be your supervisor, is that what

2    you're saying?

3    A.    Well, yeah.

4         MS. JACKSON:  I'm just asking.

5    A.    Well, yeah.  Yeah.

6         MS. JACKSON:  Basically.

7    A.    Yeah.

8

9         CONTINUED CROSS-EXAMINATION

10   BY MR. SAMFORD:

11   Q.    And it was your testimony that having

12        worked with the Public Service

13        Commission and Alabama Power Company

14        for some time and having all of the

15        contacts you keep mentioning, and

16        having checked out this place ahead of

17        time, you did not know that Mr. --

18        through any contact you could have made

19        or did make, that Mr. Free was the

20        supervisor of the Electrical Section?

21   A.    At the time there were no engineers in

22        the Electrical Section.

23   Q.    No, sir.  I said who was in charge and

1    the head of the Electrical Section.  I

2    did not ask if there were any

3    engineers.  You said they did not say

4    who was in charge of the Electrical

5    Section?

6  A.   I had no idea who was in charge of the

7    Electrical Section.

8       MR. SAMFORD:  All right, sir.

9    Thank you.

10      MS. SPIVEY:  Even after you got

11    here and you found out who was in

12    charge, and you were promoted to the

13    next level or the next title or, I'm

14    not sure, career path, the next level

15    up, and he continued to be your

16    supervisor, you were still working for

17    him, you weren't disappointed, you

18    continued to work in the job?

19  A.   Well, you're trying to think it's a

20    personality; it's not.

21      MS. SPIVEY:  No, I'm not.  I don't

22    think that.

23  A.   It's not.  It's not that.

1      MS. SPIVEY:  No.  I'm addressing

2  your job dissatisfaction or your --

3  A.  No, it's not job dissatisfaction.

4      MS. SPIVEY:  Well, it is to a

5  degree, because you think things could

6  be done in another way because you

7  object to his supervision.  Maybe not

8  to him as a person, but you do object

9  to that person who has no technical

10  background supervising you?

11  A.  I think in the long-run that this

12  situation is going to come back to

13  haunt me.

14      MS. SPIVEY:  But isn't that

15  Ms. Hamilton's decision?

16  A.  Who is to say how long Mrs. Hamilton is

17  going to be here?

18      MS. SPIVEY:  Isn't that

19  Ms. Hamilton's decision while you're

20  here and she's here?

21  A.  Who is to say how long Mrs. Hamilton is

22  going to be here?  She could become

23  Vice-President of IBM tomorrow.

1          MS. SPIVEY:  This is true.

2          MS. JACKSON:  I have one other

3     question.  And I don't know if anyone

4     here can answer this.  Is this position

5     unique to the Commission, the public

6     utility -- Mr. Kelly's position, is it

7     just unique to this Commission?

8          MS. HAMILTON:  It is as far as I

9     know.

10         MS. JACKSON:  So he would have

11    this position in another State agency,

12    right?

13         MS. HAMILTON:  Not this position.

14         MS. JACKSON:  Not this one, but a

15    similar position may be available?

16         MS. HAMILTON:   Yeah.  In other

17    agencies probably, yeah.

18         MR. DILLARD:  I have a number of

19    questions, I'm just trying to get them

20    in some type of order here.  Was there

21    any one event, episode, interpersonal

22    exchange or anything of that nature

23    that was a catalyst for this event

1      today?

2  A.  No.

3       MR. DILLARD:  This hearing today?

4  A.  This is a discussion that's been going

5      on a year and a half.  A year and a

6      half or two year discussion that I

7      thought that this position could --

8      should -- you know, should be over in

9      the technical field, not been

10     encumbered, not be working with

11     non-technical people as your peers, not

12     being in staff meetings with

13     non-technical people presenting your

14     report, they show no interest, you

15     know, in what you're doing and how

16     you're doing it.

17       I've tried to involve them in my

18     work, and show them what Alabama Power

19     Company is all about, by taking them to

20     a site visit and getting them involved

21     to show them what a SCATA system is,

22     talk about what a transformer is, what

23     a breaker is, how the power is

1    generated, transmission, how is it

2    distributed.  A lot of folks that work

3    in that section don't have any idea how

4    those coulombs or how those amps dance

5    down those power lines.  They don't

6    have the foggiest idea how the lights

7    go on.

8         So I've tried to show them that,

9    sure, you know, a lot of money is being

10   -- flowing in and out of the company,

11   but that's only a small segment.

12   Alabama Power Company is an engineering

13   firm.  It is an engineering firm.  If

14   you don't understand how to keep the

15   lights on and how to keep the amps

16   coming down the line, you don't

17   understand the purpose of the company.

18        MR. DILLARD:  Do you feel that

19   you're a square peg in a round hole

20   scenario?

21   A.   I think you said it.

22        MR. DILLARD:  Okay.  Let's say

23   Ms. Hamilton retired tomorrow, would

1    you be eligible to apply for her

2    position as Director of the Energy

3    Division?

4  A. I would -- you know, looking at this

5    organizational chart, I would say no.

6        MR. DILLARD:  Absent the

7    organizational chart, based on State

8    Merit System employees, State Personnel

9    rules, would you be able to apply for

10    her job tomorrow?

11  A. I have no idea.  I haven't seen the

12    specifications for Ms. Hamilton's job.

13        MR. DILLARD:  Well, she's, I

14    believe, held a position similar to

15    yours previously, correct?

16  A. I think Ms. Hamilton has testified also

17    that those specs are changed and

18    revised on a constant basis, too.

19        MR. DILLARD:  Okay.  It's like

20    we're running two parallel tracks here.

21    One being the -- I've got you quoted

22    here as saying that your fellows do not

23    appreciate your expertise, your fellow

1    employees; that you are reduced to

2    making parables and that is unfairly

3    burdensome to you, and that you have to

4    be very creative to create these

5    parables; and that your fellow

6    employees are oftentimes intimidated,

7    or they express some type of

8    technical-phobia?

9  A.   That is correct.

10       MR. DILLARD:  And those are direct

11   quotes that I wrote there.  You are

12   playing on an unlevel playing field;

13   that you have a fractured career path;

14   that you have lost synergy; that you've

15   not been kept informed of changes?

16  A.   That is correct.

17       MR. DILLARD:  Would you -- based

18   on the foregoing, would you -- or could

19   we agree that you feel that you've

20   reached an untenable situation in your

21   present position?

22  A.   Not the position; it's where the job is

23   located.  I wouldn't say untenable.

1    You know, don't make it personal.' It's

2    about where this job is located in the

3    organizational structure.   I think that

4    if you locate that job over there in a

5    Technical Section that you could get --

6    you know, that you would increase

7    synergy.

8        MR. DILLARD:  That leads me to my

9    second reason of why I say parallel

10   tracks here.  Because there is a lot of

11   your focus shifted to Rick Cleckler's

12   role and his relationship to the

13   division director, and that you seem to

14   allude that you would enjoy and be more

15   appreciative of your job if you had a

16   similar position in the organizational

17   chart as Mr. Cleckler?

18   A.   That is correct.

19       MR. DILLARD:  With direct access

20   to the Director, not going through an

21   inline supervisor prior to that?

22   A.   That is correct.

23       MR. DILLARD:  Would you concur

1    that basically what you're citing here

2    is a flawed institutional configuration

3    of sorts?

4  A.  Those are strong words.  I wouldn't --

5    Ms. Hamilton has the right to organize

6    her division anyway she wants to, but

7    I'm talking about how it affects my

8    position and how it affects me.

9        MR. DILLARD:  Okay.  Would you

10   agree to the old addage that knowledge

11   is power?

12  A.  I think you hit the nail -- hit the

13   nail on the head again.

14       MR. DILLARD:  Well, knowledge is

15   power, you know, and that's what I

16   teach my 17-year-old son and hopefully

17   that will sink in.  Do you -- you

18   expressed, you know, that you have

19   advanced technical knowledge and, again

20   back to the parables, that your role at

21   times you feel to your detriment is to

22   have to come back and break down or put

23   in layman's terms complex technical

1   theories and applications; is that

2   fair?

3  A.   That's correct.

4       MR. DILLARD:  Okay.

5  A.   You know, you've got to admit,

6   electricity is something you can't see,

7   you can't hear, you can't smell.  So

8   how are you going to make people

9   understand something that's magic to

10  most folks.

11      MR. DILLARD:  Well, I understand

12  your position there.  My point is, by

13  virtue of that knowledge, and as we

14  stated earlier that knowledge is power,

15  by virtue of you having that distinct

16  knowledge, don't you feel that empowers

17  you, gives you some skills that are not

18  present in your fellow employees,

19  therefore making you a more marketable

20  commodity as far as future

21  opportunities?

22 A.   I don't get the gist of your question.

23      MR. DILLARD:  Okay.  Shall we say

1    again that knowledge is power?  If you

2    have advanced knowledge of the field

3    that you're currently dealing with,

4    which is energy, and you have the

5    capabilities to take complex technical

6    terms and theories and convert them

7    into layman's terms and then

8    communicate them to your fellow

9    employees, don't you feel that that

10    benefits your fellow employees and the

11    Commission and the citizens of this

12    state as a whole?

13  A.   How are you going to get that

14    information out when you've got an

15    accountant manager who acts as a whip?

16    He sends in the information and he

17    sends out the information.

18          (Off the record.)

19        MR. DILLARD:  Would you agree that

20    this advanced technical knowledge that

21    you have and your capabilities to take

22    these complex scenarios and put them

23    into layman's language could be

1    beneficial to you in your career path?

2  A.  Well, I would assume they would.  You

3    know, each situation is different, each

4    application is different, so, you know,

5    you just can't say as a generic answer

6    that it's going to be correct one

7    hundred percent of the time.

8        MR. DILLARD:  Do you think your

9    supervisor, in this case Mr. Free,

10    values you as an employee because of

11    your skills?

12  A.  I think that's why we -- you know, I

13    can't speak for Mr. Free.

14        MR. DILLARD:  Do your performance

15    evaluations reflect his appreciation of

16    your skills?

17  A.  But I also believe that Mr. Free also

18    evaluates some of his non-technical

19    people higher than he evaluates my

20    evaluation.

21        MR. DILLARD:  Okay.  The crux of

22    the matter here again, again I still

23    think we're running on parallel tracks

1    here, is your dissatisfaction with the

2    institutional configuration, how it's

3    currently configured as it relates to

4    your role versus Mr. Cleckler's role at

5    the Commission?

6  A.    That is correct.

7        MR. DILLARD:  Your inability to

8    communicate both horizontally and

9    vertically or the, shall we say,

10   hurdles that you encounter trying to

11   communicate horizontally and vertically

12   in your day-to-day activities at the

13   Commission?

14  A.   That is correct.  There is a daily

15   challenge for me to be able to

16   communicate.

17       MR. DILLARD:  And you feel, based

18   on those considerations, that you will

19   not be afforded career advancement

20   opportunities in the future based on

21   those considerations?

22  A.   I think it could come back and be my

23   worst nightmare if I don't get this

1      situation corrected.

2          MR. DILLARD:  How do you propose

3      correcting this situation?

4   A.  I proposed in my letter that I be

5      realigned with Mr. Cleckler.

6          MR. DILLARD:  Even though

7      Mr. Cleckler -- even though he may be

8      an engineer, he's dealing with separate

9      matters; even though that you're in a

10     situation where there is no per se

11     technical section per se that currently

12     exists, you're proposing that a

13     separate section be constructed?

14  A.  No.  I'm proposing that I join

15     Mr. Cleckler over there in his

16     configuration.  You've got to remember,

17     Mr. Cleckler's Form 40 -- I mean,

18     Mr. Cleckler's job description, job

19     title are identical.  There is no

20     difference in his job title than mine;

21     identical.

22         MR. DILLARD:  Let's say the

23     Commission concurs with your

1  recommendation and we remove your desk

2  from the Energy Division and put it in

3  whatever spot next to Mr. Cleckler's;

4  will you still be faced with the role

5  of having to go to Mr. Free in the

6  Energy Section and explain these

7  complex scenarios in parables to that

8  staff?

9  A.  I will feel free to be an engineer that

10  I could be.  Now, if I decided to write

11  my reports in glorified technical terms

12  and Mr. Free can't understand, the

13  burden is on him.  Now the burden is on

14  me.

15      MR. DILLARD:  I see.  And, again,

16  you don't feel that your -- or you

17  still don't see my point here.  Do you

18  not agree with me that you have this

19  capability, unique capability, to take

20  complex matters and put them into

21  layman's terms that the Commissioners,

22  the Director, your immediate

23  supervisors can understand, you don't

1       -- do you view that as an asset that

2       you have?

3  A.   Sure, I do.

4            MR. DILLARD:  And that empowers

5       you as an employee?

6  A.   To be able to communicate is very

7       important.

8            MR. DILLARD:  Makes you an

9       essential part of this organization?

10 A.   I would hope so.

11           MR. DILLARD:  Okay.  That's pretty

12      much going to wrap up my questioning.

13           JUDGE MORRIS:  I don't have

14      anything.  Ms. Allen, anything further?

15           MS. ALLEN:  I had something

16      earlier and I absolutely lost it.  It

17      was to follow-up something that

18      Mr. Samford had asked.

19

20              REDIRECT EXAMINATION

21 BY MS. ALLEN:

22 Q.   I want to make sure that the panel

23      understands, you are looking for a

1    change in your job location on the
2    organizational chart, not necessarily a
3    change in the job that you perform on a
4    day-to-day basis?
5  A.   That is correct.
6  Q.   And you're looking simply for a
7    different direct line supervisor;
8    instead of reporting through Mr. Free,
9    reporting directly to Ms. Hamilton?
10 A.   That is correct.
11 Q.   And that is based on your concern that
12   Mr. Free does not have an engineering
13   background?
14 A.   Right. My concern is Mr. Free can't
15   fully appreciate the scope that I bring
16   to the job. He doesn't really
17   appreciate the ability that I possess.
18 Q.   All right. And that does remind me
19   what it was that I was going to
20   follow-up on Mr. Samford's question.
21   The request for production where he
22   asked for a specific instance where
23   Mr. Free misdirected or misapplied a

```
1        report or failed to understand or

2        somehow failed to appropriately rate a

3        report that you had submitted.  Does

4        Mr. Free provide you the same level of

5        supervision for your engineering duties

6        as he does for the other duties that

7        you perform under the section?

8   A.   No.  The engineering, he pretty much

9        give me hands-free on those engineering

10       things.  But other stuff, you know,

11       he's checking the spelling, checking

12       the punctation, checking the

13       capitalization, checking the dates,

14       checking the time, checking the month,

15       checking the year, checking to check to

16       check.

17  Q.   But he does not really pick apart your

18       engineering?

19  A.   No.  He gives me a free pass on that.

20  Q.   Well, you'll have to forgive me, most

21       employees would love to have a

22       situation like that.

23  A.   Well, I'm thinking long-term.  I'm
```

1      thinking long-term.  This situation

2      could come back to haunt me if I don't

3      get it corrected.

4  Q.  Now, if this panel chooses not to or

5      the Commission does not follow any

6      recommendation for your move, is that

7      going to interfere with your ability to

8      work with Mr. Free?

9  A.  No.  No.  No.  I'm a professional, I

10     hope I can do my job in a professional

11     manner.

12         MS. ALLEN:  All right.  I think

13     that's all I have.

14         MR. SAMFORD:  Your Honor, I have

15     one.

16

17             RECROSS-EXAMINATION

18  BY MR. SAMFORD:

19  Q.  So if Mr. Free happened to leave and he

20     was replaced by another analyst who

21     more closely appreciated the job you

22     are doing, would you have a problem

23     being rated or supervised by a

```
 1        non-engineer?
 2   A.   Didn't you object to that question when
 3        we tried to ask that question with
 4        Mr. --
 5   Q.   I asked you.  I wasn't looking for a
 6        question.  I do not recall doing so.  I
 7        merely -- it sounded -- I was listening
 8        just based on what you said after
 9        Mr. Dillard, and I thought I heard you
10        -- you said it's nothing personal
11        against Mr. Free, but then when you say
12        he can't appreciate my value to the
13        organization, it sounds more like John
14        Free, and not a non-engineer supervisor
15        that is the perceived problem?
16   A.   That's a hypothetical question and I'm
17        not going to --
18   Q.   Well --
19             MS. ALLEN:  Well, let me follow-up
20        and follow that same line of
21        questioning.
22
23
```

FURTHER REDIRECT EXAMINATION

BY MS. ALLEN:

Q.   If any accountant was your supervisor,
     would you have these same concerns?

A.   That is correct.

Q.   Okay.  You're looking to be supervised
     directly by an engineer?

A.   That is correct.  My evaluation will
     have more value.  If I'm supervised by
     an engineer I believe that my
     evaluation would have more value than
     one supervised by an accountant.  That
     could come back to haunt me in the
     future.


FURTHER RECROSS-EXAMINATION

BY MR. SAMFORD:

Q.   And the last question I would ask is,
     is it possible that you having a free
     pass, free rein, I'm sorry, I don't
     remember the exact words, as to
     engineering matters is because
     Mr. Free, as your supervisor, trusts

1    you in your ability and relies on your

2    engineering abilities?

3  A.  I can't speak to what Mr. Free's

4    thought pattern is.

5        MR. SAMFORD:  Thank you.

6        MR. DILLARD:  I have got one more

7    question.  Let's say we will entertain

8    the hypothetical scenario like I

9    proposed earlier that you do get to

10   move your desk and abut it with

11   Mr. Cleckler's here, and then you are

12   free to write detailed, lengthy

13   engineering reports which would then go

14   to Ms. Hamilton, correct?

15 A.  Well, it still could be reviewed by --

16   I don't have a problem with Mr. Free

17   reviewing it.

18       MR. DILLARD:  Well, let's say they

19   go to Ms. Hamilton, directly to the

20   Director, because we've removed the

21   intermediary here in this scenario.

22   And by virtue of her position as an

23   engineer and also having worked in a

1          similar position that you're in today,

2          you would assume that she would be able

3          to understand and decipher these

4          lengthy complex reports that you're now

5          generating; is that correct?

6   A.     That is correct.  She might not -- you

7          know, I think she's been out of it for

8          some time, but I still believe, you

9          know, she studied engineering.  She

10         might have some small question, but she

11         wouldn't have any detailed question

12         where we've got to spend a couple of

13         hours or days trying to hash this point

14         out.  I believe that it would probably

15         come back to surface.

16              MR. DILLARD:  Okay.  Well, let's

17         rock along about a year.  Ms. Hamilton,

18         again, opts to retire.  You wake up one

19         morning and, let's say, John Free is

20         now the Director, or Bob Reed out of

21         Natural Gas is now the Director; you're

22         back to square one?

23  A.     I wouldn't have a problem with it.

1    You're talking about Director.  You're

2    not talking about someone who is

3    suppressed in the organization.

4    Mr. Free is suppressed in the

5    organization.  The Director versus a

6    first line supervisor, you're talking

7    -- you're mixing apples with oranges

8    now.

9        MR. DILLARD:  But my contention is

10   that what you're back to if that

11   scenario is envisioned is that you have

12   someone directly above you that does

13   not appreciate your expertise, is

14   unable to translate, you'll have to be

15   relegated to giving them parables, et

16   cetera?

17 A.  No, you're dealing -- no.  You look at

18   an organizational chart, you're dealing

19   at a higher level in the organizational

20   chart.  Mrs. Hamilton is an engineer.

21   She might not need to know anything

22   about accounting and rates and stuff.

23   She's there because her job is to look

1  at the total organization, not to be --

2  not to be handcuffed to doing

3  day-to-day routine things.  Her job is

4  long range planning.

5  MR. DILLARD:  Well, that begs the

6  question of what value would these

7  lengthy detailed reports be to this

8  Commission if no one at this Commission

9  is able to comprehend them?

10  A.  They would be on record.  They would be

11  a body of knowledge so we could go back

12  and research if we had to.  You know,

13  there would be a record of what --

14  MR. DILLARD:  And your role would

15  then become archivist?

16  A.  Well, basically I'm an archivist now.

17  MR. DILLARD:  I see.  That

18  concludes my questions.

19  JUDGE MORRIS:  I have just one

20  very quick question.  Since you've been

21  in this position, have you had an

22  opportunity, or has Mr. Free assigned

23  you work, or have you been involved

1        with, outside of your engineering area,

2        any kind of analysis of the rates and

3        tariffs and the engineering costs and

4        how this stuff flows into the rates and

5        tariffs?

6   A.   Rates and tariffs is strictly done by

7        Mr. Free and I think four or five other

8        analysts he have, to my knowledge.  If

9        they have a specific reason of why the

10       costs at Plant Gaston, you know, went

11       up, the fuel costs or whatever, I could

12       look at my engineering report and say,

13       oh, no, we lost a stair winding or

14       something, that might explain why the

15       cost went up or something.  You know,

16       basically I'm outnumbered.  You have

17       four of those looking at cost -- four

18       or five of those looking at cost and

19       you've got one guy who is looking at

20       the whole spectrum of engineering at

21       Alabama Power Company.

22           JUDGE MORRIS:  So you don't get

23       involved in anything having to do with

1          the cost?

2     A.   We talk.  What we do, we talk.  Like I

3          say, we talk.  If he has a problem, you

4          know, we talk and try to figure out

5          what caused it.  He's looking at it --

6          we're looking at it from two different

7          directions.  He's looking at it from

8          the accountant part; I'm looking at it

9          from the engineering part.  We're tying

10         to put -- you know, that's why I'm

11         saying if I'm in the other section, I

12         wouldn't have a problem coming in and

13         talking with John Free.  We have a

14         different perspective on what could

15         have or what might have caused this

16         problem.  He's looking at it from an

17         accountant perspective; I'm looking at

18         it from an engineering perspective.

19         We're trained and we're taught totally

20         different.

21              JUDGE MORRIS:  Okay.  Do you have

22         any desire to -- is it your desire

23         long-term to stay in this position or

1    would you like to advance into a higher

2    position at the Commission?

3 A.  Well, you know, I have no idea. Right

4    now I enjoy the work I do; I enjoy the

5    people I work with. You know, this is

6    a dream job for me, because I get to

7    look at generation, transmission,

8    distribution, nuclear. I get to look

9    at every aspect of Alabama Power

10   Company. If I wanted to choose to look

11   at broadband on a power line, I can do

12   that. This is a dream job for

13   engineers to have this wide latiscope

14   to go and to do basically anything I

15   want to do as it relates to Alabama

16   Power Company.

17        JUDGE MORRIS: So you're saying at

18   this point you have no desire to move

19   to a higher level position in the

20   Commission?

21 A.  No. I have no desire to be Director.

22   I have no desire to be rate supervisor.

23        JUDGE MORRIS: Okay.

A.    I am satisfied with the job I presently
have.  This is a dream job.

JUDGE MORRIS:  All right.  I have
no further questions.  This probably
marks a good opportunity to break for
lunch before we lose all of our local
places.

MR. SAMFORD:  Well, I was going to
say, Your Honor, are you done, Linda?

MS. ALLEN:  I'm pretty much done.

MR. SAMFORD:  Because I'm going to
say I would love about a ten minute
break, but I can Dorinda in and out of
here like -- it ain't going to be long.
And she's probably still sitting out
there.

JUDGE MORRIS:  Okay.  Well, let's
go ahead if that's the case.

MR. SAMFORD:  I mean, that's all,
I'm not going to call anybody else but
Dorinda, and I do not intend to be very
long with that.

JUDGE MORRIS:  Okay.  Well, let's

1    get her in here and we'll get this over

2    and done with and then we'll break.

3              (Recess.)

4         JUDGE MORRIS:   Ms. Overstreet,

5    please raise your right hand.

6              (Witness sworn.)

7         JUDGE MORRIS:   Please be seated.

8

9         LOY OVERSTREET, of lawful age,

10   having been duly sworn, testified as

11   follows:

12

13              DIRECT EXAMINATION

14   BY MR. SAMFORD:

15   Q.   Please state your name for the record?

16   A.   Loy Overstreet.

17   Q.   Please spell your last name?

18   A.   O-V-E-R-S-T-R-E-E-T.

19   Q.   Thank you.  And what is your position

20        at the Public Service Commission?

21   A.   Personnel Assistant II.

22   Q.   And how long have you been in Personnel

23        at the Commission?

1    A.    February of '92.

2    Q.    Do you attend meetings of the Personnel

3          Council?

4    A.    Yes, sir.

5    Q.    Do you consult professional journals

6          and other personnel publications?

7    A.    Yes, sir.

8    Q.    Do those council meetings and the other

9          professional activities keep you

10         abreast of the current state of

11         personnel law?

12   A.    Yes, sir.

13   Q.    Are there any -- are there any

14         instances in the organization of the

15         Commission where someone supervises an

16         individual that is not of the same job

17         classification?

18   A.    The --

19   Q.    In other words -- go ahead.

20   A.    The only requirement that I'm aware of

21         is that they just -- the person in

22         order to supervise has to be in a

23         higher classification.

1   Q.   So as a person that has done this for a

2        number of years and stays up on

3        personnel matters, you are not aware of

4        any requirement that the person be in

5        line, so to speak, or of the same job

6        classification?

7   A.   No, sir, just that they need to be in a

8        higher classification.

9   Q.   To which division are you assigned?

10   A.   Advisory Division.

11   Q.   Who is your immediate supervisor?

12   A.   Dorinda Kepler.

13   Q.   What is Ms. Kepler's job

14        classification?

15   A.   Personnel Assistant III.

16   Q.   Personnel Assistant III.  And who is

17        her supervisor?

18   A.   Judy McLean.

19   Q.   Is Ms. McLean a personnel supervisor?

20   A.   She is the Director of the Advisory

21        staff.

22   Q.   And has she got a personnel manager

23        degree or anything?  Do you know if --

1      do you know what her degree is?

2  A.  No, not that I'm aware of.  I don't

3      know what her degree is in.

4  Q.  Okay.  In your experience -- shifting a

5      little bit.  In your experience is it

6      possible that there would be a Form 40

7      job description for certain positions

8      that were not totally current or were

9      out-of-date?

10  A.  There could be that they're not -- you

11     know, the latest one we would have

12     would be the last time that their job

13     duties have changed.

14        MR. SAMFORD:  That's all I have.

15        JUDGE MORRIS:  Okay.

16        MS. ALLEN:  I don't have any

17     questions.

18        JUDGE MORRIS:  Ms. Hamilton?

19        MS. HAMILTON:  No.

20        JUDGE MORRIS:  Okay.  You're

21     excused.

22        MR. SAMFORD:  I told you it was

23     going to be short.  Dorinda sat here

1    all morning and then she missed her

2    performance.

3        THE WITNESS:  Oh, I'll give her

4    one.

5        JUDGE MORRIS:  Do y'all wish to

6    make closing statements?

7        MS. ALLEN:  I will be glad to.

8        JUDGE MORRIS:  Okay.

9        MS. ALLEN:  There has been a lot

10   discussed today.  I want to make sure

11   that the panel is focused on a couple

12   of issues.  There have been some items

13   brought up that have attempted to maybe

14   cloud the issues.

15       Mr. Kelly is an engineer.  That's

16   what his background is; that's what his

17   position at the PSC is.  He's not

18   unhappy with the work he does.  He

19   acknowledges Ms. Hamilton's ability to

20   organize the division pretty much the

21   way she wants to organize it.  He is

22   making a recommendation based on what

23   he perceives to be a proper delegation

or assignment of job responsibilities.

Again, no disrespect to Mr. Free, he has no technical background. Mr. Kelly would like to have an opportunity to work in an area where he has a direct peer. Now, I don't know what all Mr. Cleckler does with these other special projects, but he's an engineer. Mr. Kelly would have an opportunity to work with, seek input from, bounce ideas off of, and so forth, Mr. Cleckler if he were in the same section.

And I understand that there are some issues about having a supervisor who is or isn't an engineer. Mr. Samford has brought out the fact that his direct supervisor is not an attorney. I would find that difficult. Apparently Mr. Samford doesn't have a problem with that. I don't know what all Mr. Samford does with the Commission, but I'm thinking that if he

had a technical legal question, he
might seek some input from somebody in
the Legal Division.  I have no idea
what Ms. McLean's expertise is or is
not in the law, I'm just making an
assumption.

Mr. Kelly is -- has a very
technical background.  Mr. Free has a
technical background.  But they're in
two different areas of responsibility.
Mr. Kelly would like to have the
opportunity to work directly with other
engineers and to report to the division
head, the division chief, currently
Ms. Hamilton.

In years past, looking at several
annual reports that have been submitted
for your review, there has been a
Technical Section that has encompassed
people who have the same general job
description that Mr. Kelly does.  At
some point the titles changed, but
there were engineering individuals in

1   this Technical Section.  Why or when

2   they changed, Ms. Hamilton has

3   addressed some issues.

4         It would seem that having a

5   separate Technical Division, which

6   would allow engineers to cross-train

7   one another, to be backups for one

8   another in the event one was out, have

9   the opportunity to, as I said, bounce

10  ideas off of one another, then be able

11  to present information to the Director.

12  If information needs to go to the

13  Electricity Section, then it can be

14  drafted in such a way to go to the

15  Electricity Section.  If it needs to go

16  to the Gas Pipeline Safety Section,

17  then the appropriate person in the

18  Technical Division could decide how

19  best to present that information to

20  that division chief.  But, over all,

21  Ms. Hamilton, or the person who is in

22  the Director's job, needs to get a very

23  specific understanding of the technical

1   nature of what these engineers do.

2       And, again, Mr. Free, I think, has

3   a great deal of understanding based on

4   his backgound of accounting practices.

5   And I believe that it's very -- based

6   on Mr. Kelly's testimony that it is

7   apparent that he feels very comfortable

8   reporting or analyzing Mr. Kelly's job

9   performance in those areas.  He seems

10  to have a great deal of institutional

11  knowledge about certain things that go

12  on in the Electricity Section.  He has

13  picked up a lot about the engineering

14  -- the engineering field, but he is

15  still not an engineer.

16      Mr. Kelly's job description, job

17  specifications, give every indication

18  to a reasonable person that he would be

19  supervised by someone who could analyze

20  and supervise based on technical and

21  engineering soundness.  Mr. Free is

22  unable to do that.  Mr. Kelly simply

23  wants to be in a position where the

1   person who is overseeing his career

2   path has a basic understanding of what

3   it is that he understands and does for

4   a living.

5        Again, if this panel and the

6   Commission choose not to provide this

7   particular remedy that Mr. Kelly has

8   sought, he's not looking for another

9   job; he loves what he does.  He simply

10  thinks that, in his opinion, and again

11  it may not be what the Commission

12  thinks, but in his opinion that this

13  would make more sense in a way that

14  would provide better service to the

15  Commission itself and to the taxpayers

16  of Alabama.  And for that I would ask

17  that y'all look at the job

18  specifications, look at the different

19  backgrounds of the parties involved,

20  and come to a logical conclusion as to

21  what makes the most sense for this

22  Commission.  Thank you.

23       JUDGE MORRIS:  Are you going to

1    sum up?

2        MS. HAMILTON:  I just want to say

3    a couple of things that I would like

4    the committee to take with them to

5    their deliberation, is that when I was

6    an engineer in the Electricity Section,

7    it was incumbent upon me to help my

8    supervisor understand engineering

9    principles.  And I used analogies and I

10   didn't have a problem with that.  And

11   also Mr. Kelly is an engineer, but I

12   want you to also remember that he has a

13   background in business administration;

14   he has experience as a statistician;

15   those qualities we also saw as

16   attractive to him being more suitable

17   for work in the Electricity Section.

18   Because we don't generate kilowatts

19   here at the Commission, we only

20   regulate the company.  And we just need

21   someone with an understanding of those

22   engineering principles and then to

23   communicate those things to the people

1    with financial backgrounds.

2        I'm sure that the 25 other people

3    in the Energy Division would love it if

4    I had an accounting degree, but they

5    also have to communicate their

6    financial information to me in such a

7    way that I can understand it, because I

8    don't have training in accounting.  So

9    I don't understand why Mr. Kelly feels

10   like he should be treated any

11   differently.  Thank you.

12       MR. SAMFORD:  I told you at the

13   beginning that this was a simple case

14   and I think it still is.  If I was

15   responsible for the cloudiness of which

16   Ms. Allen speaks, I apologize.  I still

17   think the issues -- and a lot of it,

18   when Mr. Dillard up there started

19   laying it down, it helped me think

20   about it.

21       You know, Mr. Kelly applied for

22   the job.  He may not have known exactly

23   at all, but he sure made enough

1    contacts with those folks that he knew

2    from Alabama Power, you know, where it

3    seemed like he would have learned who

4    the supervisor was. He could have

5    asked here, but he didn't. But he got

6    in here for whatever reason and he got

7    dissatisfied. He doesn't like it

8    because a non-engineer is his boss.

9    Whether it's not personal, it's just

10   professional, or whatever, but the fact

11   remains that he is in the division, he

12   was given the job, he was promoted, he

13   had his probationary period, he got his

14   raises on time and everything like

15   that. The organization hasn't changed

16   since he came in.

17        There is no rules, law,

18   regulations that say a person must be

19   supervised by one in a comparable job

20   classification. In answer to the

21   statement Ms. Allen made, Judy McLean

22   supervises me administratively. She

23   doesn't supervise my legal ability. If

1    I was in private practice, I would not

2    have a supervisor. You know, if I

3    happened to be an Assistant Attorney

4    General or whatever, I would have to

5    answer to the big guy. But the

6    Commissioners are also generally not

7    lawyers and that does not keep me from

8    being employed under George C. Wallace,

9    Junior's supervision for that matter.

10    I get a little confused when, you

11    know, there's talk saying, well, it

12    would be okay if I went where Rick

13    Cleckler was even if Ms. Hamilton left

14    because that would be the Director.

15    And if my first line supervisor is a

16    non-engineer, as long as they're the

17    Director, it's okay. I'm not sure I

18    understand the difference in having a

19    first -- you know, a first line

20    supervisor is a first line supervisor.

21    And if that person is a non-engineer,

22    either it's good or it's not. I'm

23    still not real clear on that. It may

1    just be me.

2        But I'm hearing a lot of it's okay

3    for Ms. Hamilton to organize how she

4    wants to organize as long as she moves

5    me over to where Rick is.  I generally

6    support the right of any organization

7    to organize, but just get me out of

8    here the way I want it to do, because I

9    love my job, I don't want to quit, I

10   don't want to find another job, just

11   take care of my problem and it doesn't

12   matter about the rest.

13       And finally, you know, I would say

14   that Mr. -- I think Mr. Free

15   demonstrated clearly that even though

16   he is not an engineer, that having been

17   here 15 years, having the avenue of

18   discussing with Ms. Hamilton,

19   discussing with Rick Cleckler,

20   discussing with other people, I think

21   it is clear that he has knowledge that

22   would allow him to supervise someone

23   that is an engineer.  I think it just

1    wasn't convenient and perhaps annoying

2    and took too much time to explain it to

3    Mr. Free in his office.

4         Finally, I guess the most

5    disturbing thing I've heard today is

6    once we got into the even playing field

7    thing, I know we have said we weren't

8    going to make it personal and things,

9    but I just hope that none of the

10   proceedings today are a veiled attempt

11   to say "If you don't, I'm going to use

12   a grievance if I can get what I want,

13   but if I can't, we haven't made up our

14   mind yet on whether to go to EEOC

15   because y'all are discriminating."

16   Because then the charges have become

17   more personal and more directed at

18   certain people or persons.  And I

19   certainly hope that was not -- you

20   know, I just dreamt that up.

21        In any event, I appreciate your

22   time.  There's no requirement --

23   Ms. Hamilton testified that she

organizes at her discretion with the
approval of the Commission. That's the
way it has been, that's the way it
needs to be, otherwise government would
be in turmoil because nobody could
supervise anybody else just about.
Thank you for your attention.

JUDGE MORRIS: There's one
housekeeping measure that I need to
take up and that is to formally accept
into the record Employee's Exhibits 1
through 14, as so labeled, and PSC
Exhibits 2 and 3. And we will note for
the record that there was not submitted
a PSC Exhibit 1.

MR. SAMFORD: That is correct.

JUDGE MORRIS: Those are accepted
into the record. And with that this
hearing is concluded. I thank everyone
for their time. And, Panel, we will
break and resume here at 2:30; does
that give everyone enough time, in the
Legal conference room?

1              (Hearing concluded.)

2

3              REPORTER'S CERTIFICATE

4

5    STATE OF ALABAMA

6    COUNTY OF MONTGOMERY

7

8              I, Ricky L. Tyler, Certified

9    Shorthand Reporter and Notary Public in and

10   for the State of Alabama at Large, do hereby

11   certify that on Wednesday, August 10th,

12   2005, on behalf of the Employee Grievance

13   Panel of the Alabama Public Service

14   Commission, I reported the proceedings in

15   the matter of:  Employee Grievance of

16   Gregory Kelly, now pending before the

17   Alabama Public Service Commission; that the

18   foregoing 209 computer-printed pages contain

19   a true and accurate transcription of the

20   proceedings.

21             I further certify that I am

22   neither of kin nor of counsel to the parties

23   to said cause, nor in any manner interested

211

1    in the results thereof.

2              This 17th day of August, 2005.

3

4

5    _____
     Ricky L. Tyler
6    Certified Shorthand Reporter
     And Notary Public
7    State of Alabama at Large

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

3-months

PSC Form 14
Revised 6/1/98

STATE OF ALABAMA
PUBLIC SERVICE COMMISSION
EMPLOYEE PRELIMINARY/INTERIM PERFORMANCE APPRAISAL
(Please read other side before completing.)

[ ] Preliminary Report        [ ] Interim Report

Employee Name: __Gregory Kelly__         Social Security Number: ▓▓▓▓▓▓▓

Agency: __018__ / Public Service Commission         Division: __Energy__

Classification: __Util. Engineering Spec. I__         Class Code: __20521__

Period Covered From: __7/13/02__ To: __10/12/02__         Position Number: __4117402__

Defendants'
Exhibit 61

**APPRAISAL SIGNATURES:** Signatures are to be provided after the form has been completed.

SSN ▓▓ - ▓ - ▓▓
RATING SUPERVISOR
Signature _John D. Free_         __10/9/02__
Date/Initial if comments are attached

EMPLOYEE Signature _Gregory Kelly_         __10-9-02__
Date/Initial if comments are attached

SSN ▓▓ - ▓ - ▓▓
REVIEWING SUPERVISOR
Signature _ChrisHamilton_         __10/9/2002__
Date/Initial if comments are attached

**PROBATIONARY PERFORMANCE APPRAISAL SCORE:** Locate the Responsibility Score on the back of this form and write it in the appropriate space. Locate the Disciplinary Score, also on the back of this form, and write it in the appropriate space. The Disciplinary Score is subtracted from the Responsibility Score to derive the Preliminary or Interim performance Appraisal Score.

__22.0__         -         __0__         =         __22.0__
Responsibility              Disciplinary              Probationary Performance Appraisal
Score                       Score                     Score

This employee's work:

| [ ] | [ ] | [X] | [ ] | [ ] |
|---|---|---|---|---|
| Does Not Meet Standards (6.6 or below) | Partially Meets Standards (6.7 - 16.6) | Meets Standards (16.7 - 26.6) | Exceeds Standards (26.7 - 36.6) | Consistently Exceeds Standards (36.7 - 40) |

**WORK HABITS:** Check the appropriate box for each work habit area. If "Noncompliance" is to be marked, a step of the discipline system (warning, reprimand, suspension) must have been taken with the employee during the appraisal period. See the Disciplinary Actions area on the back of this form for disciplinary documentation.

|  | Compliance | Noncompliance |
|---|---|---|
| Attendance | [X] | [ ] |
| Punctuality | [X] | [ ] |
| Cooperation with Coworkers | [X] | [ ] |
| Compliance with Rules | [X] | [ ] |

**RESPONSIBILITIES:** List an abbreviated version of the employee's responsibilities below as documented on and discussed during the Preappraisal. Record the appropriate rating in the box for each responsibility. Documentation is to be maintained in the agency's personnel files if a "0" or "4" rating is given. Rating(s) of appropriate responsibilities should reflect any disciplinary action(s) that has been taken during this probationary period.

| 0 | 1 | 2 | 3 | 4 |
|---|---|---|---|---|
| Does Not Meet Standards | Partially Meets Standards | Meets Standards | Exceeds Standards | Consistently Exceeds Standards |

| Responsibility | Rating |
|---|---|
| 1. Assist in the analysis, research and documentation of all petitions/filings,... | [ N/A ] |
| 2. Prepare monthly monitoring reports (T & D, reliability, peak demand, etc.),... | [ 2 ] |
| 3. Performs research, analysis and documentation for special projects... | [ N/A ] |
| 4. Completes interactive training of Microsoft's Excel and Word training videos... | [ N/A ] |
| 5. Designs and develops analytical reports (spreadsheets, tables, graphs, etc.),... | [ 2 ] |
| 6. Completes continuing education exercises... | [ 2 ] |
| 7. Performs monthly visits/inspections (approximately three trips per month to various locations)... | [ 3 ] |
| 8. Perform the necessary research, visits, analysis, inquiries... | [ 2 ] |
| 9. _____ | [ ] |
| 10. _____ | [ ] |

RESPONSIBILITY SCORE:

$\underline{11}$   Divided by   $\underline{5}$   Equals   $\underline{2.20}$   Times   10   Equals   $\underline{22.0}$
Total of                      Number of              Average                        Responsibility
Responsibilities/Results      Responsibilities       Responsibility                 Score
Ratings                                              Rating

**DISCIPLINARY ACTIONS:** Any disciplinary action taken with the employee during this probationary period is to be listed below. For each area, list the specific disciplinary step taken, the date of action, and the reason or unwanted behavior it involved. Copies of disciplinary documentation are to be maintained in the agency's personnel files. Remember, appropriate responsibilities and work habit(s) should reflect the fact that performance required disciplinary action.

_____

_____

_____

_____

_____

**DISCIPLINARY SCORE:** This section should include the use of the discipline steps of reprimand and suspension only. The Disciplinary Score does not include warnings (oral). Warnings are documented only in the Work Habits and Disciplinary Actions areas. Identify the most severe step of the discipline system that has been utilized with the employee during this appraisal period. If the most severe step was one or more reprimands, the Disciplinary Score will be 7. If the most severe step was one or more suspensions, the Disciplinary Score will be 17. Otherwise, the Disciplinary Score will be zero.

DISCIPLINARY SCORE: _____ 0 _____

Form 13F    **EMPLOYEE  PROBATIONARY PERFORMANCE  APPRAISAL**
Revised (6/1/1998)
STATE  OF  ALABAMA
Personnel  Department

Employee Name: GREGORY FELL

Social Security Number: ██████████

Agency: 018/PUBLIC SERVICE COMMISSION

Division: Energy

Classification: UTIL ENGINEERING SPEC I

Class Code: 20521

Period Covered From: 07/13/2002  To: 01/12/2003

Position Number: 4117402

**Defendants' Exhibit 63**

**APPRAISAL SIGNATURES:** Signatures are to be provided after the form has been completed.

SSN ██ - ██ - ██
RATING SUPERVISOR

Signature *John D. Free*

Date / Initial if comments are attached

Signature *Gregory Felly*

*EMPLOYEE* Signature

Date / Initial if comments are attached

SSN ██ - ██ - ██
REVIEWING SUPERVISOR

Signature *Mattie Milton*

12/16/2002

Date / Initial if comments are attached

It is recommended that the employee be:

____ Continued probationally in the position named (reason stated in Disciplinary Actions area)

__✓__ Given permanent status in the position. Probationary increase to $ 1540.60 Step 3 Effective Jan. 25, 2003

____ Terminated before or at the end of the probationary period (reason stated in Disiplinary Actions Area) *pay grade 77*

*George C. Wallace, Jr.*

*J. Cook  Jim Sullivan*

APPOINTING AUTHORITY Signature

Dec. 17, 2002

Date

$ 1467.80 → $1540.60

1/2 L2 in suspense

**PROBATIONARY PERFORMANCE APPRAISAL SCORE:** Locate the Responsibility Score on the back of this form and write it in the appropriate space. Locate the Disciplinary Score, also on the back of this form, and write it in the appropriate space. The Disciplinary Score is subtracted from the Responsibility Score to derive the Probationary Performance Appraisal Score.

✓ OK

| 23.30 | − | 0 | = | 23.30 |
|---|---|---|---|---|
| Responsibility Score | | Disciplinary Score | | Probationary Performance Appraisal Score |

This employee's work:

| ☐ | ☐ | ☒ | ☐ | ☐ |
|---|---|---|---|---|
| Does Not Meet Standards (6.6 or below) | Partially Meets Standards (6.7 – 16.6) | Meets Standards (16.7 – 26.6) | Exceeds Standards (26.7 – 36.6) | Consistently Exceeds Standards ( 36.7 - 40 ) |

**WORK HABITS :** Check the appropriate box for each work habit area. If "Noncompliance" is to be marked, a step of the discipline system (warning, reprimand, suspension) must have been taken with the employee during the probationary period. See the Disciplinary Actions area on the back of this form for disciplinary documentation.

|  | Compliance | Noncompliance |
|---|---|---|
| Attendance | ☒ | ☐ |
| Punctuality | ☒ | ☐ |
| Cooperation with Coworkers | ☒ | ☐ |
| Compliance with Rules | ☒ | ☐ |

*RESPONSIBILITIES:* List an abbreviated version of the employee's responsibilities below as documented on and discussed during the Preappraisal. Record the appropriate rating in the box for each responsibility. Rating(s) of appropriate responsibilities should reflect any disciplinary action(s) that has been taken during this probationary period.

| 0 | 1 | 2 | 3 | 4 |
|---|---|---|---|---|
| Does Not Meet Standards | Partially Meets Standards | Meets Standards | Exceeds Standards | Consistently Exceeds Standards |

| Responsibility | Rating |
|---|---|
| 1. Assist in the analysis, research and documentation of all petitions/filings,... | N/A |
| 2. Prepare monthly monitoring reports (T & D, reliability, peak demand, etc.),... | 2 |
| 3. Performs research, analysis and documentation for special projects... | 2 |
| 4. Completes interactive training of Microsoft's Excel and Word training videos... | 2 |
| 5. Designs and develops analytical reports (spreadsheets, tables, graphs, etc.),... | N/A |
| 6. Completes continuing education exercises... | 2 |
| 7. Performs monthly visits/inspections (approximately three trips per month to various locations)... | 3 |
| 8. Perform the necessary research, visits, analysis, inquiries... | 3 |
| 9. | |
| 10. | |

*RESPONSIBILITY SCORE:*

| 14 | ÷ | 6 | = | 2.33 | x | 10 | = | 23.30 |
|---|---|---|---|---|---|---|---|---|
| Total of Responsibilities/Results Ratings | | Number of Responsibilities | | Average Responsibility Rating | | | | Responsibility Score |

*DISCIPLINARY ACTIONS:* Any disciplinary action taken with the employee during this probationary period is to be listed below. For each area, list the specific disciplinary step taken, the date of action, and the reason or unwanted behavior it involved. Copies of disciplinary documentation are to be maintained in the agency's personnel files. Remember, appropriate responsibilities and work habit(s) should reflect the fact that performance required disciplinary action.

*DISCIPLINARY SCORE:* This section should include the use of the discipline steps of reprimand and suspension only. The Disciplinary Score does not include warnings (oral). Warnings are documented only in the Work Habits and Disciplinary Actions areas. Identify the most severe step of the discipline system that has been utilized with the employee during this probationary period. If the most severe step was one or more reprimands, the Disciplinary Score will be 7. If the most severe step was one or more suspensions, the Disciplinary Score will be 17. Otherwise, the Disciplinary Score will be zero.

DISCIPLINARY SCORE:  0

<u>MEMORANDUM</u>



TO:  John Free, Supervisor of Electricity
     Energy Division

FROM:  Gregory Kelly, Utility Engineer Specialist I
       Energy Division

SUBJECT:  Response to Probationary Performance Appraisal
          dated December 16, 2002

On December 16, 2002, we reviewed my job duties and responsibilities regarding my final evaluation of probationary status. I believe that the evaluation given was an inadequate reflection of the duties I performed. During a six-month time span the Engineering Department of the Electricity Section received full reorganization and restructuring in order to facilitate an efficient work process. Prior to my inclusion on the Engineering Department, there were no guidelines for such mediums such as spreadsheets, studies, special projects, etc.

You and I personally had to formulate a basic structure by which all reporting standards in the department would be met. Moreover, that system is still in place today to contribute to the efficiency and productivity of the department. This is an ongoing process that is constantly being revised and improved to increase work output.

I believe this evaluation denotes the divergent outlooks that you and I had on the job procedures and functions during the restructuring process. Our differing perspectives on the most suitable way to carry out the duties for the Engineering Department served as an inhibiting factor for work. In order to establish this process, constant time and cooperation were required by both parties in order to reach a general consensus on the entire format for the work system.

In conclusion, I feel that an honest mistake was made regarding the evaluation of the quality of work that was performed by me. A few factors (namely the ones previously mentioned) should have been considered when the evaluation was made.

Furthermore, I believe that you possess admirable management skills. However, I must respectively disagree with the evaluation that was given. I believe that under the circumstances, my quality of work and skills of restructuring the Engineering Department were more than adequate.

I am still optimistic and excited about my future at the Public Service Commission and State Government. I believe that with our improved communication on the methods of working that work efficiency has increased. I will move forward and continue to meet the objectives of the job.


Gregory Kelly                          Date  May 28, 2003

cc: Janice Hamilton, Director of the Energy Division
     Public Service Commission

**Form 13**
Revised (1/1/1999)

# EMPLOYEE PERFORMANCE APPRAISAL
## STATE OF ALABAMA
### Personnel Department

| | Number of Steps |
|---|---|
| 2 | |

Employee Name: GREGORY KELLY

Social Security Number: ▮▮▮▮▮

Agency: 018/PUBLIC SERVICE COMMISSION

Division: Energy

Classification: UTIL ENGINEERING SPEC I

Class Code: 20521

Period Covered From: 11/01/2002    To: 11/01/2003

Annual Raise Effective: JANUARY 2004

---

**APPRAISAL SIGNATURES:** Signatures are to be provided after the form has been completed.

| Rating Supervisor | Employee | Reviewing Supervisor |
|---|---|---|
| SSN ▮▮▮▮▮ | | SSN 424 - 86 - 3067 |
| Signature *John D. Free* | Signature *Gregory Kelly* | Signature *M Hamilton* |
| Date October 22, 2003 | Date 10-22-2003 | Date 10/23/03 |
| Initial if comments are attached | Initial if comments are attached | Initial if comments are attached |

---

**PERFORMANCE APPRAISAL SCORE:** Locate the Responsibility Score on the back of this form and write it in the appropriate space. Locate the Disciplinary Score, also on the back of this form, and write it in the appropriate space. The Disciplinary Score is subtracted from the Responsibility Score to derive the Performance Appraisal Score.

31.4 — 0 = 31.4

| Responsibility Score | Disciplinary Score | Performance Appraisal Score |
|---|---|---|

This employee's work:

| ☐ | ☐ | ☐ | ☒ | ☐ |
|---|---|---|---|---|
| Does Not Meet Standards (6.6 or below) | Partially Meets Standards (6.7 – 16.6) | Meets Standards (16.7 – 26.6) | Exceeds Standards (26.7 – 36.6) | Consistently Exceeds Standards ( 36.7 - 40 ) |

---

**WORK HABITS :** Check the appropriate box for each work habit area. If "Noncompliance" is to be marked, a step of the discipline system (warning, reprimand, suspension) must have been taken with the employee during the appraisal period. See the Disciplinary Actions area on the back of this form for disciplinary documentation.

| | Compliance | Noncompliance |
|---|---|---|
| Attendance | ☒ | ☐ |
| Punctuality | ☒ | ☐ |
| Cooperation with Coworkers | ☒ | ☐ |
| Compliance with Rules | ☒ | ☐ |

COPY

Defendants' Exhibit 65

RESPONSIBILITIES: List an abbreviated version of the employee's responsibilities below as documented on and discussed during the Preappraise    Record the appropriate rating in the    for each responsibility. Rating(s) of appropriate responsibilities should reflect any disciplinary action(s) that has been taken during this appraisal period.

| 0 | 1 | 2 | 3 | 4 |
|---|---|---|---|---|
| Does Not Meet Standards | Partially Meets Standards | Meets Standards | Exceeds Standards | Consistently Exceeds Standards |

| Responsibility | Rating |
|---|---|
| 1. Assist in the analysis, research and documentation of all petitions/filings,… | 2 |
| 2. Prepare monthly monitoring reports (T & D, reliability, peak demand, etc.),… | 3 |
| 3. Performs research, analysis and documentation for special projects… | 3 |
| 4. Designs and develops analytical reports (spreadsheets, tables, graphs, etc.),… | NA |
| 5. Completes continuing education exercises… | 3 |
| 6. Performs monthly visits/inspections (approximately three trips per month to various locations)… | 4 |
| 7. Perform the necessary research, visits, analysis, inquiries… | 4 |
| 8. Reviews the monthly reports, submitted by Alabama Power Company, regarding meter… | 3 |
| 9. | |
| 10. | |

**RESPONSIBILITY SCORE:**

22 ÷ 7 = 3.14 x 10 = 31.4

| Total of Responsibilities/Results Ratings | Number of Responsibilities | Average Responsibility Rating | | Responsibility Score |
|---|---|---|---|---|

**DISCIPLINARY ACTIONS:** Any disciplinary action taken with the employee during this appraisal period is to be listed below. For each area, list the specific disciplinary step taken, the date of action, and the reason or unwanted behavior it involved. Copies of disciplinary documentation are to be maintained in the agency's personnel files. Remember, appropriate responsibilities and work habit(s) should reflect the fact that performance required disciplinary action.

**DISCIPLINARY SCORE:** This section should include the use of the discipline steps of reprimand and suspension only. The Disciplinary Score does not include warnings (oral). Warnings are documented only in the Work Habits and Disciplinary Actions areas. Identify the most severe step of the discipline system that has been utilized with the employee during this appraisal period. If the most severe step was one or more reprimands, the Disciplinary Score will be 7. If the most severe step was one or more suspensions, the Disciplinary Score will be 17. Otherwise, the Disciplinary Score will be zero.

DISCIPLINARY SCORE: 0

3-mon cns

PSC Form 14
Revised 6/1/98

STATE OF ALABAMA
PUBLIC SERVICE COMMISSION
EMPLOYEE PRELIMINARY/INTERIM PERFORMANCE APPRAISAL
(Please read other side before completing.)

L ...liminary Report    [ ] Interim Report

Employee Name: **Gregory Kelly**

Social Security Number: ███████████

Agency: **018 / Public Service Commission**

Division: **Energy**

Classification: **Utility Engineering Specialist II**

Class Code: **20522**

Period Covered From: **5/29/04**  To: **8/28/04**

Position Number: **4117203**

**APPRAISAL SIGNATURES:** Signatures are to be provided after the form has been completed.

SSN ███ - ███ - ███
RATING SUPERVISOR

Signature  *John D. Lee*

**8-27-04**
Date/Initial if comments are attached

EMPLOYEE Signature  *Gregory Kelly*

**9-27-04**
Date/Initial if comments are attached

SSN ███ - ███ - ███
REVIEWING SUPERVISOR

Signature *W. Hamilton*

**8/30/04**
Date/Initial if comments are attached

**PROBATIONARY PERFORMANCE APPRAISAL SCORE:** Locate the Responsibility Score on the back of this form and write it in the appropriate space. Locate the Disciplinary Score, also on the back of this form, and write it in the appropriate space. The Disciplinary Score is subtracted from the Responsibility Score to derive the Preliminary or Interim performance Appraisal Score.

**35.60** - **0** = **35.60**

Responsibility Score  —  Disciplinary Score  =  Probationary Performance Appraisal Score

This employee's work:

| Does Not Meet Standards (6.6 or below) | Partially Meets Standards (6.7 - 16.6) | Meets Standards (16.7 - 26.6) | Exceeds Standards (26.7 - 36.6) | Consistently Exceeds Standards (36.7 - 40) |
|---|---|---|---|---|
| [ ] | [ ] | [ ] | [X] | [ ] |

**WORK HABITS:** Check the appropriate box for each work habit area. If "Noncompliance" is to be marked, a step of the discipline system (warning, reprimand, suspension) must have been taken with the employee during the appraisal period. See the Disciplinary Actions area on the back of this form for disciplinary documentation.

|  | Compliance | Noncompliance |
|---|---|---|
| Attendance | [X] | [ ] |
| Punctuality | [X] | [ ] |
| Cooperation with Coworkers | [X] | [ ] |
| Compliance with Rules | [X] | [ ] |

Defendants' Exhibit 68

**RESPONSIBILITIES:** List an abbreviated version of the employee's responsibilities below as documented on and discussed during the Preappraisal. Record the appropriate rating in the box for each responsibility. Documentation is to be maintained in the agency's personnel files if a "0" or "4" rating is given. Rating(s) of appropriate responsibilities should reflect any disciplinary action(s) that has been taken during this probationary period.

| 0 | 1 | 2 | 3 | 4 |
|---|---|---|---|---|
| Does Not Meet Standards | Partially Meets Standards | Meets Standards | Exceeds Standards | Consistently Exceeds Standards |

| Responsibility | Rating |
|---|---|
| 1. Review monthly reports submitted by Alabama Power Company regarding.... | [ 3 ] |
| 2. Perform monthly visits and inspections (approximately three trips per month .... | [ 4 ] |
| 3. Document each visit and/or inspection of APCo facilities in order to... | [ 4 ] |
| 4. Perform technical research, analysis, and documentation for special projects ... | [ 3 ] |
| 5. Prepare monthly monitoring reports (T & D, reliability, peak demand, capacity factors | [ 3 ] |
| 6. Respond to technical data requests, phone inquiries, surveys and .... | [ 4 ] |
| 7. Perform the necessary research, visits, analysis, inquiries, etc. in order .... | [ 4 ] |
| 8. Continue professional development and other work related activities fo include .... | [ 3 ] |
| 9. Perform technical research, analysis, and documentation of the .... | [ 4 ] |
| 10. | [ ] |

RESPONSIBILITY SCORE:

_32_ Divided by _9_ Equals _3.56_ Times 10 Equals _35.6_

Total of Responsibilities/Results Ratings

Number of Responsibilities

Average Responsibility Rating

Responsibility Score

**DISCIPLINARY ACTIONS:** Any disciplinary action taken with the employee during this probationary period is to be listed below. For each area, list the specific disciplinary step taken, the date of action, and the reason or unwanted behavior it involved. Copies of disciplinary documentation are to be maintained in the agency's personnel files. Remember, appropriate responsibilities and work habit(s) should reflect the fact that performance required disciplinary action.

**DISCIPLINARY SCORE:** This section should include the use of the discipline steps of reprimand and suspension only. The Disciplinary Score does not include warnings (oral). Warnings are documented only in the Work Habits and Disciplinary Actions areas. Identify the most severe step of the discipline system that has been utilized with the employee during this appraisal period. If the most severe step was one or more reprimands, the Disciplinary Score will be 7. If the most severe step was one or more suspensions, the Disciplinary Score will be 17. Otherwise, the Disciplinary Score will be zero.

DISCIPLINARY SCORE: _0_

April 17, 2006

**Comments**

Once again, Mr. Free is attempting to recast the highly complex and technical job of engineering into a t-crossing and i-doting job classification. Engineers are taught to solve the world's problems by using science and technology. Mr. Free does not possess these problem solving skills. My evaluation is drifting into areas in which he can only quantitatively measure (clerical and data input errors).

For example, section #4 and #5, Mr. Free rates these areas #2 (meet standards). These areas require technical skills. Mr. Free has never assisted or provided leadership in solving technical problems associated with this position. He simply gives permission to others to review and discuss these issues with me. Others do not trust or rely on his ability in these areas.

No leadership, no assistance and no coaching are provided to the employee by supervisor in these areas. Why? An action plan is absent to help the employee improve his score. I welcome input from by supervisor on highly complex and technical problems associated with job (items #2-#5) on my evaluation (voltage standards, drawing specifications, transformer testing, reliability studies, etc.).

Gregory Kelly

4-17-2006



Defendants' Exhibit 74



# STATE OF ALABAMA
ALABAMA PUBLIC SERVICE COMMISSION
P.O. BOX 304260
MONTGOMERY, ALABAMA 36130-4260

September 18, 2006

JIM SULLIVAN, PRESIDENT

JAN COOK, ASSOCIATE COMMISSIONER

GEORGE C. WALLACE, JR., ASSOCIATE COMMISSIONER

WALTER L. THOMAS, JR.
SECRETARY



## MEMORANDUM

TO:        Mr. John Free,
           PSC Analyst Manager

FROM:      Mr. Gregory Kelly, *GK*
           PSC Technical Specialist, Senior

SUBJECT:   Response to Appraisal Review
           Period from October 1, 2005 – October 1, 2006

I have received your appraisal review and comments for the period covering October 1, 2005 - October 1, 2006. I would like to state my objections to the score and exercise my right to respond to your comments. You have incorrectly provided a low score and again rendered materially false information concerning my character and work ethic.

Under your supervision, accountants are treated with professional respect and scored higher than me the engineer because of your bias and flawed scoring system, which focuses on the accounting activities of bookkeeping and clerical skills. In a multi-functional work group, the twin problems of accounting myopia and technical phobia harm the complex field of engineering. The onus is on the supervisor to be equally skilled in all areas under his supervision.

The record is clear that my position is void of any technical leadership and/or assistance, and that you lack the technical competency, professional credibility and management consistency to render a fair evaluation for my performance. I also believe that the record is clear concerning your harassing and petty behavior toward others, as well as your undermining and disrespectful attitude toward me and engineering. This information has been thoroughly documented.

As for your comments concerning my work habits, I respectfully suggest that you direct these unfounded and threatening remarks toward the known and correct individuals and/or work groups who misuse and abuse company time and resources. I also believe that your name would be included in this grouping as one the offenders as a result of the counterproductive activities listed below:

- ❖ Providing income tax and accounting service to others
- ❖ Providing home construction services for yourself and others
- ❖ Providing accounting instruction service to others
- ❖ Gathering information on hunting activities for personal use



Defendants' Exhibit 76

Your unprofessional behavior, lack of technical expertise and fondness for deception are well documented. I refuse to be threatened, harassed, and intimidated by a flawed and troubled supervisor who promotes fear and embraces bias and unjust policies

GK

cc:   Ms. Janice M. Hamilton, Energy Director
      Ms. Dorinda Kepler, Personnel Assistant III
      File

<u>MEMORANDUM</u>                                                    February 28, 2006

TO:        Mr. Gregory Kelly
           Public Utility Technical Specialist, Senior

FROM:      Mr. John Free
           Public Utility Analyst Manager

SUBJECT:   Your site visit to Birmingham Metro District on Friday, February 10, 2006, and related
           absence from the office.


This memorandum is for the purpose of documenting our counseling session held on Monday morning, February 13, 2006. At this meeting, we discussed, among other things, your work schedule on Friday, February 10, 2006 and your failure to return to the office after your site visit to Birmingham Metro District was completed early that day.

Specifically, during our discussion, when asked what time your meeting had concluded on Friday, you responded that it was over at 12:00 PM. Later, you stated that the meeting took place from approximately 10:20 – 11:30 AM. In response, I proposed that after allowing one hour for lunch and two hours driving time from Birmingham to Montgomery, you should have been able to report to your office no later than 2:30 PM. You agreed but commented that you were ill and needed to go to Pri-Med. I explained that a doctor's visit was your decision but that you must call in to the office and receive permission to be on leave. Furthermore, I clearly explained to you that such an incident as this is considered "walking off the job", which is a serious violation. In fact, our Alabama Public Service Commission Employee Guidelines categorizes such behavior as a "more serious violation that may result in suspension or discharge on the first offense..." (pgs. 21 – 22.) I further explained to you that the expectations are for an employee to return to their work office whenever an outside assignment has been completed and the employee has returned to the Metropolitan Montgomery area on or before 4:00 PM. You indicated that you clearly understand this policy and will, in the future, comply with this policy.


                              J.F.



Cc:    Ms. Janice M. Hamilton, Director
       Energy Division


Defendants' Exhibit 79



# STATE OF ALABAMA

ALABAMA PUBLIC SERVICE COMMISSION
P.O. BOX 304260
MONTGOMERY, ALABAMA 36130-4260

JIM SULLIVAN, PRESIDENT

JAN COOK, ASSOCIATE COMMISSIONER

GEORGE C. WALLACE, JR., ASSOCIATE COMMISSIONER

WALTER L. THOMAS, JR.

SECRETARY

## MEMORANDUM

February 28, 2006

**TO:**      Electricity Section Staff

**FROM:**    John Free
             Public Utility Analyst Manager

**SUBJECT:** Expectations Regarding Work Policies and Guidelines.

Please find below written descriptions for two of our work-related policies. This memorandum is to remind each of you of the expectations associated with the following policies and reinforce that the policies apply uniformly to each of you. This is by no means an exhaustive list, but merely the policies that need addressing at this time. I will address or clarify other policies as the need arises.

Work-related polices are necessary and serve as guidelines for all of us to follow. However, I understand employee flexibility from time to time is also necessary. If, on occasion, you should need such flexibility, please let me know and it will be considered on a case by case basis.

If you should have any questions or need any clarification, please let me know. Also, this memorandum supersedes any previous understandings regarding the policies below.

Cc:    Ms. Janice M. Hamilton, Director
       Energy Division



Defendants'
Exhibit 80

## Electricity Section Policy

**Open Doors and/or Blinds** — Office doors may be kept opened or closed. <u>All blinds should be adjusted in such a manner that presents a clear view into each office. A slight tilt in the blinds is acceptable so long as there is a clear view into the office.</u>

**Tardiness, Breaks, Lunch Hours, End of a Shift (5:00 PM)** — Our work schedules begin at 8:00 AM and end at 5:00 PM, absent specific exemption. Tardiness is defined in our Employee Guidelines manual as "not on the job, ready to work at the beginning of the work day." If an employee knows he/she is going to be more than 10 minutes late (using our computer clocks as set by the PSC server), he/she is required to call the office to inform his/her manager of the ensuing tardiness. On arrival, appropriate leave (rounded to nearest 15-minute increment) should be submitted. However, frequent tardiness (defined as more than once a week averaged over a monthly period), even with notification and leave, is not acceptable.

Each employee is entitled to two breaks from work for a period of fifteen minutes, one in the morning (no earlier than one hour after the beginning of work) and one in the mid-afternoon (ending no later than one hour before the conclusion of the workday).

Lunch hours are for a period of 60 minutes and should begin between the hours of 11:00 AM and 1:00 PM each day (see APSC Employee Guidelines.) On rare occasions, an employee may be allowed to work through lunch and leave at 4:00 PM. Eating at your desk is considered part of your lunch hour or break period.

Also, <u>these guidelines should be followed while working outside of the office. As such, there is an expectation that an employee should return to their work office whenever an outside assignment has been completed and the employee has returned to Metropolitan Montgomery (allowing a reasonable amount of time for travel.) at or before 4:00 PM.</u> Of course, approved leave in lieu of returning to the office is acceptable.



# STATE OF ALABAMA
### ALABAMA PUBLIC SERVICE COMMISSION
P.O. BOX 304260
MONTGOMERY, ALABAMA 36130-4260

March 1, 2006

JIM SULLIVAN, PRESIDENT

JAN COOK, ASSOCIATE COMMISSIONER

GEORGE C. WALLACE, JR., ASSOCIATE COMMISSIONER

WALTER L. THOMAS, JR.
SECRETARY

## MEMORANDUM

TO:      Mr. John Free
         Public Utility Analyst Manager

FROM:    Gregory Kelly
         Public Utility Technical Specialist, Senior

SUBJECT: Response to memo dated February 28, 2006: My visit to Birmingham Metro District
         on Friday, February 10, 2006, and related absence from the office.

On February 10, 2006, I was faced with a serious medical condition. I had an inflamed and infected
left ear. I later learned from a medical specialist that I had a ruptured ear drum.

On the aforementioned date, I was driving my personal car and was returning from a business trip in
the Birmingham area. I returned to the Montgomery-Metro area somewhere around 3:00-3:30 p.m.
My vision was impaired and a sharp pain existed in my ear. I made the decision to seek immediate
medical attention at the Pri-Med location in east Montgomery.

A physician completed an examination and observed a large blockage in my left ear. I am still, as
of today, receiving treatment for this medical problem. I left the medical location around 6:15-6:30
p.m. after receiving additional treatment from the medical staff.

On Monday, February 13, 2006, this information was discussed with you and other unfounded and
false charges of misuse of company's vehicle and time.

You agreed that I could not have misused the company's vehicle because I drove my own personal
vehicle. After reviewing the timeline of events, you agreed that two hours of sick leave should be
the proper allocated time for this medical event. You also seem to agree that an employee's
emergency medical condition must receive prompt and proper attention and this can not be received
as "walking off the job".



Defendants'
Exhibit 81

I am somewhat confused to receive a memo from you when all these events were properly explained and discussed. However, this situation is another example of your repressive style of management which ignores reasons and facts. An employee's emergency health concerns should never be an issue of conflict.

Eldridge Cleaver once said, "Respect commands itself and it can never be given nor withheld when it is due". In other words, respect is an earned quality.

Hopefully, we can focus on the real issues that define our jobs. I am ready to move on and get beyond this pettiness that is beginning to engulf our section.


GK


cc: Ms. Janice M. Hamilton,
    Director of Energy Division

April 17, 2006

**Comments**

Once again, Mr. Free is attempting to recast the highly complex and technical job of engineering into a t-crossing and i-doting job classification. Engineers are taught to solve the world's problems by using science and technology. Mr. Free does not possess these problem solving skills. My evaluation is drifting into areas in which he can only quantitatively measure (clerical and data input errors).

For example, section #4 and #5, Mr. Free rates these areas #2 (meet standards). These areas require technical skills. Mr. Free has never assisted or provided leadership in solving technical problems associated with this position. He simply gives permission to others to review and discuss these issues with me. Others do not trust or rely on his ability in these areas.

No leadership, no assistance and no coaching are provided to the employee by supervisor in these areas. Why? An action plan is absent to help the employee improve his score. I welcome input from by supervisor on highly complex and technical problems associated with job (items #2-#5) on my evaluation (voltage standards, drawing specifications, transformer testing, reliability studies, etc.).

*Gregory Kelly*

4-17-2006


Defendants'
Exhibit 84



# STATE OF ALABAMA
ALABAMA PUBLIC SERVICE COMMISSION
P.O. BOX 304260
MONTGOMERY, ALABAMA 36130-4260

April 21, 2006

JIM SULLIVAN, PRESIDENT

JAN COOK, ASSOCIATE COMMISSIONER

GEORGE C. WALLACE, JR., ASSOCIATE COMMISSIONER

WALTER L. THOMAS, JR.

SECRETARY

## MEMORANDUM

TO:        Mr. Gregory Kelly,
           PSC Technical Specialist, Senior

FROM:      Mr. John Free,
           PSC Analyst Manager

SUBJECT:   Mid-Appraisal "Comments" Submitted by Greg Kelly

I have received your "Comments" dated April 17, 2006 and must express my disagreement. Your assessment regarding my leadership, assistance, coaching, and use of action plans, as it relates to your performance, is inappropriate and inaccurate. In fact, I have provided substantial assistance and coaching to you, in support of your performance, on many occasions. As a testament to my sincere efforts, I am providing you the following list of actions that I have taken in an effort to improve your performance.

- On each of your Pre-Appraisals, Mid-Appraisals, and Performance Appraisals, we have conducted a "sit-down" review of your responsibilities and performance. At each of these meetings, I have offered suggestions and instructive comments to you as a means of improving your performance.
- I have conducted monthly reviews of your work and provided you with appropriate feedback and written comments.
- At your last annual Performance Appraisal, I provided you a document entitled "Ideas for Improving Performance Ratings". In this document, as the title suggest, are several ideas for you to use to improve your performance.
- More recently (April 13, 2006), we sat together in our conference room and discussed your mid-appraisal for nearly two hours. During this time, I made several suggestions for how you could improve your performance. Most noteworthy among them were:  1) Prepare accurate reports, 2) Provide accurate and timely documentation, and 3) Provide meaningful information in your reports. Also, as a reference, I pointed out which of your reports that I considered to be either above-standard or sub-standard. I also expressed to you the reasons for my assessment.

Defendants'
Exhibit 85

- Regarding Action Plans, such tools are only <u>required</u> when performance is below "meets standards". As such, I have provided you with an action plan for your Responsibility No. 1. It is included in the subject Mid-Appraisal review.
- With the current Mid-Appraisal, I provided you a complete review of your written reports (Responsibility No. 3) in which I highlighted certain facts and data that I considered to be both meaningful and informative.
- With the current Mid-Appraisal, I provided you with various staff reports prepared in prior years (Rick Cleckler and Mary Martin) in which I highlighted particular facts and data that I considered to be both meaningful and informative.
- With the current Mid-Appraisal, I provided you with three different report formats used by engineers employed with the Kentucky PSC in order to assist you with documenting your site visits/field inspections.

It is apparent from the above measures, which are not all inclusive, that I have made a concerted attempt to assist you in improving particular areas of your performance. Most notably among these are your documentation, report preparation, and continuing education responsibilities.

On a separate but related matter, I must again address your propensity to level unfounded personal accusations toward me in an inappropriate manner. In your "comments" dated April 17, 2006, you state that: 1) Mr. Free does not possess these problem solving skills; 2) Mr. Free has never assisted or provided leadership in solving technical problems associated with this position; 3) Others do not trust or rely on his ability in these areas; and 4) No leadership, no assistance, and no coaching are provided to the employee by supervisor in these areas. As stated previously, these representations are both unfounded and inappropriately expressed. By memorandum dated February 14, 2006, you were notified that any future unfounded remarks would likely result in disciplinary action. By way of this memorandum, I am notifying you that any further unfounded and degrading remarks regarding my character will be considered insubordinate behavior and will result in disciplinary action.

Cc:    Ms. Janice M. Hamilton, Director
       Energy Division

       File



# STATE OF ALABAMA
ALABAMA PUBLIC SERVICE COMMISSION
P.O. BOX 304260
MONTGOMERY, ALABAMA 36130-4260

August 10, 2006

JIM SULLIVAN, PRESIDENT

JAN COOK, ASSOCIATE COMMISSIONER

GEORGE C. WALLACE, JR., ASSOCIATE COMMISSIONER

WALTER L. THOMAS, JR.
SECRETARY

## MEMORANDUM

TO:      Mr. John Free,
         PSC Analyst Manager

FROM:    Mr. Gregory Kelly,
         PSC Technical Specialist, Senior

SUBJECT: Misinformation on "Form 40"


On my "Form 40" Section #21, the document indicates that my supervisor will provide "close hands-on supervision" for my position. This statement suggests that my supervisor has advance technical skills and training because my position is a senior level engineering position in the Commission.

I strongly believe that this statement is materially false, grossly misleading and clearly deceptive. My supervisor is an accountant without any formal training in the field of engineering. My position requires the following basic engineering skills and training:


- ❖ Ability to read engineering drawings, schematics and blue prints.
- ❖ Familiar with engineering tools, components, devices, instruments and equipment that are used in the field of engineering.
- ❖ Familiar with basic safety rules, switching policies, maintenance and operation procedures which govern power engineering work.
- ❖ Experience as an engineer performing various utility work (power quality tests, load study analysis, etc.)


My position does not receive the same rights, privileges and opportunities as other similar situated positions in the Commission. The other engineering and senior accountant positions in the Commission all receive the less restrictive general/administrative supervision. All these positions are in a lower or equal job classification.

Defendants' Exhibit 87

I believe that the net effect of this statement hypes, exaggerates and over estimates the supervisor's abilities while it undermines, degrades, and discounts the skills and training of the engineer. Accountants and engineers are not professional peers and do not share the same technical DNA profile. This profile is outlined above. I take exception to this act because it shows outward disrespect for the field of engineering.

Misinformation and materially false statements should not be allowed on any employee's "Form 40". This situation should not occur in a professional organization and especially in state government which operates on goodwill and the public trust.

I submit that the form should be revised to show the proper relationship which exist between the supervisor and employee. The form should indicate general/administrative supervision rather than "close hands-on supervision".

I am still hopeful that my position can receive the same professional courtesy as most jobs have in the Commission.

*Gregory Kelly*

GK

cc:    Ms. Janice M. Hamilton, Energy Director
       Ms. Dorinda Kepler, Personnel Assistant III
       File



**STATE OF ALABAMA**

ALABAMA PUBLIC SERVICE COMMISSION
P.O. BOX 304260
MONTGOMERY, ALABAMA 36130-4260

August 15, 2006

JIM SULLIVAN, PRESIDENT

JAN COOK, ASSOCIATE COMMISSIONER

GEORGE C. WALLACE, JR., ASSOCIATE COMMISSIONER

WALTER L. THOMAS, JR.
SECRETARY

## MEMORANDUM

TO:        Mr. Gregory Kelly,
           PSC Technical Specialist, Senior

FROM:      Mr. John Free
           PSC Analyst Manager

SUBJECT:   Form 40

I have received your memorandum, dated August 10, 2006, whereby you stated your disagreement with Item No. 21, as marked on your current Form 40. In particular, you requested that this item be so marked as to indicate a "General/Administrative" type of Supervision (provided by your immediate supervisor) rather than "Close/Hands On" supervision.

In response to your request, I am not aware of any conditions and/or circumstances that would warrant such a modification to your Form 40. Furthermore, the type of supervision provided is at the supervisor's discretion and may vary from one assignment to another and/or from one employee to another. Also, the level of supervision exercised over an employee's work could be the result of numerous factors such as the employee's level of experience with a particular task, the number of years that the supervisor and employee have been working together, the degree of trust that the supervisor has with the employee, the past performance level of an employee and, the approach to management that is preferred by the supervisor.

Cc:    Ms. Janice M. Hamilton, Energy Division Director
       Ms. Dorinda Kepler, Personnel Assistant III
       File


Defendants' Exhibit 88



# STATE OF ALABAMA
ALABAMA PUBLIC SERVICE COMMISSION
P.O. BOX 304260
MONTGOMERY, ALABAMA 36130-4260

August 17, 2006

JIM SULLIVAN, PRESIDENT

JAN COOK, ASSOCIATE COMMISSIONER

GEORGE C. WALLACE, JR., ASSOCIATE COMMISSIONER

WALTER L. THOMAS, JR.
SECRETARY

## MEMORANDUM

TO:      Mr. John Free,
         PSC Analyst Manager

FROM:    Mr. Gregory Kelly, *GK*
         PSC Technical Specialist, Senior

SUBJECT: Misinformation on "Form 40"


I have received your memo, dated August 15, 2006 concerning the aforementioned matter and I would like to state an objection. You have incorrectly scored my "Form-40" Item #21.

You do not provide "Close/Hands On" supervision for my position as PSC Technical Specialist, Senior. Notwithstanding the reasons for this fact, I acknowledge this for the record.

Therefore, I respectfully request that my letter dated August 10, 2006 be attached to my "Form-40" and placed in my personnel files in PSC and Sate Personnel Departments.


cc:  Ms. Janice M. Hamilton, Energy Director
     Ms. Dorinda Kepler, Personnel Assistant III
     File



Defendants' Exhibit 89



# STATE OF ALABAMA
### ALABAMA PUBLIC SERVICE COMMISSION.
### P.O. BOX 304260
### MONTGOMERY, ALABAMA 36130-4260

· August 18, 2006

JIM SULLIVAN, PRESIDENT
JAN COOK, ASSOCIATE COMMISSIONER
GEORGE·C. WALLACE, JR., ASSOCIATE COMMISSIONER

WALTER L. THOMAS, JR.
SECRETARY



## MEMORANDUM

TO:      Mr. John Free,
         PSC Analyst Manager

FROM:    Mr. Gregory Kelly, *GK*
         PSC Technical Specialist, Senior

SUBJECT: Harassing and Threatening Behavior

You have engaged in unprofessional conduct. On several occasions over the last nine (9) months you have issued threats and warnings which have been unprovoked.

6-12-06:    Threatened to take action against by evaluation for comments I made about a group work assignment

4-21-06:    Threatened to file insubordinate charges for my written response to your mid-term appraisal comments concerning my work

2-28-06:    You submitted a counseling letter and warning for my failure to return to the office. This complaint was filed 15 days later after my explanation (an emergency trip to a medical office for a ruptured ear drum).

1-25-06:    Threatened to take disciplining actions because I expressed my concerns regarding your technical expertise and style of management

By my submission of this letter, I hereby request this behavior cease and desist because these actions are unwarranted and unjustified.

cc:   Ms. Janice M. Hamilton, Energy Director
      Ms. Dorinda Kepler, Personnel Assistance III
      File ·.



Defendants' Exhibit 90



# STATE OF ALABAMA
ALABAMA PUBLIC SERVICE COMMISSION
P.O. BOX 304260
MONTGOMERY, ALABAMA 36130-4260

August 22, 2006

JIM SULLIVAN, PRESIDENT

JAN COOK, ASSOCIATE COMMISSIONER

GEORGE C. WALLACE, JR., ASSOCIATE COMMISSIONER

WALTER L. THOMAS, JR.
SECRETARY

## MEMORANDUM

TO:      Mr. Gregory Kelly,
         PSC Technical Specialist, Senior

FROM:    Mr. John Free,
         PSC Analyst Manager

SUBJECT:   Claims of Harassing and Threatening Behavior



    I have received your memorandum, dated August 18, 2006, whereby you claimed that I have "engaged in unprofessional conduct" by way of "issuing threats and warnings" against you.   I categorically deny these claims of "harassing" and "threatening" behavior.

    In each case that you received counseling, a warning or other disciplinary notice, such action was completely justified due to your misconduct.  You are misconstruing as "threats" my well-documented managerial attempts to bring you into compliance with the rules, regulations and guidelines of the State Personnel Department, the Commission, the Energy Division and the Electricity Section.  I will continue to utilize the managerial model established by the State Personnel Department to bring you, and all other employees under my direct supervision and control, into compliance with those rules and regulations when such corrective action is warranted.

Cc:    Ms. Janice M. Hamilton, Energy Division Director
       Ms. Dorinda Kepler, Personnel Assistant III
       File



Defendants' Exhibit 91

*Supervisor's copy*

**Form 13**
**Revised (01/2006)**

# EMPLOYEE PERFORMANCE *APPRAISAL*
## STATE OF ALABAMA
### Personnel Department

*CONFIDENTIAL*

Employee Name: <u>GREGORY KELLY</u>

Social Security Number: ▓▓▓▓▓

Agency: <u>018/PUBLIC SERVICE COMMISSION</u>

Division:   ENERGY

Classification: <u>PUBLIC UTIL TEC SPEC, SR</u>

Class Code: <u>20522</u> Position #: <u>04117203</u>

Period Covered From: <u>10/01/2005</u> To: <u>10/01/2006</u>

Annual Raise Effective: <u>DECEMBER 2006</u>

---

**APPRAISAL SIGNATURES:** Signatures are to be provided after the form has been completed.  Signatures denote supervisor and employee discussion and receipt of form.  Employee signature does not denote agreement.  All signatures are mandatory.

| Rating Supervisor | Employee | Reviewing Supervisor |
|---|---|---|
| SSN  XXX- XX- 6701 | | SSN  XXX- XX- 3067 |
| *John D. Free* | *Gregory Kelly* | *J M Hamilton* |
| Rater Signature | Employee Signature | Reviewer Signature |
| John D. Free | | Janice M. Hamilton |
| Rater Printed Name | Employee Signature | Reviewer Printed Name |
| 9-15-06 | 9-15-2006 | 9/15/2006 |
| Date | Date | Date |
| | * RESPONSE PENDING | |
| Initial if comments attached | Initial if comments attached | Initial if comments attached |

---

**PERFORMANCE APPRAISAL SCORE:**  Locate the Responsibility Score on the back of this form and write it in the appropriate space.  Locate the Disciplinary Score, also on the back of this form, and write it in the appropriate space.  The Disciplinary Score is subtracted from the Responsibility Score to derive the Performance Appraisal Score.  Mandatory documentation is to be maintained in the agency's personnel files if a "Does Not Meet" or "Consistently Exceeds" rating is given.

| 30 | - | 0 | = | 30 |
|---|---|---|---|---|
| Responsibility Score | | Disciplinary Score | | Performance Appraisal Score |

This employee's work:

| ☐ | ☐ | ☐ | ☒ | ☐ |
|---|---|---|---|---|
| Does Not Meet Standards (6.6 or below) | Partially Meets Standards (6.7 – 16.6) | Meets Standards (16.7 – 26.6) | Exceeds Standards (26.7 – 36.6) | Consistently Exceeds Standards (36.7 – 40) |

---

**WORK HABITS:**  Check the appropriate space for each Work Habit area.  Work Habits pertain to conduct occurring in this Appraisal period.  Provide an explanation below for marking any work habit as "Unsatisfactory."  Attach additional sheets if necessary.  No disciplinary action has to be taken to mark a Work Habit "Unsatisfactory."


Defendants' Exhibit 92

| | Unsatisfactory | Satisfactory | |
|---|---|---|---|
| Attendance | — | X | |
| Punctuality | | X | See Notes |
| Cooperation with Coworkers | | X | |
| Compliance with Rules | | X | See Notes |

**RESPONSIBILITIES:** List an abbreviated version of the employee's responsibilities below as documented on and discussed during the Preappraisal.    Record the appropriate rating in the box for each responsibility. Rating(s) of appropriate responsibilities should reflect any disciplinary action(s) that has been taken during this appraisal period.

| 0 | 1 | 2 | 3 | 4 |
|---|---|---|---|---|
| Does Not Meet Standards | Partially Meets Standards | Meets Standards | Exceeds Standards | Consistently Exceeds Standards |

---

**Responsibility**                                                                                   **Rating**

1. Review monthly reports submitted by Alabama Power Company regarding …                             | 1 |

2. Performs monthly visits and inspections (approximately three trips per month to various .         | 4 |

3. Document each visit and/or inspection of APCo facilities in order to…                             | 4 |

4. Perform technical research, analysis, and documentation for special projects…                    | 2 |

5. Respond to technical data requests, phone inquiries, surveys and…                                 | 4 |

6. Continue professional development and other work related activities to include…                  | 3 |

7. _____                                  | |

8. _____                                  | |

9. _____                                  | |

10. _____                                  | |

---

**RESPONSIBILITY SCORE:**

| _18_ | ÷ | _6_ | = | _3.0_ | × | 10 | = | _30.0_ | /DK |
|---|---|---|---|---|---|---|---|---|---|
| Total of Responsibilities/Results Ratings | | Number of Responsibilities | | Average Responsibility Rating | | | | Responsibility Score | |

---

**DISCIPLINARY ACTIONS:**  Any disciplinary action taken with the employee during this appraisal period is to be documented below.  Provide the number of disciplinary actions and steps taken with the employee during the appraisal year.  If no disciplinary action has been taken, a "0" should be marked in each block provided.  Attach a copy of the warning(s), reprimand(s), suspension(s) or demotion to the Appraisal.

| **Warning** | **Reprimand** | **Suspension** | **Demotion** |
|---|---|---|---|
| 0 | 0 | 0 | 0 |

---

**DISCIPLINARY SCORE:**  This section should include the use of the discipline steps of reprimand, suspension, and demotion only.  The Disciplinary Score does not include scores for counseling and warnings.  To calculate the Disciplinary Score, identify the most severe step of discipline taken with the employee during this appraisal period.  If the most severe step was one or more reprimands, the Disciplinary Score will be 7.  If the most severe step was one or more suspensions, the Disciplinary Score will be 17.  If the most severe step taken with the employee in the appraisal year was one or more demotions, the Disciplinary Score will be 24.  Otherwise, the Disciplinary Score will be 0.

**DISCIPLINARY SCORE:**    _0_

September 15, 2006

**Gregory Kelly**
**Evaluation for the Period**
**October 1, 2005 – August 31, 2006**

**Work Habits:**

**Attendance** – Satisfactory

**Punctuality** – Greg is late for work quite often in the mornings. Also, Greg tends to extend his lunch hour from time to time beyond what is considered reasonable. Greg needs to make every effort to correct this pattern of tardiness. We have discussed this on several occasions. <u>Absent improvement in this area, this work habit will be marked Unsatisfactory on the next Performance Appraisal.</u>

**Cooperation with Coworkers** – Satisfactory

**Compliance with Rules** – See notes under Punctuality.

(1) Review monthly reports submitted by Alabama Power Company regarding 1.) Monthly Meter Tests, 2.) Customer outages, 3.) Hydro and fossil plant outages, 4.) Hydro and fossil plant performance, 5.) Farley operating performance, 6) Peak Demand Report, and 7) Environmental Reports in order to determine if any unusual or significant events (non-routine or extraordinary events) occurred in the previous month's operations and or testing procedures. This information should be documented in the Operations Summary Report and included in the monthly Black Book, as well as the Section's Electronic files.

**Rating:** Partially Meets Standards - 1

| | |
|---|---|
| October 2005: | Report on file, routine comments provided, three data errors and one typographical error. |
| November 2005: | Report on file, routine comments provided, three data errors and seven typographical errors. |
| December 2005: | Report on file, routine comments provided, three data errors and five typographical errors. |
| January 2006: | Report on file, routine comments provided, four data errors, seven typographical errors, and two incomplete items. |
| February 2006: | Report on file, routine comments provided, two data errors and nine typographical errors. |
| March 2006: | Report on file, routine comments provided. |
| April 2006: | Report on file, routine comments provided. |
| May 2006: | Report on file, routine comments provided, ten data errors.  As a result of the staff's review (John and Greg) of the Customer Outage Report the Company has agreed to add an additional outage category.  The Company's response was: Greg, I have talked to Power Delivery and we have come up with another term to describe the outages on our report.  We will keep the two current reasons of Scheduled Outages - Customer Notified and Scheduled Outages - Customer Not Notified.  We will add a third category of Scheduled Outages - Emergency Repair. |
| June 2006: | Report on file, routine comments provided. |
| July 2006: | Report on file, routine comments provided. |
| August 2006: | Report in progress. |

**Also, prepare monthly monitoring reports (Peak Demand, Generation Capacity Factors, etc.), as assigned by Supervisor, so that the Company's books and records are analyzed for cost variances, budget variances, and/or significant trends.  The reports should be completed by the 10th of each month, for the prior month's financials received, with each significant variance documented within the report (greater than 10% or $500,000).**

| | |
|---|---|
| October 2005: | Generation Capacity report on file, eleven errors detected. |
| November 2005: | Generation Capacity report on file, thirteen data errors detected and two typographical errors. |
| December 2005: | Generation Capacity report on file, two data errors detected and one formatting error. |
| January 2006: | Generation Capacity report on file, nine data errors and one formatting error detected. |
| February 2006: | Generation Capacity report on file, six data errors and one formatting error detected.  Peak Demand report on file, no errors detected. |

| | |
|---|---|
| March 2006: | Generation Capacity report on file, no data errors detected. Peak Demand report on file, no errors detected. |
| April 2006: | Generation Capacity report on file, six data errors detected. Peak Demand report on file, no errors detected. |
| May 2006: | Generation Capacity report on file, no data errors detected. Peak Demand report on file, no errors detected. |
| June 2006: | Generation Capacity report on file, nine data errors detected. Peak Demand report on file, no errors detected. |
| July 2006: | Generation Capacity report on file, one data error detected. Peak Demand report on file, no errors detected. |
| August: | Reports are in progress. |

Strengths:  Reports were completed on time.

Developmental Opportunities:  The monthly Operational Report contained numerous data, typographical, and formatting errors for the period October 2005 – February 2006, which yielded these reports unreliable.  The number of errors decreased for the period March 2006 – August 2006.  All reports should be accurate and reliable at the time of inclusion in the Black Book.  Also, this report should present the more important and noteworthy information (forced outages, start-up failures, nuclear refueling, etc.) gathered from reviewing the Company's operational reports listed above.

The peak demand report should be completed and on file on a monthly basis.

The Generation Capacity Report contained numerous data, typographical, and formatting errors for the period October 2005 – August 2006, which yielded these reports unreliable. The amount of errors did decrease during the March – August period.  All reports should be accurate and reliable at the time of inclusion in the Black Book.

(2) Plans and performs monthly visits and inspections (approximately three separate visits per month to various locations and facilities) of Alabama Power Company's utility plant operations (generation, transmission, distribution, etc.) and construction projects to gain an understanding of the Company's operating & maintenance practices, environmental projects, plant performance, system reliability, outages (planned & forced), infrastructure improvements, distribution service quality, extensions and enlargements, customer concerns, project expenditures as well as other related matters. The visits should be planned and performed in a well organized and efficient manner.

**Rating:**  Consistently Exceeds Standards – 4

**Comments**  Greg scheduled and conducted 41 site visits/meetings over the period October 2005 – August 2006 for an average of 3.73 per month (see visits under Item 3). Each month, Greg provides me a written schedule of his confirmed site visits for the month. Also, Greg maintains a chronological list of his visits from 2002 through the present time. Greg's inspections for this period were diversified among steam plants, dams, district offices, an engineering office, and a meter shop.

I strongly encourage Greg to improve the efficiency of the inspections/visits by:  1) Allowing a reasonable amount of travel time for a visit, but not excessive amounts. Make every reasonable effort to arrive at a scheduled meeting on time, 2) Including as many inspections/visits as reasonably possibly for a particular region while traveling away from home base in order to utilize travel time most efficiently, 3) Preparing an agenda and items for discussion before going to the site, 4) Reviewing any internal reports and/or Company reports that relate to the site before going to the meeting, 5) Inspecting the facility for compliance with Commission Rules (meter rules, customer notification rules, etc.), and 6) Completing a written report within 30 days of the inspection.

On August 1, 2006, Greg was assigned to meet with APCO regarding 4 poor performing feeders and discuss reasons/solutions for each. To my knowledge, Greg is planning to work this into his site visit schedule.

Also, I recommend that Greg utilize his site visits/inspections of the generating facilities to review and discuss matters other than just environmental projects. Greg needs to expand his discussions to include plant performance, maintenance projects, construction projects, forced outages, scheduled outages, etc.

Greg has been informed that to exceed standards he would need to make more visits than required under the standard. Also, Greg was informed that planning the visits, making the visits in an efficient manner and making visits to various type facilities were part of the expected standard.

(3) Document each visit and/or inspection of APCo facilities in order to establish a <u>detailed written record</u> of the information discussed during each visit. The report must include all vital information obtained and/or discussed during the visit. The report should be completed in time to be included with the corresponding Black Book, or as directed by Supervisor. For example, the written reports for visits made in August should be completed and included in the August Black Book and Section's electronic files.

Rating: Consistently Exceeds Standards – 4

**October 2005 (3)**
Union Springs District Office – report on file, meets standards.
Daleville District Office – report on file, exceeds standards.
Yates Dam - report on file, exceeds standards.
Martin Dam - report on file, exceeds standards.

**November 2005 (2)**
Gorgas Steam Plant – report on file, meets standards. Suggestions: Only 3 of 5 environmental projects are mentioned in the report. Need to report on all projects addressed in the ECO Plan and/or included in the monthly environmental reports submitted by the company. .
Miller Steam Plant - report on file, partially meets standards. Suggestions: Only 3 of 5 environmental projects are mentioned in the report. Need to report on all projects addressed in the ECO Plan and/or included in the monthly environmental reports submitted by the company. .
Thurlow Dam - report on file, exceeds standards.
East Jefferson District - report on file, meets standards.

**December 2005 (3)**
Greene County Steam Plant – report on file, exceeds standards. .
Demopolis District Office – report on file, exceeds standards.

**January 2006 (3)**
Anniston District Engineering – report on file, exceeds standards.
Anniston Meter Shop – report on file, exceeds standards.
E.C. Gaston Steam Plant - report on file, exceeds standards.
Prattville/Montgomery Metro Office – report on file, exceeds standards.

**February 2006 (2)**
Birmingham Metro - report on file, provided follow-up news article related to a Birmingham Metro outage, exceeds standards.
Barry Steam Plant - report on file, meets standards.
Saraland Office - report on file, meets standards.
Olin Co-Gen Plant - report on file, meets standards.

**March 2006 (2.5)**
Jordan Dam – report on file, exceeds standards.
Montgomery Meter Shop – report on file, meets standards. Suggestions: <u>When visiting meter shops, we need to incorporate the Commissions responsibilities as stated in E-Rules 3 – 9 and conduct inspections of equipment as prescribed.</u>
Tuscaloosa District Operation Center – report on file, exceeds standards.

Bankhead Dam – Report on file, meets standards. Suggestions: Confirm explanation of an "exciter". Elaborate on the need for dissolved oxygen and why it is required. Elaborate on the need for a farm tractor and how it will be used.

**April 2006 (3)**
Montgomery District Office – report on file, exceeds standards. Suggestion: Elaborate on the construction projects. Why are they needed?
Pell City District – report on file, meets standards.
Neely Henry Dam – Report on file, exceeds standards. Suggestion: Clarify why the Company would rewind an exciter rather than replace with a new solid state exciter?
Powell Avenue Steam Plant – Report on file, exceeds standards.

**May 2006 (3)**
Gorgas Steam Plant – Report on file, meets standards. Suggestions: Investigate and report on all environmental projects, O&M projects, other capital projects and plant performance.
Miller Steam Plant - Report on file, exceeds standards. Suggestions: Investigate and report on all environmental projects, O&M projects, other capital projects and plant performance.
Auburn District Engineering – Report on file, exceeds standards. Suggestions: Report on major maintenance projects such as line miles cleared this year, etc.
Smith Dam – Report on file, exceeds standards. Suggestions: Clarify what part of the generator was rewound, i.e. stator. Discuss maintenance projects also.

**June 2006 (3)**
Eufaula District Engineering - Report on file, exceeds standards. Suggestions: Report on major maintenance projects such as line miles cleared this year, etc.
Phenix City District - Report on file, exceeds standards. Suggestions: Report on major maintenance projects such as line miles cleared this year, etc.
Selma District - Report on file, exceeds standards. Suggestions: Explain why the major capital projects are needed and report on major maintenance projects such as line miles cleared this year, etc.
Vamons Meter and Instrument Test Lab – Report on file, meets standards. Suggestions: When visiting meter shops, we need to incorporate the Commissions responsibilities as stated in E-Rules 3 – 9 and conduct inspections of equipment as prescribed.

**July 2006 (3)**
Plant Harris – Report on file, exceeds standards.
Tallassee District – Report on file, meets standards.
Walter Bouldin Dam – Report on file, exceeds standards.

**August 2006**
Clanton District Engineering – Report in progress.
Gardendale District Engineering – Report in progress.
Birmingham DOC – Report in progress.
Montgomery Division Engineering – Report in progress.

**Comments:** In most cases, Greg has provided sufficient background information for the reader. Also, Greg normally provides staffing information. In future reports, Greg should always include a detailed review of the facility's responsibilities and how the personnel are utilized to carry out its responsibilities. Greg should include a detailed discussion of any construction projects in the area or included in that

facility's budget as well as maintenance projects. Voltage levels and load levels at time of visit should be documented if applicable.  Security, safety, reliability, Sarbanes-Oxley, separation of appliance sales, connects/ reconnects, and estimating meter reads should be discussed if applicable.  A visual inspection (walk down, ride the lines, etc.) of the facilities should be completed.  Also, Greg needs to report on the facility's compliance with Commission Rules if applicable.

(4) Perform technical research, analysis, and documentation for special projects. This assignment may include work-related matters such as: 1.) IEEE, NESC, NEC, and ANSI Standards, 2.) FERC and NARUC technical issues, 3.) APCo rates, regulations, and policies 4.) APSC rules and regulations, and 5.) Petitions, filings, and/or other rate matters such as environmental projects. Each assignment should be completed as directed by Supervisor.

**Rating:** Meets Standards – 2.

**October 2005** – Participated in APSC Annual Report.

**January 2006** – Greg was asked to review, comment, and/or pose questions and concerns regarding the 2005 – 2006 environmental capital projects, O&M items, and Technology Fact Sheets included in the staff's preliminary report. Greg responded with several suggestions regarding the layout of the report, but only asked one question (which was inaccurate) regarding the environmental projects. I expect more input from Greg regarding the environmental compliance plans.

**January 2006** – Greg compiled all of his 2005 site visit reports that were related to inspections of environmental projects. They were submitted to me electronically for inclusion in the Staff Report.

**January 2006** - Greg compiled all of his 2005 site visit photos that were related to inspections of environmental projects. They were submitted to me electronically for inclusion in the Staff Report.

**January 2006** – Performed technical research and prepared a technology fact sheet for TOXECON II and COHPAC.

**May 2006** – Review Reliability metrics. Greg's comments: "We want a downward trend, which is good. What happen in 2002 & 2004, these numbers buck the trend in the opposite direction? Major storms are not calculated in the data."

**May 2006** – Reviewed Company's responses to poor performing feeders. Greg's comments: "You have brought awareness to the situation- which is good. The engineer should find something with on OCB (OIL CLOSING BREAKER) and correct the problem with a work order. It could be minor or the protection scheme changed. Let's wait and see what he finds."

**May 2006** – Responded to Janice's inquiry regarding energy conservation measures. Greg's comments: "My single best idea is the integration or merging of technologies-AMR (automatic meter reading) & AMIS (advance metering information system). In the future, the internet will become our friend. APCo's energy direct program uses AMR and AMIS technologies. However, only large industrial customers are putting in the SCADA equipment and paying the cost to monitor and reduce demand. Others (small business and homes) also could benefit from the merging of these technologies in the future."

**June 2006** – Greg was assigned to work with Linda Gardner to evaluate APCO's proposed filings regarding various service extension policies. Specifically, they were asked to: 1.) Read and begin an evaluation of the filings, 2.) Draft a list of data requests pursuant to the filings, 3.) Determine what information is needed to provided an assessment of the proposed filings, 4.) Determine if we should accept the filings as proposed or would they recommend any changes and 5.) Provide a strong basis for our position. After two weeks, a meeting was called for Greg and Linda to present there findings. Greg's contribution at this meeting was limited to stating that the proposed filings were "complex" and that we did not have the "expertise" to work on these filings. Afterwards, Greg expressed an interest in probing around the edges of the proposed filings.

**July 2006** – Regarding proposed service extension policies, Greg provided his "findings", suggestions" and "final comments" on July 11, 2006.

**August – September 2006** – Greg has a renewed effort in evaluating the Company's proposed service extension policies.  He should complete his review within the next month or so and <u>this will also be considered on his next performance appraisal.</u>

(5) Respond to technical data requests, phone inquiries, surveys and questionnaires from consumers, consultants, etc. and assist in the investigation of service complaints so that information is released in accordance with PSC rules and state law, and to reasonably assure the Utility's compliance to the General Rules and Special Electric Rules of the Alabama Public Service Commission (extension plans & policies, T & D maps, meter records, interruptions, etc.), as well as the staff's responsibilities regarding the same rules. This responsibility should be completed in a courteous and prompt manner with a brief synopsis included with the section's monthly Activities Report and/or documented in the monthly Complaints Report.

**Rating:** Consistently Exceeds Standards – 4.

**September – November 2005:** Monitored the Carl Tamm complaint of low voltage and provided insightful information to Consumer Services regarding the complaint. However, the monthly documentation of the correspondence/communications related to this complaint was minimal (2).

**December 2005 – February 2006:** Russell Balch & Tiger Suites request for an exception to Sub-Metering rule. Records are incomplete and inaccurate. Greg attended the first meeting on this request. Afterwards, Manager performed oversight of this requests. I strongly encourage Greg to follow-up on any inquiries of which he has been involved (1).

**December 2005 – February 2006:** Monitored the Billy Walters complaint regarding extension of service costs and provided insightful information to Consumer Services regarding the complaint. However the monthly documentation of the correspondence/communications related to this complaint was minimal (2).

**January – February 2006:** Monitored the Mary Thompson complaint regarding extension of service cost. Requested cost estimates and engineering drawings and suggested a site visit may be in order after reviewing the specific information. However the monthly documentation of the correspondence/communications related to this complaint was minimal (2).

**February 16, 2006** – Mr. Bradley requested a copy of the Company's Meter Test Plan. Greg summarized the Company's Meter Test Plan that is on file at the Commission and provided this information to Mr. Bradley. (3)

**March 2006** – Noted that the Mary Thompson case should be closed out.

**March 2006** - Christy Tubbs – Comments from Consumer Services: "I spoke with Greg about a high bill complaint on yesterday. I have a consumer who is adamant that her bill is wrong and she is insistent that there is some explanation for it; she also refuses to pay the bill which is $120+. I have talked to Greg about this and may need to do so again and wanted to make sure you were aware that he was advising me on this one. The consumer's name is Christy Tubbs." (2)

**April 2006** –
Troy Hull – Provided assistance regarding the Commission's Master Metering rules. (3)

**April 2006** - Energy Billing Systems had questions on sub-metering/ratio utility billing. Greg provided the Commissions E-rules and discussed sub-metering. (3)

**May 2006** - Mr. and Mrs. Hanlin contacted the Commission and questioned APCo's rules about electric service. The customer has a camper on site. The utility was contacted and advised that it relies on a permanency test which requires water service, sewer and/or a foundation at the site before residential

construction rates apply, otherwise the service is priced using the commercial temporary service ratio and this job would cost $25, 548.18 to provide service. The consumer was advised by PSC on 5/25 that the utility is following its customary practice to provide service to a location like the consumers, and she understood this explanation but did not agree with this practice. The customer advised that she is considering placing a mobile home at the site instead of camper and having services connected to it. Comments from Consumer Services: "Greg, thanks for providing your opinion on this one and verifying that the company's practice is reasonable and customary which helped to advise the consumer." (3)

**May 2006 -** Mr. Stewart Barron has contacted the Commission and requested information about three phase power from APCo in connection with the Company's plans to charge a business instead of residential rate. He states that the nature of his home has not changed. But, he has a piece of machinery that could use three phase power and be classified as commercial. He has paid the Company to provide this service under a commercial contract, but yet he believes that it is unfair that he should be charged a commercial rate. More documentation needed. If APCo and the customer have signed a contract for 3-phase service, then there is nothing we can do. In most cases there is going to be a contract between the customer and APCo before money is exchanged.

Greg's comments: If the customer had called the Commission before signing the contract, I would have advised the customer to buy a 1-phase to 3-phase converter. He would have saved a ton of money for rewiring and APCo cost for providing the service, if we are talking about a small motor or electrical device. As an electrical engineer, he (the customer) should have known about this option. (3)

**May 2006 -** Mr. Lynn Fike of Triple E Fencing contacted the Commission and requested help and an explanation of the out-of-ratio cost which APCo had proposed to charge his business for the installation of new services. The Commission reviewed the rate and construction plans which was proposed by APCo. The Commission is now discussing this issue with the engineering and management staff of APCo. Need more documentation as to the outcome of this item. (2)

**May 2006 -** Toni Desalvo — assisted Sheila with compiling generating plant development in Alabama. (2)

**June 2006 -** Mr. Cleveland Biggs. A general question was received from Consumer Services about APCo charges to place a new pole and transformer at a customer's business when service had recently been provided to location. The jest of the question was whether the company could charge to place a new pole and transformer at a customer's business when service had recently been provided to the location a year or so ago. I advised Consumer Services to review the past contract to see if all conditions were honored before service was terminated. If not, APCo can charge for restoring service. Comments from Consumer Services: "Greg, thank you for providing your technical opinion on the Alabama Power inquiry that we received in Consumer Services on Friday (6/2). Based on our discussion with you about the company's usual policy to require all businesses to enter into a contract for service we advised the consumer, Mr. Cleveland Biggs, that the utility could charge to place service if he did not satisfy the initial terms of his contract or the company had not recovered its cost before he terminated service." (3)

**June 2006 -** Mr. Michael Beverly. The customer wanted information on pole height for electrical power poles. This question was a legal issue that involved an electrical contact case in which someone was seriously injured. I advised the customer to review the NEC and NESC codes. I also advised the customer that he may consider hiring his own expert or consulting engineer. (2)

**June 2006 -** Dental practice is having sudden spikes in usage. Comments from CS: "Since you advised about possible causes of spikes (bad neutral, grounding, bad compressor, etc.) they will be discussed with the consumer and the utility. At your suggestion we have also asked the company to place a voltage recording meter at the location to help determine the cause and to possibly consider

sending one of its energy case managers or advisors to the customer's premise to help troubleshoot this complaint. I advised Consumer Services to request APCO to test the voltage and current by setting a recording voltage meeting. I also outlined the possible causes of this problem." (3)

June 2006 - Ms. Pugh. The customer reported frequent outages. Consumer Services requested a copy of the section's outage report. After reviewing the outage report, I was not able to provide the requested information in a format which was acceptable to Consumer Services. Comments from CS: "Thank you for showing me the outage report that you do receive but it does not provide the type of information I was hoping to see and I will follow-up with John, Judi and Janice to see if there is support to receive this type of information and the benefits of it for consumers and the Commission. If you can provide some supporting need for this type of information it could help the cause. Thanks again for your advice it gives Consumer Services technical understanding and knowledge about the company's plant and abilities that we often need." (3)

June 2006 - Mr. John Crowell. The customer questioned the bill that he received from APCo. A bad capacitor was later founded by the customer's electrician. I explained the function of a capacitor to Consumer Services and requested Consumer Services to identify where the capacitor was located in the customer electric circuit. This information is needed before the above question can be properly answered. Need to provide follow-up information on this item. (3)

**July 2006**
No activity this month.

**August 2006 -** George May – Comments from CS: "Your technical advice explained how the utility initially determines demand for a location and provided an explanation of why the meter constant was different for each location." (3)

**Comments:** Ongoing documentation of each outstanding item should be updated each month and reflect current month activities/communications and status of each item. Details are very important. <u>Absent improved documentation of each inquiry/complaint, the rating for this responsibility will decrease on the next Performance Appraisal.</u>

(6) Continue professional development and other work related activities to include: 1.) Attending meetings, 2.) Training, 3.) Attending seminars and conferences, 4.) Reading of Technical Periodicals., 5.) Reading current news articles related to the Energy and Electricity Sectors and 6.) Research industry specific issues. This task should be pursued in order to gain an understanding of Alabama utility regulation as well as the electric utility industry. These developmental activities should be completed at least once each quarter and documented in a detailed report. The report should be completed and included the corresponding monthly Black Book.

Rating: Exceeds Standards – 3.

November 2005 – Net Metering webcast. Did not participate.

November 2005 – Substation monitoring web seminar. Did not participate.

January 2006 – Researched Kyoto Protocol and the Clear Skies Initiative. Incorporated some of this information as background material in one of his reports.

January 2006 – Researched Gulf Coast Ozone Study (GCOS). Incorporated some of this information as background material in one of his reports.

February 2006 – Provided a news article regarding a hydrogen power plant.

March 2006 – Provided news article regarding Broadband Power Play.

April 2006 – World May Turn Back Clock for Liquid Coal Future.

April 2006 - Greg provided an overview of APCO's organizational structure at the Division Level which is comprised of crews, LOLs, engineering, districts, etc.

May 2006 – Utilities Turning to Vegetable Oil-Based Transformer Fluids.

May 2006 - Provided an AMR article. The AMR article was interesting and timely, because we are currently reviewing a critical peak price for rate FDT that will use AMI as the backbone.

May 2006 - E-Forum on EPACT 2005 – did not attend.

May 2006 - Greg provided an overview of APCO's inspection and maintenance programs. Discussed performance measures and budget processes.

June 2006 – Did not attend the Net-Metering conference call.

June 2006 – Attended a meeting with APCO to discuss the Company's storm preparedness procedures.

June 2006 – Reviewed several engineering publications and newsletters.

July 2006 – Attended a training class entitled: "Fossil Power Plant Fundamental Workshop and Training" in Raleigh, NC.

**July 2006** – Reviewed several engineering publications and newsletters.

**August 2006** – Book Explores Developments in Organic Farming.

**August 2006** - Slow Start for Revival of Nuclear Reactors.

**August 2006** - Utility Mergers

**August 2006** - Summarize Bob Burns Report regarding repeal of PUCHA – incomplete.

**August 2006** - Reviewed several engineering publications and newsletters.

**August 2006** - Researched AEC Mcintosh plant being off-line for 18 months.

**August 2006** – Provided Gasification Tech. Council webpage update

**Comments:** Attend as many in-house training opportunities as possible.  Provide summaries of articles with relevant comments as to how the information may impact the Company, the Commission, customers, the industry, etc.



# STATE OF ALABAMA
ALABAMA PUBLIC SERVICE COMMISSION
P.O. BOX 304260
MONTGOMERY, ALABAMA 36130-4260

September 18, 2006

JIM SULLIVAN, PRESIDENT
JAN COOK, ASSOCIATE COMMISSIONER
GEORGE C. WALLACE, JR., ASSOCIATE COMMISSIONER

WALTER L. THOMAS, JR.
SECRETARY



## MEMORANDUM

TO:       Mr. John Free,
          PSC Analyst Manager

FROM:     Mr. Gregory Kelly,
          PSC Technical Specialist, Senior

SUBJECT:  Response to Appraisal Review
          Period from October 1, 2005 - October 1, 2006

I have received your appraisal review and comments for the period covering October 1, 2005 - October 1, 2006. I would like to state my objections to the score and exercise my right to respond to your comments. You have incorrectly provided a low score and again rendered materially false information concerning my character and work ethic.

Under your supervision, accountants are treated with professional respect and scored higher than me the engineer because of your bias and flawed scoring system, which focuses on the accounting activities of bookkeeping and clerical skills. In a multi-functional work group, the twin problems of accounting myopia and technical phobia harm the complex field of engineering. The onus is on the supervisor to be equally skilled in all areas under his supervision.

The record is clear that my position is void of any technical leadership and/or assistance, and that you lack the technical competency, professional credibility and management consistency to render a fair evaluation for my performance. I also believe that the record is clear concerning your harassing and petty behavior toward others, as well as your undermining and disrespectful attitude toward me and engineering. This information has been thoroughly documented.

As for your comments concerning my work habits, I respectfully suggest that you direct these unfounded and threatening remarks toward the known and correct individuals and/or work groups who misuse and abuse company time and resources. I also believe that your name would be included in this grouping as one the offenders as a result of the counterproductive activities listed below:

- ❖ Providing income tax and accounting service to others
- ❖ Providing home construction services for yourself and others
- ❖ Providing accounting instruction service to others
- ❖ Gathering information on hunting activities for personal use

Your unprofessional behavior, lack of technical expertise and fondness for deception are well documented. I refuse to be threatened, harassed, and intimidated by a flawed and troubled supervisor who promotes fear and embraces bias and unjust policies

GK

cc:    Ms. Janice M. Hamilton, Energy Director
       Ms. Dorinda Kepler, Personnel Assistant III
       File

**Form 13P**                    **EMPLOYEE PERFORMANCE *PREAPPRAISAL***
Revised (01/2006)                        **STATE OF ALABAMA**
                                          **Personnel Department**

Employee Name: <u>GREGORY KELLY</u>                   Social Security Number: <u>XXX-XX-4641</u>

Agency: <u>018/PUBLIC SERVICE COMMISSION</u>          Division:     ENERGY

Classification: <u>PUBLIC UTIL TEC SPEC, SR</u>       Class Code: <u>20522</u>

Period Covered From: <u>10/01/2006</u> To: <u>10/01/2007</u>   Position Number: <u>04117203</u>

**RESPONSIBILITIES/RESULTS:** Responsibilities and results on which an employee will be rated should be listed below. These factors should be discussed with the employee during the Preappraisal session at the beginning of each appraisal year. Please refer to the Performance Appraisal Manual for instruction on specifics of preparing, conducting, and completing the Preappraisal. Refer to the same manual for information concerning how to develop responsibilities and results.

1. Review monthly reports submitted by Alabama Power Company regarding 1.) Monthly Meter Tests, 2.) Customer outages, 3.) Hydro and fossil plant outages, 4.) Hydro and fossil plant performance, 5.) Farley operating performance, 6) <u>Peak Demand Report, (7) ECR Report and (8) Environmental Reports</u> in order to determine if any unusual or significant events (non-routine or extraordinary events) occurred in the previous month's operations and/or testing procedures. This summary information should be documented on a monthly basis in the Operations Summary Report, <u>Generation capacity Report and Peak demand report</u> and included in the monthly Black Book, as well as the Section's Electronic files.

2. Plans and performs monthly visits and inspections (approximately three separate visits per month to various locations and facilities) of Alabama Power Company's utility plant operations (generation, transmission, distribution, etc.) and construction projects to gain an understanding of the Company's operating & maintenance practices, environmental projects, plant performance, system reliability, outages (planned & forced), infrastructure improvements, distribution service quality, extensions and enlargements, customer concerns, project expenditures as well as other related matters. The visits should be planned and performed in a well organized and efficient manner <u>and a chronological record should be maintained of all site visits.</u>

3. Document each visit and/or inspection of APCo facilities in order to establish a <u>detailed</u> written record of the information discussed during each visit. The report must include all vital information obtained and/or discussed during the visit. The report should be completed in time to be included with the corresponding Black Book, or as directed by Supervisor. For example, the written reports for visits made in August should be completed and included in the August Black Book and Section's electronic files.

4. Perform technical research, analysis, and documentation for <u>special projects.</u> This assignment may include work-related matters such as: 1.) IEEE, NESC, NEC, and ANSI Standards, 2.) FERC and NARUC technical issues, 3.) APCo rates, regulations, and policies 4.) APSC rules and regulations, and 5.) Petitions, filings, and/or other rate matters such as environmental projects. Each assignment should be completed as directed by Supervisor.

5. Respond to technical data requests, phone inquiries, surveys and questionnaires from consumers, consultants, etc. and assist in the investigation of service complaints so that information is released in accordance with PSC rules and state law, and to reasonably assure the Utility's compliance to the General Rules and Special Electric Rules of the Alabama Public Service Commission (extension plans & policies, T & D maps, meter records, interruptions, etc.), as well as the staff's responsibilities regarding the same rules. This responsibility should be completed in a courteous and prompt manner with <u>a detailed report included in the monthly Technical Complaints Report</u> and a brief synopsis included with the section's monthly Activities Report and/or documented in the monthly Complaints Report.

6. Continue professional development and other work related activities to include: 1.) Attending meetings, 2.) Training, 3.) Attending seminars and conferences, 4.) Reading of Technical Periodicals., 5.) Reading current news articles related to the Energy and Electricity Sectors and 6.) Research industry specific issues. This task should be pursued in order to gain an understanding of Alabama utility regulation as well as the electric utility industry. <u>These developmental activities should be completed on an ongoing basis and documented to include summary reports, staff commentary, suggestions, etc. and provided to Manager for review. Also, a brief synopsis should be included in the monthly Black Book.</u>

**WORK HABITS:** Provide a check in the appropriate space to document that the policies and procedures concerning the following areas have been discussed with the employee. For instructions, refer to the Performance Appraisal Manual and policies of the agency.

CHECK WHEN DISCUSSED:

| | |
|---|---|
| _____X_____ | Attendance |
| _____X_____ | Punctuality |
| _____X_____ | Cooperation with Coworkers |
| _____X_____ | Compliance with Rules |

**PREAPPRAISAL SIGNATURES:** Signatures are mandatory.

Date the Preappraisal Session was held with the employee: _September 15, 2006_

Employee Signature: (denotes discussion and receipt of form, not agreement) _X Gregory Kelly_

Rater Signature: (denotes discussion and employee receipt of form) _John D. Fale_

Reviewer Signature: _JM Hamilton 9/15/06_

---

## EMPLOYEE PERFORMANCE *MIDAPPRAISAL*

Describe any employee's strength(s) in performing responsibilities and/or conducting work habits, as observed, during the first half of the appraisal period.

_____

_____

Describe any area(s) that the employee needs to improve in performance of responsibilities and/or work habits, as observed, during the first half of the appraisal period. Document any actions taken or the corrective action plan that was developed to improve the areas of weakness. If a plan has not been developed, it is appropriate for the rater to consider developing a plan at this time.

_____

_____

State the areas where the employee has performed in a fully competent manner during the first half of the appraisal period. Documentation in this area means that the employee performed to the expected level of performance as discussed in the Preappraisal session. If there is no documentation in the first two areas, this section should be completed.

_____

_____

A Midappraisal session has been held on this date and performance has been discussed:_____

Employee Signature:_____    Initial if comments attached:_____

Rater Signature:_____    Initial if comments attached:_____

Reviewer Signature:_____    Initial if comments attached:_____

(Signatures denote that a Midappraisal session has been held between the supervisor and employee. Signatures are mandatory. Employee signature does not denote agreement but discussion of the form and rater comments. Comments may be attached. The person attaching comments must initial in the appropriate space.)

*file*



# STATE OF ALABAMA
### ALABAMA PUBLIC SERVICE COMMISSION
P.O. BOX 304260
MONTGOMERY, ALABAMA 36130-4260

October 25, 2006

JIM SULLIVAN, PRESIDENT

JAN COOK, ASSOCIATE COMMISSIONER

GEORGE C. WALLACE, JR., ASSOCIATE COMMISSIONER

WALTER L. THOMAS, JR.
SECRETARY

## MEMORANDUM



TO:       Mr. Gregory Kelly,
          PSC Technical Specialist, Senior

FROM:     Mr. John Free,
          PSC Analyst Manager

SUBJECT:  Greg Kelly Comments Dated September 18, 2006

I have received your "Comments" dated September 18, 2006 and must notify you that such comments are disrespectful, unprofessional and considered highly insubordinate. By memorandums dated February 14, 2006 and April 21, 2006, whereby I responded to similar comments of yours, you were warned that if such conduct were to continue, it would result in disciplinary action. Accordingly, you are being served with a "Written Reprimand" attached hereto. Please read the document in its entirety and sign. You will be provided copies within a few days or so.

Cc:    The Honorable John A. Garner
       Chief Administrative Law Judge

       Ms. Janice M. Hamilton, Director
       Energy Division

       Ms. Dorinda J. Kepler
       PSC Personnel

       File



Defendants'
Exhibit 94

## CONFIDENTIAL

# COPY  *employee provided copy via hard mail 10-26-06*
*JK*

THIS IS A:

_____ COUNSELING
_____ WARNING
XXXXX WRITTEN REPRIMAND



**Employee Name:** Mr. Gregory Kelly

I.    **Facts of the performance or work conduct problem:** On September 18, 2006, Mr. Greg Kelly submitted comments, in the form of a memorandum, to Mr. John Free. Mr. Kelly's comments were in response to Mr. Kelly's September 15, 2006 Performance Appraisal. Excerpts from Mr. Kelly's memorandum are included below.

"The record is clear that my position is void of any technical leadership and/or assistance, and that you lack the technical competency, professional credibility and management consistency to render a fair evaluation for my performance. I also believe that the record is clear concerning your harassing and petty behavior toward others, as well as your undermining and disrespectful attitude toward me and engineering. This information has been thoroughly documented.

As for your comments concerning my work habits, I respectfully suggest that you direct these unfounded and threatening remarks toward the known and correct individuals and/or work groups who misuse and abuse company time and resources. I also believe that your name would be included in this grouping as one the offenders as a result of the counterproductive activities listed below:

.:. Providing income tax and accounting service to others
.:. Providing home construction services for yourself and others
.:. Providing accounting instruction service to others
.:. Gathering information on hunting activities for personal use

Your unprofessional behavior, lack of technical expertise and fondness for deception are well documented. I refuse to be threatened, harassed, and intimidated by a flawed and troubled supervisor who promotes fear and embraces bias and unjust policies."

Mr. Kelly's comments included in his memorandum exhibited the following conduct:

1. failure to follow an order,
2. disobedience,
3. failure to submit to authority as shown by demeanor or words,
4. use of abusive or threatening language,
5. submitting false and fraudulent information,
6. disrespect for authority, and
7. unprofessional and insubordinate conduct.

II. **Prior Actions:** Mr. Kelly has been warned on two prior occasions that such comments are not acceptable. Furthermore, Mr. Kelly was informed that such future conduct would result in disciplinary action (see attachments).

III. How the situation can be resolved:

1. While Mr. Kelly has the right to respond to a performance appraisal, it is not appropriate or acceptable to assault the character of and/or show aggression toward the rating supervisor. Mr. Kelly should cease to exhibit unprofessional and insubordinate behavior immediately. Continuance of such conduct or similar actions will result in further disciplinary action of increasing severity.


Supervisor's Signature: _John D. Free_

Employee's Signature: _Grady Kelly_

Date: _10 - 25 - 06_

Employee's signature denotes discussion not necessarily agreement. The employee may add comments which must be attached to this form. The form must be given to the employee with copies to the supervisory file and Personnel Office file in the agency.



STATE OF ALAB A
ALABAMA PUBLIC SERVICE COMMISSION
P.O. BOX 304260
MONTGOMERY, ALABAMA 36130-4260

September 18, 2006

WALTER L. THOMAS, JR.
SECRETARY

JIM SULLIVAN, PRESIDENT
JAN COOK, ASSOCIATE COMMISSIONER
GEORGE C. WALLACE, JR., ASSOCIATE COMMISSIONER

## MEMORANDUM

TO:      Mr. John Free,
         PSC Analyst Manager

FROM:    Mr. Gregory Kelly, *GK*
         PSC Technical Specialist, Senior

SUBJECT: Response to Appraisal Review
         Period from October 1, 2005 - October 1, 2006

I have received your appraisal review and comments for the period covering October 1, 2005 - October 1, 2006. I would like to state my objections to the score and exercise my right to respond to your comments. You have incorrectly provided a low score and again rendered materially false information concerning my character and work ethic.

Under your supervision, accountants are treated with professional respect and scored higher than me the engineer because of your bias and flawed scoring system, which focuses on the accounting activities of bookkeeping and clerical skills. In a multi-functional work group, the twin problems of accounting myopia and technical phobia harm the complex field of engineering. The onus is on the supervisor to be equally skilled in all areas under his supervision.

The record is clear that my position is void of any technical leadership and/or assistance, and that you lack the technical competency, professional credibility and management consistency to render a fair evaluation for my performance. I also believe that the record is clear concerning your harassing and petty behavior toward others, as well as your undermining and disrespectful attitude toward me and engineering. This information has been thoroughly documented.

As for your comments concerning my work habits, I respectfully suggest that you direct these unfounded and threatening remarks toward the known and correct individuals and/or work groups who misuse and abuse company time and resources. I also believe that your name would be included in this grouping as one the offenders as a result of the counterproductive activities listed below:

   ❖ Providing income tax and accounting service to others
   ❖ Providing home construction services for yourself and others
   ❖ Providing accounting instruction service to others
   ❖ Gathering information on hunting activities for personal use

Your unprofessional behavior, lack of technical expertise and fondness for deception are well documented. I refuse to be threatened, harassed, and intimidated by a flawed and troubled supervisor who promotes fear and embraces bias and unjust policies

GK

cc:   Ms. Janice M. Hamilton, Energy Director
      Ms. Dorinda Kepler, Personnel Assistant III
      File



## STATE OF ALABAMA
### ALABAMA PUBLIC SERVICE COMMISSION
P.O. BOX 304260
MONTGOMERY, ALABAMA 36130-4260

February 14, 2006

WALTER L. THOMAS, JR.
SECRETARY

JIM SULLIVAN, PRESIDENT
JAN COOK, ASSOCIATE COMMISSIONER
GEORGE C. WALLACE, JR., ASSOCIATE COMMISSIONER

## MEMORANDUM

**TO:**   Mr. Gregory Kelly
Public Utility Technical Specialist, Senior

**FROM:**   Mr. John Free
Public Utility Analyst Manager

**SUBJECT:**   Your Memorandum dated January 25, 2006

I have received and reviewed your "Unleveled – Playing Field for Engineering Positions" memorandum, dated January 25, 2006, wherein you made numerous unfounded allegations that cause me great concern. Please be advised that I categorically deny your claims that I have been unfair, indifferent and inconsistent and/or selective in my supervision and evaluation of employees under my direct supervision and control. To the contrary, it has always been my goal to be as fair and objective as I can humanly be with every employee in the section that I supervise.

Aside from the inaccuracy of your allegations regarding my fairness, I am quite concerned by your unfounded representations that I have "engaged in mischief, deception and questionable professional conduct" and "seek to unjustly enrich your (my) own non-tech profession by integrating and linking it with the high-tech field of engineering." In addition to being untrue, these remarks and accusations are, at a minimum, borderline insubordinate and abusive. **By way of this memorandum, I am notifying you that any future unfounded remarks of this nature will not be tolerated and will likely result in disciplinary action.**

Finally, I have previously advised you that there are no plans at this time to request State Personnel to reevaluate the PSC engineering positions or to request a pay adjustment for those same positions. I will advise you regarding the need for further salary research regarding your position if I decide to pursue the requested reevaluation in the future. From this point forward, do not spend any part of your work day on the proposed reevaluation and do not send me any verbal or written requests for such a reevaluation unless I advise you to do so.

As indicated in my memorandum of January 23, 2006, if you are no longer satisfied with the compensation package that you accepted for your current position, you certainly have the option of pursuing other career opportunities as they become available.

Cc:   The Honorable John A. Garner
      Chief Administrative Law Judge

      Ms. Janice M. Hamilton, Director
      Energy Division

      Ms. Dorinda J. Kepler
      PSC Personnel



# STATE OF ALABAMA

ALABAMA PUBLIC SERVICE COMMISSION
P.O. BOX 304260
MONTGOMERY, ALABAMA 36130-4260

April 21, 2006

JIM SULLIVAN, PRESIDENT

JAN COOK, ASSOCIATE COMMISSIONER

GEORGE C. WALLACE, JR., ASSOCIATE COMMISSIONER

WALTER L. THOMAS, JR.
SECRETARY

## MEMORANDUM

TO:        Mr. Gregory Kelly,
           PSC Technical Specialist, Senior

FROM:      Mr. John Free,
           PSC Analyst Manager

SUBJECT:   Mid-Appraisal "Comments" Submitted by Greg Kelly

I have received your "Comments" dated April 17, 2006 and must express my disagreement. Your assessment regarding my leadership, assistance, coaching, and use of action plans, as it relates to your performance, is inappropriate and inaccurate. In fact, I have provided substantial assistance and coaching to you, in support of your performance, on many occasions. As a testament to my sincere efforts, I am providing you the following list of actions that I have taken in an effort to improve your performance.

- On each of your Pre-Appraisals, Mid-Appraisals, and Performance Appraisals, we have conducted a "sit-down" review of your responsibilities and performance. At each of these meetings, I have offered suggestions and instructive comments to you as a means of improving your performance.
- I have conducted monthly reviews of your work and provided you with appropriate feedback and written comments.
- At your last annual Performance Appraisal, I provided you a document entitled "Ideas for Improving Performance Ratings". In this document, as the title suggest, are several ideas for you to use to improve your performance.
- More recently (April 13, 2006), we sat together in our conference room and discussed your mid-appraisal for nearly two hours. During this time, I made several suggestions for how you could improve your performance. Most noteworthy among them were: 1) Prepare accurate reports, 2) Provide accurate and timely documentation, and 3) Provide meaningful information in your reports. Also, as a reference, I pointed out which of your reports that I considered to be either above-standard or sub-standard. I also expressed to you the reasons for my assessment.

- Regarding Action Plans, such tools are only <u>required</u> when performance is below "meets standards". As such, I have provided you with an action plan for your Responsibility No. 1. It is included in the subject Mid-Appraisal review.
- With the current Mid-Appraisal, I provided you a complete review of your written reports (Responsibility No. 3) in which I highlighted certain facts and data that I considered to be both meaningful and informative.
- With the current Mid-Appraisal, I provided you with various staff reports prepared in prior years (Rick Cleckler and Mary Martin) in which I highlighted particular facts and data that I considered to be both meaningful and informative.
- With the current Mid-Appraisal, I provided you with three different report formats used by engineers employed with the Kentucky PSC in order to assist you with documenting your site visits/field inspections.

It is apparent from the above measures, which are not all inclusive, that I have made a concerted attempt to assist you in improving particular areas of your performance. Most notably among these are your documentation, report preparation, and continuing education responsibilities.

On a separate but related matter, I must again address your propensity to level unfounded personal accusations toward me in an inappropriate manner. In your "comments" dated April 17, 2006, you state that: 1) Mr. Free does not possess these problem solving skills; 2) Mr. Free has never assisted or provided leadership in solving technical problems associated with this position; 3) Others do not trust or rely on his ability in these areas; and 4) No leadership, no assistance, and no coaching are provided to the employee by supervisor in these areas. As stated previously, these representations are both unfounded and inappropriately expressed. By memorandum dated February 14, 2006, you were notified that any future unfounded remarks would likely result in disciplinary action. By way of this memorandum, I am notifying you that any further unfounded and degrading remarks regarding my character will be considered insubordinate behavior and will result in disciplinary action.

Cc:    Ms. Janice M. Hamilton, Director
       Energy Division

       File

Transcript of John Free's Disciplinary Meeting with Gregory Kelly
October 25, 2006 at ~12:35 PM

I began the meeting by stating to Greg Kelly that he was asked to be present because of his ongoing behavior problems. I stated that his supervisor, John Free, wanted to address those problems with him in my presence. I started the tape recorder and asked for one of them to give their consent to the tape recording. Greg refused to consent while John gave his consent to the recording.

Here is the text version of the verbal exchange between John Free and Greg Kelly:

**Hamilton:** Ahhmm, I've got a tape recorder. We'll just tape the session so that we'll have it on record. And could I get consent from one of you to tape this?

**Kelly:** Naw, naw.

**Free:** I give my consent.

**Hamilton:** Well, I just need consent from one of you.

**Free:** This is, ah, Greg, going back to your comments (*unintelligible*) pertaining to your evaluation. It dates back a while where ... I'm going to give you this copy to follow along. That's just the cover letter. This is a copy of the written reprimand. This is three copies of letters that...of memos that have gone on between me and you. As you see back this month (*unintelligible*) dated April in response to your comments at that time. I asked you to please don't do it again. It was insubordinate, highly inappropriate the comments that you were making. And as we moved through time, another evaluation or something transpired. And again, you filed comments (*unintelligible*) highly insubordinate. And that is not acceptable. And again, I asked you by way of a memorandum, please don't do that again or disciplinary action will follow. Recently, we sat down with your evaluation, went through it and you filed these comments. And rather than improving, things are getting worse. I don't know what else to do other than start the disciplinary procedure with a written reprimand. So we need to go through it and get your signature.

**Kelly:** I can sign it. I don't have a problem with that.

**Free:** As long as you sign this one. This is the original. That one's just for you to go along with for right now.

**Kelly:** I can read it.

**Free:** Huh?

**Kelly:** I can read it. I can go back to my office and read it.

**Free:** So, you don't want to discuss it or go over it?

**Kelly:** Don't need to discuss it. (*unintelligible*)

**Free:** The bottom line is that while you do have a right to file comments, attacking your supervisor is unacceptable.

**Kelly:** The facts speak for themselves.

**Free:** Okay. This is the original that needs your signature.

(*Pause while Mr. Kelly signs the document*)

**Free:** And then you'll get a copy of the original within, I think, it's ten days after it's placed (*unintelligible*)

**Kelly:** Thank you.

**Free:** You don't have any further questions.

**Kelly:** No.

(*Session ends*)


Defendants' Exhibit 95

Form 3 - Revised 1091

# APPLICATION FOR EXAMINATION
### RETURN TO
STATE PERSONNEL DEPARTMENT
MONTGOMERY, ALABAMA 36130

## AN EQUAL OPPORTUNITY EMPLOYER

GENERAL INSTRUCTIONS:

A separate application is required for each job. Do not write in shaded areas. Type or print...

Defendants' Exhibit 97

OCT 29 4 40 PM '93

ENTER SOCIAL SECURITY NUMBER HERE

Full Name: GREGORY  N/A  KELLY
First  Middle  Last

Title of Examination for Which you are Applying: 11102 STATISTICIAN II

Address: 6213 WILLOW GLENN DR
House or Apartment No.  Street

Option (if Applicable):

MONTGOMERY AL  MONTGOMERY  36117
City  State  County  Zip Code

Telephone Number: Home 271-2478  Work N/A

Date of Birth: Mo 11  Day 28  Year 56

The following information is required for Governmental reporting or recordkeeping purposes only:

Sex (Check One)
1. | ✓ | Male
2. | | Female

Race (Check One)
1. | | White
2. | ✓ | Black
5. | | American Indian or Alaskan Native
3. | | Hispanic
6. | | Other
4. | | Asian or Pacific Islander

EDUCATION  High School Graduate or GED? | | Yes | | No  If No, circle highest grade completed  1 2 3 4 5 6  7 8 9 10 11 12

| Name and location of high school attended | FROM (Mo./Yr.) | TO (Mo./Yr.) | Did you Graduate? | Date of Graduation | Area of Study |
|---|---|---|---|---|---|
| SIDNEY LANIER | 09/73 | 06/75 | YES | 6/75 | N/A |

| Name and location of Colleges and Universities Attended | FROM (Mo./Yr.) | TO (Mo./Yr.) | Did you Graduate? | Fields of Study Major(s) | Minor(s) | Degree and Date |
|---|---|---|---|---|---|---|
| AUBURN UNIVERSITY | 9/75 | 12/79 | YES | ELECTRICAL ENGINEERING | N/A | 12/79 |
| TROY STATE UNIVERSITY | 9/87 | 12/90 | YES | MASTER BUSINESS | ADM N/A | 12/90 |

Name and location of business, correspondence or vocational school attended  N/A

If you attended college, but did not graduate, show credit received
Sem. hrs. _____  Qtr. hrs. N/A

List professional certificate or license if applicable _____ N/A

COMPLETE THIS SECTION IF YOU ARE CLAIMING VETERAN'S PREFERENCE  N/A

If you claim Veteran's Preference, check the type below. Attach copies (which will not be returned) of the required documents to your application to support your claim.

1. | | Veteran (5 points) — Requires DD214 or document showing dates of service and type of discharge. If this has been submitted previously & is on file with this office, you may disregard this requirement.
2. | | Disabled Veteran (10 points) — Requires DD214 or other document as above & letter of disability from V.A. dated within last 6 months. V.A. letter must be kept updated until register is established or you lose the extra 5 points.
3. | | Veteran's widow (10 points) — Requires DD214 or other document as above & marriage & death certificates. Cannot be claimed if widow remarries.
4. | | Disabled Veteran's wife (10 points) — Requires DD214 or other document as above & V.A. letter of disability dated within last 6 months. Cannot be claimed unless still married to disabled veteran.
5. | | Permanently Disabled Veteran (10 points) — Requires DD214 or other document as above indicating veteran is permanently disabled; or DD214 or other document & V.A. letter indicating permanent disability.

COMPLETE THIS SECTION IN ORDER TO BE SCHEDULED FOR WRITTEN EXAMS

Written exams will be given periodically in any of the places listed below for which a sufficient number of applicants express preference. Indicate by number your 1st, 2nd, and 3rd choices.

01 | | Alexander City
02 | | Andalusia
03 | | Birmingham
04 | | Decatur
05 | | Dothan
06 | | Anniston
07 | | Linden
08 | | Mobile
09 | | Montgomery
10 | | Selma
11 | | Sheffield
12 | | Tuscaloosa

If you qualify, you will receive a notice showing the place and time you are to report for the exam.

NOTICE: The processing of an application or admission to a test does not preclude the subsequent removal of an applicant's name from an eligible register for any disqualifying reason.

CERTIFICATE (Must be signed in ink by applicant):
I certify that all statements on or attached to this application are true and correct to the best of my knowledge. I understand that any false statements may cause me to be refused the opportunity of examination, to be removed from an eligible register, or terminated from employment. I further authorize the release of all relevant prior employment, military service and criminal records. If employed I agree, consistent with applicable laws, to receive compensatory time off in lieu of overtime compensation for any overtime hours worked.

## REFERENCES

List three reliable persons, not relatives or present employer, who know you well enough to give information about you.

| Name | Address and Phone Number | Employer |
|------|--------------------------|----------|
| JOHN DIXON | 5919 BALMORAL RD PH#277-6881 | SOUTH CENTRAL BELL |
| KEN STRONG | 15658 CARRIAGE BROOK RD A#279-7467 | ALA POWER CO |
| MARGARETT BARTON | 6177 JENNIFER LN P#281-0180 | MTGY BOARD OF EDUCATION |

I. If you need special testing aids and/or services in order to accommodate a disability or health problem, (e.g., interpreters or reading devices), please indicate these requirements in the space below.

II. Have you ever been involuntarily terminated, discharged, forced or asked to resign, from any job or employment?  (✓)Yes ( ) No
If you answered Yes to the above question, attach an explanation on a separate sheet noting any mitigating or extenuating circumstances. *THE REASON(S) ARE UNKNOWN TO ME AT THE PRESENT TIME.*

NOTE: A CRIMINAL CONVICTION WILL NOT NECESSARILY BE A BAR TO CONSIDERATION FOR EMPLOYMENT, EXCEPT THAT A FELONY CONVICTION WILL BAR EMPLOYMENT IN A LAW ENFORCEMENT JOB; THE DISCLOSURE OF A MISDEMEANOR CONVICTION WILL NOT AUTOMATICALLY RESULT IN DISQUALIFICATION. CRIMINAL HISTORIES WILL BE SUBMITTED TO THE NATIONAL CRIME INFORMATION CENTER (NCIC) FOR VERIFICATION. FAILURE TO DISCLOSE A CONVICTION MAY BE CONSIDERED AS GROUNDS FOR DISQUALIFICATION. FOR THESE REASONS, APPLICANTS SHOULD BE CAREFUL TO DISCLOSE ALL CRIMINAL CONVICTIONS IN THE SPACE BELOW.

III. Have you ever been convicted of a misdemeanor or felony crime?  ( ) Yes ( ✓ ) No
If you answered Yes to the above question, list in the space below, all prior misdemeanor and felony convictions and any extenuating or mitigating circumstances regarding such convictions. If necessary, you may use a separate sheet or sheets and attach to application.  *N/A*

## WORK HISTORY

### THIS SECTION MUST BE COMPLETED REGARDLESS OF WHETHER OR NOT A RESUME' IS ATTACHED

Begin with your PRESENT or most recent employment, list in REVERSE ORDER periods of employment. Each time you changed jobs or your title changed should be listed as a separate period. Describe in detail your specific duties. (Attach additional sheets if needed.)

1. Current or Last Employer: ALA POWER CO

Your Official Job Title: SENIOR ENGINEER

Address: 240 DEXTER AVE

Type of Business: ELECTRIC CATILITY

| FROM Month Year | TO Month Year | Total Months | If part-time, number of hours per week | Beginning Salary | Ending Salary | May we contact employer? |
|---|---|---|---|---|---|---|
| | | | N/A | $ 19,500 per YR | $ 38,000 per YR | ( )Yes ( ) No |

Number/Title of Employees You Supervised: NONE

Equipment You Operated: COMPUTERS / ELECTRONIC EQUIP

Reason for Leaving: TERMINATED

Name, Title, and Phone Number of Supervisor:

Describe Your Duties in Detail:
I WAS AN ELECTRICAL ENGINEER IN THE POWER DISTRIBUTION SECTION IN THE MONTGOMERY DISTRICT. I WAS RESPONSIBLE FOR PROVIDING SERVICE TO NEW HOMES AND BUSINESS IN THE MONTGOMERY DISTRICT SERVICE AREA

2. Employer _N/A_ | Your Official Job Title

Address | Type of Business

| FROM Month Year | TO Month Year | Total Months | If part-time, number of hours per week ____ | Beginning Salary $ ____ per ____ | Ending Salary $ ____ per ____ |

Number/Title of Employees You Supervised | Equipment You Operated | Reason for Leaving

Name, Title, and Phone Number of Supervisor

Describe Your Duties in Detail:

3. Employer _N/A_ | Your Official Job Title

Address | Type of Business

| FROM Month Year | TO Month Year | Total Months | If part-time, number of hours per week ____ | Beginning Salary $ ____ per ____ | Ending Salary $ ____ per ____ |

Number/Title of Employees You Supervised | Equipment You Operated | Reason for Leaving

Name, Title, and Phone Number of Supervisor

Describe Your Duties in Detail:

4. Employer _N/A_ | Your Official Job Title

Address | Type of Business

| FROM Month Year | TO Month Year | Total Months | If part-time, number of hours per week ____ | Beginning Salary $ ____ per ____ | Ending Salary $ ____ per ____ |

Number/Title of Employees You Supervised | Equipment You Operated | Reason for Leaving

Name, Title, and Phone Number of Supervisor

Describe Your Duties in Detail:

# AVAILABILITY

Please answer the following questions carefully, you will be considered for employment only in the locations where you indicate you will accept work. You will not be considered for jobs involving overnight travel, temporary, part-time or shiftwork unless you indicate that you will accept employment under these conditions.

NOTE! If you decline three offers for consideration of appointment in the class for which you are applying, your name will be placed in the inactive section of the list of eligibles for that class. If your name is certified to an agency and you fail to reply to that agency's inquiry concerning your availability for appointment to a position, your name will be placed in the inactive section of the list of eligibles for that class. Depending on the circumstances, your name may be restored to the active section of the list of eligibles by submitting a satisfactory written explanation of your reasons for declining offers of appointment.

Please indicate in the spaces provided beneath the map of Alabama those areas of the state in which you would accept employment. You may choose a combination of up to seven counties and/or regions from the list below. If you list a region, you will be considered available for all counties in that region. The counties included in each region are listed alphabetically below the region.



**81— Northwest Alabama**
17 Colbert
30 Franklin
39 Lauderdale
40 Lawrence

**82— Huntsville/Decatur Area**
36 Jackson
42 Limestone
45 Madison
48 Marshall
52 Morgan

**83— Northeast Alabama**
10 Cherokee
25 DeKalb
28 Etowah

**84— Jasper/Winfield Area**
29 Fayette
38 Lamar
47 Marion
64 Walker
67 Winston

**85— Tuscaloosa Area**
04 Bibb
32 Greene
33 Hale
54 Pickens
60 Sumter
63 Tuscaloosa

**86— Birmingham Area**
05 Blount
22 Cullman
37 Jefferson
58 Shelby
59 St. Clair

**87— East Central Alabama**
08 Calhoun
09 Chambers
14 Clay
15 Cleburne
19 Coosa
56 Randolph
61 Talladega
62 Tallapoosa

**88— Southwest Alabama**
12 Choctaw
13 Clarke
46 Marengo
65 Washington

**89— Selma/Clanton Area**
11 Chilton
24 Dallas
53 Perry
66 Wilcox

**90— Montgomery Area**
01 Autauga
26 Elmore
43 Lowndes
51 Montgomery

**91— Phenix City/Troy Area**
03 Barbour
06 Bullock
41 Lee
44 Macon
55 Pike
57 Russell

**92— Mobile Area**
02 Baldwin
49 Mobile

**93— South Central Alabama**
07 Butler
18 Conecuh
20 Covington
21 Crenshaw
27 Escambia
50 Monroe

**94— Dothan Area**
16 Coffee
23 Dale
31 Geneva
34 Henry
35 Houston

**95— Statewide**
If you list 95 you will be considered for vacancies throughout the state regardless of location (Relocation may be necessary).

Where did you learn of this job?
1) Employment Service [ ]
2) Job Announcement Notice [ ]
3) Newspaper [ ]
4) College Recruiter [ ]
5) Friends/Relatives [ ]
6) Department News Bulletin [ ]

List the numbers of up to (7) seven counties and/or regions where you are willing to work:

90 , 82 , 86 .

_____

If you want to be considered for appointment by only certain State agencies, indicate the names of up to three of those agencies below.

ENGINEERING

FINANCE AND REVENUE

PUBLIC SERVICE COMMISSION (P.S.C.)

| | OC | | PROM | |
|---|---|---|---|---|
| WT. | | | WT. | |
| E. | | | E. | |
| OR. | | | OR. | |
| OI. | | | SR. | |

Will you accept work involving extensive overnight travel?  [✓] Yes  [ ] No
Will you accept part-time work?  [✓] Yes  [ ] No
Will you accept temporary work for four months or less?  [✓] Yes  [ ] No
Which shifts are you willing to work?
0.[✓] all shifts  1.[ ] 1st only  2.[ ] 2nd only  3.[ ] 3rd only
4.[ ] 1st & 2nd only  5.[ ] 1st & 3rd only  6.[ ] 2nd & 3rd only

Enter the earliest date you will be available to interview for employment. (Your name will not appear on a list of eligibles until this date)

| Month | Day | Year |
|---|---|---|
| 1 1 | 0 1 | 9 3 |

Form 3 - Revised November 1997

**DO NOT WRITE IN THIS SPACE**

# APPLICATION FOR EXAMINATION

RETURN TO: STATE PERSONNEL DEPARTMENT
64 NORTH UNION STREET, SUITE 300
MONTGOMERY, ALABAMA 36130

AN EQUAL OPPORTUNITY EMPLOYER

**General Instructions**

A separate application is required for each job. **Do not write in shaded areas.** Complete all parts of the application. Applications not ...

Defendants'
Exhibit 98

ENTER SOCIAL SECURITY NUMBER BELOW.

**Examination For Which You Are Applying** (one per application)        **Option (if applicable)**

STATISTICIAN II - 11102

Full Name: GREGORY (First)  N/A (Middle)  KELLY (Last)

Address: 6213 WILLOW GLEN DR (House or Apartment Number / Street)

MONTGOMERY, AL (City / State)  MONTGOMERY (County)  36117 (Zip Code)

Telephone Number: Home (205) 271-2478 (Area Code)  Work (205) 242-3524 (Area Code)

**The following information is required for governmental reporting or recordkeeping purposes:**

Date of Birth: 11 (Month) . 28 (Day) . 56 (Year)    Sex (check one) 1. (✓) Male  2. ( ) Female

Race (check one) 1. ( ) White  2. (✓) Black  3. ( ) Hispanic  4. ( ) Asian or Pacific Islander  5. ( ) American Indian or Alaskan Native  6. ( ) Other

**EDUCATION:**  CIRCLE OR BRACKET THE HIGHEST GRADE OF SCHOOL COMPLETED.  ED / LC

High School Graduate or GED? (✓) Yes ( ) No   1  2  3  4  5  6  7  8  9  10  11  12  College 1  2  3 (4)

PROVIDE INFORMATION ON ALL SCHOOLS ATTENDED. SPECIFY UNDERGRADUATE OR GRADUATE WORK.

| Name and Location of School | Dates of Attendance Month/Year From | To | Credit Hours Sem. | Qtr. | Did You Graduate? Yes | No | Type of Degree and Date | Major |
|---|---|---|---|---|---|---|---|---|
| AUBURN UNIV | 9/75 | 12/79 | | | ✓ | | BS | ENGINEERING |
| TROY STATE UNIV | 9/87 | 12/90 | | | ✓ | | MASTER | BUSINESS |

PROFESSIONAL LICENSE OR CERTIFICATE

| License/Certificate Issued By | Field/Trade/Specialization | License/Certificate No. | Issue Date | Expiration Date |
|---|---|---|---|---|
| N/A | N/A | N/A | N/A | N/A |

LIST COURSES (AND HOURS) WHICH ARE PARTICULARLY RELATED TO THE POSITION (attach additional sheets, if needed).

PLEASE SEE ATTACHED LIST

## CERTIFICATION STATEMENT

I certify that all statements on or attached to this application are true and correct to the best of my knowledge. I know that any false statements may cause me to be denied the chance for testing, to be removed from an employment register, or to be released from employment. I will not discuss the test I have taken. I further authorize the release of all relevant prior employment, military service and criminal records. If employed I agree, consistent with applicable laws, to receive compensatory time off in lieu of overtime compensation for any overtime hours worked.

Signature: Gregory Kelly    Date 4-7-98

During the application process, including testing and employment consideration,

SOCIAL SECURITY NUMBER :

Should you need testing accommodations due to a health problem or disability, you must contact the State Personnel Department.

Have you ever been involuntarily terminated, discharged, forced or asked to resign from any job?   (✗) Yes   ( ) No

If you answered Yes to the above question, attach an explanation on a separate sheet noting any mitigating or extenuating circumstances.

Have you ever been convicted of a misdemeanor or felony crime?   ( ) Yes   (✗) No

If you answered Yes to the above question, list in the space below all prior misdemeanor and felony convictions and any extenuating or mitigating circumstances regarding such convictions. If necessary, you may use a separate sheet or sheets and attach to application.

THE REASON(S) WERE UNKNOWN TO ME AT THE
TIME I WAS DISCHARGED. THE COMPANY WAS DOWNSIZING.

NOTE: A CRIMINAL CONVICTION WILL NOT NECESSARILY BE A BAR TO CONSIDERATION FOR EMPLOYMENT, EXCEPT THAT A FELONY CONVICTION WILL BAR EMPLOYMENT IN A LAW ENFORCEMENT JOB; THE DISCLOSURE OF A MISDEMEANOR CONVICTION WILL NOT AUTOMATICALLY RESULT IN DISQUALIFICATION. CRIMINAL HISTORIES WILL BE SUBMITTED TO THE NATIONAL CRIME INFORMATION CENTER (NCIC) FOR VERIFICATION. FAILURE TO DISCLOSE A CONVICTION MAY BE CONSIDERED AS GROUNDS FOR DISQUALIFICATION. FOR THESE REASONS, APPLICANTS SHOULD BE CAREFUL TO DISCLOSE ALL CRIMINAL CONVICTIONS.

## WORK HISTORY
### THIS SECTION MUST BE COMPLETED REGARDLESS OF WHETHER OR NOT A RESUME' IS ATTACHED.

Begin with your PRESENT or most recent employment. List in REVERSE ORDER periods of employment. Each time you changed jobs or your title changed should be listed as a separate period. Describe in detail your duties. (Attach additional sheets if needed.)

| 1. Current or Last Employer MTGY COUNTY SCHOOL SYSTEM | | | | Your Official Job Title MATH TEACHER | | |
|---|---|---|---|---|---|---|
| Address 70 WEST EDGEMONT | | | | Type of Business PUBLIC EDUCATION | | |
| FROM Month 2 Year 98 | TO Month 4 Year 98 | Total Months 2 | Number of Hours Per Week 40 | Beginning Salary $29,200 Per YR | Ending Salary $29,200 Per YR | May we contact your employer? (✗) Yes ( ) No |
| Number/Title of Employees You Supervised On a Continuing Basis NONE | | | | Equipment You Operated N/A | | |
| Name, Title and Telephone Number of Supervisor MR. W.C. HARVEY 240-4462 | | | | Reason for Leaving ACCEPTED JOB WITH STATE OF ALA | | |
| Describe Your Duties in Detail | | | | | | |

I WAS A MATH TEACHER FOR JUNIOR HIGH
SCHOOL STUDENTS. ( 8th AND 9th GRADERS)

| 2. Employer AUDRA/ASHELEY'S BEAUTY CENTER | | | | Your Official Job Title OWNER | | |
|---|---|---|---|---|---|---|
| Address 789 SOUTH COURT ST | | | | Type of Business SALON BUSINESS | | |
| FROM Month 9 Year 95 | TO Month 10 Year 97 | Total Months 25 | Number of Hours Per Week 50 | Beginning Salary $ N/A Per | Ending Salary $ N/A Per | May we contact your N/A employer? ( ) Yes ( ) No |
| Number/Title of Employees You Supervised On a Continuing Basis N/A (SELF) | | | | Equipment You Operated N/A | | |
| Name, Title and Telephone Number of Supervisor NONE | | | | Reason for Leaving BUSINESS CLOSED | | |
| Describe Your Duties in Detail | | | | | | |

I OWNED AND OPERATED A BEAUTY SALON BUSINESS.
THE BUSINESS EMPLOYED HAIR STYLISTS AND NAIL TECHS.

SOCIAL SECURITY NUMBER [redacted]

| 3. Employer ALA POWER CO | Your Official Job Title SENIOR ENGINEER |
| Address 240 DEXTER AVE | Type of Business ELECTRIC UTILITY |

| FROM | | TO | | Total Months | Number of Hours Per Week | Beginning Salary | Ending Salary | May we contact your employer? |
| Month | Year | Month | Year | | | | | |
| 12 | 79 | 9 | 93 | | 40 | $ 19,500 Per YR | $ 58,000 Per YR | (✓) Yes ( ) No |

Number/Title of Employees You Supervised On a Continuing Basis     NONE

Equipment You Operated     COMPUTERS / ELECTRONIC EQUIP

Name, Title and Telephone Number of Supervisor     MR. JOHN JOHNSON

Reason for Leaving     DOWNSIZING / TERMINATED

Describe Your Duties in Detail
I WAS AN ELECTRICAL ENGINEER IN THE POWER DISTRIBUTION SECTION IN THE MONTGOMERY DISTRICT. I WAS RESPONSIBLE FOR PROVIDING SERVICE TO NEW HOME AND BUSINESS IN THE MONTGOMERY DISTRICT SERVICE AREA.

| 4. Employer N/A | Your Official Job Title |
| Address | Type of Business |

| FROM | | TO | | Total Months | Number of Hours Per Week | Beginning Salary | Ending Salary | May we contact your employer? |
| Month | Year | Month | Year | | | | | |
| | | | | | | $ Per | $ Per | ( ) Yes ( ) No |

Number/Title of Employees You Supervised On a Continuing Basis

Equipment You Operated

Name, Title and Telephone Number of Supervisor

Reason for Leaving

Describe Your Duties in Detail

| 5. Employer N/A | Your Official Job Title |
| Address | Type of Business |

| FROM | | TO | | Total Months | Number of Hours Per Week | Beginning Salary | Ending Salary | May we contact your employer? |
| Month | Year | Month | Year | | | | | |
| | | | | | | $ Per | $ Per | ( ) Yes ( ) No |

Number/Title of Employees You Supervised On a Continuing Basis

Equipment You Operated

Name, Title and Telephone Number of Supervisor

Reason for Leaving

Describe Your Duties in Detail

6. USING THE ABOVE FORMAT, SHOW OTHER EXPERIENCE BY USING ADDITIONAL SHEETS.

References: At the time of interview, you may be asked to furnish names and addresses of reliable persons, not relatives or present employer, who know you well enough to give information about you.

SOCIAL SECURITY NUMBER : 

## COMPLETE THIS SECTION IF YOU ARE CLAIMING VETERAN'S PREFERENCE

If you claim Veteran's Preference, check the type below. Attach copies (which will not be returned) of the required documents to your application to support your claim.

1 ( ) Veteran (5 points) - Requires DD214 or document showing dates of service and type of discharge. If this has been submitted previously and is on file with this office, you may disregard this requirement.

2 ( ) Disabled Veteran (10 points) - Requires DD214 or other document as above and letter of disability from V.A. dated within last 6 months. V.A. letter must be kept updated until register is established or you lose the extra 5 points.

3 ( ) Deceased Veteran's spouse (10 points) - Requires DD214 or other document as above and marriage and death certificates. Cannot be claimed if spouse remarries.

4 ( ) Disabled Veteran's spouse (10 points) - Requires DD214 or other document as above and V.A. letter of disability dated within last 6 months. Cannot be claimed unless still married to disabled veteran.

5 ( ) Permanently Disabled Veteran (10 points) - Requires DD214 or other document as above indicating veteran is permanently disabled or DD214 or other document and V.A. letter indicating permanent disability.

## COMPLETE THIS SECTION IN ORDER TO BE SCHEDULED FOR WRITTEN EXAMS

Written exams will be given in the places below for which a sufficient number of applicants express preference. Indicate by number your 1st, 2nd and 3rd choices.

1 ( ) Alexander City     3 ( ) Birmingham     5 ( ) Dothan     7 ( ) Linden     9 ( ) Montgomery     12 ( ) Tuscaloosa
2 ( ) Andalusia     4 ( ) Decatur     6 ( ) Jacksonville     8 ( ) Mobile     10 ( ) Selma

If you qualify, you will receive a notice showing the place and time you are to report for the exam.

### Where did you learn of this job? (check all that apply)

1 ( ) State Employment Service     5 ( ) Friend/Relative     9 ( ) Legislative Representative     13 ( ) TV/Radio Commercial
2 ( ) Job Announcement Notice     6 ( ) Dept. News Bulletin     10 ( ) State Recruiter/Counselor     14 ( ) Other _____
3 ( ) Newspaper     7 ( ) Rehabilitation Services     11 ( ) State Personnel Dept. Information Board
4 ( ) College Placement/Career Office     8 ( ) High School Counselor     12 ( ) Outreach Program (i.e. Church)

## AVAILABILITY

**81 - Northwest Alabama**
17 Colbert
30 Franklin
39 Lauderdale
40 Lawrence

**82 - Huntsville/ Decatur Area**
36 Jackson
42 Limestone
45 Madison
48 Marshall
52 Morgan

**83 - Northeast Alabama**
10 Cherokee
25 DeKalb
28 Etowah

**84 - Jasper/ Winfield Area**
29 Fayette
38 Lamar
47 Marion
64 Walker
67 Winston

**85 - Tuscaloosa Area**
04 Bibb
32 Greene
33 Hale
54 Pickens
60 Sumter
63 Tuscaloosa

**86 - Birmingham Area**
05 Blount
22 Cullman
37 Jefferson
58 Shelby
59 St. Clair

**87 - East Central Alabama**
08 Calhoun
09 Chambers
14 Clay
15 Cleburne
19 Coosa
56 Randolph
61 Talladega
62 Tallapoosa

**88 - Southwest Alabama**
12 Choctaw
13 Clarke
46 Marengo
65 Washington

**89 - Selma/Clanton Area**
11 Chilton
24 Dallas
53 Perry
66 Wilcox

**90 - Montgomery Area**
01 Autauga
26 Elmore
43 Lowndes
51 Montgomery

**91 - Phenix City/ Troy Area**
03 Barbour
06 Bullock
41 Lee
44 Macon
55 Pike
57 Russell

**92 - Mobile Area**
02 Baldwin
49 Mobile

**93 - South Central Alabama**
07 Butler
18 Conecuh
20 Covington
21 Crenshaw
27 Escambia
50 Monroe

**94 - Dothan Area**
16 Coffee
23 Dale
31 Geneva
34 Henry
35 Houston

**95 - Statewide**
(You will be considered for vacancies throughout the state. Relocation may be necessary)

Please answer the following questions with care. List in the spaces provided those areas of the state in which you would accept employment You will be considered for employment only in the locations you indicate. You may choose a combination of up to three counties and/or regions from the list above. If you list a region, you will be considered available for all counties in that region. The counties in each region are listed alphabetically below the region. You will not be considered for jobs involving overnight travel or shift work unless you so indicate.

List the numbers of up to 3 counties and/or regions where you are willing to work _90 , 82 , 86_

If you want to be considered for appointment by only certain state agencies, indicate here _____

Will you accept work involving overnight travel? (✓) Yes   ( ) No          Will you accept part-time work?   (✓) Yes   ( ) No

Will you accept temporary work?   (✓) Yes   ( ) No

Which shifts are you willing to work?   0. (✓) all shifts   1. ( ) 1st only   2. ( ) 2nd only   3. ( ) 3rd only   4. ( ) 1st and 2nd only   5. ( ) 1st & 3rd only   6. ( ) 2nd & 3rd only

Enter the earliest date you will be available to interview for employment. (Your name will not appear on a list of eligibles until this date.) _____

Month     Day     Year

Form 3 - Revised November 1997

**APPLICATION FOR EXAMINATION**

DO NOT WRITE IN THIS SPACE

RETURN TO: STATE PERSONNEL DEPARTMENT
64 NORTH UNION STREET, SUITE 300
MONTGOMERY, ALABAMA 36130

AN EQUAL OPPORTUNITY EMPLOYER

ENTER SOCIAL SECURITY NUMBER BELOW.

**General Instructions**

A separate application is required for each job. Do not write in shaded areas. Complete all parts of the application. Applications not [illegible] ...

Defendants' Exhibit 98

---

Examination For Which You Are Applying (one per application)
*STATISTICIAN II - 11/02*

Option (if applicable)

Full Name  *GREGORY*        *N/A*        *KELLY*
           First            Middle       Last

Address  *6213  WILLOW  GLEN  DR*
         House or Apartment Number     Street

*MONTGOMERY,*   *AL*        *MONTGOMERY*        *36117*
City            State       County              Zip Code

Telephone Number: Home ( *205* ) *271-2478*     Work ( *205* ) *242-3524*
                  Area Code                      Area Code

The following information is required for governmental reporting or recordkeeping purposes:

Date of Birth  *11* . *28* . *56*     Sex (check one) 1. (✓) Male  2. ( ) Female
              (Month) (Day) (Year)

Race (check one) 1. ( ) White  2. (✓) Black  3. ( ) Hispanic  4. ( ) Asian or Pacific Islander  5. ( ) American Indian or Alaskan Native  6. ( ) Other

---

**EDUCATION:**
High School Graduate or GED? (✓) Yes ( ) No

CIRCLE OR BRACKET THE HIGHEST GRADE OF SCHOOL COMPLETED.

1 2 3 4 5 6 7 8 9 10 11 12  College 1 2 3 (4)   | ED | LC

PROVIDE INFORMATION ON ALL SCHOOLS ATTENDED. SPECIFY UNDERGRADUATE OR GRADUATE WORK.

| Name and Location of School | Dates of Attendance Month/Year From | To | Credit Hours Sem. | Qtr. | Did You Graduate? Yes | No | Type of Degree and Date | Major |
|---|---|---|---|---|---|---|---|---|
| *AUBURN  UNIV* | *9/75* | *12/79* | | | ✓ | | *BS* | *ENGINEERING* |
| *TROY  STATE  UNIV* | *9/87* | *12/90* | | | ✓ | | *MASTER* | *BUSINESS* |

PROFESSIONAL LICENSE OR CERTIFICATE

| License/Certificate Issued By | Field/Trade/Specialization | License/Certificate No. | Issue Date | Expiration Date |
|---|---|---|---|---|
| *N/A* | *N/A* | *N/A* | *N/A* | *N/A* |

LIST COURSES (AND HOURS) WHICH ARE PARTICULARLY RELATED TO THE POSITION (attach additional sheets, if needed).

*PLEASE   SEE   ATTACHED   LIST*

---

**CERTIFICATION STATEMENT**

I certify that all statements on or attached to this application are true and correct to the best of my knowledge. I know that any false statements may cause me to be denied the chance for testing, to be removed from an employment register, or to be released from employment. I will not discuss the test I have taken. I further authorize the release of all relevant prior employment, military service and criminal records. If employed I agree, consistent with applicable laws, to receive compensatory time off in lieu of overtime compensation for any overtime hours worked.

Signature  *Gregory Kelly*        Date  *4-7-98*

During the application process, including testing and employment consideration,

SOCIAL SECURITY NUMBER

Should you need testing accommodations due to a health problem or disability, you must contact the State Personnel Department.

Have you ever been involuntarily terminated, discharged, forced or asked to resign from any job?   (✓) Yes   ( ) No

If you answered Yes to the above question, attach an explanation on a separate sheet noting any mitigating or extenuating circumstances.

Have you ever been convicted of a misdemeanor or felony crime?   ( ) Yes   (✓) No

If you answered Yes to the above question, list in the space below all prior misdemeanor and felony convictions and any extenuating or mitigating circumstances regarding such convictions. If necessary, you may use a separate sheet or sheets and attach to application.

THE REASON(S) WERE UNKNOWN TO ME AT THE
TIME I WAS DISCHARGED. THE COMPANY WAS DOWNSIZING.

NOTE: A CRIMINAL CONVICTION WILL NOT NECESSARILY BE A BAR TO CONSIDERATION FOR EMPLOYMENT, EXCEPT THAT A FELONY CONVICTION WILL BAR EMPLOYMENT IN A LAW ENFORCEMENT JOB; THE DISCLOSURE OF A MISDEMEANOR CONVICTION WILL NOT AUTOMATICALLY RESULT IN DISQUALIFICATION. CRIMINAL HISTORIES WILL BE SUBMITTED TO THE NATIONAL CRIME INFORMATION CENTER (NCIC) FOR VERIFICATION. FAILURE TO DISCLOSE A CONVICTION MAY BE CONSIDERED AS GROUNDS FOR DISQUALIFICATION. FOR THESE REASONS, APPLICANTS SHOULD BE CAREFUL TO DISCLOSE ALL CRIMINAL CONVICTIONS.

## WORK HISTORY
### THIS SECTION MUST BE COMPLETED REGARDLESS OF WHETHER OR NOT A RESUME' IS ATTACHED.

Begin with your PRESENT or most recent employment. List in REVERSE ORDER periods of employment. Each time you changed jobs or your title changed should be listed as a separate period. Describe in detail your duties. (Attach additional sheets if needed.)

| 1. Current or Last Employer | MTGY COUNTY SCHOOL SYSTEM | | | Your Official Job Title | MATH TEACHER | | |
|---|---|---|---|---|---|---|---|
| Address | 70 WEST EDGEMONT | | | Type of Business | PUBLIC EDUCATION | | |

| FROM | | TO | | Total Months | Number of Hours Per Week | Beginning Salary | Ending Salary | May we contact your employer? |
|---|---|---|---|---|---|---|---|---|
| Month 2 | Year 98 | Month 4 | Year 98 | 2 | 40 | $29,200 Per YR | $29,200 Per YR | (✓) Yes   ( ) No |

Number/Title of Employees You Supervised On a Continuing Basis: NONE    Equipment You Operated: N/A

Name, Title and Telephone Number of Supervisor: MR. W.C. HARVEY    Reason for Leaving: ACCEPTED JOB WITH STATE OF ALA    240-4462

Describe Your Duties in Detail

I WAS A MATH TEACHER FOR JUNIOR HIGH SCHOOL STUDENTS. (8th AND 9th GRADERS)

| 2. Employer | AUDRA/ASHELEY'S BEAUTY CENTER | | | Your Official Job Title | OWNER | | |
|---|---|---|---|---|---|---|---|
| Address | 789 SOUTH COURT ST | | | Type of Business | SALON BUSINESS | | |

| FROM | | TO | | Total Months | Number of Hours Per Week | Beginning Salary | Ending Salary | May we contact your employer? |
|---|---|---|---|---|---|---|---|---|
| Month 9 | Year 95 | Month 10 | Year 97 | 25 | 50 | $ N/A Per | $ N/A Per | N/A (✓) Yes   ( ) No |

Number/Title of Employees You Supervised On a Continuing Basis: N/A (SELF)    Equipment You Operated: N/A

Name, Title and Telephone Number of Supervisor: NONE    Reason for Leaving: BUSINESS CLOSED

Describe Your Duties in Detail

I OWNED AND OPERATED A BEAUTY SALON BUSINESS. THE BUSINESS EMPLOYED HAIR STYLISTS AND NAIL TECHS.

SOCIAL SECURITY NUMBER ~~████████████~~

| 3. Employer | ALA POWER CO | | | | Your Official Job Title | SENIOR ENGINEER |
|---|---|---|---|---|---|---|
| Address | 240 DEXTER AVE | | | | Type of Business | ELECTRIC UTILITY |

| FROM | | TO | | Total Months | Number of Hours Per Week | Beginning Salary | Ending Salary | May we contact your employer? |
|---|---|---|---|---|---|---|---|---|
| Month 12 | Year 79 | Month 9 | Year 93 | | 40 | $ 19,500 Per YR | $ 38,000 Per YR | (✗) Yes ( ) No |

**Number/Title of Employees You Supervised On a Continuing Basis** NONE

**Equipment You Operated** COMPUTERS / ELECTRONIC EQUIP

**Name, Title and Telephone Number of Supervisor** MR. JOHN JOHNSON

**Reason for Leaving** DOWNSIZING / TERMINATED

**Describe Your Duties in Detail**
I WAS AN ELECTRICAL ENGINEER IN THE POWER DISTRIBUTION SECTION IN THE MONTGOMERY DISTRICT. I WAS RESPONSIBLE FOR PROVIDING SERVICE TO NEW HOME AND BUSINESS IN THE MONTGOMERY DISTRICT SERVICE AREA.

| 4. Employer | N/A | | | | Your Official Job Title | |
|---|---|---|---|---|---|---|
| Address | | | | | Type of Business | |

| FROM | | TO | | Total Months | Number of Hours Per Week | Beginning Salary | Ending Salary | May we contact your employer? |
|---|---|---|---|---|---|---|---|---|
| Month | Year | Month | Year | | | $ Per | $ Per | (.) Yes ( ) No |

**Number/Title of Employees You Supervised On a Continuing Basis**

**Equipment You Operated**

**Name, Title and Telephone Number of Supervisor**

**Reason for Leaving**

**Describe Your Duties in Detail**

| 5. Employer | N/A | | | | Your Official Job Title | |
|---|---|---|---|---|---|---|
| Address | | | | | Type of Business | |

| FROM | | TO | | Total Months | Number of Hours Per Week | Beginning Salary | Ending Salary | May we contact your employer? |
|---|---|---|---|---|---|---|---|---|
| Month | Year | Month | Year | | | $ Per | $ Per | ( ) Yes ( ) No |

**Number/Title of Employees You Supervised On a Continuing Basis**

**Equipment You Operated**

**Name, Title and Telephone Number of Supervisor**

**Reason for Leaving**

**Describe Your Duties in Detail**

6. USING THE ABOVE FORMAT, SHOW OTHER EXPERIENCE BY USING ADDITIONAL SHEETS.

References: At the time of interview, you may be asked to furnish names and addresses of reliable persons, not relatives or present employer, who know you well enough to give information about you.

SOCIAL SECURITY NUMBER : 

## COMPLETE THIS SECTION IF YOU ARE CLAIMING VETERAN'S PREFERENCE

If you claim Veteran's Preference, check the type below. Attach copies (which will not be returned) of the required documents to your application to support your claim.

1 ( ) Veteran (5 points) - Requires DD214 or document showing dates of service and type of discharge. If this has been submitted previously and is on file with this office, you may disregard this requirement.

2 ( ) Disabled Veteran (10 points) - Requires DD214 or other document as above and letter of disability from V.A. dated within last 6 months. V.A. letter must be kept updated until register is established or you lose the extra 5 points.

3 ( ) Deceased Veteran's spouse (10 points) - Requires DD214 or other document as above and marriage and death certificates. Cannot be claimed if spouse remarries.

4 ( ) Disabled Veteran's spouse (10 points) - Requires DD214 or other document as above and V.A. letter of disability dated within last 6 months. Cannot be claimed unless still married to disabled veteran.

5 ( ) Permanently Disabled Veteran (10 points) - Requires DD214 or other document as above indicating veteran is permanently disabled or DD214 or other document and V.A. letter indicating permanent disability.

## COMPLETE THIS SECTION IN ORDER TO BE SCHEDULED FOR WRITTEN EXAMS

Written exams will be given in the places below for which a sufficient number of applicants express preference. Indicate by number your 1st, 2nd and 3rd choices.

1 ( ) Alexander City        3 ( ) Birmingham        5 ( ) Dothan        7 ( ) Linden        9 ( ) Montgomery        12 ( ) Tuscaloosa
2 ( ) Andalusia        4 ( ) Decatur        6 ( ) Jacksonville        8 ( ) Mobile        10 ( ) Selma

If you qualify, you will receive a notice showing the place and time you are to report for the exam.

### Where did you learn of this job? (check all that apply)

1 ( ) State Employment Service        5 ( ) Friend/Relative        9 ( ) Legislative Representative        13 ( ) TV/Radio Commercial
2 ( ) Job Announcement Notice        6 ( ) Dept. News Bulletin        10 ( ) State Recruiter/Counselor        14 ( ) Other
3 ( ) Newspaper        7 ( ) Rehabilitation Services        11 ( ) State Personnel Dept. Information Board
4 ( ) College Placement/Career Office        8 ( ) High School Counselor        12 ( ) Outreach Program (i.e. Church)

## AVAILABILITY

81 - Northwest Alabama
17 Colbert
30 Franklin
39 Lauderdale
40 Lawrence

84 - Jasper/ Winfield Area
29 Fayette
38 Lamar
47 Marion
64 Walker
67 Winston

87 - East Central Alabama
08 Calhoun
09 Chambers
14 Clay
15 Cleburne
19 Coosa
56 Randolph
61 Talladega
62 Tallapoosa

90 - Montgomery Area
01 Autauga
26 Elmore
43 Lowndes
51 Montgomery

93 - South Central Alabama
07 Butler
18 Conecuh
20 Covington
21 Crenshaw
27 Escambia
50 Monroe

82 - Huntsville/ Decatur Area
36 Jackson
42 Limestone
45 Madison
48 Marshall
52 Morgan

85 - Tuscaloosa Area
04 Bibb
32 Greene
33 Hale
54 Pickens
60 Sumter
63 Tuscaloosa

88 - Southwest Alabama
12 Choctaw
13 Clarke
46 Marengo
65 Washington

91 - Phenix City/ Troy Area
03 Barbour
06 Bullock
41 Lee
44 Macon
55 Pike
57 Russell

94 - Dothan Area
16 Coffee
23 Dale
31 Geneva
34 Henry
35 Houston

83 - Northeast Alabama
10 Cherokee
25 DeKalb
28 Etowah

86 - Birmingham Area
05 Blount
22 Cullman
37 Jefferson
58 Shelby
59 St. Clair

89 - Selma/Clanton Area
11 Chilton
24 Dallas
53 Perry
66 Wilcox

92 - Mobile Area
02 Baldwin
49 Mobile

95 - Statewide
(You will be considered for vacancies throughout the state. Relocation may be necessary)

Please answer the following questions with care. List in the spaces provided those areas of the state in which you would accept employment. You will be considered for employment only in the locations you indicate. You may choose a combination of up to three counties and/or regions from the list above. If you list a region, you will be considered available for all counties in that region. The counties in each region are listed alphabetically below the region. You will not be considered for jobs involving overnight travel or shift work unless you so indicate.

List the numbers of up to 3 counties and/or regions where you are willing to work    90, 82, 86

If you want to be considered for appointment by only certain state agencies, indicate here

Will you accept work involving overnight travel?    (✓) Yes    ( ) No        Will you accept part-time work?    (✓) Yes    ( ) No

Will you accept temporary work?    (✓) Yes    ( ) No

Which shifts are you willing to work?    0. (✓) all shifts    1. ( ) 1st only    2. ( ) 2nd only    3. ( ) 3rd only    4. ( ) 1st and 2nd only    5. ( ) 1st & 3rd only    6. ( ) 2nd & 3rd only

Enter the earliest date you will be available to interview for employment. (Your name will not appear on a list of eligibles until this date.)    _____ _____ _____
                                                                                                                                                          Month    Day    Year

**APPLICATION FOR EXAMINATION**

DO NOT WRITE IN THIS SPACE

**RECEIVED**

2002 MAR 12 P 1:32

PERSONNEL DEPARTMENT
STATE OF ALABAMA

RETURN TO: STATE OF ALABAMA
PERSONNEL DEPARTMENT
64 NORTH UNION STREET
P O BOX 304100
MONTGOMERY, ALABAMA 36130-4100

AN EQUAL OPPORTUNITY EMPLOYER

ENTER SOCIAL SECURITY NUMBER BELOW.

General Instructions

A separate application is required for each job. Do not write in shaded areas. Complete all parts of the application. Applications not pr[...] [...]ed.

Defendants'
Exhibit 99

Examination For Which You Are Applying (one per application)   20521  009   Option (if applicable)

Utilities Engineering Specialist I - 20521   Energy option - 009

Full Name   Gregory                              Kelly
First          Middle          Last

Address   10215 Willow Glen Drive
House or Apartment Number          Street

Montgomery          Alabama          Montgomery Co.   51   36117
City                State                County            Zip Code

Telephone Number: Home (334) 271-2478        Work (334) 242-3524
                  Area Code                   Area Code

The following information is required for governmental reporting or recordkeeping purposes:

Date of Birth   11    28    56        Sex (check one) 1. (X) Male   2. ( ) Female
              (Month) (Day) (Year)

Race (check one) 1. ( ) White   2. (X) Black   3. ( ) Hispanic   4. ( ) Asian or Pacific Islander   5. ( ) American Indian or Alaskan Native   6. ( ) Other

**EDUCATION:**   CIRCLE OR BRACKET THE HIGHEST GRADE OF SCHOOL COMPLETED.   ED 70
High School Diploma or GED? (X) Yes ( ) No   1 2 3 4 5 6 7 8 9 10 11 12   College 1 2 3 (4)   EE 123

PROVIDE INFORMATION ON ALL SCHOOLS ATTENDED. SPECIFY UNDERGRADUATE OR GRADUATE WORK.

| Name and Location of School | Dates of Attendance Month/Year From | To | Credit Hours Sem. | Qtr. | Did You Graduate? Yes | No | Type of Degree and Date | Major |
|---|---|---|---|---|---|---|---|---|
| Troy State University / Mtgy | 9-87 | 12-90 | | | X | | Business | MBA |
| Auburn University / Auburn | 9-75 | 12-79 | | | X | | Engineering | BSEE |

PROFESSIONAL LICENSE OR CERTIFICATE

| License/Certificate Issued By | Field/Trade/Specialization | License/Certificate No. | Issue Date | Expiration Date |
|---|---|---|---|---|
| n/a | n/a | n/a | n/a | n/a |
| n/a | n/a | n/a | n/a | n/a |

LIST COURSES (AND HOURS) WHICH ARE PARTICULARLY RELATED TO THE POSITION (attach additional sheets, if needed).

| | | |
|---|---|---|
| Comm. System | EE-243 Linear Feedback | EE-351 Linear Sys. | EE-362 |
| Comm. Theory | EE-441 Electro. Sys. | EE-371 | |

**CERTIFICATION STATEMENT**

I certify that all statements on or attached to this application are true and correct to the best of my knowledge. I know that any false statements may cause me to be denied the chance for testing, to be removed from an employment register, or to be released from employment. I will not discuss the test I have taken. I further authorize the release of all relevant prior employment, military service, academic/school and criminal records. If employed I agree, consistent with applicable laws, to receive compensatory time off in lieu of overtime compensation for any overtime hours worked.

Signature   Gregory Kelly        Date   3-11-2002

During the application process, including testing and employment consideration, your name may be removed from an employment register for any disqualifying reason.

SOCIAL SECURITY NUMBER :

List three reliable persons, not relatives or present employer, who know you well enough to give information about you.

| NAME | ADDRESS AND PHONE NUMBER | CC EMPLOYER |
|---|---|---|
| Mr. John Dixon | 5919 Balmoral Dr. Montgy. 277-0881 | South Central Bell |
| Ms. Cornia Judkins | 3245 Raintree Dr. Montgy 284-5812 | Mtg. Housing Authority |
| Ms. Carole Burton | 27 West ogden avenue Mtgy. 269-0311 | State of alabama - DHR |

Should you need testing accommodations due to a health problem or disability, you must contact the State Personnel Department.

Have you ever been involuntarily terminated, discharged, forced or asked to resign from any job?  (X) Yes  ( ) No

If you answered Yes to the above question, attach an explanation on a separate sheet noting any mitigating or extenuating circumstances.
The company was downsizing.

Have you ever been convicted of a misdemeanor or felony crime?  ( ) Yes  (X) No

If you answered Yes to the above question, list in the space below all prior misdemeanor and felony convictions and any extenuating or mitigating circumstances regarding such convictions.  If necessary, you may use a separate sheet or sheets and attach to application.

N/a

NOTE: A CRIMINAL CONVICTION WILL NOT NECESSARILY BE A BAR TO CONSIDERATION FOR EMPLOYMENT, EXCEPT THAT A FELONY CONVICTION WILL BAR EMPLOYMENT IN A LAW ENFORCEMENT JOB;  THE DISCLOSURE OF A MISDEMEANOR CONVICTION WILL NOT AUTOMATICALLY RESULT IN DISQUALIFICATION.  CRIMINAL HISTORIES WILL BE SUBMITTED TO THE NATIONAL CRIME INFORMATION CENTER (NCIC) FOR VERIFICATION.  FAILURE TO DISCLOSE A CONVICTION MAY BE CONSIDERED AS GROUNDS FOR DISQUALIFICATION. FOR THESE REASONS, APPLICANTS SHOULD BE CAREFUL TO DISCLOSE ALL CRIMINAL CONVICTIONS.

## WORK HISTORY
### THIS SECTION MUST BE COMPLETED REGARDLESS OF WHETHER OR NOT A RESUME' IS ATTACHED.

Begin with your PRESENT or most recent employment. List in REVERSE ORDER periods of employment. Each time you changed jobs or your title changed should be listed as a separate period. Describe in detail your duties. (Attach additional sheets if needed.)

1. Current or Last Employer State of alabama - DHR
Your Official Job Title Statistician
Address 50 Ripley Street - Gordan Persons Bldg.
Type of Business State Government

| FROM | | TO | | Total Months | Number of Hours Per Week | Beginning Salary | Ending Salary | May we contact your employer? |
|---|---|---|---|---|---|---|---|---|
| Month 4 | Year 98 | Month Present | Year | 45 | 40 | $ 22K Per Yr. | $ 30K Per Yr. | (X) Yes  ( ) No |

Number/Title of Employees You Supervised On a Continuing Basis none
Equipment You Operated office equipment, computers, etc.

Name; Title and Telephone Number of Supervisor Mr. Wayne Scott - Chief Statistician
Reason for Leaving presently employed

Describe Your Duties in Detail
- Gather and analyze reports and statistical data.
- Write, review, maintain, and revise statistical spreadsheets.
- Coordinate and review statistical work sampling data for various state agencies and counties.

SOCIAL SECURITY NUMBER : ███████████

| 2. Employer Audra & Asheley's Inc. | | | | | Your Official Job Title President and owner | | |
|---|---|---|---|---|---|---|---|
| Address 789 South Court Street Montgomery, AL | | | | | Type of Business Retail and leasing | | |
| FROM Month 9 Year 93 | TO Month 4 Year 98 | Total Months 53 | Number of Hours Per Week 105 | Beginning Salary $ N/a Per N/a | Ending Salary $ N/a Per N/a | May we contact your employer? N/a Yes ( ) No | |
| Number/Title of Employees You Supervised On a Continuing Basis Twelve (12) - Beauty consultants | | | | | Equipment You Operated Office equipment, computers, etc. | | |
| Name, Title and Telephone Number of Supervisor Self-employed | | | | | Reason for Leaving Business closed | | |
| Describe Your Duties in Detail | | | | | | | |

- Created and established Audra & Asheley's Inc.
- Provided retail store services for the beauty consulting industry.
- Leased office space for professional beauty consultants.

| 3. Employer Alabama Power Company | | | | | Your Official Job Title Senior Engineer | | |
|---|---|---|---|---|---|---|---|
| Address 240 Dexter Avenue | | | | | Type of Business Electric Utility | | |
| FROM Month 12 Year 79 | TO Month 9 Year 93 | Total Months 177 | Number of Hours Per Week 50 | Beginning Salary $ 19.5K Per yr. | Ending Salary $ 40K Per yr. | May we contact your employer? (X) Yes (..) No | |
| Number/Title of Employees You Supervised On a Continuing Basis Eight (8) - Linemen | | | | | Equipment You Operated Office equipment, computers, etc. | | |
| Name, Title and Telephone Number of Supervisor Mr. John Johnson - Superintendent | | | | | Reason for Leaving Company downsizing | | |
| Describe Your Duties in Detail | | | | | | | |

- Commission load-flow studies.
- Employed system demand studies.
- Modified and installed switch capacitors, pulse metering, fuse protection and transformation equipment.

| 4. Employer | | | | | Your Official Job Title | | |
|---|---|---|---|---|---|---|---|
| Address | | | | | Type of Business | | |
| FROM Month Year | TO Month Year | Total Months | Number of Hours Per Week | Beginning Salary $ Per | Ending Salary $ Per | May we contact your employer? ( ) Yes ( ) No | |
| Number/Title of Employees You Supervised On a Continuing Basis | | | | | Equipment You Operated | | |
| Name, Title and Telephone Number of Supervisor | | | | | Reason for Leaving | | |
| Describe Your Duties in Detail | | | | | | | |

5. USING THE ABOVE FORMAT, SHOW OTHER EXPERIENCE BY USING ADDITIONAL SHEETS.

## COMPLETE THIS SECTION IF YOU ARE CLAIMING VETERAN'S PREFERENCE

If you claim Veteran's Preference, check the type below. Attach copies (which will not be returned) of the required documents to your application to support your claim.

1 ( ) Veteran (5 points) - Requires DD214 or document showing dates of service and type of discharge. If this has been submitted previously and is on file with this office, you may disregard this requirement.

2 (X) Disabled Veteran (10 points) - Requires DD214 or other document as above and letter of disability from V.A. dated within last 6 months. V.A. letter must be kept updated until register is established or you lose the extra 5 points.

3 ( ) Deceased Veteran's spouse (10 points) - Requires DD214 or other document as above and marriage and death certificates. Cannot be claimed if spouse remarries.

4 ( ) Disabled Veteran's spouse (10 points) - Requires DD214 or other document as above and V.A. letter of disability dated within last 6 months. Cannot be claimed unless still married to disabled veteran.

5 ( ) Permanently Disabled Veteran (10 points) - Requires DD214 or other document as above indicating veteran is permanently disabled or DD214 or other document and V.A. letter indicating permanent disability.

## COMPLETE THIS SECTION IN ORDER TO BE SCHEDULED FOR WRITTEN EXAMS

Written exams will be given in the places below for which a sufficient number of applicants express preference. Indicate by number your 1st, 2nd and 3rd choices.

1 ( ) Alexander City     3 ( ) Birmingham     5 ( ) Dothan     7 ( ) Linden     9 (X) Montgomery     12 ( ) Tuscaloosa
2 ( ) Andalusia          4 ( ) Decatur        6 ( ) Jacksonville  8 ( ) Mobile     10 ( ) Selma

If you qualify, you will receive a notice showing the place and time you are to report for the exam.

### Where did you learn of this job? (check all that apply)

| | | |
|---|---|---|
| 1 ( ) State Employment Service | 5 ( ) Friend/Relative | 9 ( ) Legislative Representative | 13 ( ) TV/Radio Commercial |
| 2 (X) Job Announcement Notice | 6 ( ) Dept. News Bulletin | 10 ( ) State Recruiter/Counselor | 14 ( ) Other _____ |
| 3 ( ) Newspaper | 7 ( ) Rehabilitation Services | 11 ( ) State Personnel Dept. Information Board | 15 ( ) State Personnel Dept. Website |
| 4 ( ) College Placement/Career Office | 8 ( ) High School Counselor | 12 ( ) Outreach Program (i.e. Church) | 16 ( ) Other Website |

## AVAILABILITY

81 - Northwest Alabama
17 Colbert
30 Franklin
39 Lauderdale
40 Lawrence

84 - Jasper/Winfield Area
29 Fayette
38 Lamar
47 Marion
64 Walker
67 Winston

87 - East Central Alabama
08 Calhoun
09 Chambers
14 Clay
15 Cleburne
19 Coosa
56 Randolph
61 Talladega
62 Tallapoosa

90 - Montgomery Area
01 Autauga
26 Elmore
43 Lowndes
51 Montgomery

93 - South Central Alabama
07 Butler
18 Conecuh
20 Covington
21 Crenshaw
27 Escambia
50 Monroe

82 - Huntsville/Decatur Area
36 Jackson
42 Limestone
45 Madison
48 Marshall
52 Morgan

85 - Tuscaloosa Area
04 Bibb
32 Greene
33 Hale
54 Pickens
60 Sumter
63 Tuscaloosa

88 - Southwest Alabama
12 Choctaw
13 Clarke
46 Marengo
65 Washington

91 - Phenix City/Troy Area
03 Barbour
06 Bullock
41 Lee
44 Macon
55 Pike
57 Russell

94 - Dothan Area
16 Coffee
23 Dale
31 Geneva
34 Henry
35 Houston

83 - Northeast Alabama
10 Cherokee
25 DeKalb
28 Etowah

86 - Birmingham Area
05 Blount
22 Cullman
37 Jefferson
58 Shelby
59 St. Clair

89 - Selma/Clanton Area
11 Chilton
24 Dallas
53 Perry
66 Wilcox

92 - Mobile Area
02 Baldwin
49 Mobile

95 - Statewide (You will be considered for vacancies throughout the state. Relocation may be necessary)

Please answer the following questions with care. List in the spaces provided those areas of the state in which you would accept employment. You will be considered for employment only in the locations you indicate. You may choose a combination of up to three counties and/or regions from the list above. If you list a region, you will be considered available for all counties in that region. The counties in each region are listed alphabetically below the region. You will not be considered for jobs involving overnight travel or shift work unless you so indicate.

List the numbers of up to 3 counties and/or regions where you are willing to work    90    91    89

If you want to be considered for appointment by only certain state agencies, indicate here    N/A

Will you accept work involving overnight travel? (X) Yes  ( ) No     Will you accept part-time work?  ( ) Yes  (X) No

Will you accept temporary work?  ( ) Yes  (X) No

Which shifts are you willing to work?  0. ( ) all shifts  1. ( ) 1st only  2. ( ) 2nd only  3. ( ) 3rd only  4. ( ) 1st and 2nd only  5. ( ) 1st & 3rd only  6. ( ) 2nd & 3rd only

Enter the earliest date you will be available to interview for employment. (Your name will not appear on a list of eligibles until this date.)    4    11    2002
                                                                                                                                       Month  Day  Year

NOTE:   Your name will be placed on inactive status for this class after declining three offers of employment consideration or failing to reply to an agency's inquiry concerning your availability. Your name may be restored to the active register by written request.

Gregory Kelly
6213 Willow Glen Dr.
Montgomery, AL 36117                    Daytime Phone: 334-242-3524
Home Phone: 334-271-2478
E-mail gkelly6213@aol.com

**Objective**     To become involved in engineering management or become an engineer in a computer information system, electro-mechanical, electronic firm, government agency, or utility company.

**Experience**    1998-present  State of Alabama (D. H. R.)  Montgomery, AL
**Statistician**
- Gather and analyze reports and statistical data.
- Write, review, maintain, and revise statistical spreadsheets.
- Coordinate and review statistical work sampling data for various state agencies and countries.

1993-1998   Audra and Asheley's Inc.    Montgomery, AL
**President and Owner**
- Create and establish Audra and Asheley's Inc.
- Provide retail store services for beauty consulting industry.
- Lease office space for professional beauty consultants.

1982-1993   Alabama Power Company   Montgomery, AL
**Senior Electric Engineer**
- Commission load flow study analysis to determine system load, power factor and large industrial customers' source side load.
- Commission system analysis for the purpose of managing and forecasting alternative energy solutions.
  - Determine efficiencies of off peak loading plans
  - Conduct feasibility studies for the use of co-generation, and micro-turbine technology.
- Employ system demand studies and cost accounting analysis to budget, forecast, rank and determine capital improvement projects.
- Commission fault current studies to determine grounding and system protection requirements to improve system efficiencies.
- Employ metering and testing equipment to balance and phase the steady state voltage output of system generation equipment
- Modify and install switch capacitors to improve power factor, KVAR load flow, and system demand requirement.
- Install and modify pulse metering systems to manage system and customers' demand requirements.

- Provide technical assistance to customers' power quality question.
  - Install and modify full and half wave filters to correct harmonic distortion and improve system efficiency.
  - Install and modify distribution fuse system to coordinate with customers' synchronous motors, switch gear and HVAC equipment

1979-1982    Alabama Power Company    Montgomery, AL
**Junior Electrical Engineer**
- Supervise construction of underground and aerial cable installation for the purpose of meeting present and future demand requirements.
- Install step-up and step-down transformation to improve current flow and stabilize voltage output to improve system reliability.
- Prepare and review bid speculations from general contractors.
- Communicate with the public the issues which define the electrical utility industry ( i.e. The National Safety Code requirements, safety and health standards, chemical control and hazard communication regulations).
- Commission motor flicker studies and system voltage drop analysis for the purpose of determining the correct system protection and motor starter size equipment.

**Education**    December, 1990    Troy State University    Montgomery, AL
- MBA

December, 1979    Auburn University    Auburn, AL
- B.S., Electrical Engineering

**References**    **Carol Burton**    Department of Human Resources    Staff Manager
**Phone Number:**    334-269-0111 (Montgomery)
**Reference Type:**    Professional

**John Dixon**    South Central Bell    Engineer/ Designer
**Phone Number:**    334-277-6881   (Montgomery)
**Reference Type:**    Professional

**Coella Judkins**    Alabama Housing Financial Authority    Staff Manager
**Phone Number:**    334-284-5812 (Montgomery)
**Reference Type:**    Professional

# APPLICATION FOR EXAMINATION

RETURN TO: STATE OF ALABAMA
PERSONNEL DEPARTMENT
64 NORTH UNION STREET
P O BOX 304100
MONTGOMERY, ALABAMA 36130-4100

AN EQUAL OPPORTUNITY EMPLOYER

ENTER SOCIAL SECURITY NUMBER BELOW.

**General Instructions**

A separate application is required for each job. Do not write in shaded areas. Complete all parts of the application. Applications not pr... ... Appli...
P... ... ...bli-

**DO NOT WRITE IN THIS SPACE**

**RECEIVED**

2002 MAR 12  P 1:32

PERSONNEL DEPARTMENT
STATE OF ALABAMA

Defendants' Exhibit 99

---

**Examination For Which You Are Applying (one per application)** 20521 009   Option (if applicable) Energy Option - 009

Utilities Engineering Specialist I - 20521

Full Name **Gregory** (First)   Middle   **Kelly** (Last)

Address **10215 Willow Glen Drive**
House or Apartment Number   Street

**Montgomery** (City)   **Alabama** (State)   **Montgomery Co.** (County)   51   **36117** (Zip Code)

Telephone Number: Home (**334**) **271-2478**   Work (**334**) **242-3524**
Area Code   Area Code

The following information is required for governmental reporting or recordkeeping purposes:

Date of Birth **11** (Month) **28** (Day) **56** (Year)   Sex (check one) 1. (X) Male 2. ( ) Female

Race (check one) 1. ( ) White 2. (X) Black 3. ( ) Hispanic 4. ( ) Asian or Pacific Islander 5. ( ) American Indian or Alaskan Native 6. ( ) Other

---

**EDUCATION:**

High School Diploma or GED? (X) Yes ( ) No

CIRCLE OR BRACKET THE HIGHEST GRADE OF SCHOOL COMPLETED.

1 2 3 4 5 6 7 8 9 10 11 12 College 1 2 3 (4)   ED 70 EC 120

PROVIDE INFORMATION ON ALL SCHOOLS ATTENDED. SPECIFY UNDERGRADUATE OR GRADUATE WORK.

| Name and Location of School | Dates of Attendance Month/Year From | To | Credit Hours Sem. | Qtr. | Did You Graduate? Yes | No | Type of Degree and Date | Major |
|---|---|---|---|---|---|---|---|---|
| Troy State University / Mtgy | 9-87 | 12-90 | | | X | | Business | MBA |
| Auburn University / Auburn | 9-75 | 12-79 | | | X | | Engineering | BSEE |

PROFESSIONAL LICENSE OR CERTIFICATE

| License/Certificate Issued By | Field/Trade/Specialization | License/Certificate No. | Issue Date | Expiration Date |
|---|---|---|---|---|
| n/a | n/a | n/a | n/a | n/a |
| n/a | n/a | n/a | n/a | n/a |

LIST COURSES (AND HOURS) WHICH ARE PARTICULARLY RELATED TO THE POSITION (attach additional sheets, if needed).

Comm. System   EE-243 Linear Feedback   EE-351 Linear Sys.   EE-362
Comm. Theory   EE-441 Electro. Sys.   EE-371

---

## CERTIFICATION STATEMENT

I certify that all statements on or attached to this application are true and correct to the best of my knowledge. I know that any false statements may cause me to be denied the chance for testing, to be removed from an employment register, or to be released from employment. I will not discuss the test I have taken. I further authorize the release of all relevant prior employment, military service, academic/school and criminal records. If employed I agree, consistent with applicable laws, to receive compensatory time off in lieu of overtime compensation for any overtime hours worked.

Signature *Gregory Kelly*   Date **3-11-2002**

During the application process, including testing and employment consideration, your name may be removed from an employment register for any disqualifying reason.

SOCIAL SECURITY NUMBER : ~~[redacted]~~

List three reliable persons, not relatives or present employer, who know you well enough to give information about you.

| NAME | ADDRESS AND PHONE NUMBER | EMPLOYER |
|---|---|---|
| MR. John Dixon | 5919 Balmoral Dr. Montgy, 277-0881 | South Central Bell |
| MS. Coella Judkins | 3245 Raintree Dr. Montgy 284-5812 | Mtg. Housing Authority |
| MS. Carole Burton | 27 West ogden avenue Mtgy, 269-0311 | State of alabama- DHR |

Should you need testing accommodations due to a health problem or disability, you must contact the State Personnel Department.

Have you ever been involuntarily terminated, discharged, forced or asked to resign from any job?    (X) Yes    ( ) No

If you answered Yes to the above question, attach an explanation on a separate sheet noting any mitigating or extenuating circumstances.

The company was downsizing.

Have you ever been convicted of a misdemeanor or felony crime?    ( ) Yes    (X) No

If you answered Yes to the above question, list in the space below all prior misdemeanor and felony convictions and any extenuating or mitigating circumstances regarding such convictions. If necessary, you may use a separate sheet or sheets and attach to application.

N/a

NOTE: A CRIMINAL CONVICTION WILL NOT NECESSARILY BE A BAR TO CONSIDERATION FOR EMPLOYMENT, EXCEPT THAT A FELONY CONVICTION WILL BAR EMPLOYMENT IN A LAW ENFORCEMENT JOB; THE DISCLOSURE OF A MISDEMEANOR CONVICTION WILL NOT AUTOMATICALLY RESULT IN DISQUALIFICATION. CRIMINAL HISTORIES WILL BE SUBMITTED TO THE NATIONAL CRIME INFORMATION CENTER (NCIC) FOR VERIFICATION. FAILURE TO DISCLOSE A CONVICTION MAY BE CONSIDERED AS GROUNDS FOR DISQUALIFICATION. FOR THESE REASONS, APPLICANTS SHOULD BE CAREFUL TO DISCLOSE ALL CRIMINAL CONVICTIONS.

## WORK HISTORY
### THIS SECTION MUST BE COMPLETED REGARDLESS OF WHETHER OR NOT A RESUME' IS ATTACHED.

Begin with your PRESENT or most recent employment. List in REVERSE ORDER periods of employment. Each time you changed jobs or your title changed should be listed as a separate period. Describe in detail your duties. (Attach additional sheets if needed.)

| 1. Current or Last Employer State of alabama- DHR | | | | Your Official Job Title Statistician | | |
|---|---|---|---|---|---|---|
| Address 50 Ripley Street - Gordan Persons Bldg. | | | | Type of Business State Government | | |

| FROM | | TO | | Total Months | Number of Hours Per Week | Beginning Salary | Ending Salary | May we contact your employer? |
|---|---|---|---|---|---|---|---|---|
| Month 4 | Year 98 | Month PRESENT | Year | 45 | 40 | $ 22K Per YR. | $ 30K Per YR. | (X) Yes    ( ) No |

Number/Title of Employees You Supervised On a Continuing Basis: none    Equipment You Operated: office equipment, computers, etc.

Name, Title and Telephone Number of Supervisor: Mr. Wayne Scott - Chief Statistician    Reason for Leaving: presently employed

Describe your Duties in Detail:
- Gather and utilize reports and statistical data.
- Write, review, maintain, and revise statistical spreadsheets.
- Coordinate and review statistical work sampling data for various state agencies and counties.

SOCIAL SECURITY NUMBER : ▬▬▬▬▬▬▬▬▬

| 2. Employer | | | | Your Official Job Title | | | |
|---|---|---|---|---|---|---|---|
| Audra & Asheley's Inc. | | | | President and owner | | | |
| Address | | | | Type of Business | | | |
| 789 South Court Street Montgomery, AL | | | | Retail and leasing | | | |

| FROM | | TO | | Total Months | Number of Hours Per Week | Beginning Salary | Ending Salary | May we contact your employer? |
|---|---|---|---|---|---|---|---|---|
| Month 9 | Year 93 | Month 4 | Year 98 | 53 | 05 | $ N/a Per N/a | $ N/a Per N/a | N/a ( ) Yes ( ) No |

| Number/Title of Employees You Supervised On a Continuing Basis | Twelve (12) - Beauty consultants | Equipment You Operated | Office equipment, computers, etc. |
|---|---|---|---|
| Name, Title and Telephone Number of Supervisor | Self-employed | Reason for Leaving | Business closed |

Describe Your Duties in Detail

—Created and established Audra & Asheley's Inc.
—Provided retail store services for the beauty consulting industry.
—Leased office space for professional beauty consultants.

| 3. Employer | | | | Your Official Job Title | | | |
|---|---|---|---|---|---|---|---|
| Alabama Power Company | | | | Senior Engineer | | | |
| Address | | | | Type of Business | | | |
| 240 Dexter Avenue | | | | Electric Utility | | | |

| FROM | | TO | | Total Months | Number of Hours Per Week | Beginning Salary | Ending Salary | May we contact your employer? |
|---|---|---|---|---|---|---|---|---|
| Month 12 | Year 79 | Month 9 | Year 93 | 177 | 50 | $ 19.5K Per Yr. | $ 40K Per Yr. | (X) Yes ( ) No |

| Number/Title of Employees You Supervised On a Continuing Basis | Eight (8) - Linemen | Equipment You Operated | Office equipment, computers, etc. |
|---|---|---|---|
| Name, Title and Telephone Number of Supervisor | Mr. John Johnson-Superintendent | Reason for Leaving | Company downsizing |

Describe Your Duties in Detail

—Commission load-flow studies.
—Employed system demand studies.
—Modified and installed switch capacitors, pulse metering, fuse protection and transformation equipment.

| 4. Employer | | | | Your Official Job Title | | | |
|---|---|---|---|---|---|---|---|
| | | | | | | | |
| Address | | | | Type of Business | | | |
| | | | | | | | |

| FROM | | TO | | Total Months | Number of Hours Per Week | Beginning Salary | Ending Salary | May we contact your employer? |
|---|---|---|---|---|---|---|---|---|
| Month | Year | Month | Year | | | $ Per | $ Per | ( ) Yes ( ) No |

| Number/Title of Employees You Supervised On a Continuing Basis | | Equipment You Operated | |
|---|---|---|---|
| Name, Title and Telephone Number of Supervisor | | Reason for Leaving | |

Describe Your Duties in Detail

5. USING THE ABOVE FORMAT, SHOW OTHER EXPERIENCE BY USING ADDITIONAL SHEETS.

## COMPLETE THIS SECTION IF YOU ARE CLAIMING VETERAN'S PREFERENCE

If you claim Veteran's Preference, check the type below. Attach copies (which will not be returned) of the required documents to your application to support your claim.

1 ( )  Veteran (5 points) - Requires DD214 or document showing dates of service and type of discharge. If this has been submitted previously and is on file with this office, you may disregard this requirement.

2 ( )  Disabled Veteran (10 points) - Requires DD214 or other document as above and letter of disability from V.A. dated within last 6 months. V.A. letter must be kept updated until register is established or you lose the extra 5 points.

3 ( )  Deceased Veteran's spouse (10 points) - Requires DD214 or other document as above and marriage and death certificates. Cannot be claimed if spouse remarries.

4 ( )  Disabled Veteran's spouse (10 points) - Requires DD214 or other document as above and V.A. letter of disability dated within last 6 months. Cannot be claimed unless still married to disabled veteran.

5 ( )  Permanently Disabled Veteran (10 points) - Requires DD214 or other document as above indicating veteran is permanently disabled or DD214 or other document and V.A. letter indicating permanent disability.

## COMPLETE THIS SECTION IN ORDER TO BE SCHEDULED FOR WRITTEN EXAMS

Written exams will be given in the places below for which a sufficient number of applicants express preference. Indicate by number your 1st, 2nd and 3rd choices.

1 ( ) Alexander City       3 ( ) Birmingham      5 ( ) Dothan         7 ( ) Linden        9 (X) Montgomery     12 ( ) Tuscaloosa
2 ( ) Andalusia            4 ( ) Decatur         6 ( ) Jacksonville   8 ( ) Mobile        10 ( ) Selma

If you qualify, you will receive a notice showing the place and time you are to report for the exam.

## Where did you learn of this job? (check all that apply)

1 ( ) State Employment Service        5 ( ) Friend/Relative             9 ( ) Legislative Representative        13 ( ) TV/Radio Commercial
2 (X) Job Announcement Notice         6 ( ) Dept. News Bulletin         10 ( ) State Recruiter/Counselor        14 ( ) Other _____
3 ( ) Newspaper                       7 ( ) Rehabilitation Services     11 ( ) State Personnel Dept. Information Board   15 ( ) State Personnel Dept. Website
4 ( ) College Placement/Career Office 8 ( ) High School Counselor       12 ( ) Outreach Program (i.e. Church)   16 ( ) Other Website

## AVAILABILITY

81 - Northwest Alabama
17 Colbert
30 Franklin
39 Lauderdale
40 Lawrence

84 - Jasper/
Winfield Area
29 Fayette
38 Lamar
47 Marion
64 Walker
67 Winston

87 - East Central Alabama
08 Calhoun
09 Chambers
14 Clay
15 Cleburne
19 Coosa
56 Randolph
61 Talladega
62 Tallapoosa

82 - Huntsville/
Decatur Area
36 Jackson
42 Limestone
45 Madison
48 Marshall
52 Morgan

85 - Tuscaloosa Area
04 Bibb
32 Greene
33 Hale
54 Pickens
60 Sumter
63 Tuscaloosa

88 - Southwest Alabama
12 Choctaw
13 Clarke
46 Marengo
65 Washington

83 - Northeast Alabama
10 Cherokee
25 DeKalb
28 Etowah

86 - Birmingham Area
05 Blount
22 Cullman
37 Jefferson
58 Shelby
59 St. Clair

89 - Selma/Clanton Area
11 Chilton
24 Dallas
53 Perry
65 Wilcox

90 - Montgomery Area
01 Autauga
26 Elmore
43 Lowndes
51 Montgomery

93 - South Central Alabama
07 Butler
18 Conecuh
20 Covington
21 Crenshaw
27 Escambia
50 Monroe

91 - Phenix City/
Troy Area
03 Barbour
06 Bullock
41 Lee
44 Macon
55 Pike
57 Russell

94 - Dothan Area
16 Coffee
23 Dale
31 Geneva
34 Henry
35 Houston

92 - Mobile Area
02 Baldwin
49 Mobile

95 - Statewide
(You will be considered for vacancies throughout the state. Relocation may be necessary)



Please answer the following questions with care. List in the spaces provided those areas of the state in which you would accept employment You will be considered for employment only in the locations you indicate. You may choose a combination of up to three counties and/or regions from the list above. If you list a region, you will be considered available for all counties in that region. The counties in each region are listed alphabetically below the region. You will not be considered for jobs involving overnight travel or shift work unless you so indicate.

List the numbers of up to 3 counties and/or regions where you are willing to work   90    91    89

If you want to be considered for appointment by only certain state agencies, indicate here   N/A

Will you accept work involving overnight travel?   (X) Yes   ( ) No       Will you accept part-time work?   ( ) Yes   (X) No

Will you accept temporary work?   ( ) Yes   (X) No

Which shifts are you willing to work?   0. ( ) all shifts   1. ( ) 1st only   2. ( ) 2nd only   3. ( ) 3rd only   4. ( ) 1st and 2nd only   5. ( ) 1st & 3rd only   6. ( ) 2nd & 3rd only

Enter the earliest date you will be available to interview for employment. (Your name will not appear on a list of eligibles until this date.)   4   11   2002
                                                                                                                                      Month  Day  Year

NOTE:    Your name will be placed on inactive status for this class after declining three offers of employment consideration or failing to reply to an agency's inquiry concerning your availability. Your name may be restored to the active register by written request.

Gregory Kelly
6213 Willow Glen Dr.
Montgomery, AL 36117                    Daytime Phone: 334-242-3524
Home Phone: 334-271-2478
E-mail gkelly6213@aol.com

**Objective**    To become involved in engineering management or become an engineer in
a computer information system, electro-mechanical, electronic firm,
government agency, or utility company.

**Experience**    1998-present   State of Alabama (D. H. R.)   Montgomery, AL
**Statistician**
- Gather and analyze reports and statistical data.
- Write, review, maintain, and revise statistical spreadsheets.
- Coordinate and review statistical work sampling data for various state
  agencies and countries.

1993-1998    Audra and Asheley's Inc.    Montgomery, AL
**President and Owner**
- Create and establish Audra and Asheley's Inc.
- Provide retail store services for beauty consulting industry.
- Lease office space for professional beauty consultants.

1982-1993    Alabama Power Company    Montgomery, AL
**Senior Electric Engineer**
- Commission load flow study analysis to determine system load,
  power factor and large industrial customers' source side load.
- Commission system analysis for the purpose of managing and
  forecasting alternative energy solutions.
  - Determine efficiencies of off peak loading plans
  - Conduct feasibility studies for the use of co-generation, and micro-
    turbine technology.
- Employ system demand studies and cost accounting analysis to budget,
  forecast, rank and determine capital improvement projects.
- Commission fault current studies to determine grounding and system
  protection requirements to improve system efficiencies.
- Employ metering and testing equipment to balance and phase the steady
  state voltage output of system generation equipment
- Modify and install switch capacitors to improve power factor, KVAR
  load flow, and system demand requirement.
- Install and modify pulse metering systems to manage system and
  customers' demand requirements.

- Provide technical assistance to customers' power quality question.
  - Install and modify full and half wave filters to correct harmonic distortion and improve system efficiency.
  - Install and modify distribution fuse system to coordinate with customers' synchronous motors, switch gear and HVAC equipment

1979-1982    Alabama Power Company    Montgomery, AL
**Junior Electrical Engineer**
- Supervise construction of underground and aerial cable installation for the purpose of meeting present and future demand requirements.
- Install step-up and step-down transformation to improve current flow and stabilize voltage output to improve system reliability.
- Prepare and review bid speculations from general contractors.
- Communicate with the public the issues which define the electrical utility industry ( i.e. The National Safety Code requirements, safety and health standards, chemical control and hazard communication regulations).
- Commission motor flicker studies and system voltage drop analysis for the purpose of determining the correct system protection and motor starter size equipment.

| | | | |
|---|---|---|---|
| **Education** | December, 1990 | Troy State University | Montgomery, AL |
| | • MBA | | |
| | December, 1979 | Auburn University | Auburn, AL |
| | • B.S., Electrical Engineering | | |

| | | | |
|---|---|---|---|
| **References** | **Carol Burton** | Department of Human Resources | Staff Manager |
| | **Phone Number:** | 334-269-0111 (Montgomery) | |
| | **Reference Type:** | Professional | |
| | **John Dixon** | South Central Bell | Engineer/ Designer |
| | **Phone Number:** | 334-277-6881  (Montgomery) | |
| | **Reference Type:** | Professional | |
| | Coella Judkins | Alabama Housing Financial Authority | Staff Manager |
| | **Phone Number:** | 334-284-5812 (Montgomery) | |
| | **Reference Type:** | Professional | |

Form 3 – Revised April 2003

# APPLICATION FOR EXAMINATION

**DO NOT WRITE IN THIS SPACE**

RECEIVED

2004 MAR 19 A 10: 28

PERSONNEL DEPARTMENT
STATE OF ALABAMA

RETURN TO:  STATE OF ALABAMA
PERSONNEL DEPARTMENT
64 NORTH UNION STREET
P O BOX 304100
MONTGOMERY, ALABAMA 36130-4100
WWW.PERSONNEL.STATE.AL.US

AN EQUAL OPPORTUNITY EMPLOYER

ENTER SOCIAL SECURITY NUMBER BELOW.

**General Instructions**

A separate application is required for each job. Do not write in shaded areas. Complete all parts of the application. Applications not [...]

**Defendants' Exhibit 100**

---

Job Title of Examination (one per application): **UTILITIES ENGINEERING SPECIALIST II - 20522**    20522 009    Option (if applicable): **229**

Full Name **GREGORY** — **KELLY**
First / Middle / Last

Mailing Address **6213 WILLOW GLEN DR.**
House or Apartment Number / Street

**MONTGOMERY    ALABAMA    51**
City / State / County / Zip Code

Telephone Number: Home ( **334** ) **271-2478**    Work ( **334** ) **242-9727**
Area Code / Area Code

### The following information is required for governmental reporting or recordkeeping purposes:

Date of Birth **11 28 56**    Sex (check one) 1. (X) Male    2. ( ) Female
(Month) (Day) (Year)

Race (check one) 1. ( ) White  2. (X) Black  3. ( ) Hispanic  4. ( ) Asian or Pacific Islander  5. ( ) American Indian or Alaskan Native  6. ( ) Other

---

**EDUCATION:**    CIRCLE OR BRACKET THE HIGHEST GRADE OF SCHOOL COMPLETED.    ED **35**

High School Diploma or GED? (X) Yes  ( ) No    1  2  3  4  5  6  7  8  9  10  11  12  College  1  2  3  (4)    LC **184**

PROVIDE INFORMATION ON ALL SCHOOLS ATTENDED.  SPECIFY UNDERGRADUATE OR GRADUATE WORK.

| Name and Location of School | Dates of Attendance Month/Year From | To | Credit Hours Sem. | Qtr. | Did You Graduate? Yes | No | Type of Degree and Date | Major |
|---|---|---|---|---|---|---|---|---|
| TROY STATE UNIV (MTGY) | 9/87 | 12/90 | | | X | | BUSINESS | MBA |
| AUBURN UNIV (AUBURN) | 9/75 | 12/79 | | ✓ | X | | ENGINEERING | BSEE |

PROFESSIONAL LICENSE OR CERTIFICATE

| License/Certificate Issued By | Field/Trade/Specialization | License/Certificate No. | Issue Date | Expiration Date |
|---|---|---|---|---|
| N/A | N/A | N/A | N/A | N/A |

LIST COURSES (AND HOURS) WHICH ARE PARTICULARLY RELATED TO POSITION (attach additional sheets, if needed)

**COMM SYSTEM    EG-543  LINEAR FEEDBACK  EE-351  LINEAR SYSTEM  362**
**COMM THEORY    EE-441  ELECRO SYSTEM  EE-371**

### CERTIFICATION STATEMENT

I certify that all statements on or attached to this application are true and correct to the best of my knowledge. I know that any false statements may cause me to be denied the chance for testing, to be removed from an employment register, or to be release from employment. I will not discuss the test I have taken. I further authorize the release of all relevant prior employment, military service, academic/school and criminal records. If employed I agree, consistent with applicable laws, to receive compensatory time off in lieu of overtime compensation for any overtime hours worked.

Signature **Gregory Kelly**    Date **3-19-2004**

During the application process, including testing and employment consideration,

SOCIAL SECURITY NUMBER : ████████████████

List three reliable persons, not relatives or present employer, who know you well enough to give information about you.

| NAME | ADDRESS AND PHONE NUMBER | EMPLOYER |
|---|---|---|
| MR. JOHN DIXON | 5919 BALMORAL DR MTG, 277-6881 | SOUTH CENTRAL BELL |
| MS. COELA JUDKINS | 3245 RAINTREE DR MTG, 284-5812 | AL. HOUSING AUTHORITY |
| MS. CAROL BURTON | 27 W. OGDEN AVE MTG, 269-0311 | STATE OF AL - DHR |

---

Should you need testing accommodations due to a health problem or disability, you must contact the State Personnel Department.

Have you ever been involuntarily terminated, discharged, forced or asked to resign from any job?   [X] Yes   ( ) No

If you answered Yes to the above question, attach an explanation on a separate sheet noting any mitigating or extenuating circumstances.
THE COMPANY (APCO) WAS DOWNSIZING

Have you ever been convicted of a misdemeanor or felony crime?   ( ) Yes   [X] No

If you answered Yes to the above question, list in the space below all prior misdemeanor and felony convictions and any extenuating or mitigating circumstances regarding such convictions.  If necessary, you may use a separate sheet or sheets and attach to application.

N/A

NOTE: A CRIMINAL CONVICTION WILL NOT NECESSARILY BE A BAR TO CONSIDERATION FOR EMPLOYMENT, EXCEPT THAT A FELONY CONVICTION WILL BAR EMPLOYMENT IN A LAW ENFORCEMENT JOB; THE DISCLOSURE OF A MISDEMEANOR CONVICTION WILL NOT AUTOMATICALLY RESULT IN DISQUALIFICATION. CRIMINAL HISTORIES WILL BE SUBMITTED TO THE NATIONAL CRIME INFORMATION CENTER (NCIC) FOR VERIFICATION. FAILURE TO DISCLOSE A CONVICTION MAY BE CONSIDERED AS GROUNDS FOR DISQUALIFICATION. FOR THESE REASONS, APPLICANTS SHOULD BE CAREFUL TO DISCLOSE ALL CRIMINAL CONVICTIONS.

---

**WORK HISTORY**
**THIS SECTION MUST BE COMPLETED REGARDLESS OF WHETHER OR NOT A RESUME' IS ATTACHED.**

Begin with your PRESENT or most recent employment. List in REVERSE ORDER periods of employment. Each time you changed jobs or your title changed should be listed as a separate period. Describe in detail your duties. (Attach additional sheets if needed.)

| 1. Current or Last Employer STATE OF AL. - APSC | | | | Your Official Job Title UTILITIES ENGINEER SPC. I | | |
|---|---|---|---|---|---|---|
| Address 100 NORTH UNION STREET | | | | Type of Business STATE GOVERNMENT | | |
| FROM | | TO | Total Months | Number of Hours Per Week | Beginning Salary | Ending Salary | May we contact your employer? |

| FROM Month 7 Year 02 | TO Month 4 Year 04 PRESENT | Total Months 21 | Number of Hours Per Week 40 | Beginning Salary $ 37K Per YR | Ending Salary $ 40K Per YR | May we contact your employer? [X] Yes ( ) No |
|---|---|---|---|---|---|---|

| Number/Title of Employees You Supervised On a Continuing Basis   NONE | Equipment You Operated OFFICE EQP, COMPUTERS, ETC. |
|---|---|
| Name, Title and Telephone Number of Supervisor  MR. JOHN FREE (242-9579) | Reason for Leaving  N/A |

Describe your Duties in Detail
+ PARTICATE IN THE DEVELOPMENT OF ENGINEERING DATA, EVIDENCE, STUDIES AND testimony FOR PROCEEDINGS IN THE COMMISSION
+ PARTICATE IN STUDIES OF CONSUMER RATE CHANGES BY PREPARING CHARTS, GRAPHS, SPREAD SHEETS AND DIAGRAMS
+ REVIEW AND EVALUATE ENGINEERING PROJECTS AND PRELIMINARY FIELD ENGINEERING STUDIES

SOCIAL SECURITY NUMBER : ~~XXXXXXXX~~

| 2. Employer STATE OF AL (DHR) | Your Official Job Title STATISTICIAN |
|---|---|
| Address 50 RIPLEY ST - GORDAN PERSON | Type of Business STATE GOVERNMENT |

| FROM | | TO | | Total Months | Number of Hours Per Week | Beginning Salary | Ending Salary | May we contact your employer? |
|---|---|---|---|---|---|---|---|---|
| Month 4 | Year 98 | Month 7 | Year 02 | 51 | 40 | $ 22K Per YRS | $ 30K Per YRS | (X) Yes ( ) No |

| Number/Title of Employees You Supervised On a Continuing Basis NONE | Equipment You Operated OFFICE EQP, COMPUTERS, ETC |
|---|---|
| Name, Title and Telephone Number of Supervisor MR. WAYNE SCOTT (CHIEF STAT) | Reason for Leaving NEW JOB AT APSC |

Describe Your Duties in Detail

+ GATHER AND ANALYZE REPORTS AND STATISTICAL DATA
+ WRITE, REVIEW, MAINTAIN AND REVISE STATISTICAL
  SPREADSHEETS AND REPORTS
+ COORDINATE AND REVIEW STATISTICAL WORK SAMPLING
  DATA FOR VARIOUS STATE AGENCIES AND COUNTIES

| 3. Employer AUDRA & ASHELEY'S INC | Your Official Job Title PRESIDENT AND OWNER |
|---|---|
| Address 740 S. COURT ST MTGY, AL | Type of Business RETAIL & LEASING |

| FROM | | TO | | Total Months | Number of Hours Per Week | Beginning Salary | Ending Salary | May we contact your employer? |
|---|---|---|---|---|---|---|---|---|
| Month 9 | Year 93 | Month 4 | Year 98 | 53 | 65 | $ N/A Per N/A | $ N/A Per N/A | (X) Yes ( ) No |

| Number/Title of Employees You Supervised On a Continuing Basis BEAUTY CONSULTANTS (12) | Equipment You Operated OFFICE EQP, COMPUTERS, ETC |
|---|---|
| Name, Title and Telephone Number of Supervisor SELF EMPLOYED | Reason for Leaving BUSINESS CLOSED |

Describe Your Duties in Detail

+ CREATED AND ESTABISHED AUDRA & ASHELEY'S INC
+ PROVIDED RETAIL STORE SERVICES FOR THE
  BEAUTY CONSULTING INDUSTRY
+ LEASED OFFICE SPACE FOR PROFESSIONAL
  BEAUTY CONSULTANTS

| 4. Employer ALA POWER CO | Your Official Job Title DISTRICT ENGINEER |
|---|---|
| Address 240 DEXTER AVE | Type of Business PUBLIC UTILITY |

| FROM | | TO | | Total Months | Number of Hours Per Week | Beginning Salary | Ending Salary | May we contact your employer? |
|---|---|---|---|---|---|---|---|---|
| Month 12 | Year 79 | Month 9 | Year 93 | 177 | 50 | $ 19.5K Per YR | $ 40K Per YR | (X) Yes ( ) No |

| Number/Title of Employees You Supervised On a Continuing Basis LINEMEN (8), FOREMAN (1), LOL (4) | Equipment You Operated OFFICE EQP, COMPUTERS, ETC |
|---|---|
| Name, Title and Telephone Number of Supervisor | Reason for Leaving COMPANY DOWNSIZING |

Describe Your Duties in Detail

+ COMMISSION LOAD FLOW STUDIES AND MONITORIED SYSTEM OPERATIONS
+ EMPLOYED SYSTEM DEMAND STUDIES
+ MODIFIED AND INSTALLED SWITCH CAPACITORS, PULSE METERING
  FUSLE PROTECTION, PLC AND RELAY EQUIPMENT, AND TRANSFORMATION
  SYSTEM

5. USING THE ABOVE FORMAT, SHOW OTHER EXPERIENCE BY USING ADDITIONAL SHEETS.

SOCIAL SECURITY NUMBER : 

---

### COMPLETE THIS SECTION IF YOU ARE CLAIMING VETERAN'S PREFERENCE

If you claim Veteran's Preference, check the type below. Attach copies (which will not be returned) of the required documents to your application to support your claim.

1 ( )   Veteran (5 points) - Requires DD214 or document showing dates of service and type of discharge. If this has been submitted previously and is on file with this office, you may disregard this requirement.

2 ( )   Disabled Veteran (10 points) - Requires DD214 or other document as above and letter of disability from V.A. dated within last 6 months. V.A. letter must be kept updated until register is established or you lose the extra 5 points.

3 ( )   Deceased Veteran's spouse (10 points) - Requires DD214 or other document as above and marriage and death certificates. Cannot be claimed if spouse remarries.

4 ( )   Disabled Veteran's spouse (10 points) - Requires DD214 or other document as above and V.A. letter of disability dated within last 6 months. Cannot be claimed unless still married to disabled veteran.

5 ( )   Permanently Disabled Veteran (10 points) - Requires DD214 or other document as above indicating veteran is permanently disabled or DD214 or other document and V.A. letter indicating permanent disability.

---

### COMPLETE THIS SECTION IN ORDER TO BE SCHEDULED FOR WRITTEN EXAMS

Written exams will be given in the places below for which a sufficient number of applicants express preference. Indicate by number your 1st, 2nd and 3rd choices.

1 ( )  Alexander City       3 ( )  Birmingham      5 ( )  Dothan        7 ( )  Linden         9 (X)  Montgomery     12 ( )  Tuscaloosa
2 (X)  Andalusia            4 ( )  Decatur         6 ( )  Jacksonville  8 ( )  Mobile        10 ( )  Selma

If you qualify, you will receive a notice showing the place and time you are to report for the exam.

---

### Where did you learn of this job? (check all that apply)

1 ( )  State Employment Service          5 ( )  Friend/Relative           9 ( )  Legislative Representative        13 ( )  TV/Radio Commercial
2 (X)  Job Announcement Notice           6 ( )  Dept. News Bulletin       10 ( )  State Recruiter/Counselor        14 ( )  Other _____
3 ( )  Newspaper                         7 ( )  Rehabilitation Services   11 ( )  State Personnel Dept. Information Board   15 ( )  State Personnel Dept. Website
4 ( )  College Placement/Career Office   8 ( )  High School Counselor     12 ( )  Outreach Program (i.e. Church)   16 ( )  Other Website

---

### AVAILABILITY

**81 - Northwest Alabama**
17 Colbert
30 Franklin
39 Lauderdale
40 Lawrence

**84 - Jasper/Winfield Area**
29 Fayette
38 Lamar
47 Marion
64 Walker
67 Winston

**87 - East Central Alabama**
08 Calhoun
09 Chambers
14 Clay
15 Cleburne
19 Coosa
56 Randolph
61 Talladega
62 Tallapoosa

**90 - Montgomery Area**
01 Autauga
26 Elmore
43 Lowndes
51 Montgomery

**93 - South Central Alabama**
07 Butler
18 Conecuh
20 Covington
21 Crenshaw
27 Escambia
50 Monroe

**82 - Huntsville/Decatur Area**
36 Jackson
42 Limestone
45 Madison
48 Marshall
52 Morgan

**85 - Tuscaloosa Area**
04 Bibb
32 Greene
33 Hale
54 Pickens
60 Sumter
63 Tuscaloosa

**88 - Southwest Alabama**
12 Choctaw
13 Clarke
46 Marengo
65 Washington

**91 - Phenix City/Troy Area**
03 Barbour
06 Bullock
41 Lee
44 Macon
55 Pike
57 Russell

**94 - Dothan Area**
16 Coffee
23 Dale
31 Geneva
34 Henry
35 Houston

**83 - Northeast Alabama**
10 Cherokee
25 DeKalb
28 Etowah

**86 - Birmingham Area**
05 Blount
22 Cullman
37 Jefferson
58 Shelby
59 St. Clair

**89 - Selma/Clanton Area**
11 Chilton
24 Dallas
53 Perry
66 Wilcox

**92 - Mobile Area**
02 Baldwin
49 Mobile

**95 - Statewide**
(You will be considered for vacancies throughout the state. Relocation may be necessary)

Please answer the following questions with care. List in the spaces provided those areas of the state in which you would accept employment You will be considered for employment only in the locations you indicate. You may choose a combination of up to three counties and/or regions from the list above. If you list a region, you will be considered available for all counties in that region. The counties in each region are listed alphabetically below the region. You will not be considered for jobs involving overnight travel or shift work unless you so indicate.

List the numbers of up to 3 counties and/or regions where you are willing to work  __90   91   89__

If you want to be considered for appointment by only certain state agencies, indicate here ___N/A___

Will you accept work involving overnight travel?  (X) Yes   ( ) No        Will you accept part-time work?  ( ) Yes   (X) No

Will you accept temporary work?   ( ) Yes   (X) No

Which shifts are you willing to work?  0. ( ) all shifts   1. ( ) 1st only   2. ( ) 2nd only   3. ( ) 3rd only   4. ( ) 1st and 2nd only   5. ( ) 1st & 3rd only   6. ( ) 2nd & 3rd only

Enter the earliest date you will be available to interview for employment. (Your name will not appear on a list of eligibles until this date.) __3  19  2004__
Month   Day   Year

NOTE:   Your name will be placed on inactive status for this class after declining three offers of employment consideration or failing to reply to an agency's inquiry concerning your availability. Your name may be restored to the active register by written request.

General Comments

New Window | Help | Customize Page

**General Comments**

Kelly,Gregory                                    Employee                    EmplID:  424784641

General Comments                                          Find | View All    First ◄ 1 of 1 ► Last

| | |
|---|---|
| Comments By: | Cynthia Godbold |
| Comment Date: | 09/20/1993 |
| Comment: | Employee terminated due to "Overall unsatisfactory job performance" per Jerry Posey - Montgomery District Supt. Employee was terminated at 3:30 p.m. on 9-16-93.  Was not paid for any unused vacation. |

Save    Return to Search

Defendants' Exhibit 101

Job Data

Page 1 of 1

New Window | Help | Customize Page |

| Work Location | Job Information | Job Labor | Payroll | Salary Plan | Compensation |

Kelly,Gregory                    Employee              EmplID: ▓▓▓▓▓▓    Empl Rcd#:    0

Work Location                                                        Find | First ◄ 2 of 3 ► | 1

Employee Status:   Terminated                   Date Created: 09/20/1993

Effective Date:    09/17/1993    Effective Sequence:    0    Job Indicator: Primary Job

Action / Reason:   Termination                 UNS   Unsatisfactory Performance

                   Not Eligible for Rehire                                              History

Position Number:   00004306         Engineer, II        Position Entry Date:

                                    ☐ Position Management Record   ☐ Paid Time Off

Regulatory Region: USA              United States

Company:           APC              Alabama Power Company

Business Unit:     STDBU            Standard Business Unit

Department:        APC3100715       PD-Distribution-Gen      Department Entry Date:   12/17/1979

Location:          APC3100          Montgomery

Supervisor ID:

Reports To:

ID:

Job Data          Employment Data             Benefits Program Participation

| 💾 Save | 🔍 Return to Search | 🖨 Previous tab | 🖨 Next tab | 🔄 Refresh |

Work Location | Job Information | Job Labor | Payroll | Salary Plan | Compensation



**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF ALABAMA**
**NORTHERN DIVISION**

| | | |
|---|---|---|
| GREGORY KELLY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CASE NO:2-07-cv-610-WHA |
| | ) | |
| JOHN FREE, individually and in his official | ) | |
| position as an employee of the Alabama | ) | |
| Public Service Commission; JANICE M. | ) | |
| HAMILTON, individually and in her official | ) | |
| position as a Division Director of the | ) | |
| Alabama Public Service Commission; and | ) | |
| ALABAMA PUBLIC SERVICE | ) | |
| COMMISSION, an agency of the State of | ) | |
| Alabama, | ) | |
| | ) | |
| Defendants. | ) | |

**STATE OF ALABAMA**          )

**COUNTY OF MONTGOMERY**    )

**AFFIDAVIT OF JOHN D. FREE**

BEFORE me, the undersigned authority, a Notary Public in and for the State of Alabama at

Large, personally appeared JOHN D. FREE, who being known to me and, who being first duly

sworn deposeth and says as follows:

1.      My name is John D. Free.  I am 44 years of age and otherwise competent to testify

in courts of the United States and this state.  I have personal knowledge of the facts contained in this

affidavit.

2.      I am a 1991 graduate of the Auburn University at Montgomery Masters of

Business Administration program and received a bachelor of science degree from Auburn University

Page 1 of 9

at Montgomery in 1987. I am also a Certified Public Accountant licensed by the State of Alabama.

3.     I am currently employed as a Public Utility Analyst Manager with the Electricity Section of the Energy Division of the Alabama Public Service Commission (the "PSC") and have been so employed since mid-2001. From May 1990 until mid-2001, I was employed in the Electricity Section of the Energy Division as a Public Utilities Auditor. The Electricity Section is one of five sections in the Energy Division of the PSC. The Director of the Energy Division is Janice Hamilton. The current structure of the Energy Division has been in existence since approximately 1998, when it was reorganized by Janice Hamilton, a black female, pursuant to her discretion and duties as Energy Division Director.

4.     As a Public Utility Analyst Manager, I am responsible for the day-to-day supervision and control of the employees in the Electricity Section of the Energy Division of the PSC. In my aforementioned capacity as a Public Utility Analyst Manager, I am responsible for hiring, evaluating and rating the performance of the employees under my direct supervision and control pursuant to the Rules, Regulations and Guidelines of Alabama State Personnel Department ("State Personnel") and the Merit System of Alabama codified at *Code of Alabama*, 1975, §36-26-1, *et seq.*

5.     I hereby certify that I am the individual at the PSC who interviewed and hired the Plaintiff in this case, Mr. Gregory Kelly, on or about July 13, 2002. I hired Kelly over one other qualified black male candidate and two qualified white male candidates who appeared on an employment register compiled by State Personnel.

6.     The organizational structure of the Energy Division of the PSC is the same today as it was on the date that Kelly was hired as a Utilities Engineering Specialist I on July 13,

2002. Kelly was interviewed by me and PSC Energy Division Director, Ms. Janice M. Hamilton, and was made aware that he would report to me. Kelly expressed no concerns nor reservations regarding this organizational structure or his salary range.

7.    In addition to hiring Kelly, I have, in my capacity as Manager of the Electricity Section of the Energy Division, also hired Ms. Jackie Frazier, a 46-year-old black female, Ms. Patricia Smith, a 38-year-old black female, Ms. Sheila Ward, a 56-year-old white female, and Mr. Oretoluwa Isikalu, a 60-year-old black male who is no longer employed by the PSC.

8.    In addition to the above hirings, I have also recommended that numerous employees under my supervision be promoted. Notably, I have recommended promotions for Mr. Robert Taylor, a 57-year-old black male (from Public Utility Analyst II to Public Utility Analyst III), Ms. Sheila Ward, a 56-year-old white female (from Public Utility Analyst I to Public Utility Analyst II), Ms. Patricia Smith, a 38-year-old black female (from Public Utility Auditor I to Public Utility Analyst II), Mr. Greg Kelly (from Utility Engineering Specialist I to Utility Engineering Specialist II which is now known as a Public Utility Technical Specialist, Senior), and Ms. Jackie Frazier, a 46-year-old black female (from Administrative Support Assistant I to Administrative Support Assistant II).

9.    The electricity section is currently composed of the following employees who are listed by name, race, sex, age, title and pay grade:

John D. Free, white male, age 44, Electricity Section Manger, Pay Grade 81

Greg Kelly, black male, age 51, Public Utility Technical Specialist Senior, Pay Grade 79

Robert Taylor, III, black male, age 57, Public Utility Analyst III, Pay Grade 79

Linda D. Gardner, white female, age 58, Public Utility Analyst II, Pay Grade 74

Sheila H. Ward, white female, age 56, Public Utility Analyst II, Pay Grade 74

Patricia Smith, black female, age 38, Public Utility Analyst II, Pay Grade 74

Jackie Frazer, black female, age 46, Administrative Support Assistant II, Pay Grade 5051

10.    I deny ever promising Kelly that I would request a desk audit for any position that he has held at the PSC. Upon his promotion in May 2004, Kelly's salary structure was upgraded from pay grade 77 to pay grade 79. Despite this fact, Mr. Kelly has persistently requested that his position be further evaluated and that his pay grade be upgraded to a salary range of 85. These salary upgrades requested by Kelly would have necessitated a "desk audit" by State Personnel as subsequently explained herein. In addition, Kelly has submitted several self-prepared "market studies" of various engineering related positions.

11.    The market surveys, compiled and submitted by Kelly, attempt to compare his current salary range to the salary ranges of other positions that are engineering related. Based on this information, Mr. Kelly has requested that his salary range be increased to Pay Grade 85, which is higher than both my salary level and the salary level of Janice Hamilton, the Energy Division Director. It is unclear if Kelly's comparisons attempt to consider the following: 1) differences between private sector positions versus government sector positions; 2) the level of responsibilities for each position; 3) supervisory responsibilities of each position; 4) requirements to hold a Professional Engineer's License; and 5) other benefits that may be part of a total compensation package.

12.    It is my opinion that, in addition to private sector comparisons, the salary range for the Public Utility Technical Specialist, Senior position should be compared with the salary ranges of similarly situated positions at other Public Service Commissions in the Southeast. As such, I

contacted several other state commissions in the Southeast and requested job descriptions and salary information for engineering positions that, in my opinion, closely resembled the job responsibilities of the Public Utility Technical Specialist, Senior. Using this information, it appears that the salary range of the Public Utility Technical Specialist, Senior position is in line with the salary ranges of closely related engineering positions at other state Commissions.

13.    A "desk audit" is a process utilized by State Personnel to assess requests for salary upgrades to particular positions. Notably, when State Personnel performs desk audits for a particular position in the Merit System, all individuals within the entire state system who hold the position in question are impacted. As such, all persons holding the position in question would be interviewed as well as their managers and directors. Thus, any resulting changes to the position in question would affect all persons holding that position.

14.    It is also important to note that managers and/or directors may only request that State Personnel perform a desk audit for a particular position. The ultimate decision of whether a desk audit will be performed ultimately rest with State Personnel. Further, managers and directors are under no obligation to request desk audits for any position. The pursuit of desk audits is instead a discretionary matter impacted to some degree by an employee's responsibilities, performance and compliance with applicable rules and policies. Notably, I have never requested a desk audit for any employee under my supervision, but I have recommended promotions for numerous individuals under my supervision including Kelly as noted in 8 herein.

15.    Furthermore, it is my opinion that the pay grades for the various positions in our agency should be structured in such a way as to recognize the level of the position within the organizational structure, as well as the level of responsibilities for each position. In the current

salary structure, Kelly's position is pay grade 79, Mr. Free's pay grade is 81 and Ms. Hamilton's pay grade is 84. Therefore, as should be the case, the current salary structure does differentiate between the various positions of professional staff, managers and directors.

16.    While there have been no changes to Kelly's salary range for his current position, it is true that the job title for Kelly's position was changed from Utilities Engineering Specialist II to Public Utility Technical Specialist, Senior by State Personnel. It is important to note that this action by State Personnel was a unilateral decision by that department and in no way related to any actions on the part of the PSC. Indeed, division directors at the PSC and the PSC's personnel officer attempted to persuade State Personnel to reconsider their decision to change the job title in question because they felt it would hamper the PSC's efforts to attract and hire quality engineers that do not possess professional engineer's licenses if the word "engineer" or "engineering" is excluded from the position title.

17.    It is unclear whether State Personnel conducted any job studies when changing the job title for Kelly's position but State Personnel's actions did not impact the pay grade for Mr. Kelly's position or the job responsibilities for the position. Further, State Personnel's actions impacted all persons in state government who hold the position that Mr. Kelly does, including Rick Cleckler, a 55-year-old white male in the Special Projects Section of the PSC's Energy Division. Cleckler is approximately a 25-year veteran of the PSC, having been hired in 1983. Cleckler has an electrical engineering degree from Auburn University and is an electrician licensed by the City of Clanton. Cleckler has worked in the Special Projects Section since approximately 1998. As state Merit System employees, Kelly and Cleckler receive the same job benefits, i.e., sick leave, health care, vacation, etc., as all state Merit System employees.

18.    With respect to Kelly's claims regarding lost training opportunities, it is important to note that employees of the PSC's Energy Division receive training and professional development through various avenues, including "on the job training" whereby employees are exposed to various industry related topics and regulatory assignments that provide them with experience regarding many facets of a utility company's industry and/or business. The second method of professional development utilized by the Energy Division is through the review of work related articles, journals, magazines, newsletters, research on new technologies and/or participation in web-based seminars, conference calls and other similar activities. A third method of professional development utilized by the Energy Division is employee attendance at industry related seminars.

19.    With all of the various methods of training discussed above, the degree of professional development derived is to a great extent dependent on the individual employee's preparation, level of engagement, and the quality of the training source. Additionally, the type of training selected for employees of the Energy Division are dependent on a number of considerations, including the availability of funds, expected costs versus expected benefits of the training in question, the relevance and urgency of such training, an assessment of staff needs, staff performance and conduct, individual employee preference, distribution of training opportunities among various employees in the section and/or division, and the demonstrated benefits of the training methodology selected.

20.    Notably, Kelly has had available to him the exact same Internet access, industry publications and subscriptions as other employees in the Electricity Section of the PSC Energy Division. Further, Mr. Kelly has had as much or more opportunities to attend the more costly out-of-

state seminars/conferences than Rick Cleckler or other similarly situated employees within the Electricity Section.

21.    I deny having ever harassed Kelly or having engaged in any unwarranted or unprofessional behavior toward him. I have consistently sought to equally and faithfully apply the personnel rules, policies and procedures of the Public Service Commission, the Energy Division and the Electricity Section in a fair and unbiased manner to Kelly and all Electricity Section employees whom I oversee. On multiple occasions, Kelly has made remarks to me in interoffice Memorandums that are untrue, unwarranted and leveled personal, insulting and insubordinate accusations against me. I repeatedly advised Kelly that his comments were insubordinate and that he would subject himself to future disciplinary action if he did not cease and desist. When Kelly refused to cease and desist his offensive and insubordinate comments after repeated warnings, I had no alternative but to serve him with a written reprimand as authorized and provided for by the State of Alabama Progressive Discipline Manual.

22.    I deny that I have had accountants "spy" on Kelly. As part of my managerial responsibilities I have, on occasion, monitored the physical presence of all staff members and their compliance with the PSC's employee guidelines regarding break periods, lunch hours and their physical presence during mandatory working hours. In this regard, I have made my best efforts to apply the PSC's employee guidelines in a consistent and uniform manner.

23.    I deny that I have had Kelly's work proofread from an "accounting perspective." From time-to-time it has been my practice to have Electricity Section members assist with proofreading, spell checking and editing their fellow co-employees' reports and work products prior

to such documents being finalized. Accordingly, Kelly's reports and work products have been proof-read by his fellow Electricity Section members, the majority of whom are analyst/auditors.

24.    I hereby represent in conclusion that I have never discriminated against Mr. Kelly for his race, age, or any other reason.  This is true with respect to all aspects of his employment including his salary, his job responsibilities and his professional development and training.

Affiant further saith not.

_____
JOHN D. FREE

SWORN to and SUBSCRIBED before me this the _3rd_ day of April, 2008.

_____
NOTARY PUBLIC
My Commission Expires: _1/12/2011_

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

GREGORY KELLY,                          )
                                        )
        Plaintiff,                      )
                                        )
v.                                      )        CASE NO:2-07-cv-610-WHA
                                        )
JOHN FREE, individually and in his official    )
position as an employee of the Alabama  )
Public Service Commission; JANICE M.    )
HAMILTON, individually and in her official    )
position as a Division Director of the  )
Alabama Public Service Commission; and  )
ALABAMA PUBLIC SERVICE                  )
COMMISSION, an agency of the State of   )
Alabama,                                )
                                        )
        Defendants                      )

STATE OF ALABAMA              )

COUNTY OF MONTGOMERY    )

## AFFIDAVIT OF JANICE M. HAMILTON

BEFORE me, the undersigned authority, a Notary Public in and for the State of Alabama at Large, personally appeared JANICE M. HAMILTON, who being known to me and, who being first duly sworn deposeth and says as follows:

1.      My name is Janice M. Hamilton. I am 51 years of age and otherwise competent to testify in courts of the United States and this state. I have personal knowledge of the facts contained in this affidavit.

2.      I am a 1981 graduate of the University of Alabama at Birmingham from which I received a Bachelor of Science degree in Engineering.

3.    I am currently employed as the Director of the Energy Division of the Alabama Public Service Commission (the "PSC"), with a pay grade of 84, and have been so employed since October 1992. From August 20, 1990 until my promotion to Director in October 1992, I was a PSC Engineer in the Electricity Section of the Energy Division.

4.    As Director of the Energy Division of the PSC, I am responsible for the organizational structure of the Energy Division and the day-to-day supervision and control of the employees in the Energy Division. I am responsible for hiring, evaluating, and rating the performance of the employees under my supervision pursuant to the Rules, Regulations and Guidelines of Alabama State Personnel Department ("State Personnel") and the Merit System of the State of Alabama codified at *Code of Alabama*, 1975, §36-26-1, *et seq*.

5.    Upon my hiring by the PSC in August 1990, the Energy Division of the PSC was organized into four sections – Electricity, Natural Gas, Water and Gas Pipeline Safety. The Electricity Section consisted of eleven employees with different areas of expertise. The various disciplines included engineering, financial analysis, auditing, business accounting and administrative. Included in this group were employees with technical backgrounds that reported to Mr. Robert Duxbury, the Supervisor of the Electricity Section whose background was in the area of financial analysis. Those employees consisted of three engineers, Mr. Bernard Givan, a black male; Mr. J. Rick Cleckler, a white male; and me. It is not uncommon at the PSC and other agencies of the State of Alabama for one educational discipline to report to a manager or director with a different educational discipline or background.

6.    In October 1992, I was promoted to the position of Director of the Energy Division. In preparation for Mr. Duxbury's inevitable retirement, I made the decision to form a Technical

Section in 1993 in order to alleviate the undue burden of having to directly manage nine subordinates from the Electricity Section and three other section supervisors as well as perform my administrative duties as Director. This was also an effort to see if concentrating the division's engineering efforts into one section would be more productive. Mr. Duxbury subsequently retired in 1995.

7.    The Technical Section was led by Mr. Bernard Givan, a Utility Engineering Specialist II, who reported directly to me before and after this organizational change. Mr. Givan also reported to Mr. Duxbury prior to Mr. Duxbury's retirement. Also included in the Technical Section were Mr. Cleckler, a Utility Engineering Specialist II at the time, and Mr. Will Straughn, a Utility Engineering Technician, who was moved from the Water Section. This structure continued after Mr. Givan's resignation in February 1999. Both Mr. Cleckler and Mr. Straughn reported to me for the next couple of years. In May 2001, Mr. John Free was promoted to Electricity Section Supervisor. At the same time, Mr. Straughn was moved to the Electricity Section to perform technical support for that section absent another engineer and reported to Mr. Free. I elected at that time to retain Mr. Cleckler as the sole employee of the Technical Section due to his vast knowledge and broad background in multiple facets of regulatory principles and techniques.

8.    The Technical Section was subsequently renamed the "Special Projects Section" and continued to have Mr. Cleckler as its sole employee. Mr. Cleckler performed and continues to perform a variety of duties including coordinating the following (1) issues that pertain to multiple disciplines and/or unregulated utilities, (2) research of federal and state utility policies and topics, (3) regulatory support required to be provided to the Alabama Department of Public Health pursuant to a PSC contract, and (4) technical support to the Natural Gas, Water, Gas Pipeline Safety and

Electricity Sections. Notably, Mr. Cleckler's provision of technical support for the Electricity and Gas Pipeline Safety Sections is somewhat limited due to the fact that those two sections have always provided the bulk of their technical support with internal employees due to the inherent nature of their respective areas of responsibility.

9.      In September 2001, Mr. Straughn retired. His retirement, combined with existing engineering vacancies, left the Electricity Section without a full-time staff engineer to provide technical support. It was at this time that Mr. Free and I began our efforts to hire an engineer for the Electricity Section, a position which had been vacant since Mr. Givan's resignation in 1999.

10.      Mr. Gregory Kelly was hired as a Utility Engineering Specialist I for the Electricity Section by Mr. Free on July 13, 2002. Mr. Kelly was made aware that he would report directly to Mr. Free at the time of his hiring and raised no concerns regarding same. Notably, the organizational structure of the Energy Division discussed above was in place when Mr. Kelly was hired and on the date that Mr. Kelly filed his charges of discrimination in this matter.

11.      With respect to Mr. Kelly's insinuation that he is not in a separate technical section due to his age and/or race, I again note that the Electricity Section where Mr. Kelly is employed has for many years provided its own technical support with an employee or employees inherent to that section due to the general nature of the electricity issues addressed by that section. Accordingly, Mr. Kelly's employment within the Electricity Section is based exclusively on managerial concerns that are totally unrelated to Mr. Kelly's age and/or race. Nonetheless, both Mr. Kelly and Mr. Cleckler hold the same job title and job classification, and are in the same pay grade.

12.      It is also important to note that in July 2005, Mr. Kelly filed a formal grievance with

the PSC against me pursuant to internal PSC procedures asserting that the Energy Division's organizational structure caused him to suffer a "fractured career path, an unlevel playing field, a compromised job position, lost synergy and communication difficulties." Mr. Kelly's claims were adjudicated in accordance with the PSC's formal grievance procedures. A hearing was held concerning Mr. Kelly's claims before a PSC Administrative Law Judge and a panel of four of Mr. Kelly's PSC peers, which included two black females and two white males. The panel found, and the PSC agreed, that Mr. Kelly's grievance was due to be dismissed because the organizational structure of the Energy Division had not resulted in unfair treatment to Mr. Kelly and was a matter within the managerial discretion of the PSC and its Energy Division Director.

13.    With respect to Mr. Kelly's insinuation that he has "lost out" on training as the result of not being in charge of a technical budget, I first note that Mr. Kelly has received as much or more training than any individual in the Energy Division including Mr. Cleckler, his white male contemporary. Since 2002, when he became employed with the PSC, Mr. Kelly has attended training classes, conferences and seminars in Alexandria, VA (Electricity Law Seminar); San Francisco, CA (A Market Based Concepts for Transmission Planning Seminar); Raleigh, NC (A Fossil Power Plant Fundamental Workshop Seminar); and Denver, CO and Tampa, FL (Gasification Workshops). John Free and I also approved Mr. Kelly to attend a seminar and workshop ("Custom Power Solutions for Power Equality Issues") to be held in Chicago, Illinois.

14.    John Free and I have also approved of Kelly attending numerous seminars that he ultimately did not attend. For example, Kelly was approved to attend a seminar in Atlanta, GA ("Environmental Conference"); Bismarck, ND ("Gasification Workshop for State Government

Personnel"); Atlanta, GA ("FERC Tech Workshop 'Electric Transmission Citing Rule, Order No. 689'"); and a workshop in either Montgomery or Birmingham on Business Writing and Grammar.

15.     During the same time period, Rick Cleckler has attended only five training classes, conferences and seminars.  Two of the conferences were Gasification workshops in 2007 and 2008 in Denver, Colorado, and Tampa, Florida, which Mr. Kelly attended both.  Two of the remaining three training classes were internet self-study courses Mr. Cleckler completed at the office of the PSC in 2005 and 2006 and the final seminar was a conference on Eminent Domain in Alabama, held in Montgomery, Alabama, in 2005.  Thus, Kelly has received more training opportunities than Cleckler.

16.     Since 2002, Mr. Kelly has also received more pay raises than Rick Cleckler.  Mr. Kelly has received four cost of living adjustments ("COLAs"), two annual raises and three promotional/probationary raises.  By contrast, since 2002, Mr. Cleckler has received only four cost of living adjustment raises, as follows:

| | | | |
|---|---|---|---|
| 9/7/02 | COLA | Pay Grade 79 | Step 18 |
| 9/3/05 | COLA | Pay Grade 79 | Step 18 |
| 9/1/06 | COLA | Pay Grade 79 | Step 18 |
| 9/1/07 | COLA | Pay Grade 79 | Step 18 |

17.     In addition, as a merit system employee, Mr. Kelly receives all rights, entitlements and benefits (including health insurance, vacation, sick leave, etc.) that all merit employees receive, including Mr. Cleckler, from the State of Alabama.

18.     With regard to Mr. Kelly's request for a desk audit, like John Free, I also refused to request a desk audit for Mr. Kelly's benefit, for the same reasons set forth in John Free's affidavit submitted herewith.

19.    Finally, I deny Mr. Kelly's allegations that I have at any time acquiesced in John Free's alleged conduct. To the contrary, based upon my personal knowledge, observation and experience working with both Greg Kelly and John Free, John Free has never discriminated against Mr. Kelly with regard to any aspect of Mr. Kelly's employment with the PSC based upon Kelly's race, age or any unlawful or improper basis. Likewise, I have never known John Free to harass or engage in any unprofessional, uncivil or unwarranted conduct toward Greg Kelly. To the contrary, John Free has shown the utmost patience and professionalism in dealing with Mr. Kelly while carrying out and upholding the personnel rules and regulations of the Alabama Public Service Commission, the Energy Division and the Electricity Section.

Affiant further saith not.

_Janice M. Hamilton_
JANICE M. HAMILTON

SWORN to and SUBSCRIBED before me this the 28th day of March, 2008.

_Giles Milton Laurence_
NOTARY PUBLIC
My Commission Expires: October 21, 2010

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

GREGORY KELLY,                                    )
                                                  )
    Plaintiff,                                    )
                                                  )
v.                                                )        CASE NO:2-07-cv-610-WHA
                                                  )
JOHN FREE, individually and in his official       )
position as an employee of the Alabama Public     )
Service Commission; JANICE M. HAMILTON,           )
individually and in her official position as a    )
Division Director of the Alabama Public Service   )
Commission; and ALABAMA PUBLIC SERVICE            )
COMMISSION, an agency of the State of Alabama.    )
                                                  )
    Defendants.                                   )
                                                  )

**STATE OF ALABAMA**              )

**COUNTY OF MONTGOMERY**    )

### AFFIDAVIT OF JOHN A. GARNER

    1.    My name is John A. Garner. I am a citizen of the State of Alabama residing in Montgomery County, Alabama.

    2.    I am currently employed as the Chief Administrative Law Judge of the Legal Division of the PSC. I also serve as Director of the PSC Legal Division. I have been employed by the PSC for 22 years as of July 10, 2008. I have served in my present capacities with the PSC since June 2005.

    3.    In my present capacities with the PSC, the majority of my duties relate to a broad range of legal matters, including acting as a hearing examiner in proceedings before the PSC and representing the PSC in various legal proceedings.

4.    I have known and worked at the PSC with Gregory Kelly, John Free and Janice Hamilton ever since Gregory Kelly has been employed at the PSC.

5.    As the chief legal officer employed by the PSC, I was responsible for preparing and submitting the PSC's response to the charge of discrimination which Gregory Kelly filed with the Equal Employment Opportunity Commission.  A copy of such PSC's response is attached hereto.  In my investigation and preparation of that response, I determined, and again represent herein, that there was no evidence of any race, age or any other discrimination against Gregory Kelly by John Free, Janice Hamilton, or any one else at the PSC.

6.    I have never heard John Free nor Janice Hamilton make any racially derogatory remarks or racial slurs about Gregory Kelly.  I have also never witnessed nor known John Free or Janice Hamilton to do anything to discriminate against Gregory Kelly on the basis of race, age or any other wrongful basis.  I am also unaware of any acts committed by John Free, Janice Hamilton, or any other individual at the Commission against Gregory Kelly that would constitute harassment.

Affiant further saith not.

_____
JOHN A. GARNER

SWORN to and SUBSCRIBED before me this the _1st_ day of April, 2008.

_____
NOTARY PUBLIC
My Commission Expires: _October 21, 2010_



# STATE OF ALABAMA

ALABAMA PUBLIC SERVICE COMMISSION
P.O. BOX 304260
MONTGOMERY, ALABAMA 36130-4260

JIM SULLIVAN, PRESIDENT

JAN COOK, ASSOCIATE COMMISSIONER

SUSAN D. PARKER, PhD, ASSOCIATE COMMISSIONER

March 12, 2007

WALTER L. THOMAS, JR.

SECRETARY

Mr. Glenn Todd, Investigator
EEOC Birmingham District Office – 420
Ridge Park Place
1130 22nd Street, South
Birmingham, Alabama 35205

 In re: *Gregory Kelly v. Alabama Public Service Commission*
   Charge No. 420-2007-01781

Dear Mr. Todd:

 Attached hereto is the Position Statement of the Alabama Public Service Commission and the supporting documentation therefor. Please date stamp the extra copy of this cover letter and return it in the stamped, self-addressed envelope.

 Thank you for your assistance in this matter. Should you have questions, please do not hesitate to contact me at (334)242-5200.

     Sincerely,

     John A. Garner
     Chief Administrative Law Judge and
     Attorney for the Commission in this matter

JAG:eml
Attachments

BEFORE THE EQUAL EMPLOYMENT OPPORTUNITY COMMISSION

| | | |
|---|---|---|
| Gregory Kelly | ) | |
| | ) | |
| Complainant | ) | |
| | ) | |
| v. | ) | CHARGE NO. 420-2007-01781 |
| | ) | |
| Alabama Public Service Commission | ) | |
| | ) | |
| Respondent | ) | |

## POSITION STATEMENT OF THE ALABAMA PUBLIC SERVICE COMMISSION

Comes now the Alabama Public Service Commission (the "APSC") and submits this Position Statement in response to the Charge of Discrimination filed with the Equal Employment Opportunity Commission (the "EEOC") by Mr. Gregory Kelly ("Mr. Kelly") (or the "Complainant") and assigned Charge No. 420-2007-01781. The APSC generally denies Mr. Kelly's conclusory allegations of discrimination based on his race and/or age and responds to the more specific allegations which Mr. Kelly apparently relies upon to arrive at his claims of discrimination as noted in more detail below:

## GENERAL ALLEGATIONS

(1)     The APSC admits that Mr. Gregory Kelly is a 50-year-old black male employed in the Electricity Section of the Energy Division of the APSC.

(2)     The APSC further admits that Mr. Kelly is an Engineer, although that fact is not reflected in his job title per the specifications of the State Personnel Department of Alabama ("State Personnel"). Mr. Kelly's actual title per State Personnel is Utility Technical Specialist, Senior.

(3)     The APSC admits that Mr. Kelly's direct supervisor is Mr. John D. Free, the manager of the Electricity Section of the APSC's Energy Division, who has been employed in that capacity since May 2001 (See Affidavit of Mr. Free which is attached hereto at Appendix 1 at ¶3)

(4)    (a)    The APSC admits that Mr. Free is a white male, who at 43 years of age is younger than Mr. Kelly.  The APSC further notes that Mr. Free interviewed and subsequently hired Mr. Kelly as a Utility Engineering Specialist I on July 13, 2002 after also considering and/or interviewing one black male and two white male candidates from an employment register compiled by State Personnel. (See Free Affidavit at ¶5)

(b)    The APSC also notes that since being promoted to the position of manager of the Electricity Section of the Energy Division in May 2001, Mr. Free has hired four other individuals in addition to Mr. Kelly to work in the Electricity Section.  In particular, Mr. Free has hired Ms. Jackie Frazier, a 45-year-old black female; Ms. Patricia Smith, a 37-year-old black female; Ms. Sheila Ward, a 55-year-old white female; and Mr. Oretoluwa Isikalu, a 60-year-old black male who is no longer employed by the APSC. (See Free Affidavit at ¶7)

(c)    The APSC further represents that since being promoted to the position of Manager of the Electricity Section, Mr. Free has recommended promotions for Mr. Robert Taylor, a 56-year-old black male (from Public Utility Analyst II to Public Utility Analyst III); Ms. Sheila Ward, a 55-year-old white female (from Utility Analyst I to Public Utility Analyst II); Ms. Patricia Smith, a 37-year-old black female (from Utility Auditor I to Public Utility Analyst II); Mr. Greg Kelly, the 50-year-old black male Complainant (from Utility Engineering Specialist I to Utility Engineering Specialist II, which is now known as Public Utility Technical Specialist, Senior); and Ms. Jackie Frazier, a 45-year-old black female (from Administrative Support Assistant I to Administrative Support Assistant II). Clearly, these hirings and promotions are not reflective of discriminatory practices by the APSC or Mr. Free. (See Free Affidavit at ¶8)

(5)    The APSC admits that Mr. Free majored in Accounting and received a Bachelors of Science degree from Auburn University at Montgomery in 1987.  The APSC further notes, however, that Mr. Free is also a 1991 graduate of the Auburn University at Montgomery's Masters of Business Administration program and is a Certified Public Account licensed by the State of Alabama. (See Free Affidavit at ¶2)

(6)    The APSC admits that as Mr. Kelly's direct supervisor, Mr. Free evaluates Mr. Kelly's work performance and provides Mr. Kelly's annual performance rating pursuant to the Rules, Regulations and

Guidelines of State Personnel and the Merit System of Alabama codified at *Code of Alabama*, 1975, §36-26-1 *et seq*. The APSC asserts that it is not uncommon at the APSC and other agencies of the State of Alabama for one educational discipline to report to a manager and/or director with a different educational discipline or background. (See Free Affidavit at ¶4 and Affidavit of Janice M. Hamilton, Director of the APSC Energy Division, attached hereto as Appendix 2 at ¶5(a))

(7)     The APSC admits that there are only two other degreed engineers employed in the Energy Division of the APSC.

(8)     The APSC admits that one of the two additional engineers in the Energy Division referenced by Mr. Kelly in his charge is Ms. Janice M. Hamilton, a 50-year-old black female, who is the Director of the Energy Division of the APSC.

(9)     The APSC admits that Mr. J. Rick Cleckler ("Mr. Cleckler"), a 54-year-old white male, is the other degreed engineer in the Energy Division referenced by Mr. Kelly in his complaint. The APSC further admits that Mr. Cleckler is in charge of the Special Projects Section of the Energy Division and is the only individual in that Section. (See Hamilton Affidavit at ¶ 5(d))

(10)    The APSC denies that Mr. Cleckler "basically does the engineering work for the Water Section" of the Energy Division of the APSC. Indeed, the APSC notes that Mr. Cleckler provides technical support for all sections of the Energy Division. (See Hamilton Affidavit at ¶5(d))

(11)    The APSC admits that there are five sections in the Energy Division of the APSC. The APSC also notes that the current organizational structure of the Commission's Energy Division about which Mr. Kelly complains is the exact organizational structure which existed at the time that Mr. Kelly was hired (See Free Affidavit at ¶6 and Hamilton Affidavit at ¶6)

(12)    The APSC admits that the Water Section of the Energy Division is provided technical support by the Special Projects Section. The APSC denies, however, that the Natural Gas Section of the Energy Division is provided technical support by the Gas Pipeline Safety Section and instead notes that the Natural Gas Section is provided technical support by the Special Projects Section. The

-3-

APSC admits that Mr. Kelly provides technical support for the Electricity Section, but notes that Mr. Cleckler of the Special Projects Section is also called upon to provide technical support for the Electricity Section as well. (See Hamilton Affidavit at ¶5)

## THE SPECIFIC CHARGES ASSERTED BY MR. KELLY

(13)    The APSC denies Mr. Kelly's claim that the only section of the Energy Division which does not have technical support provided by an employee outside of the particular section in question is the Electricity Section of the Energy Division of which Mr. Kelly is an employee. Indeed, the APSC notes that no section of the Energy Division provides the entirety of its technical support internally, including the Electricity Section which is occasionally provided support by Mr. Cleckler of the Special Projects Section as noted above in ¶12. (See Hamilton Affidavit at ¶5)

(14)    The ASPC denies that Mr. Kelly is not organized in his own separate section to provide technical support to the Electricity Section due to the fact that Mr. Kelly is a black male over the age of 50 years. The APSC notes that the Electricity Section of the Energy Division has, even prior to Mr. Kelly's hiring, provided the bulk of its technical support internally because the inherent nature of issues specific to the electric industry requires a dedicated employee (or employees) within the section. (See Hamilton Affidavit at ¶¶5(d) and 7)

(15)    The APSC denies that all sections of the Energy Division of the APSC have their own separate budget to operate under and specifically denies that the Special Projects Section over which Mr. Cleckler is in charge has its own separate budget. Indeed, the APSC notes that even though the individual managers of the various sections of the Energy Division have input with the Energy Division Director regarding their respective section needs which go into the initial formulation of the overall budget for the Energy Division, none of the various sections of the Energy Division have their own separate budgets which they are responsible for actively administering and managing with the exception of the Gas Pipeline Safety Section. The manager of the Gas Pipeline Safety Section is responsible for actively managing his section's budget throughout the fiscal year because the Gas Pipeline Safety Section receives federal funding which is contingent on the amount of money expended by the section each year. (See Hamilton Affidavit at ¶9)

(16)     The APSC admits that Mr. Kelly operates under the budget of the Electricity Section, but denies that Mr. Kelly is not organized in a separate section with his own budget because he is black or because of his age. For the reasons set forth above in paragraph 14 of this position statement, the Electricity Section of the Commission's Energy Division has provided the bulk of its technical support internally with engineers dedicated to that section for many years prior to Mr. Kelly's hiring and at least since 1988. Those engineers have never operated under their own separate, actively managed budget, but have instead operated under the budget of the Electricity Section generally. (See Hamilton Affidavit at ¶¶7 and 9)

(17)     The APSC denies that Mr. Kelly has "lost out on training" as a result of not being in charge of a technical budget. As noted in paragraph 15 above, the APSC asserts that Mr. Kelly would not be "in charge" of his own budget even if he was organized in a separate section of the Energy Division of the APSC. (See Hamilton Affidavit at ¶9)

(18)     The APSC denies that Mr. Kelly has "lost out" on or been denied training opportunities because of his race or age. Indeed, the APSC notes that Mr. Kelly has been the recipient of more training opportunities than Mr. Cleckler, the 54-year-old white male Utility Technical Specialist, Senior in the Energy Division's Special Projects Section. (See Hamilton Affidavit at ¶9)

(19)     The APSC specifically denies that Mr. Kelly was initially denied the opportunity to attend training in Denver, Colorado because of his race or age. The APSC admits that the Gas Technology Training Seminar in Denver, Colorado referenced in the Complaint of Mr. Kelly is an all expense paid program that will not require the expenditure of state funds for certain APSC attendees and that Mr. Kelly's initial request to attend the seminar was denied by Mr. Free. The APSC asserts, however, that Mr. Free initially denied Mr. Kelly's request to go to Denver not because of Mr. Kelly's race or age, but because Mr. Kelly did not sufficiently explain that the Denver seminar was an all expense paid session and because Mr. Free had not yet made in-depth training evaluations for the remainder of the year. The APSC specifically denies that Mr. Kelly was subsequently allowed to go to Denver because Mr. Free was "overruled" by Ms. Hamilton, the Director of the Energy Division. The APSC instead asserts that after Mr. Free

was subsequently made aware that the Denver training seminar was free of charge, Mr. Free contacted the Denver event sponsors to confirm that fact and eventually received permission from the sponsors to send additional Commission employees, including Mr. Kelly and Ms. Hamilton, free of charge. The APSC admits that Mr. Kelly met with Ms. Hamilton regarding the Denver trip, but again denies that Ms. Hamilton "overruled" Mr. Free on that matter. (See Free Affidavit at ¶12 and Hamilton Affidavit at ¶10)

(20)     The APSC admits that the position which Mr. Kelly currently holds at the APSC has been occupied by a black person for the past 16 years except for the time period from February 1999 when Mr. Bernard Givan vacated the position due to resignation and Mr. Kelly was promoted to the position in May 2004. The position in question was formerly known as Utility Engineering Specialist II, but was changed by State Personnel to Utility Technical Specialist, Senior. (See Free Affidavit at ¶10)

(21)     The APSC has insufficient knowledge to respond to Mr. Kelly's claim that his position has not had a desk audit/job study for over 25 years or Mr. Kelly's claim that the last time a desk audit was done on his position it was occupied by a white person.

(22) (a)     The APSC denies that Mr. Kelly has specifically requested that a desk audit be performed on his position on "numerous occasions" but admits that Mr. Kelly has pursued changes to his salary range which would require a "desk audit" by State Personnel. A desk audit is the process utilized by State Personnel to upgrade the pay range of a particular position in state government. Notably, the decision of whether desk audits will be performed ultimately rests with State Personnel although managers can in their discretion request that State Personnel conduct a desk audit. (See Free Affidavit at ¶¶9(d) and (e))

(b)     The APSC asserts that Mr. Kelly's requested pay grade increases have not been pursued with State Personnel because Mr. Kelly has received an increase in pay grade by virtue of his promotion in 2002. Mr. Kelly's requested increases would have also placed him outside the acceptable guidelines of State Personnel per his job responsibilities and status in the Energy Division organizational structure. Further, the pay grade for the position held by Mr. Kelly compares favorably with the pay grade for similar positions at other utility commissions in the Southeast. It is also important to note that Mr. Kelly's Supervisor, Mr. Free, has not requested a desk

audit for any of the employees under his supervision although he has recommended promotions as noted in ¶3(c) herein. (See Free Affidavit at ¶¶9(c) and (f))

(23) (a) The APSC admits that Mr. Kelly's job title was changed from "Utilities Engineering Specialist II" to "Public Utility Technical Specialist, Senior" in May 2005. The APSC notes, however, that the change in job title referenced by Mr. Kelly was unilaterally effectuated by State Personnel for all engineers in the state system, including Mr. Cleckler, the 54-year-old white male in the Special Projects Section of the Energy Division, against the recommendation of personnel from the APSC. (See Free Affidavit at ¶10)

(b) The APSC is unaware as to whether State Personnel conducted a job study or provided specific justification for changing the job title in question. The APSC asserts, however, that such action by State Personnel would have likely been unnecessary since the decision did not impact the job responsibilities or pay grade of any individual in state government in the affected position, including Mr. Kelly or Mr. Cleckler. (See Free Affidavit at ¶10(b))

(24) (a) The APSC admits that Mr. Kelly has the same job title and pay grade as Mr. Cleckler; that Mr. Cleckler is a white male who is older than Mr. Kelly; and that Mr. Kelly is a black male. The APSC denies, however, that Mr. Kelly is "treated differently" than Mr. Cleckler except that Mr. Cleckler is situated differently in the Commission's organizational structure and is supervised by a younger black female engineer while Mr. Kelly is supervised by a younger white male Public Utility Analyst Manager with an Accounting Degree and a Certified Professional Accountant license. For the reasons set forth in ¶¶15 and 16 above, the APSC again asserts that there are valid reasons for the organizational structure established by the Energy Division which are unrelated to the race and/or age of any individual including Mr. Kelly. (See Hamilton Affidavit at ¶¶5 and 7)

(b) The APSC further notes that Mr. Kelly filed an internal grievance at the APSC against APSC Energy Division Director, Ms. Janice M. Hamilton regarding the organizational structure of the Energy Division claiming that it resulted in unfair treatment to him. In particular, Mr. Kelly asserted that he had suffered a "fractured career path, unlevel playing field, a compromised job position, lost

synergy and communication difficulties" due to the fact that he was not situated in the Special Projects Section of the APSC Energy Division where he could be supervised by an engineer. A panel of four of Mr. Kelly's APSC peers, which included two black females and two white males, found, after hearing before an APSC Administrative Law Judge, that the organizational structure of the Energy Division of the APSC did not adversely impact Mr. Kelly and was a matter within the discretion of the management of the APSC. (See Hamilton Affidavit at ¶8)

(25)    The APSC again admits that the position currently held by Mr. Kelly at the APSC has been held by a black person for the past 16 years, except for the time period from February 1999 when Mr. Bernard Givan vacated the position due to resignation and Mr. Kelly was promoted to the position in May 2004. The APSC denies, however, that Mr. Kelly is the first black, merit system engineer that has worked for the Energy Division of the APSC. The APSC indeed notes that Mr. Kelly's predecessor, Mr. Bernard Givan, was also a black, merit system engineer. (See Hamilton Affidavit at ¶5)

(26)    The APSC again denies that Mr. Kelly is treated differently than Mr. Cleckler because of Mr. Kelly's race and/or age. Indeed, the APSC asserts that Mr. Cleckler and Mr. Kelly are both engineers who hold the same job title and have the same pay grade. The APSC again maintains that the only ways in which Mr. Kelly is treated differently than Mr. Cleckler lie in the fact that Mr. Cleckler is in a separate section of the Energy Division and supervised by a younger black female with an engineering degree while Mr. Kelly is supervised by a younger white male Public Utility Analyst Manager with an accounting degree and Certified Public Accountant license. The APSC denies that these circumstances or "differences" give rise to a claim that Mr. Kelly is discriminated against by virtue of his race or age.

## CONCLUSION

In conclusion, the APSC reasserts its general denial of the Complainant's claim of discrimination based on race and/or age. Except where specifically noted to the contrary, the APSC further denies the allegations raised by the Complainant in support of his ultimate claims of discrimination.

The APSC particularly asserts that the positions set forth above and the supporting documentation provided therefor conclusively demonstrate that Mr. Kelly has failed to even remotely demonstrate any evidence of race and/or age discrimination. To the contrary, the APSC argues that:

(1)    The evidence submitted herein demonstrates that neither Mr. Free, Mr. Kelly's direct supervisor, nor anyone else at the APSC has been discriminatory in any way toward Mr. Kelly or any other employee;

(2)    Mr. Kelly is not organized in his own separate section of the Energy Division of the APSC due to legitimate managerial considerations that are completely unrelated to race and/or age;

(3)    Mr. Kelly would not be "in charge" of his own budget even if he were organized in a separate section of the Energy Division;

(4)    Mr. Kelly has not "lost out" on any training opportunities because of his race or age and has in fact received more training than his older, white contemporary in the APSC Energy Division, Mr. Cleckler;

(5)    The subtitle for all Utilities Engineering Specialist II's in state government, including Mr. Kelly and Mr. Cleckler, was changed to Utility Technical Specialist, Senior due to unilateral action by State Personnel which did not result in a change in pay grade or job responsibilities;

(6)    A desk audit has not been requested by Mr. Free for Mr. Kelly's position due to legitimate managerial considerations unrelated to race and/or age.

It thus appears that Mr. Kelly's charges of discrimination are merely vehicles for achieving his desired modifications to the organizational structure of the Energy Division of the APSC which is not discriminatory to Mr. Kelly in its establishment or effects. The APSC accordingly urges the EEOC to see through Mr. Kelly's subterfuge and dismiss his charges of discrimination on the grounds that there is no cause to support said charges.

John A. Garner
Chief Administrative Law Judge
Alabama Public Service Commission
Attorney for the Commission in this matter

-9-

## CERTIFICATE OF SERVICE

I hereby certify that the foregoing Position Statement of the Alabama Public Service Commission and the supporting documentation therefor were sent FedEx Priority Overnight, prepaid, this 12th day of March, 2007 to the party listed below:

Mr. Glenn Todd, Investigator
EEOC Birmingham District Office – 420
Ridge Park Place
1130 22nd Street, South
Birmingham, Alabama 35205

I hereby certify that the foregoing Position Statement of the Alabama Public Service Commission and the supporting documentation therefor were mailed, postage prepaid, this 12th day of March, 2007 to the party listed below:

Mr. Gregory Kelly
6213 Willow Glenn Drive
Montgomery, Alabama 36117

John A. Garner
Chief Administrative Law Judge
Alabama Public Service Commission
Attorney for the Commission in this matter

BEFORE THE EQUAL EMPLOYMENT OPPORTUNITY COMMISSION

Gregory Kelly                          )
                                       )
   Complainant                     )
                                       )
v.                                     )          CHARGE NO. 420-2007-01781
                                       )
Alabama Public Service Commission )
                                       )
   Respondent                      )

## AFFIDAVIT OF JOHN D. FREE

(1)    My name is John D. Free. I am 43 years of age and otherwise competent to testify in courts of the United States and this state. I have personal knowledge of the facts contained in this affidavit.

(2)    I am a 1991 graduate of the Auburn University at Montgomery Masters of Business Administration program and received a Bachelor of Science degree from Auburn University at Montgomery in 1987. I am also a Certified Public Accountant licensed by the State of Alabama.

(3)    I am currently employed as a Public Utility Analyst Manager with the Electricity Section of the Energy Division of the Alabama Public Service Commission (the "APSC") and have been so employed since mid-2001. From May 1990 until mid-2001, I was employed in the Electricity Section of the Energy Division as a Public Utilities Auditor.

(4)    As a Public Utility Analyst Manager, I am responsible for the day-to-day supervision and control of the employees in the Electricity Section of the Energy Division of the APSC. In my aforementioned capacity as a Public Utility Analyst Manager, I am responsible for hiring, evaluating and rating the performance of the employees under my direct supervision and control pursuant to the Rules, Regulations and Guidelines of Alabama State Personnel Department ("State Personnel") and the Merit System of Alabama codified at *Code of Alabama*, 1975, §36-26-1, *et seq.*

(5)    I hereby certify that I am the individual at the APSC who interviewed and hired the Complainant in this cause, Mr. Gregory Kelly, on or about July 13, 2002. I hired Mr. Kelly over one other black male candidate and two white male candidates who appeared on an employment register compiled by State Personnel.

(6)  The organizational structure of the Energy Division of the APSC is the same today as it was on the date that Mr. Kelly was hired as a Utilities Engineering Specialist I on July 13, 2002. Mr. Kelly was interviewed by Mr. Free and APSC Energy Division Director, Ms. Janice M. Hamilton, and was made aware that he would report to Mr. Free. Mr. Kelly expressed no concerns or reservations regarding this organizational structure or his salary range. (See JDF Exhibit 1 which is attached hereto)

(7)  In addition to hiring Mr. Kelly, I have, in my capacity as Manager of the Electricity Section of the Energy Division, also hired Ms. Jackie Frazier, a 45-year-old black female, Ms. Patricia Smith, a 37-year-old black female, Ms. Sheila Ward, a 55-year-old white female, and Mr. Oretoluwa Isikalu, a 60-year-old black male who is no longer employed by the APSC.

(8)  In addition to the above hirings, I have also recommended that numerous employees under my supervision be promoted. Notably, I have recommended promotions for Mr. Robert Taylor, a 56-year-old black male (from Public Utility Analyst II to Public Utility Analyst III), Ms. Sheila Ward, a 55-year-old white female (from Public Utility Analyst I to Public Utility Analyst II), Ms. Patricia Smith, a 37-year-old black female (from Public Utility Auditor I to Public Utility Analyst II), Mr. Greg Kelly (from Utility Engineering Specialist I to Utility Engineering Specialist II which is now known as a Public Utility Technical Specialist, Senior), and Ms. Jackie Frazier, a 45-year-old black female (from Administrative Support Assistant I to Administrative Support Assistant II).

(9)  (a)  Upon his promotion in May 2004, Mr. Kelly's salary structure was upgraded from pay grade 77 to pay grade 79. Despite this fact, Mr. Kelly has persistently requested that his position be further evaluated and that his pay grade be upgraded to a salary range of 85. These salary upgrades requested by Mr. Kelly would have necessitated a "desk audit" by State Personnel as explained in ¶9(d) below. Mr. Kelly has requested a desk audit, but not on numerous occasions as he represented. In addition, Mr. Kelly has submitted several self-prepared "market studies" of various engineering related positions.

(b)  The market surveys, compiled and submitted by Mr. Kelly, attempt to compare his current salary range to the salary ranges of other positions that are engineering related. Based on this information, Mr. Kelly has requested that his salary range be increased to Pay Grade 85, which is higher than the Energy Division Director's salary level and of his immediate supervisor, Mr. Free. It is unclear if Mr. Kelly's comparisons attempt to consider the following: 1) differences between private sector positions vs. government sector positions, 2) the level of responsibilities for each position, 3) supervisory responsibilities of each position, 4) requirements to hold a

Professional Engineer's License and 5) other benefits that may be part of a total compensation package.

(c)    It is my opinion that, in addition to private sector comparisons, the salary range for the Public Utility Technical Specialist, Senior position should be compared with the salary ranges of similarly situated positions at other Public Service Commissions in the Southeast. As such, I contacted several other state commissions in the Southeast and requested job descriptions and salary information for engineering positions that, in my opinion, closely resembled the job responsibilities of the Public Utility Technical Specialist, Senior. Using this information, it appears that the salary range of the Public Utility Technical Specialist, Senior position is in line with the salary ranges of closely related engineering positions at other state Commissions.

(d)    A "desk audit" is a process utilized by State Personnel to assess requests for salary upgrades to particular positions. Notably, when State Personnel performs desk audits for a particular position in the Merit System, all individuals within the entire state system who hold the position in question are impacted. As such, all persons holding the position in question would be interviewed as well as their managers and directors. Thus, any resulting changes to the position in question would affect all persons holding that position.

(e)    It is also important to note that managers and/or directors may only request that State Personnel perform a desk audit for a particular position. The ultimate decision of whether a desk audit will be performed ultimately rest with State Personnel. Further, managers and directors are under no obligation to request desk audits for any position. The pursuit of desk audits is instead a discretionary matter impacted to some degree by an employee's responsibilities, performance and compliance with applicable rules and policies. Notably, I have never requested a desk for any employee under my supervision, but I have recommended promotions on numerous individuals under my supervision including Mr. Kelly as noted in 8 herein.

(f)    Furthermore, it is my opinion that the pay grades for the various positions in our agency should be structured in such a way as to recognize the level of the position within the organizational structure, as well as the level of responsibilities for each position. In the current salary structure, Mr. Kelly's position is pay grade 79, Mr. Free's pay grade is 81 and Ms. Hamilton's pay grade is 84. Therefore, as should be the case, the current salary structure does

differentiate between the various positions of professional staff, managers and directors.

(10)  (a)  While there have been no changes to Mr. Kelly's salary range for his current position, it is true that the job title for Mr. Kelly's position was changed from Utilities Engineering Specialist II to Public Utility Technical Specialist, Senior by State Personnel. It is important to note that this action by State Personnel was a unilateral decision by that department and in no way related to any actions on the part of the APSC. Indeed, division directors at the APSC and the APSC's personnel officer attempted to persuade State Personnel to reconsider their decision to change the job title in question because they felt it would hamper the APSC's efforts to attract and hire quality engineers that do not possess professional engineer's licenses if the word "engineer" or "engineering" is excluded from the position title.

(b)  It is unclear whether State Personnel conducted any job studies when changing the job title for Mr. Kelly's position, but is noteworthy that State Personnel's actions did not impact the pay grade for Mr. Kelly's position or the job responsibilities for the position. Further, State Personnel's actions impacted all persons in state government who hold the position that Mr. Kelly does, including Mr. Cleckler, a 54-year-old white male in the Special Projects Section of the APSC's Energy Division.

(11)  (a)  With respect to Mr. Kelly's claims regarding lost training opportunities, it is important to note that employees of the APSC's Energy Division receive training and professional development through various avenues, including "on the job training" whereby employees are exposed to various industry related topics and regulatory assignments that provide them with experience regarding many facets of a utility company's industry and/or business. The second method of professional development utilized by the Energy Division is through the review of work related articles, journals, magazines, newsletters, research on new technologies and/or participation in web-based seminars, conference calls and other similar activities. A third method of professional development utilized by the Energy Division is employee attendance at industry related seminars.

(b)  With all of the various methods of training discussed above, the degree of professional development derived is to a great extent dependent on the individual employee's preparation, level of engagement, and the quality of the training source. Additionally, the type of training selected for employees of the Energy Division are

dependent on a number of considerations, including the availability of funds, expected costs versus expected benefits of the training in question, the relevance and urgency of such training, an assessment of staff needs, staff performance and conduct, individual employee preference, distribution of training opportunities among various employees in the section and/or division, and the demonstrated benefits of the training methodology selected.

(c)     Notably, Mr. Kelly has had available to him the exact same Internet access, industry publications and subscriptions as other employees in the Electricity Section of the APSC Energy Division.    Further, Mr. Kelly has had as much or more opportunities to attend the more costly out-of-state seminars/conferences than other similarly situated employees within the Electricity Section.

(12)    (a)    With respect to Mr. Kelly's charge that he was not allowed to attend the Gasification Technologies Workshop to be held in Denver, Colorado, on March 13-15, 2007, it is my recollection that on or about January 30, 2007, Mr. Kelly came to my office sometime around midmorning.    At the time, I was engaged in a telephone discussion with Alabama Power Company personnel regarding a work-related matter. As Mr. Kelly entered my office, I noticed that Mr. Kelly was holding some documents in his right hand.    As I was on the telephone, Mr. Kelly did not interrupt, but simply placed the papers on the left front corner of my desk and walked away. Mr. Kelly did not say anything at this time.    After completing my telephone conversation and then attending to some other small matters, I picked up the documents Mr. Kelly had left on my desk and began to scan them.    As I briefly read through some of the documents, the information that came to my attention included the following:

1.    The document was an invitation to attend a Gasification Technologies Workshop; and
2.    The workshop was being held in Denver, Colorado.

(b)     My thought process at that point was as follows:  1) Gasification Technology is not an urgent issue at this time because Alabama Power Company will not need to construct additional electric generation units for several years to come.    This being the case, I would rather save any training dollars my section may have for other issues;  2) A conference in Denver, Colorado would most likely be very costly;  3) To my recollection, it seemed that Mr. Kelly had attended a coal gasification workshop within the last two years and; 4) I believed that Alabama Power Company had a coal gasification research facility in nearby Wilsonville, Alabama which I could make arrangements for Mr. Kelly to visit to learn about coal gasification

technology more cost effectively. Based on the foregoing, I made the initial decision to not request approval for Mr. Kelly to attend the Denver workshop.

At the time of Mr. Kelly's request, I had already approved approximately three less expensive training sessions for employees of the Electricity Section. I was concerned with the Denver seminar because it was out-of-state and likely costly. I accordingly placed a "sticky note" on the top page of the Denver workshop invitation that Mr. Kelly had provided to me and wrote the following message (or something very similar):

*Greg,*
*Not at this time. I have not decided on a training schedule/budget for*
*2007.*
*John*

After writing the note above, Ms. Jackie Frazier, the Electricity Section Secretary, came into my office to deliver something. As she was leaving, I asked her if she would deliver the workshop invitation with attached "sticky note" to Mr. Kelly. Ms. Frazier indicated that she would do so.

(c)    A while later, Mr. Kelly came into my office holding some documents and inquired if I had read the documents in question in their entirety. I advised Mr. Kelly that I had not read all of the documents but did scan through them. Mr. Kelly then commented that the workshop was "free." I then asked Mr. Kelly if all of the costs were covered including accommodations and travel rather than just the workshop fee. Mr. Kelly advised that "yes," everything was covered. I suggested that Mr. Kelly leave the documents with me again. In light of this additional information, I agreed to review them more closely. I began reading the entire document (approximately 3 pages) and discovered on page 3 that the cost of the workshop, including meals, travel and hotel would indeed be reimbursed. At this time, I telephoned the contact person listed on the document, Ms. Marie Kent, to discuss the reimbursement provisions and to ascertain the appropriate procedures that would ensure timely reimbursement. In my discussions with Ms. Kent, I learned that the workshop's sponsor was not opposed to the Commission sending up to six (6) people to the workshop, free of charge, rather than three (3) persons as originally indicated in the invitation. At that point, I thought I should share the available information with Ms. Janice Hamilton, the Director of the APSC Energy Division.

(d)     Sometime later that day or the next, Ms. Hamilton came to my office and explained that Mr. Kelly had approached her and indicated that I had turned him down for a request to attend a coal gasification workshop. Ms. Hamilton further indicated that Mr. Kelly had asked if she would consider his request. I immediately recounted to Ms. Hamilton exactly what had transpired to that point regarding Mr. Kelly's request and informed her that when I had made the original decision to not allow Mr. Kelly to attend the Denver conference, I was unaware that it was an "all expenses paid" workshop. I further stated that Mr. Kelly had not mentioned that the workshop was "free" initially. I further explained to Ms. Hamilton that I had already contacted Ms. Kent for further details on the workshop and that Ms. Kent had said that the APSC could send up to six (6) people. Ms. Hamilton indicated that, in addition to Mr. Kelly that she would like to attend the workshop and would ask Mr. Cleckler to attend. Ms. Hamilton continued the conversation by asking which other employees I would like to send to the workshop. I replied that, in addition to Mr. Kelly, I would like to send Ms. Sheila Ward, Ms. Linda Gardner and possibly myself. Within a couple of days, I made the decision to not attend the workshop but suggested that perhaps Mr. Brad Williams, an assistant to the newly-elected Commissioner Susan Parker, might like to attend.

(e)     Either that same day or the next, I sent an email to Mr. Kelly informing him that Ms. Hamilton and I had reviewed the Coal Gasification Technology Workshop invitation and the associated reimbursement allowances. I further stated that we would attempt to make plans for five or six persons to attend including Mr. Kelly. I thanked Mr. Kelly for bringing this workshop to our attention (See JDF Exhibit 2 attached hereto)

(f)     On February 1, 2007, the necessary out-of-state travel requests for Mr. Kelly, Ms. Ward and Ms. Gardner were completed and approved by both Ms. Hamilton and me. On February 16, 2007, Ms. Hamilton sent an email to the persons planning to attend the workshop and copied me, whereby, Ms. Hamilton informed me therein that she had received the required travel approval from the parties in question.

(13)    I hereby represent in conclusion that I have never discriminated against Mr. Kelly for any reason including his race or age. This is true with respect to all aspects of his employment including his salary, his job responsibilities and his professional development and training.

Further, the affiant sayeth not.

_____
John D. Free

SWORN TO AND SUBSCRIBED before me this the _12<u>th</u>_ day of March, 2007.

_____
Notary Public

My Commission Expires: _October 21, 2010_



# ELECTRICITY SECTION

### As of 12/17/01

Hamilton, J.M.
Director
2-2835; IC260

ELECTRICITY

Free, John
Supervisor
2-9576; IC323

Gardner, Linda D.
Staff Accountant
2-9798; IC264

Isikalu, Oreoluwa
Accountant
2-9848; IC349

(Future)
Engr Spec II
2-5868; IC267

(Future)
Engr Spec I
2-9727; IC347

Taylor, Robert III
Analyst II
2-5870; IC266

Ward, Sheila H.
Analyst I
2-9575; IC322

(Vacant)
ASA I
2-5868; IC270



ENERGY DIVISION

As of 7/15/2002

Organizational Structure
As of March 10, 2003

Christopher J. Harvey
Gas Pipeline Safety
2-5790 / 850-0047

Jannette S. Mitchell
2-6778 / 850-0063

Receptionist
2-5779

John Paul Harris, North
2-9744 / 850-0046

David P. Snoddy
2-9768 / 850-0052

Gregory C. Meadows
2-9737 / 850-0049

O. Harold Dunson, Central
2-9732 / 850-0054

Hosie E. Powell
2-9849 / 850-0051

Tommy W. Lancaster, South
2-9752 / 850-0048

Judy D. Ramsey
2-9879 / 850-0261

Spencer C. Brady
2-9864 / 850-0044

J. Rick Chandler
Special Projects
2-9874



**Energy Division**
Organizational Structure
As of January 1, 2004

**Energy Division**
Organizational Structure
As of November 1, 2006

James H. Hileman
Division Director
2-8815 / 850-0045 (260)

Christopher J. Harvey
Gas Pipeline Safety
Administrator
2-5780 / 850-0047 (283)

Jametha S. Mitchell
Steno III
2-5779 / 850-0053 (285)

Spencer C. Brady
GPS Training Officer
2-9884 / 850-0044

Carlton L. Avery
Student Aide
2-5989 (287)

John Paul Harris, North
GPS Investigator, Supv.
2-9744 / 850-0046

David F. Snoddy
GPS Investigator, Sr.
2-9789 / 850-0052

Gregory C. Meadows
GPS Investigator, Sr.
2-9787 / 850-0048

Investigator (Future)
2-9879 (222)

O. Harold Dunson, Central
GPS Investigator, Supv.
2-9732 / 850-0054

Hoyle E. Powell
GPS Investigator, Sr.
2-9849 / 850-0051

Investigator (Future)
2-9879 (222)

Tommy W. Lancaster, South
GPS Investigator, Supv.
2-9752 / 850-0048

Jody D. Ramsey
GPS Investigator, Sr.
2-9879 / 850-0261

Investigator (Future)
2-9879 (222)

J. Rick Caldeler
PU Technical Spec., Sr.
Special Projects
2-9714 (241)

PU Tech Spec (Future)
2-9889 (267)

**From:** Free, John
**Sent:** Thursday, February 01, 2007 11:47 AM
**To:** Kelly, Greg
**Cc:** Ward, Sheila; Gardner, Linda; Cleckler, Rick; Hamilton, Janice
**Subject:** Gasification meeting in Denver

Greg,

Janice and I have reviewed the Gasification Workshop letter and the reimbursement allowances. As such, we are trying to make plans for 5 or 6 people to attend, including yourself. I have spoken with Marie Kent and she assured me this would be ok. Janice is going to book six rooms in for our attendees. We need estimates from each attendee to send to Ms. Kent for approval. Also, any cost incurred by the attendee that is not covered under the reimbursement allowance shall be borne by the attendee. Thanks for bringing this to our attention.

John

## BEFORE THE EQUAL EMPLOYMENT OPPORTUNITY COMMISSION

| | | |
|---|---|---|
| Gregory Kelly | ) | |
| | ) | |
| Complainant | ) | |
| | ) | |
| v. | ) | CHARGE NO. 420-2007-01781 |
| | ) | |
| Alabama Public Service Commission | ) | |
| | ) | |
| Respondent | ) | |

### AFFIDAVIT OF JANICE M. HAMILTON

(1)     My name is Janice M. Hamilton. I am 50 years of age and otherwise competent to testify in courts of the United States and this state. I have personal knowledge of the facts contained in this affidavit.

(2)     I am a 1981 graduate of the University of Alabama at Birmingham from which I received a Bachelor or Science degree in Engineering.

(3)     I am currently employed as the Director of the Energy Division of the Alabama Public Service Commission (the "APSC") and have been so employed since October 1992. From August 20, 1990 until my promotion to Director in October 1992, I was an APSC Engineer in the Electricity Section of the Energy Division.

(4)     As Director of the Energy Division of the APSC, I am responsible for the organizational structure of the Energy Division and the day-to-day supervision and control of the employees in the Energy Division. I am responsible for hiring, evaluating, and rating the performance of the employees under my supervision pursuant to the Rules, Regulations and Guidelines of Alabama State Personnel Department ("State Personnel") and the Merit System of the State of Alabama codified at *Code of Alabama*, 1975, §36-26-1, *et seq.*

(5)     (a)     Upon my hiring by the APSC in August 1990, the Energy Division of the APSC was organized into four sections – Electricity, Natural Gas, Water and Gas Pipeline Safety. The Electricity Section consisted of eleven employees with different areas of expertise. The various disciplines included engineering, financial analysis, auditing, business accounting and administrative. Included this group were employees with technical backgrounds that reported to Mr. Robert Duxbury, the Supervisor of the Electricity Section whose background was in the area of financial analysis. Those employees consisted of three engineers, Mr. Bernard Givan, a black male; Mr. J. Rick Cleckler, a white male; and me. It is not uncommon at the APSC and other agencies of the State of Alabama for

one educational discipline to report to a manager or director with a different educational discipline or background.

(b)   In October 1992, I was promoted to the position of Director of the Energy Division. In preparation for Mr. Duxbury's inevitable retirement, I made the decision to form a Technical Section in 1993 in order to alleviate the undue burden of having to directly manage nine subordinates from the Electricity Section and three other section supervisors as well as perform my administrative duties as Director. This was also an effort to see if concentrating the division's engineering efforts into one section would be more productive. Mr. Duxbury subsequently retired in 1995.

(c)   The Technical Section was led by Mr. Bernard Givan, a Utility Engineering Specialist II, who reported directly to me before and after this organizational change. Mr. Givan also reported to Mr. Duxbury prior to Mr. Duxbury's retirement. Also included in the Technical Section were Mr. Cleckler, a Utility Engineering Specialist II at the time, and Mr. Will Straughn, a Utility Engineering Technician, who was moved from the Water Section. This structure continued after Mr. Givan's resignation in February 1999. Both Mr. Cleckler and Mr. Straughn reported to me for the next couple of years. In May 2001, Mr. John Free was promoted to Electricity Section Supervisor. At the same time, Mr. Straughn was moved to the Electricity Section to perform technical support for that section absent another engineer and reported to Mr. Free. I elected at that time to retain Mr. Cleckler as the sole employee of the Technical Section due to his vast knowledge and broad background in multiple facets of regulatory principles and techniques. (See JMH Exhibit 1 which is attached hereto)

(d)   The Technical Section was subsequently renamed the "Special Projects Section" and continued to have Mr. Cleckler as its sole employee. Mr. Cleckler performed and continues to perform a variety of duties including coordinating the following (1) issues that pertain to multiple disciplines and/or unregulated utilities, (2) research of federal and state utility policies and topics, (3) regulatory support required to be provided to the Alabama Department of Public Health pursuant to an APSC contract, and (4) technical support to the Natural Gas, Water, Gas Pipeline Safety and Electricity Sections. Notably, Mr. Cleckler's provision of technical support for the Electricity and Gas Pipeline Safety Sections is somewhat limited due to the fact that those two sections have always provided the bulk of their technical support with internal employees due to the inherent nature of their respective areas of responsibility.

In September 2001, Mr. Straughn retired. His retirement, combined with existing engineering vacancies, left the Electricity Section without a fulltime staff engineer to provide technical support. It was at this time that Mr. Free and I began our efforts to hire an engineer for the Electricity Section, a position which had been vacant since Mr. Givan's resignation in 1999.

(6)    Mr. Gregory Kelly was hired as a Utility Engineering Specialist I for the Electricity Section by Mr. Free on July 13, 2002. Mr. Kelly was made aware that he would report directly to Mr. Free at the time of his hiring and raised no concerns regarding same. Notably, the organizational structure of the Energy Division discussed above was in place when Mr. Kelly was hired and on the date that Mr. Kelly filed his charges of discrimination in this matter. (See JMH Exhibit 1 which is attached hereto)

(7)    With respect to Mr. Kelly's insinuation that he is not in a separate technical section due to his age and/or race, I again note that the Electricity Section where Mr. Kelly is employed has for many years provided its own technical support with an employee or employees inherent to that section due to the general nature of the electricity issues addressed by that section. Accordingly, Mr. Kelly's employment within the Electricity Section is based exclusively on managerial concerns that are totally unrelated to Mr. Kelly's age and/or race.

(8)    It is also important to note that in July 2005, Mr. Kelly filed a formal grievance with the APSC against me pursuant to internal APSC procedures asserting that the Energy Division's organizational structure caused him to suffer a "fractured career path, an unlevel playing field, a compromised job position, lost synergy and communication difficulties." Mr. Kelly's claims were adjudicated in accordance with the APSC's formal grievance procedures. A hearing was held concerning Mr. Kelly's claims before an APSC Administrative Law Judge and a panel of four of Mr. Kelly's APSC peers, which included two black females and two white males. The panel found, and the APSC agreed, that Mr. Kelly's grievance was due to be dismissed because the organizational structure of the Energy Division had not resulted in unfair treatment to Mr. Kelly and was a matter within the managerial discretion of the APSC and its Energy Division Director. (See JMH Exhibit 2 attached hereto)

(9)    With respect to Mr. Kelly's insinuation that he has "lost out" on training as the result of not being in charge of a technical budget, I first note that Mr. Kelly has received as much or more training than any individual in the Energy Division including Mr. Cleckler, his white male contemporary. (See JMH Exhibit 3 attached hereto) I also note that the only section manager within the Energy Division which actively manages a section budget is the Gas Pipeline Safety Section. The Gas Pipeline Safety Section Administrator only has this responsibility due to the fact that the Gas Pipeline Safety Section receives federal funding that is contingent on amounts expended each year. The other section managers merely provide input to me on their projected needs for the fiscal year in question. I then review the information provided by each section manager and compile an overall Energy Division budget for submission to the APSC's Administrative Division, Finance Section for their review, revisions and/or approval. The Administrative Division, Finance Section then submits the overall budget of the APSC, which includes the Energy Division, to the Alabama Legislature for their review, revisions, and/or approval. No section manager in the Energy Division other than the Administrator of the Gas Pipeline Safety

Section actually has or manages a section budget. This includes Mr. Cleckler, the 54-year-old white male Utilities Technical Specialist, Senior who manages the Special Projects Section. Thus, even if Mr. Kelly were in a standalone section he would not be in charge of a budget that would allow him sole discretion regarding training opportunities just as Mr. Cleckler is not. Mr. Kelly's training would instead be considered in the overall context of the budget of the Energy Division as a whole.

(10)  (a)  Regarding Mr. Kelly's claim that I "overruled" Mr. Free's initial decision not to let Mr. Kelly attend the Gasification Technologies Seminar in Denver, Colorado scheduled for March 2007, my recollection is that on January 31, 2007, Mr. Kelly came to my office and asked me if there was any reason why I thought Mr. Free would not approve of him to attend a free conference. I first advised Mr. Kelly that I didn't know and asked him to what was he referring. Mr. Kelly then handed me the Denver coal gasification workshop invitation and pointed out to me that the invitation discussed a reimbursement proposal for state regulatory employees. I advised Mr. Kelly that I was sure that Mr. Free had a good reason for not approving his participation in the workshop and that I would speak to Mr. Free about his decision when he returned to work the next day.

       (b)  Around noon the next day, I went to Mr. Free's office to discuss the matter of the coal gasification workshop with him and to find out exactly what had transpired. When I told Mr. Free that Mr. Kelly had come to my office and complained that he was not being allowed to attend the free coal gasification workshop, Mr. Free immediately explained the matter to me just as he explained in ¶12 of his Affidavit attached hereto as Appendix 1. Mr. Free advised me that Mr. Kelly did not initially make him aware that the workshop was offered at no cost to state regulatory personnel when he first left the invitation on Mr. Free's desk. Mr. Free advised me that his first thoughts were that a trip to Denver would likely be expensive and that coal gasification was not a priority topic for immediate Commission action or concern. Mr. Free advised me that he would take a closer look into the workshop details, talk to the sponsors and reconsider his decision. Mr. Free later determined that the seminar was fully reimbursable by the workshop's sponsors and approved Mr. Kelly to attend. I at no point "overruled" Mr. Free on this matter.

Further, the affiant sayeth not.

_____
Janice M. Hamilton

SWORN TO AND SUBSCRIBED before me this the _12th_ day of March, 2007.


_____
Notary Public


My Commission Expires: _October 21, 2010_

# ELECTRICITY SECTION

## As of 12/17/01



Hamilton, J.M.
Director
2-2835; IC260

ELECTRICITY

Free, John
Supervisor
2-9579; IC323

Gardner, Linda D.
Staff Accountant
2-9798; IC264

Isikalu, Oretoluwa
Accountant
2-9848; IC349

(Future)
Engr Spec II
2-5869; IC267

(Future)
Engr Spec I
2-9727; IC347

Taylor, Robert III
Analyst II
2-5870; IC266

Ward, Sheila H.
Analyst I
2-9575; IC322

(Vacant)
ASA I
2-5888; IC270

JMH EXHIBIT A



ENERGY DIVISION

As of 7/15/2002

**Organizational Structure**
As of March 10, 2003

Jannette S. Mitchell
2-5773 / 850-0053

Christopher J. Harvey
Gas Pipeline Safety
2-5790 / 850-0747

J. Rick Chester
Special Projects
2-9744 / 850-

Receptionist
2-5778

John Paul Harris, North
2-9744 / 850-0046

David P. Snoddy
2-9769 / 850-0052

Gregory C. Meadows
2-9767 / 850-0049

Hosie E. Powell
2-9849 / 850-0051

O. Harold Dunson, Central
2-9732 / 850-0054

Tommy W. Lancaster, South
2-9762 / 850-0048

Judy D. Ramsey
2-9879 / 850-0261

Spencer C. Brady
2-9864 / 850-0044



**Energy Division**
Organizational Structure
As of January 1, 2004



**Energy Division**
Organizational Structure
As of November 1, 2006

Christopher J. Harvey
Administrator
Gas Pipeline Safety
2-5780 / 850-0047 (283)

Jannette S. Mitchell
2-5779 / 850-0053 (285)

Spencer C. Brady
GPS Training Officer
2-9884 / 850-0044

Carlton L. Avery
Student Aide
2-5869 (287)

John Paul Harris, North
GPS Investigator, Sr.
2-9744 / 850-0046

Tommy W. Lancaster, South
GPS Investigator, Supv.
2-9732 / 850-0046

Judy D. Ramsey
GPS Investigator, Sr.
2-9879 / 850-0251

Investigator (Future)
2-9879 (222)

O. Harold Duxson, Central
GPS Investigator, Supv.
2-9732 / 850-0054

David F. Snoddy
GPS Investigator, Sr.
2-9789 / 850-0002

Gregory C. Meadows
GPS Investigator, Sr.
2-9787 / 850-0049

Investigator (Future)
2-9879 (222)

Hank E. Powell
GPS Investigator, Sr.
2-9866 / 850-0051

Investigator (Future)
2-9879 (222)

Full Tech Spec (Future)
2-5869 (267)

Patrick Cleckler
Operational Spec, Sr.
Special Pipeline Sa...
2-9714 (321)

3/12/2007

# STATE OF ALABAMA

ALABAMA PUBLIC SERVICE COMMISSION
P.O. BOX 304260
MONTGOMERY, ALABAMA 36130-4260

JIM SULLIVAN, PRESIDENT
JAN COOK, ASSOCIATE COMMISSIONER
GEORGE C. WALLACE, JR., ASSOCIATE COMMISSIONER

August 23, 2005

WALTER L. THOMAS, JR.
SECRETARY

Mr. Gregory Kelly
Public Utility Technical Specialist
Alabama Public Service Commission
Montgomery, Alabama 36104

Dear Mr. Kelly:

We have reviewed the August 16, 2005 <u>Findings and Recommendations</u> of the Grievance Committee appointed to hear the Employee Grievance you filed pursuant to Section VI of the Commission's <u>Employee Guidelines and Procedures Manual</u>. We are unaware of any unusual or extenuating circumstances of record in this case which would justify a decision contrary to that reached by the Committee. Accordingly, we adopt and concur with the <u>Findings and Recommendations</u> of the Grievance Committee.

THE COMMISSION, THEREFORE, FINDS, That Mr. Gregory Kelly's request that his position be moved from the Electricity Section of the Energy Division to the Special Projects Section of the Energy Division is due to be denied.

THE COMMISSION FURTHER FINDS, That Mr. Gregory Kelly's request that he report directly to a technical manager is also due to be denied.

ALABAMA PUBLIC SERVICE COMMISSION

Jim Sullivan, President

Jan Cook, Commissioner

George C. Wallace, Jr., Commissioner

JS/JC/GCWjr:eml



# STATE OF ALABAMA
ALABAMA PUBLIC SERVICE COMMISSION
P.O. BOX 304260
MONTGOMERY, ALABAMA 36130-4260

JIM SULLIVAN, PRESIDENT

JAN COOK, ASSOCIATE COMMISSIONER

GEORGE C. WALLACE, JR., ASSOCIATE COMMISSIONER

WALTER L. THOMAS, JR.
SECRETARY

IN RE:    EMPLOYEE GRIEVANCE FILED BY MR. GREGORY KELLY

## Findings and Recommendations of the Grievance Committee

We, the Grievance Committee appointed by the Commission to hear the Employee Grievance filed by Mr. Gregory Kelly pursuant to Section VI of the Alabama Public Service Commission's Employee Guidelines, have considered said grievance as well as the testimony adduced at the August 10, 2005 hearing held on this matter and the documentation provided at said hearing.

Based on the evidence which we have been presented, we find that Mr. Kelly's grievance is without merit. Mr. Kelly made no allegations of wrongdoing or improper conduct by his immediate supervisor, Mr. John Free, or by the Energy Division director, Mrs. Janice Hamilton. His complaint appears to be that his position is not located in the Special Projects Section with the other Public Utility Technical Specialist in the Energy Division and that he is not directly supervised by another engineer. Mr. Kelly alleges that he has a "fractured career path, an unleveled playing field, compromised job position, lost synergy, and communication difficulties (vertical and horizontal)" due to this situation. We find that the evidence does not support Mr. Kelly's allegations.

Mr. Kelly testified that he was satisfied with his current job position— even remarking that it was a "dream job" – and that he had no desire to seek a higher level position at the Commission. We are therefore at a loss to understand his claims of fractured career path and unlevel playing field. The evidence indicated that Mr. Kelly is currently filling the senior engineering position available at the Commission. The current organizational structure (which has been in place since Mr. Kelly interviewed and was hired at the Commission) did not hinder him from being promoted to this position. The only higher level positions in the Energy Division (outside of Gas Pipeline Safety) are Public Utility Analyst Manager and Energy Division Director. Both of these positions are multi-discipline, involving the supervision of not only technical, but also financial and clerical disciplines. From the record, it appears that Mr. Kelly meets the education requirements for both of these positions. In fact, Mrs. Hamilton was promoted to Energy Division Director directly from the position currently held by Mr. Kelly. Given Mr. Kelly's promotion to the most senior engineering position at the Commission, his stated lack of desire to move to any higher level position, and his apparent qualification to fill such positions should he have a change of heart, we find his allegations of fractured career path and unlevel playing field completely lacking in merit.

Mr. Kelly's claim of compromised job position was equally confusing. Given his apparent satisfaction with the job, his promotion to the senior engineering classification, and his supervisor's satisfaction with his job performance, we find no compromise of Mr. Kelly's job position.

Mr. Kelly also claims that the current organization is responsible for "lost synergy" in the Energy Division. He testified that his structural separation from the other Public Utility Technical Specialist in the Energy Division and the fact that he does not report directly to Mrs. Hamilton is the

Findings and Recommendations of the Grievance Committee
August 16, 2005
Page #2

cause of "lost synergy." Mrs. Hamilton, the Division Director, disagrees. She believes that the current organization is the most efficient and effective at the current time. Given that the Commission has delegated to Mrs. Hamilton the authority and the responsibility to organize and manage the Energy Division, we see no justification to substitute Mr. Kelly's judgment for Mrs. Hamilton's.

Finally, Mr. Kelly claims that he has both vertical and horizontal communication difficulties. Our analysis of the evidence leads us to find that any communications difficulties are not due to the organization at the Energy Division, Mr. Free, Mrs. Hamilton, or any of Mr. Kelly's co-workers, but are solely attributable to Mr. Kelly.

It appears that Mr. Kelly wishes this committee to substitute his judgment for Mrs. Hamilton's judgment on how the Energy Division should be organized solely for his personal satisfaction and convenience. There were no allegations of wrongdoing or improper conduct. We find no credible evidence of fractured career path, unlevel playing field, compromised job position, or lost synergy. We find that any communications difficulties are the sole perception of Mr. Kelly. We recommend that Mr. Kelly's request for his position to be moved to the Special Projects Section and his request that he report directly to a technical manager be denied.

In conclusion, we emphasize that the above findings, conclusions and recommendation are based on the documentary evidence submitted to us and the record compiled at the hearing in this matter. We feel that, based on the information we have, the unanimous findings, conclusions and recommendations set forth herein are just, reasonable and appropriate.

Aquilla Spivey

Debra Jackson

Tom Jones

Doug Dillard

G. Scott Morris
Administrative Law Judge

| Name / Position / Section | Race / Sex/ Age | Years of Service | Date | Description of Training Classes/Conference/Seminars | Status | Location |
|---|---|---|---|---|---|---|
| Gregory Kelly<br>Tech. Spec., Senior<br>Electricity Section | Black<br>Male<br>Age 50 | 4.5 | 2003 | Electicity Law Seminar | Attended | Alexandria, VA |
| | | | 2004 | Market Based Concepts for Transmission Planning | Attended | San Francisco, California |
| | | | 2005 | PowerPoint XP/2002 Introduction | Attended | Alabama TechnaCenter |
| | | | 2005 | Seminar & Workshop for "Custom Power Solutions for Power Quality Issues". | Approved by Mr. Free & Ms. Hamilton but never received from Governor's Office. | |
| | | | 2006 | Fossil Power Plant Fundamental Workshop | Attended | Chicago, Illinois |
| | | | 2006 | Gasification Workshop for State Government Personnel | Attended | Raleigh, North Carolina |
| | | | 2006 | | Attended | Bismarch, North Dekota |
| | | | 2007 | FERC Tech. Workshop "Electric Transmission Siting Rule, Order No. 689". | Attended | Atlanta, GA |
| Rick Cleckler<br>Tech. Spec., Senior<br>Technical Section | White<br>Male<br>Age | | 2006 | Professional Electrician Studies Program - Internet 4-Part Course and Exams | | Internet Self-Study Course |
| | | | 2005 | Web conference "Updating the Pro Forma Tariff (OATT)" | | Internet Web Conference |
| | | | 2005 | Seminar "Eminent Domain in Alabama" | | Montgomery, AL |

JMH EXHIBIT 3

**FedEx**
Express
*USA Airbill*

FedEx Tracking Number **845904376695**

From **0200** Sender's Copy

**From** *Please print and press hard.*

Date **3|12|07**
Sender's FedEx Account Number **1086-3704-8**

Sender's Name **Judge John A. Garner** Phone **(334)242-5200**

Company **Alabama Public Service Commission**

Address **100 N Union St, Ste 836** Dept./Floor/Suite/Room

City **Montgomery** State **AL** ZIP **36104**

? **Your Internal Billing Reference** OPTIONAL
First 24 characters will appear on invoice.

**To**

Recipient's Name **Glenn Todd** Phone **(205) 212-2031**

Company **EEOC Birmingham District Office-420**

Address **Ridge Park Place**
To "HOLD" at FedEx location, print FedEx address. *We cannot deliver to P.O. boxes or P.O. ZIP codes.*

Address **1130 22nd Street, Ste 2000** Dept./Floor/Suite/Room

City **Birmingham** State **AL** ZIP **35205**

**Try online shipping at fedex.com**

By using this Airbill you agree to the service conditions on the back of this Airbill and in our current Service Guide, including terms that limit our liability.

**Questions? Visit our Web site at fedex.com**
or call 1.800.Go.FedEx® 800.463.3339.

**4a** **Express Package Service** *Packages up to 150 lbs.*
Delivery commitment may be later in some areas.

[X] FedEx Priority Overnight
Next business morning

[ ] FedEx Standard Overnight
Next business afternoon

[ ] FedEx First Overnight
Earliest next business morning delivery to select locations

[ ] FedEx 2Day
Second business day

[ ] FedEx Express Saver
Third business day
FedEx Envelope rate not available. Minimum charge: One-pound rate

**4b** **Express Freight Service** *Packages over 150 lbs.*
Delivery commitment may be later in some areas.

[ ] FedEx 1Day Freight*
Next business day

[ ] FedEx 2Day Freight
Second business day

[ ] FedEx 3Day Freight
Third business day
*Call for Confirmation.

**5** **Packaging** *Declared value limit $500*

[X] FedEx Envelope*

[ ] FedEx Pak*
Includes FedEx Small Pak, FedEx Large Pak, and FedEx Sturdy Pak

[ ] Other

**6** **Special Handling** Include FedEx address in Section 3.

[ ] SATURDAY Delivery
NOT Available for FedEx Priority Overnight, FedEx 2Day, FedEx 1Day Freight, and FedEx 2Day

[ ] HOLD Weekday
at FedEx Location
NOT Available for FedEx First Overnight

[ ] HOLD Saturday
at FedEx Location
Available ONLY for FedEx Priority Overnight and FedEx 2Day to select locations

Does this shipment contain dangerous goods?
One box must be checked.

[X] No

[ ] Yes
As per attached Shipper's Declaration

[ ] Yes
Shipper's Declaration not required

[ ] Dry Ice
Dry Ice, 9, UN 1845 ___ x ___ kg

Dangerous Goods (including Dry Ice) cannot be shipped in FedEx packaging.

[ ] Cargo Aircraft Only

**7** **Payment** *Bill to:*
Enter FedEx Acct. No. or Credit Card No. below.

[X] Sender
Acct. No. in Section 1 will be billed.

[ ] Recipient

[ ] Third Party

[ ] Credit Card

[ ] Cash/Check

FedEx Acct. No.
Credit Card No.
Exp. Date

**Total Packages** **Total Weight** **Total Declared Value†**

$ .00

†Our liability is limited to $100 unless you declare a higher value. See back for details.

FedEx Use Only

**8** **Release Signature** *Sign to authorize delivery without obtaining signature.*

By signing you authorize us to deliver this shipment without obtaining a signature and agree to indemnify and hold us harmless from any resulting claims.

Rev. Date 10/01 • Part #158012 • ©1994–2001 FedEx • PRINTED IN U.S.A.  MWA 04

**446**



FedEx Express
Customer Support Trace
3875 Airways Boulevard
Module H, 4th Floor
Memphis, TN 38116

U.S. Mail: PO Box 727
Memphis, TN 38194-4643

Telephone: 901-369-3600

March 13, 2007

Dear Customer:

The following is the proof of delivery you requested with the tracking number **845904376695**.

| Delivery Information: | | | |
|---|---|---|---|
| Status: | Delivered | Delivery date: | Mar 13, 2007 09:06 |
| Signed for by: | J.QUARLES | | |
| Service type: | Priority Envelope | | |

NO SIGNATURE IS AVAILABLE
FedEx Express Proof of delivery details appear below, however no signature is currently available for this FedEx Express shipment.  Availability of signature images may take up to 5 days after delivery date.

| Shipping Information: | | | |
|---|---|---|---|
| Tracking number: | 845904376695 | Ship date: | Mar 12, 2007 |

Recipient:                                  Shipper:
US                                          MON US

Thank you for choosing FedEx Express.

FedEx Worldwide Customer Service
1.800.GoFedEx 1.800.463.3339

# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF ALABAMA
### NORTHERN DIVISION

GREGORY KELLY,        )
                      )
    Plaintiff,        )
                      )
v.                  )      CASE NO:2-07-cv-610-WHA
                      )
JOHN FREE, individually and in his   )
official position as an employee of the   )
Alabama Public Service Commission;   )
JANICE M. HAMILTON, individually   )
and in her official position as a Division   )
Director of the Alabama Public Service   )
Commission; and ALABAMA PUBLIC   )
SERVICE COMMISSION, an agency of   )
the State of Alabama,   )
                      )
    Defendants.      )

**STATE OF ALABAMA**      )

**COUNTY OF MONTGOMERY**  )

### <u>AFFIDAVIT OF AQUILLA SPIVEY</u>

BEFORE me, the undersigned authority, a Notary Public in and for the State of Alabama at

Large, personally appeared AQUILLA SPIVEY, who being known to me and, who being first duly

sworn deposeth and says as follows:

1.      My name is Aquilla Spivey. I am a citizen of the State of Alabama residing in

Montgomery County, Alabama.

2.      I am currently employed as the Consumer Services Manager with the Advisory

Section of the Alabama Public Service Commission ("PSC"). I have worked for the PSC for 5 years.

3.    My primary job duties include managing the section that is responsible for receiving and responding to consumer complaints about companies the PSC regulates.

4.    I have known and worked at the PSC with Gregory Kelly, John Free and Janice Hamilton ever since Gregory Kelly has been employed at the PSC. As an employee of the PSC, I have had the opportunity to observe interactions between Gregory Kelly, John Free and Janice Hamilton. I have never heard John Free nor Janice Hamilton make any racially derogatory remarks about Gregory Kelly. I have never witnessed nor known John Free or Janice Hamilton to do anything to discriminate against Gregory Kelly on the basis of race, age or any other wrongful basis.

5.    I was a member of the Grievance Committee that heard Mr. Kelly's complaints that his career path was fractured and other criticisms regarding the Electricity Section. Mr. Kelly complained that he should not have to report to Mr. Free because Mr. Free was a certified public accountant and did not have sufficient technical engineering knowledge to be his supervisor. His grievance was his desire to be transferred to the Special Projects Section and to be aligned with Rick Cleckler, an engineer who reports directly to Ms. Hamilton. The panel and I came to the unanimous conclusion that Mr. Kelly's grievances, complaints and criticisms had no merit and that the PSC and Janice Hamilton, as director of the Energy Division, had the right and duty to organize the division the way it had been organized and operated for many years. Mr. Kelly made no complaints of racial or age discrimination at the grievance hearing nor was any specific incident of discrimination brought out in the grievance hearing.

Affiant further saith not.

_Aquilla J. S._

AQUILLA SPIVEY

SWORN to and SUBSCRIBED before me this the 1st day of April, 2008.

_Eileen Milton Laurence_

NOTARY PUBLIC

My Commission Expires: _October 21, 2010_

## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF ALABAMA
## NORTHERN DIVISION

| | | |
|---|---|---|
| GREGORY KELLY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CASE NO:2-07-cv-610-WHA |
| | ) | |
| JOHN FREE, individually and in his | ) | |
| official position as an employee of the | ) | |
| Alabama Public Service Commission; | ) | |
| JANICE M. HAMILTON, individually | ) | |
| and in her official position as a Division | ) | |
| Director of the Alabama Public Service | ) | |
| Commission; and ALABAMA PUBLIC | ) | |
| SERVICE COMMISSION, an agency of | ) | |
| the State of Alabama, | ) | |
| | ) | |
| Defendants. | ) | |

**STATE OF ALABAMA**          )

**COUNTY OF MONTGOMERY   )**

## AFFIDAVIT OF STEPHEN D. BARTELT

BEFORE me, the undersigned authority, a Notary Public in and for the State of Alabama at

Large, personally appeared STEPHEN D. BARTELT, who being known to me and, who being first

duly sworn deposeth and says as follows:

1.      My name is Steve Bartelt.  I am a citizen of the State of Alabama residing in

Montgomery County, Alabama.

2.      I am currently employed as a Utility Manager and I am the head of the Water Section

Page 1 of 2

of the Alabama Public Service Commission ("PSC"). I have held my current position since September of 2006. I have been employed with the PSC for 33 years.

3.     While working for the PSC my job duties have included auditing Alabama Power Company, gas companies, telephone companies and water companies. I currently assist in the regulation of all of the privately owned water systems in Alabama and foreign water systems doing business in Alabama.

4.     I have known and worked at the PSC with Gregory Kelly, John Free and Janice Hamilton ever since Gregory Kelly has been employed at the PSC. As an employee of the PSC, and due to the layout of the offices within the PSC, I have numerous opportunities to observe interactions between Gregory Kelly, John Free and Janice Hamilton. I have never heard John Free nor Janice Hamilton make any racially derogatory remarks about Gregory Kelly. I have never witnessed nor known John Free or Janice Hamilton do anything to discriminate against Gregory Kelly on the basis of race, age or any other wrongful basis.

Affiant further saith not.

STEPHEN D. BARTELT

SWORN to and SUBSCRIBED before me this the 28th day of March, 2008.

NOTARY PUBLIC
My Commission Expires: _8-11-2010_

# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF ALABAMA
### NORTHERN DIVISION

| | | |
|---|---|---|
| GREGORY KELLY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CASE NO:2-07-cv-610-WHA |
| | ) | |
| JOHN FREE, individually and in his | ) | |
| official position as an employee of the | ) | |
| Alabama Public Service Commission; | ) | |
| JANICE M. HAMILTON, individually | ) | |
| and in her official position as a Division | ) | |
| Director of the Alabama Public Service | ) | |
| Commission; and ALABAMA PUBLIC | ) | |
| SERVICE COMMISSION, an agency of | ) | |
| the State of Alabama, | ) | |
| | ) | |
| Defendants. | ) | |

**STATE OF ALABAMA** )

**COUNTY OF MONTGOMERY** )

### <u>AFFIDAVIT OF SHEILA WARD</u>

BEFORE me, the undersigned authority, a Notary Public in and for the State of Alabama at Large, personally appeared SHEILA WARD, who being known to me and, who being first duly sworn deposeth and says as follows:

1. My name is Sheila Ward. I am a citizen of the State of Alabama residing in Coosa County, Alabama.

2. I am currently employed as a Public Utility Analyst II with the Electricity Section of the Energy Division of the Alabama Public Service Commission ("PSC"). I have worked for the

PSC for 6 years.

3.     My primary job duty is to prepare monitoring reports regarding Alabama Power Company. I also analyze data received from Alabama Power Company and track federal and state regulatory issues for the Energy Division. I also participate, on behalf of my division, in the National Association of Regulatory Utility Commissioners.

4.     I have known and worked at the PSC with Gregory Kelly, John Free and Janice Hamilton ever since Gregory Kelly has been employed at the PSC. As an employee of the PSC, I have the opportunity to observe interactions between Gregory Kelly, John Free and Janice Hamilton. I have never heard John Free nor Janice Hamilton make any racially derogatory remarks about Gregory Kelly or anyone else at the PSC. I have never witnessed nor known John Free or Janice Hamilton to do anything to discriminate against Gregory Kelly on the basis of race, age or any wrongful basis.

Affiant further saith not.

_Sheila Ward_

SHEILA WARD

SWORN to and SUBSCRIBED before me this the ___ day of March, 2008.

_Jacqueline R. Frazier_

NOTARY PUBLIC
My Commission Expires: __8-1-2010__

# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF ALABAMA
### NORTHERN DIVISION

GREGORY KELLY,          )
                               )

      Plaintiff,         )
                               )

v.                      )        CASE NO:2-07-cv-610-WHA
                               )

JOHN FREE, individually and in his   )
official position as an employee of the   )
Alabama Public Service Commission;   )
JANICE M. HAMILTON, individually   )
and in her official position as a Division   )
Director of the Alabama Public Service   )
Commission; and ALABAMA PUBLIC   )
SERVICE COMMISSION, an agency of   )
the State of Alabama,            )
                               )

      Defendants.        )

**STATE OF ALABAMA**       )

**COUNTY OF MONTGOMERY**   )

### <u>AFFIDAVIT OF JACKIE FRAZIER</u>

BEFORE me, the undersigned authority, a Notary Public in and for the State of Alabama at Large, personally appeared JACKIE FRAZIER, who being known to me and, who being first duly sworn deposeth and says as follows:

1.      My name is Jackie Frazier. I am a citizen of the State of Alabama residing in Montgomery County, Alabama.

2.      I am currently employed as John Free's secretary in the Electricity Section of the Energy Division of the Alabama Public Service Commission ("PSC"). I have held this position for

approximately six years.

3.    While working for the PSC my job duties have included typing, correspondence and preparing memos for Electricity Section staff members, including Gregory Kelly.  In my opinion John Free is a very good boss.

4.    I have known and worked at the PSC with Gregory Kelly, John Free and Janice Hamilton ever since Gregory Kelly has been employed at the PSC.  Because my office is two doors down from the office of John Free, I have numerous opportunities each day to observe interactions between Gregory Kelly and John Free.  In my opinion, Mr. Free has been very fair, considerate and accommodating to Mr. Kelly.  There are seven employees who work under Mr. Free, two are white and five are black.  Nobody, including Gregory Kelly, is treated any differently or discriminated against on the basis of age, race or any other wrongful basis at the PSC.

5.    I have never heard John Free nor Janice Hamilton make any racially derogatory remarks about Gregory Kelly.  I have never witnessed nor known John Free or Janice Hamilton to do anything to discriminate against Gregory Kelly on the basis of race, age or any other wrongful basis.

Affiant further saith not.

_____

JACKIE FRAZIER

SWORN to and SUBSCRIBED before me this the _31st_ day of March, 2008.

_____

NOTARY PUBLIC

My Commission Expires: _1/12/2011_

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| GREGORY KELLY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CASE NO:2-07-cv-610-WHA |
| | ) | |
| JOHN FREE, individually and in his | ) | |
| official position as an employee of the | ) | |
| Alabama Public Service Commission; | ) | |
| JANICE M. HAMILTON, individually | ) | |
| and in her official position as a Division | ) | |
| Director of the Alabama Public Service | ) | |
| Commission; and ALABAMA PUBLIC | ) | |
| SERVICE COMMISSION, an agency of | ) | |
| the State of Alabama, | ) | |
| | ) | |
| Defendants. | ) | |

**STATE OF ALABAMA**              )

**COUNTY OF MONTGMERY**      )

**<u>AFFIDAVIT OF JAMES RICKY CLECKLER</u>**

BEFORE me, the undersigned authority, a Notary Public in and for the State of Alabama at

Large, personally appeared JAMES RICKY CLECKLER, who being known to me and, who being

first duly sworn deposeth and says as follows:

1.      My name is Rick Cleckler.  I am a citizen of the State of Alabama residing in

Montgomery County, Alabama.

2.      I am currently employed as a Public Utility Technical Specialist, Senior, in the

Special Projects Section of the Energy Division of the Alabama Public Service Commission

Page 1 of 2

("PSC"). I hold the same job title and have the same pay grade as Gregory Kelly. I have been employed with the PSC for 25 years.

3.     While working for the PSC my job duties have included dealing from an engineering aspect with all the regulated utilities in the State of Alabama. I currently deal with special projects that pertain to Alabama Power, Alagaso, Mobile Gas and water companies. I am also involved in an interagency agreement between the PSC and the Alabama State Health Department wherein the PSC assists the Health Department in its regulation of certain private sewage companies in the State of Alabama.

4.     I have known and worked at the PSC with Gregory Kelly, John Free and Janice Hamilton ever since Gregory Kelly has been employed at the PSC. As an employee of the PSC, and due to the layout of my office within the PSC, I have had numerous opportunities to observe interactions between Gregory Kelly and Janice Hamilton. I have never heard John Free nor Janice Hamilton make any racially derogatory remarks about Gregory Kelly. I have never witnessed nor known John Free or Janice Hamilton to do anything to discriminate against Gregory Kelly on the basis of race, age or any other wrongful basis.

Affiant further saith not.

JAMES RICKY CLECKLER

SWORN to and SUBSCRIBED before me this the 28th day of March, 2008.

NOTARY PUBLIC
My Commission Expires: _1-12-2011_

Page 2 of 2

## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF ALABAMA
## NORTHERN DIVISION

GREGORY KELLY,                          )
                                        )
    Plaintiff,                  )
                                        )
v.                                      )        CASE NO:2-07-cv-610-WHA
                                        )
JOHN FREE, individually and in his      )
official position as an employee of the )
Alabama Public Service Commission;      )
JANICE M. HAMILTON, individually        )
and in her official position as a Division )
Director of the Alabama Public Service  )
Commission; and ALABAMA PUBLIC          )
SERVICE COMMISSION, an agency of        )
the State of Alabama,                   )
                                        )
    Defendants.                 )

**STATE OF ALABAMA**              )

**COUNTY OF MONTGOMERY**    )

### AFFIDAVIT OF TONYA WILLIAMS

BEFORE me, the undersigned authority, a Notary Public in and for the State of Alabama at Large, personally appeared Tonya Williams, who being known to me and, who being first duly sworn deposeth and says as follows:

1.    My name is Tonya Williams. I am a citizen of the State of Alabama residing in Elmore County, Alabama.

2.    I am currently employed as an Accountant with the Natural Gas Section of the Energy Division of the Alabama Public Service Commission ("PSC"). I have worked for the PSC for four

years.

3.    My primary job duty is auditing natural gas companies such as Alagasco, Mobile Gas and Wheeler Basin.

4.    I have known and worked at the PSC with Gregory Kelly, John Free and Janice Hamilton ever since I have been employed at the PSC. In my opinion, John Free is very professional and a joy to work with. As an employee of the Energy Division I have had the opportunity to observe interactions between Gregory Kelly, John Free and Janice Hamilton. I have never heard John Free nor Janice Hamilton make any racially derogatory remarks about Gregory Kelly. I have never witnessed nor known John Free or Janice Hamilton to do anything to discriminate against Gregory Kelly on the basis of race, age or any other wrongful basis.

Affiant further saith not.

_Tonya Williams_
TONYA WILLIAMS

SWORN to and SUBSCRIBED before me this the 31st day of March, 2008.

_Eileen Milton Laurence_
NOTARY PUBLIC
My Commission Expires: October 21, 2010

## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF ALABAMA
## NORTHERN DIVISION

GREGORY KELLY,                          )
                                        )
    Plaintiff,                      )
                                        )
v.                                      )    CASE NO:2-07-cv-610-WHA
                                        )
JOHN FREE, individually and in his      )
official position as an employee of the )
Alabama Public Service Commission;      )
JANICE M. HAMILTON, individually        )
and in her official position as a Division )
Director of the Alabama Public Service  )
Commission; and ALABAMA PUBLIC          )
SERVICE COMMISSION, an agency of        )
the State of Alabama,                   )
                                        )
    Defendants.                     )

**STATE OF ALABAMA**              )

**COUNTY OF MONTGOMERY**   )

### AFFIDAVIT OF ROBERT EARL REED

    BEFORE me, the undersigned authority, a Notary Public in and for the State of Alabama at Large, personally appeared ROBERT REED, who being known to me and, who being first duly sworn deposeth and says as follows:

    1.    My name is Robert Reed. I am a citizen of the State of Alabama residing in Elmore County, Alabama. I am a retired Colonel in U.S. Army Reserve.

    2.    I am currently employed as the Supervisor of the Natural Gas Section of the Energy Division of the Alabama Public Service Commission ("PSC"). I have worked for the PSC for 29

years.

3.     The Natural Gas Section oversees all PSC matters relating to all investor owned gas utilities in the state, including local distribution companies and gas storage companies.

4.     John Free is my counterpart in the Electricity Section and we have a very cooperative working relationship. John Free is extraordinarily intelligent and has an excellent work ethic. I think that John Free is one of the most conscientious workers in the Energy Division.

5.     I have known and worked at the PSC with Gregory Kelly, John Free and Janice Hamilton ever since Gregory Kelly has been employed at the PSC. I work on the hall with Free, Hamilton and Kelly.

6.     I have had numerous opportunities to observe interactions between Gregory Kelly, John Free and Janice Hamilton. I have never heard John Free nor Janice Hamilton make any racially derogatory remarks about Gregory Kelly whatsoever. I have never witnessed nor known John Free or Janice Hamilton to do anything to discriminate against Gregory Kelly on the basis of race, age or any other wrongful basis.

Affiant further saith not.

_____
ROBERT EARL REED

SWORN to and SUBSCRIBED before me this the _1st_ day of April, 2008.

_____
NOTARY PUBLIC
My Commission Expires: ___1/12/2011___

## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF ALABAMA
## NORTHERN DIVISION

| | | |
|---|---|---|
| GREGORY KELLY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CASE NO:2-07-cv-610-WHA |
| | ) | |
| JOHN FREE, individually and in his | ) | |
| official position as an employee of the | ) | |
| Alabama Public Service Commission; | ) | |
| JANICE M. HAMILTON, individually | ) | |
| and in her official position as a Division | ) | |
| Director of the Alabama Public Service | ) | |
| Commission; and ALABAMA PUBLIC | ) | |
| SERVICE COMMISSION, an agency of | ) | |
| the State of Alabama, | ) | |
| | ) | |
| Defendants. | ) | |

**STATE OF ALABAMA**          )

**COUNTY OF MONTGOMERY**   )

### AFFIDAVIT OF JIM SULLIVAN

BEFORE me, the undersigned authority, a Notary Public in and for the State of Alabama at

Large, personally appeared Jim Sullivan, who being known to me and, who being first duly sworn

deposeth and says as follows:

1.      My name is Jim Sullivan, and I am the President of the Alabama Public Service

Commission ("PSC"). I have been President of the PSC since 1983 and am the country's longest-

serving, active Public Service Commissioner. In November 1998, I was elected President of the

National Association of Regulatory Utility Commissioners ("NARUC"), the principal voice of the

states on national energy and telecommunications policy. I was recently named as Chairman of NARUC's Committee on Critical Infrastructure. I have a Bachelor's Degree in business administration from the University of Mississippi, and a Masters Degree in banking and finance and a Juris Doctor Degree from the University Alabama. I am a member in good standing of the Alabama State Bar.

2.     As President of the PSC, I am familiar with the facts and circumstances involving the personnel policies of the PSC. The PSC operates under the rules, regulations, and guidelines of the Alabama State Personnel Department ("State Personnel") and the merit system of the State of Alabama codified at ALA. CODE § 36-26-1 *et seq.* (1975). The PSC is a regulatory and administrative agency created by acts of the Alabama Legislature and governed by a three-member Commission elected by statewide referendum. ALA. CODE §§ 37-1-1, 37-1-3 (1975). The PSC is charged with supervising utilities (e.g., electricity, natural gas, water, steam and telecommunications services) to ensure consumers are provided with safe, adequate and reliable services at economic rates. The PSC's general supervisory duties are established by law set forth at ALA. CODE § 37-1-32.

3.     The PSC also has an internal grievance procedure for employees who contend that they are being discriminated against or may have a valid grievance which should be addressed by the full Commission.

4.     The personnel policy of the PSC strictly prohibits any discrimination on the grounds of race, age, sex or national origin. We have constantly complied with such policy at the PSC.

5.     Gregory Kelly filed a grievance with the PSC and a four-member grievance panel, composed of two white and two black PSC employees, conducted a full evidentiary hearing in or about August 2005, and unanimously rejected Kelly's claims and entered a multi-page finding of

facts and a recommendation that Kelly's request to be moved from the Electricity Section to the Special Projects Section be denied. All three Commissioners, including myself, Jan Cook, and George C. Wallace, Jr., unanimously adopted the panel's recommendations.

6.     I have never seen nor heard any racial discrimination or racial derogatory remarks made by any one at the Commission against Gregory Kelly or any other employees of the Commission. Attached hereto and made a part hereof is the report and findings of the grievance panel as Exhibit A and the adoption of such report by the three Commissioners.

Affiant further saith not.

JIM SULLIVAN

SWORN to and SUBSCRIBED before me this the 1st day of April, 2008.

NOTARY PUBLIC
My Commission Expires: 8/10/2011



STATE OF ALABAMA
ALABAMA PUBLIC SERVICE COMMISSION
P.O. BOX 304260
MONTGOMERY, ALABAMA 36130-4260

JIM SULLIVAN, PRESIDENT

JAN COOK, ASSOCIATE COMMISSIONER

GEORGE C. WALLACE, JR., ASSOCIATE COMMISSIONER

WALTER L. THOMAS, JR.
SECRETARY

IN RE:    EMPLOYEE GRIEVANCE FILED BY MR. GREGORY KELLY

### Findings and Recommendations of the Grievance Committee

We, the Grievance Committee appointed by the Commission to hear the Employee Grievance filed by Mr. Gregory Kelly pursuant to Section VI of the Alabama Public Service Commission's Employee Guidelines, have considered said grievance as well as the testimony adduced at the August 10, 2005 hearing held on this matter and the documentation provided at said hearing.

Based on the evidence which we have been presented, we find that Mr. Kelly's grievance is without merit. Mr. Kelly made no allegations of wrongdoing or improper conduct by his immediate supervisor, Mr. John Free, or by the Energy Division director, Mrs. Janice Hamilton. His complaint appears to be that his position is not located in the Special Projects Section with the other Public Utility Technical Specialist in the Energy Division and that he is not directly supervised by another engineer. Mr. Kelly alleges that he has a "fractured career path, an unleveled playing field, compromised job position, lost synergy, and communication difficulties (vertical and horizontal)" due to this situation. We find that the evidence does not support Mr. Kelly's allegations.

Mr. Kelly testified that he was satisfied with his current job position — even remarking that it was a "dream job" — and that he had no desire to seek a higher level position at the Commission. We are therefore at a loss to understand his claims of fractured career path and unlevel playing field. The evidence indicated that Mr. Kelly is currently filling the senior engineering position available at the Commission. The current organizational structure (which has been in place since Mr. Kelly interviewed and was hired at the Commission) did not hinder him from being promoted to this position. The only higher level positions in the Energy Division (outside of Gas Pipeline Safety) are Public Utility Analyst Manager and Energy Division Director. Both of these positions are multi-discipline, involving the supervision of not only technical, but also financial and clerical disciplines. From the record, it appears that Mr. Kelly meets the education requirements for both of these positions. In fact, Mrs. Hamilton was promoted to Energy Division Director directly from the position currently held by Mr. Kelly. Given Mr. Kelly's promotion to the most senior engineering position at the Commission, his stated lack of desire to move to any higher level position, and his apparent qualification to fill such positions should he have a change of heart, we find his allegations of fractured career path and unlevel playing field completely lacking in merit.

Mr. Kelly's claim of compromised job position was equally confusing. Given his apparent satisfaction with the job, his promotion to the senior engineering classification, and his supervisor's satisfaction with his job performance, we find no compromise of Mr. Kelly's job position.

Mr. Kelly also claims that the current organization is responsible for "lost synergy" in the Energy Division. He testified that his structural separation from the other Public Utility Technical Specialist in the Energy Division and the fact that he does not report directly to Mrs. Hamilton is the

Findings and Recomme    ations of the Grievance Committee
August 16, 2005
Page #2

cause of "lost synergy." Mrs. Hamilton, the Division Director, disagrees. She believes that the current organization is the most efficient and effective at the current time. Given that the Commission has delegated to Mrs. Hamilton the authority and the responsibility to organize and manage the Energy Division, we see no justification to substitute Mr. Kelly's judgment for Mrs. Hamilton's.

Finally, Mr. Kelly claims that he has both vertical and horizontal communication difficulties. Our analysis of the evidence leads us to find that any communications difficulties are not due to the organization at the Energy Division, Mr. Free, Mrs. Hamilton, or any of Mr. Kelly's co-workers, but are solely attributable to Mr. Kelly.

It appears that Mr. Kelly wishes this committee to substitute his judgment for Mrs. Hamilton's judgment on how the Energy Division should be organized solely for his personal satisfaction and convenience. There were no allegations of wrongdoing or improper conduct. We find no credible evidence of fractured career path, unlevel playing field, compromised job position, or lost synergy. We find that any communications difficulties are the sole perception of Mr. Kelly. We recommend that Mr. Kelly's request for his position to be moved to the Special Projects Section and his request that he report directly to a technical manager be denied.

In conclusion, we emphasize that the above findings, conclusions and recommendation are based on the documentary evidence submitted to us and the record compiled at the hearing in this matter. We feel that, based on the information we have, the unanimous findings, conclusions and recommendations set forth herein are just, reasonable and appropriate.


Aquilla Spivey


Debra Jackson


Tom Jones


Doug Dillard


G. Scott Morris
Administrative Law Judge



## STATE OF ALABAMA
ALABAMA PUBLIC SERVICE COMMISSION
P.O. BOX 304260
MONTGOMERY, ALABAMA 36130-4260

JIM SULLIVAN, PRESIDENT
JAN COOK, ASSOCIATE COMMISSIONER
GEORGE C. WALLACE, JR., ASSOCIATE COMMISSIONER

August 23, 2005

WALTER L. THOMAS, JR.
SECRETARY

Mr. Gregory Kelly
Public Utility Technical Specialist
Alabama Public Service Commission
Montgomery, Alabama 36104

Dear Mr. Kelly:

We have reviewed the August 16, 2005 <u>Findings and Recommendations</u> of the Grievance Committee appointed to hear the Employee Grievance you filed pursuant to Section VI of the Commission's <u>Employee Guidelines and Procedures Manual</u>. We are unaware of any unusual or extenuating circumstances of record in this case which would justify a decision contrary to that reached by the Committee. Accordingly, we adopt and concur with the <u>Findings and Recommendations</u> of the Grievance Committee.

THE COMMISSION, THEREFORE, FINDS, That Mr. Gregory Kelly's request that his position be moved from the Electricity Section of the Energy Division to the Special Projects Section of the Energy Division is due to be denied.

THE COMMISSION FURTHER FINDS, That Mr. Gregory Kelly's request that he report directly to a technical manager is also due to be denied.

ALABAMA PUBLIC SERVICE COMMISSION

Jim Sullivan, President

Jan Cook, Commissioner

George C. Wallace, Jr., Commissioner

JS/JC/GCWjr:eml

## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF ALABAMA
## NORTHERN DIVISION

GREGORY KELLY,             )
                             )

    Plaintiff,             )
                             )

v.                         )      CASE NO:2-07-cv-610-WHA
                             )

JOHN FREE, individually and in his  )
official position as an employee of the  )
Alabama Public Service Commission;  )
JANICE M. HAMILTON, individually  )
and in her official position as a Division  )
Director of the Alabama Public Service  )
Commission; and ALABAMA PUBLIC  )
SERVICE COMMISSION, an agency of  )
the State of Alabama,          )
                             )

    Defendants.          )

**STATE OF ALABAMA**       )

**COUNTY OF MONTGOMERY**  )

### AFFIDAVIT OF PATRICIA W. SMITH

BEFORE me, the undersigned authority, a Notary Public in and for the State of Alabama at Large, personally appeared PATRICIA SMITH, who being known to me and, who being first duly sworn deposeth and says as follows:

1.      My name is Patricia Smith.  I am a citizen of the State of Alabama residing in Montgomery County, Alabama.

2.      I am currently employed as a Public Utility Analyst II for the Electricity Section of the Energy Division of the Alabama Public Service Commission ("PSC").  I have worked for the

PSC for six years, as of July 13, 2008.

3.    While working for the PSC the majority of my duties have involved auditing. Specifically, I audit the financial records of Alabama Power Company.

4.    I have known and worked at the PSC with Gregory Kelly, John Free and Janice Hamilton ever since Gregory Kelly has been employed at the PSC. Mr. Kelly started to work the same day I did. I have worked with Mr. Kelly on a few special projects and we have a good working relationship.

5.    Because I work in the Electricity Section with John Free and Gregory Kelly, I have numerous opportunities to observe interactions between Kelly and Free. I've never seen Mr. Free mistreat Mr. Kelly in anyway.

8.    I have never heard John Free nor Janice Hamilton make any racially derogatory remarks about Gregory Kelly. I have never witnessed nor known John Free or Janice Hamilton to do anything to discriminate against Gregory Kelly on the basis of race, age or any other wrongful basis.

Affiant further saith not.

_Patricia W. Smith_
PATRICIA W. SMITH

SWORN to and SUBSCRIBED before me this the _31st_ day of March, 2008.

_Brenda Yewell Roberts_
NOTARY PUBLIC
My Commission Expires: ___1/12/2011___