**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION**

RECEIVED

2008 APR 25  A 10: 04

DEBRA P. HACKETT, CLK
U.S. DISTRICT COURT
MIDDLE DISTRICT ALA

| | | |
|---|---|---|
| GREGORY KELLY | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs | ) | |
| | ) | |
| JOHN FREE, et al., | ) | CASE NO.:2:07-CV-610-WHA |
| | ) | |
| | ) | |
| Defendants. | ) | |

**PLAINTIFF'S NARRATIVE SUMMARY AND BRIEF IN OPPOSITION TO
DEFENDANTS MOTION FOR SUMMARY JUDGMENT**

Comes now the Plaintiff Gregory Kelly and in opposition to Defendants Motion for

Summary Judgement submits this narrative summary and brief.

**INTRODUCTION**

Defendant Gregory Kelly is a 51 year old black male and employed by the Public Service

Commission, Energy Division, Electricity Section. The manager of the Electricity Section and

Kelly's direct supervisor is John Free, a white male. (Kelly depo. p.19, l.18; p.20, ll.10-12).

Kelly graduated from Auburn University in 1979 with an electrical engineering degree.

(Kelly depo. p.23, ll.18-20; p.24, l.8; p.27, ll.3-5). Kelly obtained a Master's degree in business

administration from Troy State in 1990. (Kelly depo. p.50, ll.7-19).

The only other person employed and working as an engineer in the Energy Division of the

Public Service Commission is James Ricky Cleckler. (Hamilton depo. p.28, ll.5-8; Cleckler

depo. p.6, ll.16-17).

Mr. Cleckler is a white male, with a Bachelor of Electrical Engineering degree from Auburn University and is employed at the Public Service Commission in the same position classification as Plaintiff Kelly. Both Kelly and Cleckler graduated from Auburn University with a degree in Electrical Engineering and are employed in the same position classification in the same division. The differences are that Kelly is a black male and Cleckler is a white male, Cleckler reports to the division director whereas Kelly reports to a manager. (Cleckler depo. p. 43, ll.8-23; p. 44, ll.1-22). All the managers in the Energy Section of the Public Service Commission are white (Hamilton depo. p.83, ll.5-23). Plaintiff Kelly is the highest ranking black in the division, except for Hamilton, the Division Director. (Hamilton depo. p. 83, ll.19-23; p.84, ll.1-10).

According to Janice Hamilton, Division Director of the Energy Division, she sees nothing wrong with employees in the same classification and in the same division being evaluated by different standards (Hamilton depo. p.41, ll.1-23). Hamilton admits that Mr. Kelly and Mr. Cleckler are evaluated on different standards (Hamilton depo. p.43, ll.6-14). The evaluation is subjective to the managers (Hamilton depo. p. 44, ll.6-8). Hamilton also admitted there is no standardization because each person is different (Hamilton depo. p.53, ll.8-16).

The defendants are attempting to cast the internal grievance Plaintiff Kelly filed as somehow clearing them of racial discrimination. The grievance filed by Mr. Kelly in June, 2005 contained no allegation of racial discrimination and racial discrimination was not addressed in the grievance or the hearing. (Garner depo. p.10, ll.9-23; p.11, ll.1-10; Free depo. p. 9, ll.11-16; p.11, ll.19-23; p.12, ll.1-2).

The grievance hearing was held on August 10, 2005 and the Finding and Recommendations of the Grievance Committee issued August 16, 2005. (Exhibit 1)

On January 3, 2006, Plaintiff Kelly wrote Defendant Free concerning upgrading of his job (Exhibit 2 ). By letter dated January 23, 2006, Defendant Free informed Kelly that there were no plans to request state personnel to re-evaluate the Public Service Commission engineering position. (Exhibit 3 ). In February 2006 Plaintiff Kelly learned that State Personnel Department was reviewing and developing new job qualifications for his job description. He wrote a memorandum to Defendant Hamilton offering assist. (Exhibit 4 ). By memorandum dated February 13, 2006, Hamilton declined his offer of assistance. (Exhibit 5 ).

It appears the Engineer position at the Public Service Commission has not been re-evaluated by the State Personnel Department since the early 1980's. In 1981 the Public Service Commission's Commissioners wrote the Personnel Director, Mr. J. S. Frazer and requested a re-evaluation of Public Service Commission employees positions. (Exhibit 6 ). Mr. Garner, the Chief Administrative Law Judge at the Public Service Commission, who has been employed there since 1986, knows of no attempt since 1981 to have Public Service Commission positions re-evaluated in mass. (Garner depo. p.16, ll.17-23). Defendant Hamilton is not aware of any reallocation audit or desk audit on Mr. Kelly's position since she has been with the Public Service Commission. (Hamilton depo. p.30, ll.3-9). Prior to being promoted to Director of the Energy Division, Defendant Hamilton had essentially the same job as Plaintiff Kelly. (Hamilton depo. p.8, ll.22-23; p.9 ll.1-2). Actually when Kelly was hired in 2002 it was Hamilton who provided training to Kelly, not Free, his alleged supervisor. (Hamilton depo. p.9, ll.3-17).

Plaintiff Kelly's Responsibilities/Results Section of his pre-appraisal for the time period

3

5/29/04 to 5/28/05 indicated nine (9) areas. (Exhibit 7).   Plaintiff Kelly's

Responsibilities/Results section of his pre-appraisal for the time period 10/01/2005 to

10/01/2006 had been reduced to six (6) areas.(Exhibit 8 ). It is noted that the reduction came after

Kelly filed his grievance and received the results of the grievance hearing.

According to Public Service Commission's Administrative Law Judge, John Garner, all

rules of the State Personnel apply to the PSC. Rule 670-x-7-.06 of the State Personnel provides:

> "[1] An appointing authority shall report to the Director the addition
> of new assignments or the taking away of old ones. The Director shall
> investigate such changes in order to provide a basis for determining
> the effect on the clarification of the position." (Exhibit 9).

In his deposition Defendant Free admitted that Plaintiff Kelly's responsibilities and

assignments had changed from the 5-29-04 through 5-28-05 pre-appraisal to the 2006 pre-

appraisal. (Free depo. p.128, ll.-1-14).   Defendant Free admitted he was not familiar with Rule

670-X-7-.06 of the State Personnel. (Free depo. p.128, ll. 15-18).   Defendant Free admitted that

prior to changing Defendant Kelly's duties and responsibilities he did not report the changes to

the appointing authority nor was the change reported to State Personnel. (Free depo. p.130, ll. 5-

15). Free did not even report the changes to his supervisor, Janice Hamilton, until after he made

the changes. (Free depo. p.131, ll. 12-18).

Kelly did not request to have State Personnel look at his job for reallocation until after his

responsibilities were changed in October 2005.  By memorandum dated January 3, 2006, Kelly

requested a review. (Exhibit 2).  Free was not sure why the change in Kelly's job was not

reported to State Personnel. (Free depo. p.138, ll.19-22; p.139, l.1).  Free admitted that the rules,

regulations, and guidelines of the State Personnel Department apply to him in dealing with

4

employees he supervises. (Free depo. p.148, ll.9-23; p.149, ll.1-14).

On February 6, 2007 Plaintiff Kelly filed an EEOC complaint (Exhibit 10 ). On April 10, 2007, Plaintiff Kelly received his right to sue letter from EEOC. (Exhibit 11 ). On July 2, 2007 Plaintiff Kelly filed the present action (Exhibit 12).

In summary, this situation presents a case of two engineers with the Energy Division of the Public Service Commission being treated totally different. Both have an Electrical Engineering degree from Auburn University and both are in the same job classification. Cleckler the white engineer is basically left alone, does his job and reports to the Division Director. Kelly, is placed to work under a white supervisor, evaluated on a different standard than Cleckler, has his job duties changed after filing a grievance, the change in his job duties are not reported to State Personnel as required by Rule 670-x-7-.06 and when he complains he is disciplined by his supervisor. The Defendants have given no race neutral reason for Kelly's different treatment from Cleckler, except to say different supervisors have different methods and ways of supervising. The Defendants believe subjective supervision is alright and not discriminating.

## DISCUSSION

As recognized in <u>Goldsmith v. Bagby</u>, 513 F. 3d 1261 (11th Cir. 2008) " despite considerable racial progress, racism persists as an evil to be remedied in our Nation." What exist in the present situation is subtle, blatant racism. When the entire situation is reviewed clear circumstantial evidence exists to show racism. The job announcement of Plaintiff Kelly's job states "Work is assigned in broad outline by an administrative supervisor who reviews completed work for engineering soundness and satisfactory completion of assigned projects." (Exhibit 13 ). Plaintiff Kelly's supervisor states he provides Kelly with close hands on supervision, while the

5

other engineer, Cleckler, who is white, is given general administrative supervision as required by the job description. Plaintiff Kelly is required to type and evaluated on the typing. Cleckler, the white engineer, is not required to type.

Even the organizational chart, (Exhibit 14) shows subtle and blatant racism. There is no black manager. All managers are white. Only white managers report to the Division Director, who is black. Although Kelly is in the same classification and grade as Cleckler, Kelly has to report to the Division Director through a white supervisor, but Cleckler, who is white reports directly to the Division Director. Of interest to note, Kelly's position has been filled by a black person from at least 1990 forward. Cleckler, the white engineer, attends staff meetings with the Division Director, but Kelly does not. (Hamilton depo. p. 84, ll.21-23).

Title VII provides that "It shall be an unlawful employment practice for an employers . . . to fail or refuse to hire . . . any individual . . . because of such individuals race". 42 U.S.C.A. § 2000e-2(a). In 1991 the amendment to the act started, "an unlawful employment practice is established when the complaining party demonstrates that race . . . was a motivating factor for any employment practices, even though other factors also motivated the practice." 42 U.S.C.A. § 2000e-2(m). In Hall v. Alabama Association of School Boards, 326 F.3d 1157 (11th Cir. 2003) the Court stated:

> "under these amendments, if the employee shows merely that race was a motivating factor, he has established liability and thus may be entitled to some relief. Whether the employer has met its "same action" burden of proof would go the nature of the relief available."

Plaintiff readily admits that in this case there is no "smoking gun" of racial discrimination. There are no derogatory words used. However, the white engineer and the black

6

engineer are treated substantially different. "Although proof of discriminatory motive is critical it can in some circumstances be inferred from the mere fact of differences in treatment." International Bhd. of Teamsters v. U.S. 431 U.S. 325, 335, n.15, 97 S. Ct. 1843, 1854 n.15, 52 L. Ed. 2d 396 (1997).

In Burlington Industry, Inc. v. Elberth, 524 U.S. 742, 761,118 S. Ct. 2257, 2268 the Supreme Court defined a tangible employment action as " a significant hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits."

"A Plaintiff may prove a claim of intentional discrimination in three ways:
1. Direct evidence;
2. Circumstantial evidence, or;
3. Statistical proof."

Early v. Champion Int'l Corp., 407 F. 2d 1077, 1081 (11th Cir. 1990); Burke-Fowler v. Orange County, Fla.., 447 f. 3d 1319, 1322-23; Rioax v. City of Atlanta, 07-11657 (11th Cir. March 18, 2008).

In this instance, there is circumstantial evidence, thus, the case must be analyzed in the McDonnell Douglas circumstantial evidence analysis. In Rioax v. City of Atlanta, supra, the 11th Circuit discussed the evaluation of circumstantial evidence as follows:

> "Under the McDonnell Douglas framework, a plaintiff must show an inference of discriminatory intent, and therefore carries an initial burden of establishing a prima facie case of discrimination. Id. at 802. Presenting a prima facie case is not onerous as it requires only that the plaintiff establish facts adequate to permit an inference of discrimination. Holifield v. Reno, **115 F.3d 1555, 1562** (11th Cir. 1997) (citations omitted).
>
> The successful assertion of a prima facie case then "creates a rebuttal presumption that the employer unlawfully discriminated against" the

7

plaintiff. E.E.O.C. v Joe's Stone Crabs, Inc., **296 F. 3d 1265, 1272** (11th Cir. 2002) (citing U.S. Postal Serv. Bd. of Governors v. Aikens, **460 U.S. 711, 714** (1983)). If this occurs, and a prima facie case of discrimination is presented, the burden of producing evidence that the employer's action was taken for a legitimate, non-discriminatory reason then shifts to the employer. See Joe's Stone Crabs, **296 F. 3d at 1272.**

In the last step of the burden-shifting analysis, if the employer meets "its burden of production, the presumption of discrimination is rebutted, and the inquiry 'proceeds to a new level of specificity,' in which the plaintiff must show that the proffered reason really is a pretext for unlawful discrimination." Id. at 1272-73 (quoting Texas Dep't of Cmty. Affairs v Burdine, **450 U.S. 248, 255** (1981)). The focused inquiry in the last step requires the plaintiff to demonstrate "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could find them unworthy of credence." Combs v Plantation Patterns, **106 F.3d 1519, 1538** (11th Cir. 1997) (internal quotation marks and citation omitted)."

The Court in McDonnell Douglas articulated four elements for a prima facie case, but recognized that "the facts necessarily will vary in Title VII cases, and the specification...of prima facie proof required...is not necessarily applicable in every respect to differing factual situation." McDonnell Douglas, 411 U.S. 802 n.13. In this situation the Plaintiff's job responsibilities/duties were substantially changed in 2005. Pursuant to State Personnel Rule 670-X-7-.06 the appointing authority was required to report the change to the Personnel Director who is required to investigate the change to determine the effect on the classification of the position. This was not done, even though the Plaintiff requested that his position be evaluated by State Personnel after his responsibilities/duties were changed.

As the Plaintiff is one of only two engineers in the Energy Division, he only has one comparator. Although his comparator has not had his duties changed, the comparator, who is white

8

is treated substantially different from the Plaintiff in assignment work environment and how he is evaluated. The Court in <u>Rioax</u>, <u>supra</u>, recognized that it is not always possible for high-ranking employees to find suitable comparators and such is not fatal to the Plaintiff's claim.

When asked why the State Personnel Director was not informed of the changes in Plaintiff's job description and asked to investigate to determine the effect on the Plaintiffs position classification, the Defendant acted like they were unaware of Rule 670-X-7-.06. No real explanation was given. It is submitted that any reason/pretext articulated now should not be considered as it is shown no legitimate reason existed at the time for denying Plaintiff's request for a re-evaluation of his position by State Personnel. Indeed, it appears to be required.

Plaintiff Kelly enjoys his position at the Public Service Commission, but recognizes that he is not being treated the same as the white engineer, Ricky Cleckler. The Defendants argue that Kelly has suffered no damages. The damages are that his job has not been investigated to determine the effect on his position classification after his duties/responsibilities were changed. Also, he is evaluated in a far different manner than his white counterpart. Two engineers in the same job classification should not be evaluated by different standards and be at different levels in the organizational chart. The Defendants point out the promotions and salary increases that Kelly has received. This case is about the Defendants not following the State Personnel Department's rule to re-evaluate Kelly's position and evaluating Kelly in a different standard than a similar situated white engineer is evaluated. Defendants point out that when Defendant Hamilton held Kelly's job she was supervised by a white accountant. However, at that time, all engineers were supervised by the same white accountant and she was not treated any different from the white engineers. The suit is not about what the Defendants have done properly, but concerns the illegal, improper action taken or not

9

taken by the Defendants.

Count I of Plaintiff's complaint alleges racial discrimination under Title VII, with Count II alleging racial discrimination under 42 U.S.C. § 1981. Count III alleges discrimination under the Equal Protection Clause. Basically, it is undisputed that the Defendant did not comply with Rule 670-X-7-.06. when Kelly's duties/responsibilities were changed. The Defendants at their deposition could offer no reason why the rule was not followed and admitted that State Personnel rules applied to employees of the Public Service Commission. In addition it has been shown that Kelly has been treated substantially different than his white counterpart Cleckler. Not only was Kelly treated different by his supervisor, but also by the supervisor of Cleckler, Defendant Hamilton.

Both Title VII and 42 U.S.C.A. § 1981 have the same requirements of proof and present the same analytical framework. Standard v A.B.E.L. Services, 161 F. 3d 1318, 1330 (11th Cir. 1998). In Cross v State of Alabama, 48 F. 3d 1490 (11th Cir. 1995) the Court stated:

> " [148] In order to establish a violation of the Equal Protection Clause, appellees must prove discriminatory motive or purpose. *Whiting v Jackson State University* **616 F. 2d 116, 122** (5th Cir .1980). The Court in Whiting held that "such intent should be inferred in the same manner as [the Supreme Court] said it is inferred under [42 U.S.C. § 2000e-5]." *Whiting*, **616 F. 2d at 121**. "When section 1983 is used as a parallel remedy for violation of section 703 of the Title VII [42 U.S.C. § 2000e-2], the elements of the two causes of action are the same." *Hardin v Stynchcomb*, **691 F. 2d 1364, 1369 n. 16** (11th Cir. 1982) (citing *Whiting*, 616 F. 2d at 123)."

In Holifield v Reno, 115 F. 3d 1555, 1561-1562 (11th Cir. 1997) the Court stated:

> "Demonstrating a prima facie case is not onerous; it requires only that the plaintiff establish facts adequate to permit an inference of discrimination."

In this case it has been shown that Plaintiff Kelly, a black male, is treated substantially

different from Cleckler, a white male, and both occupy the same position classification. It has also

been shown that the evaluation of both are based on subjective criteria rather than objective criteria

with no set standard. Thus, treatment is substantially different. Additionally, when there were

substantial changes in Plaintiff Kelly's responsibilities/duties in 2005 the changes were not reported

to the Director of the State Personnel to investigate the effect of Kelly's position. No reason was

given by either of the Defendants at their depositions for not having the changes reported as required.

When "the elements of the prima facie case are supported by a preponderance of evidence and the

employer remains silent, the court must enter judgment for the Plaintiff." O'Conner v Consolidated

Coin Caterers Corp., 517 U.S. 308, 311, 116 S. Ct. 1307, 134 L. Ed 2d 438 (1994).


### CONCLUSION

"When the work place is permeated with discriminatory intimidation,
ridicule, and insult,' that is sufficiently severe or pervasive to alter the
conditions of the victim's employment and create an abusive working
environment,' Title VII is violated." *Harris v Forklift Systems, Inc.*,
__ U.S. __, ___, 114 S. Ct. 367, 370, 126 L. Ed. 2d 295 (1993)
(citations omitted).

A discriminatory abusive work environment, even one that does not
seriously affect employees' psychological well being, can and often
will detract from employees' job performance, discourage employees
from remaining on the job, or keep them from advancing in their
careers. Moreover, even without regard to these tangible effects, the
very fact that the discriminatory conduct was so severe or pervasive
that it created a work environment abusive to employees because of
their. . . gender. . . offends Title VII's broad rule of work place
equality."

The numerous memorandums back and forth between Defendant Free, Defendant Hamilton,

and Plaintiff Kelly is a strong indication of how this subtle, hidden discrimination is effecting Kelly.

11

However, his job evaluation still exceeds standards, except for the last one when Free disciplined Kelly because of Kelly's total frustration with his work environment.

As recognized in <u>Knight v Alabama</u>, 787 F. Supp. 1030 (N.D. Ala. 1991), Aff'd in relevant part 14 F. 3d 1534 (11th Cir. 1994), "In sum, the obligation of the state and its institutions is to eliminate root and branch to the extent practical the vestiges of segregations which continues to have impressible impact. . ."

The same is true for subtle, hidden racial employment discrimination. The Defendants are subtly, and certainly discriminating against the Plaintiff based upon his race. The totality of the circumstances certainly create a very strong inference of discrimination, although it is subtle and hidden under the guise of subjective evaluation. Defendants have learned how to discriminate in ways hard to detect. Thus, the entire situation must be considered.

Based on the foregoing, Defendants' Motion For Summary Judgment is die to be denied.

Respectfully submitted this the 25th day of April, 2008.

JIM L. DEBARDELABEN
ASB4800A40J
Attorney for Plaintiff Kelly

OF COUNSEL:
Jim L. DeBardelaben
Attorney At Law
Post Office Box 152
Montgomery, Alabama 361010-0152
(334) 265-9206
(334) 265-9299 Fax
jimdebard@aol.com

12

## CERTIFICATE OF SERVICE

I hereby certify that I have filed the foregoing with the Clerk of the Court and a copy of the foregoing has been served upon the following by placing a copy of the same in the United States mail, properly addressed and postage prepaid, on this the 25th day of April, 2008.


J.Flynn Mozingo, Esq.
Melton, Espy & Williams, P.C.
P.O. Drawer 5130
Montgomery, AL 36103-5130

OF COUNSEL

13



# STATE OF ALABAMA
ALABAMA PUBLIC SERVICE COMMISSION
P.O. BOX 304260
MONTGOMERY, ALABAMA 36130-4260

JIM SULLIVAN, PRESIDENT
JAN COOK, ASSOCIATE COMMISSIONER
GEORGE C. WALLACE, JR., ASSOCIATE COMMISSIONER

WALTER L. THOMAS, JR.
SECRETARY



IN RE:      EMPLOYEE GRIEVANCE FILED BY MR. GREGORY KELLY

<u>Findings and Recommendations of the Grievance Committee</u>

We, the Grievance Committee appointed by the Commission to hear the Employee Grievance filed by Mr. Gregory Kelly pursuant to Section VI of the Alabama Public Service Commission's <u>Employee Guidelines</u>, have considered said grievance as well as the testimony adduced at the August 10, 2005 hearing held on this matter and the documentation provided at said hearing.

Based on the evidence which we have been presented, we find that Mr. Kelly's grievance is without merit. Mr. Kelly made no allegations of wrongdoing or improper conduct by his immediate supervisor, Mr. John Free, or by the Energy Division director, Mrs. Janice Hamilton. His complaint appears to be that his position is not located in the Special Projects Section with the other Public Utility Technical Specialist in the Energy Division and that he is not directly supervised by another engineer. Mr. Kelly alleges that he has a "fractured career path, an unleveled playing field, compromised job position, lost synergy, and communication difficulties (vertical and horizontal)" due to this situation. We find that the evidence does not support Mr. Kelly's allegations.

Mr. Kelly testified that he was satisfied with his current job position — even remarking that it was a "dream job" — and that he had no desire to seek a higher level position at the Commission. We are therefore at a loss to understand his claims of fractured career path and unlevel playing field. The evidence indicated that Mr. Kelly is currently filling the senior engineering position available at the Commission. The current organizational structure (which has been in place since Mr. Kelly interviewed and was hired at the Commission) did not hinder him from being promoted to this position. The only higher level positions in the Energy Division (outside of Gas Pipeline Safety) are Public Utility Analyst Manager and Energy Division Director. Both of these positions are multi-discipline, involving the supervision of not only technical, but also financial and clerical disciplines. From the record, it appears that Mr. Kelly meets the education requirements for both of these positions. In fact, Mrs. Hamilton was promoted to Energy Division Director directly from the position currently held by Mr. Kelly. Given Mr. Kelly's promotion to the most senior engineering position at the Commission, his stated lack of desire to move to any higher level position, and his apparent qualification to fill such positions should he have a change of heart, we find his allegations of fractured career path and unlevel playing field completely lacking in merit.

Mr. Kelly's claim of compromised job position was equally confusing. Given his apparent satisfaction with the job, his promotion to the senior engineering classification, and his supervisor's satisfaction with his job performance, we find no compromise of Mr. Kelly's job position.

Mr. Kelly also claims that the current organization is responsible for "lost synergy" in the Energy Division. He testified that his structural separation from the other Public Utility Technical Specialist in the Energy Division and the fact that he does not report directly to Mrs. Hamilton is the

Findings and Recomme      tions of the Grievance Committee
August 16, 2005
Page #2

cause of "lost synergy." Mrs. Hamilton, the Division Director, disagrees. She believes that the current organization is the most efficient and effective at the current time. Given that the Commission has delegated to Mrs. Hamilton the authority and the responsibility to organize and manage the Energy Division, we see no justification to substitute Mr. Kelly's judgment for Mrs. Hamilton's.

Finally, Mr. Kelly claims that he has both vertical and horizontal communication difficulties. Our analysis of the evidence leads us to find that any communications difficulties are not due to the organization at the Energy Division, Mr. Free, Mrs. Hamilton, or any of Mr. Kelly's co-workers, but are solely attributable to Mr. Kelly.

It appears that Mr. Kelly wishes this committee to substitute his judgment for Mrs. Hamilton's judgment on how the Energy Division should be organized solely for his personal satisfaction and convenience. There were no allegations of wrongdoing or improper conduct. We find no credible evidence of fractured career path, unlevel playing field, compromised job position, or lost synergy. We find that any communications difficulties are the sole perception of Mr. Kelly. We recommend that Mr. Kelly's request for his position to be moved to the Special Projects Section and his request that he report directly to a technical manager be denied.

In conclusion, we emphasize that the above findings, conclusions and recommendation are based on the documentary evidence submitted to us and the record compiled at the hearing in this matter. We feel that, based on the information we have, the unanimous findings, conclusions and recommendations set forth herein are just, reasonable and appropriate.


Aquilla Spivey

Debra Jackson

Tom Jones

Doug Dillard


G. Scott Morris
Administrative Law Judge

January 3, 2006

## MEMORANDUM

TO:    Mr. John Free,
       PSC Analyst Manager

FROM:  Mr. Gregory Kelly,
       PSC Technical Specialist, Senior

SUBJECT: 2006 Fair Market Value for
         PSC Engineers

A review has been completed of the "2006 Job Market Value" for accountant, computer science and engineering positions in state government including the APSC. Attached are an "Executive Summary" and study findings.

As the attached "Executive Summary" shows, the Senior PSC Accountant position has been updated to reflect the market rate in the last 18-months. However, the Senior PSC Engineering position has now been neglected for more than 25-years. Accountants enjoy a 15 step gap and engineers now have only a 2 step gap between senior professional and sub-professional job classifications. If this neglect continues, the accountant's salary range 78 will soon leapfrog engineer's salary range 79.

Please explain where the fairness and why such discrepancies exist in the system? Will the engineering jobs continue to be neglected or updated like the accountant positions? Can the engineers (like the accountants) count on your support in reconciling these matters in a timely manner? Please note these disparities listed above and in the attached report are directly under your supervision.

Please reply within 10 days of the date of this letter.

GK

Attachments

cc: Ms. Janice M. Hamilton, Energy Director
    Ms. Dorinda J. Kepler, PSC Personnel

PLAINTIFF'S
EXHIBIT
2



# STATE OF ALABAMA
ALABAMA PUBLIC SERVICE COMMISSION
P.O. BOX 304260
MONTGOMERY, ALABAMA 36130-4260

January 23, 2006

JIM SULLIVAN, PRESIDENT

JAN COOK, ASSOCIATE COMMISSIONER

GEORGE C. WALLACE, JR., ASSOCIATE COMMISSIONER

WALTER L. THOMAS, JR.
SECRETARY

## MEMORANDUM

TO:        Mr. Gregory Kelly,
           PSC Technical Specialist, Senior

FROM:      Mr. John Free,
           PSC Analyst Manager

SUBJECT:   2006 Fair Market Value for
           PSC Engineers

    I have received your "2006 Job Market Value" study dated January 3, 2006 and this information will be included in your personnel file. As stated previously, there are not any plans at this time to request state personnel to re-evaluate the PSC engineering positions or to request a pay adjustment for those same positions.

    However, if you are no longer satisfied with the compensation package that you accepted for your current position, you certainly have the option of pursuing other career opportunities as they become available.

Cc:    Ms. Janice M. Hamilton, Director
       Energy Division

       Ms. Dorinda J. Kepler,
       PSC Personnel



PLAINTIFF'S
EXHIBIT

3



# STATE OF ALABAMA

ALABAMA PUBLIC SERVICE COMMISSION
P.O. BOX 304260
MONTGOMERY, ALABAMA 36130-4260

February 8, 2006

JIM SULLIVAN, PRESIDENT
JAN COOK, ASSOCIATE COMMISSIONER
GEORGE C. WALLACE, JR., ASSOCIATE COMMISSIONER

WALTER L. THOMAS, JR.
SECRETARY

## MEMORANDUM

TO:       Ms Janice Hamilton,
          PSC Energy Director

FROM:     Mr. Gregory Kelly,
          PSC Technical Specialist, Senior

SUBJECT:  Examination under Development
          For PSC Technical Specialist Position

State Personnel Department is now reviewing and developing new job qualifications for the Public Utility Specialist's position. This information was contained in the weekly status report from State Personnel dated February 8, 2006. I would like to offer my assistance in this matter.

Thank you for your consideration in advance.


GK

cc: Mr. John Free, PSC Analyst Manager
    Ms. Dorinda J. Kepler, PSC Personnel



PLAINTIFF'S
EXHIBIT

4



# STATE OF ALABAMA

ALABAMA PUBLIC SERVICE COMMISSION
P.O. BOX 304260
MONTGOMERY, ALABAMA 36130-4260

February 13, 2006

JIM SULLIVAN, PRESIDENT
JAN COOK, ASSOCIATE COMMISSIONER
GEORGE C. WALLACE, JR., ASSOCIATE COMMISSIONER

WALTER L. THOMAS, JR.
SECRETARY

# *M E M O R A N D U M*

To:     Mr. Gregory Kelly
        Public Utility Technical Specialist, Senior

From:   Janice M. Hamilton, Director
        Energy Division

Re:     Examination under Development for
        PSC Technical Specialist Position


I do not anticipate that your participation or input in the above-referenced matter would be necessary. However, thank you for offering your assistance.


Cc:     Mr. John D. Free, Public Utility Analyst Manager
        Ms. Dorinda J. Kepler, PSC Personnel
        File



**PLAINTIFF'S EXHIBIT**
**5**



STATE OF ALABAMA
ALABAMA PUBLIC SERVICE COMMISSION
STATE OFFICE BUILDING
P.O. BOX 991
MONTGOMERY, ALABAMA 36102

BILLY JOE CAMP, PRESIDENT
LYNN GREER, ASSOCIATE COMMISSIONER
JIM FOLSOM, JR., ASSOCIATE COMMISSIONER

August 18, 1981

Mr. J. S. Frazer
Personnel Director
Personnel Department
402 Administrative Building
Montgomery, Alabama    36130

Re:    Review of Proposed APSC
       Pay Ranges for Merit System Positions

Dear Mr. Frazer:

We wish to thank you for this opportunity to express our concerns again on a subject of such current importance and concern to our employees and management. Employees, supervisors, division directors and we Commissioners have reviewed the salary levels recommended by the State Personnel office. We are particularly concerned about the down-grading in pay ranges in certain disciplines, especially the transportation and utility areas where we are having less than success in attracting and retaining qualified employees. Attachment 1 shows the number of job classifications where critical cuts have been made with a recommended pay range to achieve parity with present grades.

Our recommended pay range changes are shown on Attachment 2. We have previously furnished you justification for these changes and would appreciate an opportunity for our division directors to work with your staff in complete discussions on each position. We have comparison data to discuss with you from the other state regulatory commissions, Federal regulatory bodies, and our regulated companies.

From our point of view the setting of reasonable pay ranges revolves around the importance of obtaining and retaining highly skilled regulatory employees who have been educated and trained for a complex task.

PLAINTIFF'S
EXHIBIT

6

tabbies®

Mr. J. S. Frazer
August 18, 1981
page 2


We are convinced that our proposals to increase selected pay ranges will
improve our ability to regulate effectively and equitably transportation
and utility companies.

Sincerely,

Billy Joe Camp
President

Lynn Greer
Commissioner #1

Jim Folsom, Jr.
Commissioner #2

Attachments (2)

| Proposed Class Code | Proposed Class Title | Craver Proposed Range | Recommended Range To Achieve Equity With Present Range |
|---|---|---|---|
| 11244 | Transportation Rate Supervisor | 78 | 79 |
| 11254 | Utility Rate Supervisor | 79 | 80 |
| 11258 | Rate Analysis Research Director | 82 | 83 |
| 11274 | PSC Transportation Director | 82 | 83 |
| 20513 | Utility Consumer Complaints Supervisor | 67 | 75 |
| 61410 | Railway Safety Inspector | 73 | 78 |
| 61412 | Railway Car Inspector | 70 | 73 |
| 61414 | Railway Track Inspector | 73 | 76 |
| 61420 | Transportation Enforcement Officer I | 64 | 68 |
| 61421 | Transportation Enforcement Officer II | 69 | 74 |
| 61423 | Transportation Enforcement Supv. | 77 | 78 |
| 61451 | Pipeline Safety Investigator I | 63 | 67 |
| 61452 | Pipeline Safety Investigator II | 69 | 72 |
| 61453 | Pipeline Safety Investigator III | - | 77 |
| 61455 | Pipeline Safety Training Officer | 74 | 77 |

| | | | | |
|---|---|---|---|---|
| 20502 | Utility Investigative Technician II | 72 | 74 | |
| 20503 | Utility Investigative Technician III | 77 | 79 | |
| 20510 | Utility Consumer Complaints Investigator | 64 | 65 | |
| 20513 | Utility Consumer Complaints Supervisor | 67 | 82 | 77  80 |
| 20521 | Utility Engineering Specialist I | 77 | 80  78 | 77 |
| 20522 | Utility Engineering Specialist II | 80 | 83  80 | 79 |
| 20525 | Utility Engineering Director | 83 | 86  83  82 | 84 |
| 61410 | Railway Safety Inspector | 73 | 80 | |
| 61412 | Railway Car Inspector | 70 | 75 | |
| 61414 | Railway Track Inspector | 73 | 75 | |
| 61420 | Transportation Enforcement Officer I | 64 | 73 | |
| 61421 | Transportation Enforcement Officer II | 69 | 75 | |
| 61423 | Transportation Enforcement Supv. | 77 | 80 | |
| 61451 | Pipeline Safety Investigator I | 63 | 67 | |
| 61452 | Pipeline Safety Investigator II | 69 | 72 | |
| 61453 | Pipeline Safety Investigator III | 74 | 77 | |
| 61455 | Pipeline Safety Training Officer | 74 | 77 | |
| 61458 | Gas Pipeline Safety Administrator | 78 | 80 | |

Proposed Ranges for APSC Technical Positions

| Proposed Class Code | Proposed Class Title | Craver Proposed Range | APSC Proposed Range | NOW |
|---|---|---|---|---|
| 10626 | Chief Accountant PSC | 80 | 82 | |
| 11240 | Transportation Rate Analyst | 65 | 70 | |
| 11242 | Transportation Rate Specialist | 73 | 75 | |
| 11244 | Transportation Rate Supervisor | 78 | 80 | 81 |
| 11251 | Public Utilities Analyst I | 68 | 69 | |
| 11252 | Public Utilities Analyst II " " ANALYST III | 74 | 75 | 75 78 |
| 11254 | Utility Rate Supervisor | 79 | 80 | |
| 11256 | Utility Financial Auditing & Analysis Dir. | 82 | 85 | |
| 11258 | Rate Analysis Research Director | 82 | 85 | |
| 11261 | ~~Public Utilities Auditor I~~ | ~~68~~ | ~~69~~ | |
| 11262 | ~~Public Utilities Auditor II~~ | ~~74~~ | ~~75~~ | |
| 11263 | ~~Public Utilities Auditor III~~ | ~~78~~ | ~~80~~ | |
| 11270 | Secretary PSC | 79 | 82 | 84 |
| 11274 | PSC Transportation Director | 82 | 85 | |
| 11540 | Administrative Law Judge | 77 | 81 | 87 |
| 11543 | Chief Administrative Law Judge | 85 | 85 | 87 |
| 20501 | Utility Investigative Technician I | 67 | 69 | |

Form 13P                    EM.  )YEE PERFORMANCE APF     ISAL          *Promoted 9/2*
Revised (1/1/1998)                    STATE OF ALABAMA
                                     Personnel Department

*PREAPPRAISAL*

Employee Name: __Gregory Kelly__                Social Security Number: __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__

Agency: __018    Public Service Commission__     Division: __Energy__

Classification: __Utility Engineering Spec. II__  Class Code: __20522__

Period Covered From: __5/29/04__  To: __5/28/05__   Position #4I17203

PLAINTIFF'S EXHIBIT
7

**RESPONSIBILITIES/RESULTS:** Responsibilities and results on which an employee will be rated should be listed below. These areas should be discussed with the employee during the Preappraisal session at the beginning of each appraisal year. Please refer to the Performance Appraisal Manual for instruction on how to develop responsibilities and results.

## RESPONSIBILITIES/RESULTS

1. Review monthly reports submitted by Alabama Power Company regarding 1.) Monthly Meter Tests, 2.) Customer outages, 3.) Hydro and fossil plant outages, 4.) Hydro and fossil plant performance, 5.) Farley operating performance, and 6.) Peak demand in order to determine if any unusual or significant events (non-routine or extraordinary events) occurred in the previous month's operations and or testing procedures. These items should be noted and discussed with supervisor as well as discussed with the appropriate APCo personnel during site visits.

2. Performs monthly visits and inspections (approximately three trips per month to various locations) of Alabama Power Company's utility plant operations (generation, transmission, distribution, etc.) and construction projects to gain an understanding of the Company's operating & maintenance practices, plant performance, system reliability, outages (planned & forced), infrastructure improvements, distribution service quality, extensions and enlargements, customer concerns, project expenditures as well as other related matters.

3. Document each visit and/or inspection of APCo facilities in order to establish a detailed written record of the information discussed during each visit. The report should be completed within one week after the visit and provided to Supervisor.

4. Perform technical research, analysis, and documentation for special projects. This assignment may include work-related matters such as: 1.) IEEE, NESC, NEC, and ANSI Standards, 2.) FERC and NARUC technical issues, 3.) APCo rates, regulations, and policies 4.) APSC rules and regulations, and 5.) Petitions, filings, and/or other rate matters. Each assignment should be properly documented to include: 1.) Scope of research, 2.) Sources of information, and 3.) Results of the analysis. Each assignment should be completed as directed by Supervisor.

5. Prepare monthly monitoring reports (T & D, reliability, peak demand, capacity factors, etc.), as assigned by Supervisor, so that the Company's books and records are analyzed for cost variances, budget variances, and/or significant trends. The reports should be completed by the 10th of each month, for the prior month's financials received, with each significant variance documented within the report (greater than 10% or $500,000).

6. Respond to technical data requests, phone inquiries, surveys and questionnaires from consumers, consultants, and others so that information is released in accordance with PSC rules, state law and supervisor's direction in a courteous and prompt manner with a brief synopsis included with section's monthly activities report.

7. Perform the necessary research, visits, analysis, inquiries, etc. in order to assist in the investigation of service complaints and to reasonably assure the Utility's compliance to the General Rules and Special Electric Rules of the Alabama Public Service Commission (extension plans & policies, T & D maps, meter records, interruptions, etc.) as well as the staff's responsibilities regarding the same rules. The efforts and activities relevant to this assignment should be completely documented in a permanent file and discussed with Supervisor on a monthly basis.

8. Continue professional development and other work related activities to include: 1.) Attending meetings, 2.) Training, 3.) Attending seminars and conferences, 4.) Reading of Technical Periodicals, 5.) Reading current news articles related to the Energy and Electricity Sectors and 6.) Research industry specific issues. This task should be pursued in order to gain an understanding of Alabama utility regulation as well as the electric utility industry. These developmental activities should be completed on a monthly basis, documented, and discussed with supervisor.

9. Perform technical research, analysis, and documentation of the Company's Environmental Compliance activities and strategies (SCRs, Low NOx Burners, ESPs, SNCRs, Scrubbers, Mercury controls, fuel switching, construction schedules and budgets, etc.) All research, analysis, and monitoring should be properly documented to include: 1.) Scope of research, 2.) Sources of information, and 3.) Results of the analysis. The ...

**WORK HABITS:** Provide a c[...] in the appropriate space when the p[...]es and procedures concerning the following areas have been discussed with the employee. In particular, the attendance and punctuality policies [...]uld be provided to the employee in writing. For instructions, refer to the performance appraisal manual and policies of the agency.

CHECK IF DISCUSSED:       ___X___   Attendance

                          ___X___   Punctuality

                          ___X___   Cooperation with Coworkers

                          ___X___   Compliance with Rules

**PREAPPRAISAL SIGNATURES:** Date of Session: ___6 - 11 - 04___

Employee Signature: _Gregory Kelly_____

Rater Signature: _John D. Free_  6-11-2004_____

Reviewer Signature: _M Hamilton_  6/11/04_____

## MIDAPPRAISAL

Describe the employee's performance strength(s) as observed during the first half of the appraisal period.

_____

_____

_____

Describe area(s) of the employee's performance that need improvement as observed during the first half of the appraisal period.

_____

_____

_____

Document the action plan that has been discussed to improve the areas of weakness.

_____

_____

_____

A midappraisal has been held and performance has been discussed:

Date:_____

Employee Signature:_____          Rater Signature:_____

Form 13P          EMPLO    PERFORMANCE *PREAPPRA* L
Revised (06/2005)          STATE OF ALABAMA
Personnel Department

Employee Name: <u>GREGORY KELLY</u>          Social Security Number: 4▮▮▮▮▮▮

Agency: <u>018/PUBLIC SERVICE COMMISSION</u>          Division: Energy

Classification: <u>PUBLIC UTIL TEC SPEC, SR</u>          Class Code: <u>20522</u>

Period Covered From: <u>10/01/2005</u> To: <u>10/01/2006</u>          Position Number: <u>04117203</u>

**RESPONSIBILITIES/RESULTS:** Responsibilities and results on which an employee will be rated should be listed below. These factors should be discussed with the employee during the Preappraisal session at the beginning of each appraisal year. Please refer to the Performance Appraisal Manual for instruction on specifics of preparing, conducting, and completing the Preappraisal. Refer to the same manual for information concerning how to develop responsibilities and results.

1. Review monthly reports submitted by Alabama Power Company regarding 1.) Monthly Meter Tests, 2.) Customer outages, 3.) Hydro and fossil plant outages, 4.) Hydro and fossil plant performance, 5.) Farley operating performance, 6) Peak Demand Report, and Environmental Reports in order to determine if any unusual or significant events (non-routine or extraordinary events) occurred in the previous month's operations and or testing procedures. This information should be documented in the Operations Summary Report and included in the monthly Black Book, as well as the Section's Electronic files.

2. Plans and performs monthly visits and inspections (approximately three separate visits per month to various locations and facilities) of Alabama Power Company's utility plant operations (generation, transmission, distribution, etc.) and construction projects to gain an understanding of the Company's operating & maintenance practices, environmental projects, plant performance, system reliability, outages (planned & forced), infrastructure improvements, distribution service quality, extensions and enlargements, customer concerns, project expenditures as well as other related matters. The visits should be planned and performed in a well organized and efficient manner.

3. Document each visit and/or inspection of APCo facilities in order to establish a <u>detailed</u> written record of the information discussed during each visit. The report must include all vital information obtained and/or discussed during the visit. The report should be completed in time to be included with the corresponding Black Book, or as directed by Supervisor. For example, the written reports for visits made in August should be completed and included in the August Black Book and Section's electronic files.

4. Perform technical research, analysis, and documentation for **special projects**. This assignment may include work-related matters such as: 1.) IEEE, NESC, NEC, and ANSI Standards, 2.) FERC and NARUC technical issues, 3.) APCo rates, regulations, and policies 4.) APSC rules and regulations, and 5.) Petitions, filings, and/or other rate matters such as environmental projects. Each assignment should be completed as directed by Supervisor.

5. Respond to technical data requests, phone inquiries, surveys and questionnaires from consumers, consultants, etc. and assist in the investigation of service complaints so that information is released in accordance with PSC rules and state law, and to reasonably assure the Utility's compliance with the General Rules and Special Electric Rules of the Alabama Public Service Commission (extension plans & policies, T & D maps, meter records, interruptions, etc.), as well as the staff's responsibilities regarding the same rules. This responsibility should be completed in a courteous and prompt manner with a brief synopsis included with the section's monthly Activities Report and/or documented in the monthly Complaints Report.

6. Continue professional development and other work related activities to include: 1.) Attending meetings, 2.) Training, 3.) Attending seminars and conferences, 4.) Reading of Technical Periodicals., 5.) Reading current news articles related to the Energy and Electricity Sectors and 6.) Research industry specific issues. This task should be pursued in order to gain an understanding of Alabama utility regulation as well as the electric utility industry. These developmental activities should be completed at least once each quarter and documented in a detailed report. The report should be completed and included the corresponding monthly Black Book.

PLAINTIFF'S
EXHIBIT
8

*WORK HABITS:* Provide a check in the appropriate space to document that the policies and procedures concerning the following areas have been discussed with the employee. For instructions, refer to the Performance Appraisal Manual and policies of the agency.

CHECK WHEN DISCUSSED:

|   |   |
|---|---|
| ___X___ | Attendance |
| ___X___ | Punctuality |
| ___X___ | Cooperation with Coworkers |
| ___X___ | Compliance with Rules |

---

## PREAPPRAISAL SIGNATURES: Signatures are mandatory.

Date the Preappraisal Session was held with the employee: _October 5, 2005_

Employee Signature: (denotes discussion and receipt of form, not agreement) _Gregory Kelly_

Rater Signature: (denotes discussion and employee receipt of form) _John D. Free_

Reviewer Signature: _M Hamilton  10/6/05_

---

## EMPLOYEE PERFORMANCE *MIDAPPRAISAL*

Describe any employee's strength(s) in performing responsibilities and/or conducting work habits, as observed, during the first half of the appraisal period.  _See attachments._

Describe any area(s) that the employee needs to improve in performance of responsibilities and/or work habits, as observed, during the first half of the appraisal period. Document any actions taken or the corrective action plan that was developed to improve the areas of weakness. If a plan has not been developed, it is appropriate for the rater to consider developing a plan at this time.  _See attachments._

State the areas where the employee has performed in a fully competent manner during the first half of the appraisal period. Documentation in this area means that the employee performed to the expected level of performance as discussed in the Preappraisal session. If there is no documentation in the first two areas, this section should be completed.  _See attachments._

A Midappraisal session has been held on this date and performance has been discussed: _____

Employee Signature: X _Gregory Kelly_          Initial if comments attached: _GK_

Rater Signature: _John D. Free  4-21-06_          Initial if comments attached: _JDF_

Reviewer Signature: _M Hamilton  4/21/2006_          Initial if comments attached: _____

(Signatures denote that a Midappraisal session has been held between the supervisor and employee. Signatures are mandatory. Employee signature does not denote agreement but discussion of the form and rater comments. Comments may be attached. The person attaching comments must initial in the appropriate space.)

43-2008

(d) The fact that the actual tasks performed by the incumbent of a position do not appear in the specification for the class to which the position has been allocated shall not be taken to mean that the position is necessarily excluded from the class. Nor shall any one example of a typical task taken without relation to the parts of the specification be construed as determining that a position should be allocated to the class.

(e) The statement of minimum qualifications expresses the minimum background in terms of education and experience which would be required of any new appointee to a position in the class as evidence of his ability to perform the work properly, and is to be so construed and not as imposing in itself any new or additional requirements upon incumbents of positions. Although they may not be expressed, such qualifications as should properly be required of incumbents of all or any positions, such as good physical condition, freedom from disabling defects, citizenship, suitable age, honesty, sobriety and industry, are taken for granted.

**Author:**
**Statutory Authority:** Code of Ala. 1975, § 36-26-11.
**History:** Filed September 29, 1981.

**670-X-7-.05 Allocation Of New Positions.** When new positions are created in any department, complete job descriptions shall be furnished [to] the Director by the department, and he shall study the duties and responsibilities of the new position and determine the proper classification. If any appropriate classification does not already exist he shall prepare a new class specification and submit it to the Board for approval at its next regular meeting.

**Author:**
**Statutory Authority:** Code of Ala. 1975, § 36-26-11.
**History:** Filed September 29, 1981.

**670-X-7-.06 Reallocations.**

(1) An appointing authority shall report to the Director the addition of new assignments or the taking away of old ones. The Director shall investigate such changes in order to provide a basis for determining the effect on the classification of the position.



PLAINTIFF'S EXHIBIT
9
tabbies

(2) The Director shall, on his own initiative, make periodic investigations of any and all positions in order to determine changes in duties and responsibilities of positions as a basis for keeping the classification plan up-to-date.

(3) An employee may at any time make a request in writing to the Director for a review of the description of his position. The request shall set forth the employee's reasons for the review and must be substantiated by his supervisor and the department head. If such reasons appear to be substantial, the Director shall make an investigation of the position with a view to determining the correctness or incorrectness of the allocation and the adjustment necessary.

(4) When it is found by any of the methods outlined above that a position is not in the most appropriate class, the Director shall reallocate it to the most appropriate class.

(5) A position that is reallocated to a higher class should normally be filled by certification and appointment from the open competitive or promotional eligible register for the new class. However, if the incumbent has been performing the duties that are the basis for reallocation for three months or more in a completely satisfactory manner at the time the position is reallocated to a higher class, he may be given status in the new class, if his name is among the upper one-half of those on the competitive eligible list or promotional list, as of the date of its establishment; or when he passes an examination for the class with a similar rating. Provided, however, that if the incumbent has been performing the duties that are the basis for reallocation for five years or more in a completely satisfactory manner at the time the position is reallocated to a higher class, he will be given status in the new class if his name appears on the competitive or promotional eligible list, as of the date of its establishment; or when he passes an examination for the class with a similar rating.

(6) If a position is reallocated to a lower class in a series, the incumbent may be given regular status in the new class; but may remain eligible for three years to go into a position in the higher class.

26

(7) If a position is reallocated to a class in another series (as from clerical to stenographic) the incumbent shall be required to pass an examination qualifying for that part of the work not covered by the previous examination.

(8) If the incumbent does not appear qualified for the new class to which the position is being reallocated, or if he fails to qualify on examination, he may be transferred to a position in the class for which he has previously qualified or be laid off if there is no position to which he may be transferred, and the position filled by a qualified person.

**Author:**
**Statutory Authority:** Code of Ala. 1975, § 36-26-11.
**History:** Filed September 29, 1981.

IN ... OF DISCRIMINATION

This form is affected by the Privacy ... of 1974; see Privacy Act Statement on reverse before completing this form.

☐ FEPA
☒☒ EEOC 420-2007-017...

_____ and EEOC

(State or local Agency, if any)

| NAME (Indicate Mr., Ms., or Mrs.) | HOME TELEPHONE NO. (Include Area Code) |
|---|---|
| Mr. Gregory Kelly | (334) 271-2478 |

| STREET ADDRESS | CITY, STATE AND ZIP CODE | COUNTY |
|---|---|---|
| 6213 Willow Glenn Drive, Montgomery, AL 36117 | | Montgomery |

NAMED IS THE EMPLOYER, LABOR ORGANIZATION, EMPLOYMENT AGENCY, APPRENTICESHIP COMMITTEE, STATE OR LOCAL GOVERNMENT AGENCY WHO DISCRIMINATED AGAINST ME (If more than one list below.)

| NAME | NO. OF EMPLOYEES/MEMBERS | TELEPHONE NUMBER (Include Area Code) |
|---|---|---|
| Alabama Public Service COmmission | Approx. 103 | (334) 242-2696 |

| STREET ADDRESS | CITY, STATE AND ZIP CODE |
|---|---|
| 100 North Union Street, Montgomery, Alabama 36104 | |

| NAME | TELEPHONE NUMBER (Include Area Code) |
|---|---|
| John Free | (334) 242-9579 |

| STREET ADDRESS | CITY, STATE AND ZIP CODE |
|---|---|
| 100 NOrth UNion Street, Montgomery, AL 36104 | |

| CAUSE OF DISCRIMINATION BASED ON (Check appropriate box(es)) | DATE MOST RECENT OR CONTINUING DISCRIMINATION TOOK PLACE (Month, day, year) |
|---|---|
| ☒☒ RACE  ☐ COLOR  ☐ SEX  ☐ RELIGION  ☐ NATIONAL ORIGIN  ☒☒ AGE  ☐ RETALIATION  ☐ OTHER(Specify) | 01-30-07 |

THE PARTICULARS ARE (If additional space is needed, attached extra.sheet(s)):

Janice M. Hamilton
100 North Union Street
Montgomery, AL 36104
(334) 242-2835

Particulars are attached

PLAINTIFF'S EXHIBIT 10

FEB 0 9 2007

| ☐ I also want this charge filed with the EEOC. I will advise the agencies if I change my address or telephone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures. | NOTARY - (When necessary to meet State and Local Requirements) |
|---|---|
| I declare under penalty of perjury that the foregoing is true and correct. | I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief. |

SIGNATURE OF COMPLAINANT

*Gregory Kelly*

SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE (Day, month, and year)

02/06/07

Date 02/06/07    Charging Party (Signature)

EEOC FORM 5 MAR 84    PREVIOUS EDITIONS OF THIS FORM ARE OBSOLETE AND MUST NOT BE USED

FILE COPY

## STATEMENT OF PARTICULARS

My name is Gregory Kelly, I am a fifty (50) year old black male employed by the Alabama Public Service Commission as a Public Utility Technical Specialist, Senior Energy Division, in the Electricity Section, as an Engineer.

My direct supervisor is John D. Free, a white male, younger than I, who is the Electricity Section Manager. John Free has an accounting degree, but evaluates my work performance and provides my annual performance rating. There are only two other degreed engineers employed in the Energy Division. Janice M. Hamilton is a black female, Division Director and has an engineering degree. The other degreed engineer is J. Rick Cleckler, a white male, and is in charge of the Special Project Section, but he is the only person in that section. Basically, J. Rick Cleckler does the engineering work for the Water Section.

There are five sections in the Energy Division. The Water Section, who is provided technical support by the Special Projects Section, Natural Gas Section, who is provided technical support by the Gas Pipeline Safety Section, and the Electricity Section which I am in and whose technical support is also provided by me. It is apparent that the only section that does not have technical support separate is the one whose technical support would be provided by a black male, over fifty (50) years of age.

All sections have budgets to operate under. The other two sections, being Special Projects and Gas & Pipeline Safety, that provide technical assistance have their own separate budget. However, I have to operate under the Electricity Section budget. Thus, if I was separate I would be the only black in a section that had its own budget. As a result of being in charge of the technical budget, I have lost out on training. The latest example was I was offered the opportunity to go to Denver Colorado for a Gas Technology Workshop. It was a all expense paid seminar, and would not cost the State of Alabama one cent. My supervisor, John Free, refused permission to go citing budget reasons. This happened on January 30, 2007. Since no state funds would be spent, the budget explanation has to be false. I believe I was not allowed to attend because of my race and possibly because of my age. On January 31, 2007, I had a meeting with Janice M. Hamilton concerning Mr. Free not allowing me to go to Colorado for training. Director Hamilton overruled John Free, not only allowing me to go, but several other staff members, including herself as well.

The position I presently hold has been occupied by a black person for the past sixteen (16) years. This position has not had a desk audit (job study) for over twenty five (25) years. The last time a desk audit was done on this position, it was occupied by a white person. I have on numerous occasions requested that a desk audit be performed on my position. Each time my request has been refused by John Free.

In May 2005 my job title was changed from "Utilities Engineering Specialist II" to "Public Utility Technical Specialist, Senior." No job study was conducted at this time and no reason was provided for the change in job titles. However, since I have the same job title as J. rick Clecker, a

FEB 0 9 2007

white male, I do not understand why I am treated differently, except that I am a black person.

Although the position I hold has been filled by a black person for the past sixteen (16) years, I am the first merit system black engineer that has worked for the Alabama Public Service Commission, Energy Division. The only explanation of why I am treated different from J. Rick Cleckler is my age and my race. I believe my age is an issue because John Free and Janice M. Hamilton are younger than I am . I believe my race definitely prevents me from being treated the same as J. Rick Cleckler, as we have the same position, are both degreed engineers, and both provide technical assistance, but he is supervised by a black female with an engineering degree and I am supervised by a younger white male with an accounting degree.

FEB 0 9 2007

EEOC Form 161 (3/98)   U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION

## DISMISSAL AND NOTICE OF RIGHTS

| | |
|---|---|
| To:  Gregory Kelly<br>c/o Attorney Jim L. DeBardelaben<br>P. O. Box 152<br>Montgomery, AL 36101-0152 | From:  Birmingham District Office - 420<br>Ridge Park Place<br>1130 22nd Street, South<br>Birmingham, AL 35205 |

☐  On behalf of person(s) aggrieved whose identity is
CONFIDENTIAL (29 CFR § 1601.7(a))

| EEOC Charge No. | EEOC Representative | Telephone No. |
|---|---|---|
| 420-2007-01781 | Glenn Todd, Investigator | (205) 212-2031 |

**THE EEOC IS CLOSING ITS FILE ON THIS CHARGE FOR THE FOLLOWING REASON:**

☐  The facts alleged in the charge fail to state a claim under any of the statutes enforced by the EEOC.

☐  Your allegations did not involve a disability as defined by the Americans with Disabilities Act.

☐  The Respondent employs less than the required number of employees or is not otherwise covered by the statutes.

☐  Your charge was not timely filed with EEOC; in other words, you waited too long after the date(s) of the alleged discrimination to file your charge.

☐  Having been given 30 days in which to respond, you failed to provide information, failed to appear or be available for interviews/conferences, or otherwise failed to cooperate to the extent that it was not possible to resolve your charge.

☐  While reasonable efforts were made to locate you, we were not able to do so.

☐  You were given 30 days to accept a reasonable settlement offer that affords full relief for the harm you alleged.

☒  The EEOC issues the following determination: Based upon its investigation, the EEOC is unable to conclude that the information obtained establishes violations of the statutes. This does not certify that the respondent is in compliance with the statutes. No finding is made as to any other issues that might be construed as having been raised by this charge.

☐  The EEOC has adopted the findings of the state or local fair employment practices agency that investigated this charge.

☐  Other (briefly state)

### - NOTICE OF SUIT RIGHTS -
(See the additional information attached to this form.)

**Title VII, the Americans with Disabilities Act, and/or the Age Discrimination in Employment Act:** This will be the only notice of dismissal and of your right to sue that we will send you. You may file a lawsuit against the respondent(s) under federal law based on this charge in federal or state court. Your lawsuit **must be filed WITHIN 90 DAYS** of your receipt of this Notice; or your right to sue based on this charge will be lost. (The time limit for filing suit based on a state claim may be different.)

**Equal Pay Act (EPA):** EPA suits must be filed in federal or state court within 2 years (3 years for willful violations) of the alleged EPA underpayment. This means that **backpay due for any violations that occurred more than 2 years (3 years)** before you file suit may not be collectible.

On behalf of the Commission

Delner Franklin-Thomas      4/10/07

Delner  Franklin-Thomas,
District Director      (Date Mailed)

Enclosure(s)

cc:  John A. Garner, Esq.
Attorney for the Commission
State of Alabama
Public Service Commission
P. O. Box 304260
Montgomery, AL 36130-4260



PLAINTIFF'S
EXHIBIT
11

INFORMATION RELATED TO FILING SUIT
UNDER THE LAWS ENFORCED BY THE EEOC

*(This information relates to filing suit in Federal or State court under Federal law.*
*If you also plan to sue claiming violations of State law, please be aware that time limits and other*
*provisions of State law may be shorter or more limited than those described below.)*

**PRIVATE SUIT RIGHTS --**  **Title VII of the Civil Rights Act, the Americans with Disabilities Act (ADA),**
**or the Age Discrimination in Employment Act (ADEA):**

In order to pursue this matter further, you must file a lawsuit against the respondent(s) named in the charge **within 90 days** of the date you *receive* this Notice. Therefore, you should **keep a record of this date**. Once this 90-day period is over, your right to sue based on the charge referred to in this Notice will be lost. If you intend to consult an attorney, you should do so promptly. Give your attorney a copy of this Notice, and its envelope, and tell him or her the date you received it. Furthermore, in order to avoid any question that you did not act in a timely manner, it is prudent that your suit be filed **within 90 days of the date this Notice was *mailed* to you** (as indicated where the Notice is signed) or the date of the postmark, if later.

Your lawsuit may be filed in U.S. District Court or a State court of competent jurisdiction. (Usually, the appropriate State court is the general civil trial court.) Whether you file in Federal or State court is a matter for you to decide after talking to your attorney. Filing this Notice is not enough. You must file a "complaint" that contains a short statement of the facts of your case which shows that you are entitled to relief. Your suit may include any matter alleged in the charge or, to the extent permitted by court decisions, matters like or related to the matters alleged in the charge. Generally, suits are brought in the State where the alleged unlawful practice occurred, but in some cases can be brought where relevant employment records are kept, where the employment would have been, or where the respondent has its main office. If you have simple questions, you usually can get answers from the office of the clerk of the court where you are bringing suit, but do not expect that office to write your complaint or make legal strategy decisions for you.

**PRIVATE SUIT RIGHTS -- Equal Pay Act (EPA):**

EPA suits must be filed in court within 2 years (3 years for willful violations) of the alleged EPA underpayment: backpay due for violations that occurred **more than 2 years (3 years)** before you file suit may not be collectible. For example, if you were underpaid under the EPA for work performed from 7/1/96 to 12/1/96, you should file suit **before 7/1/98** -- *not* 12/1/98 -- in order to recover unpaid wages due for July 1996. This time limit for filing an EPA suit is separate from the 90-day filing period under Title VII, the ADA or the ADEA referred to above. Therefore, if you also plan to sue under Title VII, the ADA or the ADEA, in addition to suing on the EPA claim, suit must be filed within 90 days of this Notice **and** within the 2- or 3-year EPA backpay recovery period.

**ATTORNEY REPRESENTATION -- Title VII and the ADA:**

If you cannot afford or have been unable to obtain a lawyer to represent you, the U.S. District Court having jurisdiction in your case ma-, in limited circumstances, assist you in obtaining a lawyer. Requests for such assistance must be made to the U.S. District Court in the form and manner it requires (you should be prepared to explain in detail your efforts to retain an attorney). Requests should be made well before the end of the 90-day period mentioned above, because such requests do <u>not</u> relieve you of the requirement to bring suit within 90 days.

**ATTORNEY REFERRAL AND EEOC ASSISTANCE -- All Statutes:**

You may contact the EEOC representative shown on your Notice if you need help in finding a lawyer or if you have any questions about your legal rights, including advice on which U.S. District Court can hear your case. If you need to inspect or obtain a copy of information in EEOC's file on the charge, please request it promptly in writing and provide your charge number (as shown on your Notice). While EEOC destroys charge files after a certain time, all charge files are kept for at least 6 months after our last action on the case. Therefore, if you file suit and want to review the charge file, **please make your review request <u>within 6 months</u> of this Notice.** (Before filing suit, any request should be made within the next 90 days.)

*IF YOU FILE SUIT, PLEASE SEND A COPY OF YOUR COURT COMPLAINT TO THIS OFFICE.*

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF ALABAMA**
**NORTHERN DIVISION**

RECEIVED

2007 JUL -2  A 10: 28

DEBRA P. HACKETT, CLK
U.S. DISTRICT COURT
MIDDLE DISTRICT ALA

| | |
|---|---|
| **GREGORY KELLY** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| **vs** ) | |
| ) | |
| **JOHN FREE, Individually and in his official** ) | **CASE NO.:** |
| **position as an employee of the Alabama Public** ) | |
| **Service Commission;** ) | |
| **JANICE M. HAMILTON, Individually and in** ) | **JURY TRIAL DEMANDED** |
| **her official position as a Division Director of the** ) | |
| **Alabama Public Service Commission;** ) | |
| **ALABAMA PUBLIC SERVICE COMMISSION,** ) | |
| **an agency of the State of Alabama.** ) | |
| ) | |
| **Defendants.** ) | |

<u>**COMPLAINT**</u>

Comes Now the Plaintiff, Gregory Kelly, and files this Complaint seeking relief under the

provisions of Title VII of the Civil Rights Act of 1964, as amended in 1991, 42 U.S.C. §2000 @

et. seq. and under the provisions of 42 U.S.C. §§ 1981, 1983 and under the Equal Protection

Clause of the Fourteenth Amendment to the Constitution of the United States. The Plaintiff also

seeks relief on various state causes of action.

<u>**JURISDICTION**</u>

1. Jurisdiction in this Honorable Court is posted under the provisions of 28 U.S.C. §

1331 and 28 U.S.C. § 1343 because it involves the civil rights of the Plaintiff and because it

involves questions of Federal law.



**PLAINTIFF'S EXHIBIT 12**

Announcement Date: March 17, 2004

**State of Alabama**
**Personnel Department**
**64 North Union Street**
**PO Box 304100**
**Montgomery, AL 36130-4100**
**(334) 242-3389**
**Internet: www.personnel.state.al.us**

## UTILITIES ENGINEERING SPECIALIST II - 20522
### Energy Option - 009
### $42,039.40-$64,035.40

*Pub. Uty. Tech. Spec., Sr.*

**Department: Public Services Commission**
**Location: Montgomery**

### Type of Examination

An **open-competitive** register will be established by an evaluation of the extent and quality of the applicants' training and experience. Applicants may be required to complete a supplemental questionnaire. This evaluation of training and experience will comprise 100% of the final grade.

### Qualifications Needed to Apply

You must have **all** of the following to qualify:

- Bachelor's degree in Electrical Engineering, Mechanical Engineering, Industrial Engineering, Civil Engineering, Chemical Engineering, Nuclear Engineering, or a closely related engineering field.

  Four years of professional engineering experience in the electric, natural gas, or water utility field or in an agency regulating utilities, to include one year of experience in a supervisory or team leadership capacity.

### Special Requirement

Eligibility for licensure as a professional engineer by the Alabama Board for the Registration of Professional Engineers and Land Surveyors.

### Kind of Work

This is advanced professional engineering work with electric, water, and natural gas utilities. Employees in this class perform a variety of complex engineering duties associated with the planning, location, design, or construction of utility engineering projects. Work involves independently performing, reviewing, or monitoring engineering studies; conducting location investigations; and supervising the preparation and review of plans and specifications. Assignments require the independent selection of courses of action for which well-established guidelines may not be available. Supervision is normally exercised over engineers and technical personnel. Work is assigned in broad outline by an administrative supervisor who reviews completed work for engineering soundness and satisfactory completion of assigned projects.

### How to Apply

Use an Application for Examination form. You can get the form at this office or any Alabama Employment Service Office. It can also be downloaded from our web site. You must send your application to the State Personnel Department. It must be received by the close of business on **April 07, 2004**. Applications received after 5:00 p.m. on this date **WILL NOT BE ACCEPTED**. The names of those who apply late will be put on a mailing list. They will be notified when they should apply again. The State Personnel Department is not responsible for late receipt of applications due to mail service. Photocopied applications are accepted. Our fax number is 334-242-1110.

*Individuals currently on the register must reapply to remain eligible for employment.*
THE STATE OF ALABAMA IS AN EQUAL OPPORTUN

Employ

PLAINTIFF'S
EXHIBIT
13

(Communications)
TITLE:  UTILITIES ENGINEERING SPECIALIST II (Energy)        CODE:  20522

DEFINITION

    This is advance professional engineering work with radio, tele-phone, electric, and gas utilities.
    Employees in this class perform a variety of complex engineering duties associated with the planning, location, design, or construction of utility engineering projects.  Work involves independently perform-ing, reviewing, or monitoring engineering studies; conducting location investigations; and supervising the preparation and review of plans and specifications.  Assignments require the independent selection of courses of action for which well established guidelines may not be available.  Supervision is normally exercised over engineers and tech-nical personnel.  Work is assigned in broad outline by an administra-tive supervisor who reviews completed work for engineering soundness and satisfactory completion of assigned projects.

EXAMPLES OF WORK PERFORMED  (Any one position may not include all of the duties listed, nor do the examples cover all of the duties which may be performed.)

    Supervises and coordinates programs to insure that the construction, operation, and services of companies regulated by the commission conform with established laws, rules, and regulations.
    Advises field technicians regarding engineering problems in the utility industry.
    Participates in proceedings of the Commission where specialized technical knowledge of the utility industry is required.
    Assists in the formulation or interpretation of Commission policies regarding the utility industry.
    Keeps abreast of all engineering developments in telephone, gas, radio, and electric utilities, and advises other members of the utility engineering division.
    Assists in the development of training programs pertaining to the telephone, gas, and electric industry.
    Reviews field engineering reports regarding utility companies and makes appropriate recommendations.
    Assists in formulating the staff position regarding proceedings be-ford the Commission and prepares engineering evidence, testimony, and cross-examination questions regarding cases involving utility industry; acts as an expert withness as required.
    Recommends service, policies, and standards for Commission approval.
    Conducts studies of plant property, inventories, and construction, appraising value and physical conditions and determining compliance with approved policies and standards.
    Represents the Commission in conferences with the radio, telephone, gas, and electric utility companies regarding engineering problems.
    Participates in industry association meetings to keep abreast of modern trends and practices.

TITLE:  UTILITIES ENGINEERING SPECAILIST II  (CONT'D)

Advises other divisions regarding evaluations of property and inventories, rate changes, and depreciation rates in the radio and telephone or gas and electric utility industries.

Performs related work as assigned.

REQUIRED KNOWLEDGES, SKILLS, AND ABILITIES

Considerable knowledge of engineering principles, practices and operations applied in the planning, location, design, construction, and maintenance of all types of utility systems.

Considerable knowledge of Public Service Commission administrative and technical policies and procedures.

Considerable knowledge of the procedures and practices applied in inspecting and testing radio, telephone, gas, and electric systems.

Ability to plan, advise, and review the work of various professional and technical construction and maintenance personnel involved in radio, telephone, gas, and electric systems.

Ability to establish and maintain effective working relationships with associates, subordinates, superiors, and the general public.

Ability to express ideas clearly and concisely orally and in writing.

Ability to prepare written reports.

QULIFICATIONS

Any combination of training and experience equivalent to:

Graduation from an accredited four-year college or university with major course work in engineering, preferably in electrical, mechanical, or civil engineering.

Considerable progressively responsible professional engineering experience in the telecommunication, gas, or electric utility industry, including experience in a supervisory capacity.

SPECIAL REQUIREMENT

Eligibility for licensure as a professional engineer by the Alabama Board for the Registration of Professional Engineers and Land Surveyors.



PLAINTIFF'S EXHIBIT 14

# Energy Division

Organizational Structure
As of August 1, 2007

- Janice M. Hamilton, **Division Director**, 2-2835 / 850-0043 (260/221)
  - Stephen D. "Steve" Bartelt, Manager, **Water Section**, 2-2695 (274)
    - Maverick D. Roberts, ASA II, 2-2696 (261)
  - Robert E. "Bob" Reed, Manager, **Natural Gas Section**, 2-2698 (268)
    - Brenda P. Roberts, ASA III, 2-2697 (262)
    - I. Joe Leverette, PU Analyst III, 2-9568 (330)
      - Tonya L. Williams, Accountant, 2-9585 (329)
    - Donald C. Powell, PU Analyst III, 2-9793 (290)
    - William C. "Bill" Knight, PU Analyst II, 2-9711 (348)
      - PU Analyst (Future), 2-9889 (279)
  - John D. Free, Manager, **Electricity Section**, 2-8579 (823)
    - Jacqueline R. Frazier, ASA II, 2-5868 (270)
    - Robert Taylor, III, PU Analyst III, 2-5870 (268)
    - Sheila H. Ward, PU Analyst II, 2-8575 (322)
    - Linda D. Gardner, PU Analyst II, 2-9798 (264)
    - Patricia W. Smith, PU Analyst II, 2-9848 (349)
    - Gregory Kelly, PU Technical Spec. Sr., 2-9727 (347)
    - Vacant, PU Technical Specialist, 2-5869 (267)
  - Christopher J. Harvey, Administrator, **Pipeline Safety Section**, 2-5780 / 850-0047 (283)
    - Administrator (Future)
    - Jannette S. Mitchell, Steno III, 2-5779 / 850-0053 (285)
    - Spencer C. Brady, GPS Training Officer, 2-9864 / 850-0044
    - John Paul Harris, North, GPS Investigator, Supv., 2-9744 / 850-0046
      - David F. Snoddy, GPS Investigator, Sr., 2-9788 / 850-0052
        - Investigator (Future)
      - Gregory C. Meadows, GPS Investigator, Sr., 2-9787 / 850-0049
    - Tommy W. Lancaster, South, GPS Investigator, Supv., 2-9752 / 850-0048
      - Judy D. Ramsey, GPS Investigator, Sr., 2-9879 / 850-0261
    - O. Harold Dunson, Central, GPS Investigator, Supv., 2-9732 / 850-0054
      - Hosie E. Powell, GPS Investigator, Sr., 2-9849 / 850-0051
        - Investigator (Future)
  - J. Rick Cleckler, PU Technical Spec, Sr., **Special Projects Section**, 2-9714 (321)
    - PU Tech Spec (Future), 2-9863 (324)

COPY          1

1          IN THE UNITED STATES DISTRICT COURT

2          FOR THE MIDDLE DISTRICT OF ALABAMA

3               NORTHERN DIVISION

4

5   GREGORY KELLY,

6          Plaintiff,

7     vs.                    CIVIL ACTION NO.
                             2:07-cv-610-WHA
8
    JOHN FREE, et al.,
9
          Defendants.
10

11

12          * * * * * * * * * * * *

13

14

15      **VIDEOTAPED DEPOSITION OF GREGORY KELLY**,

16   taken pursuant to stipulation and agreement before

     Lyn Daugherty, ACCR #66, Certified Court Reporter

17   and Commissioner for the State of Alabama at Large,

18   in the Law Offices of Melton, Espy & Williams, 255

19   Dexter Avenue, Montgomery, Alabama, on Thursday,

20   March 6th, 2008, commencing at approximately

21   9:05 a.m.

22

23          * * * * * * * * * * * *

19

1          section, a natural gas section, electricity

2          section, and a gas pipeline safety section;

3          is that correct?

4     A.   According to this diagram, that's correct.

5     Q.   Okay.  Well, do you know that to be true

6          where you work?

7     A.   I've seen people cross over and work in

8          different sections.  I've seen -- you know,

9          I've seen people just work in all different

10         areas and all different responsibilities.

11         So, you know, to say this organizational

12         chart is adhered to strictly, that's not

13         the case.

14    Q.   Okay.  Well, you work in the electricity

15         section at the Alabama Public Service

16         Commission.

17    A.   That is where my job is located, yeah.

18    Q.   Okay.  And the head of the electricity

19         section is John Free; correct?

20    A.   That's what this organizational chart

21         states.

22    Q.   Well, is he not the head of the electricity

23         section of the Public Service Commission?

20

1   A.   According to -- Yeah.  That's what the

2        chart states.

3   Q.   Well, I'm asking what your knowledge is.

4   A.   From my knowledge, yes, that's correct.

5   Q.   From your knowledge John Free is head of

6        the electricity section?

7   A.   That's correct.

8   Q.   And you work in the electricity section?

9   A.   That's correct.

10   Q.   And John Free is your manager and

11        supervisor?

12   A.   That's correct.

13   Q.   And John Free reports to Janice Hamilton?

14   A.   According to the organizational chart,

15        that's correct.

16   Q.   To your knowledge, does John Free report to

17        Janice Hamilton?

18   A.   That's -- That's correct.

19   Q.   And Janice Hamilton is John Free's manager

20        and supervisor?

21   A.   That is correct, from my knowledge.

22   Q.   Okay.  The energy division has an

23        individual by the name of Rick Cleckler

23

```
 1   A.    She's a black female.

 2   Q.    Okay.  So there are a total of how many

 3         black employees working in the electricity

 4         section under John Free?

 5   A.    Well, let's count them up.  You've got

 6         myself, Robert Taylor, you've got

 7         Jacqueline Frazier, and you've got Patricia

 8         Smith.  That's four.

 9   Q.    Okay.  So that is four out of one, two,

10         three, four, five, six?

11   A.    That's correct.

12   Q.    Okay.  I'm going to ask you in a few

13         minutes a little bit more about your

14         educational background.  But it's my

15         understanding that you have a degree in

16         engineering?

17   A.    That's correct.

18   Q.    And you obtained that degree from Auburn

19         University?

20   A.    That's correct.

21   Q.    You are not a licensed engineer with the

22         State of Alabama; correct?

23   A.    That is correct.
```

24

1    Q.    Have you ever sat for the licensing exam

2          with the State of Alabama?

3    A.    That's not -- No, I haven't.

4    Q.    You have not?

5    A.    No.

6    Q.    And why haven't you?

7    A.    Well, it's a sad state to talk about.  When

8          I finished Auburn University in 1979, to

9          sit for the exam you have to be mentored by

10         an engineer.  He has to vouch for your

11         qualification.  When I finished Auburn

12         University in 1979, I think I was about the

13         sixth or seventh black engineer to ever

14         finish from Auburn University.  And at that

15         day and time you still had a lot of

16         prejudice and racism.  I couldn't find an

17         engineer who would let me work under him,

18         matriculate under him so I could take the

19         EIT and the PE exam.  So after being

20         frustrated for a number of years, I decided

21         now to pursue a PE.

22   Q.    Okay.  You used the letters PE.  What does

23         that mean?

1     engineer to -- black engineer to graduate

2     from Auburn?

3  A.  In electrical engineering.

4  Q.  In electrical engineering?

5  A.  Yes.

6  Q.  Had there been any blacks to graduate from

7     Auburn prior to you in other engineering

8     areas besides electrical?

9  A.  Well, I don't have that knowledge.  But I

10    had a couple of fraternity brothers who --

11    you know, that's one reason I went to

12    Auburn University.  I really wanted to

13    become a civil engineer.  But once I

14    pledged and became a Kappa Alpha Psi

15    fraternity, most of my fraternity brothers

16    was civil engineers and they convinced me

17    that they had support and structure there

18    and they would help me become an electrical

19    engineer.  I had two fraternity brothers

20    that sort of act as mentors when I was at

21    Auburn University.  And ironically they

22    mentored me so well I was able to finish

23    before they did.

50

1          attend any other colleges, universities or

2          schools?

3     A.   Yes, I did.

4     Q.   Could you tell me what they were?

5     A.   I attended Troy State University.

6     Q.   What years did you attend Troy State?

7     A.   I attended Troy at night.  I think the

8          years was 1987 going part-time, work

9          full-time 1987 through 1990.

10    Q.   So roughly three years?

11    A.   Going part-time working during the day

12         going to school at night.

13    Q.   Did you graduate from Troy State?

14    A.   Yes, I did.

15    Q.   And what degree did you obtain from Troy

16         State?

17    A.   Master's degree in business administration.

18    Q.   Otherwise known as an MBA?

19    A.   That's correct.

20    Q.   Other than Troy, Auburn and Lanier, have

21         you attended any other schools, colleges or

22         universities?

23    A.   No.

## FREEDOM COURT REPORTING

1

1       IN THE UNITED STATES DISTRICT COURT

2       FOR THE MIDDLE DISTRICT OF ALABAMA

3               NORTHERN DIVISION

4

5   GREGORY KELLY,              )

6           Plaintiff,          )

7   vs.                         )   CASE NUMBER:

8   JOHN FREE, et al.,          )   2:07-CV-610-WHA

9           Defendants.         )

10

11          DEPOSITION OF JOHN FREE

12          In accordance with Rule 5(d) of

13  The Alabama Rules of Civil Procedure, as

14  Amended, effective May 15, 1988, I, Cindy

15  Weldon, am hereby delivering to Jim

16  Debardelaben, the original transcript of the

17  oral testimony taken on the 15th day of

18  April, 2008, along with exhibits.

19          Please be advised that this is the

20  same and not retained by the Court Reporter,

21  nor filed with the Court.

22

23

## FREEDOM COURT REPORTING

9

1    his grievance -- the notice he filed, didn't

2    you?

3        A.    Could you show me the notice?

4        Q.    I have misplaced it.   Here we go.

5    Let me mark this.   It was Defendant's

6    Exhibit No. 52.   Let me mark that as

7    Plaintiff's Exhibit No. 1.

8            (Whereupon, Plaintiff's Exhibit

9    No. 1 was marked for identification and

10   attached to the original transcript.)

11       Q.    Have you seen that before?

12       A.    Well, sir, I'm very familiar with

13   the grievance hearing.   But I'm not

14   completely sure I actually have seen this

15   document.   I don't see where it was cc'd to

16   me.   I'm not sure.

17       Q.    Okay.   As you read that document,

18   is there any place in his grievance that he

19   raises any issue about race discrimination?

20       A.    As I read this document?

21       Q.    Yes, sir.

22       A.    Can I read it?

23       Q.    Sure.

## FREEDOM COURT REPORTING

11

1    individual defendants.

2         And we're entitled to have all

3    three of them present.  He's a

4    representative of the Public Service

5    Commission.

6         MR. DEBARDELABEN:  Okay.  Well,

7    I'll re-notice him or take him at the end of

8    this one because I was -- I never take

9    lawyers' depositions.

10        MR. MELTON:  We don't need a

11   notice, Jim.  Just say you want him and

12   he'll be available.

13        MR. MOZINGO:  He's right here.

14        MR. MELTON:  It's no big deal.

15        MR. DEBARDELABEN:  Okay.

16        MR. MELTON:  The document ought to

17   speak for itself.  But go ahead, John.

18        A.   The question again, please, sir.

19        Q.   Is there any allegation of race

20   discrimination in that document?

21        A.   I don't believe that is mentioned

22   in this document.  I'm not sure anything

23   like that could be inferred.  But I don't

## FREEDOM COURT REPORTING

12

1    see race discrimination mentioned in this

2    document.

3        Q.   And that led to the hearing before

4    that he had before the Public Service

5    Commission on his grievance?

6        A.   I believe that's correct.

7        Q.   Okay.  Let me show you this.

8    We'll mark this as Plaintiff's 2.

9            (Whereupon, Plaintiff's Exhibit

10   No. 2 was marked for identification and

11   attached to the original transcript.)

12           MR. MELTON:  What is your

13   question?

14       Q.   Do you recognize that exhibit?

15       A.   I believe so.  I mean, I've seen

16   several organizational charts over the

17   years.  This appears to be one of them.

18       Q.   Does that appear to be the

19   organization structure of the Energy

20   Division as of August the 1st, 2007?

21       A.   August 1st, 2007.  That would be

22   -- I'm not sure how long Maverick Roberts

23   has been up there with us.  I know he's

## FREEDOM COURT REPORTING

128

1     Q.    How many responsibilities and

2   results are on Plaintiff's Exhibit No. 13,

3   the pre-appraisal for 5-29-04 to 5-28-05?

4     A.    It originally had eight and I

5   believe number nine was added.

6     Q.    So it's got nine.  So there's been

7   a change of three that he doesn't have in

8   the 2006, 2007 responsibilities and

9   assignments?

10    A.    Yes, sir.  Enumerated

11  responsibilities, that's correct.

12    Q.    His responsibilities and

13  assignments have been changed, haven't they?

14    A.    It appears so, yes, sir.

15    Q.    All right.  I want you to -- Are

16  you familiar with Rule 670-X-7-.06 of the

17  State Personnel Board?

18    A.    No, sir.

19    Q.    Make that our No. 20.

20        (Whereupon, Plaintiff's Exhibit

21  No. 20 was marked for identification and

22  attached to the original transcript.)

23    Q.    Would you please take a minute and

## FREEDOM COURT REPORTING

130

1        Q.   Did you report to your appointing

2  authority?

3        A.   Did I report to the appointing

4  authority?

5        Q.   Let's strike that.  Prior to you

6  changing Mr. Kelly's duties and

7  responsibilities, was that reported to your

8  appointing authority in any way whatsoever?

9        A.   Prior to me changing from nine to

10  six, no, sir, I don't believe it was.

11        Q.   Was it reported to the director of

12  the State Personnel?

13        A.   No, sir.  Only through the

14  performance appraisal process where they

15  receive copies of it.

16        Q.   Do you know whether when you

17  changed Mr. Kelly's duties and

18  responsibilities -- I say duties and

19  responsibilities.

20        When you added and took away

21  assignments to Mr. Kelly, was there any type

22  of investigation made by the Personnel

23  Department to see if he should stay at the

## FREEDOM COURT REPORTING

131

1    same job description?

2        A.    No, sir.  Not that I'm aware of.

3        Q.    Were you not aware that this rule

4    required that to be done?

5        A.    This is the --

6        MR. MOZINGO:  Object to the form.

7        Q.    Were you not aware of this rule,

8    sir?

9        A.    I don't believe I was.  I believe

10   this is the first time I've read this rule

11   as far as I can recall.

12       Q.    Okay.  Now, prior to you changing

13   Mr. Kelly's assignments, giving new ones or

14   taking away old ones, did you tell even Ms.

15   Hamilton in writing what you were doing?

16       A.    She saw the changes after I made

17   them, but I believe prior to Mr. Kelly

18   seeing them before the discussion.

19       Q.    Now, one of the -- Mark this as

20   21.  I only have one copy of this.

21       (Whereupon, Plaintiff's Exhibit

22   No. 21 was marked for identification and

23   attached to the original transcript.)

## FREEDOM COURT REPORTING

138

1        A.    Right.  There's a board over the

2    department.  And the department I guess sets

3    policy and guidelines for all State

4    employees I guess.

5        Q.    And your employee performance

6    appraisals are on Form 13P from the State of

7    Alabama Personnel Department, aren't they?

8        A.    Yes, sir.  I think you mentioned

9    two separate forms earlier.  But I'll take

10    that you're looking at one of them and

11    quoting that.

12        Q.    I'm looking at Exhibit 8.

13        A.    Okay.

14        Q.    So to your knowledge, are you

15    exempt from the requirements made by the

16    State Personnel Board?

17        A.    No, sir.  To my knowledge, I

18    wouldn't be.

19        Q.    Okay.  With all the changes in Mr.

20    Kelly's job duties and responsibilities and

21    assignments, why wouldn't it be reported to

22    the director of State Personnel?

23            MR. MOZINGO:  Same objection.

## FREEDOM COURT REPORTING

139

1        A.    I'm not sure, sir.

2        Q.    Okay.

3        THE WITNESS:  Do we have time for

4  another break?  Is that okay?

5        MR. DEBARDELABEN:  We can take

6  lunch if y'all want to.

7        MR. MOZINGO:  Let's take lunch.

8        (Whereupon, a lunch recess was

9  taken.)

10       Q.  Mr. Free, I forgot to ask you this

11  when we started this morning.  Are you on

12  any type of medication?

13       A.    I take a vitamin and an aspirin.

14       Q.    So that wouldn't affect your

15  answers you've given here today?

16       A.    No, sir.

17       Q.    Have you ever been diagnosed with

18  any type of disorder like ADD, OCD or

19  anything like that?

20       A.    No, sir.

21       Q.    So you have no diagnosed

22  disorders?

23       A.    No, sir.

## FREEDOM COURT REPORTING

148

1    attached to the original transcript.)

2         Q.    You signed this affidavit, didn't

3    you?

4         A.    Yes, sir.

5         Q.    And you swore that everything you

6    put in here was true and correct, didn't

7    you?

8         A.    Yes, sir.

9         Q.    Would you read paragraph four?

10        A.    Paragraph four.  The paragraph

11   item number four?

12        Q.    Yes, sir.

13        A.    Okay.  As a Public Utility Analyst

14   manager, I am responsible for the day-to-day

15   supervision and control of the employees of

16   the Electricity Section of the Energy

17   Division of the PSC.

18             In my aforementioned capacity as a

19   Public Utility Analyst manager, I am

20   responsible for hiring, evaluating and

21   rating the performance of the employees

22   under my direct supervision and control

23   pursuant to the rules, regulations and

**FREEDOM COURT REPORTING**

149

1    guidelines of Alabama State Personnel

2    Department, paren, State Personnel, close

3    paren, and the merit system of Alabama

4    codified at Code of Alabama, 1975, Section

5    36-26-1.

6        Q.  So according to your affidavit,

7    you rate the employees in your section under

8    your supervision and control pursuant to the

9    rules, regulations and guidelines of the

10    Alabama State Personnel Department?

11        A.  Correct.

12        Q.  Okay.  So their rules apply to

13    you?

14        A.  Correct.

15        Q.  Okay.  Mr. Free, show you what

16    we'll mark as 23.

17        (Whereupon, Plaintiff's Exhibit

18    No. 23 was marked for identification and

19    attached to the original transcript.)

20        MR. MOZINGO:  This is Plaintiff's

21    Exhibit 23?

22        MR. DEBARDELABEN:  23.

23        Q.  Do you recall this memorandum from

# FREEDOM COURT REPORTING

1

EXHIBITS

1          IN THE UNITED STATES DISTRICT COURT

2          FOR THE MIDDLE DISTRICT OF ALABAMA

3                  NORTHERN DIVISION

4

5    GREGORY KELLY,               )

6              Plaintiff,         )

7    vs.                          )    CASE NUMBER:

8    JOHN FREE, et al.,           )    2:07-CV-610-WHA

9              Defendants.        )

10

11         DEPOSITION OF JOHN GARNER

12         In accordance with Rule 5(d) of

13   The Alabama Rules of Civil Procedure, as

14   Amended, effective May 15, 1988, I, Cindy

15   Weldon, am hereby delivering to Jim

16   Debardelaben, the original transcript of the

17   oral testimony taken on the 15th day of

18   April, 2008, along with exhibits.

19         Please be advised that this is the

20   same and not retained by the Court Reporter,

21   nor filed with the Court.

22

23

# FREEDOM COURT REPORTING

10

1    attached to the original transcript.)

2         Q.    Is that your affidavit you filed

3    in this case?

4         A.    Yes, sir.  It appears to be.

5         Q.    Okay.

6              MR. MOZINGO:  This is Plaintiff's

7    Exhibit 28?

8              MR. DEBARDELABEN:  28, yes, sir.

9         Q.    And you attached to it near the

10   back a document called employee grievance

11   filed by Mr. Gregory Kelly?

12        A.    What I attached to my affidavit

13   was the Commission's response to the EEOC

14   charge that Mr. Kelly filed.  And this

15   document that you're referencing was part of

16   that EEOC filing that the Commission made in

17   response to his charge.

18        Q.    I want to ask you about that

19   employee grievance.  At any place in Mr.

20   Kelly's grievance that he filed before the

21   Board, did he raise an issue about race

22   discrimination?

23        A.    Not to my knowledge.  I did not

## FREEDOM COURT REPORTING

11

1  handle the proceeding.  But to my knowledge,

2  he did not.

3      Q.    And it's not addressed in finding

4  the recommendation of the Grievance

5  Committee, is it?

6      A.    Not to my knowledge.

7      Q.    That wasn't -- Race discrimination

8  wasn't even an issue at that point before

9  the Board, was it?

10     A.    Not to my knowledge.

11     Q.    Okay.  Now, I also noticed that

12  you attached an affidavit of Mr. Free to

13  this complaint -- this affidavit?

14     A.    That was because it was part of

15  the documentation that was submitted to the

16  EEOC.  Yes, sir.

17     Q.    Right.  Now, in paragraph nine of

18  that affidavit, you discuss basically desk

19  audits; correct?  I mean, Mr. Free does?

20     A.    Mr. Free does, yes, sir.

21     Q.    Do you know who prepared this

22  affidavit for Mr. Free?

23     A.    Mr. Free contributed substantially

## FREEDOM COURT REPORTING

16

1       A.    Yes, sir.

2       Q.    Were you at all aware about the

3    Commission back in I believe -- Lynn Greer

4    was one of the Commissioners back in '81 --

5    getting -- writing Mr. Frazier, getting a --

6    I'm going to show you what was previously

7    marked as Exhibit 24, the letter requesting

8    an analysis of the jobs at PSC by the

9    Personnel Board, a thumbnail.

10      A.    Was I aware of this?

11      Q.    Yes, sir.

12      A.    No, sir.  I was not aware of this

13   until today.

14      Q.    Since you've been there -- and you

15   say since 1986?

16      A.    Yes, sir.

17      Q.    Do you know of any evaluation by

18   the Personnel Board of a job at the Public

19   Service Commission in the same way that it

20   was requested in 1981?

21      A.    I'm not aware of another attempt

22   by the Commission to get a number of

23   positions re-evaluated like this one in

## FREEDOM COURT REPORTING

1

29

30

```
 1           IN THE UNITED STATES DISTRICT COURT

 2           FOR THE MIDDLE DISTRICT OF ALABAMA

 3                  NORTHERN DIVISION

 4

 5     GREGORY KELLY,              )

 6               Plaintiff,        )

 7     vs.                         )   CASE NUMBER:

 8     JOHN FREE, et al.,          )   2:07-CV-610-WHA

 9               Defendants.       )

10

11        DEPOSITION OF JAMES RICKY CLECKLER

12             In accordance with Rule 5(d) of

13     The Alabama Rules of Civil Procedure, as

14     Amended, effective May 15, 1988, I, Cindy

15     Weldon, am hereby delivering to Jim

16     Debardelaben, the original transcript of the

17     oral testimony taken on the 16th day of

18     April, 2008, along with exhibits.

19             Please be advised that this is the

20     same and not retained by the Court Reporter,

21     nor filed with the Court.

22

23
```

## FREEDOM COURT REPORTING

6

1          JAMES RICKY CLECKLER,

2     after first being duly sworn, testified

3               as follows:

4     EXAMINATION BY MR. DEBARDELABEN:

5          THE COURT REPORTER:  Usual

6     stipulations?

7          MR. MOZINGO:  Yes.

8          MR. DEBARDELABEN:  Yes.

9     Q.    Would you state your name, please,

10    sir.

11    A.    James Ricky Cleckler.

12    Q.    And, Mr. Cleckler, where do you

13    live?

14    A.    2113 Yarborough Street,

15    Montgomery.

16    Q.    And how are you employed?

17    A.    Alabama Public Service Commission.

18    Q.    And what's your position?

19    A.    They recently changed my title to

20    Utilities Technical Specialist.

21    Q.    Public Utilities Technical

22    Specialist Senior?

23    A.    Right.  Yes, sir.

## FREEDOM COURT REPORTING

43

1    between two people in the same position.

2              MR. MOZINGO:  It says typing.

3              MR. MELTON:  The further objection

4    is Exhibit 3 speaks for itself.

5         Q.   Now, Mr. Kelly, I haven't asked

6    you this.

7              MR. MELTON:  This is Mr. Cleckler.

8         Q.   Mr. Cleckler, I'm getting old.

9    Mr. Cleckler, I haven't asked you this

10   because I can sit down here and look at

11   you.  But you are a white gentleman, aren't

12   you?

13        A.   Yes, sir.

14        Q.   And Mr. Kelly is a black

15   gentleman?

16        A.   Appears to be.

17        Q.   And you graduated from Auburn with

18   an engineering degree?

19        A.   Bachelor of Electrical

20   Engineering, yes, sir?

21        A.   And Mr. Kelly, to your knowledge,

22   graduated from Auburn?

23        A.   To my knowledge.

## FREEDOM COURT REPORTING

44

1      Q.   Okay.  So y'all both have the same

2  degree and you've got the same position

3  classification at the Public Service

4  Commission?

5      A.   Yes, sir.

6      Q.   But y'all are different races?

7      A.   That's true.

8      Q.   And got different bosses?

9      A.   That's true.

10     Q.   Your boss is the division of --

11  the director?

12     A.   That's right.

13     Q.   And Mr. Kelly's boss is a manager,

14  supervisor?

15     MR. MOZINGO:  Object to the form.

16     Q.   Mr. Free, he's under Ms. Hamilton,

17  isn't he?

18     A.   He reports directly to Ms.

19  Hamilton.

20     Q.   Just like you report directly to

21  Ms. Hamilton?

22     A.   That's true.

23     Q.   Y'all are on the same line of

## FREEDOM COURT REPORTING

1

1    IN THE UNITED STATES DISTRICT COURT

2    FOR THE MIDDLE DISTRICT OF ALABAMA

3    NORTHERN DIVISION

4

5    GREGORY KELLY,                    )

6            Plaintiff,        )

7    vs.                          )    CASE NUMBER:

8    JOHN FREE, et al.,          )    2:07-CV-610-WHA

9            Defendants.      )

10

11    DEPOSITION OF JANICE M. HAMILTON

12        In accordance with Rule 5(d) of

13    The Alabama Rules of Civil Procedure, as

14    Amended, effective May 15, 1988, I, Cindy

15    Weldon, am hereby delivering to Jim

16    Debardelaben, the original transcript of the

17    oral testimony taken on the 15th day of

18    April, 2008, along with exhibits.

19        Please be advised that this is the

20    same and not retained by the Court Reporter,

21    nor filed with the Court.

22

23

## FREEDOM COURT REPORTING

8

1    Q.    1990 at PSC.   Okay.   What was your

2    job?

3    A.    At that time, I was responsible

4    for making generating plant site visits and

5    performing various reports and calculations

6    on the plant performance, reporting any

7    operational changes that were happening at

8    the power plants and various duties such as

9    that.

10    Q.    Okay.   How long did you perform

11    that job?

12    A.    For about two years.

13    Q.    What was your next job at the PSC?

14    A.    My next job was my current job,

15    director of the Energy Division.

16    Q.    Did you have -- Prior to you being

17    promoted up -- When were you promoted to

18    director?

19    A.    When?

20    Q.    Yes, ma'am.

21    A.    In October of 1992.

22    Q.    Okay.   Prior to being promoted to

23    director, did you have essentially the same

## FREEDOM COURT REPORTING

9

1   job as Mr. Kelly has now?

2       A.   Yes, sir, I did.

3       Q.   Okay.  When Mr. Kelly was hired,

4   did you give him any training?

5       A.   Yes, I did.

6       Q.   What kind of training did you give

7   him?

8       A.   I went with him to one of the coal

9   fired generating plants and we -- I showed

10  him how to ask questions of the generating

11  plant personnel and things to look for as

12  he's doing his reviews of their plant

13  performance.

14          And if I remember correctly, we

15  also went to one of the hydroelectric

16  plants.  We visited and did our

17  investigation together on that.

18      Q.   Who did you work under when you

19  worked in the job that Mr. Kelly has?

20      A.   I worked under Mr. Robert T.

21  Duxbury.

22      Q.   And what was his position?

23      A.   His position was utility rate

## FREEDOM COURT REPORTING

28

1      Division.

2          Q.    But he's not in the Energy

3      Division?

4          A.    Correct.

5          Q.    And I should have said PSC Energy

6      Division.  That's the only degreed

7      engineers?

8          A.    Yes, sir.

9          Q.    Why isn't Mr. Kelly in the same

10     division with Mr. Cleckler?

11         A.    He is in the same division with

12     Mr. Cleckler.

13         Q.    Why isn't he in the same section?

14         A.    Because he works for the

15     Electricity Section which works with Alabama

16     Power Company.

17         Q.    Can't Mr. Cleckler -- I mean, you

18     say you need -- you have a lot of jobs you

19     don't get done that used to be done with the

20     Electricity Section?

21         A.    Uh-huh.

22         Q.    And I'm paraphrasing.  Wouldn't it

23     be helpful to have both engineers in the

## FREEDOM COURT REPORTING

30

1    you?

2           A.    I have no idea.

3           Q.    Do you know when the last time a

4    reallocation audit or desk audit was done on

5    Mr. Kelly's position?

6           A.    No, sir.  I don't know that.

7           Q.    Has one ever been done since your

8    association with the PSC in 1990?

9           A.    No, sir.  Not to my knowledge.

10          Q.    Okay.  So we know it's been at

11   least eighteen years that you can verify?

12          A.    Well, I don't know if State

13   Personnel hasn't done something on their own

14   that they haven't notified us of.  But I'm

15   not aware of anything.

16          Q.    And you've either been in that

17   position or supervisor of that position for

18   eighteen years?

19          A.    No, sir.  It's been sixteen.

20          Q.    How many?

21          A.    Sixteen.

22          Q.    I thought you came in 1990?

23          A.    But I was not a division director.

## FREEDOM COURT REPORTING

41

1    and Mr. Cleckler be graded by the same

2    standard since they are both in the same

3    position?

4         MR. MOZINGO:  Object to the form.

5         A.   Not necessarily, no.  I mean, I

6    have my standards and Mr. Free has his

7    standards.  But the work products he gives

8    to me, I grade those.  And I'm sure he wants

9    his work products to be perfect or as near

10   perfect as possible.

11        Q.   So it's okay in your opinion for

12   employees in the same classification to be

13   graded by different standards even if they

14   are in the same division?

15        MR. MOZINGO: Object to the form.

16        Q.   Let me get that out.  You see

17   nothing wrong with employees in the same

18   classification in the same division being

19   graded by different standards?

20        MR. MOZINGO:  Object to the form.

21        A.   No, sir.  I don't see any anything

22   wrong with that because different people

23   have different perceptions and different

## FREEDOM COURT REPORTING

43

1   can actually measure.

2         So it's basically a qualitative

3   standard that we are held to.  And the

4   quality is in the eye of the beholder in

5   most cases.

6         Q.   So in other words, what you're

7   telling me as we look at this, Mr. Cleckler

8   can be graded on different standards than

9   Mr. Kelly there in the same -- even though

10  they are in the same classification, and Mr.

11  Leverette can be graded on different

12  standards, Mr. Joe Leverette from Mr. Robert

13  Taylor?

14        A.   Absolutely.  Yes.  That's correct.

15        Q.   And Mr. Leverette and Mr. Taylor

16  are in the same classification?

17        A.   Yes, sir.

18        Q.   So across the board at the Public

19  Service Commission, there is no consistency

20  on how you are evaluated at the end of the

21  year on your annual report?

22        MR. MOZINGO:  Object to the form.

23        A.   We hope that it does move towards

## FREEDOM COURT REPORTING

44

1    that.  But you can't guarantee that.

2         Q.    So y'all have no set standards on

3    how you evaluate how the managers evaluate

4    the people under them?

5              MR. MOZINGO:   Object to the form.

6         Q.    Evaluation is subjective to the

7    manager, isn't it?

8         A.    Sometimes it is, yes, sir.

9         Q.    Okay.  And then you are, for lack

10   of a better word, the funnel that all

11   evaluation comes through, aren't you?

12        A.    Yes, sir.

13        Q.    Do you ever tell -- Do you ever --

14   excuse me.  That's a bad question.  Do you

15   have a system to try to make sure the

16   evaluations are standard?

17        A.    Yes, sir.  I make comments from

18   time to time on various staff people

19   evaluations.  When they come to me, I'll

20   review them and I may question some of the

21   grades that were given.

22              And we discuss -- I discuss with

23   the supervisors at times the various things

## FREEDOM COURT REPORTING

46

A.    I could discuss with him my observations and any comments I may have made to his supervisor.

Q.    Would the same standards apply, observation apply to Mr. Taylor as would apply to Mr. Joe Leverette?

A.    Yes, sir, I would say so.

Q.    Okay.  So do you try to get those -- Do the same standards you use on Mr. Cleckler apply to Mr. Kelly?

A.    I would say yes.

Q.    Okay.  So you try to make no difference?

A.    Right.

Q.    Now, on Mr. Kelly, have you ever had a complaint about him doing his job?

A.    From his supervisor?

Q.    As you have seen.  Does he do his work?

MR. MOZINGO:  I object.  There are two different questions there.

Q.    Does he perform his assigned duties and most of the time exceeds

# FREEDOM COURT REPORTING

53

1        A.    No, sir.

2        Q.    And that's left up to the

3    subjective standards of each supervisor?

4        A.    Yes, sir.

5        Q.    At least in your -- in the Energy

6    Division?

7        A.    Yes, sir.

8        Q.    So the way -- There's no

9    standardization of supervision in the Energy

10    Division, is there?

11            MR. MOZINGO:   Object to the form.

12        A.    There's no standardization of

13    supervision?

14        Q.    Yes.

15        A.    No.   Because each person is

16    different.

17        Q.    Okay.   Mr. Free and Mr. Kelly seem

18    to have a personality conflict, don't they?

19        A.    I don't think -- It seems that Mr.

20    Kelly has more of a problem with Mr. Free to

21    me in my opinion.

22        Q.    Now, that hasn't hindered Mr.

23    Kelly in getting his job done, though.   He's

## FREEDOM COURT REPORTING

83

1    well, I don't know.

2         Q.    Kind of hard to remember back

3    sixteen years, isn't it?

4         A.    It is a little difficult.

5         Q.    Let me ask you something.  And I

6    didn't cover this.  Is Mr. Bartel black or

7    white?

8         A.    He's white.

9         Q.    Mr. Reed black or white?

10        A.    He's white.

11        Q.    Mr. Free is white; correct?

12        A.    Correct.

13        Q.    Mr. Harvey, is he black or white?

14        A.    He's white.

15        Q.    Mr. Cleckler is white; correct?

16        A.    Correct.

17        Q.    So you have no black managers?

18        A.    No, sir.  Not at this time.

19        Q.    And the highest ranking black you

20   have under you is Mr. -- under that would be

21   Mr. Kelly?

22        A.    Highest ranking as far as what is

23   concerned?

## FREEDOM COURT REPORTING

84

1          Q.    Position, pay.

2          A.    As far as pay?  I'm not sure that

3     --

4          Q.    As far as salary grade or however

5     y'all say it.

6          A.    Salary range?

7          Q.    Yes.

8          A.    I would think so.

9          Q.    I don't know what his range is.

10          A.    He would be the highest, yes.

11          Q.    In fact, he has the same salary

12     grade as Mr. Cleckler and Mr. Cleckler is up

13     in the management area, isn't he?

14          A.    No, sir.

15          Q.    Well, he's on the same line as the

16     managers, isn't he?

17          A.    He's on the same line as the

18     managers because he reports to me.

19          Q.    Now, y'all have staff meetings?

20          A.    Yes, sir, we do.

21          Q.    Does Mr. Cleckler attend staff

22     meetings?

23          A.    Yes, sir.