IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| GREGORY KELLY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No.  2:07cv610-WHA |
| | ) | (WO) |
| JOHN FREE, individually and in his | ) | |
| official position as an employee of the | ) | |
| Alabama Public Service Commission; | ) | |
| JANICE M. HAMILTON, individually | ) | |
| and in her official position as a Division | ) | |
| Director of the Alabama Public Service | ) | |
| Commission; and ALABAMA PUBLIC | ) | |
| SERVICE COMMISSION, an agency of | ) | |
| the State of Alabama, | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

## I. INTRODUCTION

This case is before the court on a Motion for Summary Judgment filed by the Defendants,

Alabama Public Service Commission ("APSC"), John Free ("Free") and Janice Hamilton

("Hamilton") (together "Defendants").  This case arises from Gregory Kelly's ("Kelly") claims

that Defendants have treated him differently and created a hostile work environment based on his

race and age, particularly when Defendants refused to request an audit of his job position in

order to increase his current salary.  Kelly seeks "actual damages, equitable and declaratory

relief, and recovery of costs and attorney fees to which he may be entitled . . . ." (Compl. ¶ 16.);

*see also* Kelly Depo. 322:18-323:13 (seeking the salary and lost salary that he believes he should

have been paid had the APSC granted the desk audit).

For the reasons to be discussed, the Motion for Summary Judgment is due to be

GRANTED.

## II.  SUMMARY JUDGMENT STANDARD

Under Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

The party asking for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the 'pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Id.* at 323.  The movant can meet this burden by presenting evidence showing there is no dispute of material fact, or by showing, or pointing out to, the district court that the nonmoving party has failed to present evidence in support of some element of its case on which it bears the ultimate burden of proof.  *Id.* at 322-24.

Once the moving party has met its burden, Rule 56(e) "requires the nonmoving party to go beyond the pleadings and by [its] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Id.* at 324.  To avoid summary judgment, the nonmoving party "must do more than show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  On the other hand, the evidence of the nonmovant must be believed and all justifiable inferences must be drawn in its favor.  *See Anderson v. Liberty Lobby*, 477 U.S. 242, 255 (1986).  After the nonmoving party has responded

to the motion for summary judgment, the court must grant summary judgment if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(c).

The summary judgment rule is to be applied in employment discrimination cases as in any other case. *Chapman v. AI Transport*, 229 F.3d 1012, 1026 (11th Cir. 2000) (en banc).

### III. <u>FACTS</u>

The submissions of the parties establish the following facts, construed in a light most favorable to the non-movant:

Plaintiff Kelly ("Kelly") is a 51-year-old African-American man employed as an engineer with the Alabama Public Service Commission (APSC). Specifically, Kelly is a Senior Public Utility Technical Specialist in the Electricity Section of the Energy Division. Kelly has a bachelor's degree in electrical engineering from Auburn University as well as a master's in business administration from Troy State.

Kelly's supervisor, 44-year-old, white defendant John Free ("Free"), is the Electricity Section Manager. Free has an accounting background but nonetheless evaluates Kelly's technical engineering work. There are three other African-Americans working under Free in the Electricity Section of the Energy Division, but Kelly is the only African-American engineer in the Section.

Janice M. Hamilton ("Hamilton"), a 51-year-old African-American woman, is Director of the entire Energy Division. Hamilton has an engineering background, and is slightly younger than Kelly.

J. Rick Cleckler ("Cleckler") is a white male engineer employed in the Special Projects Section of the Energy Division. Cleckler is younger than Kelly. All the section managers within

the Energy Division are white, and Kelly is the highest ranking black in the Division, with the

exception of Hamilton, his superior, and Cleckler, who holds the same position in another

Section of the Energy Division. Both Kelly and Cleckler graduated from Auburn University

with electrical engineering degrees, and both are employed in the same position, Senior Public

Utility Technical Specialist, within the Energy Division. As an engineer in the Special Projects

Section[1], however, Cleckler reports directly to Hamilton. Kelly, an engineer in the Electricity

Section, reports directly to Free, who in turn reports to Hamilton.

Hamilton admits that Cleckler and Kelly are "not necessarily" graded by the same

standard due to the fact that they are directly supervised by two separate individuals, and that

"different people have different perceptions." (Br. in Opp. at 2; Hamilton Depo. 41:1-23.) As

---

[1] At times this Section is referred to by its former name, the "Technical Section," instead of its current official name, the "Special Projects Section." (See Kelly Depo: 105:15-22.) After Hamilton was promoted to Director of the Energy Division in October 1992, she formed the Technical Section in 1993 "in order the alleviate the undue burden of having to directly manage nine subordinates from the Electricity Section and three other section supervisors as well as perform [the] administrative duties as Director." (Aff. Hamilton ¶ 6.) Another purpose of forming the "Technical Section" was to "see if concentrating the division's engineering efforts into one section would be more productive." *Id.* As members of the "Technical Section" eventually left or retired, the employees within the Technical Section dwindled until only Cleckler was left; the Technical Section "was subsequently renamed the 'Special Projects Section' and continued to have Mr. Cleckler as its sole employee." (Aff. Hamilton ¶ 8.)

Division Director, however, Hamilton attempts to ensure that the employee evaluations are standard by "mak[ing] comments from time to time on various staff people evaluations," by reviewing the evaluations and occasionally questioning the grades given, and by generally being the "funnel that all evaluation comes through." (Hamilton Depo. 44:17-21, 44:9-11.)

      Kelly admittedly had a "good working relationship" with Free and Hamilton, until Kelly requested a "desk audit" for his position. (Kelly Depo: 236:17-237:12.) A desk audit is "a process utilized by the State Personnel Department to upgrade the pay range of a particular position in state government." (Br. in Supp. of Mot. for Summ. J. ("Br. in Supp.") at 13; Aff. Free ¶ 13.) Although managers such as Free or Hamilton may request that a desk audit be done, the ultimate decision of whether to perform a desk audit for a given position classification rests with the State Personnel Department. (Kelly Depo. 112:4-10.) In 2004, Kelly received, a promotion, upon Free's recommendation, resulting in a higher position and pay grade within the APSC. (Br. in Supp. at 2; Kelly Depo. 114:16-115:2.) Kelly maintains, however, that a pay promotion and a desk audit are "two different animals," and that it is nonsensical for the APSC to state that "pay grade increases [as a consequence of a desk audit] have not been pursued with State Personnel because Mr. Kelly has received an increase in pay grade by virtue of his promotion in 2002." (Kelly Depo. 113:20-114:3, 113:9-14.) Kelly further claims that if Free or Hamilton had requested a desk audit for his position from State Personnel, even if such request was ultimately denied, then "we wouldn't be here today." (Kelly Depo. 277:9-16, 278:18-279:20, 280:19-281:15.)

      Kelly filed a formal grievance with the APSC, requesting a reorganization of his position from the Electricity Section under Free to the Special Projects Section alongside Cleckler, where he could report directly to Hamilton. (Pl.'s Exh. 1, Doc. 22-2; Aff. Hamilton ¶ 12.) Kelly

claimed in his grievance that, due to his misplacement underneath an accounting professional instead of another engineer, he has suffered a "fractured career path, an unleveled [sic] playing field, compromised job position, lost synergy, and communication difficulties (vertical and horizontal)." (*Id.*; *see also* Kelly Depo. 131:22-132:9.)  Providing insight into the connection between his denied desk audit requests and his grievance for reorganization of his job classification within the Energy Division, Kelly explains:

> A. Mr. Free is an accountant.  I'm an engineer.  I shouldn't be held down and judged according to what accountant[s] make.  My job should float on the merits of engineer pay grade.  It shouldn't be capped by what [an] accountant makes.
> . . .
> A. If I reported to an engineer manager, I would be able to make up to what an engineer management make. [sic].
> Q. Okay. So the – . . . The sole reason you believe that your income is limited is because you're having to work in an accounting section and under an accountant?
> A. I think that's one of the major factors.
> Q. That's one of the major factors?
> A. Yes.
> . . .
> Q.  Okay.  Well, do you know of another major reason besides that one?
> A. Not that I have – Not that I know right now.

(Kelly Depo. 122:12-17, 123:14-124:9.)

Kelly claims that Free discriminates against him on the basis of his age and/or race by treating him differently from Cleckler and "most employees."  Specifically, Kelly claims that Free: (1) attempts to write him up if he is a few minutes late from a doctor's visit for him or his son (Kelly Depo. 170:12-18); (2) allows Cleckler and other employees to ignore rules such as being at their desk, closing the blinds, and coming to work drunk (Kelly Depo. 166:7-168:13, 168:22-169:1); (3) embarrasses him by having accountants "nitpick his work for spelling and punctuation" (Kelly Depo. 169:2-9); (4) refuses to request a desk audit for his job from State Personnel (169:16-170:7; 171:8-10); (5) requires Kelly to "dumb down" his technical

6

engineering reports for his non-engineer, accountant supervisor; (Kelly Depo. 167:18-169:1);

and (6) restricts some of his training opportunities (Kelly Depo. 171:13-15).[2]  To the extent that

Hamilton has allegedly discriminated against him based on age or race, Kelly claims it has been

from her "acquiescence" to Free's discriminatory behavior (Kelly Depo. 162:23-166:3) and her

subjective evaluation of employees with no uniform standard (Br. in Opp. at 5.)  Kelly adds the

APSC as a Defendant, but never names it specifically, except to allege that "the Defendants" are

in violation of Title VII (Compl. ¶ 16) or § 1981 (Compl. ¶ 19), and, after alleging racial

discrimination on the part of Defendants Free and Hamilton specifically, that "the actions of the

Defendants have created a racially hostile and/or generally hostile and abusive working

environment." (Compl. ¶ 18.)  All other references to a Defendant specify Free or Hamilton. The

court assumes, therefore, that Kelly adds the APSC as a Defendant on a respondeat superior

---

[2]  There are actually two different types of training opportunities that Kelly claims he has been
denied. One is the opportunity to train and do work in other sections of the Energy Division,
such as the Gas or Water sections; Kelly seems to blame this on his job placement within the
organization, the subject of his earlier grievance, but still opines that this restriction is due to his
race. (Kelly Depo. 103:1-106:19, 105:8-11.)  The other alleged denial of training opportunities is
the denial of opportunities to attend conferences and other forms of continuing education that
would enhance Kelly's marketability. (Kelly Depo. 90:8- 98:8 (lost paperwork for a trip to
Chicago); 98:11-101:19, 107:19-110:1 (unspecified denials by Free of requests to attend
seminars).)  Kelly is unable to dispute, however, the APSC's assertion that Kelly has actually
received *more* training opportunities than Cleckler. (Kelly Depo. 110:12-111:13.)

basis.

## IV. <u>DISCUSSION</u>

### A. Kelly's Discrimination Claims

#### *1. Racial Discrimination Claims*

Kelly first brings a "Racial Discrimination" claim under Title VII of the Civil Rights Act of 1964, as amended ("Title VII"), alleging discrimination due to a "racially hostile working environment." (Compl. ¶¶ 15-16.)  Second, Kelly alleges that Free and Hamilton have "discriminated against him based on his race, and the actions of the Defendants have created a racially hostile and/or generally hostile and abusive working environment . . . in violation of 42 U.S.C. § 1981." (Compl. ¶ 18.)  Third, Kelly alleges that Free and Hamilton have subjected him to different treatment from similarly situated white males, thus "denying him equal protection of the law" and "creat[ing] an abusive, hostile and intimidating working environment for the Plaintiff." (Compl. ¶ 21.)  Finally, Kelly alleges a state law claim of harassment, alleging that the string of correspondence from Free to Kelly threatening possible disciplinary action, Free's failure or inability to provide "close hands-on supervision" due to his lack of adequate engineering knowledge and background, and Hamilton's conscious acquiescence in the face of Free's allegedly discriminatory behavior all constitute harassment. (Compl. ¶¶ 24-31.)

Claims of racial discrimination under § 1981 and § 1983 merge into a single cause of action under § 1983. *Butts v. County of Volusia*, 222 F.3d 891, 893 (11th Cir. 2000); *Mack v. State of Alabama DHR,* 201 F. Supp. 2d 1196, 1206 n.5 (M.D. Ala. 2002)*; Godby v. Montgomery Co. Bd of Educ.,* 996 F. Supp. 1390, 1411 (M.D. Ala. 1998).  Additionally, racial discrimination claims within the employment context, whether brought under Title VII or § 1983, are subject to the identical *McDonnell Douglas-Burdine* test described below.  This court

shall therefore analyze Kelly's racial discrimination claims as a Title VII claim and a § 1983 claim (into which his § 1981 claim is merged), all rising or falling for summary judgment purposes according to a single *McDonnell Douglas-Burdine* analysis. The court will examine Kelly's hostile work environment and disparate treatment claims under this framework.

<u>2. Age Discrimination Claims</u>

The ADEA provides that it is illegal for an employer "to fail or refuse to hire or to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age." 29 U.S.C. § 623(a)(1) (2007). The analytical framework for proving age discrimination under the ADEA when presenting circumstantial evidence also uses the *McDonnell Douglas-Burdine* burden-shifting framework. *Cofield v. Goldkist*, 267 F.3d 1264, 1267 n.6 (11th Cir. 2001)(*citing Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 141-42 (2000)).

Neither Kelly's Complaint nor his Statement of Particulars for his EEOC charge mentions the ADEA or his rights under the ADEA. Further, Kelly's Complaint fails to explicitly allege how his rights under the ADEA were violated, except to state, within Count I ("First Cause of Action") of the Complaint for "Racial Discrimination under Title VII of the Civil Rights Act of 1964," that "[p]laintiff avers and alleges that his age is an issue as he is older than John Free and Janice M. Hamilton." (Compl. ¶ 15.) In the next paragraph, Kelly alleges that Free and Hamilton had "created a racially hostile working environment . . . in violation of the Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000 @ et. seq., as amended." (Compl. ¶ 16.) Other than realleging and incorporating all prior paragraphs at the beginning of each count, this is the only age reference made in the Complaint.

Typically, more specific pleading is required. *See GJR Invests. v. County of Escambia,*

132 F.3d 1359, 1367 (11th Cir. Fla. 1998) ("It simply fails to state an equal protection claim,

even without the additional hurdle of the heightened pleading standard. The words "equal

protection" do not appear anywhere in the complaint."); *Jarrett v. Alexander,* 235 F. Supp. 2d

1208, 1212 (M.D. Ala. 2002) (dismissing without prejudice the basis of equal protection claims

for failure to sufficiently allege the basis of the claims against the individuals).  Because Kelly

consistently stated in his Complaint and EEOC charge that age was an "issue" or factor in his

mistreatment, because the Defendants argued for summary judgment in their favor on any age-

based discrimination claim, because the ADEA is the single cause of action for age-based

discrimination other than an equal pay argument (which is not being made here), this court is not

concerned about lack of notice to the defendant, and will therefore construe his statement as an

ADEA claim.

**B. Racial Discrimination Claims (Title VII, § 1983, and the *McDonnell-Burdine* analysis)**

      Where, as here, a plaintiff seeks to prove intentional discrimination on the basis of race

under § 1981 by using circumstantial evidence of intent, the court applies the framework first set

out by the United States Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792

(1973).  Under this framework, the plaintiff must establish a prima facie case of discrimination.

*Id.* at 802.  After the plaintiff has established a prima facie case of discrimination, the burden of

production is placed upon the employer to articulate a legitimate nondiscriminatory reason for its

employment action.  *Texas Dept. of Cmty. Affairs v. Burdine*, 450 U.S. 248, 254 (1981).  The

plaintiff may seek to demonstrate that the proffered reason was not the true reason for the

employment decision "either directly by persuading the court that a discriminatory reason more

likely motivated the employer or indirectly by showing that the employer's proffered explanation

is unworthy of credence."  *Id.* at 256; *Combs v. Plantation Patterns*, 106 F.3d 1519, 1528 (11th

Cir. 1997), *cert. denied*, 522 U.S. 1045 (1998). A plaintiff's prima facie case, combined with

sufficient evidence to find that the employer's asserted justification is false, may permit the trier

of fact to conclude that the employer unlawfully discriminated. *Reeves v. Sanderson Plumbing*

*Products, Inc.*, 530 U.S. 133, 147 (2000).

*Prima facie case: hostile work environment*

More than one recitation of the elements of a prima facie case can exist, because "[t]he

facts necessarily will vary in Title VII cases, and the specification . . . of the prima facie proof

required . . . is not necessarily applicable in every respect to differing factual situations."

*McDonnell*, 411 U.S. at 802 n.13. For this hostile work environment claim, Kelly must show

that: (1) he belongs to a protected group; (2) he has been subject to unwelcome harassment; (3)

the harassment was based on a protected characteristic (in this case, Kelly's race); (4) the

harassment was sufficiently severe or pervasive to alter the terms and conditions of employment

and create a discriminatorily abusive working environment; and (5) the employer is responsible

for such an environment under either a theory of vicarious or direct liability. *Alexander v.*

*Opelika City Bd. Of Educ.*, 2008 U.S. Dist. LEXIS 10840, at *9 (M.D. Ala. Feb. 12, 2008)

(*quoting Miller v. Kenworth of Dothan, Inc.,* 277 F.3d 1269, 1275 (11th Cir. 2002)). With

respect to the fourth element, the "employee must subjectively perceive the harassment as

sufficiently severe and pervasive as to alter the terms and conditions of employment, and this

subjective perception must be objectively reasonable." *Mendoza v. Borden, Inc.,* 195 F.3d 1238,

1245 (11th Cir. 1999) (en banc); *Faragher v. City of Boca Raton*, 524 U.S. 775, 787 (1998) ("A

recurring point in these opinions is that 'simple teasing,' offhand comments, and isolated

incidents (unless extremely serious) will not amount to discriminatory changes in the 'terms and

conditions of employment.'")(internal citations omitted). Because the defendants do not dispute

11

that Kelly subjectively perceived his work environment to be abusive, this court turns to the objective component of this analysis.

In hostile work environment cases, the critical issue is often whether members of one race (or sex, or age) are exposed to disadvantageous terms or conditions of employment to which members of the other race (or age or sex) are not exposed. *Oncale v. Sundowner Offshore Servs., Inc.,* 523 U.S. 75, 80 (1998). Thus, even in hostile work environment claims, as opposed to disparate treatment claims, a plaintiff must still show "that similarly situated persons not of [the plaintiff's protected class] were treated differently and better" in order to provide the circumstantial evidence necessary to avoid summary judgment on the "based on" element. *Reeves v. C..H. Robinson Worldwide, Inc.,* 2008 U.S. App. LEXIS 9171, at *8 (11th Cir. April 28, 2008) (*quoting Baldwin v. Blue Cross/Blue Shield of Ala.,* 480 F.3d 1287, 1302 (11th Cir.), *cert. denied*, __U.S.__, 128 S.Ct. 499, 169 L. Ed. 2d 341 (2007)).

Kelly has failed to provide any evidence that other similarly situated employees outside of his race or age were treated differently and better. The undisputed evidence shows that Kelly had the same job, pay grade, and job benefits as his white counterpart, Cleckler, who had been with the APSC for twenty-five years versus Kelly's six years of employment with the APSC. Kelly claims that he was denied a desk audit because of his race, but he fails to provide an example of any other similarly situated employee, especially his alleged comparator Cleckler, who *was* provided a desk audit upon request; in fact, Free has never requested a desk audit for himself or any other employee under his supervision in the Electricity Section. Kelly claims that he was denied certain training opportunities, but the undisputed record shows that Kelly was provided more training opportunities and even more pay raises than his more veteran counterpart, Cleckler.

12

The only difference between Cleckler and Kelly before this court, therefore, is that Cleckler attends staff meetings, and Cleckler reports directly to Director Hamilton, whereas Kelly does not attend staff meetings, and reports to Hamilton indirectly through his accountant supervisor Free. In other words, the only difference between them results from their differential placement in the organizational structure - a structure set into place long before Kelly was hired in 2002. Kelly has therefore failed to provide sufficient evidence of the third hostile work environment prong: that the alleged harassment was based on his race.

Even if such intention could be implied based on the fact that Kelly is African-American and Cleckler is white, and that an African-American person has filled Kelly's position since 1990, Kelly has failed to prove that Free's denial of a few training opportunities, the extra layer of supervision and the inability to attend staff meetings is "sufficiently severe or pervasive to alter the terms and conditions of his employment and create an abusive work environment" when he has received more training opportunities and pay raises than Cleckler during a shorter period of employment. In evaluating whether treatment is "sufficiently severe or pervasive," a court must "examine the conduct in context, not as isolated acts, and determine under the totality of the circumstances whether the harassing conduct is sufficiently severe or pervasive to alter the terms or conditions of the plaintiff's employment." *Mendoza v. Borden, Inc.,* 195 F.3d at 1246. Factors relevant to such conduct are: "(1) the frequency of the conduct; (2) the severity of the conduct; (3) whether the conduct is physically threatening or humiliating, or a mere offensive utterance; and (4) whether the conduct unreasonably interferes with the employee's job performance." *Id.* In this situation, specifically, the court finds that the combination of the fact of denial of training opportunities when such opportunities are granted to the plaintiff more often than his white colleague, the fact that his position was assigned to a different supervisor before

13

he was hired to fill such position, and the fact that Cleckler attends meetings with his own supervisor while Kelly does not attend meetings with his supervisor's supervisor is neither sufficiently severe, physically threatening or humiliating, nor an unreasonable interference with Kelly's performance, so as to constitute an abusive or hostile working environment, and thus insufficient to satisfy the prima facie case of Kelly's hostile work environment claim. .

To the extent that Kelly attempts to state a hostile work environment claim based on the way he is treated compared to treatment of the other employees within his section, he similarly fails to provide sufficient evidence to state a prima facie claim.  Kelly claims that Free has the accountants proofread his work, but does not dispute that Free has *all* employees within the Electricity Section proofread each others' work product and reports.  Kelly threatens to write Kelly up for being late from a doctor's visit without having first called it in, but Kelly does not dispute that APSC policies require such action.  Kelly complains that he must keep his blinds open, and that Free has co-workers check on Kelly to ensure he is in the office, but Free requires all employees to keep their interior office blinds open so that work areas are visible, and Free strictly and uniformly enforces the APSC policies regarding vacation leave, sick leave, and time off. (MSJ at 32; Def.'s Exh. 80 at 2-3, Doc. # 18-9 at 15-16.)  Essentially, Kelly's complaints that he is treated differently because of his race or age are really complaints that he *is not* treated differently because he is an engineer.  Being an engineer, needless to say, is not a protected characteristic.

Again, even if the summary judgment standard required that the court infer that such differences in treatment were based on race or age, they would not be "sufficiently severe or pervasive" to satisfy the fourth requirement of the *prima facie* case.  Although Kelly implies that Free's conduct (and Hamilton's acquiescence to the conduct) is somewhat regular (Kelly Depo.

14

167: 19-168:13), he describes its effect, at worst, as "embarrassing." (Kelly Depo. 162:23,

165:13, 167:19, 168:5, 168:7), "insulting" (Kelly Depo. 164:3, 232:18; 232:2-23, 233:2, 233:9,

233:16, 281:8 ), or, using the conclusory term, "abusive" (Kelly Depo. 163:1, 164:4, 165:12,

175:7, 176:22).  Although Kelly may have very well felt subjectively threatened, there is no

objective reason to believe that such conduct was physically threatening or humiliating based on

his race.  The race-based inference that Kelly urges is that the conduct was imposed upon him,

and not upon Cleckler, the only other individual in his job classification.  Cleckler happens to be

white, but has a completely different supervisor: yet another of Kelly's complaints.  That Free

might require Kelly's work to be proofread, and indeed all the work of those whom he

supervises, but not Cleckler's, logically flows from the fact that Free does not supervise

Cleckler, and is not responsible for his work.  Finally, one may forcefully argue that required

proofreading, strict observance of the policy regarding attendance and doctor's visits, an open

blinds policy, and occasional surveillance to ensure that workers are working would not

"unreasonably interfere" with job performance, but instead would enhance it.  This court finds

that Kelly's complaints based on his treatment by Free in the office do not rise above the "petty

slights and minor annoyances" that fall short of a prima facie case of discrimination under

federal law. *Burlington Northern & Santa Fe Railway Co.,* 548 U.S. 53, 126 Sct. 2405, 2415

(2006).

*Prima facie case: disparate treatment*

          To establish a prima facie case for disparate treatment, Kelly must show that: (1) he is a

member of a protected class; (2) he was subjected to an adverse employment action; (3) his

employer treated similarly situated employees outside his protected class more favorably than he

was treated; and (4) he was qualified to do the job. *Burke-Fowler v. Orange County,* 447 F.3d

1319, 1322 (11th Cir. 2006). There is no dispute that Kelly is both a member of a protected class and that he was qualified to do his job. Kelly fails, however, to show that he was subjected to any adverse employment action.

Recently, the Supreme Court in *Burlington* expanded the definition of "adverse employment action" under the antiretaliation provision to "extend[] beyond workplace-related or employment-related retaliatory acts and harm." *Burlington Northern & Santa Fe Ry. v. White*, 548 U.S. 53, 126 S.Ct. 2405, 2414 (2006). Accordingly, the Supreme Court drew a distinction from the substantive provision, which requires an action which adversely affects the "'terms, conditions, or benefits' of employment," and the broader antiretaliation provision. *Id.* at 2411 (internal citations omitted); *see also Osahar v. U.S. Postal Serv.,* 2008 U.S. App. LEXIS 1073, at *21 n.7 (11th Cir. January 15, 2008). Kelly makes no retaliation claims, and therefore is subject to the narrower definition of "adverse employment action" mandated by the substantive anti-discrimination claim.

Despite his embarrassment, or perceived "abusive" behavior, however, Kelly can not point to an example of how the behavior has adversely affected the "terms, conditions, or benefits" of his employment. As stated before, in his short six years at the APSC, Kelly has received more training opportunities and more pay raises than his comparator Cleckler, who has been employed for twenty-five years. In fact, since Kelly's promotion in 2004, the two men have the same title, the same pay grade, and the same job benefits. (Aff. Hamilton ¶ 17; Aff. Free ¶ 17.) Kelly may have been denied the desk audit, but Free has never given a desk audit to anyone under this supervision, so Kelly cannot point to someone treated differently in that respect. (Aff. Free ¶ 14.) Although the salary range for Kelly's position may be less than similar positions for engineers in the private sector, it closely resembles the salary ranges for

16

similar positions at other state Commissions in the Southeast. (Aff. Free. ¶ 12.)

Kelly also points to certain warnings and other "discipline" from Free upon having arrived late from the doctor's office, or in response to his complaints about the refusal to request a desk audit.  The evidence shows that this "discipline" consisted of memoranda back and forth between Kelly and Free, and warnings by Free that continued abuse would, in the future, result in increasingly serious progressive discipline. (Def.'s Exh. 58 to Kelly Depo.)  The Eleventh Circuit has held that informal reprimands that are not part of any formal "progressive discipline" structure do not sufficiently constitute "adverse employment action." *Davis v. Town of Lake Park, Fla.,* 245 F.3d 1232, 1240 (11th Cir. 2001).  Similarly, any perceived loss of prestige or embarrassment suffered by Kelly because of the disciplinary memoranda, weighed against his recent promotions, his accelerated rise in salary compared to Cleckler, and his numerous training opportunities despite those for which he was denied, is "simply not enough to prevail on this record." *Id.* at 1244 (finding that loss of prestige associated with temporary demotions, without any associated changes in salary or benefits, not actionable under Title VII.)  Otherwise, federal courts would be forced to "sit as a super-personnel department that reexamines an entity's business decisions." *Id.*

In his response to the Defendants' Motion for Summary Judgment, Kelly cites *Hall* for the proposition that "if the employee shows merely that race was a motivating factor, he has established liability and thus may be entitled to some relief." *Hall v. Alabama Assoc. of Sch. Bds.,* 326 F.3d 1157, 1165 (11th Cir. 2003).  Kelly's only justification for the proposition that race or age was the basis for his suffering was that he was older than Cleckler and Free, a few months older than Hamilton, and that his one comparator, Cleckler, is white.  This basis alone could not prove by a preponderance of the evidence that race or age was a motivating factor in

17

any of the APSC's conduct, and therefore *Hall* does not apply.

Finally, Kelly's Brief in Opposition to the Motion for Summary Judgment seems to focus primarily on a retaliation claim not previously raised - that Kelly's job duties, as reflected in the comparison of the Responsibilities/Results sections for two pre-appraisal evaluations, were significantly altered from May 2005 to October 2005, without reporting the changes to the proper appointing authorities as Kelly claims that APSC Rule 670-x-7-.06 requires. (Br. in Opp. At 3-4.) *See* Pl.'s Exh. 7-8, 16. The Response also merely "noted that the reduction came after Kelly filed his grievance and received the results of the grievance hearing." (Br. in Opp. At 4.) Kelly filed this response, however, on April 25, 2008, and attached, as evidence, a letter written to the State Personnel board dated April 21, 2008. *See* Pl.'s Exh. 16. No previous mention of the differing pre-appraisals or of Rule 670-x-7.06 was made in the Complaint. This court's Scheduling Order, issued on August 22, 2007, set the deadline for amended pleadings as October 21, 2007. (Doc. # 10.) No motion for leave to amend pleadings or to extend the deadline was filed. *See* Fed. R. Civ. P. 15(a)(2). The court, therefore, cannot address this claim, raised for the first time over five months after the amended pleadings deadline has expired, based on evidence created four days prior to the filing of the brief in which the claim was raised.

Even if the court could admit such an argument, Kelly's argument that the unreported change in job responsibilities violates Rule 670-x-7.06 is mistaken. As the State Personnel Director's May 1, 2008 response to Kelly's letter, attached by Defendant's in reply to Kelly's argument, explains:

> A job classification may remain the same, but the duties within that classification may change depending on the needs of the agency. Different employees may have the same job classification, but can appropriately perform different duties within that classification, as the needs of the agency dictates. [sic] The method utilized by the State Personnel Department for tracking changes in job assignments and ensuring

> compliance with Rule 670-x-7-.06(1), is through the agency's completion and submission of a Form 40. In fact, Form 40s for your position have been submitted to the State Personnel Department several times over the last few years for review. The job duties contained in each of these Form 40s were reviewed by a Personnel Analyst and found to be appropriate for your classification. Therefore, your complaint regarding Rule 670-X-7-.06(1) is unfounded as it was complied with by both the Public Service commission and the State Personnel Department.

( Def.'s Exh. 17, at 1-2.) The letter goes on to correct Kelly's continual assertion that his salary had not been reviewed since 1981, since there hadn't been a desk audit:

> Your letter also suggests that the salary range for your classification has not been reviewed since 1981. This is simply not correct. Salary studies are performed by the State Personnel Department in the normal course of business. Your job classification was reviewed by the State Personnel Department in 2004. During this review, the job specifications were changed; however, the salary range was deemed appropriate.

*Id.* at 2. Therefore, even if this court could consider Kelly's untimely retaliation claim, he has not met his prima facie burden. Summary judgment on Kelly's racial discrimination claims is therefore due to be GRANTED.

## C. Age Discrimination Claims (ADEA and the McDonnell-Burdine Analysis)

Assuming that Kelly has sufficiently stated a claim of age discrimination under the ADEA, he still fails to meet his prima facie burden to survive summary judgment. With respect to any hostile environment claims, assuming without deciding that such claim can be stated under the ADEA, as discussed above, Kelly fails to show that any alleged harassment was "sufficiently severe or pervasive" to constitute a hostile working environment. Even if he has, Kelly fails to provide any evidence that the alleged harassment was "based on" the fact that he is older, other than to state the fact that Free is younger than he, and that Hamilton is a few months younger than he. With respect to any disparate treatment claim, Kelly fails to provide *specific* evidence of a similarly situated younger person, such as Cleckler, receiving the beneficial treatment that he claims he is denied, at least nothing exceeding the "petty slights and minor

annoyances" insufficient to prove a federal claim.  *Burlington Northern & Santa Fe Railway Co.,* 548 U.S. 53, 126 S.Ct. 2405, 2415 (2006).

More important, Kelly fails to make any reference to age discrimination in his Response to the Defendant's Motion for Summary Judgment, but rather focuses solely on racial discrimination. *See generally* Br. in Opp.  Even if Kelly had met his prima facie burden, therefore, he failed to show any pretext.  Reply Br. at 3 n.1; *Cooper v. Southern Co.,* 390 F.3d 695, 725 (11th Cir. 2004) ("To survive summary judgment, the plaintiff must then 'come forward with evidence, including the previously produced evidence establishing the prima facie case, sufficient to permit a reasonable fact-finder to conclude that the reasons given by the employer were not the real reasons for the adverse employment decision.").  For these reasons, summary judgment with respect to Kelly's age discrimination claims, to the extent that he continues to argue them, are due to be GRANTED.

## D. State law harassment claim

Finally, Kelly asserts a state law claim in his Complaint (Fourth Cause of Action – State Action – Harassment), that Free's threats of disciplinary action, as memorialized in the string of memoranda exchanged between Kelly and Free, as well as Free's "lack of adequate engineering knowledge and training," amounts to "constant and on going [sic] harassment." (Compl. ¶ 31.) Kelly further alleges that Hamilton has acquiesced in this harassment, and that "[s]aid harassment has caused Plaintiff Kelly to suffer embarrassment in front of his co-workers and to suffer mental and emotional pain and anguish." (Compl. ¶¶ 31-32.)

The Defendants argue in their motion for summary judgment that "Alabama law does not recognize a civil cause of action for harassment" independent from the standard "common law tort theories such as assault and battery, invasion of privacy, negligent training and supervision,

20

and outrage." (Br. in Supp. at 36  (*quoting Machen v. Childersburg Bancorporation,* 761 So. 2d

981, 983 n.1 (Ala. 2000)(refusing to recognize independent cause of action for sexual

harassment)).  The Defendants further argued that Free's actions were "not based on Kelly's race

or age, nor were they . . . severe or pervasive" but instead were "reasonable and justified." (Br. in

Supp. at 37.)  Kelly's Brief in Opposition to Summary Judgment fails to address the Defendants'

argument with respect to his state law harassment claim. (*See generally* Br. in  Opp.)

       Because Kelly did not address the Defendants' legal or factual arguments regarding the

state law harassment claim in his opposition to the Defendant's Motion for Summary Judgment,

the court finds that Kelly has abandoned his state law harassment claim.  The "onus is upon the

parties to formulate arguments; grounds alleged in the complaint but not relied upon in summary

judgment are deemed abandoned." *Resolution Trust Corp. v. Dunmar Corp.,* 43 F.3d 587, 599

(11th Cir. 1995); *see, e.g., Sierra Club v. Georgia Power Co.,* 365 F. Supp. 2d 1287, 1293 (N.D.

Ga. 2004) (finding that the plaintiffs had abandoned a claim because the plaintiffs did not

address this issue in their opposition to the defendant's motion for summary judgment even

though the plaintiffs had alleged this claim in their complaint.).  Accordingly, no further analysis

or discussion of the harassment claim is necessary, and the court finds that summary judgment

on Kelly's harassment claim is due to be GRANTED.

## V. <u>CONCLUSION</u>

       It is significant that Kelly has repeatedly said that he would not object to working under

Free if he were an engineer, and that the two of them got along fine until Kelly was denied a

desk audit.  It seems that if one truly and subjectively felt that his supervisor was discriminating

against him based on his *race* or his *age,* he would object to continuing under that person's

supervision regardless of whether or not the individual supervisor had an engineering degree.

When Kelly's requests for a desk audit and his grievances to be reorganized out from under an accountant supervisor section were denied, Kelly appealed to this federal court for a remedy.  But engineers are not a class protected by Title VII or the Fourteenth Amendment, and Kelly has not met his prima facie burden of showing that he has been subject to any adverse employment action that altered the terms, conditions, or benefits of his position, that his work environment was sufficiently severe and pervasive as to be hostile, that similarly situated people were given benefits that he was denied, or that any harassment was based on his race or age.  In the absence of any such evidence, this court may not oversee the Alabama Public Service Commission's budget or organizational structure, commanding that it increase salaries and re-organize employees.  Such is not the role of a court.  In the absence of any such evidence, summary judgment on Kelly's claims is due to be GRANTED.

For the foregoing reasons, it is hereby ordered that:

1. Defendants' Motion for Summary Judgment is ordered GRANTED.

2. A separate judgment will be entered in accordance with this Memorandum Opinion and Order.

Done this 23rd day of May, 2008.

_____/s/ W. Harold Albritton_____

W.  HAROLD ALBRITTON

SENIOR UNITED STATES DISTRICT JUDGE